# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** _____ |
| **v.** | : | **DATE FILED:** _____ |
| **JOHN DOUGHERTY** | : | **18 U.S.C. § 371 (conspiracy to embezzle** |
| **ROBERT HENON** | | **labor union and employee benefit plan** |
| **BRIAN BURROWS** | : | **assets – 1 count)** |
| **MICHAEL NEILL** | | **29 U.S.C. § 501(c) (embezzlement of labor** |
| **MARITA CRAWFORD** | : | **union assets – 40 counts)** |
| **NIKO RODRIGUEZ** | | **18 U.S.C. § 664 (theft from employee** |
| **BRIAN FIOCCA** | : | **benefit plan – 1 count)** |
| **ANTHONY MASSA** | | **18 U.S.C. § 1343 (wire fraud – 26 counts)** |
| | : | **18 U.S.C. § 1001 (false statements – 1** |
| | | **count)** |
| | : | **29 U.S.C. §§ 431, 439(b) (falsification of** |
| | | **labor union annual report – 2 counts)** |
| | : | **29 U.S.C §§ 436, 439(c) (falsification of** |
| | | **labor union financial records – 2 counts)** |
| | : | **26 U.S.C. § 7206(1) (making and** |
| | | **subscribing to false federal income tax** |
| | | **returns – 14 counts)** |
| | : | **18 U.S.C. § 371 (conspiracy to accept** |
| | | **unlawful payments from an employer – 1** |
| | | **count)** |
| | : | **29 U.S.C. § 186(b)(1), (a)(2), (d)(2)** |
| | | **(accepting unlawful payment from an** |
| | | **employer – 4 counts)** |
| | : | **29 U.S.C. § 186(b)(1), (a)(4), (d)(2)** |
| | | **(accepting unlawful payment from an** |
| | : | **employer – 4 counts)** |
| | | **18 U.S.C. § 371 (conspiracy to commit** |
| | : | **honest services fraud, federal program** |
| | | **bribery – 1 count)** |
| | : | **18 U.S.C. §§ 1343, 1346 (honest services** |
| | | **wire fraud – 14 counts)** |
| | : | **18 U.S.C. §§ 1341, 1346 (honest services** |
| | | **mail fraud – 1 count)** |
| | : | **18 U.S.C. § 666(a)(1)(B) (federal program** |
| | | **bribery – 4 counts)** |
| | : | **18 U.S.C. § 2 (aiding and abetting)** |
| | | **Notices of Forfeiture** |

**INDICTMENT**

**TABLE OF CONTENTS**

**Count(s)**                                                                                         **Page**

1          Conspiracy to Embezzle from Labor Union and Employee Benefits
           Plan, 18 U.S.C. § 371 ........................................................................................1

           Introduction ..........................................................................................1

           The Defendants and Other Individuals and Entities....................................3

           The Conspiracy ...................................................................................12

           Object of the Conspiracy ......................................................................13

           Manner and Means ..............................................................................13

                      Theft from Local 98 and Apprentice Training Fund to
                      Pay for Construction and Other Services .....................................14

                      Use of Local 98 Credit Cards for Personal Goods ......................14

                      Use of Local 98 Credit Cards for Personal Meals .......................15

                      Use of Local 98 Credit Cards for Expenses Associated
                      with Personal Travel ...............................................................16

                      Fraudulent Reimbursements for Personal Expenses....................16

                      Theft of Local 98 Funds to Purchase Concert and
                      Sporting Event Tickets..............................................................16

                      Use of Local 98 Employees for Personal Tasks and
                      Errands .................................................................................17

                      Payments to Non-Employees, Payments for No-Show
                      Jobs, and Overpayment of Favored Local 98 Employees.............18

                      Additional Embezzlement of Local 98 Funds..............................18

Overt Acts ................................................................ 18

    Acts Involving Theft of Local 98 and Apprentice Training Funds to Pay for Construction and Other Services ....................................................... 19

    Acts Involving the Use of Local 98 Credit Cards for Personal Goods ............................................... 30

    Acts Involving the Use of Local 98 Credit Cards for Personal Meals ................................................ 42

    Acts Involving the Use of Local 98 Credit Cards for Expenses Associated with Personal Travel ................. 48

    Acts Involving Fraudulent Reimbursements for Personal Expenses ............................................. 50

    Acts Involving Theft of Local 98 Petty Cash and Funds for Personal Purchases and to Purchase Concert and Sporting Event Tickets ........................... 58

    Acts Involving the Use of Local 98 Employees for Personal Tasks and Errands ................................ 61

    Acts Involving Payments to Non-Employees and No-Show Employees, and Overpayment of Favored Local 98 Employees ................................................ 66

2-41    Embezzlement and Theft of Labor Union Assets, 29 U.S.C. § 501(c) ................ 71

42    Theft from Employee Benefit Plan, 18 U.S.C. § 664 .......................................... 74

43-66    Wire Fraud Thefts from Local 98, 18 U.S.C. § 1343 .......................................... 75

    The Scheme ................................................ 75

    Manner and Means ................................................ 76

67-68    Wire Fraud Thefts from Political Action Committee, 18 U.S.C. § 1343 ............. 79

    The Scheme ................................................ 80

    Manner and Means ................................................ 81

| 69 | Making False Statements to the FBI, 18 U.S.C. § 1001(a)(2) | 83 |
|----|----|----|
| 70 | Falsification of Annual Financial Report Filed by Labor Union, 29 U.S.C. §§ 431(b) and 439(b) | 84 |
| 71 | Falsification of Annual Financial Report Filed by Labor Union, 29 U.S.C. §§ 431(b) and 439(b) | 86 |
| 72 | Falsification of Financial Records Required to Be Kept by Labor Union, 29 U.S.C. §§ 436 and 439(c) | 87 |
| 73 | Falsification of Financial Records Required to Be Kept by Labor Union, 29 U.S.C. §§ 436 and 439(c) | 88 |
| 74-78 | Filing False Federal Income Tax Returns, 26 U.S.C. § 7206(1) | 89 |
| 79-83 | Filing False Federal Income Tax Returns, 26 U.S.C. § 7206(1) | 91 |
| 84-87 | Filing False Federal Income Tax Returns, 26 U.S.C. § 7206(1) | 92 |
| 88 | Conspiracy to Accept Unlawful Payments from an Employer, 18 U.S.C. § 371 | 93 |
|    | The Conspiracy | 94 |
|    | Objects of the Conspiracy | 94 |
|    | Manner and Means | 95 |
|    | Overt Acts | 96 |
| 89 | Accepting Unlawful Payments from an Employer, 18 U.S.C. § 186(a)(2), (b)(1), and (d)(2) | 99 |
| 90 | Accepting Unlawful Payments from an Employer, 18 U.S.C. § 186(a)(2), (b)(1), and (d)(2) | 100 |
| 91 | Accepting Unlawful Payments from an Employer, 18 U.S.C. § 186(a)(2), (b)(1), and (d)(2) | 101 |
| 92 | Accepting Unlawful Payments from an Employer, 18 U.S.C. § 186(a)(2), (b)(1), and (d)(2) | 102 |

93      Accepting Unlawful Payments from an Employer,
        18 U.S.C. § 186(a)(4), (b)(1), and (d)(2)..........................................103

94      Accepting Unlawful Payments from an Employer,
        18 U.S.C. § 186(a)(4), (b)(1), and (d)(2)..........................................105

95      Accepting Unlawful Payments from an Employer,
        18 U.S.C. § 186(a)(4), (b)(1), and (d)(2)..........................................106

96      Accepting Unlawful Payments from an Employer,
        18 U.S.C. § 186(a)(4), (b)(1), and (d)(2)..........................................107

97      Conspiracy to Commit Honest Services Fraud and Federal Program
        Bribery, 18 U.S.C. § 371 ..................................................................108

        Introduction..........................................................................108

        The Conspiracy .....................................................................109

        Manner and Means ...............................................................110

        Overt Acts ............................................................................112

                Abuse of L&I Enforcement Activity to Discourage Use
                of Non-Union Labor at Children's Hospital of
                Philadelphia ..............................................................112

                HENON Allows DOUGHERTY to Influence the
                Comcast Franchise Agreement .................................114

                HENON Drafts Towing Resolution at Direction of
                DOUGHERTY .........................................................118

                HENON Abuses Philadelphia City Council Position to
                Threaten Political Opponents of DOUGHERTY .......................119

                HENON Opposes Performance Audit of the
                Philadelphia Parking Authority (PPA) at the Request of
                PPA Officials and on the Advice of DOUGHERTY.................121

                HENON Delays Legislation at the Request of
                DOUGHERTY .........................................................125

                DOUGHERTY and HENON Attempt to Conceal the
                True Nature of Their Relationship.............................................126

98-108          Honest Services Wire Fraud, 18 U.S.C. §§ 1343, 1346....................................128

109             Honest Services Mail Fraud, 18 U.S.C. §§ 1341, 1346 ....................................132

110-112         Honest Services Wire Fraud, 18 U.S.C. §§ 1343, 1346....................................134

                        Introduction ........................................................................................134

                        The Scheme.........................................................................................134

                        Manner and Means .............................................................................135

113             Federal Program Bribery – Accepting, 18 U.S.C. § 666(a)(1)(B)....................143

114             Federal Program Bribery – Soliciting, 18 U.S.C. § 666(a)(1)(B)....................144

115             Federal Program Bribery – Accepting, 18 U.S.C. § 666(a)(1)(B)....................145

116             Federal Program Bribery – Accepting, 18 U.S.C. § 666(a)(1)(B)....................146

Notice of Forfeiture One ..............................................................................................147

Notice of Forfeiture Two ..............................................................................................149

Notice of Forfeiture Three.............................................................................................150

Notice of Forfeiture Four ..............................................................................................151

Notice of Forfeiture Five...............................................................................................152

## COUNT ONE
### (Conspiracy to Embezzle from Labor Union and Employee Benefits Plan)
### 18 U.S.C. § 371

**THE GRAND JURY CHARGES THAT:**

At all times material to this Indictment, unless otherwise stated:

### Introduction

1.      Local 98 of the International Brotherhood of Electrical Workers (hereinafter "Local 98") was a labor organization, also referred to as a union, charged under the laws of the United States, and the union's own constitution, with representing the best interests of the workers who compose its membership. These members fund Local 98 with a portion of their salaries based on each hour of pay that they earn. The assets of the union were the assets of the membership, not its leadership. Under federal law, and the constitution and by-laws of the union, these assets could only be used for legitimate business expenses of the union, and the leadership and other members of Local 98 were prohibited from using the funds and other assets of Local 98 for their personal benefit. Local 98 also established and maintained an apprenticeship training program, the purpose of which was to provide electrical industry training for apprentice members of Local 98 and continuing education for journeyman members of Local 98.

2.      Defendant JOHN DOUGHERTY ("DOUGHERTY") was the Business Manager of Local 98, and in that capacity he controlled the operations of Local 98. All of the union's employees were subordinate to him. DOUGHERTY used this control, and a variety of methods, to repeatedly and persistently steal from Local 98 and put his own self-interests over that of the membership of the union. He used Local 98 as his personal bank account and as a means to obtain employment for himself, his family, and his friends. He conspired with and was aided and abetted in this conduct by defendants BRIAN BURROWS, MICHAEL NEILL, MARITA

- 1 -

CRAWFORD, NIKO RODRIGUEZ, BRIAN FIOCCA, ANTHONY MASSA, and other individuals known to the grand jury. None of this conduct was authorized by the constitution and by-laws of Local 98, and all of this conduct unlawfully deprived the union and its members of funds and assets.

3.     A part of this embezzlement conspiracy involved the use of credit cards and bank accounts that Local 98 maintained for supporting Local 98's operations. Local 98 maintained funds in several bank accounts, including General Fund and Job Recovery Fund accounts. Local 98 maintained a credit card account with American Express that allowed the union to pay for expenses legitimately incurred through the operation of the union. There were approximately 20 Local 98 American Express cards assigned to Local 98 personnel. Defendant JOHN DOUGHERTY had three Local 98 American Express cards in his name that he used, and permitted others to use, to make personal purchases, often several times each week. These purchases included personal groceries, household goods, and restaurant meals. DOUGHERTY used these bank accounts, credit cards, and other methods to divert union funds to the conspirators' personal use. DOUGHERTY also stole money from the union by falsely claiming that he made union-related purchases, using his own funds and his personal credit card, for which he requested and received reimbursements.

4.     Defendant JOHN DOUGHERTY also used funds of Local 98 and the apprentice training program to pay contractors who worked on his home and on other personal properties, including a tavern pub that he owned. Acting with others, including defendants BRIAN BURROWS, MICHAEL NEILL, and ANTHONY MASSA, DOUGHERTY misrepresented this personal work as work performed on union facilities. He also directed subordinate employees to accept his false claims that expenditures were for union-related purposes without any further

- 2 -

oversight or review. Based on these false representations, the contractors were paid with funds of Local 98 and the apprentice training program. DOUGHERTY then manipulated the union's reporting and auditing requirements to hide his thefts.

5.      As another part of the embezzlement conspiracy, defendant JOHN DOUGHERTY directed the union to hire his family members and close associates to be on the Local 98 payroll. He favored these employees with raises and extra pay for hours never worked and for hours worked doing personal tasks for DOUGHERTY. DOUGHERTY also hired and assigned union employees to work primarily on performing personal errands for DOUGHERTY, his family, and others. DOUGHERTY likewise used Local 98 funds to pay purported consulting fees and other expenditures to further his personal and political interests, without relation to the business interests of Local 98.

6.      Through the methods described above and others described in this count of this Indictment, the defendants embezzled at least $600,481 from Local 98 and its apprentice training fund.

## The Defendants and Other Individuals and Entities

7.      Local 98 was a "labor organization" engaged in an industry affecting commerce within the meaning of those terms in Title 29, United States Code, Section 402, and an "employee organization" engaged in an industry and activity affecting commerce within the meaning of Sections 1002 and 1003 of Title 29, United States Code. Local 98 represented, actively sought to represent, and admitted to membership individuals who were

employed as electricians by employers engaged within the Commonwealth of Pennsylvania in an industry affecting commerce. Local 98 had approximately 4,600 members.

8.     Local 98 was required to file a Form LM-2 Labor Organization Annual Report with the United States Department of Labor, pursuant to the Labor Management Reporting and Disclosure Act ("LMRDA"), Title 29, United States Code, Section 431(b). In the LM-2, Local 98 was required to report the previous fiscal year's disbursements for official business purposes, including union administration, political contributions, gifts and grants, and general overhead. Union expenditures Local 98 was to report also included the amounts of salary, reimbursed expenses, allowances, and other financial disbursements paid to union officers and employees receiving more than $10,000 from Local 98 during the fiscal year for which the LM-2 report was filed. Local 98 was also required to keep and maintain records on the matters reported on the LM-2 report which provide in sufficient detail the basic information and data by which the LM-2 report may be verified, explained, clarified, and checked for accuracy and completeness, pursuant to Title 29, United States Code, Section 436. Such required records included expense vouchers and receipts, worksheets, and other contemporaneous records reflecting all union receipts and disbursements reported on the LM-2 reports.

9.     Local 98 operations were funded, in part, by its members, through money paid as membership dues and fees deducted from their paychecks or contributed by the individual members. Once Local 98 received the money, the funds became the property of Local 98 and its members as a group. Article XVIII, Section 5 of the IBEW Constitution (2011) stated:

> [t]he funds and property of a [Local] U[nion] shall be used only for such purposes as are approved by the I[nternational Union] P[resident], or as are specified in this Constitution and as may be necessary to transact, properly manage and conduct its business.

Local 98's Bylaws further clarify that Local 98 funds were for the payment of the "legitimate expenses" of the union.

10.     Local 98's apprentice training program was established and maintained by Local 98 and electrical industry employers, whose employees were represented by Local 98 pursuant to collective bargaining agreements, by means of the Electrical Workers Joint Apprenticeship and Training Trust Fund ("Apprentice Training Fund" or "Fund"). The Apprentice Training Fund was an "employee welfare benefit plan" subject to Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), as defined in Title 29, United States Code, Sections 1002 and 1003. ERISA is part of a federal law enacted to protect employee welfare benefit plans by regulating matters affecting the operation of such plans, including plans established and maintained for the purpose of providing employees and union members with apprenticeship or other training programs. Local 98's Apprentice Training Fund also filed an annual financial report (Form 990 Return of Organization Exempt from Income Tax) with the United States Internal Revenue Service. The Apprentice Training Fund was supported by monetary contributions from the electrical industry employers, governmental grants, and income received from the Fund's rental properties and other investments. For 2016, the Apprentice Training Fund reported net assets or fund balances of $20,861,487.

11.     Defendant JOHN DOUGHERTY was the Business Manager of Local 98 since approximately 1993. As such, he was an officer and representative of Local 98, as well as a fiduciary who occupied a position of trust in relation to Local 98 and its members as a group, pursuant to the LMRDA and Title 29, United States Code, Sections 402(q) and 501(a). As a fiduciary of Local 98, DOUGHERTY had a duty and obligation to: (1) hold the money and funds of Local 98 solely for the benefit of the union and its members; (2) manage and expend Local

98's funds in accordance with its constitution, by-laws, and applicable resolutions of its executive board and general members; (3) avoid acting, directly or indirectly, on his own personal behalf or for the benefit of any party whose interests were adverse to Local 98's interests; (4) refrain from holding or acquiring any pecuniary or personal interest that conflicted with Local 98's interests; and (5) account to Local 98 for any profit he received, in whatever capacity, in connection with transactions conducted by him or under his direction on behalf of the organization. From 2010 through 2016, DOUGHERTY was paid a total salary of $1,407,385 by Local 98.

12.    Defendant JOHN DOUGHERTY was a partner in JMB Real Estate Corporation, which owned the building that housed Doc's Union Pub, a licensed liquor establishment located at 1843 South Second Street in Philadelphia. DOUGHERTY was also a partner in Doc's Union Pub.

13.    Defendant BRIAN BURROWS was the President of Local 98 and held that position since approximately 2008 to the present. As such, he was an officer of Local 98, and he was a fiduciary with duties and obligations in regard to Local 98 and its members as a group like those held by defendant JOHN DOUGHERTY. BURROWS oversaw the operations of Local 98, including finances. BURROWS was one of two people whose signature (usually by stamp) was required on checks drawn on Local 98's General Fund account. BURROWS also signed all checks from Local 98's Job Recovery Fund. From 2010 through 2016, BURROWS was paid a total salary of $1,069,194 by Local 98.

14.    Defendant BRIAN BURROWS served on the Board of Trustees of the Apprentice Training Fund since at least 2011 to the present, and he was a fiduciary with respect to the Apprentice Training Fund for purposes of ERISA and the Fund's governing trust agreement

- 6 -

(which empowered the Trustees with general supervision of the Fund's operation in accordance with the trust agreement and applicable law). The trust agreement gave the trustees discretionary authority to use and apply Apprentice Training Fund monies to pay for all reasonable and necessary expenses of administering the Apprentice Training Fund. As a fiduciary of an employee welfare benefit plan with discretionary authority over the expenditure of Fund assets, BURROWS was required, pursuant to Title 29, United States Code, Sections 1002(21) and 1104(a), to discharge his duties with respect to the Apprentice Training Fund solely in the interest of the Fund's participants and beneficiaries and for the exclusive purpose of: (1) providing benefits to such participants and beneficiaries; (2) defraying the reasonable expenses of administering the Fund; and (3) acting in accordance with the documents and instruments governing the Fund insofar as such documents and instruments were consistent with the provisions of ERISA. Pursuant to Title 29, United States Code, Section 1106(b), BURROWS was also obligated as a fiduciary with respect to the Apprentice Training Fund to: (1) not deal with the assets of the Fund in his own interest or for his own account; (2) not act in any transaction involving the Fund on behalf of a party (or represent a party) whose interests are adverse to the interests of the Fund or the interests of its participants or beneficiaries; and (3) not receive any consideration for his own personal account from any party dealing with the Fund in connection with a transaction involving the assets of the Fund.

15.     Defendant BRIAN BURROWS was a partner in JMB Real Estate Corporation and in Doc's Union Pub. Defendant BURROWS was also a partner in the ownership of 1837 South Second Street, Philadelphia ("the Pennsport Building"), a building containing multiple commercial and residential rental units.

16.     Defendant MICHAEL NEILL was the Training Director of Local 98's Apprentice Training Fund and held that position since approximately June 2008. As the principal officer of the Apprentice Training Fund, defendant NEILL oversaw its operations including finances, and he also was a fiduciary with respect to the Fund with obligations like those held by defendant BRIAN BURROWS. NEILL was one of two people whose signature (usually by stamp) was required on checks drawn on Local 98's Apprentice Training Fund. From 2010 through 2016, NEILL was paid a total salary of $1,189,673 by the Apprentice Training Fund.

17.     Defendant MICHAEL NEILL was a partner in JMB Real Estate Corporation and a partner in Doc's Union Pub. Defendant NEILL was also a partner in the ownership of the Pennsport Building.

18.     Defendant MARITA CRAWFORD was employed by Local 98 as an office employee in 2011, as a business agent or representative between 2012 and 2016, and as its Political Director since approximately November 2011 to the present. As a business agent and representative who exercised substantial independent authority pursuant to Title 29, United States Code, Sections 402(q) and 501(a), defendant CRAWFORD occupied a position of trust and had fiduciary duties and obligations in regard to Local 98 and its members as a group which were like those held by defendants JOHN DOUGHERTY and BRIAN BURROWS. From 2011 through 2016, CRAWFORD was paid a total salary of $738,381 by Local 98. CRAWFORD had a Local 98 American Express card in her name.

19.     Defendant NIKO RODRIGUEZ was employed by the Local 98's Apprentice Training Fund from approximately 2011 through April 2016. In approximately April 2016, defendant RODRIGUEZ was transferred from the payroll of the Apprentice Training Fund to that of Local 98. From 2010 through 2016, RODRIGUEZ was paid a total salary of $372,631 by

the Apprentice Training Fund and by Local 98. RODRIGUEZ regularly performed personal errands and chores for defendant JOHN DOUGHERTY and DOUGHERTY's family members and associates as part of his job.

20.     Defendant BRIAN FIOCCA was employed by Local 98 as an office employee and held that position since approximately 2010 to the present. BRIAN FIOCCA is the nephew of defendant JOHN DOUGHERTY. From 2010 through 2016, BRIAN FIOCCA was paid a total salary of $423,872 by Local 98. BRIAN FIOCCA regularly performed personal errands and chores for DOUGHERTY and DOUGHERTY's family members and associates as part of his job. BRIAN FIOCCA, along with defendant NIKO RODRIGUEZ and others, were referred to by DOUGHERTY as "the kids," a group of Local 98 employees who regularly performed personal errands and chores at the direction of DOUGHERTY.

21.     Defendant ANTHONY MASSA was the owner and operator of Massa Construction. MASSA did extensive construction contract work for Local 98 for many years. Between 2010 and May 2016, Local 98 paid Massa Construction over $1.8 million for work performed and directed by MASSA.

22.     Family Member No. 1, known to the grand jury, is a close relative of defendant JOHN DOUGHERTY. Family Member No. 1 resides with DOUGHERTY in Philadelphia. Family Member No. 1 was not an employee of Local 98.

23.     Family Member No. 2, known to the grand jury, is a close relative of defendant JOHN DOUGHERTY. Family Member No. 2 was not an employee of Local 98.

24.     Family Member No. 3, known to the grand jury, is a close relative of defendant JOHN DOUGHERTY. Family Member No. 3 resided next door to DOUGHERTY in Philadelphia. Family Member No. 3 was not an employee of Local 98.

25.     Family Member No. 4, known to the grand jury, is a close relative of defendant JOHN DOUGHERTY. Family Member No. 4 was not an employee of Local 98.

26.     Family Member No. 5, known to the grand jury, is a close relative of defendant JOHN DOUGHERTY. Since approximately 2002, Family Member No. 5 was an employee of the Philadelphia Electrical and Technology Charter High School, a school closely associated with Local 98. Until approximately 2013, Local 98 reported to the Department of Labor that Family Member No. 5 was an employee of Local 98.

27.     Family Member No. 6, known to the grand jury, is a close relative of defendant JOHN DOUGHERTY. Family Member No. 6 was an employee of Local 98.

28.     Family Member No. 7, known to the grand jury, is a close relative of defendant JOHN DOUGHERTY. Family Member No. 7 was a part-time employee of Local 98 during the summer, from 2013 through 2016, during breaks from school.

29.     Family Member No. 8, known to the grand jury, is a close relative of defendant JOHN DOUGHERTY. Family Member No. 8 lived next door to DOUGHERTY in Philadelphia. Family Member No. 8 was a part-time summer employee of Local 98 and its apprentice training from 2013 through 2016, during breaks from school.

30.     Family Member No. 9, known to the grand jury, is a close relative of defendant JOHN DOUGHERTY. Since approximately 2010, Family Member No. 9 was an employee of the Philadelphia Electrical and Technology Charter High School. Until approximately 2012, Local 98 reported to the Department of Labor that Family Member No. 9 was an employee of Local 98. Family Member No. 9 was paid as a consultant by Local 98, at the direction of defendant DOUGHERTY, for work never performed by Family Member No. 9.

31.     Family Member No. 10, known to the grand jury, is a close relative of defendant JOHN DOUGHERTY. Family Member No. 10 was employed by Local 98 from approximately 2012 through 2013. Family Member No. 10 used Local 98 American Express cards assigned to defendant JOHN DOUGHERTY to make personal purchases for both DOUGHERTY and himself.

32.     Individual No. 1, known to the grand jury, was an employee of Local 98 since approximately 2011. Individual No. 1 is a close relative of defendant MARITA CRAWFORD. Individual No. 1 was one of "the kids," a group of Local 98 employees who regularly performed personal errands and chores at the direction of defendant JOHN DOUGHERTY.

33.     Individual No. 2, known to the grand jury, was an employee of Local 98 from approximately 1999 through 2011. Defendant ANTHONY MASSA, at the direction of defendant MICHAEL NEILL, performed construction work on the Philadelphia residence of Individual No. 2, for which Local 98 and the Apprentice Training Fund paid the bill.

34.     Individual No. 3, known to the grand jury, was not an employee of Local 98. Individual No. 3 was paid as a consultant by Local 98, at the direction of defendant JOHN DOUGHERTY, for work never performed by Individual No. 3.

35.     Individual No. 4, known to the grand jury, was an employee of Local 98 beginning in approximately 2005. Individual No. 4 was a member of the Local 98 Executive Committee.

36.     Individual No. 5, known to the grand jury, was an office employee of Local 98 beginning in approximately 2014.

37.     Individual No. 6, known to the grand jury, was an office employee of Local 98 beginning in approximately 2014.

38.     Individual No. 7, known to the grand jury, was a maintenance employee of Local 98 beginning in approximately 2008.

39.     Individual No. 8, known to the grand jury, was an office employee of Local 98 beginning in approximately 2012.

40.     Individual No. 9, known to the grand jury, was not an employee of Local 98. Individual No. 9 was paid as a consultant by Local 98, at the direction of defendant JOHN DOUGHERTY, for personal work performed on the residence of defendant MARITA CRAWFORD.

41.     Political Official No. 1, known to the grand jury, was an elected official in the City of Philadelphia.

### The Conspiracy

42.     From in or about April 2010 through August 2016, in Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOHN DOUGHERTY,**
**BRIAN BURROWS,**
**MICHAEL NEILL,**
**MARITA CRAWFORD,**
**NIKO RODRIGUEZ,**
**BRIAN FIOCCA, and**
**ANTHONY MASSA**

knowingly and intentionally conspired and agreed with each other and others, known and unknown to the grand jury, to commit offenses against the United States, that is, (1) to embezzle, steal, and unlawfully and willfully abstract and convert to their use and the use of others, the monies, funds, securities, property, and other assets of Local 98, contrary to Title 29, United States Code, Section 50l(c), and (2) to embezzle, steal, and unlawfully and willfully abstract and

- 12 -

convert to their use and the use of others, the monies, funds, securities, property, and other assets of the Apprentice Training Fund, contrary to Title 18, United States Code, Section 664.

## Object of the Conspiracy

43.    The object of the conspiracy was for defendants JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, MARITA CRAWFORD, NIKO RODRIGUEZ, BRIAN FIOCCA, and ANTHONY MASSA to embezzle, steal, and unlawfully and willfully abstract and convert the moneys, funds, securities, property, and other assets belonging to Local 98 and the Apprentice Training Fund, for the personal use of the defendants and the use of their families, friends, and commercial businesses.

## Manner and Means

44.    In furtherance of their conspiracy, defendants JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, MARITA CRAWFORD, NIKO RODRIGUEZ, BRIAN FIOCCA, ANTHONY MASSA, and others known and unknown to the grand jury, employed the following manner and means, among others:

a.    The defendants unlawfully used the funds and assets of Local 98 by expending union funds for personal and other unauthorized expenses, contrary to the provisions of the IBEW constitution, the by-laws of Local 98, and the beneficial interests of the members of Local 98;

b.    The defendants unlawfully used the funds and assets of the Apprentice Training Fund by expending training funds for personal and other unauthorized expenses, contrary to the provisions of the Apprentice Training Fund's trust agreement and ERISA; and

c.     The defendants concealed the unlawful use of the funds and assets of Local 98 and the Apprentice Training Fund by falsely representing that the funds were used for legitimate, business-related expenses of Local 98 and the Apprentice Training Fund.

### Theft from Local 98 and Apprentice Training Fund
### to Pay for Construction and Other Services

45.   Defendants JOHN DOUGHERTY, BRIAN BURROWS, and MICHAEL NEILL hired defendant ANTHONY MASSA, and paid MASSA with Local 98 and Apprentice Training Fund funds, to perform construction work and other services at properties personally owned by DOUGHERTY, BURROWS, and NEILL, including their homes, the pub owned by all three, and properties owned by family members, friends, and associates of these defendants, knowing that the work and services were not related to any business purpose of Local 98 and the Apprentice Training Fund. Defendants DOUGHERTY, BURROWS, and NEILL obtained these payments by falsely representing to the union that the services were performed at Local 98 properties. The cost of such personal work paid by Local 98 and the Apprentice Training Fund was at least $391,230.

### Use of Local 98 Credit Cards for Personal Goods

46.   Defendant JOHN DOUGHERTY routinely misused, and authorized others to misuse, Local 98 American Express credit card accounts, assigned in the name of defendant DOUGHERTY and others, to purchase vast quantities of personal goods for use of the defendants, their family members, and their associates. These expenditures took place on scores of occasions, sometimes daily, throughout the course of the conspiracy, often at the Target store and Lowe's Home Improvement store locations near DOUGHERTY's residence. Defendants DOUGHERTY, MARITA CRAWFORD, NIKO RODRIGUEZ, BRIAN FIOCCA, and others known to the grand jury, using Local 98 credit cards paid with Local 98 funds, routinely

purchased a wide variety of grocery and mercantile needs of a household, including food products, medications, hair care, personal care products, infant care items, bath products, household supplies, cleaning products, household furnishings, adult and children's clothing, garden supplies, pet food and pet care items, holiday decorations and gifts, and electronic accessories.

47.     Defendant JOHN DOUGHERTY provided the Local 98 credit cards to his drivers, including defendants NIKO RODRIGUEZ, BRIAN FIOCCA, and Individual No. 1 (whom defendant DOUGHERTY collectively referred to as "the kids"), who then made personal purchases for DOUGHERTY, DOUGHERTY's family members, and for themselves. On or about March 26, 2014, DOUGHERTY directed the issuance by American Express of an additional card on the Local 98 account so that "the kids" had regular access to a card without having to obtain one from DOUGHERTY, and could make purchases for him. DOUGHERTY also made the Local 98 American Express cards available for personal use by family members and others who did not work for the union, including Family Member No. 10. DOUGHERTY falsely represented to the union that these numerous personal purchases were related to union business, or failed to disclose that the expenses were personal in nature, causing Local 98 to pay for these goods.

### Use of Local 98 Credit Cards for Personal Meals

48.     Defendant JOHN DOUGHERTY routinely misused, and authorized others to misuse, Local 98 American Express credit card accounts, assigned in the name of DOUGHERTY and other Local 98 employees, to purchase restaurant and takeout meals for the defendants, their family members, and their associates. These meals were paid for by Local 98, even though they were not related to the business of Local 98. DOUGHERTY falsely

represented to the union that these numerous personal purchases were union business-related, or failed to disclose that the purchases were personal in nature, causing Local 98 to pay for these meals.

<u>Use of Local 98 Credit Cards for Expenses Associated with Personal Travel</u>

49.     Defendants JOHN DOUGHERTY, MARITA CRAWFORD, and others also used the Local 98 American Express cards assigned to them to pay for expenses associated with personal travel and vacations, often related to various horse racing events, as well as other personal transportation expenses. DOUGHERTY, CRAWFORD, and others falsely claimed these expenses were related to union business, or failed to disclose that the expenses were personal in nature, causing Local 98 to pay for them.

<u>Fraudulent Reimbursements for Personal Expenses</u>

50.     In addition to the use of Local 98 credit cards described above, defendant JOHN DOUGHERTY employed schemes to receive monetary payments of union funds by falsely claiming and receiving reimbursement for personal expenses incurred by defendant DOUGHERTY that were not related to Local 98 operations. He regularly directed Local 98 personnel to accept his false characterization of expenses as relating to union business, based solely on his representation, even though he frequently did not produce receipts or other documentation for these expenses. The expenditures were for merchandise and meals, for which DOUGHERTY paid with cash or a personal credit card, and then sought and obtained reimbursement from Local 98.

<u>Theft of Local 98 Funds to Purchase Concert and Sporting Event Tickets</u>

51.     Between 2008 and May 2016, Local 98 spent more than $6 million on concert, sports, and other tickets at various venues. Defendant JOHN DOUGHERTY regularly provided

many of these tickets to family members, friends, and favored associates without any legitimate Local 98 business-related justification. DOUGHERTY also authorized the payment by Local 98 of expenses for food, beverages, and other concessions incurred by these individuals while attending the events.

Use of Local 98 Employees for Personal Tasks and Errands

52.   Defendant JOHN DOUGHERTY regularly directed persons employed by Local 98 or the Apprentice Training Fund, including defendants NIKO RODRIGUEZ, BRIAN FIOCCA, and Individual No. 1, to provide personal services to defendant DOUGHERTY, his family members, and associates, during regular union business hours, using equipment and vehicles belonging to Local 98, for which such persons were compensated by Local 98 or by the Apprentice Training Fund. These personal tasks, entirely unrelated to the business purposes of Local 98, included: (1) driving DOUGHERTY and members of his family to numerous personal appointments; (2) shopping for and delivering purchases to the residences of DOUGHERTY and family members; (3) trash removal; (4) yard work; (5) snow removal; (6) other maintenance at the residences of DOUGHERTY, defendant MARITA CRAWFORD, Family Member No. 3, and the residences of other family, friends, and associates of DOUGHERTY; (7) transporting goods to and from DOUGHERTY's shore house in New Jersey; (8) picking up DOUGHERTY's dry cleaning; (9) fueling and cleaning the car of Family Member No. 2; (10) delivering food (paid for with Local 98 funds) to DOUGHERTY's family members; (11) serving as a cleaning and furniture moving service for DOUGHERTY, his family members, and favored associates; and (12) placing sports bets for him. DOUGHERTY's regular misuse of Local 98 employees for his personal tasks was well known to defendant BRIAN BURROWS, the president of the union. DOUGHERTY, BURROWS, and defendant MICHAEL NEILL also directed persons employed

- 17 -

by Local 98 and the Apprentice Training Fund to perform maintenance and other personal services at properties they owned, including Doc's Union Pub and the Pennsport Building, during periods when Local 98 or the Apprentice Training Fund was compensating these employees.

Payments to Non-Employees, Payments for No-Show Jobs,
and Overpayment of Favored Local 98 Employees

53.   Defendant JOHN DOUGHERTY also authorized the expenditure of Local 98 funds to pay money to and sponsor trips of family members and other associates in order to further defendant DOUGHERTY's personal and political interests, without any relation to the business interests of Local 98.

Additional Embezzlement of Local 98 Funds

54.   Defendant JOHN DOUGHERTY also stole cash belonging to Local 98 and kept in the union's "petty cash" funds. Likewise, DOUGHERTY stole cash belonging to Local 98's Committee on Political Education (COPE) political action committee and kept in the committee's petty cash fund. From on or about November 7, 2013, through August 3, 2016, DOUGHERTY took $53,778.04 in cash from these petty cash funds, did not return those funds, and did not provide receipts or other documentation.

55.   On or about October 30, 2015, defendant JOHN DOUGHERTY offered a membership to the Sporting Club at the Bellevue in Philadelphia to Family Member No. 4, explaining that "I got a different world than most people ever exist in. I am able to take care of a lot of people all the time."

**Overt Acts**

In furtherance of the embezzlement conspiracy and to effect its unlawful object, defendants JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, MARITA

- 18 -

CRAWFORD, NIKO RODRIGUEZ, and BRIAN FIOCCA, along with defendant ANTHONY

MASSA, and other conspirators committed and caused to be committed, in the Eastern District

of Pennsylvania and elsewhere, the overt acts described herein. These overt acts fall into several

categories, as follows: acts involving theft of Local 98 and Apprentice Training Funds to pay for

construction and other services; acts involving the use of Local 98 credit cards for personal

goods; acts involving the use of Local 98 credit cards for personal meals; acts involving the use

of Local 98 credit cards for expenses associated with personal travel; acts involving fraudulent

reimbursements for personal expenses; acts involving theft of Local 98 petty cash and funds for

personal purposes and to purchase concert and sporting event tickets; acts involving the use of

Local 98 employees for personal chores and errands; and acts involving payments to non-

employees and no-show employees, and overpayment to employees favored by DOUGHERTY.

Acts Involving Theft of Local 98 and Apprentice Training<br>Funds to Pay for Construction and Other Services

1.     Defendants JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, and

ANTHONY MASSA caused Local 98 to pay for work on DOUGHERTY's personal residence in

Philadelphia, Pennsylvania.

a.     In or about April 2010, defendant ANTHONY MASSA and Massa

Construction performed construction and repair work, including construction related to the

remediation of termites, at the residence of defendant JOHN DOUGHERTY. On or about

September 28, 2010, at the direction of defendant MICHAEL NEILL, defendant MASSA

prepared and submitted an invoice to Local 98 that falsely described the work on

DOUGHERTY's residence as work performed at properties owned by Local 98. MASSA later

billed Local 98 for the work performed at DOUGHERTY's residence. On or about October 28,

2010, defendant NEILL issued a check from the Local 98 Apprentice Training Fund to Massa Construction paying this invoice.

        b.      In or about April 2015 through July 2015, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including repair of a water leak and the installation of a front door, at defendant JOHN DOUGHERTY's residence. On or about August 31, 2015, at the direction of defendant BRIAN BURROWS, defendant MASSA prepared and submitted an invoice to Local 98 that falsely described the work on DOUGHERTY's residence as work performed at properties owned by Local 98. MASSA later billed Local 98 $4,990 for the work performed at DOUGHERTY's residence. On or about September 11, 2015, defendant BURROWS issued a check from the Local 98 General Fund to Massa Construction paying this invoice.

        c.      On or about September 2, 2015, through December 30, 2015, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including repair of damages caused by a water leak, at the residence of defendant JOHN DOUGHERTY. On or about January 18, 2016, at the direction of defendant BRIAN BURROWS, defendant MASSA prepared and submitted an invoice to Local 98 that falsely described the work on DOUGHERTY's residence as work performed at properties owned by Local 98, and billed Local 98 $4,508 for the work performed at DOUGHERTY's residence. On or about January 22, 2016, defendant BURROWS issued a check from the Local 98 General Fund to Massa Construction paying this invoice.

        d.      In or about January 2016 through April 2016, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including construction and leak remediation, at the residence of defendant JOHN DOUGHERTY. On or

about May 1, 2016, at the direction of defendant BRIAN BURROWS, defendant MASSA prepared and submitted an invoice to Local 98 that falsely described the work on DOUGHERTY's residence as work performed at properties owned by Local 98. MASSA later billed Local 98 $26,316 for the work performed at DOUGHERTY's residence. On or about May 11, 2016, defendant BURROWS issued a check from the Local 98 Norristown General Fund to Massa Construction paying this invoice.

    e.  On or about January 22, 2016, defendant JOHN DOUGHERTY authorized the use of Local 98 funds to pay a contractor for snow removal services, including snow removal from the residence of Family Member No. 4. On or about January 23, 2016, Individual No. 6, a Local 98 employee, told DOUGHERTY, "I have them guys starting at 4 am with snow removal doing [Family Member No. 4] first." DOUGHERTY and defendant BRIAN BURROWS authorized payment to the contractor, which included payment for the snow removal from the residence of Family Member No. 4.

    2.  Defendants JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, and ANTHONY MASSA caused Local 98 to pay for work on the personal residence of defendant BURROWS in Mt. Laurel, New Jersey.

    a.  In or about July 2010 through October 2010, defendant ANTHONY MASSA and Massa Construction performed construction work, including the addition of a walk-in closet, and the demolition and renovation of the bathroom in the master bedroom, at defendant BRIAN BURROWS's residence. On or about December 3, 2010, at the direction of defendant BURROWS, defendant MASSA prepared and submitted an invoice to Local 98 that falsely described the work on BURROWS's residence as work performed at properties owned by Local 98. MASSA later billed Local 98 $39,736 for the work performed at BURROWS's residence.

On or about December 6, 2010, BURROWS issued a check from the Local 98 Job Recovery Fund to Massa Construction paying this invoice.

        b.      On or about September 10, 2015, through September 11, 2015, defendant ANTHONY MASSA and Massa Construction hired and paid for a mechanical services contractor to repair the air conditioning and cooling system at defendant BRIAN BURROWS's residence. On or about September 30, 2015, defendant MASSA paid approximately $1,021 to the contractor for the work performed at BURROWS's residence. On or about January 13, 2016, at the direction of defendant BURROWS, defendant MASSA prepared and submitted an invoice to Local 98 that falsely described the work on BURROWS's residence as work performed at properties owned by Local 98, and billed Local 98 $1,021 for the work performed at BURROWS's residence. On or about February 5, 2016, BURROWS issued a check from the Local 98 General Fund to Massa Construction paying this invoice.

        c.      In or about December 2015, defendant ANTHONY MASSA and Massa Construction performed construction work, including the installation of a fence, at the BURROWS residence. On or about January 18, 2016, at the direction of defendant BRIAN BURROWS, defendant MASSA prepared and submitted an invoice to Local 98 that falsely described the work on BURROWS's residence as work performed at properties owned by Local 98. MASSA later billed Local 98 $5,666 for the work performed at BURROWS's residence. On or about February 5, 2016, BURROWS issued a check from Local 98 paying this invoice.

        d.      On or about May 2, 2016, at the direction of defendant BRIAN BURROWS, defendant ANTHONY MASSA prepared and submitted an invoice to Local 98 that falsely described the work on BURROWS's residence as work performed at properties owned by Local 98, and billed Local 98 $2,208 for the work performed at the residence of BURROWS. On

or about May 11, 2016, BURROWS issued a check from the Local 98 General Fund to Massa Construction paying this invoice.

        3.      Defendants JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, and ANTHONY MASSA caused Local 98 to pay for work on the personal residence of defendant NEILL in Philadelphia, Pennsylvania.

        a.      In or about June 2010, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including repair of the stairs, at defendant MICHAEL NEILL's residence. On or about November 29, 2010, at the direction of defendant NEILL, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work on NEILL's residence as work performed at properties owned by Local 98, and billed Local 98 for the work performed at the residence of NEILL. On or about November 30, 2010, defendant NEILL issued a check from the Local 98 Apprentice Training Fund to Massa Construction paying this invoice.

        b.      On or about March 13, 2015, through June 25, 2015, defendant ANTHONY MASSA and Massa Construction performed construction work, including repairs to the roof, at the residence of defendant MICHAEL NEILL. On or about June 25, 2015, at the direction of defendant NEILL, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work on NEILL's residence as work performed at properties owned by Local 98, and billed Local 98 for the work performed at the residence of NEILL. On or about June 30, 2015, defendant NEILL issued a check from the Local 98 Apprentice Training Fund to Massa Construction paying this invoice.

4.     Defendants JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL and ANTHONY MASSA caused Local 98 to pay for work on the personal residence of Family Member No. 2 in Somers Point, New Jersey.

a.     In about April 2015 through July 2015, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including construction and repairs resulting from a water leak, at the residence of Family Member No. 2. On or about August 31, 2015, at the direction of defendant BRIAN BURROWS, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work on the residence of Family Member No. 2 as work performed at properties owned by Local 98, and billed Local 98 $4,316 for the work performed at the residence of Family Member No. 2. On or about September 11, 2015, defendant BURROWS issued a check from the Local 98 General Fund to Massa Construction paying this invoice.

b.     On or about November 3, 2015, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including repair of damages caused by a water leak, at the residence of Family Member No. 2. On or about January 18, 2016, at the direction of defendant BRIAN BURROWS, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work on the residence of Family Member No. 2 as work performed at properties owned by Local 98, and billed Local 98 $758 for the work performed at the residence of Family Member No. 2. On or about January 22, 2016, defendant BURROWS issued a check from the Local 98 General Fund to Massa Construction paying this invoice.

5.     Defendants JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, and ANTHONY MASSA caused Local 98 to pay for work on the personal residence of Family

Member No. 3 in Philadelphia, Pennsylvania, performed by defendant MASSA and Massa Construction on or about May 9, 2013, through March 19, 2014, including construction and repairs resulting from a water leak. On or about March 25, 2014, at the direction of defendant BURROWS, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work on the residence of Family Member No. 3 as work performed at properties owned by Local 98, and billed Local 98 $3,350 for the work performed at the residence of Family Member No. 3. On or about March 28, 2014, defendant BURROWS issued a check from the Local 98 General Fund to Massa Construction paying this invoice.

6. Defendants JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, and ANTHONY MASSA caused Local 98 to pay for work on the personal residence of Family Member No. 4 in Philadelphia, Pennsylvania, performed by defendant MASSA and Massa Construction on or about November 1, 2011, through November 7, 2011, including construction, repairs, and painting. In or about November 2011 through December 2011, at the direction of defendant BURROWS, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work on the residence of Family Member No. 4 as work performed at properties owned by Local 98, and billed Local 98 for the work performed at the residence of Family Member No. 4. In or about December 2011, defendant BURROWS issued a check from the Local 98 General Fund to Massa Construction paying this invoice.

7. Defendants JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, and ANTHONY MASSA caused Local 98 to pay for construction or repair work on the personal residence of Family Member No. 5 in Philadelphia, Pennsylvania, performed by defendant MASSA and Massa Construction in or about May 2013 through March 2014. On or about March 25, 2014, at the direction of defendant BURROWS, defendant MASSA prepared and

submitted an invoice to Local 98, which falsely described the work on the residence of Family Member No. 5 as work performed at properties owned by Local 98, and billed Local 98 $1,529 for the work performed at the residence of Family Member No. 5. On or about March 28, 2014, BURROWS issued a check from the Local 98 General Fund to Massa Construction paying this invoice.

      8.     Defendants JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, and ANTHONY MASSA caused Local 98 to pay for work on the personal residence of Individual No. 2 in Philadelphia, Pennsylvania.

      a.     In or about April 2010, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including construction related to the installation of a bedroom and closet, at the residence of Individual No. 2. On or about September 28, 2010, at the direction of defendant MICHAEL NEILL, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work on the residence of Individual No. 2 as work performed at properties owned by Local 98, and billed Local 98 for the work performed at the residence of Individual No. 2. On or about October 28, 2010, defendant NEILL issued a check from the Local 98 Apprentice Training Fund to Massa Construction paying this invoice.

      b.     In or about June 2010, defendant ANTHONY MASSA and Massa Construction performed additional construction and repair work, including construction related to the installation of a bedroom closet, at the residence of Individual No. 2. On or about November 29, 2010, at the direction of defendant MICHAEL NEILL, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work on the residence of Individual No. 2 as work performed at properties owned by Local 98, and billed

Local 98 for the work performed at the residence of Individual No. 2. On or about November 30, 2010, defendant NEILL issued a check from the Local 98 Apprentice Training Fund to Massa Construction paying this invoice.

9.  Defendants JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, and ANTHONY MASSA caused Local 98 to pay for construction and repair work at Doc's Union Pub, located at 1843 South Second Street in Philadelphia, which was owned by defendants DOUGHERTY, BURROWS, and NEILL.

a.  On or about June 14, 2010, through June 17, 2010, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including plumbing repairs, at Doc's Union Pub. On or about November 29, 2010, at the direction of defendant MICHAEL NEILL, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work on Doc's Union Pub as work performed at properties owned by Local 98, and billed Local 98 for the work performed at Doc's Union Pub. On or about November 30, 2010, defendant NEILL issued a check from the Local 98 Apprentice Training Fund to Massa Construction paying this invoice.

b.  In or about March 2015 through July 2015, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including construction and repairs to the roof, walls, and windows, at Doc's Union Pub. On or about August 13, 2015, at the direction of defendant BRIAN BURROWS, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work on Doc's Union Pub as work performed at properties owned by Local 98, and billed Local 98 $6,692 for the work performed at Doc's Union Pub. On or about August 14, 2015, defendant BURROWS issued a check from the Local 98 General Fund to Massa Construction paying this invoice.

- 27 -

c.      On or about October 30 through on or about December 31, 2015, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including repairs to the bathroom walls and floors, at Doc's Union Pub. On or about January 18, 2016, at the direction of defendant BRIAN BURROWS, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work on Doc's Union Pub as work performed at properties owned by Local 98, and billed Local 98 $986 for the work performed at Doc's Union Pub. On or about January 22, 2016, defendant BURROWS issued a check from the Local 98 General Fund to Massa Construction paying this invoice.

10.    Defendants JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, and ANTHONY MASSA caused Local 98 to pay for construction and repair work at the Pennsport Building, in Philadelphia, Pennsylvania, a building owned by defendants BURROWS and NEILL.

a.      In or about April 2010, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including spackling and plumbing work, at the Pennsport Building. On or about September 28, 2010, at the direction of defendants BRIAN BURROWS and MICHAEL NEILL, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work at the Pennsport Building as work performed at properties owned by Local 98, and billed Local 98 for the work performed at the Pennsport Building. On or about October 28, 2010, defendant NEILL issued a check from the Local 98 Apprentice Training Fund to Massa Construction paying this invoice.

b.      In or about June 2010, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including construction related to the installation of a skylight and window, at the Pennsport Building. On or about November 29,

2010, at the direction of defendants BRIAN BURROWS and MICHAEL NEILL, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work at the Pennsport Building as work performed at properties owned by Local 98, and billed Local 98 for the work performed at the Pennsport Building. On or about November 30, 2010, defendant NEILL issued a check from the Local 98 Apprentice Training Fund to Massa Construction paying this invoice.

       c.      In or about May 2013 through March 2014, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including repairs to walls, floors, and ceilings, at the Pennsport Building. On or about March 25, 2014, at the direction of defendant BRIAN BURROWS, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work at the Pennsport Building as work performed at properties owned by Local 98, and billed Local 98 $7,288 for the work performed at the Pennsport Building. On or about March 28, 2014, defendant BURROWS issued a check from the Local 98 General Fund to Massa Construction paying this invoice.

       d.      In or about March 2015 through June 2015, defendant ANTHONY MASSA and Massa Construction performed construction and repair work, including plumbing services and the repair of a skylight, at the Pennsport Building. On or about August 13, 2015, at the direction of defendant BRIAN BURROWS, defendant MASSA prepared and submitted an invoice to Local 98, which falsely described the work at the Pennsport Building as work performed at properties owned by Local 98, and billed Local 98 $2,862 for the work performed at the Pennsport Building. On or about August 14, 2015, defendant BURROWS issued a check from the Local 98 General Fund to Massa Construction paying this invoice.

<u>Acts Involving the Use of Local 98 Credit Cards for Personal Goods</u>

11.     The following overt acts are representative examples of the hundreds of personal purchases made through the misuse of Local 98 American Express credit card accounts in the name of defendant JOHN DOUGHERTY and others:

a.     On or about April 24, 2013, at Boyd's clothing store in Philadelphia, Pennsylvania, defendant MARITA CRAWFORD used and authorized the use of a Local 98 American Express credit card, in the name of CRAWFORD, to purchase $2,500 in Boyd's gift cards, which she gave to defendant JOHN DOUGHERTY for his personal use. CRAWFORD falsely reported to Local 98 that the expense for this purchase was for "Gift cards for Scholarship Banquet - IBEW Local 98 / NECA."

b.     On or about February 24, 2014, at the Target store in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY used and authorized the use of a Local 98 American Express credit card, in the name of DOUGHERTY, to purchase approximately $135.16 of merchandise, including bananas, toothbrush, toothpaste, mouthwash, deodorant, soap, Noxzema facial cleanser, shampoo, conditioner, Q-Tips cotton swabs, sunscreen, lip balm, and bottled water. DOUGHERTY falsely reported to Local 98 that the expense for this purchase was for "Work Supplies."

c.     On or about March 31, 2014, at the Target store in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY used and authorized the use of a Local 98 American Express credit card, in the name of DOUGHERTY, to purchase approximately $602.62 of merchandise, including over-the-counter medicine, a coffee machine and coffee pods, Easter decorations, waste baskets, a door mat, storage tubs, bath towels, washcloths, planters,

soap, scented candles, scented plug-in air fresheners and refills, and DVDs, which DOUGHERTY delivered to his personal residence.

        d.      On or about July 22, 2014, at Lowe's Home Improvement store in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY used and authorized the use of a Local 98 American Express credit card, in the name of DOUGHERTY, to purchase approximately $131.27 of merchandise, including a pressure washer and cleaning supplies. These goods were then used by defendant NIKO RODRIGUEZ and an employee of Local 98 to clean the sidewalk and exteriors at the residences of defendant DOUGHERTY and Family Member No. 3.

        e.      On or about October 13, 2014, at the Target store in Philadelphia, Pennsylvania, defendant NIKO RODRIGUEZ used a Local 98 American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase approximately $147.04 of merchandise, including diapers, baby wipes, Pam cooking oil, mouthwash, laundry detergent, room deodorizer, home doormat, cleaning products, and bottled water. Defendant RODRIGUEZ delivered the merchandise to his own residence and the personal residences of DOUGHERTY and Family Member No. 3.

        f.      On or about October 28, 2014, at the Target store in Philadelphia, Pennsylvania, Family Member No. 10 used a Local 98 American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase approximately $284.62 of merchandise, including a Baby Einstein baby walker, diapers, baby food, baby wipes, nursery purified water, teeth whitening strips, shaving razors and blades, frozen pizza, meat products, and Starbucks Frappuccino chilled coffee drinks. Family Member No. 10 delivered the merchandise to Family

Member No. 3's residence. When submitting the expense report for the expenditure of these Local 98 funds, defendant DOUGHERTY failed to provide a justification for the expenditure.

g.      On or about November 6, 2014, at the Target store in Philadelphia, Pennsylvania, defendants BRIAN FIOCCA and NIKO RODRIGUEZ used a Local 98 American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase approximately $319.79 of merchandise, including children's clothing, hats, a vacuum cleaner, toothbrushes, toothpaste, mouthwash, soap, Noxzema facial cleanser, deodorant, a hair brush, lip balm, and bottled water. Defendants RODRIGUEZ and FIOCCA delivered the merchandise to the personal residences of defendant DOUGHERTY and Family Member No. 3. When submitting the expense report for the expenditure of these Local 98 funds, DOUGHERTY did not provide a justification for the expenditure.

h.      On or about November 28, 2014, at Lowe's Home Improvement store in Philadelphia, Pennsylvania, defendant NIKO RODRIGUEZ used a Local 98 American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase approximately $135.62 of merchandise, including a silver snowflake tree and holiday ornaments and decorations. Defendant RODRIGUEZ delivered the merchandise to his own personal residence in Philadelphia. When submitting the expense report for the expenditure of these Local 98 funds, defendant DOUGHERTY failed to provide a justification for the expenditure.

i.      On or about December 1, 2014, at the Target store in Philadelphia, Pennsylvania, defendant BRIAN FIOCCA used a Local 98 American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase approximately $547.51 of merchandise, including a Christmas tree, Lucky Charms breakfast cereal, Cinnamon Toast Crunch breakfast cereal, bagel bites, Starbucks Frappuccino coffee drink, peanut butter, jelly, bread, hot sauce,

ketchup, frozen pizza, macaroni and cheese, meat products, frozen desserts, a Healthy Choice

prepared meal, salad dressing, potato chips, tortilla snacks, salsa, ice cream, cookie dough mix,

chewing gum, Dixie cups, drink coasters, toothpaste, mouthwash, soap, shampoo, tissues,

dishwashing detergent, cleaning supplies, laundry bags, sweatshirt, tee-shirt, lamp bases,

lampshades, light bulbs, batteries, bottled water, and scented candles. When submitting the

expense report for the expenditure of these Local 98 funds, defendant DOUGHERTY failed to

provide a justification for the expenditure.

    j.  On or about December 4, 2014, at a Brooks Brothers store in Philadelphia,

Pennsylvania, defendant JOHN DOUGHERTY used a Local 98 American Express credit card, in

the name of DOUGHERTY, to purchase approximately $567 of men's clothing, including a pair

of jeans, a cotton turtleneck, a cotton cashmere crewneck sweater, and two Merino wool sweater

vests.

    k.  On or about December 23, 2014, at the IKEA store in Philadelphia,

Pennsylvania, defendant NIKO RODRIGUEZ used a Local 98 American Express credit card, in

the name of defendant JOHN DOUGHERTY, to purchase approximately $409.32 of

merchandise, including a mattress for a bed. Defendant RODRIGUEZ delivered the merchandise

to his residence.

    l.  On or about December 24, 2014, at Lowe's Home Improvement store in

Philadelphia, Pennsylvania, defendant BRIAN FIOCCA and Individual No. 1 used a Local 98

American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase

approximately $782.97 of merchandise, including patio chairs, a patio loveseat, firewood

kindling, firestarter, a fire log, trash cans, and gift cards. Defendant FIOCCA and Individual No.

1 delivered the merchandise to the residences of defendant DOUGHERTY and Family Member

No. 3. When submitting the expense report for the expenditure of these Local 98 funds, DOUGHERTY failed to provide a justification for the expenditure.

m.     On or about February 5, 2015, defendant BRIAN FIOCCA, at the C & D Appliance store, in Philadelphia, Pennsylvania, used a Local 98 American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase a washing machine, for approximately $470, which defendant FIOCCA arranged to be delivered to the residence of Family Member No. 3. Over two years later, on or about December 28, 2017, after personnel from Local 98 were made aware by law enforcement of the purchase of the washing machine by FIOCCA, FIOCCA wrote a check to defendant DOUGHERTY for $470, citing "Reimbursement for Washing Machine," and DOUGHERTY wrote a check to Local 98 for $470, citing "Reimbursement." At the same time, the purpose of the $470 purchase was changed in Local 98's Quick Book accounting files from "small refrigerator for office in ne, phila." to "to be reimbursed – Personal."

n.     On or about February 6, 2015, at the IKEA store in Philadelphia, Pennsylvania, defendants BRIAN FIOCCA and Family Member No. 10 used a Local 98 American Express credit card in the name of defendant JOHN DOUGHERTY, to purchase approximately $572.37 of merchandise, including a mattress and bed sheets. DOUGHERTY later falsely reported to Local 98 that the expense for this purchase was for "campaign office set up."

o.     On or about February 6, 2015, at the Target store in Philadelphia, Pennsylvania, defendants BRIAN FIOCCA and Family Member No. 10 used a Local 98 American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase approximately $549.27 of merchandise, including dog food, baby food, diapers, Cocoa Pebbles

breakfast cereal, Cap'n Crunch breakfast cereal, breakfast bars, bananas, juice, frozen fruit, smoothie mix, frozen pizza, bacon, milk, bread, processed cheese spray, cans of tuna fish, soda, Red Bull energy drink, smart water, Starbucks Frappuccino chilled coffee drinks, cookies, tortilla wraps, tortilla chips, salsa, egg rolls, sirloin steaks, chuck steaks, chicken breast, barbecue sauce, frozen vegetables, toothpaste, makeup remover cleansing towelettes, shampoo, skin moisturizer, hair bands, men's razors, men's exercise pants, board shorts, wristwatch, toilet paper, and bottled water, which were delivered to the residence of Family Member No. 3. DOUGHERTY falsely reported to Local 98 that the expense for this purchase was for "campaign office supplies."

       p.      On or about May 20, 2015, at the Target store in Philadelphia, Pennsylvania, defendant NIKO RODRIGUEZ used a Local 98 American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase approximately $207.67 of merchandise, including bottled water, diapers, baby wipes, baby daily moisture lotion, toothbrushes, toothpaste, movie theater gift card, Clorox cleaning wipes, Neutrogena body wash, Neutrogena facial wash, kitchen trash bags, facial tissues, and laundry detergent. Defendant RODRIGUEZ delivered this merchandise to his personal residence. DOUGHERTY falsely reported to Local 98 that the expense for this purchase was for "Office Supplies."

       q.      On or about June 15, 2015, defendant JOHN DOUGHERTY told defendant NIKO RODRIGUEZ, "We gotta do an H2O and a wipe thing," directing defendant RODRIGUEZ to purchase baby wipes and bottled water and deliver these products to the residence of DOUGHERTY. On or about this same date, at the Target store in Philadelphia, Pennsylvania, RODRIGUEZ used a Local 98 American Express credit card, in the name of DOUGHERTY, to purchase approximately $67.69 of merchandise, including baby sippy cups, movie ticket gift card, bananas, bread, Pam cooking oil, baby wipes, and bottled water, which

RODRIGUEZ delivered to the residences of DOUGHERTY and RODRIGUEZ. DOUGHERTY falsely reported to Local 98 that the expense for this purchase was for "office supplies."

r.      On or about July 6, 2015, at the Target store in Philadelphia, Pennsylvania, defendant NIKO RODRIGUEZ used a Local 98 American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase approximately $113.51 of merchandise, including diaper pail refill bags, baby wipes, Honey Bunches of Oats cereal, oatmeal, sugar, milk, bananas, children's pajamas, and over-the-counter allergy medicine, which defendant RODRIGUEZ delivered to his own residence. DOUGHERTY falsely reported to Local 98 that the expense for this purchase was for "office supplies."

s.      On or about July 21, 2015, defendant JOHN DOUGHERTY texted defendant NIKO RODRIGUEZ and directed him to purchase "2 thick chair pads w high \backs /neck pillow attach'd -- for [Family Member No. 1]  -- Blue ,,, she is sitting on those 'thin' blue pads!!," and deliver the chair pads to Family Member No. 1. On or about the same day, RODRIGUEZ traveled to the Lowe's Home Improvement store in Philadelphia, Pennsylvania, and used a Local 98 American Express credit card, in the name of defendant DOUGHERTY, to purchase approximately $92.28 of merchandise, including two patio chair cushions, which RODRIGUEZ delivered to the residence of DOUGHERTY. DOUGHERTY falsely reported to Local 98 that the expense for this purchase was for "chairs for picket line."

t.      On or about October 6, 2015, defendant JOHN DOUGHERTY (JD) engaged in the following exchange of text messages with Family Member No. 1 (FM1) and with defendant NIKO RODRIGUEZ (NR).

FM1 to JD:        We need water!

JD to NR:         Can you grab waters ect + drop off 1st !!!

| JD to FM1: | On it |
| FM1 to JD: | Thanks!!!! |
| NR to JD: | U got it |

On or about the same day, at the Target store in Philadelphia, Pennsylvania, defendant RODRIGUEZ, at the direction of defendant DOUGHERTY, used a Local 98 American Express credit card, in the name of DOUGHERTY, to purchase approximately $106.19 of merchandise, including baby wipes, toothpaste, mouthwash, Neutrogena facial cleanser, lip balm, laundry detergent, paper towels, and bottled water, which RODRIGUEZ delivered to the residence of DOUGHERTY. DOUGHERTY falsely reported to Local 98 that the expense for this purchase was for "office meeting expense."

u.      On or about October 31, 2015, at the Target store in Philadelphia, Pennsylvania, defendant BRIAN FIOCCA used a Local 98 American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase approximately $248.15 of merchandise, including ice cream, coffee creamer, bottled water, trash bags, boxer shorts, sweatshirt, tee-shirt, gloves, Disney character pillows, Disney throw blankets, and a cell phone case. Defendant FIOCCA delivered this merchandise to his own residence and that of Family Member No. 3. Defendant DOUGHERTY falsely reported to Local 98 that the expense for this purchase was for "office supplies."

v.      On or about November 5, 2015, at the Target store in Philadelphia, Pennsylvania, defendant NIKO RODRIGUEZ used a Local 98 American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase approximately $145.74 of merchandise, including baby food, diapers, baby wipes, skim and whole milk, organic eggs, juice, a shower liner, a shower curtain, air freshener, paper towels, and bottled water, which

defendant RODRIGUEZ delivered to his own residence. DOUGHERTY falsely reported to Local 98 that the expense for this purchase was for "office supplies."

        w.     On or about November 27, 2015, at the Target store in Philadelphia, Pennsylvania, defendant BRIAN FIOCCA used a Local 98 American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase approximately $205.04 of merchandise, including a dog toy, toothbrushes, toothpaste, mouthwash, soap, shampoo, hair conditioner, hair styling products, nail polish, mascara, Q-Tips cotton swabs, a jacket, sweatshirt, earrings, paper towels, and toilet paper. DOUGHERTY falsely reported to Local 98 that the expense for this purchase was for "office meeting expense."

        x.     On or about December 8, 2015, at the Barnes & Noble Booksellers in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY used a Local 98 American Express credit card, in the name of DOUGHERTY, to purchase approximately $77.04 of merchandise, including books by author Danielle Steele and HGTV Christmas magazines, which DOUGHERTY delivered or arranged to be delivered to defendant MARITA CRAWFORD and Family Member No. 1. DOUGHERTY later falsely reported to Local 98 that the "expense" was for books for an attorney's office and for a "Celebration of Service."

        12.     The following are additional acts involving the use of Local 98 credit cards for personal goods:

| Act | Date | Purchaser | Merchant | Merchandise Purchased | Amount | Expense Report Claim |
|---|---|---|---|---|---|---|
| a. | 09/11/2014 | BRIAN FIOCCA | Target | Dog food, dog treats, Lucky Charms breakfast cereal, Cheerios breakfast cereal, meat products, bananas, blackberries, grapes, fresh fruit mix, peanuts, butter substitute, coffee, bread, frozen fruit bars, toothpaste, mouthwash, shampoo, women's razors, deodorant, men's cardigan sweater, men's button down shirt, scented candles, and bottled water | $222.53 | None |
| b. | 09/19/2014 | BRIAN FIOCCA | Target | Shredded cheese, prepared pizza crusts, tomatoes, bread, Pam cooking oil, ketchup, cookie dough mix, soap, throw blanket, tee-shirts, pants, and scented candles | $240.63 | None |
| c. | 09/25/2014 | BRIAN FIOCCA | Target | Dog food, prepared pizza crusts, bread, soup, juice, potato chips, ice cream, cookies, cakes, toothbrushes, toothpaste, mouthwash, soap, men's care products, candles, men's button down shirt, men's cardigan sweater, children's clothing, paper towels, and bottled water | $300.28 | None |
| d. | 09/28/2014 | Family Member No. 10 | Target | Shirts, pants, lip balm | $139.18 | None |
| e. | 10/06/2014 | NIKO RODRIGUEZ | Target | Baby food, granola snacks, barbeque sauce, child's Disney costume, a child's overcoat, men's tank top shirts, and Halloween decorations | $166.44 | None |

| Act | Date | Purchaser | Merchant | Merchandise Purchased | Amount | Expense Report Claim |
|---|---|---|---|---|---|---|
| f. | 10/13/2014 | NIKO RODRIGUEZ | Target | Mouthwash, facial soap, contact lens solution, baby wipes, paper towels, and bottled water | $79.18 | None |
| g. | 11/19/2014 | NIKO RODRIGUEZ | Target | Baby food, baby wipes, bread, tea, almonds, honey, floor mats, and kitchen supplies, including towels and placemats | $170.23 | None |
| h. | 11/20/2014 | NIKO RODRIGUEZ | Target | Baby powder, facial cleanser, and shampoo | $43.95 | None |
| i. | 11/26/2014 | BRIAN FIOCCA | Target | Dog food, toothbrush, toothpaste, disposable razors, skin care product, button down shirts, lounge pants, baby wipes, paper towels, and bottled water | $250.58 | None |
| j. | 11/30/2014 | NIKO RODRIGUEZ | Target | Baby food, diapers, milk, and orange juice | $46.34 | None |
| k. | 12/18/2014 | NIKO RODRIGUEZ | Target | Baby food, raspberries, honey, band aids, socks, and boxer shorts | $182.59 | None |
| l. | 12/30/2014 | BRIAN FIOCCA | Target | Cold medicine, nasal spray, cough drops, tissues, tee-shirts, pants, gloves, baby wipes, paper towels, and bottled water | $268.31 | None |
| m. | 01/20/2015 | NIKO RODRIGUEZ | Target | Laundry detergent, baby wipes, paper towels, and bottled water | $63.43 | Office Supplies |
| n. | 02/02/2015 | NIKO RODRIGUEZ | Target | Diapers, baby bottle brush, baby wipes, energy bars, Pam cooking oil, shampoo, hair bands, deodorant, paper towels, and candles | $131.55 | Office Supplies |

| Act | Date | Purchaser | Merchant | Merchandise Purchased | Amount | Expense Report Claim |
|---|---|---|---|---|---|---|
| o. | 02/24/2015 | NIKO RODRIGUEZ | Target | Baby food, a Baby Bullet baby food preparation system, baby wipes, bread, disposable plates, dishwashing detergent, contact lens solution, and bottled water | $169.95 | Campaign Office Supplies |
| p. | 02/24/2015 | BRIAN FIOCCA | Target | Bananas, blackberries, grapes, fresh fruit, breakfast bars, strip steak, chicken, ground turkey, meat products, bread, mustard, salad, frozen vegetables, asparagus, olive oil, vinegar, juice, snack chips, frozen fruit bars, bottled water, and toilet paper | $218.04 | None |
| q. | 03/16/2015 | NIKO RODRIGUEZ | Target | Diapers, board shorts, paper towels, and bottled water | $91.15 | None |
| r. | 04/02/2015 | NIKO RODRIGUEZ | Lowe's | Bottled water, gift card | $111.91 | None |
| s. | 05/26/2015 | NIKO RODRIGUEZ | Target | Contact lens solution, contact lens cases, baby wipes, paper towels, and bottled water | $87.47 | None |
| t. | 05/29/2015 | NIKO RODRIGUEZ | Target | Rice Krispies breakfast cereal, an accent rug, utility tubs, cleaning supplies, kitchen towels, bottled water, and a movie ticket gift card | $177.73 | None |
| u. | 06/05/2015 | NIKO RODRIGUEZ | Whole Foods | Roses | $56.12 | None |
| v. | 06/23/2015 | NIKO RODRIGUEZ | Target | Baby food, honey, organic dairy products, paper towels, and bottled water | $61.30 | Office Supplies |
| w. | 07/02/2015 | NIKO RODRIGUEZ | Target | Baby bubble bath and baby wash, tank top shirt, and bread | $31.90 | None |

| Act | Date | Purchaser | Merchant | Merchandise Purchased | Amount | Expense Report Claim |
|-----|------|-----------|----------|----------------------|--------|---------------------|
| x. | 07/09/2015 | NIKO RODRIGUEZ | Target | Diapers, baby food, baby teething wafers, yogurt, apple juice, Johnson's baby lotion, milk, toothpaste, mouthwash, pain medication, trash bags, and a cell phone case | $166.58 | Office Supplies |
| y. | 07/17/2015 | NIKO RODRIGUEZ | Target | Honey, hair care product, skin care product, cleaning products, baby wipes, paper towels, and bottled water | $81.72 | None |
| z. | 09/24/2015 | NIKO RODRIGUEZ | Target | Baby wash, moisturizing lotion, toothpaste, mouthwash, body wash, contact lens solution, Clorox cleaning product, wood soap cleaner, pillows, pillow cases, and bed sheets | $212.76 | Office Supplies |
| aa. | 11/25/2015 | NIKO RODRIGUEZ | Target | Diapers, a bath sponge, bed sheets, bath rug, hand towel, clothes hampers, indoor heaters, lightbulbs, baby wipes, paper towels, and bottled water | $254.71 | Supplies for Toys and Turkeys Food Drive |
| bb. | 12/02/2015 | NIKO RODRIGUEZ | Target | Baby wipes, bananas, bottled water, disposable plates, and paper towels | $76.62 | Supplies for Local 98 |
| cc. | 02/26/2016 | NIKO RODRIGUEZ | Target | Baby wipes, bananas, bottled water, and paper towels | $41.82 | Supplies for Hall |

## Acts Involving the Use of Local 98 Credit Cards for Personal Meals

13.   The following overt acts are examples of the misuse of Local 98 American

Express credit card accounts in the name of defendant JOHN DOUGHERTY and others to

purchase restaurant and takeout meals for the defendants, their family members, and their associates:

a.      On or about April 30, 2015, defendant JOHN DOUGHERTY called defendant NIKO RODRIGUEZ and directed RODRIGUEZ to the Famous 4th Street Deli in Philadelphia, Pennsylvania, stating, "OK, I need you to go to Famous for me. OK. And I need you to get a few soups, a few briskets, you know, and I'll try, I'll call the order in beforehand. OK. … So and then we'll just pick it up, tell them to put it on my account." On or about the same day, defendant DOUGHERTY used a Local 98 American Express credit card, in the name of DOUGHERTY, to purchase from the Famous 4th Street Deli approximately $177.56 of food, including brisket sandwiches, potato salad, soup, bagels, cookies, and soda, which defendant RODRIGUEZ, at the direction of DOUGHERTY, delivered to Family Member No. 1, Family Member No. 3, and Family Member No. 6.

b.      On or about April 30, 2015, at the Famous 4th Street Deli in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY used a Local 98 American Express credit card, in the name of DOUGHERTY, to purchase approximately $175.74 of food, including brisket sandwiches and cookies, which DOUGHERTY arranged to be delivered to defendant BRIAN BURROWS's residence.

c.      Defendant JOHN DOUGHERTY falsely reported to Local 98 that the purchases of food from Famous 4th Street Deli on or about April 30, 2015, for both his family members and for BURROWS, were for a "meeting with [Individual No. 3] (self help) and others re: rehabilitative Local 98 member assistance program."

d.      On or about May 2, 2015, at the Old Homestead restaurant, in Atlantic City, New Jersey, defendants JOHN DOUGHERTY and MARITA CRAWFORD used a Local

98 American Express credit card, in the name of defendant CRAWFORD, to spend approximately $1,378.88 on a birthday dinner for DOUGHERTY that was attended by family members and friends who were not employees or members of Local 98. CRAWFORD falsely reported to Local 98 that the birthday dinner was a "Political Campaign Meeting Hosted by John Dougherty."

      e.     On or about May 10, 2015, defendant JOHN DOUGHERTY told Family Member No. 1 that they would dine out and then purchase dinner for Family Member No. 1's parents. On or about the same day, at Famous Dave's restaurant in Philadelphia, Pennsylvania, DOUGHERTY used a Local 98 American Express credit card, in the name of DOUGHERTY, to spend approximately $122.43 for a meal for DOUGHERTY and his family members. DOUGHERTY falsely reported to Local 98 that the food from Famous Dave's was a "Meeting with [union official] (98) and various salts Re: Local 98 salting program."

      f.     On or about May 14, 2015, defendant JOHN DOUGHERTY directed defendant BRIAN FIOCCA to use a Local 98 American Express credit card, in the name of defendant DOUGHERTY, to order approximately $60.37 in meals from Nick's Old Original Roast Beef restaurant in Philadelphia, Pennsylvania, for DOUGHERTY and his family. DOUGHERTY told defendant FIOCCA, "OK, grab a sandwich, grab a roast beef with cheese with hot peppers, and drop that off to [Family Member No. 1] … and drop … a roast beef and a ham off at [Family Member No. 1's] mother's and a roast beef and a ham off at your place."

      g.     On or about June 21, 2015, at Moonshine restaurant, in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY used and authorized the use of a Local 98 American Express credit card, in the name of DOUGHERTY, to spend approximately $175.23

for a meal for DOUGHERTY's family, including Family Member Nos. 1, 2 and 3, on Father's Day in 2015.

       h.      On or about July 2, 2015, at the Old Homestead restaurant, in Atlantic City, New Jersey, defendant JOHN DOUGHERTY used a Local 98 American Express credit card, in the name of DOUGHERTY, to spend approximately $3,972.04 on a birthday dinner for defendant MARITA CRAWFORD that was attended by family members and friends who were not employees or members of Local 98. DOUGHERTY falsely reported to Local 98 that this birthday dinner was a "Local 98 Marketing/Business Development Golf Outing." More than three years later, on or about August 16, 2018, after law enforcement made inquiries about the nature of this meal to employees of Local 98, DOUGHERTY wrote a check to Local 98 that included $1,588.82 as reimbursement for a portion of the Old Homestead birthday meal.

       i.      On or about July 11, 2015, defendant JOHN DOUGHERTY called Individual No. 4, an employee of Local 98, and told him, "You guys go to dinner, whatever you got, just put it on your card and I'll take care of it," informing Individual No. 4 to buy dinner, at Local 98's expense, for defendant MARITA CRAWFORD, Individual No. 4, and Family Member No. 2, while they were on a gambling trip to Atlantic City, New Jersey. On or about the same day, at the Borgata restaurant in Atlantic City, New Jersey, Individual No. 4, at the direction of DOUGHERTY, used a Local 98 American Express credit card in the name of Individual No. 4 to spend approximately $118.17 for a meal for Individual No. 4, defendant CRAWFORD, and Family Member No. 2. Thereafter, Individual No. 4 falsely reported to Local 98 that the expense for this meal was a "Political Strategy Dinner Meeting - Marita, [Individual No. 4] & 1 Other."

j.      On or about August 5, 2015, at Termini Brothers Bakery in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY used and authorized the use of a Local 98 American Express credit card, in the name of DOUGHERTY, to purchase a birthday cake for Family Member No. 2 for approximately $125. On or about the same day, DOUGHERTY called Family Member No. 1 and said, "I got a cake for Friday. I don't know if [Family Member No. 2] is going to be around or not … It says 'Happy Birthday Pop'."

k.      On or about August 26, 2015, at the Café Martorano restaurant, in Atlantic City, New Jersey, defendant JOHN DOUGHERTY used a Local 98 American Express credit card, in the name of defendant DOUGHERTY, to spend approximately $1,907.49, on a birthday dinner for Family Member No. 1. DOUGHERTY falsely reported to Local 98 that this birthday dinner was for an "IBEW Third District Progress Meeting (AC)."

l.      On or about November 1, 2015, defendant JOHN DOUGHERTY called Family Member No. 1 and stated, "Tomorrow, tell your mom and dad not to cook, I got crab cakes coming from the Palm … They'll like that. That's for you too." On or about the following day, defendant DOUGHERTY called The Palm restaurant, in Philadelphia, Pennsylvania, and ordered four meals for takeout. DOUGHERTY stated: "I'm gonna shoot somebody up there right now with a credit card." On or about the same day, at The Palm restaurant, defendant NIKO RODRIGUEZ, at DOUGHERTY's direction, used a Local 98 American Express credit card, in the name of DOUGHERTY, to purchase approximately $406.08 in meals. DOUGHERTY called defendant RODRIGUEZ and directed him to deliver to Family Member No. 1 "potato, salad, asparagus and crab cake, OK, and then give everything else to [Family Member No. 1's] mother." Defendant RODRIGUEZ then delivered the food to Family Member No. 1 and the parents of Family Member No. 1, as directed. DOUGHERTY falsely reported to Local 98 that

the expense for this meal was for a "Meeting with [Philadelphia elected official, political consultant, and paid political advisor] and two other RE: Election."

m.     On or about November 18, 2015, defendant JOHN DOUGHERTY called the father of Family Member No. 1 and stated, "Tomorrow, I got crab cakes and sirloin steak coming. So I got you a really nice dinner tomorrow night," informing this individual that DOUGHERTY would be purchasing meals for this person the following day. On or about the following day, at The Palm restaurant, in Philadelphia, Pennsylvania, defendant NIKO RODRIGUEZ, at DOUGHERTY's direction, used a Local 98 American Express credit card, in the name of DOUGHERTY, to purchase approximately $386.64 in meals, which RODRIGUEZ then delivered to Family Member No. 1, the parents of Family Member No. 1, and Family Member No. 5. DOUGHERTY falsely reported to Local 98 that the expense for this meal was for a meeting for "ASB Capital Ground Breaking - IO Reps, Local 98 Business Representatives, and Reps from other Unions."

n.     On or about April 1, 2016, at Butcher and Singer restaurant, in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY used a Local 98 American Express credit card, in the name of DOUGHERTY, to pay approximately $216.36 for a dinner for Family Member Nos. 1 and 3. DOUGHERTY falsely reported to Local 98 that the expense for this meal was for a "political meeting."

o.     On or about June 14, 2016, at Famous 4th Street Deli, in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY used and authorized the use of a Local 98 American Express credit card, in the name of DOUGHERTY, to spend approximately $388.80 on a food buffet for a physician who had treated DOUGHERTY, and the physician's staff, telling the physician, "I just wanted to tell you guys thank you, I appreciate everything you do."

<u>Acts Involving the Use of Local 98 Credit Cards</u>
<u>for Expenses Associated with Personal Travel</u>

14.    The following are representative examples of acts in which defendants JOHN

DOUGHERTY, MARITA CRAWFORD, and others used the Local 98 American Express cards

assigned to them to pay for expenses associated with personal travel and vacations, often related

to various horse racing events, as well as other personal transportation expenses:

a.    On or about December 13, 2013, at Guerlain Boutique at The Waldorf

Astoria, in New York, New York, defendant MARITA CRAWFORD used a Local 98 American

Express credit card, in the name of CRAWFORD, to spend approximately $261.25 on beauty

and makeup services for CRAWFORD and Family Member No. 6.

b.    On or about December 12, 2014, at Guerlain Boutique at The Waldorf

Astoria, in New York, New York, defendant MARITA CRAWFORD used a Local 98 American

Express credit card, in the name of CRAWFORD, to spend approximately $245 on beauty and

makeup services for CRAWFORD and the girlfriend of Individual No. 1. CRAWFORD later

reported to Local 98 that the expense for this purchase was for "PA Society."

c.    On or about June 4, 2015, at the Sheraton JFK Airport Hotel in New York,

New York, defendant MARITA CRAWFORD used a Local 98 American Express credit card, in

the name of CRAWFORD, to spend approximately $335.13 on a hotel room during a personal

trip to attend the Belmont Stakes horse race. When submitting the expense report for her

expenditure of these Local 98 funds, CRAWFORD failed to provide a justification for the

expenditure.

d.    On or about June 4, 2015, at Lenny's Clam Bar restaurant, in Howard

Beach, New York, Individual No. 4 used a Local 98 American Express credit card in his own

name to spend approximately $118.20 on a dinner for himself, defendant MARITA

CRAWFORD, and Family Member No. 2, during a personal trip to attend the Belmont Stakes horse race. When submitting the expense report for his expenditure of these Local 98 funds, Individual No. 4 falsely claimed the meal was a "Political Strategy Dinner Meeting with Marita and 1 other."

   e. On or about June 5, 2015, at Matteo's restaurant, in Howard Beach, New York, defendant JOHN DOUGHERTY used a Local 98 American Express credit card in his own name to spend approximately $554.50 on a dinner for himself, defendant MARITA CRAWFORD, Family Member No. 2, and others, during a personal trip to attend the Belmont Stakes horse race. DOUGHERTY falsely reported to Local 98 that the expense for this meal was for a "Political Meeting (NY) 6 people."

   f. On or about June 6, 2015, at Matteo's restaurant, in Howard Beach, New York, defendant JOHN DOUGHERTY used a Local 98 American Express credit card in his own name to spend approximately $472.90 on a dinner for himself, defendant MARITA CRAWFORD, Family Member No. 2, and others, during a personal trip to attend the Belmont Stakes horse race. DOUGHERTY falsely reported to Local 98 that the expense for this meal was for a "Political Meeting (NY) 6 people."

   g. On or about June 10, 2015, at D&J BP AMOCO gas station and G Line Car Wash, both in Philadelphia, Pennsylvania, defendant NIKO RODRIGUEZ used a Local 98 American Express credit card, in the name of defendant JOHN DOUGHERTY, to purchase a total of $28.01 in gasoline and car cleaning services for the vehicle of the Family Member No. 2. DOUGHERTY later falsely reported to Local 98 that the expense for these purchases were for, respectively, "gas – Local 98 vehicle," and "car maintenance – Local 98 vehicle." In similar fashion, DOUGHERTY routinely used Local 98 funds to pay for gas and service for Family

Member No. 2's personal vehicle and made the false representation to Local 98 that the expenditure was for a Local 98 vehicle.

h.      On or about August 29, 2015, at Siro's restaurant, in Saratoga Springs, New York, defendant MARITA CRAWFORD, at the direction of defendant JOHN DOUGHERTY, used a Local 98 American Express credit card, in the name of defendant CRAWFORD, to spend approximately $586.57 on a dinner for herself, Family Member No. 2, and others, during a personal trip to attend horse races. CRAWFORD falsely reported to Local 98 that the expense for this meal was for a "26th Ward & [attorney], Political Dinner."

i.      On or about June 10, 2016, defendant JOHN DOUGHERTY directed defendant NIKO RODRIGUEZ to purchase breakfast sandwiches the following morning for the benefit of DOUGHERTY and others, who were taking a rented limousine to attend the Belmont Stakes horse race in Belmont Park, New York. On or about the following day, at the Fat Joe's restaurant in Philadelphia, Pennsylvania, defendant RODRIGUEZ used a Local 98 American Express credit card, in the name of DOUGHERTY, to purchase approximately $93.05 of sandwiches. RODRIGUEZ delivered these sandwiches to DOUGHERTY and others to eat en route to New York. DOUGHERTY falsely reported to Local 98 that the expense for this meal was for a "Meeting at Hall."

<u>Acts Involving Fraudulent Reimbursements for Personal Expenses</u>

15.      The following overt acts are representative of instances in which defendant JOHN DOUGHERTY received monetary payments of union funds by falsely claiming a right to reimbursement for tips or gratuities paid from his own personal funds at sporting events and concerts that he never attended:

a.      $200 reimbursed on or about July 1, 2015, in relation to a Phillies game that took place on or about June 4, 2015;

b.      $200 reimbursed on or about July 1, 2015, in relation to Phillies games that took place on or about June 6, 2015;

c.      $400 reimbursed on or about July 1, 2015, in relation to a Barry Manilow concert that took place on or about June 13, 2015;

d.      $200 reimbursed on or about July 1, 2015, in relation to a Phillies game that took place on or about June 19, 2015;

e.      $200 reimbursed on or about January 11, 2016, in relation to a Phillies game that took place on or about July 30, 2015;

f.      $200 reimbursed on or about January 11, 2016, in relation to a Phillies game that took place on or about August 4, 2015;

g.      $100 reimbursed on or about January 11, 2016, in relation to a Billy Joel concert that took place on or about August 13, 2015;

h.      $100 reimbursed on or about January 11, 2016, in relation to a Zac Brown Band concert that took place on or about August 15, 2015; and

i.      $100 reimbursed on or about January 11, 2016, in relation to a Philadelphia Flyers game that took place on or about October 24, 2015.

16.      The following overt acts are additional instances in which defendant JOHN DOUGHERTY received monetary payments of union funds by falsely claiming and receiving reimbursement for personal expenses incurred by DOUGHERTY that were not related to Local 98 operations:

a.      On or about February 5, 2014, at the Target store in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY used and authorized the use of a personal American Express credit card, in the name of DOUGHERTY, to purchase approximately $524.33 of merchandise, including children's medicine, mouthwash, shaving cream, deodorant, bath towels, washcloths, bath mats, candy, magazines, a book, CDs, and DVDs. DOUGHERTY submitted a request to Local 98 for reimbursement for this purchase, which he falsely identified as "Supplies," and defendant BRIAN BURROWS approved the request.

b.      On or about February 19, 2015, at Pietro's restaurant in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY purchased dinner for himself and Family Member Nos. 1 and 6, paid the $79.67 bill in cash, and thereafter submitted a request to Local 98 for reimbursement for this purchase, which he falsely identified as a purchase for "Meeting with [labor official] Re: Diversity in the Union Movement."

c.      On or about February 21, 2015, at the Famous Dave's restaurant in Philadelphia, Pennsylvania, Family Member Nos. 1, 2, and 3 had a meal, defendant JOHN DOUGHERTY paid the $75.84 bill in cash, and DOUGHERTY submitted a request to Local 98 for reimbursement for this purchase, which he falsely identified as a purchase for "Meeting with [labor officials] Re: Picket Line."

d.      On or about April 28, 2015, at the Target store in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY used and authorized the use of a personal American Express credit card, in the name of DOUGHERTY, to purchase for the benefit of DOUGHERTY and others approximately $163.45 of merchandise, including cake pans, breakfast bars, tea bags, disposable plates, lip balm, toothpaste, deodorant, hair gel, baby lotion, paper towels, pillows, a blanket, and Clorox cleaning wipes. Defendant NIKO RODRIGUEZ

- 52 -

delivered these items to his own residence. DOUGHERTY submitted a request to Local 98 for reimbursement for this purchase, which he falsely identified as "supplies," and defendant BRIAN BURROWS approved the request.

       e.     On or about April 30, 2015, defendant JOHN DOUGHERTY (JD) and defendant NIKO RODRIGUEZ (NR) engaged in the following conversation, in which DOUGHERTY directed RODRIGUEZ to purchase specific items from the Target store in Philadelphia, Pennsylvania, for the benefit of DOUGHERTY and his family:

> JD:    Hey. When you would you also get down there get like a six pack of paper towels for her –
>
> NR:    OK.
>
> JD:    - and get about and get like about 16 wipes all together, you know them,
>
> NR:    OK.
>
> JD:    -like five in a pack and bring her two packs up.
>
> NR:    You got it.
>
> JD:    Two packs, water, paper towels, and maybe some dog rawhide if you can get some of the bones, little bon- you know bones. Decent size bones.
>
> NR:    OK.

On or about the same day, at the Target store in Philadelphia, Pennsylvania, defendant RODRIGUEZ used a personal American Express credit card, in the name of DOUGHERTY, to purchase approximately $115.68 of merchandise, including beef hide dog bones, honey, baby wipes, paper towels, and bottled water. RODRIGUEZ delivered these items to the residences of DOUGHERTY and Family Member No. 6. DOUGHERTY submitted a request to Local 98 for reimbursement for this purchase, which he falsely identified as "Supplies," and defendant BRIAN BURROWS approved the request.

f.     On or about May 9, 2015, at Marathon Grill restaurant in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY purchased lunch for himself and Family Member No. 1, and paid the $55.08 bill in cash. Thereafter, he submitted a request to Local 98 for reimbursement for this purchase, which he falsely identified as an expense for a "Meeting with [labor official] (98) RE: Local 98 Salting Program."

g.     On or about June 14, 2015, defendant JOHN DOUGHERTY called Family Member No. 6 and invited her to dinner at Famous Dave's restaurant in Philadelphia. After the dinner, he paid the $31.92 bill in cash, and thereafter submitted a request to Local 98 for reimbursement for this purchase, which he falsely identified as a purchase for "Meeting with [electrical contractor] ([company]Electric) Re: EOM Volunteer Project."

h.     On or about July 11, 2015, defendant JOHN DOUGHERTY called Family Member No. 6 and invited her to have lunch with DOUGHERTY and Family Member No. 1 at the Marathon Grill restaurant in Philadelphia. DOUGHERTY paid the $45.36 bill in cash and thereafter submitted a request to Local 98 for reimbursement for this purchase that he falsely identified as an expense for a "Meeting with [Local 98 official] (98) and [Local 98 official] (98) Re: Organizing."

i.     On or about August 24, 2015, defendant JOHN DOUGHERTY called defendant NIKO RODRIGUEZ and directed RODRIGUEZ to travel to For Pete's Sake restaurant in Philadelphia, Pennsylvania, and purchase "two mozzarellas, steak well done, steak salad, chicken fingers, and you know they go to Sigel Street," informing RODRIGUEZ to purchase and deliver meals to the parents of Family Member No. 1. On or about the same day, at For Pete's Sake restaurant, defendant RODRIGUEZ used a personal American Express credit card, in the name of DOUGHERTY, to purchase approximately $64.29 in meals. RODRIGUEZ

- 54 -

then delivered those meals to Family Member No. 1's parents. DOUGHERTY submitted a request to Local 98 for reimbursement for this purchase, that he falsely identified as a purchase for "Meeting Re: Local 98 Business," and defendant BRIAN BURROWS approved the request.

        j.      On or about September 4, 2015, defendant JOHN DOUGHERTY told defendant NIKO RODRIGUEZ to purchase storage boxes and a trash can to be used while transporting DOUGHERTY's personal belongings from the New Jersey shore back to Philadelphia. On or about the same day, at the Home Depot store in Philadelphia, Pennsylvania, defendant RODRIGUEZ and Individual No. 1 used a personal American Express credit card, in the name of DOUGHERTY, to purchase approximately $23.11 of merchandise, including boxes and a 32-gallon trash can. DOUGHERTY submitted a request to Local 98 for reimbursement for this purchase, which he falsely identified as a purchase for "Storage Boxes and Trashcan for Hall," and defendant BRIAN BURROWS approved the request. Also on or about September 4, 2015, DOUGHERTY told RODRIGUEZ and Individual No. 1, while they were transporting DOUGHERTY's personal belongings, "Make sure you guys get a bite to eat, go to the Anchorage or something before you come over my house and give me the receipt, OK?" On or about that day, at the Anchorage Tavern in Somers Point, New Jersey, defendants RODRIGUEZ and Individual No. 1 used a personal American Express credit card, in the name of DOUGHERTY, to purchase a meal, for approximately $61.60. DOUGHERTY thereafter submitted a request to Local 98 for reimbursement for this purchase, which he falsely identified as a purchase for "Meeting Local 351," and defendant BRIAN BURROWS approved the request.

        k.      On or about October 24, 2015, at the Honey Baked Ham Company in Pike Creek, Delaware, Family Member No. 9, at the direction of defendant JOHN DOUGHERTY,

purchased seven hams, paid the $274.20 bill in cash, and at least some of the hams were given to defendant MARITA CRAWFORD and to other friends and family of DOUGHERTY. DOUGHERTY submitted a request to Local 98 for reimbursement for this purchase, which he falsely identified as a purchase for "Donated to St. John Neumann Church."

        l.      On or about November 23, 2015, defendant JOHN DOUGHERTY engaged in communications with Individual No. 5 ("Ind5"), directing the employee to order a lemon cake for the DOUGHERTY family's Thanksgiving dinner:

Ind5:    Del Frisco's has a lemon cake (not a buttercake) that you can buy for $88. They need at least 48 hours notice. The Palm's carrot cake is $88 and they need 48 hours notice as well.

JD:      Order me 1 of each !!

Ind5:    OK. I'm guessing you want to pick them up on Wednesday?

JD:      Yes.

On or about November 25, 2015, at the Del Frisco's restaurant in Philadelphia, Pennsylvania, defendant DOUGHERTY authorized the use of a personal American Express credit card, in the name of DOUGHERTY, to purchase a lemon cake in the amount of $103.68, which DOUGHERTY then delivered to the residence of Family Member No. 3. DOUGHERTY submitted a request to Local 98 for reimbursement for this purchase, which he falsely identified as a purchase for "Meeting Re: State Policy Issues," and defendant BRIAN BURROWS approved the request.

        m.      On or about December 5, 2015, at Bridget Foy's restaurant in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY purchased a meal for himself and Family Member No. 1, and takeout meals for the parents of Family Member No. 1, paid the $104.54 bill in cash, and submitted a request to Local 98 for reimbursement for this purchase,

which he falsely identified as a business expense for a "Meeting with [union official], re: PET Charter School, Politics."

          n.        On or about December 14, 2015, at Pietro's restaurant in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY purchased dinner for himself and Family Member No. 1, and takeout food for Family Member No. 8, paid the $81 bill in cash, and thereafter submitted a request to Local 98 for reimbursement for this purchase, which he falsely identified as a purchase for "Food for Toys and Turkeys Volunteers."

          o.        On or about December 23, 2015, at the Honey Baked Ham Company in Pike Creek, Delaware, Family Member No. 9, at the direction of defendant JOHN DOUGHERTY, purchased seven hams and various sides and condiments and paid the $309.57 bill in cash. On or about the same day, DOUGHERTY told Family Member No. 9, "Drop one off at [Family Member No. 1's] mom's, one off at my house, two off at your house, OK, call [Individual No. 1] and give him two." DOUGHERTY submitted a reimbursement request to Local 98 for this purchase that he falsely identified as a purchase for "Toys and Turkeys (for food baskets)."

          p.        On or about December 24, 2015, at the Target store in Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY used and authorized the use of a personal American Express credit card, in the name of DOUGHERTY, to purchase approximately $370.20 of merchandise, including dog food, mouthwash, mascara, nail polish, beauty products, a gift card, a Disney item, shirt, shorts, and leggings. DOUGHERTY submitted a reimbursement request to Local 98 for this purchase that he falsely identified as a charitable purchase for "Toys & Turkeys." Defendant BRIAN BURROWS approved the request.

q.      On or about March 4, 2016, at the Bridgewater Pub restaurant in

Philadelphia, Pennsylvania, defendant JOHN DOUGHERTY purchased dinner for himself and

Family Member No. 1, paid the $34.56 bill in cash, and submitted a request to Local 98 for

reimbursement for this purchase. He falsely identified this purchase as a "Meeting with [out-of-

state politician] and [Pennsylvania politician] Re: Governor exploring Presidential Run."

r.      On or about June 24, 2016, defendant JOHN DOUGHERTY advised

defendant MARITA CRAWFORD that he would purchase food at Francoluigi's restaurant in

Philadelphia, Pennsylvania, for a birthday party for Individual No. 1, which was to be held the

following day at CRAWFORD's residence. DOUGHERTY purchased the food and paid the

$424.76 bill in cash, and thereafter submitted a request to Local 98 for reimbursement for this

purchase, which he falsely identified as "Reorganization of the First Ward."

Acts Involving Theft of Local 98 Petty Cash and Funds
for Personal Purposes and to Purchase Concert and Sporting Event Tickets

17.     The following overt acts are representative of expenditures in which defendant

JOHN DOUGHERTY used and approved the use of Local 98 funds to purchase concert and

sporting event tickets for family members, friends, and favored associates without any legitimate

Local 98 business-related justification:

a.      On or about June 4, 2015, eight tickets were purchased for $1,200 for

Taylor Swift concerts, and charged to the IBEW Local 98 Job Recovery American Express

account, at least four of which were for the minor daughter of a close friend of defendant

MARITA CRAWFORD.

b.      On or about June 16, 2015, four luxury suite tickets were purchased for

$600 for a Bette Midler concert, and charged to the IBEW Local 98 Job Recovery American

Express account, provided to a family member of defendant MARITA CRAWFORD.

c.      On or about July 11, 2015, two tickets were purchased for $260 for a Kenny Chesney concert, and charged to the IBEW Local 98 Job Recovery American Express account, provided to Family Member No. 5.

d.      On or about August 4, 2015, ten tickets were purchased for $770 for a baseball game between the Philadelphia Phillies and the Los Angeles Dodgers, and charged to the IBEW Local 98 Job Recovery American Express account, provided to Family Member No. 10 for Family Member No. 2 and the family of Family Member No. 10 to attend the game. Local 98 also paid additional funds for concessions purchased at this game on behalf of Family Member No. 2 and the family of Family Member No. 10. Defendant JOHN DOUGHERTY told Family Member No. 10, "You could have season tickets as long as you take care of [Family Member No. 2]."

e.      On or about August 13, 2015, defendant MARITA CRAWFORD invited at least six family members and friends to attend a Billy Joel concert at Lincoln Financial Field, in Philadelphia, Pennsylvania, using tickets charged to the IBEW Local 98 Job Recovery American Express account, with CRAWFORD telling one such friend that the tickets were in a luxury suite because "you know the way we roll."

f.      On or about September 20, 2015, Individual No. 4, a Local 98 employee, told defendant JOHN DOUGHERTY that a luxury suite at the Philadelphia Eagles football game, paid for by Local 98, should be called "Marita's box," because many personal friends of defendant MARITA CRAWFORD were in attendance. DOUGHERTY then scolded Individual No. 4 and told him he could lose his job with Local 98 for making such comments.

g.      On or about January 20, 2016, two tickets were purchased for $230 for a performance of "Beautiful – The Carole King Musical," charged to the IBEW Local 98 Job Recovery American Express account, and provided to Family Member Nos. 1 and 3.

h.      On or about January 26, 2016, a luxury suite was purchased for $4,500 for a Philadelphia 76ers game against the Golden State Warriors, and charged to the IBEW Local 98 Job Recovery American Express account. On or about January 29, 2016, defendant JOHN DOUGHERTY arranged for at least three of the tickets to this suite to be given to Family Member No. 5 and another quantity of these tickets was given to defendant BRIAN FIOCCA.

i.      On or about January 27, 2016, six tickets were purchased for $2,100 for a Bruce Springsteen concert, and charged to the IBEW Local 98 Job Recovery American Express account. Defendant JOHN DOUGHERTY offered two of these tickets to a manager at an automotive dealership in Philadelphia who was assisting DOUGHERTY in arranging for the lease of a vehicle to be used by Family Member No. 2.

j.      On or about February 10, 2016, eight tickets were purchased for $96 for a basketball game between Temple University and the University of Connecticut, charged to the IBEW Local 98 Job Recovery American Express account, and provided to Family Member No. 5.

k.      On or about April 1, 2016, two tickets to a Rihanna concert were acquired by redeeming a credit for luxury suite seats obtained by Local 98 pursuant to an events package that Local 98 had purchased from the Wells Fargo Center; and the two tickets were provided to Family Member No. 8.

l.       On or about May 6, 2016, eight tickets were purchased for $1,192 for a Justin Bieber concert, charged to the IBEW Local 98 Job Recovery American Express account, and provided by defendant JOHN DOUGHERTY to Family Member No. 8.

m.       On May 23, 2016, defendant JOHN DOUGHERTY removed $1,000 of Local 98 money from a Local 98 petty cash fund and transferred it into his own personal cash fund.

<u>Acts Involving the Use of Local 98 Employees for Personal Tasks and Errands</u>

18.    The following overt acts are representative of instances in which defendant JOHN DOUGHERTY regularly directed persons employed by Local 98 or the Apprentice Training Fund, including defendants NIKO RODRIGUEZ, BRIAN FIOCCA, and Individual No. 1, to provide personal services to DOUGHERTY and his family members and associates. These services occurred during regular business hours, and the employees were compensated by Local 98 or the Apprentice Training Fund for tasks which were entirely unrelated to the business of Local 98 and the Apprentice Training Fund. Sometimes these tasks were performed with equipment and vehicles belonging to Local 98. The examples include:

a.       On or about May 4, 2015, defendant JOHN DOUGHERTY directed defendant NIKO RODRIGUEZ and Individual No. 7, another Local 98 employee, to use Local 98 equipment to power wash the sidewalks in front of the residences of DOUGHERTY and Family Member No. 3, with DOUGHERTY instructing RODRIGUEZ, "Make sure you do it like really good like the inside of them walls, you know what I mean like I told you. Just spray it up really good, the pavements really good. . . . I just want it to be scrubbed up and fresh. Then you get a ladder, all the windows and around the doors and everything."

- 61 -

b.      On or about May 13, 2015, at the direction of defendant JOHN

DOUGHERTY, Individual No. 1 and other employees of Local 98 delivered patio furniture to

the residence of defendant MARITA CRAWFORD, and cleaned and raked the exterior of

CRAWFORD's residence, with DOUGHERTY engaging in the following conversation with

Individual No. 1 ("Ind1"):

Ind1:   I think we're gonna go to Southwest to put more lawn signs up.

JD:     Hey, before you do that, go pick up your mother's furniture, I forgot to tell you
        that today. Grab that today and also whatever junk you got in there, whatever you
        need to move out of that backyard if you got any trash get rid of it. Do what you
        gotta do, OK?

Ind1:   OK.

JD:     OK, take care yeah pick her stuff up, bring that home, clean everything off. While
        ya got everybody there grab a rake, do what you gotta do. Just rake up the back
        stuff, throw it in trash bag while you got the guys right there. Sweep with the
        front, do what you gotta do.

c.      On or about June 16, 2015, at the direction of defendant JOHN

DOUGHERTY, Individual No. 1 and Family Member No. 7 cleaned out the garage at the

residence of defendant MARITA CRAWFORD, with DOUGHERTY telling CRAWFORD,

"What I need us to do is focus in on our stuff. I need you to take care of yourself. That's all I

care about, OK, number one. Then I want you take care of them dogs. I'm sending the kids over

today and they know what to do."

d.      On or about June 24, 2015, defendant JOHN DOUGHERTY directed

Individual No. 1 to "get the truck" and clean tree debris and trash from the sidewalk in front of

DOUGHERTY's residence.

e.       On or about June 30, 2015, defendant JOHN DOUGHERTY directed Individual No. 1 and Family Member No. 7 to clean and gas the vehicle belonging to Family Member No. 2.

f.       On or about July 23, 2015, Family Member No. 1 sent a text to defendant JOHN DOUGHERTY stating, "Yoga at 12:00 need a ride at 1:15 please," and DOUGHERTY then texted defendant NIKO RODRIGUEZ, "1pm [Family Member No. 1] needs a pick up ,,,." On or about the same day, defendant RODRIGUEZ picked up Family Member No. 1 from DOUGHERTY's residence and drove Family Member NO. 1 to various personal appointments.

g.       On or about August 23, 2015, defendant BRIAN BURROWS advised defendant ROBERT HENON that "the kids" who worked for defendant JOHN DOUGHERTY did not do any work for Local 98, with BURROWS stating, "[DOUGHERTY] has got his nephew [defendant BRIAN FIOCCA] and NIKO [RODRIGUEZ] and [Individual No. 1] and he thinks them kids are the -. Them kids, it's all smoke and mirrors with them kids … That deadbeat, [Individual No. 1], he's just a stone j******, that's all that kid is. … I don't know what they do all day."

h.       On or about August 28, 2015, defendant NIKO RODRIGUEZ and other Local 98 employees washed the sidewalks in front of the residences of defendant JOHN DOUGHERTY and Family Member No. 3. While there, RODRIGUEZ and DOUGHERTY engaged in the following text message exchange:

NR:  Should I water the tomatoes while I'm here?

JD:  Yes !!!

i.       On or about September 2, 2015, defendant JOHN DOUGHERTY was asked by Family Member No. 1, "Do you think maybe you can tell Niko to tell [Individual No.

1] to come for the trash?  It's getting bigger and bigger. …  Ever since he took over, he's not as conscientious as Niko and them were." DOUGHERTY then directed Individual No. 1, "Make sure you grab the trash out of front, for me," causing Individual No. 1 to remove the trash from the exterior of DOUGHERTY's residence and check the nearby drains to make sure they were clear of obstructions.

    j.  On or about December 9, 2015, at the direction of defendant JOHN DOUGHERTY, Individual No. 1 and another Local 98 employee picked up furniture, including a futon, and moved it into the residence of Family Member No. 3. Individual No. 1 then asked DOUGHERTY whether he should assemble the futon the following day "after work," and DOUGHERTY told him to "do it during" work.

    k.  On or about January 2, 2016, defendant BRIAN BURROWS asked defendant JOHN DOUGHERTY, "If we got one of the kids around or something that got a truck, we got some trash on the side of bar." On or about the same day, DOUGHERTY directed Individual No. 1 to clean the trash outside of Doc's Union Pub.

    l.  On or about January 5, 2016, defendant JOHN DOUGHERTY directed defendant BRIAN FIOCCA to leave a Local 98 union picket line and travel to the residence of Family Member No. 2 in Somers Point, New Jersey, stating, "I want you to come down, pick up [Family Member No. 2's] keys, they're down the shore. Load your car up, take your time, check the shore, check his house out real good, get the mail, make sure there's nothing leaking anywhere. Look at the lawn, look around the lawn, OK, then come back up."

    m.  On or about February 24, 2016, defendant JOHN DOUGHERTY told Family Member No. 1, "If you need a hand, I got kids," reminding Family Member No. 1 that

DOUGHERTY could send Local 98 employees to help Family Member No. 1 bring laundry to the laundromat while their drying machine was being repaired.

n.      On or about April 2, 2016, defendant JOHN DOUGHERTY and Individual No. 1 (Ind1) engaged in the following conversation,

Ind1:   I didn't realize there was a couch on [Family Member No. 3's] step.

JD:     Yeah. Just see if you can get that and toss that too, OK?

Ind1:   Alright I'm gonna have to figure out where I'm going to toss it, alright.

JD:     Yeah, just put it at 3rd and Jackson. Put it up against the fence if we can't get in.

On or about the same day, Individual No. 1 used a Local 98 vehicle and removed an old couch put out for trash outside the residence of Family Member No. 3 and placed it for pickup outside the Local 98 Apprentice building.

o.      On or about April 12, 2016, defendant JOHN DOUGHERTY and defendant BRIAN FIOCCA engaged in the following text message exchange:

BF:     Took [Family Member No. 2] up and back.. All good!! Can I use truck + [Individual No. 1] so I can grab crib and move futon in my house??

JD:     Yes.

On or about the same day, defendant BRIAN FIOCCA and Individual No. 1 used a Local 98 vehicle and helped FIOCCA move furniture into his residence.

p.      On or about August 23, 2016, at the direction of defendant JOHN DOUGHERTY, defendant NIKO RODRIGUEZ drove to DOUGHERTY's rental house at the New Jersey shore to disconnect televisions and to bring back samples of pool water for DOUGHERTY.

<u>Acts Involving Payments to Non-Employees and No-Show
Employees, and Overpayment of Favored Local 98 Employees</u>

19.     The following overt acts represent instances in which defendant JOHN

DOUGHERTY authorized the expenditure of Local 98 funds to pay no-show employees, to

overpay favored Local 98 employees, or make payments to non-employees of Local 98 whom

defendant DOUGHERTY favored for personal or political reasons unrelated to the business

interests of Local 98:

a.     During the summers of 2013, 2014, 2015, and 2016, at the direction of

defendant JOHN DOUGHERTY, Local 98 paid Family Member No. 7 for hours allegedly

worked as a summer employee of Local 98. Payments were made for weeks during which

Family Member No. 7 was in fact on vacation, attending school full-time, or otherwise not

engaged in work for Local 98. These payments were made as follows:

(1)     $800, on or about August 15, 2013;

(2)     $800, on or about June 26, 2014;

(3)     $800, on or about August 21, 2014;

(4)     $800, on or about September 4, 2014;

(5)     $800, on or about July 2, 2015;

(6)     $800, on or about August 27, 2015;

(7)     $800, on or about September 3, 2015;

(8)     $800, on or about September 10, 2015;

(9)     $800, on or about September 17, 2015;

(10)    $800, on or about July 14, 2016;

(11)    $800, on or about August 11, 2016; and

(12)    $800, on or about August 18, 2016.

b.      On or about September 3 and September 10, 2013, at the direction of defendant JOHN DOUGHERTY, Family Member No. 8 was paid $1,200 by Local 98 for work performed as a summer employee of Local 98, during the weeks of August 26-30, 2013, and September 2-6, 2013. Family Member No. 8 had already returned to college as a full-time student during those time periods and did not work the hours for which Family Member No. 8 was paid.

c.      On or about March 14, 2015, defendant BRIAN BURROWS, at the direction of defendant JOHN DOUGHERTY, authorized the payment of $3,995, from the Local 98 Job Recovery Fund, to be used for the travel and housing of Family Member No. 8 and a classmate to attend a basketball tournament in Costa Rica. Thereafter, DOUGHERTY stated, "[Family Member No. 8] gets the chance to play in Costa Rica. [Family Member No. 8]'s got two other kids. . . [and] needs you know $2,300. Well who they gonna go to?  They're gonna go to me." In addition, on or about July 1 and July 8, 2015, at the direction of DOUGHERTY, Family Member No. 8 was paid $1,200 by Local 98 for working as a summer employee of Local 98, during the weeks Family Member No. 8 was at the basketball tournament in Costa Rica and did not work.

d.      On or about September 9, 2015, at the direction of defendant JOHN DOUGHERTY, Family Member No. 8 was paid $600 by Local 98 for work performed as a summer employee of Local 98, although Family Member No. 8 did not work the hours for which Family Member No. 8 was paid.

e.      During 2014, 2015, and 2016, at the direction of defendant JOHN DOUGHERTY, Local 98 paid Individual No. 8 double pay or other payments for work Individual No. 8 did not perform. These payments were made as follows:

(1)     $1,000, on or about October 16, 2014;

(2)     $1,000, on or about April 30, 2015;

(3)     $1,000, on or about May 7, 2015;

(4)     $1,000, on or about May 21, 2015;

(5)     $1,000, on or about May 28, 2015;

(6)     $1,000, on or about July 2, 2015;

(7)     $1,000, on or about August 20, 2015; and

(8)     $1,000, on or about December 31, 2015.

f.      On or about May 19, 2016, upon authorizing the payment of an additional $1,500 to Individual No. 8, defendant JOHN DOUGHERTY told George Peltz (charged elsewhere) he had done so because Individual No. 8 was purchasing a new house. DOUGHERTY stated, "I paid [Individual No. 8] like $1,700 bucks or something over and above, like, like, with, taxes out of it, I figured [Individual No. 8] could use it to buy something for the house, you know. . . . What I try to do is, like keep it within reason so it don't look too crazy, you know."

g.      From on or about September 10, 2015, through December 24, 2015, at the direction of defendant JOHN DOUGHERTY, Local 98 paid Individual No. 8 $25 per hour for working 40 hours each week as a business office employee of Local 98, although Individual No. 8 she attended college in Reading, Pennsylvania at least two days per week and did not work more than 24 hours each week for Local 98 during this period.

h.      On or about February 25, 2015, and July 24, 2015, defendant BRIAN BURROWS, at the direction of defendant JOHN DOUGHERTY, authorized the issuance of two Local 98 checks, for $3,200 each, payable to Children's International Summer Villages, an

organization that provides educational programs for students in the United States and abroad.
The checks, totaling $6,400, were paid for the children of Political Official No. 1 to travel
internationally as part of a summer internship program. DOUGHERTY authorized these
payments while DOUGHERTY was seeking the endorsement of this official for candidates
running for Mayor of Philadelphia and Justice of the Pennsylvania Supreme Court.
DOUGHERTY later directed a Local 98 press spokesman to falsely claim that these payments
were "scholarships," provided after "several levels of internal scrutiny."

            i.      On or about September 21, 2015, defendant BRIAN BURROWS, at the
direction of defendant JOHN DOUGHERTY, authorized the payment of $7,500 from the Local
98 General Fund to Family Member No. 9 for "consulting" work, when DOUGHERTY knew
Family Member No. 9 had not earned that payment. DOUGHERTY initiated the payment after
Family Member No. 9 told DOUGHERTY that Family Member No. 9 needed money for a
recent home purchase, to which DOUGHERTY responded, "When's the last time I let any of
you flounder?"

            j.      On or about January 8, 2016, defendant JOHN DOUGHERTY told
defendant MARITA CRAWFORD, "[Individual No. 1] is a great kid. That's why I told him, I
told him he's got an extra week. I didn't give him f-----g $20 here and $50 here. I said I'm going
to give you an extra week's pay. You get to clear $600 or $700 or whatever he clears, and you
get to stick it in your pocket. So, if you feel like buying sunglasses, you feel like keeping your
girl out, buying cigar, take your mom to dinner, you have it. It's money you didn't have."

            k.      On or about May 16, 2016, defendant JOHN DOUGHERTY directed the
payment from Local 98 of $5,000, as a "consulting payment," to Individual No. 3 in exchange

for Individual No. 3 accompanying defendant MARITA CRAWFORD on a personal trip to Florida.

l.       On or about June 9, 2016, defendant JOHN DOUGHERTY authorized payment of $1,500 from Local 98 to Individual No. 9 in exchange for construction work that Individual No. 9 performed at the residence of defendant MARITA CRAWFORD. DOUGHERTY falsely described this as a payment to Individual No. 9 for "Gratis Work for 98."

All in violation of Title 18, United States Code, Section 371.

**COUNTS TWO TO FORTY-ONE**
**(Embezzlement and Theft of Labor Union Assets)**
**29 U.S.C. § 501(c)**

**THE GRAND JURY FURTHER CHARGES THAT**:

1.     The allegations in Paragraphs 1 through 41, 43 through 55, and Overt Acts 1 through 19 (including all subparts) of Count One of this Indictment are incorporated here.

2.     On or about the dates listed in the chart below, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, the defendants listed below, while employed by Local 98, directly and indirectly, did embezzle, steal, and unlawfully and willfully abstract and convert to their own use and the use of others, and did aid and abet such embezzlement, theft, abstraction, and conversion of the moneys, funds, securities, property, and other assets of Local 98 in the approximate amounts as described below:

| Count | Defendants(s) | Date | Amount and Use of Stolen Funds |
|---|---|---|---|
| 2 | **JOHN DOUGHERTY, BRIAN BURROWS, ANTHONY MASSA** | 03/25/2014 | $1,529 for construction and repair work at residence of Family Member No. 5 |
| 3 | **JOHN DOUGHERTY, BRIAN BURROWS, ANTHONY MASSA** | 03/28/2014 | $3,350 for construction and repair work at residence of Family Member No. 3 |
| 4 | **BRIAN BURROWS, MICHAEL NEILL, ANTHONY MASSA** | 03/28/2014 | $7,288 for construction and repair work at the Pennsport Building |
| 5 | **JOHN DOUGHERTY** | 10/28/2014 | $284.62 for purchases at Target |
| 6 | **JOHN DOUGHERTY, NIKO RODRIGUEZ** | 11/28/2014 | $135.62 for purchases at Lowe's |
| 7 | **JOHN DOUGHERTY, NIKO RODRIGUEZ** | 12/23/2014 | $409.32 for purchases at IKEA |
| 8 | **JOHN DOUGHERTY, BRIAN FIOCCA** | 02/05/2015 | $470 for purchase at C&D Appliance Store |
| 9 | **JOHN DOUGHERTY, BRIAN FIOCCA** | 02/06/2015 | $572.37 for purchases at IKEA |
| 10 | **JOHN DOUGHERTY, BRIAN FIOCCA** | 02/06/2015 | $549.27 for purchases at Target |

- 71 -

| Count | Defendants(s) | Date | Amount and Use of Stolen Funds |
|-------|---------------|------|-------------------------------|
| 11 | **JOHN DOUGHERTY** | 04/30/2015 | $115.68 for purchases at Target |
| 12 | **JOHN DOUGHERTY, MARITA CRAWFORD** | 05/02/2015 | $1,378.88 for dinner at Old Homestead restaurant |
| 13 | **JOHN DOUGHERTY, NIKO RODRIGUEZ** | 05/20/2015 | $207.67 for purchases at Target |
| 14 | **MARITA CRAWFORD** | 06/04/2015 | $335.13 for hotel in New York City |
| 15 | **JOHN DOUGHERTY** | 06/06/2015 | $472.90 for dinner at Matteo's restaurant |
| 16 | **JOHN DOUGHERTY, NIKO RODRIGUEZ** | 06/15/2015 | $67.69 for purchases at Target |
| 17 | **JOHN DOUGHERTY, NIKO RODRIGUEZ** | 07/06/2015 | $113.51 for purchases at Target |
| 18 | **JOHN DOUGHERTY** | 07/21/2015 | $92.28 for purchases at Lowe's |
| 19 | **JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, ANTHONY MASSA** | 08/14/2015 | $6,692 for construction and repair work at Doc's Union Pub |
| 20 | **BRIAN BURROWS, MICHAEL NEILL, ANTHONY MASSA** | 08/14/2015 | $2,862 for construction and repair work at the Pennsport Building |
| 21 | **JOHN DOUGHERTY, MARITA CRAWFORD** | 08/29/2015 | $586.57 for dinner at Siro's restaurant |
| 22 | **JOHN DOUGHERTY** | 09/04/2015 | $61.60 for meal at Anchorage Tavern |
| 23 | **JOHN DOUGHERTY, BRIAN BURROWS, ANTHONY MASSA** | 09/11/2015 | $4,990 for construction and repair at DOUGHERTY's residence |
| 24 | **JOHN DOUGHERTY, BRIAN BURROWS, ANTHONY MASSA** | 09/11/2015 | $4,316 for construction and repair work at Family Member No. 2's residence |
| 25 | **JOHN DOUGHERTY** | 10/06/2015 | $106.19 for purchases at Target |
| 26 | **JOHN DOUGHERTY, BRIAN FIOCCA** | 10/31/2015 | $248.15 for purchases at Target |
| 27 | **JOHN DOUGHERTY** | 11/02/2015 | $406.08 for takeout meals at The Palm restaurant |
| 28 | **JOHN DOUGHERTY, NIKO RODRIGUEZ** | 11/05/2015 | $145.74 for purchases at Target |
| 29 | **JOHN DOUGHERTY** | 11/19/2015 | $386.64 for takeout meals at The Palm restaurant |

| Count | Defendants(s) | Date | Amount and Use of Stolen Funds |
|---|---|---|---|
| 30 | **JOHN DOUGHERTY** | 11/25/2015 | $103.68 for purchase at Del Frisco's restaurant |
| 31 | **JOHN DOUGHERTY, BRIAN FIOCCA** | 11/27/2015 | $205.04 for purchases at Target |
| 32 | **JOHN DOUGHERTY** | 12/23/2015 | $309.57 for purchases at Honey Baked Ham Company |
| 33 | **BRIAN BURROWS, ANTHONY MASSA** | 01/05/2016 | $1,021 for construction and repair work at BURROWS's residence |
| 34 | **JOHN DOUGHERTY, BRIAN BURROWS, ANTHONY MASSA** | 01/22/2016 | $4,508 for construction and repair work at DOUGHERTY's residence |
| 35 | **JOHN DOUGHERTY, BRIAN BURROWS, MICHAEL NEILL, ANTHONY MASSA** | 01/22/2016 | $986 for construction and repair work at Doc's Union Pub |
| 36 | **JOHN DOUGHERTY, BRIAN BURROWS, ANTHONY MASSA** | 01/22/2016 | $758 for construction and repair work at Family Member No. 2's residence |
| 37 | **BRIAN BURROWS, ANTHONY MASSA** | 02/05/2016 | $5,666 for construction and repair work at BURROWS's residence |
| 38 | **JOHN DOUGHERTY** | 04/01/2016 | $216.36 for dinner at Butcher and Singer restaurant |
| 39 | **JOHN DOUGHERTY, BRIAN BURROWS, ANTHONY MASSA** | 05/11/2016 | $26,316 for construction and repair work at DOUGHERTY's residence |
| 40 | **BRIAN BURROWS, ANTHONY MASSA** | 05/11/2016 | $2,208 for construction and repair work at BURROWS's residence |
| 41 | **JOHN DOUGHERTY, MARITA CRAWFORD** | 06/24/2016 | $424.76 for food at Francoluigi's restaurant for birthday party for Individual No. 1 |

All in violation of Title 29, United States Code, Section 501(c), and Title 18 United States Code, Section 2.

## COUNT FORTY-TWO
### (Theft from Employee Benefit Plan)
### 18 U.S.C. § 664

**THE GRAND JURY FURTHER CHARGES THAT:**

1.    The allegations in Paragraphs 1 through 41, 43 through 55, and Overt Acts 1 through 19 (including all subparts) of Count One of this Indictment are incorporated here.

2.    On or about June 30, 2015, in Philadelphia, in the Eastern District of Pennsylvania, defendants

### MICHAEL NEILL and
### ANTHONY MASSA

did embezzle, steal, and unlawfully and willfully abstract and convert to their own use the moneys, funds, securities, property, and other assets of the Apprentice Training Fund, that is, NEILL expended money from the Apprentice Training Fund for roof repairs and other construction work performed at NEILL's residence by Massa Construction and which was falsely described in billings as having been performed on properties owned by Local 98 and the Apprentice Training Fund.

All in violation of Title 18, United States Code, Sections 664 and 2.

## COUNTS FORTY-THREE TO SIXTY-SIX
### (Wire Fraud Thefts from Local 98)
### 18 U.S.C. § 1343

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 41, 43 through 55, and Overt Acts 1 through 19 (including all subparts) of Count One of this Indictment are incorporated here.

2.      American Express is a financial services company operating in interstate commerce that offers financial services for individuals and businesses worldwide, including an American Express credit card that allows the holder to purchase goods and services based on the holder's promise to pay for them. Purchases made in Pennsylvania using American Express credit cards cause electronic data, signals, and sounds to be transmitted, by means of wire communications in interstate commerce, from the location where the card was used, to servers in Florida, Arizona, and India, for purposes of processing payment to the vendors and generating a bill for the account holder of the credit card.

### The Scheme

3.      From in or about April 2010 through August 2016, in Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOHN DOUGHERTY,
MARITA CRAWFORD,
NIKO RODRIGUEZ, and
BRIAN FIOCCA**

devised and intended to devise or willfully participated in a scheme to obtain money and property from Local 98 by means of false and fraudulent pretenses, representations, and promises.

**Manner and Means**

It was part of the scheme that:

4.        The defendants used the American Express credit cards issued to officers and employees of Local 98 to pay for personal goods, services, food, meals, travel, and transportation, contrary to the constitution, bylaws, and rules of Local 98. Those provisions restricted the use of the cards to union-related business.

5.        The defendants used a personal American Express card issued to defendant JOHN DOUGHERTY to pay for personal goods, services, food, meals, travel, and transportation. Defendant DOUGHERTY thereafter requested and received reimbursement for these personal expenditures from Local 98, contrary to the constitution, bylaws, and rules of Local 98.

6.        The defendants falsely represented or caused others to falsely represent that these personal purchases of goods, services, food, meals, travel, and transportation were business-related expenditures of Local 98.

7.        On or about each of the dates set forth below, at Philadelphia, Pennsylvania, in the Eastern District of Pennsylvania, and elsewhere, the defendants listed below, for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted signals and sounds by means of wire communication in interstate commerce, from the merchants identified in the counts below to American Express servers described above, in order to complete the purchases identified in each count:

| Count | Defendant(s) | Date | Amount and Use of Stolen Funds |
|-------|-------------|------|-------------------------------|
| 43 | **JOHN DOUGHERTY** | 10/28/2014 | $284.62 for purchases at Target on a Local 98 American Express credit card |
| 44 | **JOHN DOUGHERTY, NIKO RODRIGUEZ** | 11/28/2014 | $135.62 for purchases at Lowe's on a Local 98 American Express credit card |
| 45 | **JOHN DOUGHERTY, NIKO RODRIGUEZ** | 12/23/2014 | $409.32 for purchases at IKEA on a Local 98 American Express credit card |

| Count | Defendant(s) | Date | Amount and Use of Stolen Funds |
|---|---|---|---|
| 46 | **JOHN DOUGHERTY, BRIAN FIOCCA** | 02/05/2015 | $470 for purchase at C&D appliance store on a Local 98 American Express credit card |
| 47 | **JOHN DOUGHERTY, BRIAN FIOCCA** | 02/06/2015 | $572.37 for purchases at IKEA on a Local 98 American Express credit card |
| 48 | **JOHN DOUGHERTY, BRIAN FIOCCA** | 02/06/2015 | $549.27 for purchases at Target on a Local 98 American Express credit card |
| 49 | **JOHN DOUGHERTY** | 04/30/2015 | $115.68 for purchases at Target on an American Express credit card in DOUGHERTY's name |
| 50 | **JOHN DOUGHERTY, MARITA CRAWFORD** | 05/02/2015 | $1,378.88 for dinner at Old Homestead restaurant on a Local 98 American Express credit card |
| 51 | **JOHN DOUGHERTY, NIKO RODRIGUEZ** | 05/20/2015 | $207.67 for purchases at Target on a Local 98 American Express credit card |
| 52 | **MARITA CRAWFORD** | 06/04/2015 | $335.13 for hotel in New York City on a Local 98 American Express credit card |
| 53 | **JOHN DOUGHERTY** | 06/06/2015 | $472.90 for dinner at Matteo's restaurant on a Local 98 American Express credit card |
| 54 | **JOHN DOUGHERTY, NIKO RODRIGUEZ** | 06/15/2015 | $67.69 for purchases at Target on a Local 98 American Express credit card |
| 55 | **JOHN DOUGHERTY, NIKO RODRIGUEZ** | 07/06/2015 | $113.51 for purchases at Target on a Local 98 American Express credit card |
| 56 | **JOHN DOUGHERTY** | 07/21/2015 | $92.28 for purchases at Lowe's on a Local 98 American Express credit card |
| 57 | **JOHN DOUGHERTY, MARITA CRAWFORD** | 08/29/2015 | $586.57 for dinner at Siro's restaurant on a Local 98 American Express credit card |
| 58 | **JOHN DOUGHERTY** | 09/04/2015 | $61.60 for meal at Anchorage Tavern on an American Express credit card in DOUGHERTY's name |
| 59 | **JOHN DOUGHERTY** | 10/06/2015 | $106.19 for purchases at Target on a Local 98 American Express credit card |
| 60 | **JOHN DOUGHERTY, BRIAN FIOCCA** | 10/31/2015 | $248.15 for purchases at Target on a Local 98 American Express credit card |
| 61 | **JOHN DOUGHERTY** | 11/02/2015 | $406.08 for takeout meals at The Palm restaurant on a Local 98 American Express credit card |
| 62 | **JOHN DOUGHERTY, NIKO RODRIGUEZ** | 11/05/2015 | $145.74 for purchases at Target on a Local 98 American Express credit card |
| 63 | **JOHN DOUGHERTY** | 11/19/2015 | $386.64 for takeout meals at The Palm restaurant on a Local 98 American Express credit card |

| Count | Defendant(s) | Date | Amount and Use of Stolen Funds |
|---|---|---|---|
| 64 | **JOHN DOUGHERTY** | 11/25/2015 | $103.68 for meal at Del Frisco's restaurant on an American Express credit card in DOUGHERTY's name |
| 65 | **JOHN DOUGHERTY, BRIAN FIOCCA** | 11/27/2015 | $205.04 for purchases at Target on a Local 98 American Express credit card |
| 66 | **JOHN DOUGHERTY** | 04/01/2016 | $216.36 for dinner at Butcher and Singer restaurant on a Local 98 American Express credit card |

All in violation of Title 18, United States Code, Sections 1343 and 1349, and 2.

**COUNTS SIXTY-SEVEN AND SIXTY-EIGHT**
**(Wire Fraud Thefts from Political Action Committee)**
**18 U.S.C. § 1343**

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this Indictment:

1.     Paragraphs 1 through 41, 43 through 55, and Overt Acts 1 through 19 (including all subparts) of Count One of this Indictment are incorporated here.

2.     For election purposes, the City of Philadelphia was divided into voting divisions (also called precincts), and voting divisions were grouped into wards. In each division within a ward, members of the Democratic and Republican parties elected committeepersons, who in turn elected the leader of the party in that ward.

3.     New Gen1 was a political action committee ("PAC") for South Philadelphia's First Ward which was funded by contributions from individuals and other PACs to support political candidates and other PACs. IBEW Local 98's Committee on Political Education ("COPE") PAC and the IBEW COPE (Washington DC) were primary sources of the funds of the New Gen1 PAC. Under state law and the rules of the PAC, the funds of the New Gen1 PAC could be used only for the purpose of influencing the outcome of a nomination contest or election, and not for any personal purpose.

4.     Defendant JOHN DOUGHERTY was the leader of the Democratic Party in the First Ward until approximately December 2015.

5.     Individual No. 10 was defendant JOHN DOUGHERTY's chosen successor as leader of South Philadelphia's First Ward political subdivision, and occupied that position beginning in December 2015.

6.     During the time period at issue in this Indictment, defendant JOHN DOUGHERTY used his control over the party in the First Ward to spend New Gen1 funds on personal purchases for himself and others.

7.     Defendant MARITA CRAWFORD was one of the signatories with authority to spend New Gen1 funds. CRAWFORD's home address was listed as the address of New Gen1 in the PAC's filings with the Commonwealth of Pennsylvania. CRAWFORD spent New Gen1 funds on personal purchases for herself and others.

8.     TD Bank is a financial services company operating in interstate commerce that offers financial services for individuals and businesses worldwide, including a TD Bank debit card that allows the holder to purchase goods and services drawing on funds held in an account at TD Bank. Purchases made in Pennsylvania using TD Bank debit cards cause electronic data, signals, and sounds to be transmitted by means of wire communications in interstate commerce, from the location where the card was used, to a processor in Florida, and then to a server in New Jersey, Maine, or North Carolina, for purposes of processing payment to the vendors and generating a debit from the account holder of the debit card.

## The Scheme

9.     From in or about December 2015 through July 2016, defendants

**JOHN DOUGHERTY and
MARITA CRAWFORD**

devised and intended to devise, or willfully participated in, a scheme to defraud and to obtain money and property from a political action committee by means of false and fraudulent pretenses, representations, and promises.

**Manner and Means**

It was part of the scheme that:

10.     On or about December 18, 2015, defendant JOHN DOUGHERTY directed

Individual No. 10 to use a debit card associated with the New Gen 1 PAC bank account at TD

Bank to purchase, from a Brooks Brothers store in Philadelphia, Pennsylvania, a total of $2,000

in gift cards, stating, "Just put it on our card." These gift cards were subsequently used by

DOUGHERTY and defendant MARITA CRAWFORD to make personal clothing purchases,

contrary to the PAC's restriction that the card not be used for personal purchases unrelated to the

operation of the PAC.

11.     Defendant NIKO RODRIGUEZ later filed a campaign finance report with

the Commonwealth of Pennsylvania, as treasurer of New Gen1, in which he falsely reported the

expenditure at Brooks Brothers as "holiday gifts."

12.     On or about July 3, 2016, at Palladino's restaurant in Philadelphia, Pennsylvania,

defendant JOHN DOUGHERTY directed defendant MARITA CRAWFORD and Individual No.

10 to use a New Gen1 PAC credit card to spend approximately $477.05 on a birthday dinner for

CRAWFORD, for the benefit of CRAWFORD, which was attended by her friends and family,

including Individual No. 10 and Family Member No. 2, with DOUGHERTY stating, "Put that on

the Ward card."

13.     Defendant NIKO RODRIGUEZ filed a campaign finance report with the

Commonwealth of Pennsylvania, as treasurer of New Gen1, in which he falsely reported the

expenditure at Palladino's restaurant as a "meeting expense."

14.     On or about each of the dates set forth below, at Philadelphia, Pennsylvania, in

the Eastern District of Pennsylvania, and elsewhere, the defendants listed below, for the purpose

of executing the scheme described above, and attempting to do so, caused to be transmitted signals and sounds by means of wire communication in interstate commerce, from the merchants identified in the counts below to the TD Bank processing center and servers described above, in order to complete the purchases identified in each count:

| Count | Defendant | Date | Amount and Use of Stolen Funds |
|---|---|---|---|
| 67 | **JOHN DOUGHERTY** | 12/18/2015 | $2,000 for purchase at Brooks Brothers on New Gen 1 TD Bank debit card |
| 68 | **JOHN DOUGHERTY, MARITA CRAWFORD** | 07/03/2016 | $477.05 for purchase at Palladino's restaurant on New Gen 1 TD Bank debit card |

All in violation of Title 18, United States Code, Sections 1343 and 1349, and 2.

## COUNT SIXTY-NINE
### (Making False Statements to the FBI)
### 18 U.S.C. § 1001(a)(2)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      The allegations contained in Paragraphs 1 through 22, 33, 45, and Overt Acts 1 through 10 (including all subparts) of Count One of this Indictment are incorporated here.

2.      On or about August 5, 2016, at Philadelphia, in the Eastern District of Pennsylvania, defendant

**ANTHONY MASSA,**

in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), an agency of the executive branch of the United States, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations in that defendant MASSA advised agents of the FBI that he had not billed Local 98 for work performed by Massa Construction on the personal residences of defendant JOHN DOUGHERTY, and others known to the grand jury, when, as MASSA knew, he had billed such work to Local 98.

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT SEVENTY
### (Falsification of Annual Financial Report Filed by Labor Union)
### 29 U.S.C. §§ 431(b) and 439(b)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      The allegations in Paragraphs 1 through 41 and 43 through 55, and Overt Acts 1 through 19 (including all subparts) of Count One of this Indictment are incorporated here.

2.      At all times material to this Count, as a labor organization engaged in an industry affecting commerce and subject to the Labor Management Reporting and Disclosure Act of 1959, Local 98 was required pursuant to Title 29, United States Code, Section 431(b), to file an annual financial (LM-2) report with the United States Department of Labor, signed by Local 98's president or treasurer or corresponding principal officers, and also to maintain records, including expense reports and reimbursement paperwork, which allow the Department of Labor to verify, explain, clarify, and check for accuracy and completeness the information and data contained in the LM-2 report.

3.      On or about March 30, 2016, in Philadelphia and the Eastern District of Pennsylvania, and elsewhere, defendants

**JOHN DOUGHERTY,**
**BRIAN BURROWS, and**
**MARITA CRAWFORD**

did make, and caused to be made, false statements and representations of material fact knowing them to be false, and did knowingly fail to disclose, and caused not to be disclosed, material facts, in a report and document required to be filed by Local 98 with the United States Department of Labor. This report is the annual financial report form LM-2 filed for Local 98's fiscal year ending on December 31, 2015.

All in violation of Title 29, United States Code, Sections 431(b) and 439(b), and Title 18, United States Code, Section 2.

## COUNT SEVENTY-ONE
**(Falsification of Annual Financial Report Filed by Labor Union)**
**29 U.S.C. §§ 431(b) and 439(b)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.  The allegations in Paragraphs 1 through 41 and 43 through 55, and Overt Acts 1 through 19 (including all subparts), of Count One of this Indictment, and Paragraph 2 of Count Seventy of this Indictment are incorporated here.

2.  On or about July 31, 2018, in Philadelphia and the Eastern District of Pennsylvania, and elsewhere, defendants

**JOHN DOUGHERTY and**
**BRIAN BURROWS**

did make, and caused to be made, false statements and representations of material fact knowing them to be false, and did knowingly fail to disclose, and caused to be not disclosed, material facts, in a report and document required to be filed by Local 98 with the United States Department of Labor. This report is the annual financial report form LM-2 filed for Local 98's fiscal year ending on December 31, 2016.

All in violation of Title 29, United States Code, Sections 431(b) and 439(b), and Title 18, United States Code, Section 2.

## COUNT SEVENTY-TWO
### (Falsification of Financial Records Required to Be Kept by Labor Union)
### 29 U.S.C. §§ 436 and 439(c)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.    The allegations in Paragraphs 1 through 41 and 43 through 55, and Overt Acts 1 through 19 (including all subparts) of Count One of this Indictment, and Paragraph 2 of Count Seventy of this Indictment are incorporated here.

2.    From on or about January 1, 2015, until on or about December 31, 2015, in Philadelphia and the Eastern District of Pennsylvania and elsewhere, defendants

**JOHN DOUGHERTY,**
**BRIAN BURROWS, and**
**MARITA CRAWFORD**

did willfully make, and cause to be made, false entries in records required to be kept by Local 98, that is, expense reports and reimbursement paperwork, records on matters required to be reported and which would verify, explain, clarify, and check for accuracy and completeness information and data in the annual financial report of Local 98 which was filed with the United States Department of Labor for Local 98's fiscal year ending on December 31, 2015.

All in violation of Title 29, United States Code, Sections 436 and 439(c).

## COUNT SEVENTY-THREE
### (Falsification of Financial Records Required to Be Kept by Labor Union)
### 29 U.S.C. §§ 436 and 439(c)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      The allegations in Paragraphs 1 through 41 and 43 through 55, and Overt Acts 1 through 19 (including all subparts) of Count One of this Indictment, and Paragraph 2 of Count Seventy of this Indictment are incorporated here.

2.      From on or about January 1, 2016, until on or about December 31, 2016, in Philadelphia and the Eastern District of Pennsylvania and elsewhere, defendants

### JOHN DOUGHERTY and
### BRIAN BURROWS

did willfully make, and cause to be made, false entries in records required to be kept by Local 98, that is, expense reports and reimbursement paperwork, records on matters required to be reported and which would verify, explain, clarify, and check for accuracy and completeness information and data in the annual financial report of Local 98 which was filed with the United States Department of Labor for Local 98's fiscal year ending on December 31, 2016.

All in violation of Title 29, United States Code, Sections 436 and 439(c).

## COUNTS SEVENTY-FOUR TO SEVENTY-EIGHT
### (Filing False Federal Income Tax Returns)
### 26 U.S.C. § 7206(1)

**THE GRAND JURY FURTHER CHARGES THAT**:

On or about the dates identified below, in the Eastern District of Pennsylvania, defendant

### JOHN DOUGHERTY

willfully made and subscribed United States income tax returns, Forms 1040, for the calendar

years listed below, each of which was verified by a written declaration that it was made under the

penalty of perjury and filed with the Director, Internal Revenue Service Center, and each of

which defendant DOUGHERTY did not believe to be true and correct as to every material

matter, in that DOUGHERTY did not report additional income, identified below, in each return:

| Count | Filing Date/Calendar Year | Unreported Additional Income |
|---|---|---|
| 74 | October 15, 2013/ Calendar Year 2012 | Approximately $20,544 in renovations, improvements, or repairs to his own home, the home of Family Member No. 3, and Doc's Union Pub |
| 75 | September 9, 2014/ Calendar Year 2013 | Approximately $17,839 in renovations, improvements, or repairs to his own home, the homes of Family Member Nos. 2, 3, and 5, a co-worker's home, and Doc's Union Pub, and approximately $27,678 in Local 98 funds taken for his personal use |
| 76 | October 15, 2015/ Calendar Year 2014 | Approximately $10,889 in renovations, improvements, or repairs to his own home, the homes of Family Member Nos. 2 and 5, and Doc's Union Pub, and approximately $46,447 in Local 98 funds taken for his personal use |
| 77 | October 17, 2016/ Calendar Year 2015 | Approximately $28,879 in renovations, improvements, or repairs to his own home, the homes of Family Member Nos. 2 and 5, and Doc's Union Pub, and approximately $63,392 in Local 98 funds taken for his personal use |
| 78 | October 16, 2017/ Calendar Year 2016 | Approximately $28,848 in renovations, improvements, or repairs to his own home, and approximately $27,440 in Local 98 funds taken for his personal use |

All in violation of Title 26, United States Code, Section 7206(1).

**COUNTS SEVENTY-NINE TO EIGHTY-THREE**
**Filing False Federal Income Tax Returns**
**26 U.S.C. § 7206(1)**

**THE GRAND JURY FURTHER CHARGES THAT**:

On or about the dates identified below, in the Eastern District of Pennsylvania, defendant

**BRIAN BURROWS**

willfully made and subscribed United States income tax returns, Forms 1040, for the calendar

years listed below, each of which was verified by a written declaration that it was made under the

penalty of perjury and filed with the Director, Internal Revenue Service Center, and each of

which defendant BURROWS did not believe to be true and correct as to every material matter, in

that BURROWS did not report additional income, identified below, in each return:

| Count | Filing Date/Calendar Year | Unreported Additional Income |
|-------|---------------------------|------------------------------|
| 79 | May 28, 2013/ Calendar Year 2012 | Approximately $28,410 in renovations, improvements, or repairs to his own home, the Pennsport Building, and Doc's Union Pub |
| 80 | May 27, 2014/ Calendar Year 2013 | Approximately $9,695 in renovations, improvements, or repairs to his own home, the Pennsport Building, and Doc's Union Pub |
| 81 | August 31, 2015/ Calendar Year 2014 | Approximately $12,886 in renovations, improvements, or repairs to his own home, the Pennsport Building, and Doc's Union Pub |
| 82 | July 5, 2016/ Calendar Year 2015 | Approximately $11,662 in renovations, improvements, or repairs to his own home, the Pennsport Building, and Doc's Union Pub |
| 83 | July 5, 2017/ Calendar Year 2016 | Approximately $2,208 in renovations, improvements, or repairs to his own home |

All in violation of Title 26, United States Code, Section 7206(1).

## COUNTS EIGHTY-FOUR TO EIGHTY-SEVEN
**(Filing False Federal Income Tax Returns)**
**26 U.S.C. § 7206(1)**

**THE GRAND JURY FURTHER CHARGES THAT**:

On or about the dates identified below, in the Eastern District of Pennsylvania, defendant

### MICHAEL NEILL

willfully made and subscribed United States income tax returns, Forms 1040, for the calendar

years listed below, each of which was verified by a written declaration that it was made under the

penalty of perjury and filed with the Director, Internal Revenue Service Center, and each of

which defendant NEILL did not believe to be true and correct as to every material matter, in that

NEILL did not report additional income, identified below, in each return:

| Count | Filing Date/Calendar Year | Unreported Additional Income |
|-------|---------------------------|------------------------------|
| 84 | April 15, 2013/ Calendar Year 2012 | Approximately $24,662 in renovations, improvements, or repairs to the Pennsport Building and Doc's Union Pub |
| 85 | April 15, 2014/ Calendar Year 2013 | Approximately $10,000 in renovations, improvements, or repairs to his own home, the Pennsport Building, and Doc's Union Pub |
| 86 | October 7, 2015/ Calendar Year 2014 | Approximately $10,148 in renovations, improvements, or repairs to the Pennsport Building, and Doc's Union Pub |
| 87 | October 7, 2016/ Calendar Year 2015 | Approximately $13,140 in renovations, improvements, or repairs to his own home, the Pennsport Building, and Doc's Union Pub |

All in violation of Title 26, United States Code, Section 7206(1).

**COUNT EIGHTY-EIGHT**
**(Conspiracy to Accept Unlawful Payments from an Employer)**
**18 U.S.C. § 371**

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times relevant to this Indictment:

1.       Paragraphs 1, 2, 7 through 12, 23, and 26 of Count One of this Indictment are incorporated here.

2.       Section 302 of the Labor Management Relations Act ("LMRA" or "Taft-Hartley Act"), 29 U.S.C. § 186, prohibited certain financial transactions involving the payment and delivery of money and other things of value from employers and persons acting in the interest of employers to the officers and employees of labor organizations. The statute also prohibited such officers and employees of labor organizations from requesting, demanding, receiving, and accepting such monies and other things of value.

3.       Local Union 98 of the International Brotherhood of Electrical Workers (hereafter "Local 98") was a labor organization which was engaged in commerce and which represented, sought to represent, and would admit to membership employees who were employed in an industry affecting commerce as those terms are defined in Title 29, United States Code, Sections 142 and 152, that is, the electrical construction industry in eastern Pennsylvania. Defendant JOHN DOUGHERTY was an officer and employee of Local 98, that is, Business Manager.

4.       MJK Electric was an electrical construction employer whose employees were employed in the electrical construction industry in eastern Pennsylvania and elsewhere whose employees Local 98 represented, sought to represent, and would admit to membership pursuant to labor agreements between MJK Electric and Local 98. As the owner and operating officer of

MJK Electric, George Peltz (charged elsewhere) was a person acting in the interest of employer MJK Electric.

## The Conspiracy

5.     From in or about January 2012 through in or about December 2016, in the Eastern District of Pennsylvania and elsewhere, defendant

## JOHN DOUGHERTY

conspired and agreed with George Peltz (charged elsewhere), together and with others known to the grand jury, to commit offenses against the United States, that is, to unlawfully and willfully request, demand, receive, and accept the payment, loan, and delivery of money and other things of value exceeding $1,000 from MJK Electric and persons acting in the interest of MJK Electric, contrary to Title 29, United States Code, Sections 186(a), (b)(1), and (d)(2).

## Objects of the Conspiracy

6.     The objects of such conspiracy were that:

a.     Defendant JOHN DOUGHERTY unlawfully and willfully requested, demanded, received, and accepted the payment, loan, and delivery of money and other things of value exceeding $1,000 from MJK Electric and persons acting in the interest of MJK Electric to defendant JOHN DOUGHERTY as an officer and employee of Local 98 which represented, sought to represent, and would admit to membership employees of MJK Electric, in violation of Title 29, United States Code, Section 186(a)(2), (b)(1), and (d)(2); and

b.     Defendant JOHN DOUGHERTY unlawfully and willfully requested, demanded, received, and accepted the payment, loan, and delivery of money and other things of value exceeding $1,000 from MJK Electric and persons acting in the interest of MJK Electric to defendant JOHN DOUGHERTY, knowing that such money and other things of value were

intended to influence defendant JOHN DOUGHERTY with respect to his actions, decisions, and duties as a representative of MJK Electric employees and as an officer and employee of Local 98, in violation of Title 29, United States Code, Sections 186(a)(4), (b)(1), and (d)(2).

## **Manner and Means**

It was part of the conspiracy that:

7.      George Peltz, charged elsewhere, agreed to pay, lend, and deliver, and did pay, lend, and deliver, to defendant JOHN DOUGHERTY and members of his immediate family and close relatives, the things of value described below; and DOUGHERTY agreed to request and accept, and did request and accept, things of value, including the products and services described below, free of charge to DOUGHERTY and his family members and relatives, from George Peltz and MJK Electric, and persons acting in the interest of MJK Electric:

a.      Approximately $29,537 for a security system and LED displays, which were installed at Doc's Union Pub, of which defendant DOUGHERTY was part-owner;

b.      Approximately $2,900 of materials and maintenance and repair work at the home of Family Member No. 2;

c.      Large screen televisions, with a retail value of $4,207, which were installed in the home of DOUGHERTY;

d.      Large screen televisions and a security system, with a retail value of $19,882, which were installed in the home of Family Member No. 5; and

e.      Gift cards and gift certificates worth $4,500 from a clothing store in Philadelphia.

8.      In his role as Business Manager of Local 98, defendant JOHN DOUGHERTY assisted George Peltz and MJK Electric as follows:

a.      Helping MJK Electric become a preferred vendor with Comcast, resulting in approximately $2,184,288 in contractor payments from Comcast;

b.      Causing Local 98's Job Recovery Fund to pay MJK Electric approximately $1,685,761, an amount that was greater than that received by any other electrical contractor which received Job Recovery funds from January 2012 through July 2016;

c.      Causing Local 98 to hire MJK Electric for projects primarily completed at union facilities, resulting in approximately $912,337.98 in payments from Local 98's General Fund to MJK Electric;

d.      Steering other union contractors' electrical work to MJK Electric, for which MJK received at least $2,396,164; and

e.       Hiring a member of Peltz's family at Local 98, and paying the family member approximately $15,900 for hours not worked.

## Overt Acts

In furtherance of the conspiracy and to effect its unlawful objects, defendant JOHN DOUGHERTY, George Peltz, and others known to the grand jury committed and caused to be committed, in the Eastern District of Pennsylvania and elsewhere, the overt acts described herein.

1.      From in or about 2012, to in or about 2013, in Philadelphia, George Peltz and employees of MJK Electric purchased and installed a security system and LED displays, with a retail value of $37,377, in a business partially owned by defendant JOHN DOUGHERTY, $29,537 of which was provided without charge to DOUGHERTY and the business he partially owned.

2.      From in or about December 2014 to in or about June 2015, George Peltz and employees of MJK Electric provided materials, maintenance, and repair work, with a value of approximately $2,900, at the home of Family Member No. 2.

3.      In or about March 2014, George Peltz and employees of MJK Electric purchased and installed large screen televisions, with a retail value of $4,207, in the home of defendant JOHN DOUGHERTY.

4.      From in or about December 2015, to in or about January 2016, George Peltz and employees of MJK Electric purchased and installed large screen televisions and a security system, with a retail value of $19,882, in the home of a Family Member No. 5.

5.      From in or about April 2013, to in or about April 2016, George Peltz gave defendant JOHN DOUGHERTY gift cards and gift certificates worth $4,500 from Boyd's, a clothing store in Philadelphia.

6.      From in or about November 2015, through in or about June 2016, in Philadelphia, defendant JOHN DOUGHERTY helped MJK Electric became a preferred vendor with Comcast, and as a result, MJK Electric obtained approximately $2,184,288 in payments from Comcast between July 2016 and December 2016.

7.      From in or about January 2012 through in or about July 2016, in Philadelphia, defendant JOHN DOUGHERTY caused Local 98's Job Recovery Fund to pay MJK approximately $1,685,761.

8.      From in or about January 2012 through in or about July 2016, in Philadelphia, defendant JOHN DOUGHERTY caused Local 98's General Fund to pay MJK approximately $912,337.98 for projects primarily completed at union facilities.

9.      From in or about January 2012 through in or about July 2016, in Philadelphia, defendant JOHN DOUGHERTY steered other union electrical work to MJK Electric, for which MJK received at least $2,396,164.

10.     From in or about October 2014 to in or about May 2016, in Philadelphia, defendant JOHN DOUGHERTY hired a member of Peltz's family at Local 98, and paid the family member approximately $15,900 for hours not worked.

All in violation of Title 18, United States Code, Section 371.

## COUNT EIGHTY-NINE
### (Accepting Unlawful Payments from an Employer)
### 29 U.S.C. § 186(a)(2), (b)(1), and (d)(2)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 4 of Count Eighty-Eight of this Indictment are incorporated here.

2.     In or about March 2014, in the Eastern District of Pennsylvania and elsewhere, defendant

### JOHN DOUGHERTY,

an officer and employee of Local 98, did unlawfully and willfully request, demand, receive, and accept the payment, loan, and delivery of money and other things of value exceeding $1,000 from George Peltz, MJK Electric, and persons acting in the interest of MJK Electric, that is, large screen televisions with a retail value of $4,207, purchased and installed in DOUGHERTY's home without charge to DOUGHERTY.

In violation of Title 29, United States Code, Sections 186(a)(2), (b)(1), and (d)(2).

## COUNT NINETY
**(Accepting Unlawful Payments from an Employer)**
**29 U.S.C. § 186(a)(2), (b)(1), and (d)(2)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 4 of Count Eighty-Eight of this Indictment are incorporated here.

2.      From in or about February 2014 through in or about June 2015, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOHN DOUGHERTY,**

an officer and employee of Local 98, did unlawfully and willfully request, demand, receive, and accept the payment, loan, and delivery of money and other things of value exceeding $1,000 from George Peltz, MJK Electric, and persons acting in the interest of MJK Electric, that is, approximately $2,900 in materials, maintenance, and repairs done at the home of Family Member No. 2 without charge to DOUGHERTY and Family Member No. 2.

In violation of Title 29, United States Code, Sections 186(a)(2), (b)(1), and (d)(2).

## COUNT NINETY-ONE
### (Accepting Unlawful Payments from an Employer)
### 29 U.S.C. § 186(a)(2), (b)(1), and (d)(2)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 4 of Count Eighty-Eight of this Indictment are incorporated here.

2.      From in or about December 2015 through in or about January 2016, in the Eastern District of Pennsylvania and elsewhere, defendant

### JOHN DOUGHERTY,

an officer and employee of Local 98, did unlawfully and willfully request, demand, receive, and accept the payment, loan, and delivery of money and other things of value exceeding $1,000 from George Peltz, MJK Electric, and persons acting in the interest of MJK Electric, that is, large screen televisions and a security system with a retail value of approximately $19,882, purchased and installed at the home of Family Member No. 5 without charge to DOUGHERTY and Family Member No. 5.

In violation of Title 29, United States Code, Sections 186(a)(2), (b)(1), and (d)(2).

## COUNT NINETY-TWO
**(Accepting Unlawful Payments from an Employer)**
**29 U.S.C. § 186(a)(2), (b)(1), and (d)(2)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 4 of Count Eighty-Eight of this Indictment are incorporated here.

2.     From in or about October 2014 through in or about April 2016, in the Eastern District of Pennsylvania and elsewhere, defendant

### JOHN DOUGHERTY,

an officer and employee of Local 98, did unlawfully and willfully request, demand, receive, and accept the payment, loan, and delivery of money and other things of value exceeding $1,000 from George Peltz, MJK Electric, and persons acting in the interest of MJK Electric, that is, $3,000 in gift cards and gift certificates at a clothing store in Philadelphia.

In violation of Title 29, United States Code, Sections 186(a)(2), (b)(1), and (d)(2).

**COUNT NINETY-THREE**
**(Accepting Unlawful Payments from an Employer)**
**29 U.S.C. § 186(a)(4), (b)(1), and (d)(2)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 4 of Count Eighty-Eight of this Indictment are incorporated here.

2.     From in or about February 2014 through in or about July 2016, as Business Manager of Local 98, JOHN DOUGHERTY assisted George Peltz and MJK Electric in the matters described below:

a.     Helped MJK Electric become a preferred vendor with Comcast, which resulted in approximately $2,184,288 in payments for MJK Electric from Comcast from July 2016 through December 2016;

b.     Caused Local 98's Job Recovery Fund to pay MJK Electric approximately $691,758.70, from February 2014 through July 2016, which was more than any other electrical contractor received during that period;

c.     Caused Local 98's General Fund to pay MJK approximately $703,252.87 for projects primarily completed at union facilities from February 2014 through July 2016;

d.     Steered other union electrical work to MJK Electric, for which MJK received at least $2,396,164 in contractor payments from February 2014 through December 2016; and

e.      Hired a member of Peltz's family at Local 98, and paid the family member approximately $15,900 for hours not worked from in or about October 2014 to in or about May 2016.

3.      In or about March 2014, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOHN DOUGHERTY,**

an officer and employee of Local 98, did unlawfully and willfully request, demand, receive, and accept the payment, loan, and delivery of money and other things of value exceeding $1,000 from George Peltz, MJK Electric, and persons acting in the interest of MJK Electric, that is, large screen televisions with a retail value of $4,207, purchased and installed in DOUGHERTY's home, knowing that such money and things of value were intended to influence DOUGHERTY with respect to his actions, decisions, and duties as a representative of MJK Electric employees and as an officer and employee of Local 98.

In violation of Title 29, United States Code, Sections 186(a)(4), (b)(1), and (d)(2).

## COUNT NINETY-FOUR
**(Accepting Unlawful Payments from an Employer)**
**29 U.S.C. § 186(a)(4), (b)(1), and (d)(2)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 4 of Count Eighty-Eight of this Indictment, and Paragraph 2 of Count Ninety-Three of this Indictment, are incorporated here.

2.      From in or about December 2014 through in or about June 2015, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOHN DOUGHERTY,**

an officer and employee of Local 98, did unlawfully and willfully request, demand, receive, and accept the payment, loan, and delivery of money and other things of value exceeding $1,000 from George Peltz, MJK Electric, and persons acting in the interest of MJK Electric, that is, approximately $2,900 in materials, maintenance, and repairs done at the home of Family Member No. 2, knowing that such money and things of value were intended to influence DOUGHERTY with respect to his actions, decisions, and duties as a representative of MJK Electric employees and as an officer and employee of Local 98.

In violation of Title 29, United States Code, Sections 186(a)(4), (b)(1), and (d)(2).

## COUNT NINETY-FIVE
**(Accepting Unlawful Payments from an Employer)**
**29 U.S.C. § 186(a)(4), (b)(1), and (d)(2)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 4 of Count Eighty-Eight of this Indictment, and Paragraph 2 of Count Ninety-Three of this Indictment, are incorporated here.

2.     From in or about December 2015 through in or about January 2016, in the Eastern District of Pennsylvania and elsewhere, defendant

### JOHN DOUGHERTY,

an officer and employee of Local 98, did unlawfully and willfully request, demand, receive, and accept the payment, loan, and delivery of money and other things of value exceeding $1,000 from George Peltz, MJK Electric, and persons acting in the interest of MJK Electric, that is, large screen televisions and a security system with a retail value of approximately $19,882, purchased and installed at the home of Family Member No. 5, knowing that such money and things of value were intended to influence DOUGHERTY with respect to his actions, decisions, and duties as a representative of MJK Electric employees and as an officer and employee of Local 98.

In violation of Title 29, United States Code, Sections 186(a)(4), (b)(1), and (d)(2).

## COUNT NINETY-SIX
**(Accepting Unlawful Payments from an Employer)**
**29 U.S.C. § 186(a)(4), (b)(1), and (d)(2)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.  Paragraphs 1 through 4 of Count Eighty-Eight of this Indictment, and Paragraph 2 of Count Ninety-Three of this Indictment, are incorporated here.

2.  From in or about August 2014 through in or about April 2016, in the Eastern District of Pennsylvania and elsewhere, defendant

### JOHN DOUGHERTY,

an officer and employee of Local 98, did unlawfully and willfully request, demand, receive, and accept the payment, loan, and delivery of money and other things of value exceeding $1,000 from George Peltz, MJK Electric, and persons acting in the interest of MJK Electric, that is, $3,000 in gift cards and gift certificates at a clothing store in Philadelphia, knowing that such money and things of value were intended to influence DOUGHERTY with respect to his actions, decisions, and duties as a representative of MJK Electric employees and as an officer and employee of Local 98.

In violation of Title 29, United States Code, Sections 186(a)(4), (b)(1), and (d)(2).

## COUNT NINETY-SEVEN
**(Conspiracy to Commit Honest Services Fraud and Federal Program Bribery)**
**18 U.S.C. § 371**

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this Indictment:

### Introduction

1.     The allegations in Paragraphs 1, 2, 7, 11, 18, and 25 of Count One and Paragraphs 3, 4, and 8(a), and Overt Act 6 of Count Eighty-Eight of this Indictment are incorporated here.

2.     In November 2011, defendant ROBERT HENON was elected to serve as a Philadelphia City Councilman representing the Sixth Council District in Philadelphia. Defendant HENON was sworn in on January 3, 2012. At the time he took office, HENON became the Chair of the Committee on Public Property and Public Works, which is responsible for all matters relating to City property and buildings.

3.      Defendant ROBERT HENON received a salary paid by the City of Philadelphia of $129,373 in 2015, and $138,890 in 2016.

4.     Defendant ROBERT HENON's office also vested him with actual and perceived authority over certain other public officials, including employees of the Philadelphia Department of Licenses & Inspections ("L&I"). L&I administered and enforced Philadelphia's code requirements, including building, electrical, fire, health, housing, business, and zoning regulations. Inspectors employed by L&I were empowered to issue cease and desist orders (that is, to shut down construction projects) for violations of the City codes.

5.     The Philadelphia Parking Authority (PPA) was an agency created by a Philadelphia City ordinance to provide parking services for residents, businesses, and visitors in Philadelphia. PPA Official No. 1 and PPA Official No. 2 were officials of PPA.

6. The citizens of Philadelphia had an intangible right to the honest services of their public officials, including defendant ROBERT HENON. This included the right to receive HENON's honest judgment and conduct regarding matters of public business, not influenced by any bribe, that is, the payment of money or provision of any other personal benefit in exchange for official acts.

7. Prior to being elected as a City Councilman, defendant ROBERT HENON had served as the Political Director of Local 98 since 2003.

8. The City of Philadelphia received benefits in excess of $10,000 in the one-year period from January 1, 2015, to December 31, 2015, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other forms of federal assistance. The City of Philadelphia received benefits in excess of $10,000 in the one-year period from January 1, 2016, to December 31, 2016, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other forms of federal assistance.

9. Comcast of Philadelphia (hereafter "Comcast"), a cable service provider, had entered into a 15-year franchise agreement with the City of Philadelphia to provide cable service within the City's limits in accordance with the terms of the agreement. During 2015, Comcast was negotiating the terms of the renewal of the franchise agreement with the Mayor's Office and the Public Property Committee of City Council, which was chaired by defendant ROBERT HENON.

### The Conspiracy

10. From at least in or about May 2015, to in or about September 2016, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOHN DOUGHERTY and
ROBERT HENON**

conspired and agreed, together and with others known to the grand jury, to commit offenses against the United States, that is, to:

        a.      Knowingly devise and engage in a scheme with the intent to defraud the City of Philadelphia and its citizens of the right to defendant ROBERT HENON's honest services in the affairs of the City of Philadelphia, in violation of Title 18, United States Code, Sections 1341, 1343, and 1346; and

        b.      Engage in Federal program bribery, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 666(a)(2).

### Manner and Means

      It was part of the conspiracy that:

      11.      Defendant JOHN DOUGHERTY, through Local 98, provided defendant ROBERT HENON with a stream of personal benefits during the time that HENON was a member of Philadelphia City Council. The benefits given to HENON by DOUGHERTY included a salary from Local 98 and tickets to sporting events. Specifically:

        a.      Local 98 paid ROBERT HENON a salary during the time he served as a City Councilman, totaling $70,649 in 2015 and $73,131 in 2016. On Local 98's annual LM-2 reports filed with the United States Department of Labor, Local 98 described HENON's position as "office staff." On annual financial disclosure forms that HENON was required to file with the City Board of Ethics in 2015 and 2016, specifying the source, but not the amount, of income over $500 and gifts over $200 (in the aggregate), HENON disclosed Local 98 as a source of income, describing his position as "electrician," while not disclosing any gifts. In fact, throughout the period of the conspiracy, HENON did not work as "office staff" nor as an electrician for Local 98, and HENON did not perform any significant work of any kind for Local

98 apart from his efforts as a member of the Philadelphia City Council to act as directed by and to benefit defendant JOHN DOUGHERTY.

       b.     During 2015 and 2016, defendant JOHN DOUGHERTY gave defendant ROBERT HENON tickets to sporting events with a value of approximately $11,807. These tickets were paid for by Local 98.

     12.    Defendant JOHN DOUGHERTY gave these things of value to defendant ROBERT HENON with the intent to influence HENON in HENON's capacity as a member of Philadelphia City Council and Chair of the Committee on Public Property, and in exchange for HENON acting on behalf of DOUGHERTY, in his capacity as a member of Philadelphia City Council, and performing official acts as directed by and on behalf of DOUGHERTY.

     13.    Defendant ROBERT HENON accepted the stream of personal benefits from defendant JOHN DOUGHERTY, knowing that the benefits were given in exchange for HENON's performance of official acts at the direction of and on behalf of defendant DOUGHERTY. Furthermore, defendants DOUGHERTY and HENON attempted to hide the true nature of their illegal relationship from the public.

     14.    The official acts that defendant ROBERT HENON took, attempted to take, or caused as part of this illegal relationship included the following:

       a.     At defendant JOHN DOUGHERTY's direction, defendant HENON caused L&I to inspect, and in some instances shut down, operations or construction work, at locations outside of his district, where non-union laborers were involved in electrical work construction activity.

       b.     At defendant JOHN DOUGHERTY's direction, defendant HENON drafted, supported, advocated, and sponsored Philadelphia City Council legislation, resolutions,

and other Council legislative activities that were favorable to defendant DOUGHERTY's personal, professional, or financial interests.

       c.    At defendant JOHN DOUGHERTY's direction, defendant HENON allowed defendant DOUGHERTY to demand concessions by Comcast during the franchise contract negotiations between the City of Philadelphia and Comcast, which ultimately resulted in Comcast hiring MJK Electric, a union electrical contractor defendant DOUGHERTY favored, for electrical contracting work.

## Overt Acts

In furtherance of the conspiracy and to effect its unlawful objects, defendants JOHN DOUGHERTY and ROBERT HENON, and others known to the grand jury, committed and caused to be committed, in the Eastern District of Pennsylvania and elsewhere, the overt acts described herein.

### Abuse of L&I Enforcement Activity to Discourage Use of Non-Union Labor at Children's Hospital of Philadelphia

1.    On or about July 19, 2015, after learning that a non-union company was installing MRI machines at a new facility at the Children's Hospital of Philadelphia ("CHOP"), defendant JOHN DOUGHERTY instructed a business agent of Local 98 to contact defendant ROBERT HENON, texting the business agent as follows: "Do it + call Henon ,,, tonight ,,,, Call Condi tonight to jump in +resolve."

2.    On or about July 20, 2015, defendant JOHN DOUGHERTY called an administrator of CHOP to discuss the installation of the MRI machine at the hospital. The administrator said that the installation was being performed by the manufacturer of the MRI machine because the manufacturer would not honor the warranty if anyone else did it. After complaining that Local 98 was not given an opportunity to bid on the project, DOUGHERTY

warned the administrator: "It is also an L&I violation . . . you don't want a city thing shutting it down. We have had other hospitals shut down because of that."

3.      On or about July 21, 2015, in response to a complaint to L&I by defendant ROBERT HENON about the installation of the MRI machine at CHOP by technicians employed by the manufacturer of the MRI machine, L&I employees inspected the installation and issued a preliminary stop work order.

4.      On or about July 22, 2015, after causing an inspection at CHOP by L&I inspectors, defendant JOHN DOUGHERTY called defendant ROBERT HENON and complained that someone at L&I had reversed the stop work order and had given CHOP permission to continue work, stating, "L&I went out and shut them down and then somebody gave them the okay, they said, inside the system, today to go to work." In response, HENON replied, "Oh really? Uh, well the other one, the other part was me, all right," adding, "I'll walk over personally."

5.      On or about July 23, 2015, defendant JOHN DOUGHERTY called a business agent of Local 98 and asked if there were "any issues you got floatin' around at Penn that we should be paying attention to?" After the business agent reported that the only issue was the installation at CHOP, DOUGHERTY replied, "Yeah, CHOP. I'm on top of that. I have (unintelligible), Bobby (unintelligible) call that guy, but we don't want that out, that we did that."

6.      On or about August 19, 2015, after a Local 98 business agent called defendant ROBERT HENON and said that defendant JOHN DOUGHERTY wanted HENON to know that a different non-union company was installing another MRI machine at CHOP, HENON instructed the business agent to send him the information, urging him to "Send me the exact

location again and, and, and, who it is. This way I can just I can read what it is, only because I got my hands full. Write it down too. And text it to me. Don't email . . . And then, and then, and then delete your email."

7.     On or about August 20, 2015, in response to a complaint to L&I by defendant ROBERT HENON about the installation of a second MRI machine at CHOP by technicians employed by the manufacturer of the MRI machine, L&I employees inspected the installation and issued a stop work order, and L&I subsequently denied the issuance of a Certificate of Occupancy for the room in which the MRI was being installed.

8.     On or about August 21, 2015, defendant JOHN DOUGHERTY, while discussing L&I shutting down the project at CHOP with a Local 98 business agent, instructed the business agent to notify another Local 98 business agent, commenting, "[W]e want them to keep on file; they shut down that GE room up at Children's Hospital; they red-striped it . . . but we got to be smart, we don't want them to f*** us. We got to capitalize off that. I got to get a meeting with Children's Hospital again, things like that, you know."

### HENON Allows DOUGHERTY to Influence the Comcast Franchise Agreement

9.     On multiple occasions between May and August 2015, defendant JOHN DOUGHERTY and George Peltz (charged elsewhere) discussed work Comcast was doing in Philadelphia and the fact that DOUGHERTY and Peltz wanted MJK Electric to obtain future work from Comcast.

10.    In or about March 2015, defendant ROBERT HENON, in his capacity as Chairman of Philadelphia City Council's Committee for Public Property and Public Works, emailed a letter to Comcast officials notifying them of his intention to begin negotiations on the renewal of Comcast's cable franchise agreement with the City of Philadelphia. HENON's

committee, along with the Mayor's Office, was conducting the negotiations on behalf of
Philadelphia.

11.     On or about November 19, 2015, defendant JOHN DOUGHERTY sent a text
message to defendant ROBERT HENON, in which he complained that a non-union contractor
received too much fiber optic cable work from Comcast. DOUGHERTY texted: "MJK just told
me [non-union contactor] is in every building,,,COMCAST knows,,,[name of Comcast official]
in the low level install mng,,,WE NEED to GET CERTIFIED pay roll,,,my only REQUEST on
this renewal was to get this work."

12.     On or about November 25, 2015, defendant ROBERT HENON caused his Chief
of Staff to advise a Comcast negotiator on the franchise agreement that if Comcast hired MJK
Electric, it would advance the negotiations of the franchise agreement.

13.     On or about November 27, 2015, defendant ROBERT HENON reported to
defendant JOHN DOUGHERTY that one of the issues raised during the negotiations was that
MJK Electric charged rates that were approximately 60% more than the non-union electrical
contractor Comcast was using. DOUGHERTY instructed HENON that during negotiations,
"don't let Comcast suggest that [MJK] is a favorite son."

14.     On or about November 27, 2015, defendant JOHN DOUGHERTY advised the
political director of Local 98, defendant MARITA CRAWFORD (charged elsewhere in this
Indictment), that he had given defendant ROBERT HENON all 24 seats in Local 98's luxury box
at Lincoln Financial Field for an upcoming Eagles game. Defendant DOUGHERTY also told
CRAWFORD that he had explained to HENON that if the final franchise agreement with
Comcast "was not good for me, then we have some f***ing issues."

15.     On or about November 30, 2015, defendant JOHN DOUGHERTY reported to another organized labor leader in Philadelphia that he had warned defendant ROBERT HENON not to finalize the agreement with Comcast the next day, reminding HENON, "[W]ithout an agreement from me? What the h***, that doesn't do me any good. That is why you are over there, that is why we raised 600 grand, that is why we did the deal . . . for one reason – to put you on public property to fight a giant." Later, talking about HENON, DOUGHERTY stated, "Listen, he absolutely is not doing anything that would, he calls for information and he doesn't do it, and this is becoming a little bit of a problem with him, okay, because he is getting too crafty here, okay, and he's got to understand, look, he wouldn't be in the majority leader position if it wasn't for us."

16.     On or about November 30, 2015, during a conversation with defendant MARITA CRAWFORD about the Comcast agreement, defendant JOHN DOUGHERTY advised that defendant ROBERT HENON, through his Philadelphia City Council position, should "have the ability to hold it up if he says, you know, we are not going to vote this out of committee tomorrow; I am going to hold it."

17.     On or about December 1, 2015, defendant JOHN DOUGHERTY called George Peltz to obtain information about the work DOUGHERTY wanted HENON to pursue, which DOUGHERTY planned to use during negotiations with Comcast for the franchise agreement renewal.

18.     On or about December 1, 2015, defendant ROBERT HENON, in responding to defendant JOHN DOUGHERTY's concern that he was not doing what DOUGHERTY wanted him to do, advised DOUGHERTY that he would delay moving the Comcast franchise agreement

through the committee until DOUGHERTY got what he wanted, adding, "I don't give a f***
about anybody, all right, but f***ing you and us, and you know that."

19.     On or about December 2, 2015, the day before the Public Property and Public
Works Committee was scheduled to vote on moving the franchise agreement out of committee,
defendant ROBERT HENON held a meeting in his Philadelphia City Council chambers with
defendant JOHN DOUGHERTY and the Comcast employees who were negotiating the franchise
agreement. Defendant DOUGHERTY ran the meeting and warned that if Comcast did not agree
to give certain fiber optic work to union contractors, the franchise agreement would not be
approved by Philadelphia City Council.

20.     On or about December 2, 2015, defendant JOHN DOUGHERTY called George
Peltz (charged elsewhere) and asked him to provide calculations to show how he would bid for
the Comcast work.

21.     On or about December 3, 2015, defendant ROBERT HENON delayed the Public
Property and Public Works Committee vote so that he and defendant JOHN DOUGHERTY
could meet privately with Comcast negotiators at a hotel in Philadelphia. At the meeting,
HENON and DOUGHERTY discussed the rate that Comcast was willing to pay for work that
DOUGHERTY had demanded. The parties agreed that if a union electrical contractor bid no
more than 125% of the rate (known as "the rate card") Comcast was previously willing to pay, it
would be considered "competitive."

22.     On or about December 3, 2015, after the private meeting with Comcast, defendant
ROBERT HENON chaired the meeting of the Public Property and Public Works Committee and
voted to present the franchise agreement to Philadelphia City Council for a final vote.

23.     On or about December 10, 2015, defendant ROBERT HENON voted in favor of the franchise agreement, and Philadelphia City Council approved the agreement.

24.     During 2016, MJK Electric, owned by George Peltz, performed contract work for Comcast, billed Comcast at rates significantly higher than 125% of Comcast's rate card, and received more than $1 million in revenue from Comcast.

25.     From in or about January 2015, to at least in or about July 2016, at the direction of defendant ROBERT HENON, a member of defendant HENON's legislative staff assisted in the effort to draft a document that recorded the terms of the agreement between defendant JOHN DOUGHERTY and Comcast.

### HENON Drafts Towing Resolution at Direction of DOUGHERTY

26.     On or about September 22, 2015, defendant JOHN DOUGHERTY called defendant ROBERT HENON and told HENON that an employee of a towing company had tried to tow his car, forcing DOUGHERTY to pay $200 in cash to the employee to get the car removed from the tow truck. DOUGHERTY, angered at the employee's attitude, told HENON that "I think tomorrow, we f***ng put in a bill to certify, 'cause if they can rob me, they can try to rob anybody." DOUGHERTY told HENON that "what we are going to do" is put a bill through Philadelphia City Council that will require the drivers to go through training. DOUGHERTY said, "Just tell them you have heard nothing but complaints," "just smoke 'em," and added that he does not "abuse government," but he did tell the tow truck driver who he was. DOUGHERTY complained that the driver was unable to give him $10 in change, and "that $10 is going to cost their f***ing industry a bundle." HENON said he would put something together.

27.     On or about September 30, 2015, defendant ROBERT HENON caused a member of his staff to make a secret recording of the impound lot of the towing company, and to draft a

resolution entitled, "Authorizing City Council's Committee on Licenses and Inspections to hold public hearings to investigate the operations of [the name of the company that towed DOUGHERTY's car] in the City of Philadelphia for the purposes of protecting the general welfare and public interest of the residents of Philadelphia . . ."

HENON Abuses Philadelphia City Council Position to
Threaten Political Opponents of DOUGHERTY

28.     In advance of the May 2015 primary election, defendant ROBERT HENON threatened to propose a tax on sweetened soft drinks (a "soda tax"), which he knew was opposed by the Teamsters Union, because of a political commercial sponsored by the Teamsters Union that portrayed defendant JOHN DOUGHERTY in a negative light.

29.     On or about May 13, 2015, defendant ROBERT HENON notified defendant JOHN DOUGHERTY by text that he planned to retaliate against the Teamsters Union, advising DOUGHERTY, "I just saw the Carpenters and Teamsters commercial with you in it. I'm going to f*** them big time, just so you know. . . .They see the polls and know that nothing will change the outcome. I'm just so mad but . . . . I will be smart about it but there will be consequences."

30.     On or about May 13, 2015, defendant JOHN DOUGHERTY advised defendant BRIAN BURROWS (charged elsewhere in this Indictment), Local 98 president, that he planned to use his relationship with defendant ROBERT HENON to threaten the Teamsters Union for the political commercials that portrayed DOUGHERTY in a negative light. DOUGHERTY said, "Let me tell you what Bobby HENON's going to do, and he's already talked to [elected local public official]. They're going to start to put a tax on soda again and that will cost the Teamsters 100 jobs in Philly."

31.     Between on or about May 17, 2015, to on or about May 19, 2015, defendant ROBERT HENON caused his City Council staff to work with a Philadelphia advertising agency to prepare materials, including a flyer and a script for a video, to promote his proposal for a soda tax.

32.     On or about July 21, 2015, defendant JOHN DOUGHERTY told a person connected to the Philadelphia Convention Center that he wanted someone to deliver the message to a named Teamsters Union officer that if the officer keeps "using the Convention Center against [Family Member No. 4] in his conversations . . . he is going to wind up with a f***ing soda tax which is going to kill him. . . . and Bobby HENON is delivering that message."

33.     On or about February 11, 2016, defendant JOHN DOUGHERTY advised defendant ROBERT HENON that officials in the Philadelphia Mayor's Office wanted to know if defendant HENON would introduce the soda tax in City Council. HENON expressed his dislike of the Teamsters Union and hesitation about introducing the legislation, based on his concern that the soda tax might affect DOUGHERTY's relationship with the Teamsters Union.

34.     On or about February 11, 2016, defendant JOHN DOUGHERTY told defendant ROBERT HENON that he [DOUGHERTY] had advised the Philadelphia Mayor's Office that HENON was available to support the soda tax.

35.     On or about February 16, 2016, defendants JOHN DOUGHERTY and ROBERT HENON discussed how they could get the soda tax legislation passed, and DOUGHERTY instructed HENON on what steps to take.

36.     On or about February 21, 2016, after a member of the Mayor's administration explained to defendant JOHN DOUGHERTY the benefits that the soda tax would provide to the

City of Philadelphia, DOUGHERTY replied, "You don't have to explain to me. I don't give a f***. Listen, my goal is to make sure you are alright, that's all."

37.     On or about March 1, 2016, defendant JOHN DOUGHERTY sent defendant ROBERT HENON a text message, urging HENON to "stay INFRONT of the soda tax!!"

38.     On or about May 7, 2016, defendant JOHN DOUGHERTY instructed defendant ROBERT HENON to start talking to other Philadelphia City Council members about the soda tax.

39.     On or about May 24, 2016, defendant ROBERT HENON told defendant JOHN DOUGHERTY that a member of City Council would vote in favor of a soda tax if the member got a "little, like, hug." Defendant DOUGHERTY told HENON, "… Let him know that once you get this stuff, there's gonna be a ton of major league jobs, that his wife [is] more than qualified for."

40.     On or about June 16, 2016, defendant ROBERT HENON voted for the soda tax bill.

<u>HENON Opposes Performance Audit of the Philadelphia Parking Authority (PPA)<br>at the Request of PPA Officials and on the Advice of DOUGHERTY</u>

41.     In or about June 2016, a member of Philadelphia City Council proposed a resolution to conduct a performance audit of the PPA to determine how the PPA was spending revenue generated by its operations and to determine if the PPA could share more of its revenue to fund certain city operations, including contributing more money to the School District of Philadelphia.

42.     On or about June 11, 2016, defendant ROBERT HENON was informed by PPA Official No. 1 that a member of City Council was proposing a resolution calling for an audit of the Parking Authority. After PPA Official No. 1 told HENON that he and PPA Official No. 2

were strongly opposed to the resolution, and asked if HENON was "alright with that," HENON replied, "Yeah, I am just trying to figure out how I publicly come out and vote no."

43.     On or about June 12, 2016, defendant ROBERT HENON called PPA Official No. 2, who was also an official of a union whose members install glass, and asked for assistance obtaining glass for windows that were needed at the house of a close friend of HENON. PPA Official No. 2 also expressed his opposition to the resolution to audit PPA, to which HENON responded, "Let me work it out."

44.     On June 13, 2016, PPA Official No. 2 called defendant ROBERT HENON and said he needed an address or a contact to look at the house of HENON's friend. PPA Official No. 2 said, referring to the PPA audit resolution, "I need you, how many people you can get for us, to just vote no [on the audit resolution]. You're going to vote on it Thursday." HENON said, "Okay, let, let me work, let me work on it, okay?"

45.     On or about June 15, 2016, defendant ROBERT HENON and PPA Official No. 2 discussed the PPA audit proposal before Philadelphia City Council. PPA Official No. 2 stated that he knew the audit resolution was not going to pass, but he wanted to use the vote to find out who was going to vote in favor of the resolution. PPA Official No. 2 explained that any member of Philadelphia City Council who voted in favor of the resolution would be denied PPA jobs for their constituents and money from the PPA, stating, "I want, see, just see who the f***'s going do it and who's not, because nobody is going to get a f***ing job out of there, or a f***ing penny out of it." HENON assured PPA Official No. 2 that "we will beat it down."

46.     On or about June 15, 2016, defendant ROBERT HENON reported to PPA Official No. 2 that other members of Philadelphia City Council were going to vote against the resolution to audit the PPA.

47.     On or about June 16, 2016, the day that the resolution for the PPA audit was going to be presented to Philadelphia City Council, defendant ROBERT HENON reported to PPA Official No. 2 that City Council was going to "table" the resolution rather than vote on it. When PPA Official No. 2 insisted that it be "voted down," HENON said he could do that.

48.     On or about June 16, 2016, defendant ROBERT HENON told defendant JOHN DOUGHERTY about the resolution to audit PPA and asked, "How can I vote against an audit of the PPA when they have public money," and the City Council member who proposed the audit "is doing what I would do?" HENON told DOUGHERTY that PPA Official No. 1 and PPA Official No. 2 were very upset about the resolution, and that PPA Official No. 2 was totally against tabling it. HENON also told DOUGHERTY that another member of City Council wanted to table it, to prevent City Council from attracting negative publicity for failing to audit the PPA. When HENON asked DOUGHERTY what he should do, DOUGHERTY advised HENON to table the resolution, and to let another City Council member be blamed for tabling the audit rather than voting it down. DOUGHERTY also directed HENON to tell PPA Official No. 2 that HENON was on his side. DOUGHERTY further advised HENON that if HENON were running for City Council President, HENON "would have to audit it."

49.     On or about June 16, 2016, defendant JOHN DOUGHERTY told defendant MARITA CRAWFORD (charged elsewhere in this Indictment) to make sure defendant ROBERT HENON "shoots it down," so that PPA Official No. 2 and his allies remain on their side.

50.     On or about June 16, 2016, defendant ROBERT HENON participated in City Council proceedings as the resolution to audit the PPA was brought before Philadelphia City Council. A member of City Council moved that the resolution be tabled, and a voice vote, which

simply requires Philadelphia City Council members to orally vote yes or no, was conducted on the motion to table the resolution. A majority of the members of Philadelphia City Council voted that the resolution to audit the PPA be tabled.

51.     On or about June 17, 2016, defendant ROBERT HENON called PPA Official No. 2, who told defendant ROBERT HENON that PPA Official No. 2 could get the glass for the windows that HENON had requested for his friend's house, and that someone could come by and take measurements. HENON then advised PPA Official No. 2 that the audit proposal had been tabled and that another member of Philadelphia City Council said it would not come back. PPA Official No. 2 said he was satisfied with that.

52.     On or about June 20, 2016, PPA Official No. 2 and an employee of the Glazers Union told defendant ROBERT HENON that the employee was going to the house of HENON's friend to measure the windows and determine what was needed.

53.     On or about June 27, 2016, defendant ROBERT HENON received a voicemail from PPA Official No. 2, saying, "The guy who came over to measure is the guy we sent over to take care of that for you and for them. All good. On it. Thank you. See you."

54.     On or about June 30, 2016, PPA Official No. 2 told defendant ROBERT HENON that he was going to HENON's fundraiser that night, but that he could not give him any more money because he had already given the maximum amount allowed. PPA Official No. 2 then told HENON that he had someone go to the house of HENON's friend to work on the windows. PPA Official No. 2 told HENON, "We're gonna pay for the material, and she'll just pay for the labor." HENON replied, "Okay, great."

55.     On or about August 31, 2016, the glass supplier referred by PPA Official No. 2 to defendant ROBERT HENON delivered 27 panes of glass, which cost approximately $3,105, to the home of defendant ROBERT HENON's friend.

56.     On or about September 29, 2016, the resolution to audit the PPA was brought up in Philadelphia City Council for a vote. A voice vote was conducted, and a majority of the members of Philadelphia City Council voted against the resolution to audit the PPA.

<u>HENON Delays Legislation at the Request of DOUGHERTY</u>

57.     On or about August 20, 2015, defendant ROBERT HENON asked defendant JOHN DOUGHERTY what he should do concerning pending Plumbing Code legislation. After advising HENON that he should delay the legislation until the new administration took office in January 2016, DOUGHERTY told HENON to use the legislation to help DOUGHERTY be elected Business Manager of the Building Trades, which was an organization made up of unions representing various trades, such as electricians, plumbers, glazers, and sheet metal workers. DOUGHERTY stated that he believed the head of the Plumbers Union was going to vote against DOUGHERTY for Business Manager of the Building Trades. DOUGHERTY and HENON then had the following exchange:

RH:     F*** the Plumbers

JD:     Do it because it helps me with the Building Trades thing.

RH:     F*** it. That is exactly what I am saying, I am going to screw them, make them come back to me, because they have been avoiding me, because of the Building Trades stuff.

JD:     Yo, you hear what I am saying, do it.

58.     On or about September 2, 2015, defendant ROBERT HENON told an elected state official that he was using the legislation concerning the plumbing and electrical codes as

leverage for "internal trade politics," stating as follows: "Okay, 'cause I wanna . . . put in the international plumbing (unintelligible) because . . . there, there's a reason. It's . . . leveraging. It's internal trade politics, so, I'm gonna, what I was gonna do is, kinda . . . eh . . . aah . . . disguise it in the middle of everything . . . my strategy was to do that and then, and then, just sit on it, you know . . . 'cause the plumbers are acting like, like total [expletive deleted], alright . . . against John [DOUGHERTY] . . . you know, with the Building Trades."

59.     On or about September 2, 2015, defendant ROBERT HENON attended the meeting of the Building Trades at which defendant JOHN DOUGHERTY was elected Business Manager.

60.     On or about September 16, 2015, defendant ROBERT HENON told his staff that he was going to delay introduction of the plumbing code legislation for "timing reasons."

DOUGHERTY and HENON Attempt to
Conceal the True Nature of Their Relationship

61.     On or about May 4, 2015, defendant JOHN DOUGHERTY contacted defendant ROBERT HENON by telephone to discuss an editorial that appeared in the *Philadelphia Inquirer* on May 3, 2015, which was critical of DOUGHERTY and his close relationship with HENON. DOUGHERTY told HENON that he was dictating a response to the editorial to the spokesperson for Local 98, that the response would be drafted so it would appear to be from HENON, and that it would say that HENON operated independently of DOUGHERTY. DOUGHERTY further advised that the response would state that DOUGHERTY only called HENON "four times in four years."

62.     Between on or about May 4, 2015, and on or about May 13, 2015, defendant JOHN DOUGHERTY caused the drafting of an op-ed submission, under defendant ROBERT HENON's byline, which falsely stated, in part, as follows: "[c]ontrary to the board's malicious

- 126 -

statement about John in its head-scratching endorsement of [candidate for mayor], John has never asked me to vote a certain way or introduce legislation on his behalf. Yes, John is my best friend and a former colleague, but I'm lucky if I hear from him more than once every few months."

63.     On or about May 13, 2015, defendant JOHN DOUGHERTY directed the spokesperson for Local 98 to instruct defendant ROBERT HENON to submit the response to the *Philadelphia Inquirer* for publication.

64.     On about June 26, 2015, defendant JOHN DOUGHERTY instructed Local 98's political director, defendant MARITA CRAWFORD (charged elsewhere in this Indictment), to reprimand defendant ROBERT HENON about an editorial that appeared in the *Philadelphia Daily News* on June 25, 2015, criticizing L&I for not citing Local 98 for Philadelphia City Code violations and for being afraid to stand up to DOUGHERTY. Believing that HENON had failed adequately to handle the circumstances giving rise to the critical editorial, DOUGHERTY instructed CRAWFORD to remind HENON that DOUGHERTY is the reason HENON is paid by the union, stating, "I am the f***ing guy saving him [HENON] in the f***ing union."

All in violation of Title 18, United States Code, Section 371.

**COUNTS NINETY-EIGHT TO ONE HUNDRED EIGHT**
**(Honest Services Wire Fraud)**
**18 U.S.C. §§ 1343, 1346**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 14 and Overt Acts 1 through 64 of Count Ninety-Seven of this Indictment are incorporated here.

2.      Defendant JOHN DOUGHERTY, through Local 98, provided defendant ROBERT HENON with a stream of personal benefits, consisting of things of value, during the time that HENON was a member of Philadelphia City Council. The benefits given to HENON by DOUGHERTY included a salary from Local 98 and tickets to sporting events and concerts. During the period charged in these Counts, defendant ROBERT HENON did not perform any significant work of any kind for Local 98, apart from his efforts as a member of the Philadelphia City Council to act as directed by and to benefit defendant JOHN DOUGHERTY.

3.      Defendant JOHN DOUGHERTY gave these things of value to defendant ROBERT HENON with the intent to influence HENON in HENON's capacity as a member of Philadelphia City Council and Chair of the Committee on Public Property, and in exchange for HENON acting on behalf of DOUGHERTY, in his capacity as a member of Philadelphia City Council, and performing official acts as directed by and on behalf of DOUGHERTY.

4.      Defendant ROBERT HENON accepted the stream of personal benefits from defendant JOHN DOUGHERTY, knowing that the benefits were given in exchange for HENON's performance of official acts at the direction of and on behalf of defendant DOUGHERTY. Furthermore, defendants DOUGHERTY and HENON attempted to hide the true nature of their illegal relationship from the public.

5.      The official acts that defendant ROBERT HENON took, attempted to take, or caused as part of this illegal relationship included the following:

a.      At defendant JOHN DOUGHERTY's direction, defendant HENON caused L&I to inspect, and in some instances shut down, operations or construction work at locations outside of his district, where non-union laborers were involved in electrical work construction activity.

b.      At defendant JOHN DOUGHERTY's direction, defendant HENON drafted, supported, advocated, and sponsored Philadelphia City Council legislation, resolutions, and other Council legislative activities that were favorable to defendant DOUGHERTY's personal, professional, or financial interests.

c.      At defendant JOHN DOUGHERTY's direction, defendant HENON allowed defendant DOUGHERTY to demand concessions by Comcast during the franchise contract negotiations between the City of Philadelphia and Comcast, which ultimately resulted in Comcast hiring MJK Electric, a union electrical contractor defendant DOUGHERTY favored, for electrical contracting work.

6.      From in or about May 2015, through in or about September 2016, at Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

**JOHN DOUGHERTY and
ROBERT HENON**

knowingly devised and participated in a scheme and artifice to defraud and deprive the citizens of the City of Philadelphia of their right to the honest services of defendant ROBERT HENON, through bribery, that is, in exchange for receiving things of value from Local 98, which included his salary and tickets to sporting events and concerts, defendant ROBERT HENON, at the

request of, and on behalf of, defendant JOHN DOUGHERTY, took official actions as a member of Philadelphia City Council.

7.        For the purpose of executing and attempting to execute the scheme and artifice to defraud and deprive the citizens of Philadelphia of defendant ROBERT HENON's honest services as a member of Philadelphia City Council, on or about the dates below in the Eastern District of Pennsylvania and elsewhere, defendants JOHN DOUGHERTY and ROBERT HENON and others knowingly caused to be transmitted, and aided and abetted the transmission of, by means of wire communication in interstate commerce, the signals and sounds described below, each transmission constituting a separate count:

| Count | Date | Description |
|---|---|---|
| 98 | 05/19/2015 | Digital information transmitted via wire, concerning HENON's Local 98 salary for the prior week of approximately $1,374.20, sent from Philadelphia to Rochester, New York |
| 99 | 07/21/2015 | Digital information transmitted via wire, concerning HENON's Local 98 salary for the prior week of approximately $1,374.20, sent from Philadelphia to Rochester, New York |
| 100 | 08/18/2015 | Digital information transmitted via wire, concerning HENON's Local 98 salary for the prior week of approximately $1,374.20, sent from Philadelphia to Rochester, New York |
| 101 | 08/20/2015 | Telephone call between HENON, in New Jersey, and DOUGHERTY, in Philadelphia |

| Count | Date | Description |
|---|---|---|
| 102 | 09/29/2015 | Digital information transmitted via wire, concerning HENON's Local 98 salary for the prior week of approximately $1,374.20, sent from Philadelphia to Rochester, New York |
| 103 | 09/30/2015 | Email sent from a member of HENON's staff, from the email account @bobbyhenon.com, to another staff member, which traveled from Philadelphia to a location outside of Pennsylvania |
| 104 | 10/02/2015 | Electronic transfer of digital copy of check for $10,000, dated 10/23/2015, written on the account of HENON's campaign fund, payable to an advertising agency, which traveled from Texas to Philadelphia |
| 105 | 11/24/2015 | Email sent from the email address of HENON at the account @bobbyhenon.com, to the email address of a Comcast employee, which traveled from Philadelphia to a location outside Pennsylvania |
| 106 | 12/08/2015 | Digital information transmitted via wire, concerning HENON's weekly Local 98 salary for the prior week of approximately $1,374.20, sent from Philadelphia to Rochester, New York |
| 107 | 06/12/2016 | Telephone call between HENON, in Philadelphia, and PPA Official No. 2, in New Jersey |
| 108 | 06/21/2016 | Digital information transmitted via wire, concerning HENON's Local 98 salary for the prior week of approximately $1,422, sent from Philadelphia to Rochester, New York |

All in violation of Title 18, United States Code, Sections 1343 and 1346, and 2.

## COUNT ONE HUNDRED NINE
### Honest Services Mail Fraud
### 18 U.S.C. §§ 1341, 1346

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 14 and Overt Acts 1 through 64 of Count Ninety-Seven of this Indictment, and Paragraphs 2 through 5 of Counts Ninety-Eight through One Hundred Eight of this Indictment, are incorporated here.

2.      From in or about May 2015, through in or about September 2016, at Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### JOHN DOUGHERTY and
### ROBERT HENON

knowingly devised and participated in a scheme and artifice to defraud and deprive the citizens of the City of Philadelphia of their right to the honest services of defendant ROBERT HENON, through bribery, that is, in exchange for receiving things of value from Local 98, which included his salary and tickets to sporting events and concerts, defendant ROBERT HENON, at the request of, and on behalf of, defendant JOHN DOUGHERTY, took official actions as a member of Philadelphia City Council.

3.      For the purpose of executing and attempting to execute the scheme and artifice to defraud and deprive the citizens of Philadelphia of defendant ROBERT HENON's honest services as a member of Philadelphia City Council, on or about the date below in the Eastern District of Pennsylvania and elsewhere, defendants JOHN DOUGHERTY and ROBERT HENON and others knowingly caused to be deposited, to be sent and delivered by the Postal Service and any private and commercial interstate carrier, the matter and thing described below:

| Count | Date | Description |
|-------|------|-------------|
| 109 | 07/23/2015 | Notice of violations mailed from L&I in Philadelphia to the Children's Hospital of Philadelphia |

In violation of Title 18, United States Code, Sections 1341 and 1346, and 2.

## COUNTS ONE HUNDRED TEN TO ONE HUNDRED TWELVE
### (Honest Services Wire Fraud)
### 18 U.S.C. §§ 1343 and 1346

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 14 of Count Ninety-Seven of this Indictment are incorporated here.

### Introduction

At all times material to this Indictment:

2.      Verizon Pennsylvania Inc. ("Verizon") was a telecommunications company that, in part, provided television and communication services via fiber optic cable in the City of Philadelphia, including a fiber optic internet service known as "FIOS."

3.      The Communication Workers of America ("CWA") was a labor union whose members were employees of Verizon and other communications companies.

### The Scheme

4.      From in or about September 2015, to in or about June 2016, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

### ROBERT HENON

knowingly devised and participated in a scheme and artifice to defraud and deprive the citizens of the City of Philadelphia of their right to his honest services as a member of Philadelphia City Council, through bribery, that is, in return for campaign contributions, defendant HENON took official actions to put pressure on Verizon to settle a labor dispute with the CWA.

**Manner and Means**

5.       Although he was running unopposed for City Council in the 2015 election for his Philadelphia City Council seat in the Sixth District of Philadelphia, defendant ROBERT HENON was raising money for this and future campaigns for other elected offices.

6.       To raise money, defendant ROBERT HENON personally solicited potential donors, many of whom had given him money in the past.

7.       At the same time he was soliciting these contributions, he asked his potential donors what, if anything, he could do for them.

8.       On or about September 10, 2015, an official of the CWA (hereafter "CWA Official No. 1") called defendant ROBERT HENON, told him about issues the CWA was having with Verizon concerning the installation of fiber optic cable in the City of Philadelphia, and asked HENON, as an official of Philadelphia City Council, to push for an audit of the project because it might help the CWA with the contract negotiations it was having with Verizon.

9.       On or about September 23, 2015, at approximately 12:56 p.m., defendant ROBERT HENON called CWA Official No. 1 and said, "This is a political call, so I'm calling to ask for continued support of my campaign and my future ambitions." HENON said that he was hoping to get at least $5,000 from CWA. After CWA Official No. 1 told HENON that he would try, HENON thanked him, and said, "Question, non-related, as a matter of fact, I am going to hang up and give you a call right back."

10.       On or about September 23, 2015, at approximately 12:58 p.m., defendant ROBERT HENON called CWA Official No. 1, who answered, "What do you have to do, show

that it is a separate call?" Defendant HENON responded, "Yeah, yeah, yeah." Defendant

HENON and CWA Official No. 1 discussed the following topics related to Verizon:

        a.      HENON reported that he talked to an executive from Verizon and advised

him to resolve the contract with the CWA, and told him that it was in his best interest to do so,

because negotiation of the Comcast franchise agreement was taking place. HENON asked CWA

Official No. 1, "So is there anything, should I just listen, or is there anything that I should be

saying?" CWA Official No. 1 then told HENON about some of the contract issues that remained

unresolved between the CWA and Verizon.

        b.      CWA Official No. 1 offered to send the information about the contract

issues to HENON via email. HENON said, "I didn't know if there was any kind of local

influence that would be helpful." HENON added that he was going to talk to someone in the

Philadelphia Office of Information Technology about Verizon's progress installing fiber optic

cable in Philadelphia and call the CWA official back.

    11.      On or about September 26, 2015, defendant ROBERT HENON sent, or caused to

be sent, a letter containing his signature, dated September 26, 2015, addressed to CWA Official

No. 1, requesting a campaign contribution of $10,000 from the CWA before October 16, 2015.

    12.      On or about October 16, 2015, CWA Official No. 1 and defendant ROBERT

HENON spoke about a CWA campaign contribution to defendant HENON and official steps

HENON could take against VERIZON.

        a.      CWA Official No. 1 told HENON that he had obtained for HENON a

$5,000 contribution from the CWA. Defendant HENON acknowledged that $5,000 was the

largest contribution he had ever received from the CWA. CWA Official No. 1 also told HENON

that he was prepared to justify his request for a $5,000 contribution to HENON by telling the CWA board, "I know what I can ask Bobby [HENON] to do for us."

      b.    CWA Official No. 1 added, "Quick question. What I need is, I know we talked about the Verizon piece of it, now, we talked about it last time about, you know, checking on them with their franchise agreement, things like that. How difficult is it, regardless of what they are telling you, to put pressure on them, to bring them in for a hearing?" HENON replied, "Let me see where they are, let me see." CWA Official No. 1 added, "[h]ere is the thing, I need to ramp up putting some pressure on them to get them to move on some of this s*** that we are having problems with here." HENON asked, "What are you having problems with?" CWA Official No. 1 responded, "We are having huge problems with the build, with the negotiations. We are having huge problems with them at the bargaining table." CWA Official #1 said that he wanted HENON to "have them come in and answer questions in a public hearing, make them come in put some, make them sweat a little bit."

      13.    On or about October 16, 2015, at the request of CWA Official No. 1, the Political Action Committee of the CWA issued a check for $5,000, payable to the campaign of defendant ROBERT HENON.

      14.    On or about November 10, 2015, defendant ROBERT HENON called CWA Official No. 1 and told him, "The City asked to hold off on a hearing." CWA Official No. 1 replied, "Well, . . . the problem is, the whole point of doing this on our end is to put some pressure on them with the problems we're having at the bargaining table. . . . I want to put that, ramp that same kind of pressure up on them here . . ." Defendant HENON said, "I can get a December hearing set and use that as leverage . . ."

15.     On or about November 18, 2015, defendant ROBERT HENON called CWA Official No. 1 and stated that he told a Verizon executive about the hearing, and that "the color in his face changed." CWA Official No.1 replied, "Good, good, that is exactly what we want to get out of them."

16.     On or about December 1, 2015, defendant ROBERT HENON called CWA Official No. 1 and told him that an elected City official asked him to postpone the hearing until 2016. HENON asked CWA Official No. 1 if that was okay; he replied that it was fine with him.

17.     On or about March 14, 2016, defendant ROBERT HENON sent, or caused to be sent, a letter containing his signature, dated March 14, 2016, addressed to CWA Official No. 1, requesting a campaign contribution of $5,000 from the CWA before March 31, 2016.

18.     On or about March 15, 2016, CWA Official No. 1 requested that the CWA contribute an additional $3,000 to defendant ROBERT HENON. That same day, the Political Action Committee of the CWA issued a check for $3,000, payable to defendant HENON's campaign.

19.     In or about April 2016, defendant ROBERT HENON scheduled a committee hearing for April 29, 2016, allegedly to address the status of Verizon's installation of fiber optic cable in Philadelphia, even though members of the Philadelphia Office of Information and Technology, who were overseeing the project, had not requested a hearing and did not feel that a hearing was necessary.

20.     On or about April 12, 2016, members of the CWA went on strike because of the lack of a contract between the CWA and Verizon.

21.     On or about April 27, 2016, defendant ROBERT HENON called CWA Official No. 1 and talked about the upcoming hearing. HENON encouraged CWA Official No. 1 to fill the Council chamber with as many CWA members as possible.

22.     On or about April 27, 2016, defendant ROBERT HENON called his office and instructed a member of his staff to call CWA Official No. 1 and review the hearing agenda with him.

23.     On or about April 27, 2016, CWA Official No. 1 called defendant JOHN DOUGHERTY (charged elsewhere in this Indictment) and talked about the upcoming hearing. CWA Official No. 1 said, "We are all geared up for that. I got about 400 or 500 people coming down there and we are throwing them down there with a bunch of shirts. But I am trying to mask it. I got all my guys coming down, and I am telling all my people listen, this isn't a CWA hearing, this a hearing about the citizens of Philadelphia not getting FIOS." He added, "Like I said, at the end of the day, they are eventually going to get this [labor agreement between the CWA and Verizon] done, but this is our opportunity to give them a black eye while we are trying to get this s*** done."

24.     On or about April 29, 2018, at the request of defendant ROBERT HENON, there was a joint hearing of the Public Property and Public Works Committee and the Office of Information Technology (OIT) concerning the status of the installation of fiber optic cable by Verizon pursuant to the franchise agreement between Verizon and the City of Philadelphia. HENON conducted the hearing. At the hearing, witnesses from the OIT who were monitoring Verizon's compliance with the franchise agreement testified that: (1) Verizon had met its benchmarks in 2013 and 2015; (2) the CWA strike was to blame for the delay in verifying the fiber optic cable installation status, as required to determine whether Verizon was in compliance

with the franchise agreement; and (3) up to the time of the strike, Verizon had been in compliance with the franchise agreement. During the hearing, defendant HENON told the OIT witnesses that the lack of a work force "was unacceptable."

25.     Witnesses from Verizon testified that certification of Verizon's compliance had halted because of the strike, and that they believed they were in compliance with the franchise agreement. Defendant ROBERT HENON told the Verizon witnesses, "We are having a hearing because of the lack of information and lack of a work force . . . I have no faith and confidence that the information I am getting is truthful."

26.     CWA Official No. 1 and another official from the CWA (CWA Official No. 2) testified at the hearing. Both testified that Verizon should not be believed. Toward the end of the hearing, defendant HENON commented that CWA members were "great employees," and that they were "the ones who are making money for Verizon."

27.     On or about April 29, 2016, CWA Official No. 2 sent the following text message to defendant JOHN DOUGHERTY (charged elsewhere in this Indictment): "HENON is killing Verizon in this Hearing!!!! Thank You!"

28.     On or about May 10, 2016, CWA Official No. 2 called defendant ROBERT HENON, who said, "I f***ing destroyed them [Verizon] on KYW today." CWA Official No. 2 said that defendant HENON did a great job at that April 29 hearing, and he appreciated it. HENON then asked if there had been any progress on the negotiations with Verizon.

29.     On or about May 11, 2016, defendant ROBERT HENON told CWA Official No. 1, "I was just giving you a heads up. I whacked Verizon again yesterday."

30.     On or about May 11, 2016, defendant ROBERT HENON told JOHN DOUGHERTY that he had just gotten off the phone with CWA Official No. 1, and that he "just

wanted to give him a heads up, you know, about me whacking Verizon on KYW and in a hearing yesterday, in case he gets any phone calls."

31.    On or about June 27, 2016, CWA Official No. 1 requested that the CWA contribute an additional $5,000 to defendant ROBERT HENON. That same day, the Political Action Committee of the CWA issued a check for $5,000 to the campaign of defendant HENON.

32.    On or about June 30, 2016, CWA Official No. 1 called defendant ROBERT HENON and left a voice message stating that he was not going to defendant HENON's fundraiser but wanted to make sure HENON was fine with his absence. CWA Official No. 1 also said he sent a $5,000 check for HENON, and that if HENON wanted him to attend the event, he would.

33.    On or about June 30, 2016, defendant ROBERT HENON called CWA Official No. 1, and said that he had received his message. They agreed to meet and "figure out what's going on." Defendant HENON said he appreciated CWA Official No. 1's support, and CWA Official No. 1 thanked HENON for all of his help.

34.    For the purpose of executing and attempting to execute the scheme and artifice to defraud and deprive the citizens of Philadelphia of his honest services as a member of Philadelphia City Council, on or about the dates below in the Eastern District of Pennsylvania and elsewhere, defendant ROBERT HENON knowingly caused to be transmitted, and aided and abetted the transmission of, by means of wire communication in interstate commerce, the signals and sounds described below, each transmission constituting a separate count:

| Count | Date | Description |
|---|---|---|
| 110 | 10/20/2015 | Electronic transfer of digital copy of check for $5,000, written on the account of the CWA, payable to HENON's campaign account, from Texas to Philadelphia |
| 111 | 03/25/2016 | Electronic transfer of digital copy of check for $3,000, written on the account of the CWA, payable to HENON's campaign account, from Texas to Philadelphia |
| 112 | 07/05/2016 | Electronic transfer of digital copy of check for $5,000, written on the account of the CWA, payable to HENON's campaign account, from Texas to Philadelphia |

All in violation of Title 18, United States Code, Sections 1343 and 1346, and 2.

## COUNT ONE HUNDRED THIRTEEN
### (Federal Program Bribery – Accepting)
### 18 U.S.C. § 666(a)(1)(B)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 7 and Overt Acts 41 through 56 of Count Ninety-Seven of this Indictment are incorporated here.

2.      In or about June 2016, through in or about September 2016, at Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**ROBERT HENON,**

while a Councilman for the City of Philadelphia, being an agent of the City of Philadelphia, which received benefits in excess of $10,000 in the one-year period from January 1, 2016, to December 31, 2016, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited, demanded, accepted, and agreed to accept something of value, intending to be influenced and rewarded in connection with the business, transaction, and series of transactions of the City of Philadelphia involving something of value of $5,000 or more, that is, HENON agreed to accept insulated glass for the home of a close friend, worth approximately $3,000, from PPA Official No. 2, intending to be influenced and rewarded in connection with his vote, on September 29, 2016, against a resolution authorizing Philadelphia City Council to conduct a performance audit of the Philadelphia Parking Authority.

In violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT ONE HUNDRED FOURTEEN
### (Federal Program Bribery – Soliciting)
### 18 U.S.C. § 666(a)(1)(B)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 33 of Counts One Hundred Ten to One Hundred Twelve of this Indictment are incorporated here.

2.      From on or about September 23, 2015, through on or about October 16, 2015, at Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**ROBERT HENON,**

while a Councilman for the City of Philadelphia, being an agent of the City of Philadelphia, which received benefits in excess of $10,000 in the one-year period from January 1, 2015, to December 31, 2015, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited, demanded, accepted, and agreed to accept something of value, intending to be influenced and rewarded in connection with the business, transaction, and series of transactions of the City of Philadelphia involving something of value of $5,000 or more, that is, HENON solicited and accepted campaign contributions from CWA Official No. 1, intending to be influenced and rewarded in connection with the act of having the Committee on Public Property and Public Works of the Philadelphia City Council of the City of Philadelphia, which he chaired, hold a public hearing to review the status of Verizon's compliance with the City of Philadelphia's franchise agreement with Verizon Pennsylvania, Inc., the primary purpose of which was to put pressure on Verizon to settle a labor dispute with the CWA, which hearing was held on April 29, 2016.

In violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT ONE HUNDRED FIFTEEN
### (Federal Program Bribery – Accepting)
### 18 U.S.C. § 666(a)(1)(B)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 33 of Counts One Hundred Ten to One Hundred Twelve of this Indictment are incorporated here.

2.      On or about March 15, 2016, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**ROBERT HENON,**

while a Councilman for the City of Philadelphia, being an agent of the City of Philadelphia, which received benefits in excess of $10,000 in the one-year period from January 1, 2016, to December 31, 2016, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited, demanded, accepted, and agreed to accept something of value, intending to be influenced and rewarded in connection with the business, transaction, and series of transactions of the City of Philadelphia involving something of value of $5,000 or more, that is, HENON accepted campaign contributions from CWA Official No. 1, intending to be influenced and rewarded in connection with the act of having the Committee on Public Property and Public Works of the Council of the City of Philadelphia, which he chaired, hold a public hearing to review the status of Verizon's compliance with the City's Franchise Agreement with Verizon Pennsylvania, Inc., the primary purpose of which was to put pressure on Verizon to settle a labor dispute with the CWA, which hearing was held on April 29, 2016.

In violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT ONE HUNDRED SIXTEEN
### (Federal Program Bribery – Accepting)
### 18 U.S.C. § 666(a)(1)(B)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 33 of Counts One Hundred Ten to One Hundred Twelve of this Indictment are incorporated here.

2.      On or about June 27, 2016, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**ROBERT HENON,**

while a Councilman for the City of Philadelphia, being an agent of the City of Philadelphia, which received benefits in excess of $10,000 in the one-year period from January 1, 2016, to December 31, 2016, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited, demanded, accepted, and agreed to accept something of value, intending to be influenced and rewarded in connection with the business, transaction, and series of transactions of the City of Philadelphia involving something of value of $5,000 or more, that is, HENON accepted campaign contributions from CWA Official No. 1, intending to be influenced and rewarded in connection with the act of having the Committee on Public Property and Public Works of the Council of the City of Philadelphia, which he chaired, hold a public hearing to review the status of Verizon's compliance with the City of Philadelphia's Franchise Agreement with Verizon Pennsylvania, Inc., the primary purpose of which was to put pressure on Verizon to settle a labor dispute with the CWA, which hearing was held on April 29, 2016.

In violation of Title 18, United States Code, Section 666(a)(1)(B).

## NOTICE OF FORFEITURE ONE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.       As a result of the violations of Title 18, United States Code, Sections 371, 664, and 1343, and Title 29, United States Code, Section 501(c), set forth in Counts One through Sixty-Six of this Indictment, defendants

**JOHN DOUGHERTY,**
**BRIAN BURROWS,**
**MICHAEL NEILL,**
**MARITA CRAWFORD,**
**NIKO RODRIGUEZ,**
**BRIAN FIOCCA, and**
**ANTHONY MASSA**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such violations, including, but not limited to, the sum of at least $600,481.

2.       If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

       a.       cannot be located upon the exercise of due diligence;

       b.       has been transferred or sold to, or deposited with, a third party;

       c.       has been placed beyond the jurisdiction of the Court;

       d.       has been substantially diminished in value; or

       e.       has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

## <u>NOTICE OF FORFEITURE TWO</u>

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Section 1343, set forth in Counts Sixty-Seven and Sixty-Eight of this Indictment, defendants

**JOHN DOUGHERTY and**
**MARITA CRAWFORD**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such violations, including, but not limited to, the sum of at least $2,477.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the Court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be divided

                without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

## <u>NOTICE OF FORFEITURE THREE</u>

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Section 371 and Title 29, United States Code, Section 186 set forth in Counts Eighty-Eight through Ninety-Six of this Indictment, defendant

### JOHN DOUGHERTY

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such violations, including, but not limited to, the sum of at least $61,026.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

- 150 -

## NOTICE OF FORFEITURE FOUR

**THE GRAND JURY FURTHER CHARGES THAT:**

1.        As a result of the violations of Title 18, United States Code, Sections 371, 666, 1341, and 1343, set forth in Counts Ninety-Seven through One Hundred Nine and Count One Hundred Thirteen of this Indictment, defendants

**JOHN DOUGHERTY and**
**ROBERT HENON**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such violations, including, but not limited to, the sum of at least $158,892.

2.        If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

      a.        cannot be located upon the exercise of due diligence;

      b.        has been transferred or sold to, or deposited with, a third party;

      c.        has been placed beyond the jurisdiction of the Court;

      d.        has been substantially diminished in value; or

      e.        has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

- 151 -

## <u>NOTICE OF FORFEITURE FIVE</u>

**THE GRAND JURY FURTHER CHARGES THAT:**

1.        As a result of the violations of Title 18, United States Code, Sections 666 and 1343, set forth in Counts One Hundred Ten through One Hundred Twelve and One Hundred Fourteen through One Hundred Sixteen of this Indictment, defendant

**ROBERT HENON**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such violations, including, but not limited to, the sum of at least $13,000.

2.        If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

          a.        cannot be located upon the exercise of due diligence;

          b.        has been transferred or sold to, or deposited with, a third party;

          c.        has been placed beyond the jurisdiction of the Court;

          d.        has been substantially diminished in value; or

          e.        has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

A TRUE BILL:

_____
FOREPERSON

JENNIFER ARBITTIER WILLIAMS
Attorney for the United States,
Acting Under Authority Conferred by 28 U.S.C. § 515

- 153 -