**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

--------------------------------------------------------------

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| Plaintiff, | : CRIMINAL NO: 2:19-cr-00064-JLS-1 |
| v. | : |
| | : |
| JOHN DOUGHERTY, | : |
| | : |
| Defendant. | : |
| | : |

--------------------------------------------------------------

## <u>DEFENDANT'S MOTION TO SUPPRESS TITLE III WIRETAP EVIDENCE</u>

Defendant John Dougherty, by and through his undersigned counsel, hereby moves to suppress the government's wire interceptions of his cellular telephone (the "Target Telephone," as described in the court's April 29, 2015 order approving the government's Title III wiretapping application).[1] In support, defendant relies on the accompanying memorandum of law, incorporated by reference herein.

Date: August 6, 2019

*/s/ Henry E. Hockeimer, Jr.*
Henry E. Hockeimer, Jr. (I.D. No. 86768)
David L. Axelrod (I.D. No. 323729)
Terence M. Grugan (I.D. No. 307211)
Emilia McKee Vassallo (I.D. No. 318428)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
T: 215.665.8500
F: 215.864.8999

*Attorneys for Defendant John Dougherty*

---

[1] The cell phone number is listed in the government's affidavit and the court's April 29, 2015 order authorizing the interception, but it is omitted here to protect Dougherty's privacy.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---------------------------------------------------------------

UNITED STATES OF AMERICA,          :
          :

          Plaintiff,          : CRIMINAL NO: 2:19-cr-00064-JLS-1
      v.          :
          :

JOHN DOUGHERTY,          :
          :

          Defendant.          :
          :

---------------------------------------------------------------

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION TO SUPPRESS TITLE III WIRETAP EVIDENCE**

I.    **INTRODUCTION**

Before the government may obtain a court order authorizing its interception of a person's telephone calls—perhaps the most invasive of government investigatory tactics—it must establish that wiretapping is *necessary* under the particular circumstances and in light of other investigatory techniques' effectiveness or potential danger. The government failed to make such a showing here, where it merely established its desire to obtain supplemental and superfluous evidence, rather than evidence *necessary* to its investigation. Thus, the court should suppress the wiretap evidence, the result of an unjustified fishing expedition into defendant John Dougherty's private conversations.

In presenting its case against Dougherty, the leader of the International Brotherhood of Electrical Workers Local Union 98 ("Local 98"), the government intends to introduce his private telephone conversations. The government wiretapped Dougherty's cell phone for *eighteen months*, from April 2015 through August 2016. The government intercepted these conversations pursuant to court orders granted in violation of the "necessity requirement," as it is known, of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510, *et seq.*

("Title III"). The government opted to wiretap Dougherty's cell phone to attempt to gather extraneous evidence against him and others, despite making clear in its application to the court that traditional investigative methods were sufficient to prove or disprove the target offenses. Thus, this motion requests that the court suppress the government's interceptions of Dougherty's conversations that were collected in violation of Title III.

In support of its initial April 29, 2015 application for a wiretap order (and similarly for subsequent wiretap orders), the government submitted an affidavit (Affidavit of Jason Blake, executed April 29, 2015 ("Aff.")) that relied upon evidence from its investigation up to that point to justify its request for a wiretap. The April 29, 2015 affidavit, the primary subject of this motion, listed two target offenses, embezzlement of assets from a labor organization, 29 U.S.C. § 501(c), and conspiracy to embezzle assets from a labor organization, 18 U.S.C. § 371.

Title III requires the government to include in its application for wiretapping "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." § 2518(1)(c). The government has failed to meet this "necessity requirement" because, by its own narrative, traditional investigatory methods *would have been effective* at proving or disproving the target offenses—and because the government failed to justify its decision not to execute a search warrant, which it *presumed would be effective* once executed. As explained in the discussion that follows, the government's pretextual reasoning in its affidavit fails to justify its intrusion on Dougherty's privacy. Thus, the Court should grant the defendant's motion to suppress evidence derived from the April 29, 2015 wiretap—and from all wiretaps that followed as the fruit of the illegal wiretap.

II.   **DISCUSSION**

   **A. Legal Standard**

   Title III governs the interception of oral and wire communications. Under Title III, a court may authorize the government's interception of a targeted individual's oral or wire communications only where the government meets certain requirements, including the requirement that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). When the government submits an application for Title III interception (and a supporting affidavit) to the court for approval, the application *must* include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." § 2518(1)(c). This requirement, referred to as the "necessity requirement," aims "to make doubly sure that [Title III] statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications." *United States v. Bailey*, 840 F.3d 99, 114 (3d Cir. 2016) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)).

   This requirement takes into account that the interception of a person's phone calls goes to the heart of his expectation of privacy, and it empowers courts to balance an individual's privacy with the needs of a particular investigation, based on the information the government sets forth in its application and affidavit. *See United States v. Vento*, 533 F.2d 838, 844 (3d Cir. 1976) ("Title III obliges the courts to measure the permissible use of sophisticated electronic investigative tools against the specific restraints [including the necessity requirement] imposed by Congress to avoid undue intrusions upon privacy.").

   To satisfy the necessity requirement, the government must "lay a factual predicate," *Bailey*, 840 F.3d at 114, in its application for Title III interception stating why traditional

investigative techniques "(1) have been tried and failed; (2) reasonably appear unlikely to succeed; or (3) are too dangerous to try." *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir. 2005) (citing § 2518(1)(c)). "The government must [] fully explain to the authorizing judge the basis for such a conclusion." *Vento*, 533 F.2d at 849. Other investigative procedures include surveillance, "questioning and interrogation of witnesses or participants," search warrants, and undercover agents or informants. *United States v. Castillo-Garcia*, 117 F.3d 1179, 1187 (10th Cir. 1997), *overruled on other grounds*, *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 n.1 (10th Cir. 2002).

The government need not "exhaust all other investigative procedures before resorting to electronic surveillance," *Bailey*, 840 F.3d at 114 (quoting *United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997)), however, wiretapping "is not [to be] resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *Vento*, 533 F.2d at 849 (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)). In other words, the government cannot use wiretapping as back-up evidence; such evidence must be critical to the investigation. Wiretapping is simply too invasive to serve as the belt and suspenders to the government's case.

Courts apply the necessity requirement in a "practical and common sense fashion." *Bailey*, 840 F.3d at 114 (quoting *United States v. Armocida*, 515 F.2d 29, 37 (3d Cir. 1975)). But this "'common sense approach' will not rehabilitate the government's failure to include statutorily required information in a wiretap application." *Castillo-Garcia*, 117 F.3d at 1194–95 (citation omitted). When the necessity requirement is not met, courts must grant a motion to suppress. *Cf. Bailey*, 840 F.3d at 114–15. *See, e.g.*, *United States v. Simpson*, 813 F.2d 1462, 1472–73 (9th Cir. 1987).

The notion that the government may implement a wiretap where other investigative procedures fall short of revealing the extent of a suspect's involvement in a crime or the scope of a conspiracy, *Bailey*, 840 F.3d at 116, does *not* provide a blank check for wiretapping. Title III does not provide the government the ability to blindly eavesdrop on a person's calls, in hopes that the suspect does something criminal or implicates another individual—nor does it provide the ability to indefinitely postpone using other investigative methods that would be effective.

Where traditional investigative techniques would prove or disprove the target offenses, courts prohibit wiretapping: For example, in *Simpson*, where the government's affidavit failed to note that, among other things, the suspected heroin dealer had arranged to sell heroin to undercover agents twice within two months, the court rejected the government's argument that "undercover techniques" would likely prove ineffective at "total penetration of the drug organization." 813 F.2d at 1471–72. The Ninth Circuit in *Simpson* affirmed the district court's suppression of the wiretap evidence, noting that "traditional techniques could have led to the successful infiltration of the entire enterprise" and stressing that "[t]he affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail." *Id.* at 1472–73; *see also United States v. Ailemen*, 986 F. Supp. 1228, 1242 (N.D. Cal. 1997) (finding that "[t]he pre-wiretap investigation in this case uncovered promising leads that would have obviated the necessity of a wiretap").

Similarly, in *United States v. Arrington*, the Tenth Circuit affirmed the suppression of a wiretap in a drug trafficking conspiracy case where the government failed to follow a lead that provided further opportunity to use "standard investigative methods," including a search warrant, in lieu of wiretapping. No. 99-1565, 2000 U.S. App. LEXIS 5762, at *16–18 (10th Cir. Mar. 29,

2000). The Tenth Circuit affirmed suppression of subsequent wiretaps as well, as the "fruit" of the first wiretap application. *Id.* at *18.

Courts should "refuse[] to condone a wiretap order when the supporting application only establishe[s] that law enforcement pursued traditional investigative methods that were unlikely to produce pertinent evidence before seeking the wiretap." *See Gonzalez, Inc.*, 412 F.3d at 1113–14 (finding that the government "side-stepped its responsibility to use promising traditional techniques"). In *Gonzalez*, which involved a conspiracy to smuggle aliens into the United States, the Ninth Circuit found the necessity requirement was not established where the government's affidavit listed only the following investigative efforts: "(1) five-days-worth of pen register analysis; (2) an equally short use of trap-and-trace analysis; and (3) limited physical surveillance of the Blake Avenue Office [the office that was subsequently wiretapped]." *Id.* at 1112.

In *United States v. Landeros-Lopez*, similarly, the court found the necessity requirement unmet in a drug trafficking case where "[t]he entire pre-wiretap investigation of [defendant] consisted of a toll records analysis, a pen register, some limited (but undisclosed) physical surveillance of [a co-defendant's] home, and some investigation into the criminal record of [co-defendants]." 718 F. Supp. 2d 1058, 1065–66 (D. Ariz. 2010) (stating that the government "was required to use traditional techniques for a reasonable period of time without success" before wiretapping); *see also United States v. Carneiro*, 861 F.2d 1171, 1180–83 (9th Cir. 1988) (finding the necessity requirement unmet where the government failed to investigate a suspect before implementing a wiretap; stating that a suspicion that someone is part of a conspiracy is insufficient to justify a wiretap).

While necessity may be justified in a drug conspiracy case where communications among the different co-conspirators are the only evidence of criminality, that is not the case in the

investigation of union fund embezzlement that the government was pursuing here. Whether the government can prove embezzlement of union funds in this case depends upon bank records, union records, and personal records—tangible records.[2] *See generally* Aff. Embezzlement, as it is alleged in this case, is vastly different from street crimes like drug trafficking, where money is often exchanged in cash and the players don't go by their real names. Drug cases typically do not involve extensive paper and digital records, brick-and-mortar offices, and predictable networks of colleagues, neighbors, and associates. Thus, in cases like this one, where the target offenses are embezzlement of assets from a labor organization, 29 U.S.C. § 501(c), and conspiracy to embezzle assets from a labor organization, 18 U.S.C. § 371, Aff. ¶ 3, wiretaps, while undoubtedly useful in proving or disproving a case, are not de facto necessary. In a case like this, where the target offenses listed in a wiretap application are provable or not by records, surveillance videos, and other traditional techniques, the court must scrutinize the government's application carefully and must grant suppression where wiretapping is implemented merely as gloss on an effective investigation.

## B. The Government Fails to Meet the "Necessity" Requirement Because It Has Improperly Used Wiretapping as Its Primary Investigative Tool.

The government, in its initial April 29, 2015 wiretap application, failed to show that a wiretap was more than a double-check on what it presented as an effective investigation, thus warranting suppression of the evidence derived from that application and from subsequent applications that built upon it. *See Arrington*, 2000 U.S. App. LEXIS 5762, at *18 (finding

---

[2]     For instance, Local 98, as a labor organization, is required to file annual LM-2 reports with the U.S. Department of Labor.  These reports itemize the union's spending for the prior year, including payments to officers and employees, political and lobbying expenditures, gifts and donations, and all expenses charged to union credit cards and accounts—and they are available to the public.

successive wiretaps inadmissible as fruit of the poisonous tree). To be clear, Dougherty's position is that interception of his phone calls was an *unnecessary* invasion of his privacy, but he maintains that the evidence at trial will ultimately prove his innocence. His argument in this motion, that traditional investigatory methods render a wiretap unnecessary, does not bear upon a finding of guilt or innocence in this case.

On April 29, 2015, the government applied for and was granted the court's permission to record Dougherty's voice communications, text communications, and voicemail messages via his cell phone, including as additional targets, Cecelia Dougherty, Brian Fiocca, Niko Rodriguez, and Thomas Rodriguez. Aff. ¶ 3 & p. 63. The government listed only two target offenses: embezzlement of assets from a labor organization, 29 U.S.C. § 501(c), and conspiracy to embezzle assets from a labor organization, 18 U.S.C. § 371. *Id.* ¶ 3. The government's application for Title III interception, and the judge's approval, both *only* pertain to wiretapping as it relates to the target offenses—these are the *only* offenses to be considered in this Title III analysis. *See* §§ 2518(1)(b), (3)(a)–(b).

### 1. The Government's Purported Justification

FBI Agent Jason Blake completed the affidavit in support of the government's application and stated that probable cause existed to believe that wiretap communications would yield evidence regarding (1) the target offenses, (2) the identity of others who either have knowledge of or are committing the target offenses, and (3) "the existence and location of records" documenting the offenses. Aff. ¶ 17. Further, Agent Blake stated that "[n]ormal investigative procedures have been tried and have failed, appear unlikely to succeed if tried, or are too dangerous to employ." *Id.* ¶ 18. The affidavit, though it states key Title III language in *cursory* fashion, fails to "lay a factual predicate" as to why, given the apparent effectiveness and

availability of other investigatory methods, a wiretap was *necessary* to investigate the *target crimes*. *See Bailey*, 840 F.3d at 114. This failure warrants suppression.

The government in its affidavit set forth an advanced investigation that had already purportedly developed substantial evidence of the target offenses: Based on credit card records, the government alleged that the majority of purchases made on Dougherty's three Local 98 credit cards were "personal in nature." Aff. ¶ 29. Video surveillance allegedly showed that Brian Fiocca, Niko Rodriguez, and Thomas Rodriguez "routinely" used Dougherty's Local 98 credit card to make such purchases, often at a Target store near Dougherty's home, and that they would then deliver the items to Dougherty's home (and sometimes to Fiocca's, next door). *Id*. ¶ 29–30. This, by the government's telling, corroborated agents' own observations from outside Dougherty's home. *Id*. ¶ 30.

In addition to retail surveillance cameras, pole cameras, credit card records, and agent surveillance, *id*. ¶ 29–30, the government examined pen register records, *id*. ¶ 31. These records allegedly demonstrated many instances where phone calls and text messages between Dougherty's phone and the phones of the other target interceptees immediately preceded the purchases of personal items on Dougherty's Local 98 credit cards. *Id*. For example:

> On May 2, 2014, at 9:04 A.M. and 9:46 A.M., DOUGHERTY and FIOCCA had voice communications on TARGET TELEPHONE #1. At 9:50 A.M., $42.90 was charged at the Target, using one of the Local 98 American Express credit cards assigned to DOUGHERTY, for bottled water, paper towels, and diapers. At 9:54 A.M., a black Ford F150 matching the description of the one owned by the union arrived at the DOUGHERTY residence. Two individuals matching the description of FIOCCA and NIKO RODRIGUEZ, left the F150 and carried items from the vehicle into the DOUGHERTY residence. Investigators have learned that, at the time, NIKO RODRIGUEZ and FIOCCA's brother Greg Fiocca, who also resided at 1931 E. Moyamensing Street, had infant children.

*Id*.

Based on the government's affidavit, it does not appear that any relevant pen register numbers were unknown to law enforcement. In addition to the government's investigation of Dougherty's allegedly personal purchases made on Local 98 credit cards, the government investigated him for alleged "thefts and misuse of union funds," including his reimbursement of personal credit card expenses, his charges on Local 98 credit cards for personal purchases disguised as business purchases, his use of petty cash from Local 98, and his cash withdrawals from union accounts. *Id.* ¶ 35.

Based on traditional investigatory methods, including the examination of bank and credit card records, the government alleged that Dougherty reimbursed himself with Local 98 funds for many purchases made on his personal credit card from 2011–2014 and that these reimbursements did not correspond with business expenses. *Id.* ¶¶ 37–42. The government also alleged that Dougherty used his Local 98 American Express card to make personal purchases—and enumerated a list of retailers and expenses totaling $115,636.46 from January 2011 through September 2014. *Id.* ¶¶ 45–46. As an example, one of the government's allegations stated that "[o]n five occasions between March 6, 2013 and August 27, 2014, a Local 98 American Express credit card assigned to DOUGHERTY was used to purchase $662.65 in vitamins and supplements from two GNC stores in South Philadelphia. The purchases were linked to GNC customer accounts for FIOCCA and NIKO RODRIGUEZ." *Id.* ¶ 49. And another example alleged that Dougherty charged approximately $7,750 to the union for having his father, John Dougherty, Sr., accompany him on business trips throughout 2011–2014. *Id.* ¶ 50. Further, the government alleged that "DOUGHERTY uses the TARGET TELEPHONE to arrange for FIOCCA and NIKO RODRIGUEZ to take CECELIA DOUGHERTY, who does not drive, on personal errands"—and that they similarly act as drivers for Dougherty for non-union purposes.

"NIKO RODRIGUEZ and FIOCCA have been seen by FBI surveillance performing errands for DOUGHERTY and his family, such as delivering dry cleaning, removing and transporting DOUGHERTY's personal trash, and driving DOUGHERTY's family members to various locations, including a doctor's office, hospital, and library." *Id.* ¶ 50.

The government's affidavit explained that the "objective" of its investigation "is to obtain evidence to fully prosecute DOUGHERTY, the TARGET INTERCEPTEES, and others yet unknown, for the TARGET OFFENSES." *Id.* ¶ 55. Notably, the government did not explain why it believed others were involved—or why it was unable to ascertain their identities through traditional investigatory methods. The government stated in conclusory fashion that wiretapping Dougherty's cell phone would "further the goals and objectives of this investigation" by:

> a.      Obtaining evidence of the misuse of Local 98 funds and resources for the personal benefit of DOUGHERTY, FIOCCA, NIKO RODRIGUEZ, THOMAS RODRIGUEZ, and their families; and
>
> b.      Identifying any other persons who may be participating in, aware of, authorizing, or benefitting from DOUGHERTY's embezzlement of Local 98 funds.

*Id.* ¶ 56.

The government's own language—"further the goals and objectives of this investigation"—essentially concedes that wiretap evidence serves as supplemental rather than necessary to its investigation, in violation of Title III. In many cases, the government would of course prefer to "further" its goals via a wiretap, but Title III forces the government to go about its duties in the traditional, oftentimes more difficult manner, in order to protect individuals' privacy. *See Vento*, 533 F.2d at 844 ("Title III obliges the courts to measure the permissible use of sophisticated electronic investigative tools against the specific restraints [including the necessity requirement] imposed by Congress to avoid undue intrusions upon privacy.").

In points "a" and "b" above, the government invokes cursory "necessity requirement" language, but neither these "magic words" nor their explanations establish the required "factual predicate" for wiretapping. *See* § 2518(1)(c); *Bailey*, 840 F.3d at 114. As will be discussed further below, as to the government's reason "a" above, other investigatory methods were effective, according to the government's own narrative. And as to point "b," the government did not set forth any factual basis to show "necessity," as Title III requires.

Preceding the April 29, 2015 Title III application for interception, and as noted above, the government's investigation included the use of "pole mounted remotely operated cameras to view various locations where items purchased with union funds may be delivered." Aff. ¶ 59. "However," Agent Blake noted, "physical surveillance alone is not an investigative technique which is likely to result in the discovery of the identity of all co-conspirators, the exact roles of the subjects, or the full scope of the organization." *Id.* The discussion of surveillance continued:

> Surveillance in and of itself, even if highly successful, such as observing the comings and goings of TARGET INTERCEPTEES, may not provide sufficient evidence of DOUGHERTY directing the actions of the TARGET INTERCEPTEES. Surveillance has shown the TARGET INTERCEPTEES purchasing retail goods using IBEW Local 98 American Express credit cards and the subsequently delivering those items to the home of DOUGHERTY. Pen register analysis establishes voice and text communications between the TARGET INTERCEPTEES prior to the purchase and delivery of the items. Surveillance has also shown FIOCCA and NIKO RODRIGUEZ performing errands for DOUGHERTY including delivering dry cleaning to his residence. However, surveillance is limited to public and outdoor activities and if done extensively exposes agents to detection by targets which could prematurely tip off the investigation and possibly cause the destruction of evidence. Moreover, surveillance alone cannot provide evidence of DOUGHERTY instructing or authorizing the TARGET INTERCEPTEES to purchase the goods and deliver them to his or their residence.

*Id.*

The government had also utilized pen registers, toll records, and cell site data to track calls made from Dougherty's cell phone and acknowledged that these are "valuable investigative

tools" but noted their inherent limitations; for instance, they fail to "identify the nature or substance of the conversation, or differentiate between legitimate calls and calls for criminal purposes." *Id.* ¶ 64.

Further, and critically, the government postponed its execution of search warrants, in favor of wiretapping first, without justification as to why search warrants would be insufficient to complete its investigation of the target offenses. Agent Blake noted the following:

> Other means carefully considered but not deemed likely to succeed for the reasons set forth below, include the use of a Federal Grand Jury and the execution of search warrants against the organization's place of business. *Your affiant and his partners intend to execute search warrants only after the covert investigation is completed.*

*Id.* ¶ 58 (emphasis added).

The government noted that "[s]earch warrants of Local 98 offices and the residences of DOUGHERTY, FIOCCA, NIKO RODRIGUEZ, THOMAS RODRIGUEZ, and others have been considered and will eventually be conducted." *Id.* ¶ 72. Further, the government summarized the evidence it expected to find when it finally did conduct searches:

> The searches will also be used to obtain expense reports, accounting records, receipts and other documents which are evidence of the schemes alleged here. However, the seizure of documents may not fully reveal DOUGHERTY's and the other TARGET INTERCEPTEES' knowledge of or involvement in the embezzlement scheme. For example, a search might locate expense reports or other items documenting and approving purchases made by FIOCCA and NIKO RODRIGUEZ, but those expense reports may not indicate that DOUGHERTY directed FIOCCA and NIKO RODRIGUEZ to make the purchases.

*Id.*

The government noted the purported necessity of "additional investigative steps" to "identify which documents, records, or other items should be sought during the execution of the search warrants." *Id.* It explained: "DOUGHERTY has used and continues to use TARGET TELEPHONE #1 to direct FIOCCA and NIKO RODRIGUEZ to utilize Local 98 American

Express credit cards to purchase items for DOUGHERTY's personal use. As those conversations occur, the actual item purchased, the retail receipt, expense report and other union documentation related to the purchase will be added to the list of items sought during the search." *Id*.

But the government's justifications for a wiretap are unsupported and pretextual, in light of the purported effectiveness of traditional methods, the failure to establish a "factual predicate" regarding why others may be involved in the target offenses, and the anticipated success of a search warrant. As explained in the discussion that follows, traditional investigative techniques are sufficient to prove or disprove the target offenses in this case (and, to that end, to determine the "existence and location of records"). And the Government cannot indefinitely postpone the execution of a search warrant in favor of wiretapping when it believes a search warrant would be effective. The government implemented its wiretap here as a backstop to its traditional investigation and perhaps to fish around for offenses other than the "target offenses," in violation of Title III. And the Government cannot launch a fishing expedition to determine whether others are involved in a conspiracy without any justification as to why traditional investigative techniques would be ineffective at determining their identities.

## 2. Traditional investigative techniques were sufficient to complete the investigation of the target crimes.

In its April 29, 2015 application for interception, the government sought to listen in on a group of people who live tightly intertwined, predictable lives. The five people whose communications the government sought to intercept are: Dougherty, the longtime business manager of Local 98, Aff. ¶ 10; his wife, Cecelia Dougherty, with whom he shares a home, *id.* ¶ 11; Brian Fiocca, a Local 98 employee who is also Dougherty's nephew and next-door neighbor, *id.*; Nico Rodriguez, who was paid by Local 98 through its apprentice training fund; and Thomas Rodriguez, a Local 98 employee, *id.* As the

government makes clear, these people's personal and work lives are closely wrapped up with each other's, and they interact regularly—in fact, constantly. Dougherty's network is tight. *See id.* ¶ 60 ("This experience underscores the inability of anyone other than *known* trusted associates gaining access to DOUGHERTY, let alone discussing with DOUGHERTY the crimes under investigation here."). All of the targets' identities, addresses, employment, phone numbers, and day-to-day purchases were easily discernable through bank records, retail records, Local 98 records, and extensive surveillance. *See generally* Aff. These five people do not have burner phones; they do not operate in cash payments. The investigatory roadblocks present in drug conspiracy cases where wiretapping becomes necessary simply are not present here. *See, e.g.*, *Bailey*, 840 F.3d at 115–16.

Further, the "existence and location of records," *see* Aff. ¶ 17(c), could not be more clear than in this case. On this point, the Government betrayed its own pretextual reasoning that it needed a wiretap in order to locate records when it made statements like:

> An examination of American Express credit card account records and Local 98's General Fund financial records shows that from September 2010 through December 2014 the General Fund paid the credit card charges for thirty credit cards with unique numbers issued to Local 98 members. All of the charges for those cards were included on one billing statement, which was mailed monthly to John Dougherty IBEW Local UN 98, 1719 Spring Garden St, Philadelphia PA 19130-3915. Within that billing statement, the charges were summarized under the name of each IBEW employee who had been issued an IBEW Local 98 American Express credit card. The records show that DOUGHERTY was issued three cards.

*Id.* ¶ 28.

In the section of the Affidavit titled "USE OF LOCAL 98 CREDIT CARDS TO PURCHASE PERSONAL ITEMS," the government detailed the FBI's "[r]eview of purchase records and itemized receipts" and its corroboration of allegedly personal

purchases by video surveillance. *Id.* ¶¶ 28–30. In the next section, "EXAMINATION OF COMMUNICATIONS BETWEEN THE TARGET INTERCEPTEES CLOSE IN TIME TO THE ILLEGAL USE OF LOCAL 98 CREDIT CARDS TO PURCHASE PERSONAL ITEMS," *id.* ¶¶ 31–34, the government went on to describe its extensive use of pen register records to map the communications among the target interceptees as they allegedly made personal purchases on Local 98 credit cards and delivered them for personal use.

Considering all of this, it is clear that in this case, the government has resorted to wiretapping where "traditional investigative techniques would suffice" to prove or disprove the target offenses. *Vento*, 533 F.2d at 849 (quoting *Kahn*, 415 U.S. at 153 n.12). The government sought to sure-up its case the easy way rather than by way of traditional, painstaking-but-effective methods—perhaps doubling-down on technique where it lacked substance beyond small alleged transactions for items like diapers and vitamins, *see, e.g.*, *id.* ¶ 31., despite expending significant resource. The target offenses allegedly took place via payments recorded in the course of their commission. While a wiretap would perhaps serve as a more efficient method of investigation, efficiency is not the Title III standard—*necessity* is. The courts must police necessity and limit the use of wiretap interceptions where traditional investigatory methods would be effective at proving or disproving the target offenses and where the government has (admittedly, in this case) neglected to execute a search warrant that would further prove or disprove those enumerated offenses. *See Gonzalez*, 412 F.3d at 1113–14 (finding that the government "side-stepped its responsibility to use promising traditional techniques").

The government's use of a wiretap to "further," Aff. ¶ 56, or sure-up an investigation, or perhaps to fish around in hopes of discovering additional offenses, is frankly a very disconcerting idea, especially where, as here, the suspect is nonviolent and lives a very well-documented, quotidian life. *Cf. Vento*, 533 F.2d at 846 ("There is little reason to believe that the government could have obtained convictions here if the recorded conversations had not been introduced."). The Court must vigilantly reel in such attempted government overreach.

3. **The government cannot indefinitely postpone the execution of a search warrant in favor of wiretapping when it presumes a search warrant will be effective.**

As discussed above, the government knew where the target interceptees lived and worked, and it knew where to find the records it would need to prosecute this case. Nonetheless, the government opted for wiretapping instead of executing a search warrant—and did so not out of "necessity" but out of strategy and convenience. The government's insufficient reasoning regarding search warrants is as follows:

> Search warrants of Local 98 offices and the residences of DOUGHERTY, FIOCCA, NIKO RODRIGUEZ, THOMAS RODRIGUEZ, and others have been considered and *will eventually* be conducted. The searches will be used to locate specific merchandise purchased illegally with Local 98 funds in the possession of DOUGHERTY and other co-conspirators. The searches will also be used to obtain expense reports accounting records, receipts and other documents which are evidence of the schemes alleged here. However, the seizure of documents may not fully reveal DOUGHERTY's and the other TARGET INTERCEPTEES' knowledge of or involvement in the embezzlement scheme. For example a search might locate expense reports or other items documenting and approving purchases made by FIOCCA and NIKO RODRIGUEZ, but those expense reports may not indicate that DOUGHERTY directed FIOCCA and NIKO RODRIGUEZ to make the purchases. Further, additional investigative steps need to be conducted to identify which documents, records, or other items should be sought during the execution of the search warrants. DOUGHERTY has used and continues to use TARGET TELEPHONE #1 to direct FIOCCA and NIKO RODRIGUEZ to utilize Local 98 American Express credit cards to purchase items for DOUGHERTY's personal use. As those conversations occur, the actual item purchased, the retail receipt, expense report and other union documentation related to the purchase will be added to the list of items sought during the search.

Aff. ¶ 72.

The government failed to show that search warrants "reasonably appear to be unlikely to succeed if tried," as Title III explicitly requires, instead explaining that it fully expects the execution of search warrants to be fruitful. § 2518(1)(c); *Bailey*, 840 F.3d at 114. First, as quoted above, the government explained that searches will be used to "locate merchandise purchased illegally with Local 98 funds in the possession of DOUGHERTY and other co-conspirators" and to "obtain expense reports accounting records, receipts and other documents which are evidence of the schemes alleged here." Aff. ¶ 72. By choosing a wiretap *instead* of a search, the government postponed the conclusion of its investigation, while setting forth in its own words that a search warrant would likely "succeed if tried." § 2518(1)(c). The necessity requirement prohibits the government from making such a choice. *See id.* It demands a reasonable level of necessity, not present here, in order to overcome an individual's interest in privacy. *See Vento*, 533 F.2d at 844 ("Title III obliges the courts to measure the permissible use of sophisticated electronic investigative tools against the specific restraints [including the necessity requirement] imposed by Congress to avoid undue intrusions upon privacy.").

Second, the government stated that the seizure of documents "may not fully reveal DOUGHERTY's and the other TARGET INTERCEPTEES' knowledge of or involvement in the embezzlement scheme." This representation does not undermine the likelihood of a search's effectiveness, and the government did not lay a "factual predicate" as to why it believed this conclusory statement to be true. The most it stated was that it *might not be* clear from records whether Dougherty directed others to make certain purchases. *Id.* However, in other sections of its affidavit, the government detailed how telephone records, physical surveillance, surveillance cameras, bank records, and retail records have yielded exactly that type of evidence. The government *cannot* employ wiretapping when it knows a search warrant would likely close

remaining gaps in its investigation. It is well-established law that the government cannot forego traditional investigative techniques that "would suffice to expose the crime" (or *dispose of* the crime) in favor of wiretapping. *Vento*, 533 F.2d at 849 (quoting *Kahn*, 415 U.S. at 153 n.12 (1974)). The necessity requirement does not permit such an invasive intrusion into a person's privacy for such a modest investigatory gain.

Third, the government stated that "additional investigative steps need to be conducted to identify which documents, records, or other items should be sought during the execution of the search warrants." Aff. ¶ 72. The government was apparently not referring to paper records because it knows where to find them, *see, e.g.*, *id.* ¶¶ 28, 72 (detailing exactly where the government will eventually search for records), which leaves this reference to mean only the location of the items purchased with Local 98 credit cards for personal use, *id.* ¶ 72. The government stated that it will track the locations of these items as conversations occur. *Id.* But this pretextual reason ignores the litany of descriptions throughout the affidavit that the government has surveillance tapes of personal items being purchased and subsequently delivered to the targets' homes, allegedly corroborated by pen register, credit card, and retail records. Further, most of the items allegedly illegally purchased are things like diapers, vitamins, and food, which the government knows would be discarded and consumed rather than stockpiled. *See, e.g.*, *id.* ¶ 31.

Again, this case is not a drug trafficking conspiracy case where there are no purchase records and the government needs to physically obtain the stash in order to prosecute the case. Here, the government is employing the same resources it would on an under-the-radar drug kingpin with an unidentified network of dealers to union leader with an easily discernible network of colleagues and family, with known names, addresses, phone numbers, and financial

records. Moreover, the government failed to provide any indication as to at what point in the investigation it would finally execute a search warrant—nor why a wiretap was necessary in the interim. The necessity requirement demands that the government use traditional methods of investigation where they "reasonably appear to be unlikely to succeed if tried," *Bailey*, 840 F.3d at 114, and here, a search warrant, by the governments own narrative, Aff. ¶ 72, would have been such a method.

4. **The Government cannot launch a fishing expedition to find others involved in a conspiracy, without any justification as to why it believes others are involved or why traditional investigative techniques would be ineffective.**

The government sought to intercept conversations of the five target interceptees, as well as "others yet unknown." *Id.* ¶ 3. But it neglected to provide any explanation of why it failed to discern the "others yet unknown" from pen register records, surveillance, or other techniques— or any factual basis as to why these methods fell short of determining unknown identities. And perhaps more importantly, it failed to explain why it presumed these "others" existed in the first place. The notion that others may or may not be involved in suspected embezzlement, without any justification as to who these others might be or why their identities cannot be ascertained without wiretapping, is plainly insufficient to satisfy the necessity requirement. *See Bailey*, 840 F.3d at 116. "The use of 'boiler plate' [language] and the absence of particulars in requests for wiretap authorizations have not been permitted lest wiretapping become established as a routine investigative recourse of law enforcement authorities, contrary to the restrictive intent of Congress." *Vento* 533 F.2d at 849–50.

*Bailey* involved a drug conspiracy where law enforcement could not "ascertain the identities of the people speaking with [the conspiracy leader] on the phone," despite exhaustion of other investigative methods. 840 F.3d at 115. There, unlike here, the "targets occasionally

used 'pre-paid' telephones or 'drop phones'—for which service providers were not required to maintain subscriber information—or used fictitious names to subscribe for telephone service." *Id.* (citation omitted). In *Bailey*, the government, "[w]ith meticulous and painstaking care," explained why it required wiretap evidence in order to determine who was involved in the conspiracy. *Id.* at 115–16. The government has not made such a showing here, where there is no indication that a target switched phone numbers, concealed his or her identity, or used some kind of off-the-grid cell phone. Here, the government failed to explain why pen register information, coupled with other investigative techniques (and publicly available union LM-2 forms, which list all officers and employees), failed to discern the identities of people with whom Dougherty associated—or even why traditional investigative techniques would have led the government to believe that unidentified potential coconspirators existed. *See Vento*, 533 F.2d at 849 (stating that the government must show that "other techniques are impractical under the circumstances" and must "fully explain to the authorizing judge the basis for such a conclusion"). Here, the government improperly applied for and was improperly granted a fishing expedition in violation of Title III's necessity requirement. The purported "necessity" of a wiretap in this case simply does not outweigh the immense intrusion on Dougherty's privacy. Thus, the Court should suppress the wiretap evidence gathered pursuant to the government's April 29, 2015 application for interception—and from all subsequent interceptions of Dougherty's cell phone conversations, as the fruit of the illegal wiretap.

III.    **CONCLUSION**

For the reasons set forth herein, the Court should suppress the government's Title III interceptions of John Dougherty's cellular telephone.

Date: August 6, 2019

*/s/ Henry E. Hockeimer, Jr.*
Henry E. Hockeimer, Jr. (I.D. No. 86768)
David L. Axelrod (I.D. No. 323729)
Terence M. Grugan (I.D. No. 307211)
Emilia McKee Vassallo (I.D. No. 318428)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
T: 215.665.8500
F: 215.864.8999

*Attorneys for Defendant John Dougherty*