## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO.  19 - 64** |
| **JOHN DOUGHERTY** | : | |
| **ROBERT HENON** | | |
| **BRIAN BURROWS** | : | |
| **MICHAEL NEILL** | | |
| **MARITA CRAWFORD** | : | |
| **NIKO RODRIGUEZ** | | |
| **BRIAN FIOCCA** | : | |
| **ANTHONY MASSA** | | |

## O R D E R

AND NOW, this      day of              , 2019, upon consideration of the Motion of

Defendants John Dougherty, Robert Henon, and Marita Crawford to Suppress the Title III

Interceptions, the Government's Response, and having held a hearing, it is hereby **ORDERED**

that the Motion is **DENIED.**

**BY THE COURT:**

_____
**HONORABLE PAUL S. DIAMOND**
**United States District Court Judge**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 19 - 64** |
| **JOHN DOUGHERTY** | : | |
| **ROBERT HENON** | | |
| **BRIAN BURROWS** | : | |
| **MICHAEL NEILL** | | |
| **MARITA CRAWFORD** | : | |
| **NIKO RODRIGUEZ** | | |
| **BRIAN FIOCCA** | : | |
| **ANTHONY MASSA** | | |


**GOVERNMENT'S RESPONSE TO**
**DEFENDANTS' MOTIONS TO SUPPRESS TITLE III INTERCEPTION**

The United States of America, by and through its attorneys, Jennifer A. Williams, Attorney for the United States, Acting Under Authority Conferred by 28 U.S.C. § 515, and the undersigned attorneys, hereby responds to the Motion of Defendant John Dougherty to Suppress the Title III Interception, which was joined by defendants Marita Crawford and Robert Henon. For the reasons set forth below, the motion should be denied.

**I.      Introduction**

During 2015 and 2016, United States District Court Judge Paul S. Diamond, pursuant to 18 U.S.C. § 2518, granted orders authorizing the interception of wire and electronic communications over a number of telephones. The first order, authorizing interceptions on a cellular telephone used by defendant John Dougherty, was signed by this Court on April 29, 2015. The Order and the affidavit submitted in support of the order are the subjects of the defendants' motion.

## II.    Pursuant to Local Rule 41.1, the Judge Who Issued the Interception Order Must Hear the Defendants' Motion.

The defendants' motion to suppress must be heard by Judge Diamond, as directed by

EDPA Local Rule 41.1(b), which reads as follows:

> (b) Assignment of Applications; Motions to Suppress. All applications for wire interceptions shall be assigned on a random basis to each Judge of the Court, or in his or her absence the Emergency Judge, in accordance with the provisions of Local Civil Rule 40.1. Any motion by an aggrieved party, as defined in 18 U.S.C. §2510(11), attacking the validity or sufficiency of an order authorizing or approving the interception of a wire or oral communication issued by a Judge of this Court shall be heard by the judge. Any other motion attacking such interception shall be heard by the Judge to whom the case is assigned.[1]

This rule is not discretionary, and has been followed in this district in response to a challenge

to a finding of necessity.  *See, e.g., United States v. Gutierrez*, 2007 WL 4302812, at *3 n. 3

(E.D. Pa. Dec. 6, 2007), *aff'd*, 351 F. App'x 697 (3d Cir. 2009) (judge who authorized wiretap

ruled on suppression motion based upon lack of necessity, pursuant to Rule 41.1).[2]

## III.    The Court Properly Found That the Necessity Requirement Was Satisfied.

The defendants claim that the order authorizing the wiretap was improperly granted,

because the Court erroneously found that "normal investigative procedures have been tried

and have failed or reasonably appear unlikely to succeed if tried," as required by Title 18,

---

[1]    An aggrieved" party is a "person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. §2510 (11).

[2]    The purpose of the rule, as observed by Judge Fullam, is that "it would be impermissible for one judge of this court to pass judgment upon the validity of an order previously entered by another judge of this court."  *United States v. Weaver*, 2004 WL 2399820, at *1 (E.D. Pa. Sept. 29, 2004).

United States Code, Section 2518(3)(c).  The defendants' motion should be denied, because the Court properly determined that the necessity requirement of Section 2518 was satisfied, based on the government's affidavit submitted in support of the interception.  *See* 18 U.S.C. § 2518(1)(c) (an application for a wiretap must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous").

The purpose of the necessity requirement is to ensure that electronic surveillance is not routinely employed as the initial step in a criminal investigation.  *See, e.g., United States v. Vento*, 533 F.2d 838, 849 (3d Cir. 1976).   Law enforcement officials, however, need not exhaust every conceivable investigative technique before obtaining a wiretap. *United States v. Falcone*, 364 F. Supp. 877, 889 (D.N.J. 1973) ("the wiretap is not reserved for use only as a last resort").

The necessity requirement is not the insurmountable hurdle the defendants portray it to be.  Section 2518(3)(c) does "not require the government to exhaust all other investigative procedures before resorting to electronic surveillance . . . [t]he government need only lay a factual predicate sufficient to inform the judge why other methods of investigation are not sufficient." *United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997).  The "statutory burden on the government is not great."  *United States v. Armocida*, 515 F.2d 29, 37 (3d Cir. 1975) (application should be "tested in a practical and common sense fashion").

The Court properly determined that the government had satisfied the necessity requirement here; there was a strong probability of ongoing illegal activities, and the full extent of these crimes could not otherwise be investigated satisfactorily without electronic surveillance.  *See United States v. Vastola*, 670 F. Supp. 1244, 1282-83 (D.N.J. 1987); *United*

*States v. Armocida*, 515 F.2d 29, 38 (3d Cir. 1975).

### A. The Affidavit Contained a Full and Complete Statement Explaining Why "Normal Investigative Procedures Have Been Tried and Have Failed or Reasonably Appear Unlikely to Succeed if Tried."

The defendants argue that the Court erroneously found that the necessity requirement of Section 2518(3)(c) had been satisfied, contending that, contrary to the Court's finding, traditional investigative techniques were sufficient to complete the investigation of the target crimes**,** because: 1) the affidavit described an advanced investigation that had gathered substantial evidence of the target offenses (Def. Motion at 9-10); 2) the affidavit showed that the execution of search warrants would have succeeded if tried (Def. Motion at 18-20); 3) the affiant falsely claimed that "additional investigative steps need to be conducted to identify which documents, records, or other items should be sought during the execution of the search warrants" (Def. Motion at 20-21); and 4) the government failed to explain why it was unable to achieve one of its stated objectives, identifying unknown potential participants, using the investigative techniques addressed in the affidavit (Def. Motion at 21-22).

For all of the reasons set forth below, these arguments have no basis in law or in fact, and should be rejected.  The affidavit, as required by 18 U.S.C. § 2518(1)(c), set forth a full and complete explanation why some investigative procedures had been tried and failed, and why others were considered and reasonably appeared to be unlikely, if tried, to achieve the objectives of the investigation, which were: 1) "to obtain evidence to fully prosecute DOUGHERTY, the TARGET INTERCEPTEES, and others as yet unknown, for the TARGET OFFENSES," and 2) to reveal "the full scope and nature of the offenses being investigated and the full scope and involvement of the individuals committing the offenses." Affidavit at ¶¶ 55, 57.

After reviewing the affidavit, this Court properly determined, as required by 18 U.S.C. § 2518 (3)(c), "that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried or to be too dangerous."

The section of the Affidavit describing the objectives of the investigation reads as follows:

> 55. The objective of this investigation is to obtain evidence to fully prosecute DOUGHERTY, the TARGET INTERCEPTEES, and others as yet unknown, for the TARGET OFFENSES.
>
> 56. I believe that the interception of wire and electronic communications over TARGET TELEPHONE #1 will enable the government to further the goals and objectives of this investigation. Specifically, these include:
>
> a. Obtaining evidence of the misuse of Local 98 funds and resources for the personal benefit of DOUGHERTY, FIOCCA, NIKO RODRIGUEZ, THOMAS RODRIGUEZ, and their families; and
>
> b. Identifying any other persons who may be participating in, aware of, authorizing, or benefitting from DOUGHERTY'S embezzlement of Local 98 funds.
>
> 57. Based upon my experience, and my knowledge of the facts of this investigation and the information contained in this Affidavit, I believe that the interception of wire communications sought by this affidavit is the only available investigative technique which has a reasonable likelihood of revealing the full scope and nature of the offenses being investigated and the full scope and involvement of the individuals committing the offenses. Affidavit at ¶¶ 55-57.

The government sought authorization to employ electronic surveillance to achieve the objectives of the investigation, not as the initial step, but only after a number of investigative techniques had been employed, with limited results, and other techniques were considered and reasonably appeared to be unlikely to succeed if tried. The investigative techniques that were tried or considered were: 1) physical surveillance, 2) undercover agents, 3) confidential

sources, 4) pen registers, telephone toll records, text messages and cell site data, 5) interviews of subjects, 6) arrests of violators, 7) grand jury subpoenas, 8) search warrants, and 9) trash searches.

The affidavit discussed the limitations of the investigative techniques that had been used to date, explained why other investigative techniques had not been used, because they were unlikely to succeed in achieving the above-stated objectives, and stated why it was necessary to undertake electronic surveillance. It was only after pursuing conventional investigative techniques that agents sought authorization for electronic surveillance, the only technique that offered a reasonable likelihood of success in revealing the full scope and nature of the offenses being investigated, and the full scope and nature of the involvement of the individuals committing the offenses.

Electronic surveillance is properly authorized when, as here, there is a strong probability of the existence of ongoing illegal activities involving multiple subjects, and the full extent of these crimes cannot be successfully investigated without it. *See Armocida*, 515 F.2d at 38; *United States v. Baynes*, 400 F. Supp. 285, 298-300 (E.D. Pa.), *aff'd*, 517 F.2d 1399 (3d Cir. 1975). *See also United States v. McGuire*, 307 F.3d 1192, 1197–98 (9th Cir. 2002) ("the government is entitled to more leeway in its investigative methods when it pursues a conspiracy").

### 1. Physical Surveillance

The affidavit set forth in detail how physical surveillance had been tried, and explained why it had failed to achieve the objectives of the investigation. The affiant described how the investigating agents had used, and would continue to use, surveillance videos obtained from retail stores and pole cameras, which had shown some of the Target Interceptees purchasing

retail goods using IBEW Local 98 American Express credit cards and delivering those items to Dougherty's home, as well as occasionally performing errands for Dougherty during work hours. Affidavit at ¶ 59.

The affiant explained that surveillance was "not an investigative technique which was likely to result in the discovery of the identity of all coconspirators, the exact roles of the subjects, or the full scope of the organization," and could not "provide evidence of DOUGHERTY instructing or authorizing the TARGET INTERCEPTEES to purchase the goods and deliver them to his or their residence." *Id.* at ¶ 59. The affidavit further cautioned that surveillance was limited to public activities, and if heavily relied upon, raised a risk of detection, which could prematurely expose the investigation and potentially result in the destruction of evidence. *Id.*

The affidavit also noted that physical surveillance had not always resulted in the identification of all the individuals involved in the transactions described in the affidavit. *See Id.* at ¶ 31, page 15 (March 6, 2014), page 16, (March 31, 2014), page 17 (April 28, 2014), page 18 (May 16, 2014), pages 18-19 (July 9, 2014), page 25 (Dec 23, 2014), and page 27 (Feb 10, 2015).

### 2. Undercover Agents

The use of undercover agents was considered, and determined to reasonably appear to be unlikely to succeed if tried, for the following reasons: 1) Dougherty had been the subject of previous investigations, and was aware that he could potentially be the subject of future investigations; 2) Dougherty was cautious about the people with whom he spoke, and minimized contacts with people with whom he was not close; and 3) as Business Manager of Local 98, Dougherty hired and surrounded himself with individuals who were loyal to him

and dependent on him for their jobs. *Id.* at ¶ 60. *See also* ¶ 10 (describes broad authority of Business Manager).

The affidavit included these examples: 1) Brian Fiocca, Dougherty's nephew and one of the Target Interceptees and alleged participants in the theft of union funds, is an employee of Local 98, as are his siblings - all are dependent on Dougherty for their jobs; and, 2) in 2014, as part of another investigation, an undercover agent and confidential informant unsuccessfully attempted to have direct contact with Dougherty, who had the informant deal with an intermediary. *Id.* at ¶ 61.

### 3. Use of Confidential Sources

Even though investigation had used reliable confidential sources who provided "some inside information about the operation of IBEW Local 98, the identities of DOUGHERTY's associates, and possible criminal activities in which DOUGHERTY was a participant," the sources were "not part of DOUGHERTY's inner circle," and were therefore "unable to provide direct admissible evidence of DOUGHERTY's participation in the misuse of union resources," one of the objectives of the investigation. *Id.* at ¶ 62. Additionally, later sections of the Affidavit, described below, demonstrated why no member of Dougherty's inner circle would become a confidential source.

### 4. Pen Registers, Telephone Toll Records, Text Messages and Cell Site Data

The affidavit described in detail how pen registers, telephone toll records, text messages and cell site data had been used, and would continue to be used, with some success, and explained why they had failed to achieve the objectives of the investigation, primarily because none of these investigative techniques could identify the speakers to, or most

importantly, reveal the content of, conversations. *Id.* at ¶ 64. Additionally, the affidavit pointed out that electronic surveillance was the only way to obtain the content of text messages between the Target Interceptees, because AT&T Wireless, the cellular carrier for all of the telephones used by the subjects, did not retain text message content. *Id.* at ¶ 64.

### 5. Interviews

The use of interviews of people close to the subjects of the investigation was considered, and determined to reasonably appear to be unlikely to succeed if tried for the following reasons: 1) "[a]bsent some guarantee of confidentiality, contact with such individuals could compromise the entire investigation;" 2) the investigators did not have enough information to determine who could and, more importantly, would provide information to achieve the objectives of the investigation; 3) none of the participants in, or anyone else having knowledge of the details of the offenses under investigation, were likely to cooperate; and 4) even if they did, they would likely reveal the existence of the investigation to Dougherty or others, who would take additional precautionary steps to prevent the collection of evidence by law enforcement. *Id.* at ¶ 65.

Although stating that the investigating agents would continue to use sources and interview witnesses who would not pose a risk of jeopardizing or revealing the investigation to the subjects, the affidavit sufficiently explained why interviews of individuals who possessed first-hand knowledge of the details of the crimes under investigation reasonably appeared to be unlikely to succeed if tried. *Id.* at ¶ 65.

The following example of the limited utility of interviewing witnesses who might have direct knowledge of the crimes under investigation was provided: At the time the affidavit was submitted (April 2015), John Dougherty, Brian Burrows, the Local 98 President, and

9

Michael Neill, the Local 98 Director of Apprentice Training, jointly owned a property in Philadelphia, which housed Doc's Union Pub. *Id.* at ¶ 66. The liquor license for Doc's Union Pub was held by Burrows and Neill. The Local 98 Political Action Committee, which was controlled by Dougherty, paid more than $412,000 to Doc's Pub during 2012 through 2014. *Id.* at ¶ 66, n.15.

Burrows and the former Local 98 Recording Secretary, who was also known to be close to Dougherty, were responsible for the disbursement of Local 98 funds during the period covered by the affidavit. *Id.* at ¶ 66. Additionally, Burrows, Neill, and the former Recording Secretary are subordinates of Dougherty. *Id.*

Based on the alleged misuse of union funds described in the affidavit, the affiant observed that it was likely that union officials such as Burrows and the former Recording Secretary were participants in the embezzlement, or were negligent in the performance of their official duties, which, coupled with their personal, business, and employment relationships with Dougherty, made it extremely unlikely that they would provide evidence about Dougherty. *Id.* at ¶ 66. In fact, the affidavit noted, it was more likely that such contacts would result in the exposure of the investigation, which could result in the destruction of documentation needed to prove the offenses under investigation. *Id.*

The affidavit also set forth in detail another example of why interviews of union members, or those close enough to Dougherty to have relevant information that would help the government achieve the objectives of the investigation, reasonably appeared to be unlikely to succeed if tried. *Id.* at ¶ 67. Dougherty's control over the union, and his ability and inclination to retaliate against those who challenged him, was illustrated by the example of a union member who attempted to run for a leadership position in Local 98 in 2014, and alleged

that Dougherty had mismanaged Local 98 funds. *Id.* Dougherty was involved in getting the union member improperly barred from running for the position, and brought internal charges against the member, which resulted in a $50,000 fine against the member. *Id.*

The affiant noted that a reliable confidential witness with knowledge of Local 98 has told the FBI that even though many Local 98 members believe that Dougherty may be using union funds for his personal use, they feel they cannot confront Dougherty or other union officials who are close to him, because of Dougherty's influence over which union members get jobs, and his ability to financially harm members who challenge his authority. *Id.* at ¶ 63. This is another reason why interviews of witnesses who may have direct knowledge of the crimes under investigation reasonably appeared to be unlikely to succeed if tried.

### 6.       Arrests of Violators

The affidavit acknowledged that there was "substantial evidence" that subjects and Target Interceptees Brian Fiocca and Niko Rodriguez were participating in the embezzlement of union funds, but there was not sufficient evidence "to prove at trial that DOUGHERTY was directing or participating in their alleged criminal activity." *Id.* at ¶ 69. Therefore, arresting them, or anyone else for whom there was probable cause that they had committed an offense, reasonably appeared to be unlikely to succeed in accomplishing the objectives of the investigation if tried. *United States v. Armocida*, 515 F.2d at 38 ("Although the government has actual knowledge of a conspiracy and evidence sufficient to prosecute one of the conspirators, it is unrealistic to require the termination of an investigation before the entire scope of the narcotics distribution network is uncovered and the identity of its participants learned.").

As explained in prior paragraphs, union employees, especially those with close ties to

Dougherty, were unlikely to cooperate, and would likely reveal the existence of the investigation if approached. The same logic applied to the arrest of violators, and for an additional reason. The affidavit described, in great detail, how Dougherty allegedly used his position and access to Local 98 funds to financially reward a convicted defendant who provided immunized grand jury testimony that was exculpatory to Dougherty. Affidavit at ¶ 70. Because one of the goals of the investigation was to "fully prosecute" all of the people who were committing the target offenses, having probable cause to arrest one or two subjects would not achieve that goal, especially when, as explained in the affidavit, is was unlikely that any subject, arrested or not, would cooperate with law enforcement.

### 7.    Grand Jury

Analyzing the possible use of grand jury subpoenas, the affiant noted that in his experience, as well as that of other experienced agents, extensive overt investigative activity, such as issuing grand jury subpoenas to associates of the subjects, would reveal the investigation and likely cause the subjects "to further camouflage their activities, making ultimate detection even more difficult." *Id.* at ¶ 71. The affiant observed that in similar investigations, union members rarely cooperated against other union members. *Id.* The training and experience of the affiant in this case, who had been the affiant on prior Title III applications, *see id.* at ¶ 2, is a factor properly considered by the Court. *See United States v. Williams*, 124 F.3d at 418 (quotations omitted). *United States v. Kaplan*, 2009 WL 3806277, at *10 (E.D. Pa. Nov. 13, 2009), *aff'd*, 526 F. App'x 208 (3d Cir. 2013).

Furthermore, as noted earlier in the affidavit, Dougherty's ability and inclination to retaliate against those who challenge or pose a threat to him, as well as reward those who remain loyal to him, made it unlikely that any subpoenaed witnesses with first-hand

information about the offenses under indictment would cooperate, and "even approaching such persons would create the very real likelihood that they would tip off DOUGHERTY and others to the existence of this ongoing, secret investigation." Affidavit at ¶ 71.

For these reasons, the affidavit provided a sufficient explanation why the issuance of grand jury subpoenas to associates of the subjects, or anyone having first-hand knowledge of the conduct under investigation, reasonably appeared to be unlikely to succeed if tried.

### 8.    Search Warrants

The affidavit also explained that the execution of search warrants reasonably appeared to be unlikely to succeed if tried, primarily because the seizure of documents would not fully reveal the subjects' knowledge of or involvement in the offenses under investigation, especially the content of the conversations that had allegedly occurred, and were likely to occur in the future, between Dougherty and the other subjects, in connection with the purchases that were the subject of the affidavit. *Id.* at ¶ 72.  Additionally, as reflected in the affidavit, the execution of search warrants at or around the time the affidavit was submitted (April 2015) would have greatly limited the government's investigation, given the potential scope of the conduct under investigation. *Compare* Affidavit at ¶¶ 35-51 (description of suspect transactions made between 2010 and 2014, involving more than $250,000 in Local 98 funds) *with* Affidavit at ¶¶ 28-31 (suspect transactions for which the government had pen register records and video surveillance had total value of approximately $7,000).

Furthermore, the execution of search warrants would reveal the existence of the investigation, which could potentially hinder the investigation for reasons previously set forth in the affidavit, including the destruction of documents, and causing the subjects "to further camouflage their activities."  *Id.* at ¶¶ 65, 66, 71.

13

### 9. Trash searches

The affidavit also explained why the search of discarded trash, which can be useful as an investigative method, reasonably appeared to be unlikely to succeed if tried. The trash from John Dougherty's home was taken, on almost a daily basis, for a year, to a dumpster on Local 98 property, which is surrounded by a fence, and monitored with security cameras. *Id.* at ¶¶ 34, 73.

As illustrated above, the affidavit provided a factual predicate that sufficient to support the Court's determination that "normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried or to be too dangerous," as required by Title 18, United States Code, Section 2518(3)(c).

The affiant acknowledged and described in detail the progress that had been made to date, and explained why it had not revealed the full scope and nature of the offenses being investigated and the identity and involvement of the individuals committing the offenses.

The Court appropriately authorized electronic surveillance, based on the affidavit submitted in support of the government's application, which demonstrated that there was a strong probability of ongoing illegal activities, and that the full nature and scope of the offenses could not be successfully investigated without it.

### B. The Affidavit Sufficiently Explained Why the Execution of Search Warrants Reasonably Appeared Unlikely to Succeed if Tried.

The defendants further argue that the affiant falsely stated that the execution of search warrants "reasonably appear[ed] to be unlikely to succeed if tried," when the affidavit showed the opposite, and the government knew that "a search warrant would likely close remaining gaps in its investigation." Def. Motion at 18-20. Additionally, the defendant claims that the

affiant's contention that "additional investigative steps need to be conducted to identify which documents, records, or other items should be sought during the execution of the search warrants," *see Id.* at ¶ 72, was simply a pretext for improperly obtaining authorization for a wiretap. Def. Motion at 20-21.

Both of these arguments are without merit. The affidavit set forth a sufficient factual predicate that demonstrated that the use of search warrants reasonably appeared to be unlikely to succeed if tried, for the reasons previously stated, which are set forth in more detail below.

First, the execution of search warrants would reveal the existence of the investigation, which was covert at the time the affidavit was submitted to the Court. One of the limitations of many of the investigative techniques considered in the affidavit was the potential for exposing the investigation, and how that would hinder the investigation:

> "Interviews of associates and coconspirators of the principals have been considered, but are not practical," because: 1) "[a]bsent some guarantee of confidentiality, contact with such individuals could compromise the entire investigation;" Affidavit at ¶ 65.

> "It is more likely that such contacts [witness interviews] would result in the revealing the investigation, which could result in the destruction of documentation needed to prove the offenses under investigation." *Id.* at ¶ 66.

> "[E]xtensive overt investigative activities, such as issuing grand jury subpoenas to associates of the subjects, would reveal the investigation and likely cause the subjects "to further camouflage their activities, making ultimate detection even more difficult." *Id.* at ¶ 71.

The affidavit reflects that executing search warrants before obtaining authorization to conduct a wiretap would greatly diminish, or eliminate altogether, the possibility that any investigative technique that could be subsequently employed would be successful in achieving the objectives of the investigation, or even could meaningfully advance the investigation after

that. *See United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997); *United States v. Armocida*, 515 F.2d 29, 37 (3d Cir. 1975) (application should be "tested in a practical and common sense fashion"). The affidavit recognized that risk, stating, "Your affiant and his partners intend to execute search warrants only after the covert investigation is completed." Affidavit at ¶ 58.

Second, the execution of search warrants in or around April 2015 reasonably appeared unlikely to "fully reveal DOUGHERTY's and the other TARGET INTERCEPTEES' knowledge of or involvement in the embezzlement scheme" or prove "that DOUGHERTY directed FIOCCA and NIKO RODRIGUEZ to make the purchases." *Id.* at ¶ 71.

Third, the government did not have sufficient knowledge to identify, much less develop probable cause to search for, all of the documents that would be necessary to achieve the objectives of the investigation. The scope of the documents identified in the affidavits was limited to store receipts, credit card statements, and financial statements obtained from third parties. *Id.* at ¶¶ 29, 31, 35. Other than references to "expense reports" and "other union documentation," no other additional documents were identified as the potential objects of a search. *Id.* at ¶ 72.

Finally, the execution of search warrants at or around the time the affidavit was submitted would greatly limit the scope of the government's investigation, and would prevent the government from "fully prosecut[ing]" all of the individuals involved in the Target Offenses, for the full scope the offenses being investigated. *Id.* at ¶¶ 55-57.

The affidavit identified numerous suspect purchases and transactions involving Local 98 funds allegedly made between 2010 and 2014, which cost the union more than $250,000, suggesting that the alleged embezzlement was an ongoing, wide-ranging criminal course of

conduct. *Id.* at ¶¶ 35-51. By contrast, the transactions identified in the affidavit for which the government had pen register records identifying conversations that occurred close in time to the purchases were of a total value of approximately $7,000. *Id.* at ¶¶ 28-31.

Electronic surveillance is appropriately sought where, as here, there was a strong probability of ongoing illegal activities, and the full extent of these crimes could not otherwise be successfully investigated. *United States v. Vastola*, 670 F. Supp. 1244, 1282-83 (D.N.J. 1987); *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir. 1975). *See United States v. Bailey*, 840 F.3d 99, 113–16 (3d Cir. 2016) (district court did not abuse its discretion in determining that wiretap affidavit supported finding of necessity where: 1) execution of search warrants would have revealed investigation, leading to the concealment or destruction of evidence; 2) associates of subjects were unlikely to cooperate because of threat of retribution; and 3) wiretap was necessary to reveal full scope of the criminal activity under investigation, despite the fact that law enforcement had enough evidence without it to arrest at least one subject).

### C. Identifying All of the Participants in the Embezzlement Conspiracy Was a Legitimate Objective of the Investigation that Had Not Yet Been Achieved.

The defendant incorrectly claims that one of the objectives of the investigation set forth in the affidavit, identifying all of the participants in the embezzlement, some of whom were unlikely to be known to the government at the time the affidavit was submitted, did not support the Court's finding of necessity, because the government failed to explain why it had not been able to identify "the people with whom Dougherty associated, or even why traditional investigative techniques would have led the government to believe that unidentified potential coconspirators existed." Def. Motion at 21-22. Simply put, the defendant claims that the government neglected to provide any explanation of why it was unable to achieve one of

its stated objectives, identifying "others yet unknown" who may be participants, using the investigative techniques addressed in the affidavit. *Id.*

This argument should be rejected because, like the previous one, it is based on a passage of the affidavit taken out of context. The listed goals and objectives of the investigation included "Identifying any other persons who may be participating in, aware of, authorizing, or benefitting from DOUGHERTY's embezzlement of Local 98 funds." Affidavit at ¶ 56b. The affidavit, in fact, identified a number of people who were potential participants at the time the affidavit was submitted, because there was some reason to believe they may have participated in some of the allegedly illegal purchases, approved payment by Local 98 for some of them, or benefitted from others.

As reflected in the affidavit and discussed above, Brian Burrows, Local 98 President, and Michael Neill, Local 98 Director of Apprentice Training, are subordinate to Dougherty at Local 98, and have an outside business relationship with him involving a bar, which was paid more than $412,000 during 2012-14 by the Local 98 Political Action Committee, which was controlled by Dougherty. *Id.* at ¶ 66 and n. 15. Additionally, Burrows and the former Local 98 Recording Secretary, who is also known to be close to Dougherty, were responsible for the disbursement of Local 98 funds during the time period covered by the affidavit, and, as noted in the affidavit, "it is likely that union officials such as Burrows and [the former Local 98 Recording Secretary] are participants in the embezzlement, or negligent in the performance of their official duties." *Id.* at ¶ 66.

Additionally, a number of the suspect purchases were delivered to the residence of Dougherty's sister. *Id.* at ¶¶ 11, 31. Dougherty's father was observed receiving one of the purchases, i*d.* at ¶ 31, p. 21, had his car filled with gas paid for by Local 98 on two occasions,

i*d.* at ¶ 31, p. 25, and accompanied Dougherty to the Kentucky Derby, i*d.* at ¶ 42, p. 38, a trip allegedly paid for by Local 98, and went on union trips to Vancouver, Las Vegas and San Diego during 2011 through 2014, for which Local 98 paid approximately $7,750 for his flights and lodging. *Id.* at ¶ 51.

A brother of Target Interceptee Brian Fiocca, accompanied by his girlfriend, made suspect purchases in late 2014 and early 2015 using Dougherty's Local 98 credit card. *Id.* at ¶ 31, p. 22, p. 28, n. 7.

A Local 98 employee purchased a $300 Cole Haan gift card, which a member of Dougherty's family used for personal purchases. *Id.* at ¶ 46, n. 13.

The defendant cites *United States v. Bailey*, 840 F.3d 99 (3d Cir. 2016), in support of this argument, arguing that in *Bailey*, identifying other members of the conspiracy was a legitimate need, because they were using phones with no subscriber information, and could not be otherwise identified, unlike the Target Interceptees and subjects in this case. *Bailey*, however, is inapposite to the instant case. In *Bailey*, one of the factors justifying necessity was the difficulty in identifying potential participants of a drug conspiracy who were using burner phones. Here, even though the identities of some of the potential participants were known, their roles, level of participation, intent and knowledge were not, and that evidence could only be obtained by electronic surveillance. Additionally, the potential scope of embezzlement, as described above, suggested that others whose identities were not even known at the time the affidavit was submitted could also be involved.

The training and experience of the affiant in this case, who had been the affiant on prior Title III applications, *see* affidavit at ¶ 2, also supports the Court's finding. To determine whether the Government has met the necessity requirement, the Court can properly

consider affirmations that are based, in part, upon the specialized training and experience of law enforcement officials. *United States v. Williams*, 124 F.3d at 418 (quotations omitted). *United States v. Kaplan*, 2009 WL 3806277, at *10 (E.D. Pa. Nov. 13, 2009), *aff'd*, 526 F. App'x 208 (3d Cir. 2013).

All of the other cases cited by the defendant, in which courts found that the necessity requirement had not been satisfied, are distinguishable from the case at bar. In *United States v. Simpson*, 813 F.2d 1462, 1473 (9th Cir. 1987), the Court of Appeals held that facts intentionally omitted from the affidavit showed that "traditional techniques could have led to the successful infiltration of the entire enterprise." The district court judge granted the defendants' motion to suppress the wiretap, finding that the affidavit was "artfully drafted with the intent to mislead the reviewing judge." *Id.* at 1471. The district court emphasized that the affidavit intentionally understated the nature of the involvement of a confidential informant with the subjects under investigation. *Id.* at 1471-72. No such showing has or can be made here.

In *United States v. Ailemen*, 986 F. Supp. 1228, 1231–42 (N.D. Cal. 1997), the district court adopted the magistrate's recommendation that the defendants' motion to suppress the wiretap be granted, finding more than seventeen misstatements and omissions in the affidavit submitted to the issuing judge, and that the government falsely claimed in the affidavit that normal investigative efforts were unlikely to achieve three of the objectives of the investigation, and that the affiant had attempted to conceal the truth and mislead the issuing judge. The affidavit in this case does not contain any misstatements, omissions, or false claims, and the defendants have not shown otherwise.

In four of the cases cited by the defendant, the affidavits were found deficient because

of the almost total lack of any investigation of the subject whose phone the government was seeking to wiretap. *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1111–17 (9th Cir. 2005) (finding a lack of necessity where government had been investigating subject for only five days before requesting wiretap); *United States v. Arrington*, 216 F.3d 1088 (10th Cir. 2000) (affidavit made no mention any standard investigative methods that were considered with respect to the subject whose telephone the government was seeking to intercept); *United States v. Carneiro*, 861 F.2d 1171, 1180–83 (9th Cir. 1988) (government did not use the investigative techniques described in the affidavit to investigate the subject on whose phone wiretap was sought); *United States v. Landeros-Lopez*, 718 F. Supp. 2d 1058, 1064–65 (D. Ariz. 2010) (government sought authorization to wiretap the subject's phone only 11 days after finding out about him). In this case, the government unsuccessfully attempted to achieve the objectives of the investigation for more than a year before seeking authorization for electronic surveillance. Affidavit at ¶¶ 30-34.

The affidavit explained why an assortment of traditional investigative techniques had either failed or were likely to fail to uncover the full scope of the crimes under investigation and the full scope and nature of the subjects' participation in them. Section 2518 does not require the government to take steps that would publicly expose and jeopardize an investigation before meeting the necessity requirement.

The affidavit demonstrated why electronic surveillance was the only investigative technique that had a reasonable chance of achieving the objectives of the investigation, which were: 1) "to obtain evidence to fully prosecute DOUGHERTY, the TARGET INTERCEPTEES, and others as yet unknown, for the TARGET OFFENSES," and 2) to reveal "the full scope and nature of the offenses being investigated and the full scope and

involvement of the individuals committing the offenses." Affidavit at ¶¶ 55, 57. *See also United States v. Vento*, 533 F.2d 838, 848–50 (3d Cir. 1976) ("[a]lthough normal investigative techniques might have been sufficient to implicate Gregorio in thefts from interstate shipment, such approaches could not show the scope of the conspiracy or the nature of Gregorio's on-going criminal activity. Investigations are not restricted to crimes which can be probed satisfactorily by normal methods.").

## IV.    Conclusion

The Court properly found that "normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried," as required by Title 18, United States Code, Section 2518(3)(c). The affidavit submitted in support of the interception contained "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried."

The government was not required to exhaust every conceivable investigative technique and apply for authorization for a wiretap only as a last resort. The Court properly found that the government had satisfied the necessity requirement. The affidavit demonstrated that there was a strong probability of an ongoing and wide-ranging embezzlement conspiracy, and that the full nature and scope of the criminal conduct could not otherwise be successfully investigated without it. For all of these reasons, the defendants' motion should be denied.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

RICHARD P. BARRETT
Assistant United States Attorney
Chief, Corruption and Labor Racketeering
Section

/s/ Frank R. Costello, Jr.
FRANK R. COSTELLO, JR.
PAUL L. GRAY
Assistant United States Attorneys

Dated: October 25, 2019

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, I electronically filed the foregoing response with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants, who are identified below.

Henry Hockeimer and David Axelrod
Counsel for Defendant John Dougherty

Brian McMonagle
Counsel for Defendant Robert Henon

Thomas Bergstrom
Counsel for Defendant Brian Burrows

Joseph Capone
Counsel for Defendant Michael Neill

Fortunato Perri
Counsel for Defendant Marita Crawford

Paul Hetznecker
Counsel for Defendant Niko Rodriguez

Nina Spizer
Counsel for Defendant Brian Fiocca

William Brennan
Counsel for Defendant Anthony Massa

/s/ Frank R. Costello, Jr.
FRANK R. COSTELLO, JR.
Assistant United States Attorney

Dated: October 25, 2019