**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 19-64-JLS** |
| | : | |
| **JOHN DOUGHERTY ET AL.** | : | |

---

**MEMORANDUM**

**Diamond, J.**                                                                                    **July 9, 2020**

The grand jury has charged labor leader John Dougherty and seven others with stealing vast amounts of Union money, corrupting Philadelphia government, and related crimes. Acting pursuant to Title III of the Omnibus Crime Control and Safe Streets Act, I had earlier issued a warrant authorizing the interception of Dougherty's phone. 18 U.S.C. §§ 2510 et seq. Dougherty now moves for suppression of the wiretap evidence, arguing, *inter alia*, that, given his "very well-documented, quotidian life," there was no "necessity" (as required by Title III) for the Government "to gather extraneous evidence against him and others." (Def.'s Mot. to Suppress 18, 3, Doc. No. 97.) Surely, the contention refutes itself. I recently denied Dougherty's request for an evidentiary hearing on his Suppression Motion, finding that Dougherty was simply seeking pretrial discovery to which he is not entitled. I will now deny the Motion itself.

## I.      BACKGROUND

Dougherty has led Local 98 of the International Brotherhood of Electrical Workers since 1993. During his tenure, Dougherty has been the subject or target of several public corruption and fraud investigations. (Blake Aff. ¶¶ 19–22.) Most recently, Dougherty found himself the target of a federal investigation into the purported theft of Union assets. Viewing security footage and pole camera surveillance, agents saw Dougherty's confidants repeatedly use Local 98 credit cards to buy personal items, apparently for Dougherty. Text messages and phone calls monitored on

pen registers suggested that Dougherty had directed these purchases, many of which were made at the South Philadelphia Target, blocks from Dougherty's home.  Agents learned that Dougherty regularly took large sums of money, without explanation, from Local 98's petty cash fund, and bank records revealed that Dougherty sought Union payments for suspected personal expenditures.

Although agents thus uncovered incriminating conduct, they could not: identify all participants in the apparent scheme; confirm that Dougherty instructed his confidants to make the purchases and deliver goods to him; or determine whether Dougherty intended to reimburse the Union.  As I discuss below, agents decided not to employ certain investigatory methods before seeking the Title III Warrant, concluding that these methods would either be ineffective or would likely jeopardize both the investigation and the any cooperating witnesses.

Accordingly, the Government sought a Warrant to wiretap Dougherty's cellphone and continue their investigation of the "target offenses": embezzlement and conspiracy to embezzle assets from a labor organization.  (Blake Aff. ¶ 3); see 18 U.S.C. § 2518(1)(c).  On April 29, 2015, I approved the Warrant, which the Government supported with the Affidavit of FBI Special Agent James Blake.  With my approval, the wiretap investigation continued until August 2016.

On January 29, 2019, the grand jury charged Dougherty, Philadelphia City Councilman Robert Henon (who, along with Marita Crawford, joins in the instant Motion), and five others in a 116 Count Indictment, alleging embezzlement of Union assets, as well as wire, tax, and honest services fraud, and other crimes.  (See Doc. No. 1.)  Once again, Dougherty has moved to suppress the Government's wiretap evidence, arguing that the Government violated Title III's "necessity" requirement.  18 U.S.C. § 2518(3)(c); (see generally Def.'s Mot.)  The Government opposes his Motion.  (See Gov't Opp'n, Doc. No. 106.)

Under this District's Local Rules, as the Judge who issued the challenged Warrant, I must

rule on Dougherty's Suppression Motion.  See Local. R. Crim. P. 41.1(b).  Trial is presently set to begin before Judge Schmehl on October 26, 2020.

## II.    LEGAL STANDARDS

Wiretap evidence should be suppressed when "the order of authorization or approval under which it was intercepted is insufficient on its face."  18 U.S.C. § 2518(10)(a)(ii).  Before the court may authorize a Title III wiretap, it must determine, based on the Government's "full and complete statement," *inter alia*, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(c)(3).  This does not mean, however, that the Government must first "exhaust all other investigative procedures" before seeking a wiretap.  United States v. Williams, 124 F.3d 411, 418 (3d Cir. 1997).  Rather, the Government establishes Title III "necessity" when it "lay[s] a 'factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient." United States v. McGlory, 968 F.2d 309, 345 (3d Cir. 1992) (citing United States v. Armocida, 515 F.2d 29, 38 (3d Cir. 1975)).

I must review the Government's factual predicate in a "practical and commonsense fashion." Id. at 345 (quoting United States v. Vento, 533 F.2d 838, 849 (3d Cir. 1976)).  The Third Circuit has admonished that the Government's burden in establishing "necessity" under Title III "is not great." Armocida, 515 F.2d at 38.

## III.    DISCUSSION

Dougherty argues that: (1) the  wiretap was premature because the Government obtained the Warrant before exhausting traditional investigatory methods; (2) the Warrant was "unnecessary" as the evidence already gathered would have justified the search of Dougherty's residence and office, which, in turn, should have ended the investigation; and (3) even with the

wiretap evidence, the Government could not prove Dougherty's guilt.  (Compare Def.'s Mot. 8 (accusing the Government of "improperly us[ing] wiretapping as its primary investigative tool") (capitalization altered), with id. 10 ("The government in its affidavit set forth an advanced investigation that had already purportedly developed substantial evidence of the target offenses . . . ."), and id. 9 ("[T]he evidence at trial will ultimately prove [Dougherty's] innocence.").)  Close review of the 63-page Blake Affidavit confirms that Dougherty's contradictory positions are incorrect.  See Williams, 124 F.3d at 418 ("[A] court 'may properly take into account affirmations which are founded in part upon the experience of specially trained agents.'") (quoting United States v. Ashley, 876 F.2d 1069, 1072 (1st Cir. 1989)).

### A.    "Traditional" Investigative Techniques

The Government "provide[d] a sufficient 'factual predicate' for a finding that 'normal investigative techniques' . . . were unlikely to succeed."  Williams, 124 F.3d at 419.  Experienced in conducting wiretap investigations, Agent Blake set out those techniques in detail:

> The investigative techniques that were tried or considered were: 1) physical surveillance, 2) undercover agents, 3) confidential sources, 4) pen registers, telephone toll records, text messages and cell site data, 5) interviews of subjects, 6) arrests of violators, 7) grand jury subpoenas, 8) search warrants, and 9) trash searches.

(Gov't Opp'n 5–6; see generally Blake Aff.); United States v. Bailey, 840 F.3d 99, 114 (3d Cir. 2016).  Blake provided a more than sufficient explanation for why these techniques were inadequate or impracticable.

### Physical Surveillance

Agent Blake explained why surveillance necessarily was inadequate.  In challenging that explanation, Dougherty relies primarily on decisions involving investigations where the Government sought a wiretap after only "limited (but undisclosed) physical surveillance." United

States v. Landeros-Lopez, 718 F. Supp. 2d 1058, 1065–66 (D. Ariz. 2010); see United States v. Gonzalez, Inc., 412 F.3d 1102, 1112 (9th Cir. 2005).  The Government's surveillance efforts here were robust.  Agents examined substantial footage from pole and security cameras along with months of pen register records.  (See Blake Aff. ¶ 31.)  Although the agents' "efforts undoubtedly uncovered useful information," they left key aspects of the investigation unresolved.  United States v. Kaplan, 2009 WL 3806277, at *11 (E.D. Pa. Nov. 13, 2009); see United States v. Cao, 471 F.3d 1, 3 (1st Cir. 2006) ("[T]he *partial* success of the investigation do[es] not mean that there [i]s nothing more to be done.").  Surveillance could not "provide evidence of Dougherty instructing or authorizing the target interceptees to purchase the goods and deliver them to his or their residence," nor could it identify all coconspirators.  (Blake Aff. ¶ 59 (capitalization altered).)  Because the Government's target offenses include *mens rea* elements of intent and knowledge, surveillance could not help the Government to distinguish between conspirators and non-culpable participants.

**Pen Registers, Telephone Toll Records, Text Messages, and Cell Site Data**

The Government employed these means to monitor communications in and around the suspect transactions.  Although pen registers and toll records disclose the phone numbers involved, they reveal neither the actual speaker nor the substance of the communication.  (Blake Aff. ¶ 64.)  It is thus unsurprising that pen registers often give rise to wiretaps.  See, e.g., United States v. Rivera, 532 F. App'x 304, 306 (3d Cir. 2013); United States v. Bennett, 219 F.3d 1117, 1122–23 (9th Cir. 2000).  Moreover, the mere occurrence of the calls and texts "was insufficient to reveal the 'full nature and scope' of the conspiracy."  United States v. Williams, 827 F.3d 1134, 1150 (D.C. Cir. 2016) (quoting United States v. Becton, 601 F.3d 588, 597 (D.C. Cir. 2010)); cf. Armocida, 515 F.2d at 38 (Government need not terminate "an investigation before the entire

scope of the narcotics distribution network is uncovered and the identity of its participants learned").  Similarly, "[c]ell site data can provide approximate location, but cannot provide content."  (Blake Aff. ¶ 64); see United States v. Tyree, 2008 WL 11343040, at * 6 (D. Colo. May 16, 2008) (Government met necessity requirement even though it did not analyze cell site data before obtaining wiretap).

### Undercover Agents

The Government determined that this means was unlikely to be effective because: (1) having been the subject or target of several investigations, Dougherty suspected that he would again be investigated; (2) Dougherty thus communicated directly only with his loyal "inner circle" of associates, who depended on him for their livelihoods.  (Blake Aff. ¶ 60.)  For instance, during a separate 2014 investigation, Dougherty refused to speak directly with an undercover agent or an informant doing business with Local 98.  (Id.)  Instead, he had them speak with an intermediary. (Id.)

### Interviews, Confidential Sources, and Arrests

Blake explained that recruiting Union members as informants would likely be ineffective. Once again, because Dougherty directly communicated only with his confidants, who themselves were part of the alleged conspiracy, Blake doubted that arresting culpable individuals would yield any useful cooperation.  (See Blake Aff. ¶ 69).  The Agent explained that witness interviews would similarly be less than useful.  Based on his years of experience investigating labor organizations, Blake understood that members invariably remain loyal to the union and their associates.  (Blake Aff. ¶ 71); see Williams, 124 F.3d at 418.  Blake also understood that such witnesses would have feared Dougherty's retaliation.  Indeed, Blake described how Dougherty—with complete control over the Union—punished a member who had the temerity to state publicly that Dougherty had

mismanaged Union resources.  (Blake Aff. ¶ 67.)

**The Grand Jury**

Subpoenaing witnesses would give rise to the same difficulties as interviewing them.  Once again, in Blake's experience, union members are unfailingly loyal to their organizations and thus quite reluctant to cooperate against their associates.  Moreover, as with interviews, subpoenaing "such persons would create the very real likelihood that they would tip off Dougherty and others to the existence of this ongoing, secret investigation."  (Blake. Aff. ¶ 71); see United States v. Edwards, 889 F. Supp. 2d 1, 12 (D.D.C. July 26, 2012).

**Search Warrants**

Agent Blake explained that, like other "overt" investigatory techniques, executing search warrants "would reveal the investigation and likely cause the subjects of this investigation to further camouflage their activities, making ultimate detection even more difficult."  (Blake Aff. ¶ 71.)  Title III does not require the Government to compromise its investigation by prematurely revealing to its targets that an investigation is underway.  See Williams, 124 F.3d at 419 ("[T]he affidavit stated that execution of a search warrant was unlikely to succeed because it would reveal the facts of the investigation to the targets."); see also United States v. Lopez, 300 F.3d 46, 54 (1st Cir. 2002); id. at 53 ("Title III does not 'force the government to run outlandish risks . . . before seeking a wiretap.'") (quoting United States v. Hoffman, 832 F.2d 1299, 1306 (1st Cir. 1987) (alteration in original)).  Indeed, Dougherty himself acknowledges that the Government's investigation would necessarily conclude once search warrants were executed.  (Def.'s Mot. 14–15, 17.)  Blake thus noted that he would "execute search warrants only after the covert investigation [wa]s completed."  (Blake Aff. ¶ 58.)

Finally, Dougherty quotes an Affidavit passage that well shows why Blake believed that

search warrants would otherwise be ineffective:

> [T]he seizure of documents may not reveal DOUGHERTY's and the other TARGET INTERCEPTEES' knowledge of or involvement in the embezzlement scheme. . . . [E]xpense reports may not indicate that DOUGHERTY directed [Codefendants] FIOCCA and NIKO RODRIGUEZ to make the [suspect] purchases.

(Def.'s Mot. 18 (quoting Blake Aff. ¶ 72).)  Once again, the purchase records recovered during a search likely would not indicate whether the purportedly illegal purchases were made on Dougherty's orders.  See Kaplan, 2009 WL 3806277, at *10–11.

**Trash Searches**

Blake explained that such searches could not be effectuated because Dougherty had his trash taken from his home each day and placed in a dumpster on Local 98's property, which was under constant video surveillance and enclosed by a fence.  (Blake Aff. ¶ 73; see Armocida, 414 F.2d at 37 ("Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely.") (quoting 1968 U.S. Code Cong. & Admin. News at p. 2190).

* * *

In sum, Blake offered a "full and complete" explanation of which "normal investigative procedures ha[d] been tried and ha[d] failed or reasonably appear[ed] to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c) & 3(c).  In thus "lay[ing] a 'factual predicate' sufficient to inform [me] why other methods of investigation were not sufficient," the Government fulfilled its obligation under Title III.  Williams, 124 F.3d at 418 (quoting McGlory, 968 F.2d at 345).

**B.      Necessity Standard—Non-drug Cases**

Finally, Dougherty suggests that the necessity standard is more stringent when drug crimes are not being investigated.  Dougherty thus urges that wiretapping "may be justified in a drug

8

conspiracy case" because drug dealers do not maintain "extensive paper and digital records." (Def.'s Mot. 6–7; see also id. at 16, 20.)  Wiretaps were unnecessary

> [h]ere, [because] the government is employing the same resources it would on an under-the-radar drug kingpin with an unidentified network of dealers to [a] union leader with an easily discernible network of colleagues and family, with known names, addresses, phone numbers, and financial records.

(Def.'s Mot. 20–21.)

The suggestion is as legally baseless as it is offensive.  As alleged, Dougherty ran his Union much as any other "kingpin" might run his criminal enterprise.  Dougherty purportedly: refused to speak directly to anyone but trusted associates—now his Codefendants; had his trash taken each day from his home to the Union's fenced in dumpster, which was under constant surveillance; and punished those who criticized him.  Dougherty thus made it as difficult as possible to investigate his activities using "traditional" methods.  Accordingly, wiretapping Dougherty's phone was necessary under Title III, even though this was not a "drug" investigation.  To the contrary, Dougherty is hardly the first defendant charged with financial crimes whose phone the Government permissibly intercepted under Title III.  See, e.g., United States v. Weaver, 220 F. App'x 88, 90 (3d Cir. 2007); United States v. McGuiness, 764 F. Supp. 888, 897 (S.D.N.Y. 1991).

## IV.    CONCLUSION

Dougherty urges that suppression is warranted under the necessity standard because: (1) the Government could have conducted its traditional investigation more effectively, and (2) Title III allows wiretaps only as a last resort.  As I have discussed, however, the Government had good reason not to conduct its investigation in the "effective" manner Dougherty urges.  See Armocida, 414 F.2d at 37–38.  Moreover, "necessity" does not restrict the Government so that it may employ wiretaps only as a last resort.  See United States v. Edwards, 69 F.3d 419, 429 (10th Cir. 1995) ("[L]aw enforcement officials are not required to exhaust all other conceivable investigative

procedures before resorting to wiretapping.") (internal quotation marks and citation omitted);

accord Williams, 124 F.3d at 418.

I will deny Dougherty's Motion because the Government has certainly satisfied Title III's

necessity requirement.

An appropriate Order follows.

*/s/ Paul S. Diamond*

_____

July 9, 2020                                                  Paul S. Diamond, J.