IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| | | CRIMINAL ACTION |
| v. | | No. 19-64 |
| JOHN DOUGHERTY, *et al*. | | |

**MEMORANDUM**

**SCHMEHL, J. /s/ JLS**                                                    **SEPTEMBER 1, 2020**

On January 29, 2019, a grand jury issued a 116-count indictment as to eight defendants, all allegedly entangled in a vast conspiracy to misuse and misappropriate the assets of a labor union. (ECF No. 1.)  The indictment alleges a wide-ranging scheme led by Defendant John Dougherty, the Business Manager of Local 98 of the International Brotherhood of Electrical Workers (hereinafter "Local 98"), whereby Dougherty "used this control, and a variety of methods, to repeatedly and persistently steal from Local 98 and put his own self-interests over that of the membership of the union."  (*Id*. at 1.)  These alleged misappropriations include Dougherty using Local 98 "as his personal bank account and as a means to obtain employment for himself, his family, and his friends."  (*Id.*)  The indictment further contends that these acts were not authorized by the constitution or by-laws of Local 98, and that they "unlawfully deprived the union and its members of funds and assets."  (*Id*. at 2.)

Now, this matter is before the Court on Defendant John Dougherty's Motion to Dismiss Counts 97-109 of the Indictment, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B).

(*See* ECF No. 65.)[1]   The counts that Dougherty seeks to dismiss charge him and co-defendant Robert Henon—a Philadelphia City Councilmember—with conspiring to commit, and committing, honest services fraud under 18 U.S.C. § 666.  (ECF No. 1 at 108-33.)  He alleges that despite the Government's allegations, "the facts, in [reality], reveal the normal and lawful lobbying of a City Councilmember to advance the interests of a labor union.  And a Councilmember acting in response to such efforts and in order to advance the interests of his constituents is not a fraud." (ECF No. 65 at 1.)

In so arguing, Dougherty emphasizes three arguments.  First, he asserts that the honest services fraud statute's application here is unconstitutionally vague.  (*Id*. at 9.)  Second, Dougherty argues that the Government's bribery allegations are insufficient as the pleadings do not allege that Dougherty himself "gave or offered Mr. Henon anything at all within the meaning of the federal bribery statutes."  (*Id*. at 2.)  Third, he claims that the Government cannot establish a *quid pro quo*, as Mr. Henon was given the alleged *quid*—a Local 98 salary that he received while a Philadelphia City Councilmember—starting at least as early as 2003, twelve years before the alleged *quid pro quo* at issue.  (*Id*. at 3.)  Thus, Dougherty asserts that the Government has not alleged that Dougherty possessed the specific intent to influence official action at the time Mr. Henon was offered the salary.  (*Id*. at 16.)

In the alternative, Dougherty has also moved to strike, pursuant to Federal Rule of Criminal Procedure 7(d), the allegations contained in the following paragraphs of the indictment: pg. 111, ¶ 14(a); pg. 112, ¶ 14(c); pgs. 112-119, ¶¶ 1-27; and pgs. 121-126, ¶¶ 41-60.  (*Id*.)  He claims that of the six categories of "official acts" listed in the indictment, five are "permissible actions the

---

[1] On July 2, 2019, Defendant Robert Henon filed, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), a "Motion to Join in Co-Defendant John Dougherty's Motion to Dismiss Counts 97-109 of the Indictment." (ECF No. 84.)  In the accompanying Order, we grant Henon's motion to join in this Motion to Dismiss.

Supreme Court has definitively stated do not constitute 'official acts' as a matter of law." (ECF No. 65 at 19.) As such, Dougherty asserts that these five categories are surplusage and must be stricken from the indictment as irrelevant and prejudicial. (*Id.* (citing *United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006).)

For the reasons elaborated below, we deny both Dougherty's Motion to Dismiss and his Motion, in the alternative, to Strike.

## I.    RELEVANT FACTUAL BACKGROUND[2]

In November 2011, defendant Robert Henon was elected to serve as a Philadelphia City Councilmember representing the Sixth Council District of Philadelphia. (ECF No. 1 at 108, ¶ 2.) He was sworn in on January 3, 2012. (*Id.*) When he took office, Henon became the Chair of the Committee on Public Property and Public Works, which is responsible for all matters relating to City property and buildings. (*Id.*) Comcast of Philadelphia (hereafter "Comcast"), a cable service provider, had entered into a 15-year franchise agreement with the City of Philadelphia to provide cable service within the City's limits in accordance with the terms of an agreement. (*Id.* at 109, ¶ 9.) During 2015, Comcast was negotiating the terms of the renewal of this franchise agreement with the Mayor's Office and the Public Property Committee of City Council, which was chaired by defendant Henon. (*Id.* at 109, ¶ 9.)

---

[2] This matter involves many Defendants. As this Motion only concerns Counts 97-109 of the Indictment, we will only detail relevant factual allegations relating to those charges. As our standard of review requires us to take all factual allegations in the Indictment as true, the language in this Court's Factual Background section tracks the language of the Government's Indictment. *See United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012).

In its Indictment, the Government also alleges a number of Overt Acts in furtherance of the alleged conspiracy at the center of this case. The facts underlying each of these Overt Acts are detailed below in the relevant sections of this Opinion.

Henon's office also imbued him with the "actual and perceived authority over certain other public officials," including employees of the Philadelphia Department of Licenses and Inspections ("L&I"). (*Id.* at 108, ¶ 4.) L&I administers and enforces Philadelphia's code requirements, including building, electrical, fire, health, housing, business, and zoning regulations. (*Id.*) Inspectors employed by L&I were empowered to issue cease and desist orders for violations of the City codes. (*Id.*) The Philadelphia Parking Authority (PPA)—another Philadelphia agency referenced later in this Opinion—was created by a Philadelphia City ordinance to provide parking services for residents, businesses, and visitors in Philadelphia. (*Id.*) PPA Official No. 1 and PPA Official No. 2—also referenced later in this Opinion—were officials of PPA. (*Id.* at 108, ¶ 5.)

Prior to being elected as a City Councilman, defendant Henon had served as the Political Director of Local 98 since 2003. (*Id.* at 109, ¶ 7.) It is alleged that Defendant John Dougherty, through Local 98, provided defendant Henon with a stream of personal benefits during the time that Henon was a member of Philadelphia City Council. (*Id.* at 110, ¶ 11.) The benefits given to Henon by Dougherty included a salary from Local 98 and tickets to sporting events. (*Id.*) Specifically, Local 98 paid Henon a salary during the time he served as a City Councilman, totaling $70,649 in 2015 and $73,131 in 2016. Additionally, during 2015 and 2016, Defendant Dougherty gave Defendant Henon tickets to sporting events with a value of approximately $11,807. (*Id.* at 110, ¶ 11(b).) These tickets were paid for by Local 98. (*Id.* at 110, ¶ 11(b).)

On Local 98's annual LM-2 reports filed with the United States Department of Labor, Local 98 described Henon's position as "office staff." (*Id.* at 110, ¶ 11(a).) On annual financial disclosure forms that Henon was required to file with the City Board of Ethics in 2015 and 2016, specifying the source, but not the amount, of income over $500 and gifts over $200 (in the aggregate), Henon disclosed Local 98 as a source of income, describing his position as

"electrician," while not disclosing any gifts.  (*Id*.)  In fact, throughout the period of the alleged conspiracy, the Government alleges that Henon did not work as "office staff" nor as an electrician for Local 98, and Henon did not perform any significant work of any kind for Local 98 apart from his efforts as a member of the Philadelphia City Council to act as directed by and to benefit Defendant Dougherty.  (*Id*.)

Defendant Dougherty allegedly gave these things of value to Defendant Henon with the intent to: (1) influence Henon in his capacity as a member of Philadelphia City Council and Chair of the Committee on Public Property; (2) in exchange for Henon acting on behalf of Dougherty in his capacity as a member of Philadelphia City Council; and (3) in exchange for performing official acts as directed by, and on behalf of, Dougherty.  (*Id*. at 110, ¶ 12.)  Defendant Henon is alleged to have accepted the stream of personal benefits from Defendant Dougherty, knowing that the benefits were given in exchange for Henon's performance of official acts at the direction of and on behalf of defendant Dougherty.  (*Id*. at 110, ¶ 13.)  Furthermore, defendants Dougherty and Henon allegedly attempted to hide the true nature of their illegal relationship from the public.  (*Id*. at 110, ¶ 13.)

The Government alleges that the official act that Defendant Henon took, attempted to take, or caused as part of this relationship included the following.  (*Id*. at 110, ¶ 14.)  At Defendant Dougherty's direction, defendant Henon caused L&I to inspect, and in some instances shut down, operations or construction work, at locations outside of his district, where non-union laborers were involved in electrical work construction activity.  (*Id*. at 110, ¶ 14(a).)  At Defendant Dougherty's direction, defendant Henon drafted, supported, advocated, and sponsored Philadelphia City Council legislation, resolutions, and other Council legislative activities that were favorable to defendant Dougherty's personal, professional, or financial interests.  (*Id*. at 110, ¶ 14(b).)  At

5

defendant Dougherty's direction, defendant Henon allowed Dougherty to demand concessions by Comcast during the franchise contract negotiations between the City of Philadelphia and Comcast, which ultimately resulted in Comcast hiring MJK Electric, a union electrical contractor defendant that Dougherty favored, for electrical contracting work. (*Id*. at 110, ¶ 14(c).)

## II.   MOTION TO DISMISS

### a.  LEGAL STANDARD

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), a defendant may file a motion to dismiss for failure to state an offense. FED. R. CRIM. P. 12(b)(3)(B)(v).  In assessing a motion under this Rule, ". . . a district court must accept as true the factual allegations set forth in the indictment." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012).  As factual questions are left to the jury, "a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000).  As such, challenges "to the sufficiency of the indictment should be decided based on the facts alleged within the four corners of the indictment, not the evidence outside of it." *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007).

Notwithstanding, in this analysis, mere recitation of the elements of an offense is insufficient to meet the required standard. *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002).  Indeed, to meet this standard, the indictment must allege specific facts that fall within the scope of the relevant criminal statute. *Vitillo*, 490 F.3d at 321.  Though an indictment "must allege more than just the essential elements of the offense . . . no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution."

*United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir. 2011) (citing *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007)).   Indeed, when examining the sufficiency of an indictment, the Court reviews "using a common sense construction."  *United States v. Hodge*, 211 F.3d 74, 76 (3d Cir. 2000).

### b.  ANALYSIS

#### i.  The Government's "Stream of Benefits" Theory, as Alleged, is Not Unconstitutionally Vague

Dougherty first challenges the Indictment in this case on constitutional grounds.  (ECF No. 65 at 9-12.)  He argues that the application of the honest services fraud statute to the Government's allegations is unconstitutionally vague and thus void.  (*Id.*)  The vagueness doctrine arose under the Fourteenth Amendment "because it was thought unfair to punish persons for conduct which they had no notice could subject them to criminal punishment."  *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1135 (3d Cir. 1992) (citing *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).  Vagueness may invalidate a criminal statute only: (1) where a statute, as interpreted by the courts, fails to provide proper notice to a person of ordinary intelligence that certain conduct is illegal; or (2) where a statute encourages arbitrary and discriminatory enforcement.  *United States v. Mariano*, No. 05-614, 2006 U.S. Dist. LEXIS 7497, at *9 (E.D. Pa. Feb. 28, 2006) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).)

Before being elected to the Philadelphia City Council, Mr. Henon was employed by Local 98 for eight years; he maintained that employment relationship after assuming office.  (ECF No. 65 at 11-12.)  Thus, here, Dougherty argues that the Government has alleged "nothing more tha[n] the lawful but potentially conflicted actions of Mr. Henon as dual Local 98 employee and legislator."  (*Id.*)

Under the Philadelphia City Council Ethics Policy, there is no prohibition against Councilmembers maintaining outside private employment. PHILA. CITY COUNCIL ETHICS POLICY Part III. This Policy directs Councilmembers to "[s]eek guidance if you think you may have a conflict of interest." *Id*. Based on this, Dougherty presents a theory of this case wherein Henon merely maintained lawful, ordinary employment separate from his responsibilities as a City Councilmember. (*Id*.) Accordingly, he contends that the Government's theory is unconstitutionally vague, and in this case amounts to a "conflict-of-interest case packaged in bribery terms." (*Id*.) In particular, Dougherty contends that the application of § 1346 in the Indictment leaves open the following relevant questions: "How would Mr. Henon know whether staking pro-union policy positions would constitute honest services fraud? And, how would Local 98 know whether the lawful salary it paid Mr. Henon would constitute a 'bribe?'" (*Id*. at 11); *See also Skilling v. United States*, 561 U.S. 358, 407-11 (2010).

In response, the Government avers that it has not charged an unconstitutionally vague conflict-of-interest theory here, but rather a "stream of benefits" which included Henon's Local 98 salary and sporting event tickets. (ECF No. 77 at 6-7.) The Government confirms that it did not charge anyone with merely taking pro-union positions. (*Id*.) Moreover, the Indictment alleges that during the relevant period (2015-16), although Henon was listed on Local 98 payroll as "office staff" or an "electrician," he "did not work as 'office staff' nor as an electrician for Local 98, and HENON did not perform any significant work of any kind for Local 98 apart from his efforts as a member of the Philadelphia City Council to act as directed by and to benefit defendant JOHN DOUGHERTY." (*Id*. at 110-111, ¶ 11(a).)

Further, the Government asserts that the Indictment is not vague, as it has alleged the following:

Dougherty bribed Henon with a 'stream of benefits,' which included Henon's salary from Local 98 and tickets to sporting events, with the intent to influence Henon in his capacity as a member of Philadelphia City Council, and in exchange for Henon's performance of official acts at the request of, and on behalf of Dougherty, and that Henon agreed and accepted the bribes knowing they were paid in exchange for official acts.

(*Id*. at 7-8.)

This theory is also clearly elaborated in the Indictment.  (*See* ECF No. 1 at 108, ¶¶ 11-13; ECF No. 1 at 128, ¶ 2; ECF No. 1 at 132, ¶ 1.)

Based on this, we find that the Indictment, as it applies the relevant statute, is not unconstitutionally vague.  The Government has made precise allegations by temporally limiting the scope of its charges and by making clear its allegation that Henon did not perform any significant work for Local 98 during the relevant period.    Moreover, the Indictment tracks language that the Third Circuit has found adequate.  *See United States v. Kemp*, 500 F.3d 257, 281-286 (3d Cir. 2007).  As such, we find that the Indictment provides proper notice of what conduct is illegal.   We further find that the statute, as applied, does not encourage arbitrary or discriminatory enforcement.  Accordingly, we will not dismiss these counts from the Indictment for vagueness.

### ii.   The Indictment Sufficiently Alleges that Dougherty Gave Henon Bribes Including a Local 98 Salary and Tickets to Sporting Events

The first half of Dougherty's argument stating that the Indictment does not sufficiently charge bribery centers on the alleged *quid* of the *quid pro quo*.  (*See* ECF No. 65 at 12-16.)  A bribery theory requires "a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act."  *United States v. Sun-Diamond Growers*, 526 U.S. 398, 404-05

(1999).  In this sense, the *quid* constitutes the "something of value" given or offered in exchange for a public official's official act.

Here, Dougherty argues that "the Government concedes that Local 98 paid Mr. Henon his salary and is attempting to ascribe to Mr. Dougherty personal, criminal liability for something that he is not alleged to [have done]."  (ECF No. 65 at 13.)  He underscores that that to sufficiently charge the *quid* of a *quid pro quo*, the Government must allege facts demonstrating that Mr. Dougherty expressed the authority, ability, and desire to pay the alleged bribe.  *See United States v. Jacobs*, 431 F.2d 754, 760 (2d Cir. 1970); *see also United States v. Cessa*, 856 F.3d 370, 370 (5th Cir. 2017).

In his argument, Dougherty draws a contrast between this matter and that of *United States v. Bryant*.  (ECF No. 65 at 14-15 (citing *United States v. Bryant*, No. 07-267, 2009 U.S. Dist. LEXIS 44648 (D.N.J. May 27, 2009)).)  Dougherty contrasts the facts of *Bryant* with the present allegations, claiming that "[t]he comparison with *Bryant* lays bare the infirmities of the Indictment here."  (ECF No. 65 at 14.)  In *Bryant*, the Government charged honest services fraud, alleging that the defendants "entered into a corrupt *quid pro quo* bribery arrangement whereby Gallagher hired Bryant for a 'low-show' job at [the School of Osteopathic Medicine ("SOM")], earning Bryant a salary, performance bonuses, and a credit towards his state pension, in exchange for Bryant's assistance and efforts as a State Senator to secure additional funding and other benefits from the State of New Jersey for SOM."  *Bryant*, 2009 U.S. Dist. LEXIS 44648, at *2-3.

Nothing in *Bryant*, however, stands for the proposition that the Government has not adequately alleged that Dougherty gave Henon bribes here, and that the Indictment, as a result, is inadequate.  Indeed, it can be the case—as it is here—that both the facts of *Bryant* and those alleged here meet the respective, requisite standards.  Moreover, Chief Judge Wolfson's Opinion in *Bryant*

was issued in response to a Motion for a Judgment of Acquittal—pursuant to Federal Rule of Criminal Procedure 29(a)—that was filed after the Government had already presented its case-in-chief.  *Id*. at *4-7.  As such, the standard under which *Bryant* was decided is very different from the operative standard here.  *Id*. at *5-6 ("A Rule 29 motion requires a court to determine whether the government's evidence is sufficient, or stated another way, whether the record contains 'substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt.'") (citations omitted); *See* FED. R. CRIM. P. 29(a) ("After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction."); *Compare United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir. 2011) ("no greater specificity than the statutory language is required [in the Indictment] so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.") (citations omitted).

Here, we find that the Government has met its burden and has adequately charged that Dougherty gave Henon bribes.  Indeed, the plain language of the Indictment shows this:

> Defendant JOHN DOUGHERTY, through Local 98, provided defendant ROBERT HENON with a stream of personal benefits during the time that Henon was a member of the Philadelphia City Council.  The benefits given to HENON by DOUGHERTY included a salary from Local 98 and tickets to sporting events.

> (ECF No. 1, at 110, ¶ 11.)

This allegation is plain and unambiguous.  At this stage in the proceedings, the Government is not required to allege more than a "sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir. 2011) (citing *United States v. Kemp*, 500 F.3d 257, 280 (3d

Cir. 2007)).  While Dougherty may challenge the sufficiency of the Government's evidence at a later stage, the relevant allegations as set forth in the Indictment do not justify dismissal now.

### iii. The Government Has Adequately Charged that Dougherty Possessed the Requisite Intent to Influence Henon in Exchange for Things of Value

The second half of Dougherty's argument that the Indictment inadequately charges bribery centers on Dougherty's intent.  Dougherty argues that the Government has failed to allege that he possessed the specific intent to influence official action at the time Mr. Henon was offered a Local 98 salary.  (ECF No. 65 at 16.)  In so arguing, Dougherty highlights that "critical element of a bribery charge is the exchange language, distinguishing between a bribe, which necessarily involves a *quid pro quo*, and a mere attempt to curry favor, which does not."  *United States v. Lynch*, 807 F. Supp. 2d 224, 232 (E.D. Pa. 2011) (citing *United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007).  He emphasizes that "[t]he critical holding of *Kemp* is that bribery requires a specific intent to perform a *quid pro quo* . . . the Government must allege and prove some facts from which a jury can infer that there was a specific intent to perform an exchange."  *Id*. at 233.  As such, Dougherty argues that the timing component of this charge is crucial:

> Put another way, bribery charges include a critical timing component whereby three features of the events giving rise to the charge must occur contemporaneously: the defendant must extend an offer (as defined above); the recipient of the offer must be a public official (as defined above); and the offeror must intend for the offer to influence an official act (as defined below).

(ECF No. 65 at 17 (citing *Kemp*, 500 F.3d at 281.).)

Mr. Henon has been employed by Local 98 since 2003, for much of that time as the union's Political Director.  (ECF No. 1 at 109, ¶ 7.)  Thus, Dougherty argues here that the Government has failed to adequately charge honest services fraud as "Mr. Henon earned his Local 98 salary—the

alleged *quid*—for at least eight years prior to his election to public office and twelve years before the consummation of the alleged *quid pro quo*.  (ECF No. 65 at 18.)  Accordingly, Dougherty asserts that the Government has failed to allege specific facts that demonstrate that, while Mr. Henon was a Councilmember, Dougherty expressed the authority, ability, and desire to give Henon a Local 98 salary with the intent to influence Henon's performance of an official act.  (*Id.*)

In support of this argument, Dougherty relies on this Court's decision in *Lynch*.  (*Id*. at 17 (citing *United States v. Lynch*, 807 F. Supp. 2d 224 (E.D. Pa. 2011)).)  In his Motion, Dougherty notes that in *Kemp*, this Court found that the Government had failed to adequately plead a bribery theory of honest services fraud by alleging that the public official's "actions were unlawfully rewarded and influenced by bribes, rewards, gifts, loans, and other benefits he received from defendant . . ." *Lynch*, 807 F. Supp. 2d at 233.  This Court's decision in *Lynch*, however, did not rest on the indictment's failure to allege that the defendant possessed the requisite intent.  Indeed, Dougherty selectively quotes *Lynch*, omitting that the key inadequacy was that it did "not allege an exchange" and not a failure to allege intent.  *Id*. at 233.  That the Government in *Lynch* failed to allege an exchange was rooted in the indictment's wording, which stated that the defendant had "influenced" and "rewarded" the public official.  *Id*.  ("Whereas the indictment in the *Kemp* case included both 'influence' language and 'exchange' language, the Information in this case only includes 'influence' language.").  The fact that the Government *also* "fail[ed] to allege any intent on the part of either defendant with respect to the specific actions at the time of the improper payment" merely "heightened" the indictment's inadequacy.  *Id*.  Failure to allege the required intent did not cause the *Lynch* indictment to be dismissed.

In further support of his Motion—on January 29, 2020—Dougherty submitted a Notice of Supplemental Authority.  (*See* ECF No. 112.)  Attaching a copy of the Second Circuit's January

21, 2020 opinion in *United States v. Silver*, Dougherty proposed that "the *Silver* opinion further supports . . . . that the government has failed to allege a cognizable theory of honest services fraud because [it] has failed to allege that defendant made any payments to a public official with the specific intent to influence official action on specific questions or matters." (*Id*. at 1 (citing *United States v. Silver*, 948 F.3d 538 (2d Cir. 2020).))

In so arguing, however, Dougherty mischaracterizes the Second Circuit's decision in *Silver*. In his Notice of Supplemental Authority, Dougherty states that the Second Circuit held that: "to prove the 'as the opportunities arise' theory of honest services fraud bribery . . . . the government must prove that a charged payment to a public official was made with the specific intent to influence official acts on specific questions or matters arising before the public official." (ECF No. 112 at 1.) However, this does not accurately describe the Second Circuit's holdings. First, in relevant part, the Second Circuit held that honest services fraud requires that the *official* reasonably believe, at the time the promise was made, that the payment was made in return for a commitment to perform some official act; it does not require the official and the payor to share a common intent or purpose. *Silver*, 948 F.3d at 545. Second, the court held that honest services fraud does not require advance identification of the particular act to be undertaken, though it requires that the *official* understand, at the time she accepts the payment, the particular question or matter to be influenced. *Id*. Neither of these holdings addresses the payor's intent in the context of honest services fraud. Moreover, *Silver* addresses the appropriateness of a district court's jury instructions and the sufficiency of evidence presented at trial, not the sufficiency of an indictment. *Id*. at 547. As such, we do not find *Silver* persuasive in light of the arguments presented in Dougherty's Motion and our standard of review.

In response to Dougherty's arguments, the Government asserts that it has sufficiently alleged that Dougherty gave Henon things of value with the intent to influence Henon's performance as a Philadelphia City Councilmember.  (ECF No. 77 at 10-13.)  The Government asserts that Dougherty's arguments amount to the following: the Government's "failure to allege that Dougherty intended to bribe Henon in 2003, eight years before he was elected to City Council, and twelve years before the period charged in the Indictment, calls for dismissal of the conspiracy and honest services charges."  (*Id.* at 11.)  The Government further confirms that it is alleging a "stream of personal benefits" theory, which does not require it to allege an explicit *quid pro quo* agreement that occurred on a specific date.  (*Id.*)  Under this theory, payments may be made to a public official with the intent to retain the official's services as needed, so that whenever the opportunity arises, the official will take specific action on payor's behalf.  *Kemp*, 500 F.3d at 282 (citing *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998)).

As to Counts 97 through 109 in this matter, the Indictment explicitly alleges that:

Defendant JOHN DOUGHERTY gave these things of value to defendant ROBERT HENON with the intent to influence HENON in HENON's capacity as a member of Philadelphia City Council and Chair of the Committee on Public Property, and in exchange for HENON acting on behalf of DOUGHERTY, in his capacity as a member of Philadelphia City Council, and performing official acts as directed by and on behalf of DOUGHERTY.

(ECF No. 1 at 111, ¶ 12; ECF No. 1 at 128, ¶ 2; ECF No. 1 at132, ¶ 1.)

Taking this explicit allegation of Dougherty's intent along with the above, and considering our standard of review, we find that the Indictment provides sufficient factual orientation for Dougherty to prepare his defense and will not dismiss any charges on this basis.  *See Bergrin*, 650 F.3d at 264.

### III.    MOTION TO STRIKE FROM THE INDICTMENT CERTAIN CHARGED "OFFICIAL ACTS"

In the alternative, Dougherty has moved to strike from the Indictment five of the six categories of charged "official acts," contending that under *McDonnell v. United States*, the charged acts do not constitute "official acts" as a matter of law.  (ECF No. 65 at 18 (citing *McDonnell v. United States*, 136 S. Ct. 2355 (2016)).)  As such, Dougherty contains that these five charged acts are surplusage and must be stricken from the Indictment (*Id.* at 18-25.)  We assess each of these five charged acts in turn.

### a.  LEGAL STANDARD

District Courts are afforded a narrow scope of review to strike material from an indictment. *United States v. Pharis*, 298 F.3d 228, 248 (3d Cir. 2002).  Federal Rule of Criminal Procedure 7(d) provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information."  Fed. R. Crim. P. 7(d).  This Rule is intended to protect a defendant against prejudicial allegations that are neither relevant nor material to the charges brought in an indictment.  *United States v. Alsugair*, 256 F. Supp. 2d 306, 317 (D.N.J. 2003).  (citations omitted). In this analysis, the Third Circuit has emphasized that "information that is prejudicial, yet relevant to the indictment, must be included for any future conviction to stand and information that is irrelevant need not be struck if there is no evidence that the defendant was prejudiced by its inclusion."  *United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006).  Thus, for a District Court to properly strike material from an indictment, it must be "both irrelevant (or immaterial) and prejudicial."  *Id.*

Given this restrictive standard, such motions to strike surplusage are rarely granted.  *Id.* at 611 (citing *Alsugair*, 256 F. Supp. 2d at 317).  Indeed, motions under Rule 7(d) are "addressed to

the sound discretion of the District Court and should be granted only where it is clear that the allegations contained therein [meet this standard]." *Alsugair*, 256 F. Supp. 2d at 317 (citing *United States v. Vastola*, 670 F. Supp. 1244, 1254 (D.N.J. 1987)).

### b.  ANALYSIS

In his Motion to Strike, Dougherty suggests that the Court should strike five of the six groups of charged "official acts," as they "unequivocally fall within the categories of permissible actions the Supreme Court has definitively stated do not constitute 'official acts' as a matter of law." (ECF No. 65 at 19.)  He underscores that including these acts, or any evidence thereof, at trial would be prejudicial "by exposing him to the risk that a jury could convict on the basis of an activity the Supreme Court has deemed lawful." (*Id.* (citations omitted).)  In so arguing, Dougherty lays his foundation upon *McDonnell v. United States*. (ECF No. 65 at 18-25 (citing *McDonnell v. United States*, 136 S. Ct. 2355 (2016))

In *McDonnell*, the Supreme Court considered on appeal the conviction of the former Governor of Virginia, Robert F. McDonnell, for honest services fraud and Hobbs Act extortion charges. *McDonnell*, 136 S. Ct. 2355.  These convictions stemmed from his alleged acceptance of payments, loans, gifts, and other things of value from a Virginia-based company, Star Scientific, and its CEO, in exchange for "performing official actions on an as-needed basis, as opportunities arose, to legitimize, promote, and obtain research studies for Star Scientific's products." *Id.* at 2364-65 (internal quotations omitted).

In its indictment, the Government alleged that Governor McDonnell had committed at least five "official acts," as defined in the federal bribery statute:

> (1) Arranging meetings for the CEO of Star Scientific with Virginia government officials to discuss and promote the supplement;

(2) Hosting and attending events at the Governor's Mansion designed to encourage Virginia university researchers to initiate studies and to promote Star Scientific's products to doctors for referral to their patients;

(3) Contacting other Virginia State Government officials in an effort to encourage state public universities to initiate studies of Star Scientific products;

(4) Promoting Star Scientific's products and facilitating its relationships with Virginia government officials by allowing Star Scientific's CEO to invite individuals important to the company's business to exclusive events at the Governor's Mansion; and

(5) Recommending that senior Virginia State Government officials meet with Star Scientific executives to discuss ways that the company's products could lower healthcare costs.

*Id*. at 2365-66.

In this context, and considering these allegations, the Supreme Court considered the proper interpretation of the term "official act." *Id*. at 2367 (quoting 18 U.S.C. § 201(a)(3)).  In so doing, the Court relied upon the federal bribery statute, which provides that:

". . . the term "official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."

18 U.S.C. § 201(a)(3).

Following the statute, the Court first noted that the federal bribery statute defines an "official act" as a "decision or action on a question, matter, cause, suit, proceeding[,] or controversy." *Id*. at 2371-72 (internal quotations omitted).  Refining this, the Court elaborated that the "question, matter, cause, suit, proceeding[,] or controversy must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id*. at 2372.  The Court also found that an "official act" must be something specific and focused that is "pending" or "may be brought" before an official. *Id*.  For the official's actions to quality as an "official act," however, the official must make a

decision, take an action, or agree to do so.  *Id.*  That decision or action may include using an official position to exert pressure on another official to perform an "official act," or "knowing or intending that such advice will form the basis for an 'official act' by another official."  *Id.*  After establishing these parameters, the Court then concluded that "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of 'official act.'"  *Id.*

Relying upon this standard, we will now analyze each of the five categories of charged acts that Dougherty seeks to strike from the indictment.

### i.   The Government Has Adequately Alleged Overt Acts 1-8, Detailing the Alleged Abuse of L&I Enforcement Activity to Discourage the Use of Non-Union Labor at Children's Hospital of Philadelphia

In its Indictment, the Government alleges that on or about July 19, 2015—upon learning that a non-union company was hired to install MRI machines at a new facility at the Children's Hospital of Philadelphia ("CHOP"), John Dougherty instructed a Local 98 business agent to text contact Robert Henon with a  complaint.  (ECF No. 1 at 112.)  Dougherty texted the agent, writing "Do it + call Henon ,,, tonight ,,,, Call Condi tonight to jump in +resolve [*sic*]."  (*Id.*)

On or around July 20, 2015, Dougherty called a CHOP administrator to discuss the MRI installations.  (*Id.*)  The administrator informed him that the machines' manufacturer was installing the machines as it would not honor the warranty if anyone else did so.  (*Id.*)  After complaining that Local 98 had not been allowed to bid on the project, Dougherty also warned the administrator that having the manufacturer install the MRI machines was ". . . also an L&I [Philadelphia Department of Licenses and Inspections] violation . . . you don't want a city thing shutting it down. We have had other hospitals shut down because of that."  (*Id.* at 112-13.)

19

The next day, on or around July 21, 2015, responding to an L&I complaint made by Robert Henon, L&I employees inspected the installation and issued a preliminary stop work order. (*Id.* at 113.) The following day, "after causing an inspection at CHOP by L&I inspectors," Dougherty called Henon and complained that someone at L&I had reversed the stop work order and had given CHOP permission to continue the installation by the MRI machine manufacturer. (*Id.*) In this call, Dougherty allegedly stated that "L&I went out and shut them down and then somebody gave them the okay, they said, inside the system, today to go to work." (*Id.*) Henon replied, saying "Oh really? Uh, well the other one, the other part was me, all right . . . I'll walk over personally." (*Id.*)

Then, on or around July 23, 2015, Dougherty allegedly contacted a business agent of Local 98, asking if there were "any issues you got floatin' around at Penn that we should be paying attention to?" (*Id.*) The agent responded that the only issue was the MRI installation at CHOP. (*Id.*) To this, Dougherty informed the agent, "Yeah, CHOP. I'm on top of that. I'll have [unintelligible] Bobby [unintelligible] call that guy, but we don't want that out, that we did that." (*Id.*)

Later, on or around August 19, 2015, a Local 98 business agent called Henon, stating that Dougherty wanted Henon to know that a different non-union company was installing another MRI machine at CHOP. (*Id.*) Henon then instructed the agent to send him the information: "Send me the exact location again and, and, and who it is. This way I can just I can read what it is, only because I got my hands full. Write it down too. And text it to me. Don't email . . . And then, and then, and then delete your email." (*Id.*) On or around August 20, 2015, in response to an L&I complaint that Henon filed about the installation of this MRI machine, L&I employees inspected the installation and issued a stop work order. (*Id.*) L&I subsequently denied the issuance of a Certificate of Occupancy for the room in which the MRI machine was being installed. (*Id.*)

Then, on or around August 21, 2015, Dougherty discussed L&I's shutdown of the installation at CHOP with a Local 98 business agent. (*Id*.) In this conversation, he directed the agent to notify another Local 98 agent of the shutdown, commenting, "we want them to keep on file; they shut down that GE room up at Children's Hospital; they red-striped it . . . but we got to be smart, we don't want them to f*** us. We got to capitalize off that. I got to get a meeting with Children's Hospital again, things like that, you know." (*Id*.)

Now, in response to these allegations, Dougherty proposes in his Motion that Henon did not commit any "official acts" relative to the L&I inspections at CHOP. (ECF No. 65 at 23.) Dougherty concedes that "L&I inspection decision are 'matters' . . ." under *McDonnell*. (*Id*.) He argues, however, that Henon did not use "his official position to exert pressure on another official to perform an 'official act.'" *United States v. McDonnell*, 136 S. Ct. 2355, 2372 (2016). In so arguing, he emphasizes that the Government's allegations amount to nothing more than representative government hearing from a constituent and acting appropriately on the constituent's concerns. (ECF No. 65 at 23 (citing *McDonnell*, 136 S. Ct. at 2372).) Thus, Dougherty argues, Henon committed no "official acts." (*Id*.)

The Government, in response, however, proposes that Dougherty not only mischaracterizes the allegations in the Indictment, but also the application of *McDonnell* to the facts at hand. (ECF No. 77 at 16.) First, the Government argues that L&I employees performed two "official acts" that clearly fall within the scope of "official acts" as contemplated in *McDonnell*: they "inspected the installation [of the MRI machine at CHOP]" and "issued a preliminary stop work order." (*Id*.) Second, it alleges that the L&I employees performed these official acts "in response to a complaint to L&I by defendant Robert Henon." (*Id*. (citing ECF No. 1 at 113).)

21

We agree with the Government and find that the Indictment sufficiently alleges that Henon exerted pressure on L&I employees to perform an "official act"—namely, to inspect the MRI machine installation and to issue a preliminary stop work order.  Indeed, the Supreme Court squarely addressed this in *McDonnell*, holding that:

> "[a] public official may also make a decision or take an action by using his official position to exert pressure on another official to perform an "official act," or by using his official position to provide advice to another official, knowing or intending that such advice will form the basis for an "official act" by another official."

> *McDonnell v. United States*, 136 S. Ct. 2355, 2359 (2016).

Lower courts have also elaborated upon this precedent, applying it to facts similar to the allegations against Henon and Dougherty.  *See United States v. Repak*, 852 F.3d 230, 253-54 (3d Cir. 2017) (finding that making recommendations to a city Redevelopment Authority as to which contractors should be used on specific projects constituted an "official act" under *McDonnell*); *See also United States v. Menendez*, 291 F. Supp. 3d 606, 613-19 (D.N.J. 2018) (determining that a United States Senator's calls to the State Department, and lobbying another governmental branch to change Medicare billing policies, both constituted "official acts" under *McDonnell* despite the Senator's lack of control over the agencies).

Moreover, Dougherty's argument that Henon did nothing more than ". . . direct 'a complaint' to an L&I official . . ." is inappropriate at this stage of the proceedings.  (ECF No. 65 at 23.)  An indictment need not allege everything *McDonnell* requires in jury instructions.  *United States v. Oaks*, 302 F. Supp. 3d 716, 728 n.6 (D. Md. 2018).  Additionally, it is a jury question whether the facts alleged in the Indictment amount to an "official act," and whether Henon did, in fact, possess the requisite intent to exert pressure on L&I officials.  *McDonnell*, 136 S. Ct. at 2371.

As such, and in consideration of our restrictive standard of review, we find that the Indictment sufficiently alleges that Henon exerted such pressure over L&I employees to perform "official acts." Indeed, the Indictment asserts that Henon himself told Dougherty that L&I inspecting the site and shutting down the MRI machine installation ". . . was me, all right." (ECF No. 1 at 113.) It also alleges that after L&I permitted CHOP to resume installing the MRI machines with non-union labor, Henon agreed to "walk over personally" to the site. (*Id*.) These allegations are not both "irrelevant and immaterial." *See United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006). As such, we find that the Government has sufficiently alleged Overt Acts 1 – 8; they will not be stricken from the Indictment.

### ii. The Government Has Sufficiently Alleged Overt Acts 9-25, Detailing Allegations That Henon Allowed Dougherty to Influence a Franchise Agreement Between the City of Philadelphia and Comcast

The Government also alleges in its Indictment that Robert Henon committed a number of "official acts," in violation of the federal bribery statute while negotiating Comcast's cable franchise agreement on behalf of the City of Philadelphia. (ECF No. 1 at 114-18.)

In or around March 2015, Henon, in his capacity as Chairman of the Philadelphia City Council's Committee for Public Property and Public Works, Henon emailed a letter to Comcast leadership, informing them of his intent to begin negotiating the renewal of Comcast's cable franchise agreement with the City of Philadelphia (*Id*. at 114.) In conjunction with the Mayor's Office, Henon was responsible for conducting negotiation on the City's behalf. (*Id*. at 114-15.) Later, on or around November 19, 2015, John Dougherty sent Henon a text message complaining that a non-union contractor was being awarded too much fiber optic cable work from Comcast. (*Id*.) Dougherty allegedly wanted a union contractor, MJK Electric, to receive the work. (*Id*. at

114.)  On or around November 25, 2015, Henon allegedly caused his Chief of Staff to advise a Comcast negotiator on the franchise agreement that if Comcast hired MJK Electric, it would advance the negotiations of the franchise agreement.  (*Id*. at 115.)

Then, on or around November 27, 2015, Henon reported to Dougherty that, in negotiations, Comcast had noted concerns that MJK Electric's rates were approximately 60% higher than the non-union electrical contractor that Comcast had been using.  (*Id*.)  Dougherty then instructed Henon that he should not let Comcast suggest in negotiations that MJK was "a favorite son."  (*Id*.)

On or around November 27, 2015, Dougherty then advised the Political Director of Local 98, Defendant Marita Crawford, that he had given Henon all 24 seats in Local 98's luxury box at Lincoln Financial Field for an upcoming Philadelphia Eagles football game.  (*Id*.)  Dougherty also communicated to Crawford that he had told Henon that if the final Comcast franchise agreement "was not good for me, then we have some f***ing issues."  (*Id*.)

The following week, on or around November 30, 2015, Dougherty spoke with another Philadelphia organized labor leader.  (*Id*. at 116.)  In this conversation, he informed the other labor leader that he had warned Henon not to finalize the Comcast franchise agreement the following day, reminding Henon:

> "[W]ithout an agreement from me? What the h***, that doesn't do me any good. That is why you are over there, that is why we raised 600 grand, that is why we did the deal . . . for one reason—to put you on public property to fight a giant . . . [Henon] absolutely is not doing anything that would, he calls for information and he doesn't do it, and this is becoming a little bit of a problem with him, okay, because he is getting too crafty here, okay, and he's got to understand, look, he wouldn't be in the majority leader position if it wasn't for us."

(*Id*.)

In a later conversation with Defendant Crawford on the same day, Dougherty informed Crawford that Henon should "have the ability to hold [the Comcast franchise agreement] up if he says, you know, we are not going to vote this out of committee tomorrow; I am going to hold it."  (*Id*.)

The following day, Henon allegedly responded to Dougherty's concern that he was not following Dougherty's directives by informing Dougherty that he would delay moving the Comcast franchise agreement through committee until Dougherty got what he wanted, stating, "I don't give a f*** about anybody, all right, but f***ing you and us, and you know that."  (*Id*. at 117.)  Then, on or around December 2, 2015, the day before the Public Property and Public Works Committee was scheduled to vote on moving the agreement out of committee, Henon held a meeting in his Philadelphia City Council chambers with Dougherty and the Comcast negotiators. (*Id*.)  Dougherty allegedly ran the meeting and warned Comcast that if it did not give certain fiber optic cable work to union contractors, the franchise agreement would not be approved by the Philadelphia City Council.  (*Id*.)

The next day, Henon delayed the Public Property and Public Works Committee vote so that he and Dougherty could meet privately with Comcast negotiators at a Philadelphia hotel.  (*Id*.) At the meeting, Henon and Dougherty discussed the rate that Comcast would be willing to pay for the union labor Dougherty demanded.  (*Id*.)  The parties agreed that a "competitive" bid by a union contractor would be no more than 125% of the rate that Comcast was previously willing to pay. (*Id*.)  A member of Henon's legislative staff, at Henon's direction, allegedly "assisted in the effort to draft a document that recorded the terms of the agreement" between Dougherty and Comcast. (*Id*. at 118.)  Later that day, Henon chaired the convening of the Public Property and Public Works Committee and voted to present the Comcast franchise agreement to the Philadelphia City Council

for a final vote.  (*Id*. at 117.)  On or around December 10, 2015, Henon voted in favor of the agreement.  (*Id*. at 118.)

MJK Electric later performed contract work for Comcast at rates "significantly higher than 125% of Comcast's rate card," ultimately receiving more than $1 million in revenue from Comcast.  (*Id*.)

Now, in his Motion, Dougherty advances a simple alternative interpretation of the Government's allegations: that "Mr. Henon, on Mr. Dougherty's behalf, directed his chief of staff to recommend that Comcast hire union electricians, and held two meetings between Mr. Dougherty and Comcast negotiators."  (ECF No. 65 at 23-24.)  Given this reading, Dougherty contends that the Supreme Court's holding in *McDonnell* shows "that the exact scenario charged here does not involve a decision on a matter involving the formal exercise of Governmental power, but rather standard constituent services . . ."  (*Id*. at 24 (citations omitted).)

In response, the Government contends that Dougherty mischaracterizes the allegations in the Indictment.  (ECF No. 77 at 19.)  The Government, reasserting its allegations, maintains that the negotiation of the Comcast franchise agreement on behalf of the City of Philadelphia constituted "a specific and focused matter involving a formal exercise of governmental power that was pending before Henon in his official capacity."  (*Id*.)  Further, the Government proposes that any action that Henon took, or agreed to take, in relation to these negotiations was an "official act" as defined in *McDonnell*.

Considering the allegations in the Indictment and the above arguments, we find that the Government has sufficiently alleged Overt Acts 9-25 as they relate to the Comcast franchise agreement negotiation.  Dougherty cites *McDonnell* and a recent Third Circuit decision, *United States v. Fattah*, for the proposition that "'[s]etting up a meeting . . . does not qualify as a decision

or action."  (ECF No. 65 at 24 (citing *McDonnell v. United States*, 136 S. Ct. 2355, 2371 (2016).);
*see also United States v. Fattah*, 914 F.3d 112, 154 (3d Cir. 2019)).).  However, Dougherty's
citation and argument omits key context and narrowly focuses on only one of several "official
acts" alleged in the Government's Indictment.

In *McDonnell*, the Supreme Court held that "[a]lthough it may be difficult to define the
precise reach of [the statutory terms delimiting an 'official act'], a typical meeting, call, or event
does not qualify."  *McDonnell*, 136 S. Ct. at 2358.  Under this framework, "setting up a meeting
. . . does not, standing alone, qualify as an 'official act.'"  *Id*. at 2368.  This, however, is not
what the Government alleges in its Indictment.  The Government does not allege that Henon set
up a meeting between Dougherty and Comcast negotiators, "without more."  *Id*.

Here, the Government alleges that the "question, matter, cause, suit, proceeding or
controversy" that "may at any time be pending [or] may by law be brought . . ." was the Comcast
franchise agreement.  18 U.S.C. § 201(a)(3).  The negotiation process, the terms of the Comcast
franchise agreement, and the awarding of associated labor contracts all constitute a "question,
matter, case, suit, proceeding, or controversy" that were pending before the Public Property and
Public Works Committee and the greater Philadelphia City Council.  *Id*; *United States v. Conley*,
290 F. Supp. 3d 647, 657 (E.D. Ky. 2017) (finding that the process for awarding public
construction contracts met the first prong of *McDonnell* as "[t]he bidding process and the awarding
of the contract was at a time pending before, and by law brought before, the Morgan County Judge
Executive and the Morgan County Fiscal Court, which had the final approval authority to award
such contracts.").

Moreover, the Government's allegations relative to the Comcast franchise agreement extend well beyond a public official setting up a typical meeting.  Indeed, the relevant allegations against Henon include the following:

1) Causing his Chief of Staff to advise a Comcast negotiator that if Comcast hired MJK Electric, it would advance the negotiations;

2) Agreeing to delay the vote to move the franchise agreement out of his committee until it contained the provisions that Dougherty wanted;

3) Allowing Dougherty to participate in the negotiations and demand concessions from Comcast as a condition for the approval of the agreement;

4) Voting to move the agreement out of his committee and present the franchise agreement to City Council;

5) Voting in favor of the franchise agreement; and

6) Drafting an agreement with Comcast memorializing the concessions Henon allowed Dougherty to demand using his City Council office.

(ECF No. 77 at 20.)

As such, and considering our restrictive standard of review, we find that the Government has sufficiently alleged Overt Acts 9-25 and deny Dougherty's Motion to Strike these allegations from the Indictment.

### iii. The Government Has Sufficiently Alleged Overt Acts 26 and 27, Contending that Henon Drafted a Towing Resolution at Dougherty's Direction

In its Indictment, the Government alleges that John Dougherty coordinated with Councilmember Robert Henon to seek retribution against a towing company.  (ECF No.1 at 118-19.)  On or about September 22, 2015, Dougherty allegedly called Henon and told him that "an employee of a towing company had tried to tow his car, forcing Dougherty to pay $200 in cash to the employee to get the car removed from the tow truck." (*Id*. at 118.)  Dougherty, upset with the

situation and the employee, allegedly told Henon, "'I think tomorrow, we f\*\*\*ing put in a bill to certify, 'cause if they can rob me, they can try to rob anybody." (*Id.*) Dougherty allegedly continued, telling Henon that "'what we are going to do' is put a bill through the Philadelphia City Council. . ." requiring the company's drivers to complete additional training. (*Id.*) Dougherty then allegedly instructed Henon, "[j]ust tell them you have heard nothing but complaints . . . just smoke 'em," adding that he does not "abuse government," but did tell the towing company's employee who he was. (*Id.*) Dougherty allegedly complained that the employee was unable to give him $10 in change after the incident and "that $10 [was] going to cost their f\*\*\*ing industry a bundle." (*Id.*) Henon then allegedly told Dougherty that he would propose something. (*Id.*)

On or about September 30, 2015, Henon caused a member of his staff to make a secret recording of the impound lot of the towing company, and to draft a resolution entitled "Authorizing City Council's Committee on Licenses and Inspections to hold public hearings to investigate the operations of [the name of the company that towed DOUGHERTY's car] in the City of Philadelphia for the purposes of protecting the general welfare and public interest of the residents of Philadelphia . . ." (*Id*. at 118-19.)

Now, Dougherty has moved to strike these allegations from the Indictment, claiming that "[w]hile such [a] resolution may constitute a 'question, matter, cause, suit, proceeding, or controversy' that 'may by law be brought' before a public official, the Indictment fails to allege that Mr. Henon made any decision or took any action on the resolution." (ECF No. 65 at 24.) The Government, in response, contends that Dougherty's argument ignores the allegations that, in response to Dougherty's complaint and threatened actions, Henon agreed to take official action, stating that "he would put something together." (ECF No. 77 at 21 (citations omitted).)

Applying *McDonnell*, we find that this allegation survives Dougherty's Motion to Strike. In *McDonnell*, the Supreme Court explicitly held that an "official act" requires a public official to "make a decision or take on an action on that question or matter, or agree to do so."  *McDonnell v. United States*, 137 S. Ct. 2355, 2359 (2016).  Indeed, the Court clarified that ". . . a public official is not required to actually make a decision or take an on action on a 'question, matter, cause, suit, proceeding[,] or controversy'; it is enough that the official agree to do so."  *Id.* at 2371 (citations omitted).  Further, the Court explained that such an agreement "need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain."  *Id.* Moreover, the Court elaborated that the public official need not even intend to perform the "official act," as long as he agrees to do so.  *Id.*

Here, the Government has alleged that, in response to Dougherty's complaints and threatened actions, Councilmember Henon "said he would put something together."  (ECF No. 1 at 118.)  The Government further alleges that Henon then caused a member of his staff to draft a resolution targeting the company that had towed Dougherty's car.  (*Id.*)  These allegations plainly meet the Supreme Court's definition of "official act" as propounded in *McDonnell*.  As such, we find that Official Acts 26 and 27 have been sufficiently allege, and we deny Dougherty's Motion to Strike them from the Indictment.

### iv.  The Government Has Sufficiently Alleged Overt Acts 41 – 56, Asserting that Henon Opposed a Performance Audit of the Philadelphia Parking Authority at the Request of PPA Officials and on the Advice of Dougherty

In or around June 2016, a Philadelphia City Councilmember proposed a resolution to audit the Philadelphia Parking Authority (herein, "PPA").  (ECF No. 1 at 121.)  The proposed audit

would determine how the PPA was spending its revenue and would assess if the PPA could share more of it to fund certain city operations, including the School District of Philadelphia.  (*Id*.)

In its Indictment, the Government alleges that, on or around June 11, 2016, a PPA official (named in the Indictment as "PPA Official No. 1") informed Henon of the forthcoming audit resolution.  (*Id*.)  PPA Official No. 1 informed Henon that he and another PPA official ("PPA Official No. 2") were "strongly opposed to the resolution," and asked Henon if he was "alright with that."  (*Id*. at 121-22.)  Henon replied, "Yeah, I am just trying to figure out how I publicly come out and vote no."  (*Id*. at 122.)  The next day, Henon contacted PPA Official No. 2—who was also an official of a union whose members install glass—to ask for assistance obtaining glass for windows at a close friend's home.  (*Id*.)  PPA Official No. 2 expressed opposition to the audit resolution, and Henon replied "Let me work it out."  (*Id*.)

On June 13, 2016, PPA Official No. 2 spoke with Henon again, requesting the address of Henon's friend's home.  (*Id*.)  In this conversation, PPA Official No. 2 told Henon, "I need you, how many people you can get for us, to just vote no [on the audit resolution].  You're going to vote on it Thursday."  (*Id*.)  Henon replied, "Okay, let, let me work, let me work on it, okay?"  (*Id*.)

Later, on June 15, 2016, PPA Official No. 2 and Henon discussed the audit resolution again.  (*Id*.)  PPA Official No. 2 told Henon that he knew the resolution would not pass, but that he wanted to use to the vote to find out which members of the Philadelphia City Council would vote in favor of it.  (*Id*.)  PPA Official No. 2 explained that any City Councilmember who voted in favor of the resolution would be denied PPA jobs for their constituents and money from the PPA, stating, "I want, see, just see who the f***'s going [to] do it and who's not, because nobody is going to get a f***ing job out of there, or a f***ing penny out of it."  (*Id*.)  In response, Henon

31

assured the official that "we will beat it down." (*Id*.)  Later that day, Henon reported to the official that other Philadelphia City Councilmembers would vote against the resolution.  (*Id*.)

The day that the audit resolution was to be presented to City Council—June 16, 2016— Henon reported to PPA Official No. 2 that City Council would "table" the resolution rather than vote on it.  (*Id*. at 123.)  When PPA Official No. 2 insisted that it be "voted down," Henon responded that he could do that.  (*Id*.)  Later that day, Henon told Dougherty about the resolution and asked him, "How can I vote against an audit of the PPA when they have public money?" (*Id*.) Henon told Dougherty that PPA Official No. 1 and PPA Official No. 2 were very upset about the resolution, and that PPA Official No. 2 was "totally against tabling it." (*Id*.)  Henon also told Dougherty that another City Councilmember wanted to table the resolution to prevent attracting negative publicity for blocking the audit.  (*Id*.)  In response, Dougherty advised Henon to let the other Councilmember table the resolution and take the blame for doing so, rather than voting it down.  (*Id*.)  Dougherty further advised Henon to tell PPA Official No. 2 that Henon was on his side, but cautioned Henon that if he were to run for City Council president, he would have to audit the PPA.  (*Id*.)  Dougherty then also directed defendant Marita Crawford to make sure Henon "shoots it down," so that PPA Official No. 2 and his allies remain "on their side." (*Id.*)

Later that day, the PPA audit resolution was brought before the Philadelphia City Council; Henon participated in the proceedings.  (*Id*.)  A City Councilmember moved that the resolution be tabled, and a voice vote, "which simply requires Philadelphia City Council members to orally vote yes or no, was conducted. . ." (*Id*. at 123-24.)  A majority of the Council voted that the resolution be tabled.  (*Id*. at 124.)

On or around June 17, 2016, Henon again called PPA Official No. 2.  (*Id*.)  The official told Henon that the official could get the glass for the windows that Henon had requested for his

friend's house, and that someone could come by the house to take measurements.  (*Id.*)  Henon then informed PPA Official No. 2 that the audit resolution had been tabled and that another City Councilmember had informed him that "it would not come back."  (*Id.*)  PPA Official No. 2 stated that he was satisfied with that.  (*Id.*)

Later, on June 20, 2016, PPA Official No. 2 and an employee of the Glazers Union informed Henon that an employee was going to Henon's friend's house to measure the windows and determine what was needed.  (*Id.*)  Then, on June 27, 2016, Henon received a voicemail from PPA Official No. 2 stating that "[t]he guy who came over to measure is the guy we sent over to take care of that for you and for them.  All good.  On it.  Thank you.  See you."  (*Id.*)

Three days later, on June 30, 2016, PPA Official No. 2 informed Henon that he would attend Henon's fundraiser that night, but that he could not donate any more money as he had already donated the maximum amount allowed.  (*Id.*)  PPA Official No. 2 then informed Henon that he had someone go to Henon's friend's home to work on the windows, adding that "[w]e're gonna pay for the material, and she'll just pay for the labor."  (*Id.*)  Henon replied, "Okay, great." (*Id.*)  Then, on or around August 31, 2016, the glass supplier referred by PPA Official No 2 to Henon delivered 27 panes of glass—worth approximately $3,105—to Henon's friend's home.  (*Id.* at 125.)

On or around September 29, 2016, the resolution to audit the PPA was again brought before the Philadelphia City Council for a vote.  (*Id.*)  A voice vote was conducted, and a majority of the Council voted against the resolution.  (*Id.*)

Dougherty now seeks to strike these allegations from the Indictment.  (*See* ECF No. 65 at 24-25.)  Dougherty proposes that "Mr. Henon is alleged only to have discussed the matter with Mr. Dougherty" and does not allege any "official acts" under *McDonnell*.  (*Id.*)  He argues that the

Indictment merely alleges that "[a] member of City Council moved that the resolution be tabled, and a voice vote, which simply requires Philadelphia City Council members to orally vote yes or no, was conducted on the motion to table the resolution."  (*Id.* (citing ECF No. 1 at 123).)

In response, however, the Government notes that *McDonnell* only provides what constitutes a sufficient jury instruction defining an "official act," and does not directly address what constitutes a sufficient allegation thereof.  (ECF No. 77 at 22.)  Moreover, the Government reiterates that the Indictment alleges the following "official acts": "[Henon] agreed to oppose the resolution, then agreed to table the resolution, voted in favor of tabling the resolution, and then voted against the resolution."  (*Id.* at 23 (citing *Woodward v. United States*, 905 F.3d 40, 47-48, 48 n.1 (1st Cir. 2018) (noting that opposing legislation can constitute an "official act" under *McDonnell*)).)

Considering this, along with our restrictive standard of review, we find the Government's allegations to be sufficient.  These allegations, Overt Acts 41-56, are not both irrelevant and prejudicial and will not be stricken from the Indictment.

### v.  The Government Has Sufficiently Alleged Overt Acts 57-60, Alleging that Henon Delayed Philadelphia Plumbing Code Legislation at Dougherty's Direction

The Government alleges that on or about August 20, 2015, Henon asked Dougherty for guidance on pending Plumbing Code legislation.  (ECF No. 1 at 125.)  Dougherty allegedly advised Henon that he "should delay the legislation until the new [Philadelphia mayoral] administration took office in January 2016 . . . [and directed Henon] to use the legislation to help Dougherty be elected Business Manager of the Building Trades . . ."  (*Id.*)  Dougherty communicated to Henon that he believed the head of the Plumbers Union would vote against him

in his bid for this position.  (*Id*.)  Regarding this issue, the Government alleges that the following exchange between Dougherty and Henon took place:

> Henon:          F*** the Plumbers.
>
> Dougherty:   Do it because it helps me with the Building Trades thing.
>
> Henon:          F*** it. That is exactly what I am saying, I am going to screw them, make them come back to me, because they have been avoiding me, because of the Building Trades stuff.
>
> Dougherty:   Yo, you hear what I am saying, do it.
>
> (*Id*.)

Weeks later, on or around September 2, 2015, Henon allegedly told an elected state official that he was using the pending legislation on the Philadelphia Plumbing Code and Philadelphia Electrical Code as leverage for "internal trade politics."  (*Id*. at 126.)  In this conversation, he allegedly told the official that his ". . . strategy was to . . . just sit on [the pending legislation] . . . 'cause the plumbers are acting like, like total [expletive deleted], alright . . . against John [Dougherty] . . . you know, with the Building Trades."  (*Id*.)  Later that day, Henon attended the meeting of the Building Trades where Dougherty was elected Business Manager.  (*Id*.)  Then, on or around September 16, 2015, Henon told his staff that he would be delaying introduction of the Plumbing Code legislation for "timing reasons."  (*Id*.)

In his Motion, Dougherty asserts that "Mr. Henon [is not] alleged to have taken any 'official act' with respect to the Plumbing Code legislation."  (ECF No. 65 at 25.)  He argues that Henon simply consulted with Dougherty about revisions to the Plumbing Code pending before City Council, and that Dougherty only recommended delaying the legislation until the new administration took office.  (*Id*.)  Notably, however, he does not deny any of the Government's

factual allegations.  (*See id.*)  Nonetheless, Dougherty argues that "[t]he Indictment does not allege that Mr. Henon took any action whatsoever with respect to the Plumbing Code legislation."  (*Id.*)

This is a broad mischaracterization of the Government's allegations.  First, the Indictment alleges that Henon, at Dougherty's request or direction, agreed to use pending Plumbing Code legislation to aid Dougherty in his campaign for Business Manager of the Building Trades.  (ECF No. 1 at 125.)  Second, it alleges that Henon told an elected official of this plan.  (*Id.* at 125-26.)  Third, it further claims that Henon told his staff of his intent to delay the legislation.  (*Id.* at 126.)  These acts, along with delaying the legislation, are clear instances of Henon making a decision, taking an action, or agreeing to do so, on questions, matters, causes, suits, proceedings, or controversies.  *See McDonnell v. United States*, 136 S. Ct. 2355, 2358 (2016).  We thus deny Dougherty's Motion to Strike Overt Acts 57-60 from the Indictment.

IV.     **CONCLUSION**

For the foregoing reasons, Dougherty's Motion to Dismiss and Motion, in the alternative, to Strike are denied.  An appropriate Order follows.