**IN THE UNITED STATES DISTRICT COURT FOR**

**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO.   19 - 64** |
| **JOHN DOUGHERTY** | : | |
| **ROBERT HENON** | | |
| **BRIAN BURROWS** | : | |
| **MICHAEL NEILL** | | |
| **MARITA CRAWFORD** | : | |
| **NIKO RODRIGUEZ** | | |
| **BRIAN FIOCCA** | : | |
| **ANTHONY MASSA** | | |

**<u>O R D E R</u>**

AND NOW, this      day of                 , 2021, upon consideration of the

Government's Motion to Admit Direct Evidence, and Alternatively, to Admit Evidence of

Similar Crimes and Acts of Defendant John Dougherty Pursuant to Rule 404(b) of the Federal

Rules of Evidence, it is hereby

**ORDERED**

that the Motion is GRANTED.

In support of this ruling, the Court makes the following findings:

<u>Evidence of Intent and Motive re George Peltz and MJK</u>

1.      Evidence that: a) between 2012 and April 2016, George Peltz, the owner of MJK

Electric, gave John Dougherty and members of his family things of value; and b) that from

January 2012 through July 2016, Dougherty, as Business Manager of Local 98, assisted George

Peltz and MJK Electric by causing Local 98 to pay MJK for work primarily performed on Local

98 facilities, to hire a member of Peltz's family, and pay the family member for hours not

worked, and by steering work to MJK Electric, is relevant and admissible as direct proof of

Dougherty's motive and intent, which is an essential element of the honest services fraud offenses with which he is charged.

2.      This evidence includes the following acts:

### Things of Value Provided by Peltz to Dougherty

a)    From in or about 2012 to in or about 2013, George Peltz and employees of MJK Electric purchased and installed a security system and LED displays, with an approximate retail value of $37,377, in a business partially owned by defendant John Dougherty (known as "Doc's Pub"), $29,537 of which was provided without charge to Dougherty and the business he partially owned.

b)    From in or about December 2014 to in or about June 2015, George Peltz and employees of MJK Electric provided materials, maintenance, and repair work, with a value of approximately $2,900, at the home of Family Member No. 2 (a close relative of Dougherty's).

c)    In or about March 2014, George Peltz and employees of MJK Electric purchased and installed large screen televisions, with a retail value of $4,207, in the home of defendant John Dougherty.

d)    From in or about December 2015, to in or about January 2016, George Peltz and employees of MJK Electric purchased and installed large screen televisions and a security system, with a retail value of $19,882, in the home of a Family Member No. 5 (a close relative of Dougherty's).

e)    From in or about December 2014 through January 2015, George Peltz and employees of MJK Electric performed work with a retail value of $29,700 at the home of Marita Crawford, charging Crawford only $6,400.

f)    From in or about April 2013 to in or about April 2016, George Peltz gave defendant John Dougherty gift cards and gift certificates worth $4,500 from Boyd's, a clothing store in Philadelphia.

g)    In or about June of 2014, George Peltz caused an MJK credit card and funds to be used to buy Coach beach bags (valued at approximately $1,200) and other items to be purchased for family members of John Dougherty.

### Things of Value Provided by Dougherty to Peltz

a)    From in or about January 2012 through in or about July 2016 defendant John Dougherty caused Local 98's Job Recovery Fund to pay MJK approximately $1.6 million.

b)   From in or about January 2012 through in or about July 2016, defendant John Dougherty caused Local 98's General Fund to pay MJK approximately $900,000 for projects primarily completed at union facilities.

c)   From in or about January 2012 through in or about July 2016, defendant John Dougherty steered other union electrical work to MJK Electric, for which MJK received over $2 million.

d)   From in or about October 2014 to in or about May 2016, defendant John Dougherty hired a member of Peltz's family at Local 98 and paid the family member over $15,000 for hours not worked.

3.      This evidence has a tendency to make it more probable than not that Dougherty acted with the intent to defraud, that is, with a desire or purpose to bring about some gain or benefit to himself and someone else, in this instance George Peltz.  Proof of Dougherty's intent is an essential element of the honest services mail and wire fraud charges. This evidence also has a tendency to make it more probable than not that Dougherty was motivated, in part, to provide Comcast work for MJK Electric, which was owned and operated by Dougherty's friend, George Peltz.

4.      This evidence is also admissible under Rule 404(b) to prove Dougherty's intent and motive for the same reasons.

Dougherty Control of Hiring, Paying and Supervising Local 98 agents

5.      Evidence that defendant John Dougherty controlled most, if not all, aspects of hiring, paying, and supervising Local 98 employees, agents, and consultants makes it more likely than not that he had knowledge and control of Henon's employment by Local 98 after he was elected to City Council and sworn in on January 6, 2012, and especially during the period covered by the honest services charges - May 2015 to September 2016.

6.      This evidence is relevant to prove Dougherty's knowledge and intent, essential elements of the charged honest services fraud, and to show that Henon's receipt of a salary and

benefits from Local 98 while he was a member of City Council was not the result of a mistake or coincidence and was part of a plan of which Dougherty was an integral part.

Personal Goods Received by Dougherty Paid from Local 98's General Fund

7.     Evidence that a) defendant John Dougherty obtained personal goods for which Local 98 paid from its General Fund, and b) the monies in the General Fund were derived directly from the pay received by Local 98 members, is relevant and admissible as direct proof of Dougherty's motive and intent, which is an essential element of the honest services fraud offenses with which he is charged.

8.     This evidence has a tendency to make it more probable than not that Dougherty acted with the intent to defraud, that is, with a desire or purpose to bring about some gain or benefit to himself.  Proof of Dougherty's intent is an essential element of the honest services mail and wire fraud charges.  This evidence also has a tendency to make it more probable than not that Dougherty was motivated, in part, to provide work to union members in order to enrich himself, including by causing defendant Henon to influence L&I to shut down jobs that were suspected of being done by non-union labor.

9.     This evidence is also admissible to under Rule 404(b) to prove Dougherty's intent and motive for the same reasons.

10.     The probative value of all of the evidence described above is not outweighed by the potential for unfair prejudice to the defendant.

BY THE COURT:

_____
HONORABLE JEFFREY L. SCHMEHL
United States District Court Judge

4

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO.   19 - 64** |
| **JOHN DOUGHERTY** | : | |
| **ROBERT HENON** | | |
| **BRIAN BURROWS** | : | |
| **MICHAEL NEILL** | | |
| **MARITA CRAWFORD** | : | |
| **NIKO RODRIGUEZ** | | |
| **BRIAN FIOCCA** | : | |
| **ANTHONY MASSA** | | |

## GOVERNMENT'S MOTION AND MEMORANDUM OF LAW TO ADMIT DIRECT EVIDENCE, AND ALTERNATIVELY, EVIDENCE OF SIMILAR CRIMES AND ACTS OF JOHN DOUGHERTY PURSUANT TO RULES 401 AND 404(b) OF THE FEDERAL RULES OF EVIDENCE

The United States of America, by and through its attorneys, Jennifer Arbittier Williams, Acting United States Attorney, and the undersigned attorneys, moves this Court to admit: (1) motive evidence of defendant John Dougherty's transactional relationship with the owner of an electrical company; (2) evidence of defendant Dougherty's control of the hiring, paying, and supervising of Local 98 employees; and (3) motive evidence of benefits in the form of personal goods acquired by defendant Dougherty that were paid by Local 98's General Fund.  This evidence is admissible as direct, intrinsic evidence of the charged crimes.[1]  Alternatively, all of

---

[1] Although the government believes the evidence that is the subject of this motion does not fall within the ambit of FRE 404(b), in an abundance of caution, and especially because some of the evidence described herein would also constitute evidence of the counts severed by the Court for separate trial, the government filed this motion.

this evidence is admissible even if considered evidence of similar crimes and acts under Rule 404(b) of the Federal Rules of Evidence.

## I.    Introduction

Trial on Counts 97 through 116 ("the corruption counts") in this case is scheduled to begin on October 4, 2021.  The corruption counts, which were severed by this Court from an indictment that also alleged embezzlement and labor bribery charges against defendant John Dougherty (and others), include charges that defendants Dougherty and Robert Henon conspired to commit honest services fraud and federal program bribery, in violation of 18 U.S.C. §§ 666, 1341, 1343 and 1346.  These charges arise out of Dougherty's bribery of Henon for his performance of official acts in his capacity as a member of Philadelphia City Council, and related substantive offenses.

Paragraphs 10 through 13 of Count 97 allege as follows:

10.    From at least in or about May 2015, to in or about September 2016, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOHN DOUGHERTY and
ROBERT HENON**

conspired and agreed, together and with others known to the grand jury, to commit offenses against the United States, that is, to:

a.    Knowingly devise and engage in a scheme with the intent to defraud the City of Philadelphia and its citizens of the right to defendant ROBERT HENON's honest services in the affairs of the City of Philadelphia, in violation of Title 18, United States Code, Sections 1341, 1343, and 1346; and

b.    Engage in Federal program bribery, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 666(a)(2).

<u>**Manner and Means**</u>

It was part of the conspiracy that:

- 2 -

11.     Defendant JOHN DOUGHERTY, through Local 98, provided defendant ROBERT HENON with a stream of personal benefits during the time that HENON was a member of Philadelphia City Council. The benefits given to HENON by DOUGHERTY included a salary from Local 98 and tickets to sporting events.  Specifically:

a.     Local 98 paid ROBERT HENON a salary during the time he served as a City Councilman, totaling $70,649 in 2015 and $73,131 in 2016. On Local 98's annual LM-2 reports filed with the United States Department of Labor, Local 98 described HENON's position as "office staff." On annual financial disclosure forms that HENON was required to file with the City Board of Ethics in 2015 and 2016, specifying the source, but not the amount, of income over $500 and gifts over $200 (in the aggregate), HENON disclosed Local 98 as a source of income, describing his position as "electrician," while not disclosing any gifts. In fact, throughout the period of the conspiracy, HENON did not work as "office staff" nor as an electrician for Local 98, and HENON did not perform any significant work of any kind for Local 98 apart from his efforts as a member of the Philadelphia City Council to act as directed by and to benefit defendant JOHN DOUGHERTY.

b.     During 2015 and 2016, defendant JOHN DOUGHERTY gave defendant ROBERT HENON tickets to sporting events with a value of approximately $11,807. These tickets were paid for by Local 98.

12.     Defendant JOHN DOUGHERTY gave these things of value to defendant ROBERT HENON with the intent to influence HENON in HENON's capacity as a member of Philadelphia City Council and Chair of the Committee on Public Property, and in exchange for HENON acting on behalf of DOUGHERTY, in his capacity as a member of Philadelphia City Council, and performing official acts as directed by and on behalf of DOUGHERTY.

13.     Defendant ROBERT HENON accepted the stream of personal benefits from defendant JOHN DOUGHERTY, knowing that the benefits were given in exchange for HENON's performance of official acts at the direction of and on behalf of defendant DOUGHERTY. Furthermore, defendants DOUGHERTY and HENON attempted to hide the true nature of their illegal relationship from the public. *Indictment,* Count 97, paragraphs 10-13.

## II.     Evidence of the Dougherty's Transactional Relationship with George Peltz is Admissible as Direct Proof of the Charged Offenses.

The government intends to introduce evidence at trial that defendant Dougherty had a

transactional relationship with George Peltz, the owner of MJK Electric.  This evidence is "intrinsic" to the charged offense and therefore does not fall within Federal Rule of Evidence 404(b). *See United States v. Green*, 617 F.3d 233, 245 (3d Cir. 2010).  In *Green*, the Third Circuit explained that "evidence is intrinsic if it 'directly proves' the charged offense." *Id.* at 248.  Therefore, where evidence of an act directly proves a material allegation of the indictment, the evidence is intrinsic. *See also United States v. Hoffecker*, 530 F.3d 137, 189-90 (3d Cir. 2008) (evidence that a defendant charged with commodities fraud had been given a lifetime ban on trading in precious metals, and therefore situated his venture outside the United States, was intrinsic to the fraud and thus not subject to Rule 404(b)).

The evidence - described more fully below - that defendant John Dougherty received things of value  from George Peltz, the owner of MJK, and that Dougherty, as Business Manager of Local 98, caused Local 98 to pay MJK for Local 98 work, as well as causing MJK to obtain other work, is direct proof of an essential element of the honest services mail fraud charges, which allege that the defendant "knowingly devised and participated in a scheme and artifice to defraud and deprive the citizens of the City of Philadelphia of their right to the honest services of defendant Robert Henon, through bribery." Counts 98-108.

One of the essential elements of the mail and wire fraud charges that the government must prove is an intent to defraud, the jury instruction for which reads as follows:

> To act with an "intent to defraud" means to act knowingly and with the intention or the purpose to deceive or to cheat . . . and that [i]n considering whether the defendant acted with an intent to defraud, you may consider, among other things, whether the defendant acted with a desire or purpose to bring about some gain or benefit to himself or someone else or with a desire or purpose to cause some loss to someone. *Third Circuit Model Jury Instruction* 6.18.1341-4 (Mail or Wire Fraud – "Intent to Defraud" Defined).

The subject of the honest services mail and wire fraud charges is the bribery

of a public official, defendant Henon, by defendant Dougherty.  One of the essential

elements of bribery is that the defendant "corruptly" offers or pays the bribe.  The

model instruction for this essential element reads as follows:

> A person offers a thing of value to a public official "corruptly" if the person acts knowingly and intentionally with the purpose either of accomplishing an unlawful end or unlawful result or of accomplishing some otherwise lawful end or lawful result influenced by the offer of the thing of value to the public official.
>
> Corrupt acts are ordinarily motivated by a hope or expectation of either financial gain or other benefit to one's self, or some aid or profit to another.  *Third Circuit Model Jury Instruction* 6.18 201B2-1.

The model jury instruction pertaining to proof of the required state of mind

states that:

> To determine the defendant's state of mind (what the defendant intended or knew) at a particular time, you may consider evidence about what the defendant said, what the defendant did and failed to do, how the defendant acted, and all the other facts and circumstances shown by the evidence that may prove what was in the defendant's mind at that time. *Third Circuit Model Jury Instruction* 5.01 (Proof of Required State of Mind – Intentionally, Knowingly, Willfully).

The Third Circuit model jury instruction concerning motive reads as follows:

> Motive is not an element of the offense with which the defendant is charged.  Proof of bad motive is not required to convict.  Further, proof of bad motive alone does not establish that the defendant is guilty and proof of good motive alone does not establish that the defendant is not guilty. Evidence of the defendant's motive may, however, help you find the defendant's intent. *Third Circuit Model Jury Instruction* 5.04.

As set forth in detail below, the evidence of defendant Dougherty's

relationship with Peltz is relevant and admissible to prove the defendant's motive

and intent, an essential element of the honest services mail and wire fraud charges

against the defendant.

The corruption counts include allegations that defendant Dougherty conspired with defendant Henon to steer Comcast work to George Peltz, an electrical contractor.  Evidence that: a) between 2012 and April 2016, George Peltz, the owner of MJK Electric gave John Dougherty and members of his family things of value; and b) that from January 2012, through July 2016, Dougherty, as Business Manager of Local 98, assisted George Peltz and MJK Electric by causing Local 98 to pay MJK for work primarily performed on Local 98 facilities, to hire a member of Peltz's family, and pay the family member for hours not worked, and by steering work to MJK Electric; is relevant and admissible as direct proof of Dougherty's motive and intent, which is an essential element of the honest services fraud offenses with which he is charged.

Count 97 alleges, in pertinent part, that:

> At defendant JOHN DOUGHERTY's direction, defendant HENON allowed defendant DOUGHERTY to demand concessions by Comcast during the franchise contract negotiations between the City of Philadelphia and Comcast, which ultimately resulted in Comcast hiring MJK Electric, a union electrical contractor defendant DOUGHERTY favored, for electrical contracting work.  *Indictment*, Count 97, Paragraph 14(c).

Comcast, a cable service provider, had entered into a 15-year franchise agreement with the City of Philadelphia to provide cable service.  During 2015, Comcast was negotiating the renewal of the agreement with the Mayor's Office and the Public Property Committee of City Council, which was chaired by defendant Henon. *Id.* ¶ 10.

The Overt Acts pertaining to the charges involving Comcast include the following:

> 9.   On multiple occasions between May and August 2015, defendant JOHN DOUGHERTY and George Peltz (charged elsewhere) discussed work Comcast was doing in Philadelphia and the fact that

DOUGHERTY and Peltz wanted MJK Electric to obtain future work from Comcast. *Indictment*, Count One, Overt Act 9.

. . .

11.  On or about November 19, 2015, defendant JOHN DOUGHERTY sent a text message to defendant ROBERT HENON, in which he complained that a non-union contractor received too much fiber optic cable work from Comcast. DOUGHERTY texted: "MJK just told me [non-union contactor] is in every building,,,COMCAST knows,,,[name of Comcast official] in the low level install mng,,,WE NEED to GET CERTIFIED pay roll,,,my only REQUEST on this renewal was to get this work." *Id.*, Overt Act 11.

12.  On or about November 25, 2015, defendant ROBERT HENON caused his Chief of Staff to advise a Comcast negotiator on the franchise agreement that if Comcast hired MJK Electric, it would advance the negotiations of the franchise agreement. *Id.*, Overt Act 12.

13.  On or about November 27, 2015, defendant ROBERT HENON reported to defendant JOHN DOUGHERTY that 'one of the issues raised during the negotiations was that MJK Electric charged rates that were approximately 60% more than the non-union electrical contractor Comcast was using. DOUGHERTY instructed HENON that during negotiations, "don't let Comcast suggest that [MJK] is a favorite son." *Id.*, Overt Act 13

. . .

15.  On or about November 30, 2015, defendant JOHN DOUGHERTY reported to another organized labor leader in Philadelphia that he had warned defendant ROBERT HENON not to finalize the agreement with Comcast the next day, reminding HENON, "[W]ithout an agreement from me? What the h***, that doesn't do me any good. That is why you are over there, that is why we raised 600 grand, that is why we did the deal . . . for one reason – to put you on public property to fight a giant." . . . *Id.*, Overt Act 15.

16.  On or about November 30, 2015, during a conversation with defendant MARITA CRAWFORD about the Comcast agreement, defendant JOHN DOUGHERTY advised that defendant ROBERT HENON, through his Philadelphia City Council position, should "have the ability to hold it up if he says, you know, we are not going to vote this out of committee tomorrow; I am going to hold it." *Id.*, Overt Act 16.

17.  On or about December 1, 2015, defendant JOHN DOUGHERTY called George Peltz to obtain information about the work

- 7 -

DOUGHERTY wanted HENON to pursue, which DOUGHERTY planned to use during negotiations with Comcast for the franchise agreement renewal.  *Id.*, Overt Act 17.

. . .

19.  On or about December 2, 2015, the day before the Public Property and Public Works Committee was scheduled to vote on moving the franchise agreement out of committee, defendant ROBERT HENON held a meeting in his Philadelphia City Council chambers with defendant JOHN DOUGHERTY and the Comcast employees who were negotiating the franchise agreement. Defendant DOUGHERTY ran the meeting and warned that if Comcast did not agree to give certain fiber optic work to union contractors, the franchise agreement would not be approved by Philadelphia City Council.  *Id.*, Overt Act 19.

20.  On or about December 2, 2015, defendant JOHN DOUGHERTY called George Peltz (charged elsewhere) and asked him to provide calculations to show how he would bid for the Comcast work.  *Id.*, Overt Act 20.

21.  On or about December 3, 2015, defendant ROBERT HENON delayed the Public Property and Public Works Committee vote so that he and defendant JOHN DOUGHERTY could meet privately with Comcast negotiators at a hotel in Philadelphia. At the meeting, HENON and DOUGHERTY discussed the rate that Comcast was willing to pay for work that DOUGHERTY had demanded. The parties agreed that if a union electrical contractor bid no more than 125% of the rate (known as "the rate card") Comcast was previously willing to pay, it would be considered "competitive."  *Id.*, Overt Act 21.

22.  On or about December 3, 2015, after the private meeting with Comcast, defendant ROBERT HENON chaired the meeting of the Public Property and Public Works Committee and voted to present the franchise agreement to Philadelphia City Council for a final vote.  *Id.*, Overt Act 22.

23.  On or about December 10, 2015, defendant ROBERT HENON voted in favor of the franchise agreement, and Philadelphia City Council approved the agreement.  *Id.*, Overt Act 23.

24.  During 2016, MJK Electric, owned by George Peltz, performed contract work for Comcast, billed Comcast at rates significantly higher than 125% of Comcast's rate card, and received more than $1 million in revenue from Comcast.  *Id.*, Overt Act 24.

One of the reasons defendant Dougherty warned Comcast that if it did not agree to give certain work to union contractors, the franchise agreement would not be approved by Philadelphia City Council, was to obtain work for his friend George Peltz, the owner and operator of MJK Electric.  The Comcast employees who were negotiating the renewal understood that giving work to MJK would improve their chances of reaching an agreement with the City of Philadelphia.  During the negotiations in 2015, Comcast began the process of making MJK Electric a preferred vendor with Comcast, which would allow MJK to obtain work from Comcast.  As a result, MJK Electric was paid over $2 million by Comcast between July 2016 and December 2016 for work performed pursuant to the preferred vendor agreement. No other union contractor in Philadelphia or the surrounding region was paid anything close to this amount by Comcast in 2016.

To prove that this was one of Dougherty's motives for making his demand on Comcast, the government intends to introduce evidence that George Peltz, the owner and operator of MJK Electric, gave Dougherty and his family things of value, including the following:

    1)   From in or about 2012, to in or about 2013, George Peltz and employees of MJK Electric purchased and installed a security system and LED displays, with an approximate retail value of $37,000 in a business partially owned by defendant John Dougherty, $29,537 of which was provided without charge to Dougherty and the business he partially owned.

    2)   From in or about December 2014 to in or about June 2015, George Peltz and employees of MJK Electric provided materials, maintenance, and repair work, with a value of approximately $2,900, at the home of Family Member No. 2 (a close relative of Dougherty's).

    3)   In or about March 2014, George Peltz and employees of MJK Electric purchased and installed large screen televisions, with a retail value of $4,207, in the home of defendant John Dougherty.

    3)   From in or about December 2015, to in or about January 2016, George Peltz and employees of MJK Electric purchased and

installed large screen televisions and a security system, with a retail value of $19,882, in the home of a Family Member No. 5 (a close relative of Dougherty's).

4)    From in or about December 2014 through January 2015, George Peltz and employees of MJK Electric performed work with a retail value of $29,700 at the home of Marita Crawford, charging Crawford only $6,400.

5)    From in or about April 2013, to in or about April 2016, George Peltz gave defendant John Dougherty gift cards and gift certificates worth $4,500 from Boyd's, a clothing store in Philadelphia. *See Indictment*, Counts 88-96.

6)    In or about June of 2014, George Peltz caused an MJK credit card and funds to be used to buy Coach beach bags (valued at approximately $1,200) and other items to be purchased for family members of John Dougherty.

This evidence is relevant and admissible as direct evidence of Dougherty's intent, an essential element of the honest services mail and wire fraud charges, which includes defendant Henon facilitating Dougherty's participation in the franchise agreement negotiations between the City of Philadelphia and Comcast. Thus, it is direct evidence of the crime. It is also direct evidence of Dougherty's motive, which is tied to proof of his intent.

The relationship was also lucrative in the other direction. Thus, evidence that Dougherty, in his role as Business Manager of Local 98, assisted George Peltz and MJK Electric financially in matters that did not involve Comcast is also relevant to prove the transactional nature of their relationship, which further demonstrates that one of Dougherty's motives for demanding work from Comcast was to provide things of value to George Peltz. This evidence is as follows:

7.    From in or about January 2012 through in or about July 2016, defendant John Dougherty caused Local 98's Job Recovery Fund to pay MJK approximately $1.6 million.

- 10 -

8.   From in or about January 2012 through in or about July 2016, defendant John Dougherty caused Local 98's General Fund to pay MJK over $900,000 for projects primarily completed at union facilities.

9.   From in or about January 2012 through in or about July 2016, defendant John Dougherty steered other union electrical work to MJK Electric, for which MJK received at least $2 million.

10.  From in or about October 2014 to in or about May 2016, in Philadelphia, defendant John Dougherty hired a member of Peltz's family at Local 98, and paid the family member approximately $15,900 for hours not worked. *See Indictment*, Counts 88, 93-96.

This evidence is relevant and admissible as direct evidence of Dougherty's motive and intent in making MJK electric a preferred vendor for Comcast, an essential element of the honest services mail and wire fraud conspiracy charge.[2] *See e.g., United States v. Sriyuth*, 98 F.3d 739, 747 n. 12 (3d Cir. 1996) ("motive is always relevant in a criminal case").

Rule 402 of the Federal Rules of Evidence states, in part, "All relevant evidence is admissible, except as otherwise provided by law."  Rule 401 provides that evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The Third Circuit has stated that "[t]he definition of relevant evidence is very broad . . . Rule 401 does not raise a high standard." *Moyer v. United Dominion Industries, Inc.*, 473 F.3d 532, 544-545 (3d Cir. 2007) (internal quotations and citations omitted).  Facts of consequence are not restricted to the essential elements of the charged offense.

To establish relevance, the party offering the evidence is only required to provide a reasonable explanation of how the evidence makes a fact of consequence more or less likely.

---

[2]  The things of value Dougherty and Peltz gave each other are the subject of Counts 88 through 96, which charge Dougherty with violations of Title 29, United States Code, Section 186.  Those counts were severed.  In January 2019, Peltz pled guilty before this Court to providing Dougherty with the things of value that are the subject of Counts 88 through 96.

Relevance under Rule 401 is not a competition between possible explanations of the evidence's significance. That a party contesting admissibility may be able to supply an alternate explanation of the evidentiary significance of the evidence does not affect this determination. *See Old Chief v. United States*, 519 U.S. 172, 179, 184 (1997) (an alternative explanation of the nature of the contested evidence is not germane to the relevance determination under Rule 401); *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 921 (3d Cir. 1985) ("evidence need not lead inescapably towards a single conclusion to be relevant, it need only make certain facts more probable than not."). Resolving conflicting explanations of evidence is for the jury. *See DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1202 (3d Cir. 1978) (alternate explanations go to weight, not admissibility).

The evidence of the transactional nature of the relationship between Dougherty and Peltz has a tendency to make it more probable than not that Dougherty "acted with a desire or purpose to bring about some gain or benefit to himself or someone else," and was "motivated by a hope or expectation of either financial gain or other benefit to one's self, or some aid or profit to another," which is proof of one of the essential elements of the honest services fraud charges.

Furthermore, the transactional nature of their economic relationship has a tendency to make it more probable than not that Dougherty was motivated, in part, to provide Comcast work for MJK Electric, which was owned and operated by Dougherty's friend, George Peltz. His self-interest in fostering and promoting the mutually beneficial relationship he had with Peltz provided Dougherty with reason to enlist Henon's help during the City's negotiations with Comcast to pressure Comcast to award work to MJK. As long as he kept benefits flowing to Peltz, Dougherty had every reason to believe he would continue to personally benefit from

their transactional relationship.

### III.    Evidence of the Dougherty's Transactional Relationship with George Peltz is also Admissible Under Rule 404(b) to Prove His Motive and Intent.

Alternatively, if deemed extrinsic to the charges, this same evidence is admissible under Rule 404(b) to prove defendant Dougherty's motive and intent, which is an essential element of the honest services mail fraud charges.

Rule 404(b) of the Federal Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Evidence of other crimes is admissible if it is relevant and introduced for any purpose other than simply demonstrating character. *United States v. Repak*, 852 F.3d 230, 241 (3d Cir. 2017) ("In sum, Rule 404(b) is a rule of exclusion, meaning that it excludes evidence unless the proponent can demonstrate its admissibility, but it is also "inclusive" in that it does not limit the non-propensity purposes for which evidence can be admitted.").  *See, e.g., United States v. Daraio*, 445 F.3d 253, 256-57, 264-66 (3d Cir. 2006) (defendant convicted of evading payroll taxes between from 1994 through 1998; district court did not err in admitting evidence that the defendant previously failed to comply with the tax laws in 1984, 1989–1993, 1999-2004 to show intent).  The purposes for which such evidence may be offered are not limited to those listed in the rule.  *See, e.g., United States v. Scarfo*, 850 F.2d 1015, 1019 (3d Cir. 1988) (relevant evidence can be admitted for any reason, "so long as it is used for a purpose other than proving a defendant's likelihood to have committed this particular crime based on an

inference drawn from evidence pertaining to his character.").

Rule 404(b) evidence is admissible if: (1) the evidence is offered for a proper purpose, (2) the evidence is relevant, (3) the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice, and (4) the trial court, upon request, instructs the jury that the evidence is to be considered only for the proper purpose for which it was admitted. *See Huddleston v. United States*, 485 U.S. 681, 691-92 (1988); *United States v. Givan*, 320 F.3d 452, 460-61 (3d Cir. 2003) (six-year-old drug distribution conviction was properly admitted to show knowledge and intent of defendant who was found in a car with heroin hidden under his seat).

The admission of evidence under Rule 404(b) is within the sound discretion of this Court. As long as the Court sets forth the basis for its decision, the Court's ruling is subject only to a deferential review. *United States v. Balter*, 91 F.3d 427, 437 (3d Cir. 1996) (*quoting United States v. Bethancourt*, 65 F.3d 1074, 1079 (3d Cir. 1995) (404(b) rulings may be reversed only when they are "clearly contrary to reason and not justified by the evidence").

As described above, the evidence of the transactional relationship between defendant John Dougherty and George Peltz, the owner and operator of MJK Electric, is relevant to prove Dougherty's motive and intent, and therefore is admissible under Rule 404(b). This evidence is also the subject of Counts 88 through 96 of the instant indictment. Counts 93 through 96 allege that Dougherty:

> an officer and employee of Local 98, did unlawfully and willfully request, demand, receive, and accept the payment, loan, and delivery of money and other things of value exceeding $1,000 from George Peltz, MJK Electric, and persons acting in the interest of MJK Electric . . . knowing that such money and things of value were intended to influence DOUGHERTY with respect to his actions, decisions, and duties as a representative of MJK Electric employees and as an officer and employee of Local 98 . . . [i]n violation of Title 29, United States Code, Sections

- 14 -

186(a)(4), (b)(1), and (d)(2).  *See Indictment*, Counts 93-96

Because an essential element of the Section 186(a)(4) charges is that the defendant know that the things of value were intended to influence him "with respect to his actions, decisions, and duties as a representative of MJK Electric employees and as an officer and employee of Local 98," the intent requirement is similar to that of the honest services bribery charges.  *See Third Circuit Model Jury Instruction* 6.18.201B1 (Bribery of a Public Official) (essential elements are that defendant "gave, offered, or promised something of value" to a public official, and "did so corruptly with the intent to influence an official act . . .").

That the defendant engaged in similar conduct, during the period charged in the indictment, supports an inference that he acted with the intent to defraud when committing the charged honest services offenses.  Other acts that are similar to the charged conduct are routinely admitted under Rule 404(b).  *See United States v. Repak*, 852 F.3d 230, 245-46 (3d. Cir. 2017) (evidence of uncharged solicitations of bribes "made it more likely that Repak did not "unwittingly" solicit and receive" things of value "without knowing or intending that the services were meant to influence him in his [official] role."); *United States v. Willis*, 844 F.3d 155, 169-70 (3d Cir. 2016) (evidence showing that defendant charged with bribery had previously accepted a bribe while holding a different government position was probative of the issue of the defendant's intent and made it more likely that, "the defendant intended to accept the charged payments in exchange for official acts").  *See also United States v. Abegg*, 1993 WL 195683, *8 (E.D. Pa. 1993) (probative value of 404(b) evidence arises from the following factors: the close connection between the charged and uncharged evidence; the proximity in time; the similar manner in which both acts were committed by the defendant; and the similarity in the mental state required for both acts).

- 15 -

For these reasons, evidence of the transactional nature of the relationship between John Dougherty and George Peltz is relevant and admissible under Rule 404(b) to prove that Dougherty was motivated, in part, to provide Comcast work for MJK Electric, which was owned and operated by Peltz, and that he had an intent to defraud, which is an essential element of the honest services fraud offenses with which he is charged.

## IV.   Evidence of Dougherty's Control over Employees and Agents of Local 98 Is Relevant and Admissible under Rule 404(b) to Prove His Knowledge, Intent, Absence of Mistake, and Plan.

The government also intends to prove that defendant Dougherty was responsible for keeping defendant Henon on the Local 98 payroll after Henon was elected to Philadelphia City Council in November 2012, and that he was the one who dictated the terms of his employment, which involved doing little or no work that was independent of Henon's position as a member of City Council.

Prior to being elected to City Council, Henon was the Political Director of Local 98, a job he had held since 2003. During January and February of 2012, Henon was paid his full salary from Local 98, despite the fact that he began serving his first term as a member of City Council on January 6, 2012. In February of 2012, defendant Brian Burrows (who was not charged in any corruption counts) instructed the Local 98 finance office that Henon should be paid for 20 hours of work per week, but that his benefits should be calculated as if he was being paid for 27 hours per week.[3]  That arrangement continued through 2015 and 2016.

---

[3]  If Henon's benefits were based on the 20 hours per week for which he was paid, he would not be eligible to be part of Local 98's Health and Welfare Plan.  The Plan requires an employee to work 350 hours per quarter to maintain eligibility.  The 27 hours per week, at 13 weeks per quarter, equals 351 hours, which just makes him eligible.  The calculated nature of this arrangement, which constitutes an end-run around the eligibility requirements of the Health and Welfare Plan, is illustrated by the fact the Burrows was a Trustee of the Plan in 2011 and 2012, and Henon was a Trustee of the Plan in 2010 and most of 2011.  Additionally, Henon was paid for 40 hours by Local 98 until he received his first paycheck from the City in mid-February 2012.

Henon did not work close to 20 hours per week on tasks that did not involve his role as a City Council Member.

The government intends to present evidence that defendant Dougherty controlled most, if not all, aspects of hiring, paying and supervising Local 98 employees, agents, and consultants, except for possibly a small number of administrative employees who work in the offices of Local 98.[4]  This evidence makes it more likely than not that he was the one who was responsible for the decision to pay Henon after he was elected to City Council, including the number of hours per week for which he was paid, and the benefits he would receive.  Evidence that defendant Dougherty controlled most, if not all, aspects of hiring, paying, and supervising Local 98 employees, agents, and consultants makes it more likely than not that he had knowledge and control of Henon's employment by Local 98 after he was elected to City Council and sworn in on January 6, 2012, and especially during the period covered by the honest services charges - May 2015 to September 2016.  This evidence is relevant to prove his knowledge and intent, essential elements of the charged honest services fraud, and to show that Henon's receipt of a salary and benefits from Local 98 while he was a member of City Council was not the result of a mistake or coincidence, and was part of a plan of which Dougherty was an integral part.

This evidence includes the fact that, as Business Manager, a position he has held since 1993, Dougherty exercises total control over Local 98 business agents, pursuant to the IBEW Constitution, which states that "[The Business Manager] shall appoint any and all Assistant Business Managers, Representatives or Assistants, and these shall work directly under his

---

[4]  The majority of the employees and agents whom Dougherty controls do not work in an environment where their attendance, hours and productivity can be observed.

supervision and be subject to his authority as provided in Article XVII of the Constitution."

*IBEW Constitution*, Article VI, Sec. 3.  During 2015 and 2016, Local 98 employed 10 and 13

business agents, respectively.  The majority were paid more than $150,000 per year.

Defendant Marita Crawford, who is not charged in the honest services counts (but is an

unindicted coconspirator), was paid $7,000 in 2010, and $60,000 in 2011 as a consultant by

Local 98.  She was hired by Local 98 as the Political Director, replacing Henon, in November

of 2011.  Defendant John Dougherty authorized the consulting payments to her in 2010 and

2011, and named her Political Director in 2011.  During 2015 and 2016, Dougherty is the only

person from whom Crawford took direction.

Other evidence of Dougherty's control over employees and agents of Local 98 is

described in Count One of the Indictment, as set forth below:

> 52.  Defendant JOHN DOUGHERTY regularly directed persons
> employed by Local 98 or the Apprentice Training Fund, including
> defendants NIKO RODRIGUEZ, BRIAN FIOCCA, and Individual No. 1,
> to provide personal services to defendant DOUGHERTY, his family
> members, and associates, during regular union business hours, using
> equipment and vehicles belonging to Local 98, for which such persons
> were compensated by Local 98 or by the Apprentice Training Fund. These
> personal tasks, entirely unrelated to the business purposes of Local 98,
> included: (1) driving DOUGHERTY and members of his family to
> numerous personal appointments; (2) shopping for and delivering
> purchases to the residences of DOUGHERTY and family members; (3)
> trash removal; (4) yard work; (5) snow removal; (6) other maintenance at
> the residences of DOUGHERTY, defendant MARITA CRAWFORD,
> Family Member No. 3, and the residences of other family, friends, and
> associates of DOUGHERTY; (7) transporting goods to and from
> DOUGHERTY's shore house in New Jersey; (8) picking up
> DOUGHERTY's dry cleaning; (9) fueling and cleaning the car of Family
> Member No. 2; (10) delivering food (paid for with Local 98 funds) to
> DOUGHERTY's family members; (11) serving as a cleaning and
> furniture moving service for DOUGHERTY, his family members, and
> favored associates; and (12) placing sports bets for him. *Indictment,* Count
> One, Manner and Means, paragraph 52.

**Defendants Brian Fiocca and Niko Rodriguez**

20.  Defendant BRIAN FIOCCA was employed by Local 98 as an office employee and held that position since approximately 2010 to the present. BRIAN FIOCCA is the nephew of defendant JOHN DOUGHERTY. From 2010 through 2016, BRIAN FIOCCA was paid a total salary of $423,872 by Local 98. BRIAN FIOCCA regularly performed personal errands and chores for DOUGHERTY and DOUGHERTY's family members and associates as part of his job. BRIAN FIOCCA, along with defendant NIKO RODRIGUEZ and others, were referred to by DOUGHERTY as "the kids," a group of Local 98 employees who regularly performed personal errands and chores at the direction of DOUGHERTY.  *Indictment*, Count One, Paragraph 20.

19.  Defendant NIKO RODRIGUEZ was employed by the Local 98's Apprentice Training Fund from approximately 2011 through April 2016. In approximately April 2016, defendant RODRIGUEZ was transferred from the payroll of the Apprentice Training Fund to that of Local 98. From 2010 through 2016, RODRIGUEZ was paid a total salary of $372,631 by the Apprentice Training Fund and by Local 98. RODRIGUEZ regularly performed personal errands and chores for defendant JOHN DOUGHERTY and DOUGHERTY's family members and associates as part of his job. *Indictment*, Count One, Paragraph 19.

18.  The following overt acts are representative of instances in which defendant JOHN DOUGHERTY regularly directed persons employed by Local 98 or the Apprentice Training Fund, including defendants NIKO RODRIGUEZ, BRIAN FIOCCA, and Individual No. 1, to provide personal services to DOUGHERTY and his family members and associates. These services occurred during regular business hours, and the employees were compensated by Local 98 or the Apprentice Training Fund for tasks which were entirely unrelated to the business of Local 98 and the Apprentice Training Fund. Sometimes these tasks were performed with equipment and vehicles belonging to Local 98. The examples include:

     l.       On or about January 5, 2016, defendant JOHN DOUGHERTY directed defendant BRIAN FIOCCA to leave a Local 98 union picket line and travel to the residence of Family Member No. 2 in Somers Point, New Jersey, stating, "I want you to come down, pick up [Family Member No. 2's] keys, they're down the shore. Load your car up, take your time, check the shore, check his house out real good, get the mail, make sure there's nothing leaking anywhere. Look at the lawn, look around the lawn, OK, then come back up."  *Indictment*, Count One, Overt Act 18(l).

     g.       On or about June 10, 2015, at D&J BP AMOCO gas station

- 19 -

and G Line Car Wash, both in Philadelphia, Pennsylvania, defendant
NIKO RODRIGUEZ used a Local 98 American Express credit card, in
the name of defendant JOHN DOUGHERTY, to purchase a total of
$28.01 in gasoline and car cleaning services for the vehicle of the Family
Member No. 2. DOUGHERTY later falsely reported to Local 98 that the
expense for these purchases were for, respectively, "gas – Local 98
vehicle," and "car maintenance – Local 98 vehicle." In similar fashion,
DOUGHERTY routinely used Local 98 funds to pay for gas and service
for Family Member No. 2's personal vehicle and made the false
representation to Local 98 that the expenditure was for a Local 98 vehicle.
*Indictment*, Count One, Overt Act 14(g)

     f.     On or about July 23, 2015, Family Member No. 1 sent a text
to defendant JOHN DOUGHERTY stating, "Yoga at 12:00 need a ride at
1:15 please," and DOUGHERTY then texted defendant NIKO
RODRIGUEZ, "1pm [Family Member No. 1] needs a pick up ,,,." On or
about the same day, defendant RODRIGUEZ picked up Family Member
No. 1 from DOUGHERTY's residence and drove Family Member NO. 1
to various personal appointments.  *Indictment*, Count One, Overt Act
18(f).

     h.     On or about August 28, 2015, defendant NIKO RODRIGUEZ
and other Local 98 employees washed the sidewalks in front of the
residences of defendant JOHN DOUGHERTY and Family Member No.
3. While there, RODRIGUEZ and DOUGHERTY engaged in the
following text message exchange:

          NR:     Should I water the tomatoes while I'm here?
          JD:     Yes !!! *Indictment*, Count One, Overt Act 18(h).

     p.     On or about August 23, 2016, at the direction of defendant
JOHN DOUGHERTY, defendant NIKO RODRIGUEZ drove to
DOUGHERTY's rental house at the New Jersey shore to disconnect
televisions and to bring back samples of pool water for DOUGHERTY.
*Indictment*, Count One, Overt Act 18(p).

### Family Member No. 7

28.  Family Member No. 7, known to the grand jury, is a close relative of
defendant JOHN DOUGHERTY. Family Member No. 7 was a part-time
employee of Local 98 during the summer, from 2013 through 2016,
during breaks from school.  *Indictment*, Count One, paragraph 28.

18.  The following overt acts are representative of instances in which
defendant JOHN DOUGHERTY regularly directed persons employed by
Local 98 or the Apprentice Training Fund, including defendants NIKO
RODRIGUEZ, BRIAN FIOCCA, and Individual No. 1, to provide
personal services to DOUGHERTY and his family members and

associates. These services occurred during regular business hours, and the employees were compensated by Local 98 or the Apprentice Training Fund for tasks which were entirely unrelated to the business of Local 98 and the Apprentice Training Fund. Sometimes these tasks were performed with equipment and vehicles belonging to Local 98. The examples include:

c.      On or about June 16, 2015, at the direction of defendant JOHN DOUGHERTY, Individual No. 1 and Family Member No. 7 cleaned out the garage at the residence of defendant MARITA CRAWFORD, with DOUGHERTY telling CRAWFORD, "What I need us to do is focus in on our stuff. I need you to take care of yourself. That's all I care about, OK, number one. Then I want you take care of them dogs. I'm sending the kids over today and they know what to do." *Indictment*, Count One, Overt Act 18(c).

e.      On or about June 30, 2015, defendant JOHN DOUGHERTY directed Individual No. 1 and Family Member No. 7 to clean and gas the vehicle belonging to Family Member No. 2. *Indictment*, Count One, Overt Act 18(e).

19.   The following overt acts represent instances in which defendant JOHN DOUGHERTY authorized the expenditure of Local 98 funds to pay no-show employees, or make payments to non-employees if Local 98 who defendant DOUGHERTY favored for personal or political reasons unrelated to the business interests of Local 98:

a.      During the summers of 2013, 2014, 2015, and 2016, at the direction of defendant JOHN DOUGHERTY, Local 98 paid Family Member No. 7 for hours allegedly worked as a summer employee of Local 98. Payments were made for weeks during which Family Member No. 7 was in fact on vacation, attending school full-time, or otherwise not engaged in work for Local 98. These payments were made as follows:

> (1)     $800, on or about August 15, 2013;
> (2)     $800, on or about June 26, 2014;
> (3)     $800, on or about August 21, 2014;
> (4)     $800, on or about September 4, 2014;
> (5)     $800, on or about July 2, 2015;
> (6)     $800, on or about August 27, 2015;
> (7)     $800, on or about September 3, 2015;
> (8)     $800, on or about September 10, 2015;
> (9)     $800, on or about September 17, 2015;
> (10)    $800, on or about July 14, 2016;
> (11)    $800, on or about August 11, 2016; and
> (12)    $800, on or about August 18, 2016.
> *Indictment*, Count One, Overt Act 19(a).

**Family Member No. 8**

29.     Family Member No. 8, known to the grand jury, is a close relative of defendant JOHN DOUGHERTY. Family Member No. 8 lived next door to DOUGHERTY in Philadelphia. Family Member No. 8 was a part-time summer employee of Local 98 and its apprentice training from 2013 through 2016, during breaks from school. *Indictment*, Count One, paragraph 29.

19.  The following overt acts represent instances in which defendant JOHN DOUGHERTY authorized the expenditure of Local 98 funds to pay no-show employees, or make payments to non-employees if Local 98 who defendant DOUGHERTY favored for personal or political reasons unrelated to the business interests of Local 98:

     b.     On or about September 3 and September 10, 2013, at the direction of defendant JOHN DOUGHERTY, Family Member No. 8 was paid $1,200 by Local 98 for work performed as a summer employee of Local 98, during the weeks of August 26-30, 2013, and September 2-6, 2013. Family Member No. 8 had already returned to college as a full-time student during those time periods and did not work the hours for which Family Member No. 8 was paid.

     c.     On or about March 14, 2015, defendant BRIAN BURROWS, at the direction of defendant JOHN DOUGHERTY, authorized the payment of $3,995, from the Local 98 Job Recovery Fund, to be used for the travel and housing of Family Member No. 8 and a classmate to attend a basketball tournament in Costa Rica. Thereafter, DOUGHERTY stated, "[Family Member No. 8] gets the chance to play in Costa Rica. [Family Member No. 8]'s got two other kids. . . [and] needs you know $2,300. Well who they gonna go to?  They're gonna go to me." In addition, on or about July 1 and July 8, 2015, at the direction of DOUGHERTY, Family Member No. 8 was paid $1,200 by Local 98 for working as a summer employee of Local 98, during the weeks Family Member No. 8 was at the basketball tournament in Costa Rica and did not work.

     d.     On or about September 9, 2015, at the direction of defendant JOHN DOUGHERTY, Family Member No. 8 was paid $600 by Local 98 for work performed as a summer employee of Local 98, although Family Member No. 8 did not work the hours for which Family Member No. 8 was paid. *Indictment*, Count One, Overt Acts 19(b-d).

**Family Member No. 9**

30.  Family Member No. 9, known to the grand jury, is a close relative of defendant JOHN DOUGHERTY. Since approximately 2010, Family Member No. 9 was an employee of the Philadelphia Electrical and Technology Charter High School. Until approximately 2012, Local 98

reported to the Department of Labor that Family Member No. 9 was an employee of Local 98. Family Member No. 9 was paid as a consultant by Local 98, at the direction of defendant DOUGHERTY, for work never performed by Family Member No. 9. *Indictment*, Count One, paragraph 30.

19.  The following overt acts represent instances in which defendant JOHN DOUGHERTY authorized the expenditure of Local 98 funds to pay no-show employees, or make payments to non-employees if Local 98 who defendant DOUGHERTY favored for personal or political reasons unrelated to the business interests of Local 98:

 i. On or about September 21, 2015, defendant BRIAN BURROWS, at the direction of defendant JOHN DOUGHERTY, authorized the payment of $7,500 from the Local 98 General Fund to Family Member No. 9 for "consulting" work, when DOUGHERTY knew Family Member No. 9 had not earned that payment. DOUGHERTY initiated the payment after Family Member No. 9 told DOUGHERTY that Family Member No. 9 needed money for a recent home purchase, to which DOUGHERTY responded, "When's the last time I let any of you flounder?" *Indictment*, Count One, Overt Act 19(i).

**Individual No. 1**

32.  Individual No. 1, known to the grand jury, was an employee of Local 98 since approximately 2011. Individual No. 1 is a close relative of defendant MARITA CRAWFORD. Individual No. 1 was one of "the kids," a group of Local 98 employees who regularly performed personal errands and chores at the direction of defendant JOHN DOUGHERTY. *Indictment*, Count One, paragraph 32.

18.  The following overt acts are representative of instances in which defendant JOHN DOUGHERTY regularly directed persons employed by Local 98 or the Apprentice Training Fund, including defendants NIKO RODRIGUEZ, BRIAN FIOCCA, and Individual No. 1, to provide personal services to DOUGHERTY and his family members and associates. These services occurred during regular business hours, and the employees were compensated by Local 98 or the Apprentice Training Fund for tasks which were entirely unrelated to the business of Local 98 and the Apprentice Training Fund. Sometimes these tasks were performed with equipment and vehicles belonging to Local 98. The examples include:

 b. On or about May 13, 2015, at the direction of defendant JOHN DOUGHERTY, Individual No. 1 and other employees of Local 98 delivered patio furniture to the residence of defendant MARITA CRAWFORD, and cleaned and raked the exterior of CRAWFORD's residence, with DOUGHERTY engaging in the following conversation

with Individual No. 1 ("Ind1"):

Ind1:   I think we're gonna go to Southwest to put more lawn signs up.

JD:     Hey, before you do that, go pick up your mother's furniture, I forgot to tell you that today. Grab that today and also whatever junk you got in there, whatever you need to move out of that backyard if you got any trash get rid of it. Do what you gotta do, OK?

Ind1:   OK.

JD:     OK, take care yeah pick her stuff up, bring that home, clean everything off. While ya got everybody there grab a rake, do what you gotta do. Just rake up the back stuff, throw it in trash bag while you got the guys right there. Sweep with the front, do what you gotta do.

c.      On or about June 16, 2015, at the direction of defendant JOHN DOUGHERTY, Individual No. 1 and Family Member No. 7 cleaned out the garage at the residence of defendant MARITA CRAWFORD, with DOUGHERTY telling CRAWFORD, "What I need us to do is focus in on our stuff. I need you to take care of yourself. That's all I care about, OK, number one. Then I want you take care of them dogs. I'm sending the kids over today and they know what to do."

d.      On or about June 24, 2015, defendant JOHN DOUGHERTY directed Individual No. 1 to "get the truck" and clean tree debris and trash from the sidewalk in front of DOUGHERTY's residence.

e.      On or about June 30, 2015, defendant JOHN DOUGHERTY directed Individual No. 1 and Family Member No. 7 to clean and gas the vehicle belonging to Family Member No. 2. *Indictment*, Count One, Overt Acts 18(b-e).

n.      On or about April 2, 2016, defendant JOHN DOUGHERTY and Individual No. 1 (Ind1) engaged in the following conversation,

Ind1:   I didn't realize there was a couch on [Family Member No. 3's] step.

JD:     Yeah. Just see if you can get that and toss that too, OK?

Ind1:   Alright I'm gonna have to figure out where I'm going to toss it, alright.

JD:     Yeah, just put it at 3rd and Jackson. Put it up against the fence if we can't get in.

On or about the same day, Individual No. 1 used a Local 98 vehicle and

removed an old couch put out for trash outside the residence of Family Member No. 3 and placed it for pickup outside the Local 98 Apprentice building. *Indictment*, Count One, Overt Act 18(n).

o.   On or about April 12, 2016, defendant JOHN DOUGHERTY and defendant BRIAN FIOCCA engaged in the following text message exchange:

BF:   Took [Family Member No. 2] up and back.. All good!! Can I use truck + [Individual No. 1] so I can grab crib and move futon in my house??

JD:   Yes.

On or about the same day, defendant BRIAN FIOCCA and Individual No. 1 used a Local 98 vehicle and helped FIOCCA move furniture into his residence. *Indictment*, Count One, Overt Act 18(o).

19.   The following overt acts represent instances in which defendant JOHN DOUGHERTY authorized the expenditure of Local 98 funds to pay no-show employees, or make payments to non-employees if Local 98 who defendant DOUGHERTY favored for personal or political reasons unrelated to the business interests of Local 98:

j.   On or about January 8, 2016, defendant JOHN DOUGHERTY told defendant MARITA CRAWFORD, "[Individual No. 1] is a great kid. That's why I told him, I told him he's got an extra week. I didn't give him f-----g $20 here and $50 here. I said I'm going to give you an extra week's pay. You get to clear $600 or $700 or whatever he clears, and you get to stick it in your pocket. So, if you feel like buying sunglasses, you feel like keeping your girl out, buying cigar, take your mom to dinner, you have it. It's money you didn't have." *Indictment*, Count One, Overt Act 19(j).

g.   On or about August 23, 2015, defendant BRIAN BURROWS advised defendant ROBERT HENON that "the kids" who worked for defendant JOHN DOUGHERTY did not do any work for Local 98, with BURROWS stating, "[DOUGHERTY] has got his nephew [defendant BRIAN FIOCCA] and NIKO [RODRIGUEZ] and [Individual No. 1] and he thinks them kids are the -. Them kids, it's all smoke and mirrors with them kids … That deadbeat, [Individual No. 1], he's just a stone j******, that's all that kid is. … I don't know what they do all day." *Indictment*, Count One, Overt Act 18(g).

### Individual No. 8

39.   Individual No. 8, known to the grand jury, was an office employee of Local 98 beginning in approximately 2012. *Indictment*, Count One,

paragraph 39.

19.  The following overt acts represent instances in which defendant JOHN DOUGHERTY authorized the expenditure of Local 98 funds to pay no-show employees, or make payments to non-employees if Local 98 who defendant DOUGHERTY favored for personal or political reasons unrelated to the business interests of Local 98:

    e.      During 2014, 2015, and 2016, at the direction of defendant JOHN DOUGHERTY, Local 98 paid Individual No. 8 double pay or other payments for work Individual No. 8 did not perform. These payments were made as follows:

        (1)    $1,000, on or about October 16, 2014;
        (2)    $1,000, on or about April 30, 2015;
        (3)    $1,000, on or about May 7, 2015;
        (4)    $1,000, on or about May 21, 2015;
        (5)    $1,000, on or about May 28, 2015;
        (6)    $1,000, on or about July 2, 2015;
        (7)    $1,000, on or about August 20, 2015; and
        (8)    $1,000, on or about December 31, 2015.

    f.      On or about May 19, 2016, upon authorizing the payment of an additional $1,500 to Individual No. 8, defendant JOHN DOUGHERTY told George Peltz (charged elsewhere) he had done so because Individual No. 8 was purchasing a new house. DOUGHERTY stated, "I paid [Individual No. 8] like $1,700 bucks or something over and above, like, like, with, taxes out of it, I figured [Individual No. 8] could use it to buy something for the house, you know. . . . What I try to do is, like keep it within reason so it don't look too crazy, you know."

    g.      From on or about September 10, 2015, through December 24, 2015, at the direction of defendant JOHN DOUGHERTY, Local 98 paid Individual No. 8 $25 per hour for working 40 hours each week as a business office employee of Local 98, although Individual No. 8 she attended college in Reading, Pennsylvania at least two days per week and did not work more than 24 hours each week for Local 98 during this period. *Indictment*, Count One, Overt Acts 19(e-g).

### Individual No. 3

19.  The following overt acts represent instances in which defendant JOHN DOUGHERTY authorized the expenditure of Local 98 funds to pay no-show employees, or make payments to non-employees if Local 98 who defendant DOUGHERTY favored for personal or political reasons unrelated to the business interests of Local 98:

    k.      On or about May 16, 2016, defendant JOHN DOUGHERTY

directed the payment from Local 98 of $5,000, as a "consulting payment,"
to Individual No. 3 in exchange for Individual No. 3 accompanying
defendant MARITA CRAWFORD on a personal trip to Florida.
*Indictment*, Count One, Overt Act 19(k).

During 2015 and 2016, Local 98 also paid numerous consultants, who were not

employees of Local 98, many of whom were hired by, and worked directly for defendant John

Dougherty, these individuals and entities include the following:

1)  KB Consultants;
2)  Shane Carey;
3)  Prowess LLC;
4)  Patrick Gillespie;
5)  Keel Communications;
6)  Richard Lazer;
7)  Loeper & Associates;
8)  Andre McCleary;
9)  James Moylan;
10) Michael "Ozzie" Joseph Myers;
11) Pyramid Consulting Group, Inc.;
12) Philip J. Migliarese III;
13) Jessica Squadroni;
14) Tommie W. St. Hill; and
15) We Get It Right The First Time.

During 2015 and 2016, Local 98 paid these 16 consultants, all of whom were paid as

independent contractors, a total of $1,337,249.

Evidence that defendant John Dougherty controlled most, if not all, aspects of hiring,

paying, and supervising Local 98 employees, agents, and consultants makes it more likely than

not that he had knowledge and control of Henon's employment by Local 98 and the specific

terms of his employment after he was elected to City Council and sworn in on January 6, 2012,

and especially during the period covered by the honest services charges, which was May 2015

to September 2016.  This evidence is relevant to prove Dougherty's knowledge and intent,

essential elements of the charged honest services fraud, and to show that Henon's receipt of a

salary and benefits from Local 98 while he was a member of City Council was not the result of

a mistake or coincidence, and was part of a plan of which Dougherty was an integral part. Thus, it is direct evidence of the crime.

That Dougherty was able to have the employees identified above paid for hours they did not work supports the admission of this evidence, because it shows how very tight Dougherty's control was over hiring, paying and supervising of Local 98 personnel.  During 2015 and 2016, Henon was paid by Local 98 for working 20 hours per week.  In reality, he did not spend anything close to 20 hours per week performing tasks for Local 98 that were unrelated to his position as a member of City Council.  Therefore, just like the people described above, Henon was paid by Local 98, at the direction of Dougherty, and even given a raise, for hours that he did not work for Local 98.

In addition, if any of this evidence is deemed extrinsic, other acts that are similar to the charged conduct are routinely admitted under Rule 404(b). *See United States v. Repak*, 852 F.3d 230, 245-46 (3d. Cir. 2017) (evidence of uncharged solicitations of bribes "made it more likely that Repak did not "unwittingly" solicit and receive" things of value "without knowing or intending that the services were meant to influence him in his [official] role."); *United States v. Willis*, 844 F.3d 155, 169-70 (3d Cir. 2016) (evidence showing that defendant charged with bribery had previously accepted a bribe while holding a different government position was probative of the issue of the defendant's intent and made it more likely that, "the defendant intended to accept the charged payments in exchange for official acts").  *See also United States v. Abegg*, 1993 WL 195683, *8 (E.D. Pa. 1993) (probative value of 404(b) evidence arises from the following factors: the close connection between the charged and uncharged evidence; the proximity in time; the similar manner in which both acts were committed by the defendant; and the similarity in the mental state required for both acts).  Here, the other acts evidence,

including causing Local 98 to pay personnel for work they did not perform, is similar to the charged conduct.

For all of these reasons, evidence that defendant John Dougherty controlled most, if not all, aspects of hiring, paying, and supervising Local 98 employees, agents, and consultants makes it more likely than not that he was had knowledge and control of Henon's employment by Local 98 after he was elected to City Council and sworn in on January 6, 2012, and especially during the period covered by the honest services charges (May 2015 to September 2016). This evidence is relevant to prove his knowledge and intent, essential elements of the charged honest services fraud, and to show that Henon's receipt of a salary and benefits from Local 98 while he was a member of City Council was not the result of a mistake or coincidence, and was part of a plan of which Dougherty was an integral part.

Evidence that Dougherty exercised almost total control over Local 98 employees makes it more likely than not that he was the one who arranged for Henon to continue to be paid by Local 98 after he began serving as a member of City Council in January 2012, and controlled the payment of his salary and benefits during 2015 and 2016. Thus, this evidence makes a fact of consequence more likely, is relevant to prove his participation in the honest services fraud, and to establish his knowledge and intent, and is therefore relevant and admissible.

It is also relevant to rebut any argument that defendant Brian Burrows, or anyone else, may have acted on their own in facilitating Henon's work arrangement with Local 98 after his election. Evidence that rebuts a theory of the defense, and thus makes a fact of consequence to a defendant less likely, is also relevant evidence which may be presented in the government's case-in-chief. *See United States v. Kemp*, 500 F.3d 257, 296-297 (3d Cir. 2007) (evidence disproving defendant's claims of wealth was relevant; defendant sought to negate his motive to

launder money by claiming great wealth). *See United States v. Universal Rehabilitation Services, Inc.*, 205 F.3d 657, 665 (3d Cir. 2000) (introduction of witness's plea agreement to meet impeachment).

The fact that this evidence pertains to issues which will be in dispute demonstrates the probative value of this evidence, which pertains to a significant and disputed element of the charged offenses: whether Dougherty was an active participant in the charged offenses, and acted knowingly and with fraudulent intent.

**V.      Evidence of Dougherty's Receipt of Personal Goods Paid for by Local 98 Is Admissible as Direct Proof of the Charged Offenses.**

The government also intends to introduce at trial evidence that defendant Dougherty obtained things of value, including personal goods and meals for himself and his family, that were paid for by Local 98's General Fund.  The government will also introduce evidence that the General Fund was funded by the pay earned by the members of Local 98.  This evidence, which shows that one of defendant Dougherty's motives for assuring union members receive work was to be able to have the union pay for these personal goods, is "intrinsic" to the charged offenses and therefore does not fall within Federal Rule of Evidence 404b.  *See Green*, 617 F.3d at 245; s*ee also Hoffecker*, 530 F.3d at 189-90.

For example, the corruption counts include allegations that:

> 4.      Defendant ROBERT HENON's office also vested him with actual and perceived authority over certain other public officials, including employees of the Philadelphia Department of Licenses & Inspections ("L&I"). L&I administered and enforced Philadelphia's code requirements, including building, electrical, fire, health, housing, business, and zoning regulations. Inspectors employed by L&I were empowered to issue cease and desist orders (that is, to shut down construction projects) for violations of the City codes. *Indictment*, Count 97, paragraph 4.
> …
>
> 14.      The official acts that defendant ROBERT HENON took, attempted to take, or caused as part of this illegal relationship included the following:

        a.      At defendant JOHN DOUGHERTY's direction, defendant HENON caused L&I to inspect, and in some instances shut down, operations or construction work, at locations outside of his district, where non-union laborers were involved in electrical work construction activity.

        b.      At defendant JOHN DOUGHERTY's direction, defendant HENON drafted, supported, advocated, and sponsored Philadelphia City Council legislation, resolutions, and other Council legislative activities that were favorable to defendant DOUGHERTY's personal, professional, or financial interests. *Indictment*, Count 97, paragraph 14(a-b).

…

Abuse of L&I Enforcement Activity to Discourage Use of
Non-Union Labor at Children's Hospital of Philadelphia

        1.      On or about July 19, 2015, after learning that a non-union company was installing MRI machines at a new facility at the Children's Hospital of Philadelphia ("CHOP"), defendant JOHN DOUGHERTY instructed a business agent of Local 98 to contact defendant ROBERT HENON, texting the business agent as follows: "Do it + call Henon ,,, tonight ,,,, Call Condi tonight to jump in +resolve."

        2.      On or about July 20, 2015, defendant JOHN DOUGHERTY called an administrator of CHOP to discuss the installation of the MRI machine at the hospital. The administrator said that the installation was being performed by the manufacturer of the MRI machine because the manufacturer would not honor the warranty if anyone else did it. After complaining that Local 98 was not given an opportunity to bid on the project, DOUGHERTY warned the administrator: "It is also an L&I violation . . . you don't want a city thing shutting it down. We have had other hospitals shut down because of that."

        3.      On or about July 21, 2015, in response to a complaint to L&I by defendant ROBERT HENON about the installation of the MRI machine at CHOP by technicians employed by the manufacturer of the MRI machine, L&I employees inspected the installation and issued a preliminary stop work order.

        4.      On or about July 22, 2015, after causing an inspection at CHOP by L&I inspectors, defendant JOHN DOUGHERTY called defendant ROBERT HENON and complained that someone at L&I had reversed the stop work order and had given CHOP permission to continue work, stating, "L&I went out and shut them down and then somebody gave them the okay, they said, inside the system, today to go to work." In response, HENON replied, "Oh really? Uh, well the other one, the other part was me, all right," adding, "I'll walk over personally."

        5.      On or about July 23, 2015, defendant JOHN DOUGHERTY called a business agent of Local 98 and asked if there were "any issues you got floatin' around at Penn that we should be paying attention to?" After the business agent reported that the only issue was the installation at CHOP, DOUGHERTY replied, "Yeah, CHOP. I'm on top of that. I have (unintelligible), Bobby (unintelligible) call that guy, but we don't want that out, that we did that."

        6.      On or about August 19, 2015, after a Local 98 business agent called defendant ROBERT HENON and said that defendant JOHN DOUGHERTY wanted

HENON to know that a different non-union company was installing another MRI machine at CHOP, HENON instructed the business agent to send him the information, urging him to "Send me the exact location again and, and, and, who it is. This way I can just I can read what it is, only because I got my hands full. Write it down too. And text it to me. Don't email . . . And then, and then, and then delete your email."

       7.      On or about August 20, 2015, in response to a complaint to L&I by defendant ROBERT HENON about the installation of a second MRI machine at CHOP by technicians employed by the manufacturer of the MRI machine, L&I employees inspected the installation and issued a stop work order, and L&I subsequently denied the issuance of a Certificate of Occupancy for the room in which the MRI was being installed.

       8.      On or about August 21, 2015, defendant JOHN DOUGHERTY, while discussing L&I shutting down the project at CHOP with a Local 98 business agent, instructed the business agent to notify another Local 98 business agent, commenting, "[W]e want them to keep on file; they shut down that GE room up at Children's Hospital; they red-striped it . . . but we got to be smart, we don't want them to f*** us. We got to capitalize off that. I got to get a meeting with Children's Hospital again, things like that, you know." *Indictment*, Count 97, Overt Acts 108.

      Clearly, by causing defendant Henon to take these official acts, defendant Dougherty was endeavoring to assure more work for union members.  At least one motive for defendant Dougherty's desire for more work for union members was his desire to keep as much money as possible continuing to flow into the General Fund.  To prove that this was one of Dougherty's motives for making his demands with respect to L&I (and also, in addition to his transactional relationship with Peltz, on Comcast), the government intends to introduce evidence that defendant Dougherty used the General Fund to make personal purchases, such as meals and personal items for himself and his family members.

      The government is, of course, cognizant that this Court severed the corruption counts from the embezzlement counts.  As such, the government does not propose to introduce in the trial of the corruption counts all of the evidence against defendant Dougherty that it will present in the embezzlement counts.  Instead, in the trial of the corruption counts, the government proposes to adduce evidence only that Dougherty received certain personal goods

that were paid for by Local 98, and not to introduce evidence that these goods were acquired by any illegal means, or by false statements and fraud on Local 98.  Further, the government proposes to limit the evidence adduced at the trial of the corruption counts to only a fraction of the goods that  alleged in the severed counts that Dougherty obtained by embezzlement. [5]  In particular, the government proposes to adduce evidence at the October 4 trial of personal goods obtained by Dougherty through his use Local 98 credit cards, and through his requests that Local 98 reimburse him for certain expenditures he made either in cash or through the use of a personal credit card.

This limited evidence is plainly relevant, *see Old Chief*, 519 U.S. at 179, 184; *McQueeney*, 779 F.2d at 921, as it has a tendency to make it more probable than not that Dougherty "acted with a desire or purpose to bring about some gain or benefit to himself or someone else," and was "motivated by a hope or expectation of either financial gain or other benefit to one's self, or some aid or profit to another," which is proof of one of the essential elements of the honest services fraud charges.  The financial benefits to Dougherty derived from the General Fund has a tendency to make it more probable than not that Dougherty was motivated, in part, to enlist Henon's help in having L & I shut down non-union work (even work being done at a children's hospital) in order to keep benefits flowing to himself.  As long as lots of workers were earning union wages, the General Fund would be flush, and Dougherty could continue to have the opportunity to have personal goods paid for by Local 98.

In sum, while the government is mindful of the Court's reasons for severing the embezzlement counts, the Court's sound reasoning was undoubtedly not intended to strip the

---

[5]  The embezzlement counts charge Dougherty and several other defendants with a wide-ranging conspiracy to embezzle from Local 98 and from the Apprentice Training Fund, including embezzlement of substantial sums from fraud involving construction work; abuse of Local 98 credit cards to pay for personal goods, meals, services, travel and tickets, as well as theft of cash and other crimes of theft and fraud.

government of its ability to demonstrate defendant Dougherty's financial motive for engaging in certain corrupt acts. Accordingly, the government proposes to submit to the jury in the trial on the corruption counts only a limited sample of personal purchases out of union funds, and to reference the total personal purchases in summary form, without reference to any fraudulent explanations related thereto.

## VI.     Evidence of the Dougherty's Receipt of Goods Paid for by Local 98 Is also Admissible Under Rule 404(b) to Prove His Motive and Intent.

As addressed above, if the evidence that defendant Dougherty received personal goods paid for by Local 98 for the benefit of himself and his family is deemed extrinsic to the charges, it is nonetheless admissible under Rule 404(b) to prove the defendant's motive and intent, which is an essential element of the honest services mail fraud charges.

The evidence that Dougherty received personal goods paid for with money from Local 98's General Fund provides a motive for Dougherty to take actions designed to keep as much money as possible flowing into the General Fund. As such, the evidence is clearly relevant. Further, the evidence is offered for a proper purpose, and the probative value of the evidence is not outweighed (much less substantially outweighed) by its potential for unfair prejudice. *See Huddleston*, 485 U.S. at 691-92; *Givan*, 320 F.3d at 460-61. Further, the trial court, upon request, could instruct the jury that the evidence is to be considered only for the proper purpose for which it was admitted. *Id.*

## VII.    The Probative Value of the Evidence of Defendant Dougherty's Transactional Relationship with George Peltz, His Control of Local 98 Employees, Agents, and Consultants, and His Receipt of Personal Goods Paid for by Local 98, Is Not Substantially Outweighed by the Danger of Unfair Prejudice.

The evidence that is the subject of this motion also passes muster under Rule 403, which states as follows:

> [a]lthough relevant, evidence may be excluded if its probative value
> is substantially outweighed by the danger of unfair prejudice,
> confusion of the issues, or misleading the jury, or by considerations
> of undue delay, waste of time, or needless presentation of cumulative
> evidence." Fed. R. Evid. 403.

The probative value of this evidence is not substantially outweighed by the danger of unfair prejudice.[6]  Rule 403 is an exception to the mandatory admission of relevant evidence; therefore, exclusion of evidence under Rule 403 should be "used sparingly."  *Blancha v. Raymark Industries*, 972 F.2d 507, 516 (3d Cir. 1992); *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).  Courts have universally recognized that "Virtually all evidence is prejudicial or it is not material." *See, e.g., Carter v. Hewitt*, 617 F.2d 961, 972, n.14 (3d Cir. 1980), *quoting Dollar v. Long Manufacturing Co.*, 561 F.2d 613, 618 (5th Cir. 1977).

Evidence is unfairly prejudicial if it suggests a "decision on an improper basis, commonly, though not necessarily, an emotional one."  *See* Advisory Committee Note to FRE 403.  Evidence is not "unfairly prejudicial" simply because it is "undesirable from the defendant's perspective." *Cross*, 308 F.3d at 324 n. 23.  Rather, the issue of "unfairness" is whether "the proponent would secure an advantage that results from the likelihood [that] the

---

[6] Peltz's provision of benefits to Dougherty, and Dougherty's acceptance thereof, is a violation of Title 29, United States Code, Section 186.  Dougherty is charged with violating that statute in this case, but those charges are now part of the case that has been severed by the Court for a later separate trial.  Nonetheless, the evidence of Peltz's provision of these benefits is admissible in the pending trial of the corruption counts because it is directly relevant to, and tends to show, Dougherty's motive, particularly with regard to the official acts concerning Comcast, which are charged as overt acts in the honest services conspiracy.  The same is true with regard to the personal goods that Dougherty is alleged – in the severed case – to have obtained by embezzlement, particularly with regard to the official acts involving L&I.  Furthermore, without such evidence, the defense might suggest to the jury that defendant Dougherty's motives for the actions he took in connection with his conspiracy with Henon are entirely pure, driven only by a desire to see union members receive work.  Although the jury is unlikely to know that accepting things of value from a contractor while an officer of a union that represents employees of the contractor is a crime, to the extent there is a concern about that, the Court could, of course, give a limiting instruction.  In addition, as noted, the government does not intend to suggest in this trial that Dougherty's receipt of personal goods paid by Local 98's General Fund was illegal, but a limiting instruction could be crafted for this part of the evidence as well.

evidence would persuade by illegitimate means." *United States v. Blyden*, 964 F.2d 1375, 1378 (3d Cir. 1992) (emphasis added).

To deny the government the use of the evidence described above would be to impermissibly shield the defendant from his own acts and deny the jury information that is clearly relevant to prove his knowledge, motive, and intent. Rule 403 is not intended to have such an illogical and unjust impact. *United States v. Cross*, 308 F.3d 308, 325 (3d Cir. 2002) ("Rule 403 does not provide a shield for defendants who engage in outrageous acts . . . It does not generally require the government to sanitize its case . . ." (*quoting United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998))).

The evidence of the things of value that Dougherty received from Peltz, as well as the financial benefits Dougherty provided to Peltz's company, MJK Electric, as well as to a member of Peltz's family, and the evidence that Dougherty received personal goods paid for with monies generated by Local 98 members' wages, is probative of Dougherty's motive and intent, an essential element of the charged offenses, and is not being offered for an improper basis. Likewise, the evidence that Dougherty has almost complete control over the hiring and supervision of employees and agents of Local 98 is probative of Dougherty's knowledge and intent, essential elements of the charged honest services fraud, and also is relevant to prove Dougherty's absence of mistake and plan, and is not being offered for an improper basis. For these reasons, its probative value is not outweighed in any way, much less substantially, by the danger of unfair prejudice. Rule 403 "creates a presumption of admissibility . . . when evidence is highly probative, even a large risk of unfair prejudice may be tolerable." *Cross*, 308 F.3d at 323.

This evidence is less prejudicial than other evidence admitted in this circuit under Rule 404(b). *See, e.g., United States v. Repak*, 852 F.3d 230, 249–50 (3d Cir. 2017) (evidence of an affair between defendant and his secretary was both relevant and probative with regard to his *mens rea* and motivation to commit bribery, and any risk of unfair prejudice did not substantially outweigh that probative value); *United States v. Jones*, 566 F.3d 353, 364 (3d Cir. 2009) (uncharged assaults which were necessary to prove existence of charged criminal enterprise were highly probative and admissible under Rule 403); *United States v. Ali*, 493 F.3d 387, 391 (3d Cir. 2007) (same result for uncharged extortions); *United States v. Jemal*, 26 F.3d 1267, 1272, 1276 (3d Cir. 1994) (evidence that defendant had participated in prior bank frauds, and advised an accomplice to create a false lease similar to one that was part of the charged scheme; district court was well within its discretion in holding that the probative value of this evidence was not substantially outweighed by any unfairly prejudicial effect). Here, the risk of an adverse reaction by the jury does not "substantially outweigh" the probative value of the evidence.

In *United States v. Gartmon*, 146 F.3d 1015 (D.C. Cir. 1998), the defendant, who was convicted of securities fraud and money laundering, argued on appeal that the district court improperly admitted evidence that after a female accomplice attempted to withdraw from scheme, the defendant sexually assaulted her with a gun. The court of appeals concluded that the admission of the evidence, which constituted "direct evidence of Gartmon's knowing involvement in, and direction of, the scheme to defraud" was not an abuse of discretion, because the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under Rule 403. Id. at 1020-21. The evidence in question here is more probative, and less prejudicial and the evidence admitted in *Gartmon*.

As set forth above, the evidence that is the subject of this motion has the tendency to make facts of consequence more probable than they would be without the evidence.  The evidence is probative of essential elements of the honest mail fraud charges - Dougherty's motive, knowledge, and intent pertaining to his participation in the honest services fraud.  The evidence is also relevant to prove absence of mistake and plan.  The probative value of this evidence is not outweighed in any way, much less substantially, by the danger of unfair prejudice.

## VIII.   Conclusion

Evidence the things of value that Dougherty received from Peltz, as well as the financial benefits Dougherty provided to Peltz's company, MJK Electric, and to a member of Peltz's family, and the evidence that Dougherty received personal goods paid for with money generated by Local 98 members' wages, is probative of Dougherty's motive and intent, an essential element of the charged offenses.  Likewise, the evidence that Dougherty has almost complete control over the hiring and supervision of most employees and agents of Local 98 is probative of Dougherty's knowledge and intent, essential elements of the charged honest services fraud, and also is relevant to prove Dougherty's absence of mistake and plan.  This evidence is not being offered for an improper basis.  The probative value of this evidence is not outweighed in any way, much less substantially, by the danger of unfair prejudice.  For all of

the reasons set forth above, this evidence should be admitted.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney

MICHELLE MORGAN
Assistant United States Attorney
Chief, Corruption and Labor Racketeering
Section

/s/ Frank R. Costello, Jr.
RICHARD P. BARRETT
FRANK R. COSTELLO, JR.
BEA L. WITZLEBEN
Assistant United States Attorneys

Dated:  9/10/21

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this date, I electronically filed the foregoing response with

the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

attorneys of record for the defendants, who are identified below.

Henry Hockeimer and David Axelrod
Counsel for Defendant John Dougherty

Brian McMonagle
Counsel for Defendant Robert Henon

Thomas Bergstrom
Counsel for Defendant Brian Burrows

Joseph Capone
Counsel for Defendant Michael Neill

Fortunato Perri
Counsel for Defendant Marita Crawford

Paul Hetznecker
Counsel for Defendant Niko Rodriguez

Nina Spizer
Counsel for Defendant Brian Fiocca

William Brennan
Counsel for Defendant Anthony Massa

/s/ Frank R. Costello, Jr.
FRANK R. COSTELLO, JR.
Assistant United States Attorney

Dated: 9/10/21