IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO.   19 - 64 |
| JOHN DOUGHERTY | : | |
| ROBERT HENON | | |
| BRIAN BURROWS | : | |
| MICHAEL NEILL | | |
| MARITA CRAWFORD | : | |
| NIKO RODRIGUEZ | | |
| BRIAN FIOCCA | : | |
| ANTHONY MASSA | | |

<u>**GOVERNMENT'S TRIAL MEMORANDUM**</u>

The United States of America, by and through its attorneys, Jennifer A. Williams, Acting United States Attorney, and the undersigned attorneys, hereby submits the following Trial Memorandum in advance of the trial of defendants John Dougherty and Robert Henon.

## I.    INTRODUCTION

The upcoming trial involves the following charges:

1.    Counts 97-109, which charge defendants John Dougherty and Robert Henon with conspiracy to commit honest services fraud and federal program bribery, in violation of 18 U.S.C. §§ 666, 1341, 1343 and 1346, arising out of Dougherty's bribery of Henon for his performance of official acts in his capacity as a member of Philadelphia City Council, and related substantive offenses.

2.    Counts 110-112, which charge Henon with honest services wire fraud arising from his performance of official acts in return for campaign contributions; and

3.      Counts 113-116, which charge Henon with federal program bribery arising out of the conduct charged in Counts 97-112.

## II.     HONEST SERVICES MAIL AND WIRE FRAUD AND BRIBERY CHARGES

Counts 97 through 109 charge that "[f]rom at least in or about May 2015, through in or about September 2016," defendants John Dougherty and Robert Henon, a Philadelphia City Councilman, conspired to commit honest services fraud and federal program bribery, in violation of 18 U.S.C. § 371 (Count 97), and committed honest services wire and mail fraud, in violation of 18 U.S.C. §§ 1341, 1343 and 1346 (Counts 98-109).  The Indictment alleges that Dougherty paid Henon bribes in the form of a "stream of benefits," which included Henon's salary and benefits from Local 98 and tickets to sporting events, with the intent to influence Henon, and in exchange for Henon's performance of official acts, in Henon's capacity as a member of Philadelphia City Council.

Paragraphs 10 through 14 of Count 97 allege as follows:

10.      From at least in or about May 2015, to in or about September 2016, in the Eastern District of Pennsylvania and elsewhere, defendants

JOHN DOUGHERTY and
ROBERT HENON

conspired and agreed, together and with others known to the grand jury, to commit offenses against the United States, that is, to:

a.   Knowingly devise and engage in a scheme with the intent to defraud the City of Philadelphia and its citizens of the right to defendant ROBERT HENON's honest services in the affairs of the City of Philadelphia, in violation of Title 18, United States Code, Sections 1341, 1343, and 1346; and

b.   Engage in Federal program bribery, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 666(a)(2).

Manner and Means

It was part of the conspiracy that:

11.    Defendant JOHN DOUGHERTY, through Local 98, provided defendant ROBERT HENON with a stream of personal benefits during the time that HENON was a member of Philadelphia City Council. The benefits given to HENON by DOUGHERTY included a salary from Local 98 and tickets to sporting events. Specifically:

a.    Local 98 paid ROBERT HENON a salary during the time he served as a City Councilman, totaling $70,649 in 2015 and $73,131 in 2016. On Local 98's annual LM-2 reports filed with the United States Department of Labor, Local 98 described HENON's position as "office staff." On annual financial disclosure forms that HENON was required to file with the City Board of Ethics in 2015 and 2016, specifying the source, but not the amount, of income over $500 and gifts over $200 (in the aggregate), HENON disclosed Local 98 as a source of income, describing his position as "electrician," while not disclosing any gifts. In fact, throughout the period of the conspiracy, HENON did not work as "office staff" nor as an electrician for Local 98, and HENON did not perform any significant work of any kind for Local 98 apart from his efforts as a member of the Philadelphia City Council to act as directed by and to benefit defendant JOHN DOUGHERTY.

b.    During 2015 and 2016, defendant JOHN DOUGHERTY gave defendant ROBERT HENON tickets to sporting events with a value of approximately $11,807. These tickets were paid for by Local 98.

12.    Defendant JOHN DOUGHERTY gave these things of value to defendant ROBERT HENON with the intent to influence HENON in HENON's capacity as a member of Philadelphia City Council and Chair of the Committee on Public Property, and in exchange for HENON acting on behalf of DOUGHERTY, in his capacity as a member of Philadelphia City Council, and performing official acts as directed by and on behalf of DOUGHERTY.

13.    Defendant ROBERT HENON accepted the stream of personal benefits from defendant JOHN DOUGHERTY, knowing that the benefits were given in exchange for HENON's performance of official acts at the direction of and on behalf of defendant DOUGHERTY. Furthermore, defendants DOUGHERTY and HENON attempted to hide the true nature of their illegal relationship from the public.

Count 97 also describes 64 overt acts that were allegedly committed in furtherance of the conspiracy.

The evidence will show that in exchange for the salary, benefits, and other things of value he received because of defendant John Dougherty, defendant Robert Henon agreed to take, attempted to take, took, and caused others to take numerous official acts related to his position as member of Philadelphia City Council.

Prior to being elected to City Council in November 2011, Henon was the Political Director of Local 98, a job he had held since 2003.  In December 2011, Dougherty announced that Henon "will still play a role in our union operation and will collect a check from Local 98."

During January and February 2012, Henon was paid his full salary from Local 98, despite the fact that Henon began serving his first term as a member of City Council on January 2, 2012.  In March 2012, defendant Brian Burrows (who was not charged in any corruption counts) instructed the Finance Office that Henon should be paid for 20 hours of work per week, but that his benefits should be calculated as if he was being paid for 27 hours per week.  That arrangement continued through 2015 and 2016.[1]

During 2015 and 2016, Henon received a salary from Local 98 of $70,649 and $73,131, respectively. *Id.* In addition to his salary, Henon received benefits from Local 98 in the amounts of $54,656.75 for 2015, and $56,526.11 for 2016. These benefits consisted of payments Local 98 made on Henon's behalf into Local 98's Health and Welfare Plan, Pension

---

[1]      If Henon's benefits were calculated on the 20 hours per week on which his salary was based, he would not be eligible to be part of Local 98's Health and Welfare Plan. The Plan requires employees to work 350 hours per quarter to maintain eligibility. The 27 hours per week, at 13 weeks per quarter, equals 351 hours, which just makes him eligible. The calculated nature of this arrangement, which appears to be contrary to the requirements of the Health and Welfare Plan, is buttressed by the fact that Burrows was a Trustee of the Plan in 2011 and 2012, and Henon was a Trustee of the Plan in 2010 and part of 2011.

Plan, and Profit-Sharing Plan.  Employees do not make any contributions to the plans.  They are fully funded by Local 98.

A brief description of the conduct specifically charged in the Indictment is set forth below.

### A.  Abuse of L&I Enforcement Activity

Defendants Dougherty and Henon are charged with using Henon's position as a Philadelphia City Councilperson to influence the operations of the Philadelphia Department of Licenses and Inspection (L&I) in ways that promoted the interests of Dougherty and Local 98. The evidence will show that Henon, acting in response to calls and texts from Dougherty, steered L&I officials towards construction sites where non-union electricians or other trade unions were installing equipment or electrical systems that Dougherty wanted Local 98 member electricians to be installing. By contacting L&I officials, who responded to the councilman's contacts by initiating enforcement activity, Henon fulfilled his part of his corrupt agreement with Dougherty; that is, he used his influence to cause official acts to be carried out in return for the salary and other benefits he received from Local 98.

The L&I enforcement actions initiated in response to Henon's communications disrupted construction activities at various sites in Philadelphia and served to harass contractors, equipment installers, and building owners.  For example, Dougherty and Henon delayed and impeded the installation of MRI and MRI/PET machines at Children's Hospital of Philadelphia (CHOP) in the summer of 2015.  In July 2015, when Dougherty learned that a non-union company was installing an MRI machine at CHOP, he initiated efforts to frustrate the installation through various steps, including directing Henon to contact L&I.  L&I inspectors initially issued a stop work order (SWO) because the MRI installer lacked an

electrical permit.  When Dougherty later learned that the installation was again moving forward, he contacted Henon, stating, "You know, and then L&I went out and shut them down, and then somebody gave them the okay, they said, inside the system, today to go to work." Henon replied, "Oh really? Uh, well the other one, the other part was me, all right," telling Dougherty that he was responsible for initially shutting down the installation.  Henon added, "I'll walk over personally."

In August 2015, they did it again.  After Henon learned that another sophisticated medical system, this one an MRI/PET machine, was being installed at CHOP when a Local 98 business agent explained: "Doc just asked me to give you a call again about . . . The same thing as before.  The one we had that . . . thing down there . . . L&I. . . . Now we have GE down there doing the same thing, you know." Henon replied, "Send me the exact location again and, and, and, who it is.  This way I can just I can read what it is, only because I got my hands full. Write it down, too, and text it to me. Don't email . . . and then, and then, and then delete your email." When Henon later learned from the Local 98 official that the machine manufacturer was installing the MRI/PET, Henon said, "I'm gonna make the call [to L&I], you know …" Henon promptly contacted L&I Commissioner Williams about the installation. Williams directed employees to again inspect the CHOP facility.  On August 20, 2015, L&I issued a stop work order to the contractor.

The two SWOs issued by L&I officials complicated the efforts of CHOP officials to obtain a certificate of occupancy for the building that housed the machines.  L&I eventually resolved the confusion and issued the certificate of occupancy in October 2015, thus allowing CHOP to commence operation of the medical equipment after being unable to do so for approximately three months.

### B.  Henon Allows Dougherty to Influence the Comcast Franchise Agreement

At Dougherty's direction, Henon allowed Dougherty to demand concessions by Comcast during the franchise contract negotiations between the City of Philadelphia and Comcast. During 2015, Comcast, a cable service provider, was negotiating the terms of the renewal of a 15-year franchise agreement with the City of Philadelphia to provide cable service within the City.  The hearings on the agreement were held before the Public Property Committee of City Council, which was chaired by Henon.  Henon's committee, along with the Mayor's Office, was conducting the negotiations on behalf of Philadelphia.

The negotiations started in early 2015, and began in earnest in the Fall of 2015, involved numerous hearings of the Public Property Committee and meetings involving representatives of the Mayor's Office, the Philadelphia Office of Technology, Comcast officials, other members of City Council, and public interest groups.

In November 2015, nearing the completion of the new agreement, Henon and Comcast officials discussed and identified the remaining items on which they had not yet reached agreement.  One of the remaining items related to a request that was important to many members of City Council, which was funding for low-cost Internet service (Internet Essentials) for low-income families.

By the end of November, it appeared that the parties had an agreement in principle. On November 30, 2015, after hearing that the City and Comcast had reached a consensus on the franchise agreement, Dougherty made angry calls to a number of individuals, including codefendant Marita Crawford, and defendant Robert Henon, complaining that he had not been properly informed about the status of the negotiations by Henon, and reminding Henon, "[W]ithout an agreement from me? What the h***, that doesn't do me any good."

On December 2, 2015, the day before the Public Property Committee was scheduled to vote on moving the franchise agreement out of committee, Henon held a meeting in his Philadelphia City Council chambers with defendant John Dougherty and the Comcast employees who were negotiating the franchise agreement. No one who had been negotiating the agreement on behalf of the City of Philadelphia was present.  Henon allowed Dougherty to conduct the meeting.  After recounting how he had held up the prior negotiations fifteen years ago, Dougherty told the Comcast negotiators if Comcast did not agree to give certain fiber optic work to union contractors, the franchise agreement would not be approved by Philadelphia City Council.

During the course of the negotiations, Dougherty and Henon both suggested to Comcast that it should hire MJK Electric, a union contractor owned and operated by George Peltz, a close friend of Dougherty, for work in Philadelphia. One of the Comcast officials was even informed in November 2015 by Henon's Chief of Staff that if Comcast offered MJK a contract, it would help the negotiations move forward.  After the December 2 meeting described above, Dougherty asked Peltz to provide him with calculations to show how he would bid for the Comcast work he had just demanded.

The next morning, December 3, 2015, after talking to Henon about the meeting with Comcast the day before, reminded Henon, "Last time I checked, you weren't getting anything from Comcast." During another call with Dougherty a few minutes later, Henon told him, "I'm not gonna do it without us, right, you."

On December 3, 2015, Henon delayed the Public Property Committee vote so that he and Dougherty could meet privately with Comcast negotiators and provide them with the information he got from Peltz. At the meeting, Henon and Dougherty discussed the rate that

Comcast was willing to pay for work that Dougherty had demanded and intended to steer to MJK.  Later that day, after the private meeting with Comcast, Henon chaired the meeting of the Public Property and Public Works Committee and voted to present the franchise agreement to Philadelphia City Council for a final vote. On December 10, 2015, defendant Robert Henon voted in favor of the franchise agreement, and Philadelphia City Council approved the agreement.

During 2016, MJK Electric performed contract work for Comcast received more than $1 million in revenue from Comcast.

### C. Henon Drafts Towing Resolution at Direction of Dougherty

On September 22, 2015, after he had doubled-parked, and while his car was being towed, defendant John Dougherty repeatedly called a City official, described what was happening, and made the following requests and threats of retaliation against the tow truck drivers and towing company:

> Yeah, well, I'm, I'm, I'm telling you what, I'm gonna, this f***ing kid, they are f***ing dirt balls.  We are going to put a f***ing test, on for these guys, okay?
> I want you to get the guy to call this f***ing guy right now, to come give me the money back, before they pull away.
> I am going to f*** this guy. Listen, I am going to f*** these guys.  I am going to put them f***ing out of business.
> Well, well listen, listen. Tomorrow, I am going to Bobby Henon.  There will be a bill in Council next week, okay, to f*** [two towing companies]
> Well, Bobby, listen, Bobby Henon will put a bill in tomorrow, okay.

Dougherty then called defendant Robert Henon and told Henon that an employee of a towing company had tried to tow his car, forcing Dougherty to pay $200 in cash to the employee to get the car removed from the tow truck. Dougherty, angered at the employee's attitude, told Henon that "I think tomorrow, we f***ng put in a bill to certify, 'cause if they can rob me, they can try to rob anybody." Dougherty told Henon that "what we are going to do" is

- 9 -

put a bill through Philadelphia City Council that will require the drivers to go through training. Dougherty said, "Just tell them you have heard nothing but complaints," "just smoke 'em," and added that he does not "abuse government," but he did tell the tow truck driver who he was. Dougherty complained that the driver was unable to give him $10 in change, and "that $10 is going to cost their f***ing industry a bundle." Henon said he would put something together.

After speaking with Henon, Dougherty called a third party, to whom he described his encounter, and said he was "[t]rying to figure how I could f*** them, too . . . we will figure out how to f*** them, you know?"

On September 30, 2015, defendant Robert Henon caused a member of his staff to make a secret recording of the impound lot of the towing company, and to draft a resolution entitled, "Authorizing City Council's Committee on Licenses and Inspections to hold public hearings to investigate the operations of [the name of the company that towed Dougherty's car] in the City of Philadelphia for the purposes of protecting the general welfare and public interest of the residents of Philadelphia . . ."

### D. Henon Abuses Philadelphia City Council Position to Threaten Political Opponents of Dougherty

In advance of the May 2015 primary election, Henon threatened to propose soda tax legislation as retribution for a television ad that attacked defendant John Dougherty, which Henon, Dougherty and others believed was funded, in part, by the Teamsters.  Henon, Dougherty and others believed that the Teamsters union, as well as the Carpenters union, were behind the ad.

On May 13, 2015, the morning after the ad was televised Henon sent the following text messages to Dougherty:

- 10 -

I just saw the Carpenters and Teamsters commercial with you in it. I'm going to f*** them big time, just so you know.

I'm f***ing them !! They see the polls and know that nothing will change the outcome. I'm just so mad but..... I will be smart about it but there will be consequences.

Dougherty replied with the following text message:   ;)!

The day after the text messages HENON's staff met with a Philadelphia advertising agency to prepare materials, including a flyer and a script for a video, to promote his proposal for a soda tax.

Also on the morning of May 13, 2015, defendant Brian Burrows, the Local 98 President, called Dougherty and told him he had seen the ad, was angry, and that he thought the photo of Dougherty in the ad was bad.  Dougherty told Burrows that he believed the ad was run because of a dispute between the Carpenters, Teamster and electricians at the Convention Center that began in 2014.  Dougherty also told Burrows that the management of the Center should give no breaks to the Teamsters, and if they did, he would "shut the place down." Dougherty then told Burrows, "Let me tell you what Bobby Henon is going to do, and he is already talking Jimmy Kenney, they are going to start putting tax on soda again and that will cost the Teamsters a hundred jobs in Philly."

On May 27, 2015, Dougherty told another individual that, "Bobby Henon is going to present a bill that is going to tax the soda industry for education.  As a stick it up you're a** and they can't do nothing about it and Jimmy [Kenney] is for it.  And the Teamsters are going to get screwed . . ."

Henon never proposed a soda tax in City Council during 2015.

In 2016, at the request of the Kenny administration, Henon introduced the soda tax in City Council.  Between February and May 2016, defendants John Dougherty and Robert

Henon discussed how they could get the soda tax legislation passed, and Dougherty instructed Henon on what steps to take. On February 25, 2016, while discussing the soda tax, Dougherty stated that his goal was to help the current administration get the tax passed, "because we are getting way more out of [the current administration] than we ever got." On February 29, 2016, an official for the Teamsters Union called Henon and left the following voicemail: "I'm calling about the soda tax. I guess [another Teamsters official] already talked to you . . . I did talk to John [Dougherty] about it. It's gonna create a real problem for us, so I think we are going to have to oppose it, because we have a whole lot of new jobs coming here from Coke and Pepsi. They are building a new plant, that uh, by the way, is being built union. Let me know."

On April 16, 2016, Henon told Marita Crawford that he considered supporting the soda tax because of a letter to the editor of a local paper by a Teamster official that criticized Henon for supporting the soda tax because of the negative impact it would have on union labor. On or about June 16, 2016, defendant Robert Henon voted for the soda tax bill.

### E.  Henon Opposes Performance Audit of the Philadelphia Parking Authority (PPA) at the Request of PPA Officials and on the Advice of Dougherty

Defendant Henon is charged with using his position as a Philadelphia City Councilmember to oppose a resolution pending before City Council in return for free building materials for a home being renovated by his Chief of Staff. The resolution related to an audit of the Philadelphia Parking Authority (PPA). Two City Council members put the issue of a financial audit of PPA on City Council's legislative agenda because they had expressed concern over PPA's handling of contributions it was required to make to the City of Philadelphia.

The Board of PPA opposed the audit. PPA Official No. 2, the Chairman of PPA and head of the District Council 21 (the Glaziers Union), believed that one of the sponsoring

Councilmembers was politically motivated against the PPA.  As reflected in a series of recorded conversations, PPA Official No. 2 turned to Henon to spearhead the opposition to the audit.

On June 12, 2016, while discussing the audit resolution, Henon mentioned to PPA Official No. 2 that he was looking for a person who could install glass in a house that was being renovated by its owner, who was a close friend of Henon.  Subsequent conversations show that Henon agreed to use his Council position to influence other City Council members on the audit resolution. At a minimum, he agreed to deliver a message to other City Council members that if they voted for the audit, PPA Official No. 2 would see to it there would be no future patronage jobs at PPA for them and no future campaign contributions from District Council 21, the Glaziers' Union.  Henon also vowed to oppose the audit, a step that he recognized would be at odds with the public's interest.

On the morning of June 16, 2016, Henon told defendant John Dougherty about the resolution to audit PPA and asked, "How can I vote against an audit of the PPA when they have public money," and the City Council member who proposed the audit "is doing what I would do?" Dougherty directed Henon to oppose the audit, which would keep PPA Official No. 2 on his side.  Immediately after that conversation, Dougherty told defendant Marita Crawford to make sure defendant Robert Henon "shoots it down," so that PPA Official No. 2 and his allies remained on their side.

On June 16, 2016, the resolution was tabled in City Council.  Henon reported to PPA Official No. 2 on his efforts to defeat the audit resolution and continued to work behind the scenes to devise a strategy to defeat the audit.  PPA Official No. 2 updated Henon on progress he made in ordering glass for Henon's close friend. On June 30, 2016, with the resolution still

pending before City Council, PPA Official No. 2 told Henon that "we" (District Council 21) would pay for the glass and the homeowner would just have to pay for the labor.

A glass supplier delivered the glass to the home of Henon's close friend in August 2016, and created an invoice for all 27 panes of glass in the name of Henon's close friend, but addressed the bill to District Council 21's offices. The total cost for the glass according to the bill: $3,105.

On September 29, 2016, the audit resolution was voted down by voice vote in City Council.

### F. Henon Delays Legislation at the Request of Dougherty

The Philadelphia Plumbing Code (PPC) is a set of rules and regulations governing plumbing installations in the City of Philadelphia. Around 2015, there was a push to abolish the PPC and replace it with the International Plumbing Code (IPC).  The local plumber's unions opposed this, because they believed that the IPC was not suitable to plumbing installations in Philadelphia. Plumbers, including members of the Plumber's Union, working in Philadelphia were in favor of modernizing the existing PPC instead of adopting the IPC.

Defendant Robert Henon was aware of this debate, and attempted to use it on behalf of defendant John Dougherty.  On August 20, 2015, Henon asked Dougherty what he should do concerning the pending Plumbing Code legislation. After advising Henon that he should delay the legislation until the new administration took office in January 2016, Dougherty told Henon to use the legislation to help Dougherty be elected Business Manager of the Building Trades, which was an organization made up of unions representing various trades, such as electricians, plumbers, glaziers, and sheet metal workers. Dougherty stated that he believed the head of the

Plumbers Union was going to vote against Dougherty for Business Manager of the Building Trades.

During the call Henon agreed, at Dougherty's request, to introduce the International Plumbing Code, which he knew "the plumbers don't want," and then hold it, so the Plumbers had to go through him to get what they wanted. At the end of the conversation, Henon reminded Dougherty that "this is an us thing."

Immediately after that call, Dougherty called a Philadelphia elected official to give him notice that Henon was going to use the plumbing codes to leverage the head of the Plumbers Union, and not for any legitimate legislative purpose.

Defendant John Dougherty was running for Business Manager of the Building Trades, which the heads of the union locals elect.  In the days before the election, defendant John Dougherty and Marita Crawford directed Henon to call these union officials to influence their votes.  During one of these calls, Henon told a union official that if he was not going to vote for Dougherty, he should simply not show up for the vote.  He told another, after the official said he had promised his vote for Dougherty's opponent, that he should still vote for Dougherty, saying that, "I know you gave your word, right? . . . alright, you are going to feel like [ ] for a couple days but it's, it's the right decision."

On September 2, 2015, Henon told an elected state official that he was using the legislation concerning the plumbing and electrical codes as leverage for "internal trade politics" and "disguise it in the middle of everything" because the Plumbers Union was "against John [Dougherty] . . . you know, with the Building Trades."  That same day, Henon attended the meeting of the Building Trades at which defendant John Dougherty was elected Business Manager.

### G.  Dougherty and Henon Attempt to Conceal the True Nature of Their Relationship

During the trial, the government will prove that defendants John Dougherty and Robert Henon tried to disguise the true nature of their corrupt relationship.  One of the ways they attempted to do so is by drafting a proposed op-ed submission that falsely stated that, as of May 2015, Dougherty had only called Henon "four times in four years."  During a number of recorded conversations, however, Dougherty falsely told others, including City officials and employees of Local 98, that he only spoke to Henon a few times a year. Additionally, in November of 2015, codefendant Marita Crawford, who is charged on other counts, but is an unindicted coconspirator here, told a third party who was discussing Henon's possible run for Council Majority leader, that Henon would only do it "If John wants to do it.  Maybe John says, don't run for Majority, I don't know but . . . John is the boss, that's it . . . Not Bobby, nobody."

After federal law enforcement officers executed search warrants on multiple locations, including the offices of Henon and Local 98, on August 5, 2016, Dougherty asked multiple people to watch Henon, and told one of them to instruct Henon to "don't talk about anybody to anybody, about anything."

### H.  Honest Services Fraud and Federal Program Bribery – CWA Contributions to Henon

Defendant Robert Henon is charged with honest services wire fraud and federal program bribery, arising from his solicitation and acceptance of campaign contributions from the Communications Workers of America ("CWA").

The CWA represents a large percentage of the employees of Verizon, and in late 2015 and early 2016, Verizon and CWA were in labor negotiations.  Meanwhile, in late 2015,

Verizon was preparing to complete its multi-year "build out" of service availability under a franchise agreement with the City of Philadelphia. (That agreement required Verizon to have completed the build out by a date in late February 2016.) The government will prove that between September of 2015 and June of 2016, Henon took official actions in return for campaign contributions from CWA. The corrupt and explicit agreement between defendant Henon and the CWA's representative ("CWA Official No. 1") called for CWA to donate campaign monies to Henon, and for Henon to take official actions (including calling for a hearing before City Council) that would put pressure on Verizon during the labor negotiations with the CWA.

The official acts include a public hearing before City Council held on April 29, 2016. The payments by CWA consist of three checks – one for $3,000, and two for $5,000 each.

## III. EVIDENTIARY ISSUES EXPECTED TO ARISE AT TRIAL

### A. Defendants Cannot Elicit or Present Their Own Statements

At trial, the government will present recorded conversations of defendants Dougherty and Henon that were intercepted as part of the court-authorized Title III wiretap. The government will also introduce statements the defendants made to testifying witnesses. The statements of the defendants are admissible by the government as admissions of a party opponent under F.R.E. 801(d)(2).

The defendants, however, cannot elicit or admit their own prior statements, because they are hearsay; if offered by the defendants, they are not admissions of a party opponent. The defendants cannot present any exculpatory statements they made by playing recorded of the conversations that were made during the court-authorized Title III wiretap, by questioning witnesses called by the government on cross-examination, or by any means other than through

their own testimony.  *See United States v. Kapp*, 781 F.2d 1008 (3d Cir. 1986) (affirming

district court's ruling that tape recording of a conversation between a codefendant and

government informant that defendant considered exculpatory on the issue of his knowledge of

illegality was inadmissible because it was not offered "against a party" as required by Rule

801(d)(2)).  *See also United States v. McDaniel,* 398 F.3d 540, 545 (6th Cir. 2005) (emphasis

in original) ("Rule 802(d)(2) [ ... ] does not extend to a party's attempt to introduce his or her

own statements through the testimony of other witnesses" . . . to hold otherwise would allow

defendant to do "an end run around the adversarial process by, in effect, testifying without

swearing an oath, facing cross examination, or being subjected to first hand scrutiny by the

jury").

       In *McDaniel*, the Sixth Circuit upheld the district court's decision to preclude defense

counsel from eliciting statements the defendant made to a postal inspector who testified at trial.

Id.  Although the inspector testified on direct examination for the government about statements

the defendant made to her, the defendant could not question the inspector about other things the

defendant said to the inspector, because Rule 801(d)(2) does not permit a defendant to

introduce his or her own out-of-court statements. Id. at 544.

       Defendants cannot make an end-run around these hearsay rules by citing the Rule of

Completeness. For example, many of the recordings that the government will present at trial

have been redacted.  Portions of the conversations that are unrelated to the subjects discussed

in the portions that will be played have been redacted to make the presentation of the

government's case more efficient, and not confuse the jury.  In those instances, the defendants

cannot introduce the redacted portions of the conversations by citing the Rule of Completeness,

as set forth in Federal Rule of Evidence 106, which provides that "[w]hen a writing or recorded

statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." *United States v. Hoffecker*, 530 F.3d 137, 192 (3d Cir. 2008). In *Hoffecker,* the Third Circuit upheld, under Rule 801(d)(2), the exclusion of portions of an audiotape in which the defendant made exculpatory statements, even though the government had played a portion of the recording in its case-in-chief. The Court found that the Rule of Completeness did not compel a different result. *Id.* at 192.

This principle applies to both recorded conversations as well as witness testimony that contains statements of the defendants; even if only a portion of the conversation or statement is played or presented by the government, the defendants may not present their statements that were not introduced unless they testify. *See United States v. Lentz*, 524 F.3d 501, 526 (4th Cir. 2008) ("Rule 106 does not ... render admissible the evidence which is otherwise inadmissible under the hearsay rules, [n]or does it require the admission of self serving, exculpatory statements made by a party which are being sought for admission by that same party") (internal quotations and citations omitted); *United States v. Mitchell*, 502 F.3d 931, 964 (9th Cir. 2007) (defendant was properly precluded from eliciting, on cross-examination of government agents, exculpatory statements that he had made during interviews with agents, since those statements were inadmissible hearsay); *United States v. Rivera*, 61 F.3d 131, 136 (2d Cir. 1995) ("Rule 106 does not render admissible evidence that is otherwise inadmissible"); *United States v. Mahaffy*, 2007 WL 1094153, at *2 (E.D.N.Y. Apr. 10, 2007) ("A court may ... exclude any portion that consists largely of a defendant's own self-serving statements, which, as offered by him, are inadmissible hearsay") (internal quotations omitted).

Similarly, in *United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000), the court affirmed the district court's decision precluding the defendant from eliciting his own exculpatory statements on cross-examination of a law enforcement officer, holding that the defendant's statements were inadmissible hearsay. Id. at 682.  The court recognized that any other ruling would have allowed the defendant to put his own statements before the jury without having to take the stand himself – the precise situation the hearsay rule forbids.  Id. at 682.  In reaching its decision, the *Ortega* court distinguished the defendant's attempt to elicit his own exculpatory statements from the government's use of the defendant's inculpatory statements, noting that only the latter constitute "admissions by a party opponent and . . . therefore not hearsay," and noted that the Rule of Completeness did not apply.  Id. at 681-682.

The Third Circuit in *Hoffecker* identified a narrowly-drawn exception to the general rule that the defendants may not present their statements that were not introduced unless they testify.  In that case, the Third Circuit noted thatg additional portions of a recording may be played "if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) ensure a fair and impartial understanding." *Hoffecker*, 530 F.3d at 192 (citing *United States v. Soures*, 736 F.2d 87, 91 (3d Cir.1984) (citing *United States v. Marin*, 669 F.2d 73, 84 (2d Cir.1982)).  The Third Circuit cautioned that "[t]he Rule does not require introduction of portions of a statement that are neither explanatory of nor relevant to the passages that have been admitted." *Id. See Marin*, 669 F.2d at 84; *United States v. Bailey*, 322 F. Supp. 3d 661, 675 (D. Md. 2017) ("Neither Rule 106 nor the common-law rule of completeness is triggered unless some clearly identifiably unfairness would exist without allowing the party that would be prejudiced the opportunity to offer information that would clarify or explain").

- 20 -

That an omitted portion of a conversation merely deals with the same subject matter as a published portion is not enough.  In *Hoffecker*, the Court rejected a Rule 106 claim where the defendant sought to admit his statements from one conversation in order to explain his statements during another conversation, where the prior statements were not necessary to avoid misleading the jury or to ensure a fair and impartial understanding.  530 F.3d at 192.  If the defendants seek to introduce any of their prior statements under Rule 106, the defendants must specify the particular passages that they believe are necessary for purposes of Rule 106 completeness and, for each passage, set forth why the admission of the prior statements are necessary to avoid misleading the jury or to ensure a fair and impartial understanding.  *United States v. Price*, 516 F.3d 597, 604-05 (7th Cir. 2008) (As the party seeking to admit the additional evidence, [the defendant] must establish both that the evidence is relevant to the issues in the case and that it clarifies or explains the portion offered by the Government).

**B.  The Defendants Cannot Introduce Evidence of Prior Good Acts**

The government anticipates that the defendants may attempt to introduce evidence of specific prior good acts, or recorded calls that do not reflect any statements or conduct that supports the charges in the Indictment, to rebut the charges against them. This is impermissible character testimony.  A defendant is not permitted to introduce evidence of his or her own good behavior, or even behavior that is not criminal in nature, on other occasions to demonstrate a lack of criminal intent during the commission of the charged crime.

Evidence of good conduct is not relevant to negate criminal intent, and is merely an improper attempt to portray a defendant as a person of good character through the introduction of prior "good acts."  *See United States v. Ellisor*, 522 F.3d 1255, 1267 (11th Cir. 2008) (evidence of defendant's allegedly legitimate business activities was inadmissible in his mail

- 21 -

fraud prosecution because it did not bear on his intent to defraud with respect to the act in question); *United States v. Marrero*, 904 F.2d 251, 260 (5th Cir. 1990) ("The fact that Marrero did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment.").   Testimony by others about the defendants' good works is improper character testimony concerning specific instances of purportedly good conduct and should not admitted.

Moreover, the Third Circuit has concluded that evidence of an absence of other particular bad acts is irrelevant.  In *United States v. De Peri*, 778 F.2d 963 (3d Cir. 1985), for example, the court explained that "[e]vidence that not all vendors were extorted is irrelevant to the charge that defendants conspired to extort and did extort protection payments from certain vendors." 778 F.2d at 983–84; *Government of Virgin Islands v. Grant*, 775 F.2d 508 (3d Cir. 1985) (affirming lower court's refusal to allow a defendant to introduce testimony that he never previously had been arrested or charged with a crime).

The proposition that prior good acts of a public official or of the person who bribed the public official are not relevant in a criminal trial is well established. *See, e.g., United States v. Marley*, 2015 WL 3555793, at *3-*4 (11th Cir. June 9, 2015) (upholding trial court's decision to exclude evidence of good acts performed by defendant in fraud prosecution on the ground that "evidence of the defendant's good conduct is not admissible to negate his criminal intent"); *United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011) ("prior good acts performed by the defendants allegedly for the good of the United States" inadmissible under Rule 404); *United States v. Washington*, 106 F.3d 983, 999 (D.C. Cir. 1997) (upholding trial court's decision to exclude evidence regarding the defendant's "dedication, aggressiveness and assertiveness" as a law enforcement officer on the ground that those traits were "neither

'pertinent' to nor an 'essential element' of his supposed lack of predisposition to engage in the corrupt criminal activity with which he was charged"); *United States v. Nazzaro*, 889 F.2d 1158, 1168 (1st Cir. 1990) (upholding trial court's decision to exclude evidence of "commendations received by" the defendant "in military service and as a police officer" on the ground that "the traits which they purport to show…were hardly 'pertinent' to the crimes of which [the defendant] stood accused"); *United States v. Troutman*, 814 F.2d 1428, 1454 (10th Cir. 1987) (concluding that evidence that the defendant did not extort other companies was irrelevant to whether the defendant extorted a particular company as charged in the indictment); *United States v. Russell*, 703 F.2d 1243, 1249 (11th Cir. 1983) (upholding trial court's decision to exclude evidence that the defendant "was a good county commissioner" on the ground that "[e]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant").

The defendants' purported prior good acts are also inadmissible under Federal Rule of Evidence 405.  Rule 405 states, "When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of any opinion."  Thus, even if the defendants' prior activity as public officials were somehow related to a "pertinent trait"—which it is not—Rule 405 would permit evidence of that "pertinent trait" only in the form of testimony about the defendants' reputation or testimony in the form of an opinion about character, not in the form of specific prior good acts. *See United States v. McMahan*, 394 Fed. Appx. 453 (10th Cir. 2010) (upholding trial court's decision in bribery case to exclude evidence of specific instances when the defendant "refused to accept a questionable campaign contribution" or "did not provide favorable treatment to" the briber on the ground that the defendant's "attempt to employ evidence of specific instances of

prior conduct to circumstantially prove his lack of intent to commit state-law bribery is prohibited" by the Federal Rules of Evidence); *Warner*, 396 F. Supp. 2d at 942 (concluding that "[e]ven if" public official's "policy decisions were somehow relevant under Rule 404(a)(1)," pursuant to Rule 405 the "proper form of that evidence would be through reputation or opinion testimony," not through specific good acts undertaken as a public official). The defendants should not be permitted to distract the jury from the issue before it – whether the defendants are guilty of the charged conduct - by introducing evidence of other instances in which they purportedly did not violate the law. If the defendants wish to introduce character evidence, they must do so in conformance with Federal Rule of Evidence 405(a), which limits such evidence to testimony simply stating the witness's opinion of the defendants' honesty or law-abiding nature, or the witness's knowledge of the defendants' reputation for those two traits, without evidence of any specific instances of conduct.

Rule 404(a) includes a limited exception for criminal defendants, but that exception does not apply here.  Rule 404(a)(2) provides that a criminal defendant "may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it."  That exception does not apply in this case because the defendants' purported prior good acts are not relevant to any character trait that is "pertinent" to any of the charges against them.  As the federal courts have recognized, examples of prior good acts performed by a defendant public official are not "pertinent" to charges that the defendant on other occasions committed crimes from public office.

The government can rebut this evidence on cross-examination by inquiring into specific instances of the defendant's conduct.  See Fed. R. Evid. 405(a) ("On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the

person's conduct." (emphasis added)).   But the defendants cannot introduce evidence that they did not commit honest service mail fraud on occasions not charged in Indictment, just as a defendant accused of bank robbery cannot elicit testimony that he walked past numerous banks without robbing them, and just as a defendant in a homicide case cannot elicit testimony that he did not murder many of his other acquaintances. To do so would be to introduce impermissible evidence of specific alleged good acts in a case in which the defendant's character is not an essential element of any charge, claim, or defense.

### C.  The Government Can Question Character Witnesses About Specific Instances of Conduct, Including Past and Pending Allegations Against the Defendants.

Rule 405(a) allows only two methods of proving character - reputation and opinion. Reputation evidence is from a person who knows the defendant's reputation in the community. It is not the witness's own opinion, but his or her understanding of what the community (as described by the witness) thinks of the defendant.  Opinion evidence is the witness's own opinion about the defendant's character, which can come from a number of sources. Fed. R. Evid. 405(a).

A witness called to testify regarding a person's character for honesty or law-abiding nature may not testify about specific instances of good conduct on direct examination. *Id.* According to the Rule, however, "[o]n cross-examination, inquiry is allowable into relevant specific instances of conduct." *Id.*  Questions about specific instances of conduct, which would otherwise be impermissible, are allowed on cross-examination of a character witness for the purpose of testing the character witness's knowledge of the defendant's reputation in the community, or the witness's opinion of the defendant.

The cross-examination permitted by Rule 405(a) includes prior bad conduct by the defendant.  As the Supreme Court noted in *Michelson v. United States*, "The price a defendant

must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." 335 U.S. 469, 479 (1948) (cross-examination of character witness regarding 20-year-old conviction for violating the trademark laws and 27-year-old arrest for receiving stolen goods permissible); *see United States v. Evans*, 569 F.2d 209, 210 (4th Cir. 1978) (trial court did not abuse its discretion by allowing the prosecutor ask character witnesses whether they knew of the defendant's prior convictions for larceny, assault with a deadly weapon, and receiving stolen goods, and of his arrests for assault on female, failure to stop for a police vehicle, and driving 110 miles per hour in 55-miles-per-hour zone); *Government of Virgin Islands v. Roldan*, 612 F.2d 775 (3d Cir. 1979) (asking whether witness knew defendant had been convicted of murder permitted); *United States v. Lundy*, 416 F. Supp. 2d 325, 337 (E.D. Pa. 2005) (inquiry into charges which were dismissed or conduct for which defendant was acquitted is proper).

Under Rule 405(a), the government may inquire into relevant specific instances of conduct to show the jury that the direct testimony about the defendant's good character paints an incomplete picture. By pointing to instances of a defendant's misconduct, the government can discredit the defendant's character witnesses by showing that they are too biased or too uninformed to portray the defendant accurately. Therefore, on cross-examination, courts have regularly permitted prosecutors to ask the defendant's character witnesses if he has heard about, or if his opinion would be affected by, certain past instances of the defendant's misconduct, as long as the prosecutor has a good faith basis for his information. *See United States v. Glass*, 709 F.2d 669, 673 (11th Cir. 1983).

Cross-examination of a reputation witness can include questions "about conduct, and even about charges, which may have come to the attention of the relevant community." *See United States v. Curtis*, 644 F.2d 263, 268 (3d Cir. 1981). These questions merely determine whether the information has come to the witness's attention. If the witness has not heard of specific acts inconsistent with his testimony for reputation, a jury may find the witness is too uninformed or the testimony is a fabrication. If the witness has heard of inconsistent acts and still believes the reputation is good, the jury may find that the witness's standard for good character is too low.

In this case, the government would be permitted to ask character witnesses called by John Dougherty if they were aware that, in March 2021, the defendant was indicted for conspiracy to commit extortion and extortion against a union electrical contractor, involving force and violence, and threats of violence and economic harm, to have the contractor continue to employ and pay defendant Dougherty's nephew, Gregory Fiocca for services not performed, and to have the contractor's owners, agents, and employees forego any attempt to hold Fiocca accountable and monitor his work performance, even after Fiocca allegedly assaulted a member of Local 98.

Likewise, the government would be permitted to question character witnesses called by John Dougherty if they were aware that, in January 2021, he was accused in a Civil Complaint filed by the U.S. Department of Labor of calling a candidate who was considering running for a Local 98 office, and telling him, "It'll be a long three years if you lose," which the prospective candidate perceived Dougherty's statement as a threat of losing jobs.

Cross-examination of an opinion witness should focus on what the witness knows, to test the accuracy of and basis for the favorable opinion. In *Curtis*, the Third Circuit noted that,

when the character witness testifies to an opinion, "relevant cross examination is only that which bears on the fact or factual basis for formation of the opinion." In addition, because an opinion witness testifies as to his or her present opinion, inquiry into any specific instance of conduct up to that moment when the opinion witness gives his testimony is permissible. *See United States v. Furst*, 886 F.2d 558, 577 (3d Cir. 1989).

Following this type of cross-examination, "the defendant is entitled to a limiting instruction to the effect that the prior bad act testimony does not bear on the defendant's propensity to commit such crimes again." *Government of Virgin Islands v. Roldan*, 612 F.2d 775, 781 (3d Cir. 1979) (trial court did not commit plain error by failing to give an instruction where defendant did not request one). *See also United States v. Apfelbaum*, 621 F.2d 62, 64 (3d Cir. 1980) (emphasizing importance of limiting instructions).

The Court may limit the number of character witnesses, which is a common practice and has been held to be within the trial court's discretion. *United States v. Gray*, 105 F.3d 956, 963 (5th Cir. 1997) (affirming district court's decision to limit defendant to two character witnesses and noting that "[t]his court has repeatedly allowed a maximum of three character witnesses"); *United States v. Johnson*, 730 F.2d 683, 688 (11th Cir. 1984) (affirming district court's decision to limit number of character witnesses to three); *United States v. Koessel*, 706 F.2d 271, 275 (8th Cir. 1983) (affirming district court's limit of three character witnesses); *United States v. Henry*, 560 F.2d 963, 965 (9th Cir. 1977) (district court did not abuse its discretion in limiting a defendant to two character witnesses).

### D. Admissibility of Co-Conspirator Statements

At trial, the government intends to present co-conspirator statements, principally through the intercepted telephone calls and in-person meetings of the defendants. The

government will offer this evidence, in part, to establish the existence of a criminal conspiracy. Federal Rule of Evidence 801(d)(2)(E) provides that "a statement made by a co-conspirator of a party during the course and in furtherance of that conspiracy" is not hearsay and may be admitted as evidence against a co-conspirator. In order for a court to admit the co-conspirator statement, the government must prove that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, (3) the statement was made in the course of the conspiracy; and 4) the statement was made in furtherance of the conspiracy. *United States v. Bourjaily*, 483 U.S. 171, 175 (1987); *United States v. McGlory*, 968 F.2d 309, 333 34 (3d Cir. 1992); *United States v. Gambino*, 926 F.2d 1355, 1360 (3d Cir. 1991). In making a preliminary factual determination as to the existence of a conspiracy and the defendant's participation in it, courts may consider the offered hearsay statement itself. *Bourjaily*, 483 U.S. at 180 81. "[T]here is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." *Id.*; *see also McGlory*, 968 F.2d at 334. The district court should consider the totality of the circumstances when deciding the admissibility of such evidence. "The circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement is made, or evidence corroborating the contents of the statement," should be considered by the trial court. See Fed. R. Evid. 801(d)(2) (Advisory Committee Notes); *United States v. Traitz*, 871 F.2d 368, 399 (3d Cir. 1989). When determining the admissibility of a co-conspirator statement, the existence of the conspiracy and the party's participation in that conspiracy need only be proved by a preponderance of the evidence. *Bourjaily*, 483 U.S. at 175.

Although casual conversations between co-conspirators are inadmissible, statements that, among other things, maintain cohesiveness and convey information relevant to conspiratorial objectives are in furtherance of the conspiracy and admissible under Rule 801(d)(2)(E). *Traitz*, 871 F.2d at 399.

The Third Circuit has commented that the "in furtherance" requirement is to be given a broad interpretation. *United States v. Gibbs*, 739 F.2d 838, 843 (3d Cir. 1984); *United States v. DePeri*, 778 F.2d 963, 981 (3d Cir. 1985). Although the "during the course of" and "in furtherance" requirements do not overlap entirely, they are closely related. *United States v. Ammar*, 714 F.2d 238, 253 (3d Cir.1983). While mere narratives of past events or mere idle chatter that has no current purpose are not generally deemed to occur in furtherance of the conspiracy, statements that "provide reassurance, serve to maintain trust and cohesiveness among co conspirators, or inform each other of the current status of the conspiracy" further the conspiracy. *Id.*, at 252; *see United States v. Harris*, 908 F.2d 728, 737 (11th Cir. 1990); United States v. *Hudson*, 970 F.2d 948, 958 59 (1st Cir. 1992). For example, statements which are relevant to the distribution of the proceeds of the conspiracy are considered in furtherance of the conspiracy. *Ammar*, 714 F.2d at 253. In order for statements to be deemed "in furtherance of the conspiracy," they need not actually "further" the conspiracy; it is sufficient that a statement was intended to promote the conspiracy, even if it did not actually do so. *See United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993); *United States v. Mayes*, 917 F.2d 457, 464 (10th Cir. 1990).

The trial court may admit statements pursuant to the Rule even if the statements relate to a conspiracy not charged in the indictment. *United States v. Ellis*, 156 F.3d 493, 497 (3d Cir. 1998); *United States v. Trowery*, 542 F.2d 623, 626 (3d Cir. 1976). The rationale for this rule is

that the co-conspirator provision in Rule 801(d)(2)(E) is merely a rule of evidence founded on the theory "that a person who has authorized another to speak or act to some joint end will be held responsible for what is later said or done by his agent . . ." *Trowery*, 542 F.2d at 626.

### E.  Motion to Preclude Jury Nullification Arguments

The government anticipates that the defendants may try to convince the jury to acquit not because the government failed to prove the charged crimes, but rather because a guilty verdict would be contrary to one's sense of justice, morality, or fairness.  Because any attempt to encourage so-called "jury nullification" would be irrelevant and unfairly prejudicial, the government respectfully moves the Court to preclude any such arguments by the defendant.

"[A] juror who refuses to deliberate or who commits jury nullification violates the sworn jury oath and prevents the jury from fulfilling its constitutional role."  *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006).  As the Second Circuit has explained:

> Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court—in the words of the standard oath administered to jurors in the federal courts, to "render a true verdict according to the law and the evidence."  We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent.

*United  States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) (citation omitted; emphasis in original); *see also United States v. Scarmazzo*, 554 F. Supp. 2d 1102, 1108 (E.D. Cal. 2008) ("A jury may not substitute its views that are contrary to the law by abdicating the duty to follow the law as stated by the judge.").  Accordingly, "[n]either a [d]efendant nor his attorney has a right to present evidence that is irrelevant to a legal defense to, or an element of, the crime charged."  *Scarmazzo*, 554 F. Supp. 2d at 1108; *see also United States v. Navarro-Vargas*, 408 F.3d 1184, 1198 (9th Cir. 2005) (noting that courts have "uniformly rejected" requests for jury nullification instructions) (citing cases); Fed. R. Evid. 401, 403, 403.

Because "trial courts have the duty to forestall or prevent such conduct," *Thomas*, 116 F.3d at 616, the government in this case respectfully requests that this Court preclude the defense from introducing evidence or making any arguments encouraging the jury to render a verdict in the defendant's favor based on anything other than the assertion that the defendant is not guilty of the crimes with which he is charged in the Indictment based on the evidence adduced at trial. Such improper arguments would include, but would not be limited to, contentions that: (1) defendants are being selectively prosecuted; (2) government should not enforce laws regarding campaign finance because it chills free expression; or (3) there is too much government regulation of campaign finance.

Indeed, the issue of nullification is particularly salient in a case like this where jurors may be more susceptible to, or more easily led astray by, these types of arguments.  For example, some jurors may be more susceptible to improper suggestions or arguments by the defendant that corrupt practices with respect to campaign contributions are so widespread and so deeply-ingrained that the defendants should not be held accountable where bribery is a "necessary evil."  Not only are such arguments highly dubious as a matter of fact and policy, they are improper as a matter of law.

Based on a letter defendant Dougherty submitted to the Department of Justice, the government believes Dougherty may argue he has been selectively prosecuted. The Court should preclude the defendants from arguing to the jury selective prosecution.  Defendant's reference to political motivations underlying this case suggest that he or other defendants may try either to introduce evidence at trial regarding the motivations of the government in pursuing this investigation or to argue to the jury that the defendants should be acquitted because of those motivations.

As the Supreme Court has plainly stated, "[a] selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). "In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id.* at 464 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)).

Accordingly, claims of selective prosecution must be raised before trial and resolved outside the presence of the jury. As the Third Circuit has explained, the "question of discriminatory prosecution relates not to the guilt or innocence of" the defendant, "but rather addresses itself to a constitutional defect in the institution of the prosecution," and therefore under Federal Rule of Criminal Procedure 12(b)(2) "'may be raised only by motion before trial.'" *United States v. Berrigan*, 482 F.2d 171, 175 (3d Cir. 1973) (quoting Fed. R. Crim. P. 12(b)(2)). Neither Dougherty nor Henon has filed any such motion. Therefore, the Court should not permit the defendants to introduce evidence regarding the motivations of the government in bringing this case.

### F.  Use of Summary Charts as Substantive Evidence

To further promote an efficient presentation of the evidence and to aid the jury in understanding the voluminous records relevant to the defendant's schemes, the United States may seek to introduce charts into evidence that accurately summarize recorded telephone calls, emails and texts under Federal Rule of Evidence 1006. The Rule provides that "[t]he proponent

may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. With respect to the underlying records that support the summary exhibit, Rule 1006 requires the proponent to "make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." *Id.* Additionally, "the court may order the proponent to produce them in court." *Id.*

The government intends to present charts which summarize Robert Henon's activities during two-week periods of time in August 2015, November 2015, and June 2016, based on a review of the following items:1) telephone calls; 2) emails; 3) text messages, 4) calendars; and 4) meeting transcripts for Philadelphia City Council and Council Committees.  The analysis demonstrates that Robert Henon's activities were almost exclusively related to the performance of his City Councilman duties.

Under the Rule, parties are permitted "to use charts or other exhibits to summarize voluminous materials if a summary would be helpful to the jury." *United States v. Bansal*, 663 F.3d 634, 668 (3d Cir. 2011). The Rule's "purpose . . . is to provide a practicable means of summarizing voluminous information." *United States v. Hevener*, 382 F. Supp. 2d 719, 729 (E.D. Pa. 2005) (internal quotation marks omitted). The district court retains broad discretion in determining whether records are sufficiently voluminous or complex to qualify for admission under Rule 1006. *See, e.g., Bansal*, 663 F.3d at 668 (3d Cir. 2011); *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 299 (3d Cir. 1961). Notably, "Rule 1006 does not require that it be literally impossible to examine all the underlying records before a summary chart may be utilized, but only that in-court examination would be an inconvenience." *United States v.*

*Onque*, 169 F. Supp. 3d 555, 574 (D.N.J. 2015) (alteration and internal quotation marks omitted), aff'd, 665 F. App'x 189 (3d Cir. 2016).

Once the requisite foundation is provided, a Rule 1006 summary may be admitted into evidence and go to the jury like any other admitted exhibit. *See, e.g., United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013); *United States v. Faulkenberry*, 614 F.3d 573, 588 (6th Cir. 2010); *United States v. Janati*, 374 F.3d 263, 272–73 (4th Cir. 2004). Because a Rule 1006 summary is itself evidence, no limiting or cautionary instruction is generally required. *See, e.g., United States v. Williams*, 264 F.3d 561, 575 (5th Cir. 2001) ("A summary chart that meets the requirements of Rule 1006 is itself evidence and no instruction is needed."); *United States v. Bray*, 139 F.3d 1104, 1111–12 (6th Cir. 1998) (concluding that the district court was not required to give a limiting instruction when it admitted in evidence charts under Rule 1006). It bears mention, however, that Rule 1006 does not require the summary preparer to be made available to testify. *United States v. Lynch*, 735 F. App'x 780, 786 (3d Cir. 2018).

## G. Admissibility of Both Sides of Intercepted Conversations

The statements of second or third parties contained in intercepted conversations of the defendants are properly admitted to place the defendants' statements in context. *See United States v. D'Arco*, 1991 WL 235934 (N.D. Ill. 1991). "Nor can a defendant, having made admissions, keep from the jury other segments of the discussion reasonably required to place those admissions into context." *McDowell*, 918 F.2d at 1007. *See also United States v. Stelten,* 867 F.2d 453, 454 (8th Cir. 1989) (court found that statements of a third party which were on a tape recorded conversation between defendant, an undercover agent and the third party were admissible to ensure completeness and intelligibility of the defendant's admissions which were on the tape); *United States. v. Gutierrez-Chavez*, 842 F.2d 77, 81 (5th Cir. 1988); *United States*

*v. Price*, 792 F.2d 994, 996-7 (11th Cir. 1986); *United States v. Whitman*, 771 F.2d 1348,

1351-52 (9th Cir. 1985); *United States v. Murray*, 618 F.2d 892, 900 (2d Cir. 1980) (statements

by a third party contained on tape recorded conversations between a third party and a defendant

are not hearsay when they are not offered for the truth, but offered to ensure the completeness

and intelligibility of the defendant's admissions; once properly authenticated the tape recorded

conversations are admissible).

                                              Respectfully submitted,

                                              JENNIFER ARBITTIER WILLIAMS
                                              Acting United States Attorney

                                              MICHELLE MORGAN
                                              Assistant United States Attorney
                                            Chief, Corruption & Labor Racketeering Section

                                              /s/ Frank R. Costello, Jr.                
                                              RICHARD P. BARRETT
                                            FRANK R. COSTELLO, JR.
                                            BEA WITZLEBEN
                                            Assistant United States Attorneys

Dated: October 3, 2021.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this date, I electronically filed the foregoing trial memorandum with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants, who are identified below.

Henry Hockeimer and David Axelrod
Counsel for Defendant John Dougherty

Brian McMonagle
Counsel for Defendant Robert Henon

Thomas Bergstrom
Counsel for Defendant Brian Burrows

Joseph Capone
Counsel for Defendant Michael Neill

Fortunato Perri
Counsel for Defendant Marita Crawford

Paul Hetznecker
Counsel for Defendant Niko Rodriguez

Nina Spizer
Counsel for Defendant Brian Fiocca

William Brennan
Counsel for Defendant Anthony Massa

/s/ Michelle L. Morgan
MICHELLE L. MORGAN
Assistant United States Attorney

Dated: October 3, 2021.