**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 2:19-cr-0064 |
| v. | : | |
| | : | : |
| JOHN DOUGHERTY and | : | |
| ROBERT HENON | : | |
| | : | |

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANT
JOHN DOUGHERTY FOR JUDGMENT OF ACQUITTAL**

**I.      INTRODUCTION**

"The issue is Mr. Henon's employment and everybody knows that."  (Costello, F. 4:13-14 (Tr. Day 8 (Oct. 15, 2021)).

"[T]he relevant timing in a bribery case is that of the agreement."  *United States v. Menendez*, 291 F. Supp. 3d 606, 620 (D.N.J. 2018) (*a stream of benefits case*) (emphasis added). The government must prove "that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return*."* *United States v. McDonnell*, 136 S. Ct. 2355, 2371 (2016) (*also a stream of benefits case*) (emphasis added).  "Indeed, without a requirement that an official promise to influence a particular question or matter, any official who accepts a thing of value and then later acts to the benefit of the donor, in any manner, could be vulnerable to criminal prosecution." *United States v. Silver*, 948 F.3d 538, 558 (2d Cir. 2020) (*also a stream of benefits case* where *quid* included fees earned from client referrals and intent was evaluated from time referral arrangement was entered) (emphasis added).

There has never been a case like this.  **Never**.  There has never been a case where the Government has based a bribery prosecution on a public official's ***pre-existing lawful employment***.  **Never**.  There has never been a prosecution where a public official legally received a thing of value then, mid-stream and without any evidence or explanation for this metamorphosis, that very same thing of value morphed into an illicit *quid* in a bribery scheme. **Never**.

To send this case to the jury, the Court must accept that John Dougherty – ***personally***, because this is a criminal prosecution and guilt can only be established from the Defendant's ***personal*** conduct – made salary payments to Robert Henon in 2015 to influence him to take official action even though the facts unequivocally establish that Brian Burrows gave Mr. Henon that salary in 2012.  In other words, the Court must accept the legal fiction that a corrupt agreement centered on Mr. Henon's employment and salary can be inferred from conduct in 2015 by rejecting the actual, literal facts that an actual, literal agreement centered on Mr. Henon's employment and salary was entered three years earlier.  While there are two options, there is no choice.  The Court cannot possibly permit the Government to present such a misleading and disingenuous premise to the jury.  A case that never should have been brought cannot be permitted to go forward.[1]

Although the Government artfully pled that Mr. Henon received a salary during the time of the charged conspiracy, it knew and "everybody knows," the central questions for the jury and the Court now that the facts, not allegations and not the Government's "theory", control are: when did John Dougherty – personally – give Mr. Henon this thing of value and when did Mr. Henon first accept it.  This is so because bribery prosecutions (including those under the stream

---

[1]    This was argued during on Defendants' motion to dismiss and is particularly evidence not that the Government has presented its case to the jury.

of benefits theory) arise from – and this one falls on – the central element of a *quid pro quo*; that the briber gave a thing or things of value and the public official accepted a thing or things of value ***knowing at the time of this exchange*** that the thing of value is for the public official's performance of "official action."  And the *quo* contemplated by the Defendants at the time of the *quid pro quo* must meet the definition of "official action" set forth by the Supreme Court, which requires the Defendants have contemplated "specific and focused" matters on which the public official would later take some action at the time of the agreement.  Under the applicable standards and actual facts, there was never any possibility the Government could prove guilt here and it, predictably, has not.

Under Supreme Court precedent and every case that is binding on this Court, the Government must prove that the Defendants possessed the requisite intent to influence and be influenced, respectively, at the time the *quid pro quo* – the agreement to exchange a thing or things of value (*quid*) for (*pro*) official action (*quo*) – was formed.  And, until today, the Government has benefitted from, first, a probable cause standard on the Grand Jury's approval of the Indictment and, second, myriad presumptions and inferences on Defendants' Motion to Dismiss, to avoid confronting the reality that the giving and receipt of the alleged *quid* – "Mr. Henon's employment" – predated the actions taken by Mr. Henon described at trial and outlined in the Indictment (the *quos*) by three years.  Consequently, the Government has benefitted from procedural standards to avoid until now that it must prove beyond a reasonable doubt the *pro*: that "Mr. Henon's employment" was given and accepted ***in 2012*** with the specific intent to influence "official action" – as defined in *McDonnell* – in 2015 and 2016.  We raised many of these arguments on our Motion to Dismiss and the Court, properly, found the Government was

entitled to put on its evidence before the legal sufficiency of its case could be evaluated. The Government has now concluded its case and its case unquestionably fails.

We describe herein multiple legal flaws with the Government's case that must prevent its presentation to the jury. But, the most glaring is the most fundamental. The Government has offered no evidence – none – to prove that Mr. Henon's employment was given and accepted with the specific intent to influence the "official action" described at trial. Indeed, in trying to excuse its own failure of proof by repeatedly explaining it was not up on a wire from 2012 to 2015, the Government only admits and highlights that it has no such proof. Yet, the *quid pro quo* evidence the Government was unable to acquire from 2012 to 2015 is the keystone of every bribery prosecution and its utter and complete absence here means the Government has utterly and completely failed to prove the existence of a *quid pro quo* agreement and, therefore, its honest services fraud theory. The jury may not be permitted to guess what occurred in 2012 and why. And, the Government is no longer permitted to avoid the facts and the law. The Government's failure to even attempt – let alone succeed – to prove a *quid pro quo* under the applicable standards set forth by the Supreme Court means the Government has failed to present sufficient evidence to sustain a conviction here. Thus, the Court must enter judgment of acquittal.

## II.  <u>STANDARD OF REVIEW</u>

Rule 29 of the Federal Rules of Criminal Procedure provides that, upon motion of a defendant, a district court "must enter judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The Court must grant the motion and enter a judgment of acquittal 'of any offense for which the evidence is insufficient to sustain a conviction.'" *United States v. Pawlowski*, 351 F. Supp. 3d 840, 848 (E.D. Pa. 2018) (quoting Fed. R. Crim. P. 29) (granting in part Defendant's Rule 29 motion). In

ruling on a motion pursuant to Rule 29, a district court "must determine whether any rational trier of fact could have found proof of the defendant's guilt beyond a reasonable doubt based upon the available evidence presented at trial."  *United States v. Lenegan*, No. 07-CR-689, 2009 WL 1587468, at *2 (E.D. Pa. June 4, 2009) (citing *United States v. Smith*, 294 F.3d 473, 478 (3d Cir. 2002)).  Viewing the evidence as a whole and in the light most favorable to the government, *United States v. Hoffecker*, 530 F.3d 137, 146 (3d Cir. 2008), a judgment of acquittal should be entered "if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt."  *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987); *see also United States v. Salmon*, 944 F.2d 1106, 1113 (3d Cir. 1991) (noting that a court must "determine whether a reasonable jury believing the government's evidence could find beyond a reasonable doubt that the government proved all elements of the offenses"); *United States v. Fattah*, 223 F. Supp. 36 336, 342 (E.D. Pa. 2016) (same).

## III.   DISCUSSION

### A.   The Government Has Failed to Prove the Defendants Engaged in a *Quid Pro Quo*

An official who merely accepts a thing of value in an otherwise legal manner (*e.g.* client referrals, as permitted under New York law) has not committed a crime.  If that official later acts to the benefit of the payor, she still has not committed a crime.  It is only upon a showing that, at the time the official accepted the payment, she understood it to be a payment in exchange for official influence on some specific, focused, and concrete matter[2] involving the formal exercise of governmental power that the Government has met its burden.

*United States v. Silver*, 948 F.3d 538, 577 (2d Cir. 2020).

---

[2]     *See* Section B below for the definition of "official act" under McDonnell and how this definition clarifies and narrows the Defendants' requisite intent.

The Second Circuit spoke from the perspective of a public official charged with bribery, but the flipside is also plainly true: providing a public official an otherwise legal thing of value is not a crime. *United States v. Sawyer*, 85 F.3d 713, 741 (1st Cir. 1996) (reversing convictions where the court failed to instruct the jury that a lobbyist did not commit honest services wire fraud after paying for officials' meals, taking legislators golfing, and providing other entertainment "if his intent was limited to the cultivation of business or political friendship"); *see also United States v. Bryant*, 655 F.3d 232, 245 (3d Cir. 2011) (explaining that a "key passage" in the district court's jury instructions included: "[N]ot every payment made to a public official constitutes a bribe. A payment made in a general attempt to build goodwill or curry favor with a public official, without more, does not constitute a bribe"). Doing so and later benefiting from some official action is still not a crime. *See United States v. Kemp*, 500 F.3d 257, 281 (3d Cir. 2007) (distinguishing illegal *quid pro quo* bribery from "a mere intent to curry favor" because "there is a critical difference between bribery and generalized gifts provided in an attempt to build goodwill"); *United States v. Lynch*, 807 F. Supp. 2d 224, 232 (E.D. Pa. 2011) (vacating honest services wire fraud conviction when information failed to allege "any intent on the part of [the payor] with respect to specific actions at the time of the improper payment").

"[F]or bribery, there must be a *quid pro quo* – a specific intent to give or receive something of value in exchange for an official act." *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404-05 (1999). To establish a *quid pro quo*, the Third Circuit has held that the Government must prove that "the payor provided a benefit to a public official intending that he will thereby take favorable official acts that he would not otherwise take." *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012) (stream of benefits case). In turn, as concerns the

public official, the Government must prove that "the official accepted those benefits intending, in exchange for the benefits, to take official acts to benefit the payor." *Id.*

The *pro* in *quid pro quo* – established through evidence the defendants possessed the relevant intents described above – is the lynchpin of bribery. *See United States v. Sun-Diamond Growers*, 526 U.S. 398, 404-05 (1999) ("In other words, for bribery there must be a *quid pro quo* – a specific intent to give or receive something of value *in exchange* for an official act.") (emphasis in original); *see also United States v. Bryant*, 556 F. Supp. 2d 378, 391 (D.N.J. 2008) ("Thus, the 'specific intent to . . . receive something of value in exchange for an official act' is another way of stating that the official had an intent 'to be influenced in an official act.'") (quoting *id.*)). The government must prove "that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return*." United States v. McDonnell*, 136 S. Ct. 2355, 2371 (2016). *See also United States v. Menendez*, 291 F. Supp. 3d 606, 615 (D.N.J. 2018) (quoting *United States v. Ganim*, 510 F.3d 134, 146 (2d Cir. 2007)) ("'[I]t is the requirement of an intent to perform an act in exchange for a benefit—*i.e.*, the *quid pro quo* agreement—that distinguishes those crimes from both legal and illegal gratuities.'"). In other words, the Government must prove that at the time the *quid* was given, both parties understood it was in payment for *quos* – the performance of official action. *United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007) (The key to whether a payment "constitutes a bribe is whether the parties intended for the benefit to be made in exchange for some official action"). "***Without proof of corrupt intent on the payor's part, a bribery conviction is impossible***." *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) (emphasis added).

It did not take four weeks of testimony to arrive at this point.  The Government's theory is that John Dougherty gave Mr. Henon a job at Local 98 and Mr. Henon accepted a job at Local 98 in exchange for Mr. Henon taking action on the six matters outlined in the Indictment. The Government explicitly stated that the *quid* in this case is "Mr. Henon's employment."  The Government expanded on this, explaining their theory is that "Mr. Dougherty pretty much ran the show," (Costello, F. 6: 15-15 (Tr. Day 8 (Oct. 15, 2021)), thus it proffers that Mr. Dougherty can be held personally responsible for Mr. Henon's employment.  This is the heart of the Government's case.  The question, then, is simple: Did Mr. Dougherty subjectively intend "Mr. Henon's employment" to influence Mr. Henon to "take favorable official acts that he would not otherwise take," *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012); and did Mr. Henon accept his employment "intending, in exchange for the benefits, to take official acts to benefit the payor," *id*.?  These questions, and, thus, the Government's entire case, hinge on the Defendants' intent at the time "Mr. Henon's employment" was given and received, which according to the Government's evidence occurred in 2012.

To establish the giving and receipt of the *quids* alleged – Mr. Henon's salary and benefits – the Government proffered the testimony of Don Judge, Local 98 bookkeeper.  (Tr. Day 8 (Oct. 15, 2021)).  Mr. Judge essentially placed an exact date on that critical event: February 20, 2012 when he received from Brian Burrows, Local 98 President, direction to begin providing Mr. Henon a salary based on 20 hours of work per week and benefits calculated from 27 hours of work per week.  (Id. 34:19 – 36:4).  As an initial matter, the Government not only failed to prove that John Dougherty "gave" Mr. Henon the alleged *quid*, it proved definitively that he did not, Brian Burrows did:

Q. Okay.  Well, let's talk about your style for a minute.

A. Okay.

> Q.  So, would your style be to confirm that that directive indeed came from Mr. Burrows?
>
> A.  Yes.  In other words, to confirm or be comfortable as best I can.

(Id. 37:14-20)

Mr. Judge later confirmed Mr. Dougherty was not involved in this decision-making:

> Q.  And so that note indicates that you received this direction from Brian Burrows, correct?
>
> A.  That's right.
>
> Q.  Brian, who you said was Brian Burrows?
>
> A.  That's correct.
>
> Q.  And he is the President of Local 98?
>
> A.  Yes.
>
> Q.  So, you didn't receive this direction from Mr. Dougherty regarding the change that occurred in 2012, correct?
>
> A.  ***I did not.***

(*Id*. at 59:16 – 60:1).

This testimony alone eviscerates the Government's premise that Mr. Dougherty gave Mr. Henon the alleged bribe.  "[A]n individual may not be convicted on the basis of another person's acts which he neither authorized nor adopted."  *United States v. Cryan*, 490 F. Supp. 1234, 1242 (D.N.J. 1980) (holding that co-defendants could not be convicted for bribery where they had no involvement in the execution of the bribery scheme).  *See also United States v. Williams*, 203 F. App'x 976, 988 (11th Cir. 2006) (explaining that mere association is not enough to establish criminal liability).

Setting this basic deficiency aside, and assuming for sake of argument only that Mr. Dougherty can be held responsible for Mr. Henon's employment, we merely arrive back at the fundamental flaw in this case: Mr. Dougherty can be held responsible for Mr. Henon's salary **_only_** based on the initial decision to give it to him, which occurred in 2012.  Thus, did Mr. Dougherty intend "Mr. Henon's employment," in 2012, to constitute a bribe?  The Government has provided no evidence whatsoever to establish the Defendants' intent in 2012.  There are no facts to describe, discuss or distinguish.  No testimony to examine and parse.  No documentation to scrutinize.  The Government has proffered **_nothing_** to address this question, which lies at the heart of this prosecution.

As expected, the Government has trotted-out the general bribery principle that bribery's "*quid pro quo* requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor."  *United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007).  *See also United States v. Davis*, No. 15-138-1, 2018 U.S. Dist. LEXIS 155755, at *8 (E.D. Pa. Sep. 12, 2018) (noting that under a stream of benefits theory, the government need not show "that each *quid*, or item of value, be linked to a specific *quo*, or official act.").  However, for the Court to accept that premise it must make two decisions that flagrantly contradict the evidence: First, it must ignore that there is no pattern of payments and official action from which to draw such an inference because of the three-year period during which Mr. Henon received the *quids* – salary and benefits – and performed no *quos* – official actions.  Thus, there was no pattern from which a jury could infer an agreement.  Never has a Court permitted a prosecution with this kind of temporal gap.  Accordingly, to allow this case to proceed, the Court must accept as the Government pretends that the weekly payments to Mr. Henon from January 2012 to May 2015

did not happen.  Second, it must conclude that John Dougherty personally gave Mr. Henon his salary payments or authorized them during the alleged conspiratorial timeframe.  Without making both of these decisions, the Court cannot accept the Government's argument.

As to the latter, the evidence shows that Mr. Dougherty had nothing whatsoever to do with Mr. Henon's salary, whether in 2015 or 2012.  All salary payments were automatic deposits made directly from Local 98 to Mr. Henon's bank account through automaticly scheduled ACH deposits that were set-up no later than in 2012 and with which Mr. Dougherty had nothing whatsoever to do:

> Q.  Agent Capra, you discussed the manner in which funds were deposited into Mr. Henon's account, correct?
>
> A.  Correct.  His personal bank account.
>
> Q.  Correct.  And you said that they were electronically deposited into his bank account, correct?
>
> A.  Correct.
>
> Q.  So, that's direct deposit, right?
>
> A.  Correct.
>
> Q.  What many people use to have the funds automatically transferred, right?
>
> A.  That is correct.
>
> Q.  And that's an automated process, right?
>
> A.  Correct.  That's automated.  Usually when you start a job, they'll say how to you want to get paid.  Yes.
>
> Q.  That's right.  So when – now Councilman Henon, but when Mr. Henon in 2003 and started with Local 98, he set up a direct deposit?
>
> A.  I don't know exactly when he set it up, but I do know during – he had direct deposit.

Q.  We can agree then that in 2012 when he became a Councilmember, his funds were directly deposited into his account, correct?

A.  That's correct.

Q.  Which means that nobody was sitting at a computer actually pushing a button to send him money every week for his paycheck, right?

A.  Someone at Paychex is doing what they do.  I don't know specifically.  I'm not trying to not – I don't know the process.

Q.  I appreciate that.  But it's somebody at Paychex, correct?

A.  Correct.

Q.  It's not Mr. Dougherty, right?

A.  Correct.

Q.  So Mr. Dougherty is not sitting at a computer and actually sending the funds to Mr. Henon or Councilman Henon every week, right?

A.  Correct.

(Capra, L. 88:19 – 90:8 (Tr. Day 8 (Oct. 15, 2012)).

*Contra United States v. Bryant*, 655 F.3d 232, 241-42 (3d Cir. 2011) (Defendant's three years of fraudulent employment payments and subsequent cover-up of payments was evidence of intent to enter into *quid pro quo* bribery).  Even if John Dougherty originally authorized the establishment of this automatic payment system three years prior to the events outlined in the Indictment – and he didn't, Brian Burrows, Local 98 President and Mr. Judge did – that fact would mean there is no temporal link between his authorization of those payments in 2012 and Henon's actions in 2015 and 2016 and, thus, no inference that John Dougherty subjectively intended for those payments to influence Mr. Henon's charged actions in 2015.  Subjective intent cannot be imputed to John Dougherty from the automated actions of a computer program.  *See*

*also United States v. Feldman*, 338 F.3d 212, 216 (3d Cir. 2003) (affirming district court's determination that intent could be inferred from the defendant's own actions).

        As to the former point, this theory completely ignores the three-year time period during which the *quid* was given and there were no alleged official actions given in return. ***Three years***. *United States v. Silver*, 948 F.3d 538, 556 (2d Cir. 2020) (Stream of benefits case. "The relevant point in time in a *quid pro quo* bribery scheme is the *moment at which the public official accepts the payment*.") (internal quotations omitted) (emphasis in the original).  In other words, because the Government has not and cannot prove that there was a bribery arrangement from 2012 to 2015, a jury cannot infer that the Defendants possessed the relevant intent in 2012 for Mr. Henon's employment to influence his actions in 2015 and 2016.  *See id; see also United States v. Menendez*, 291 F. Supp. 3d 606, 614-15 (D.N.J. 2018) (Stream of benefits case.  "The Government has always been required to prove that a public official agreed to perform an official act at the time of the alleged *quid pro quo*.") (internal quotations omitted).

        There is no possible formulation of facts and law that would permit the jury to find that John Dougherty personally bribed Robert Henon with his Local 98 employment.

    **B.**    **Even if the Government Had Produced Any Evidence of Intent during the Relevant Timeframe, they Have Not Provided Evidence that the Defendants Contemplated Official Action As Defined By *McDonnell***

        To be clear, the Government proffered no evidence whatsoever of the Defendants' state of mind in 2012 and for that reason, this case cannot go any further.  Accurately applying the Supreme Court's decision in *McDonnell* narrowing the definition of "official action" to the intent requirements illustrates that the Government could have never conceivably met its burden.  Under *McDonnell*, the "question, matter, suit, proceeding or controversy" upon which the public official would later take some action or make some decision must have been "specific and focused" ***at the time*** of the *quid pro quo*.  Therefore, under *McDonnell* – a stream of benefits

case – the Government cannot sustain a conviction here against Mr. Dougherty unless it proves

beyond a reasonable doubt that Mr. Dougherty intended *at the time of the* **quid pro quo** to

influence Mr. Henon to take some action or make some decision on the six "specific and

focused" "questions or matters"[3] alleged in the Indictment.  Similarly, the Government cannot

sustain a conviction here against Mr. Henon unless it proves beyond a reasonable doubt that he

accepted a job at Local 98 in 2012 knowing *at the time of the* **quid pro quo** that it was given to

him with the intent to influence his actions on the six "specific and focused" "questions or

matters" alleged in the indictment.

Prior to *McDonnell*, the Government could and did rely on broader and vaguer

conceptions of "official action" to encompass "*any* decision or action, on *any* question or matter,

that may at *any* time be pending, or which may by law be brought before *any* public official, in

such official's official capacity."  *McDonnell*, 136 S. Ct. at 2367 (emphasis in original); *See, e.g.*,

*United States v. Ozcelik*, 527 F.3d 88, 97 (3d Cir. 2008) (affirming jury instructions, pre-

*McDonnell*, that defined an "official act" as "**_any_** decision or act on **_any_** question or matter which

at **_any_** time may be pending or which may by law be brought before any public official in his or

her capacity or in his or her place of trust. The term . . . 'official act[]' includes the decisions or

actions generally expected of a public official.").  Under this pre-*McDonnell* formulation, so long

as a briber made payments to a public official with the intent that the public official would take

**any** action in his official capacity on **any** question or matter that may arise at some point in the

future, the government could establish the requisite intent. *See Fattah, 914 F.3d at 154*; *Ozcelik*,

---

3       Those "questions or matters" are: (1) the legality of the installation of MRI machines at
        CHOP; (2) whether to support legislation concerning the International Plumbing Code;
        (3) whether to support the Soda Tax; (4) negotiation of the Comcast Franchise
        Agreement; (5) whether to introduce a towing-related resolution; and (6) whether to
        support an audit of the Philadelphia Parking Authority.

527 F.3d at 97.  *McDonnell* fundamentally changed this because "any" "official action" has been replaced with action on "specific and focused" questions or matters.  *Silver*, 948 F.3d at 555 ("The Supreme Court, citing concerns that the 'standardless sweep' of this definition could 'subject [public officials] to prosecution, without fair notice, for the most prosaic interactions,' found these instructions to be inadequate.  It explained that, in order to 'avoid[] this 'vagueness shoal," a narrower definition of "official act" was necessary.") (internal citations omitted).

In *McDonnell*, the Supreme Court unequivocally rejected the Government's broad conception of "official action," by narrowing and defining with precision what Defendants must have contemplated at the time of the alleged *quid pro quo*.  *Id*. at 2373.  *See also, Silver*, 948 F.3d at 553 (holding that under *McDonnell*, bribery prosecutions require more than a nonspecific promise to undertake official action on any future matter beneficial to the payor).

The *McDonnell* Court explained that "official action" has two components.  First, the government must "identify a 'question matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may be law be brought' before a public official."  136 S. Ct at 2368 (quoting 18 U.S.C. § 201(a)(3)).  Second, the government "must prove that the public official made a decision or took an action '*on*' that question, matter cause, suit, proceeding, or controversy, or agreed to do so."  *Id.* (emphasis added).

A "question, matter, cause, suit, proceeding or controversy," must be "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee."  *Id.* at 2372.  Importantly, the Court explained that "it must also be something *specific and focused* that is 'pending' or 'may by law be brought before a public official.'"  *Id.* (emphasis added); *see also id.* at 2374 (noting that the "'question matter cause suit proceeding or controversy' must be more specific and focused than a

broad policy objective.").  The Court further described it as "something that is relatively circumscribed – the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete."  *Id.* at 2369.

Second, the government must demonstrate that the public official "made a decision or take an action *on* that question or matter, or agreed to do so."  *Id.* at 2370.  Not every decision or action "customarily performed by a public official, such as the myriad decisions to refer a constituent to another official," however, constitutes an "official act."  *Id.* at 2371.  Where the government alleges that the public official influenced another public official to act, it must demonstrate that the official used his "position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official."  *Id.* at 2372.  Indeed, the Court in *McDonnell* was clear – "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so) – without more" does not constitute and official act.  *Id.*

*McDonnell* fundamentally altered the intent required to support a bribery conviction because the requisite intent for both briber and public official require the Defendants contemplate at the time of the *quid pro quo* that the benefit was given in exchange for "properly defined" "official action."  *Id.* at 2375 (jury must find defendant "agreed to make a decision or take an action on a properly defined 'question, matter, cause, suit, proceeding or controversy").  Indeed, the Supreme Court emphasized that the relevant point in time in a bribery scheme is the moment the public official accepts the payment.  *Id.* at 2365 ("[T]he offense is completed at the time when the public official receives a payment in return for his ***agreement to perform <u>specific acts</u>***.") (emphasis added).  As noted above, the requisite intents are that: "the payor provided a benefit to a public official intending that he will thereby take favorable official acts that he would

not otherwise take," and "the official accepted those benefits intending, in exchange for the

benefits, to take official acts to benefit the payor."  *United States v. Wright*, 665 F.3d 560, 568

(3d Cir. 2012).  Properly defining "official action" according to *McDonnell* in each standard

results as follows:

- Payor: "provided a benefit to a public official intending that he will thereby ["make a decision or take an action *on"* "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee" that "must also be something ***specific and focused*** that is 'pending' or 'may by law be brought before a public official"] that he would not otherwise take.

- Public Official: accepted those benefits intending, in exchange for the benefits, to ["make a decision or take an action *on"* "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee" that "must also be something ***specific and focused*** that is 'pending' or 'may by law be brought before a public official"] to benefit the payor.

In other words, because, as the Supreme Court emphasized, the relevant time-

period in a bribery prosecution is the moment the *quid pro quo* was formed, the Defendants must

have contemplated "properly defined" "official action" at that moment, which involves some

action on "specific and focused" questions or matters.  *Id*. at 2374.

Here, under *McDonnell*, the Government is required to prove that at the time Mr.

Dougherty and Mr. Henon agreed to the alleged *quid pro quo* – which, as discussed above, as a

factual matter could have occurred only in 2012 – they both contemplated that the Mr. Henon

would take some action on the "specific and focused" "questions or matters" alleged.  *See, e.g.,*

*Silver*, 948 F.3d at 569 (for bribery prosecution, Government must prove that, "at the time the

bribe was accepted [the public official] agreed to take official action on a specific and focused

question or matter").

The Government cannot plausibly dispute this application of the Supreme Court's unequivocal words.  Indeed, from the perspective of the public official, the Second Circuit parsimoniously set forth this analysis, concluding:

> *McDonnell* thus stands for the proposition that bribery requires that an official accept a payment, knowing that he is expected to use his office to influence a "focused," "concrete," and "specific" question or matter that "may be understood to refer to a formal exercise of governmental power. . . . And, absent a promise, there is no *quid pro quo*.

*Silver*, 948 F.3d at 557.  Because the Second Circuit's decision merely applied the Supreme Court's definition of "official action" to the intent required of a public official, there is no meaningful reason why the same analysis does not produce the same result when applied to the requisite intent of the briber because it also requires contemplation of "official action."

To the extent the Government contends the Defendants need not have contemplated "specific and focused" questions and matters at the time of the *quid pro quo*, it necessarily argues that the Defendants did not contemplate "official action" as "properly defined" by the Supreme Court.  In other words, the Government is certain to argue that an agreement to take official action on ***any*** "question or matter" that arises in the future satisfies the *quid pro quo* requirement.[4]  However, this position is squarely at odd with the Supreme Court's

---

[4]    As the Second Circuit explained: "This point is illustrated in the context of this case by considering the following example:  An official accepts a bribe, stating to the payor that she will 'take official acts as the opportunities arise.'  In other words, the official has promised to take – as the opportunities arise – 'any decision or action on any question, matter, cause, suit, proceeding or controversy [that] may be pending,' 18 U.S.C. § 201(a)(3) (emphasis added), a promise so vague as to be meaningless.  The official has not agreed to take official action on a properly defined – i.e. docused, concrete and specific – question or matter.  The official has failed to offer a quo.  Absent any additional specificity, criminal liability could attach to any later action the official takes so long as the official is exercising some ability granted to him or her by law, regardless of the fact that the official essentially promised nothing in return for the payment." *Silver*, 948 F.3d 557.

explicit language that the official must promise to act on "specific and focused" questions or matters *"at the time when the public official receives a payment in return for his **agreement to perform specific acts**." Id.* at 2465.  As the Second Circuit held, under *McDonnell*, "for an official to promise to perform an official act – and thereby engage in the prohibited *quid pro quo* – the official must promise to act on an identified 'question, matter, cause, suit, proceeding, or controversy' at the time of the promise."  *Silver*, 948 F.3d at 556.

The Supreme Court's explanation for why such a limitation on bribery prosecutions is not only necessary but vital to our system of government could have been written for this case:

> In the government's view, nearly anything a public official accepts – from a campaign contribution to lunch – couns as a quid; and nearly anything a public official dos – from arranging a meeting to inviting a guest to an event – counts as a quo.

> But conscientious public official *__arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time__*.  The basic compact underlying representative government assumes that public officials will hear from their constituents and act appropriately on their concerns – whether it is the union official worried about a plant closing or the homeowners who wonder why it took five days to restore power to their neighborhood after a storm.  The Government's position could cast a pall of potential prosecution over these relationships *__if the union had given a campaign contribution in the past or the homeowner invited the official to join them on their annual outing to the ballgame.__*  Officials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse.  This concern is substantial.

> …

> A related concern is that, under the Government's interpretation, the term 'official act' is not defined '*__with sufficient definiteness that ordinary people can understand what conduct is prohibited,__*' *__or 'in a manner that does not encourage arbitrary and discriminatory enforcement__*.'  Under the standardless sweep of the Government's reading, public officials could be subject to

prosecution, without fair notice, for the most prosaic interactions. 'Invoking so shapeless a provision to condemn someone to prison for up to 15 years raises the serious concern that the provision does not comport with the Constitution's guarantee of due process.  Our more constrained interpretation of § 201(a)(3) avoids this 'vagueness shoal.'

The Government's position also raises significant federalism concerns.  A state defines itself as a sovereign through 'the structure of its government, and the character of thse who exercise government authority.'  That includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents.  Here, where a more limited interpretation of 'official act' is supported by both text and precedent, ***we decline to 'construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards' of 'good government for local and state officials***.'"

*McDonnell*, 136 S. Ct. at 2372-73.

The Supreme Court could not have described and predicted against the Government's overreach in this case any clearer or with more precision had it sat through this trial.

The Government has offered no evidence that the Defendants contemplated at the time "Mr. Henon's employment" was given and accepted the six "specific and focused" questions and matters alleged because no such evidence could possibly exist under the Government's theory.  Four alleged questions or matters involve purely spontaneous issues, which the Defendants could not have conceived of in advance: (1) the legality of the installation of MRI machines at CHOP; (2) the towing resolution; (3) the Parking Authority Audit; and (4) the Plumbing Code legislation.  The Soda Tax legislation emerged as an issue only after Mayor Kenney was elected to office in 2016.  And, concerning the Comcast Franchise Agreement, while it arguably was capable of advance consideration, the Government has not presented a single piece of evidence that the Defendants did contemplate Mr. Henon taking some action on the Comcast Franchise Agreement when he accepted his job at Local 98 in 2012.  Accordingly,

the Government has not – because it could not – produced any evidence that the Defendants understood Mr. Henon's employment was in exchange for some action on these six "specific and focused" questions or matters. The Government has, therefore, failed to prove the Defendants possessed the requisite intent to sustain convictions here.

      **C.**      **Each Alleged "Official Act" Fails for Various Reasons.**

          **1.**      **Children's Hospital of Philadelphia**

The Government's comments during argument reveal a stunning disregard for the holding of McDonnell. Repeatedly, the Government invokes generalized "influence" and generalized "pressure" and general conduct engaged in by Mr. Henon by virtue of his position. The Government repeatedly and by necessity acts as if McDonnell was never decided and its unwillingness to accept the legal reality under McDonnell is no more apparent than in its theory regarding CHOP. Grappling with the fact that it failed to produce evidence to satisfy the applicable standards, the Government made precisely the argument squarely rejected by the Supreme Court:

> Mr. Barrett: Let me just jump in on that. He [Mr. Henon] has a certain position on City Council. He is a person who is in charge of the L&I review committee on City Council. So he is familiar with that, and that uniquely positions him uniquely to advise, as he does regularly with L&I, to do things. And that's our view of what is occurring here. That is the advising that is reference in the McDonnell language.

(Tr. Trans. 130:12-19) (Oct. 28, 2021)).

The Government could not have more thoroughly eviscerated its own case if it tried.

Obviously, as described above, the ability to generally advise a committee is not an official action. Under McDonnell, the "specific and focused" "question, matter, cause, suit, proceeding or controversy" is the compliance of Children's Hospital of Philadelphia (CHOP) contractors with all applicable Philadelphia codes and regulations with respect to the installation

of the subject MRI machines.  The "decision" or "action" on that "question" or "matter" is the

decision to inspect the work sites in July and August 2015.  Under McDonnell, "[s]etting up a

meeting, hosting an event, or calling an official . . . does not qualify as a decision or action on the

pending question." *McDonnell*, 136 S. Ct. at 2371.  For the Government to prove the CHOP

allegations, it must prove that Mr. Henon "exert[ed] pressure on another official [to inspect the

CHOP machines] or provide[d] advice, knowing and intending such advice to form the basis for

[the decision to inspect the CHOP machines." *Id*.  The government unquestionably ahs failed to

meet this burden as it has not established that Mr. Henon used his position to pressure L&I

officials to conduct the July or August inspections.

With regard to the July incident, not only did Mr. Henon not pressure L&I to do

anything, he did not do anything whatsoever to bring about that inspection.  The evidence

conclusively established that James Dollard, Local 98's safety coordinator did so on July 20,

2015.  *See* JD-017.  In response to this complaint, on July 21, 2015, L&I Inspector Peter DeLisi

inspected the MRI installation, issued violations and a stop work order.  JD-043.  CHOP Project

Manager, James Hanson, independently decided to ignore the stop work order and complete the

installation on July 22, 2015.  *See* 10/7/2021 Tr., Hanson, 256: 17-257:1; *see also* JD-036.

There, the story of the July MRI machine ends.  Indeed, while the government introduced a call

between Mr. Henon and Mr. Dougherty in which Mr. Henon states "I'll walk over personally"

after Mr. Dougherty complained the July installation continued, the Government failed to

establish the following: (1) "walk over" where?; (2) to do what?; (3) to speak with whom?; (4) to

say what?  Walking over somewhere is obviously not an official act.  And, of course, as this

conversation occurred on July 22, 2015 after the installation had already concluded, the answers

to these questions – which the Government never provided – are ultimately irrelevant anyway.

Concerning the August MRI installation, the evidence established that Local 98 Business Agent Bob Bark contacted Mr. Henon to complain that improper electrical work was being performed at CHOP, as is his Constitutional right. Former L&I Commissioner Carlton Williams testified that Mr. Henon called him to report an issue at CHOP regarding an unlicensed contractor installing an MRI. 10/12 Tr., Williams, 45:15-23; *see also* JD-044 (Williams directing L&I inspectors stating "[p]lease see complaint below and investigate and take appropriate action."). Under McDonnell, what Mr. Henon said and did on that call determines whether this scenario included "official action." To that question, Commissioner Williams was unequivocal – Mr. Henon provided information. Mr. Williams did not testify that Mr. Henon pressured him to conduct an inspection, nor did he testify that Mr. Henon advised him to do so. The evidence is unequivocal: Mr. Henon provided information.

Moreover, and more fundamentally, it was Councilman Henon's job responsibility to forward complaints to the appropriate agency or official when received. It, therefore, is not possible to conclude that Mr. Dougherty paid Mr. Henon a bribe to forward legitimate complaints to L&I actions that "he would not otherwise take." *Wright*, 665 F.3d at 568. The Government has conclusively failed to carry its burden here.[5]

---

[5]    Moreover, the government bases these counts on Dougherty's constitutionally protected right to petition government. *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) (explaining that the right to petition is one of "the most precious of the liberties safeguarded by the Bill of Rights.") (internal citation and quotation marks omitted); *see also Mirabella v. Villard*, 853 F.3d 641, 653 (3d Cir. 2017) ("Petitioning serves numerous, fundamental interests of petitioners and the government alike. It is 'essential to freedom,' liberty and self-government. As such, to safeguard First Amendment protections, like honest services cases alleging that campaign contributions were impermissible bribes, the government must meet a heightened burden. *See United States v. Davis*, 841 Fed. App'x 375, 379 (3d Cir. 2021) ("[A] campaign contribution becomes an illegal bribe 'only if the payments are made in return for an *explicit* promise or undertaking by the official to perform or not perform an official act.'") (emphasis added) (quoting *McCormick v. United States*, 500 U.S. 257, 273 (1991)); *United States v.*

2.        **The PPA Audit and the Plumbing Code**

Here, the government alleges that the "question, matter, cause, suit, proceeding or controversy" is the audit of the Philadelphia Parking Authority (PPA) and the rules and regulations that govern plumbers operating in the city of Philadelphia.  The "decisions" or "actions" on that "questions" or "matters" are the decisions that Mr. Henon made with respect to two pieces of legislation that affected these issues.  The Government simply has not met that burden with regard to either of these issues.

Post-*Skilling*, the Government must demonstrate that "the payor provided a benefit to a public official intending that he will thereby take favorable official acts *that he would not otherwise take.*"  *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012) (emphasis added).  In *United States v. Menedez*, 291 F. Supp. 3d 606 (D.N.J. 2018), the district court elaborated upon this requirement, noting that this inquiry is relevant to whether the defendant payor had the "requisite intent to commit bribery."  *Id*. at 619.  With regard to both the PPA Audit and the Plumbing Code, it is clear that Mr. Henon was the individual who contemplated taking action, not Mr. Dougherty, and simply sought advice from Dougherty regarding what action to take.  *Id*.  *See also United States v. Reichberg*, 5 F.4th 233, 247 (2d Cir. 2021) (holding that honest services fraud conviction required the payor to understand  "that the public official was expected, as a result of the payment to exercise *particular* kinds of influence as *specific* opportunities arose") (internal formatting omitted); *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) (explaining that "it is sufficient [for a bribery conviction] to show that the

*McGregor*, 879 F. Supp. 2d 1308, 1312 (M.D. Ala. 2012) ("Because campaign contributions implicate significant First Amendment rights, courts have fashioned heightened standards of proof to ensure that protected political activity is not criminalized or unduly chilled.").  Thus, such activity cannot be criminalized absent an explicit *quid pro quo*, which the government has failed to establish with regard to Dougherty's actions with regards to the violations of the Philadelphia City Code that were reported.

payor intended for each payment to induce the official to adopt a specific course of action" and that a *quid pro quo* exists if "payments were made with the intent of securing a specific *type* of official action or favor in return).

Further fatal to the Government's case with regard to these allegations, is the fact that Mr. Henon *never took any action* with regard to either subject matter.  With regard to the Plumbing Code, the Government contends that the "official act" that Mr. Henon took was that he introduced and then sat on legislation to modernize the Plumbing Code.  Indictment at ¶¶ 57-58.  However, what the evidence demonstrates is that Mr. Henon never introduced the plumbing code at any point in time from May 2015 through August 2016 (or after).  *See* 31-179; 31-176; 31-184.

Similarly, with regard to the PPA Audit, Councilmember Henon was not the individual responsible for taking the official action on the resolution.  Rather, it was Council President Clarke who tabled the resolution.  *See*  G-310.

### 3.     The Comcast Franchise Agreement

As a threshold matter, although the Government has spent extensive time at trial establishing that Mr. Dougherty participated in two meetings on December 2 and 3, 2015, these meetings as a matter of law are not sufficient to establish that Mr. Henon took an official act.  *See McDonnell v. United States*,136 S. Ct. 2355, 2368 (2016) ("setting up a meeting, calling another public official, or hosting an event does not standing alone qualify as an 'official act.'").  Moreover, each witness who testified about these meetings – Kathleen Sullivan, Mark Reilly, and Tom Holroyd – noted that there were no explicit demands that were made during those meetings.  Rather, Mr. Dougherty was expressing his desire to get jobs for members of the Building Trades unions.  *See* 10/20 Tr., Sullivan, 45:10-17, 10/19 Tr. (Reilly)115:15-22.

Therefore, as a matter of law, these meetings are insufficient to establish that Mr. Henon took an official action.

Nor is Mr. Henon's action in calling for a recess of the Public Property Committee on December 2, 2015 or voting to approve the Comcast Franchise Agreement official acts. As the Chair of the Public Property Committee, Mr. Henon's action in recessing the meeting to later that day was merely a ministerial act that does not rise to the level of "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee" to constitute an official act. *McDonnell v. United States*, 136 S. Ct. 2355, 2372 (2016).

### 4. Soda Tax

With regard to the Soda Tax, the Government contends that the "question, matter, cause, suit, proceeding or controversy" is the consideration of legislation taxing sugary drinks, also referred to as the "Soda Tax." The Government's theory has evolved in the years since the Indictment was unsealed, and now, it is twofold. First, the Government asserts that in May 2015, the "decision" or "action" on that "question" or "matter" was Mr. Henon's decision to have his staff "work with a Philadelphia advertising agency to prepare materials, including a flyer and a script for a video, to promote his proposal for a soda tax." (Indictment p. 126 ¶ 31.). Second, the Government asserts that Mr. Henon took a second "decision" "in June 2016, when he voted in favor of the Soda Tax. (Indictment p. 127 ¶ 40). The Government has not, however, established at trial an official act sufficient to convict either Mr. Dougherty or Mr. Henon.

As a threshold matter, producing a commercial is obviously not a "decision or action" on legislation. Moreover, the evidence demonstrates that a Soda Tax has been contemplated by various City officials on numerous occasions, including twice under Mayor Michael Nutter's administration. *See* 10/7 Tr. (Blake) 45:21-24. Indeed, with regard to Soda

Tax 1, the evidence demonstrates that Mr. Henon began researching whether imposing such a tax would be advantageous to the City *in April 2015*. *See* 10/7 Tr. (Horvath) 177:4-8; RH 007. After conducting this research, Mr. Henon initiated efforts to create promotional materials to promote the soda tax, including a commercial and literature, in early May 2015. Although the Government asserts that these efforts were taken at the behest of Mr. Dougherty after the Teamsters created and aired a commercial critical of Mr. Dougherty, the evidence demonstrates that that commercial aired *after* Mr. Henon took these actions in May 2015.

Further fatal to the charges related to "Soda Tax 1" is that the materials that Mr. Henon created in support of the soda tax in May 2015, *none of which were ever used*, were all funded by Mr. Henon's campaign; no governmental funds were used. *See* 10/7 Tr. (Horvath) (158:11-20). Therefore, these materials and Mr. Henon's actions associated with creating them, cannot form the basis of an honest services charge, and judgment of acquittal must be entered with regard to Count 104.[6]

With regard to Soda Tax 2, the evidence demonstrates that the tax was strongly supported by Mayor Jim Kenney, who sought to introduce the bill as his first major piece of legislation. *See* 10/18 Tr. (Byzon) 52: 12:24 (testifying that Mayor Kenney included the need for a Soda Tax in his first budget address). Mr. Henon independently thought that the Soda Tax was a "good idea." 10/7 Tr. (Horvath) 182:7-9. And, to increase the chances of the Soda Tax passing in 2016, members of the Kenney administration lobbied Mr. Henon for his support for the tax. Thus, the Government has not demonstrated, as it must, that this was an action that Mr. Henon – a pro-labor councilmember at heart, who supported the Kenney Administration – would otherwise not have taken. *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012).

---

[6]     Soda tax legislation was not introduced at any point in 2015.  10/7 Tr. (Horvath) 161:16-21.

Further, even if the Government were able to show that Mr. Dougherty believed that Mr. Henon would not have otherwise supported the Soda Tax in the Spring of 2016 – which is belied by Mr. Henon's early and independent decision to create materials in support of the tax in early May 2015 – the Government has failed to demonstrate that Mr. Dougherty acted with the requisite intent to influence Mr. Henon to vote in favor of the tax in June 2016.  Rather, Mr. Dougherty's own words indicate that he supported the tax in the spring of 2016 as a way of supporting his friend, pro-labor Mayor Kenney.  *See* 70963; *see also* 10/15 Tr. (Grace) 123:9-11. In fact, it was Mayor Kenney's administration that *engaged Mr. Dougherty* to help ensure that the tax would pass. JD-193; *see also* 10/14 Tr. (Lazer) 121:5-16.  The Kenney administration did so, because it believed that to get the soda tax passed, it was essential that labor supported the proposal.  10/14 Tr. (Lazer) 121:5-8; *see also id.* at 126:8-10 (Deputy Mayor Lazer testifying that he though "one of the main reasons the bill was not successful in the prior administration,[was that] *it did not have labor support*." (emphasis added)).   Thus, Mr. Lazer contacted Mr. Dougherty, on behalf of the Kenney administration to schedule a meeting with the Mayor and Mr. Dougherty to discuss "strategy on how [the Administration] would move the bill." 10/14 Tr. (Lazer) 126:2-13.  After that meeting, in an attempt to ensure that the tax would pass, Mr. Dougherty arranged and attended a meeting with key members of the Kenney administration and representatives of Coca Cola and "local soda mogul," Harold Honickman. *See* JD-193.  *Mr. Henon did not attend this meeting.*  10/19 Tr. (Blake) 42:19-22.

Therefore, because the Government has not met its burden with regard to Soda Tax 1 and 2, judgment of acquittal must be entered with regard to Counts 98, 104, and 108.

### 5.    Towing

With regard to the towing-related charges, Government contends that the "question, matter, cause, suit, proceeding or controversy" is the review of towing practices

within the City of Philadelphia.  The Government asserts that in May 2015, the "decision" or "action" on that "question" or "matter" was Mr. Henon's decision to have an intern draft a non-binding resolution that called for hearings regarding a company's towing practices within the City of Philadelphia.  However, the Government has failed to establish that this constitutes an official act.

The evidence demonstrates that Mr. Dougherty had his car towed on the night of September 22, 2014.  A week later, on September 29, 2015, Mr. Henon's Chief of Staff directed an unpaid intern, Tom Holroyd, to investigate the towing practices of the company that towed Mr. Dougherty's car.  10/19 Tr. (Holroyd) 230:5-9; 10/19 Tr. (Holroyd) at 79:8-16.  As part of that investigation, Mr. Holroyd traveled to George Smith Towing, where he witnessed firsthand violations of the Philadelphia City Code regarding cash payments to tow truck operators.  10/19 Tr. (Holroyd) 83:17-22.  The Chief of Staff also directed Holroyd to draft a resolution calling for hearings on this towing company's business practices.  10/19 Tr. (Holroyd) at 79:17-25.  Ultimately, however, the towing resolution was never introduced to City Council and no official action was ever taken upon it.  *See* 10/19 Tr. (Holroyd) at 89:25-90:9.  Moreover, given that Mr. Holroyd was an unpaid intern, and therefore, was not an employee of the city at the time he took these action, it cannot be said that his actions are sufficient to establish that Mr. Henon took an official action at Mr. Dougherty's request.  Therefore, judgment of acquittal must be entered with regard to the towing resolution related counts of the Indictment.

Moreover, the evidence presented at trial demonstrates that even if having an unpaid intern draft a non-binding resolution that called for hearings constituted an official act, Mr. Henon would have taken action *regardless of Mr. Dougherty's experience* on the night of September 22, 2015.  First, as Mr. Holroyd testified, Mr. Henon had had his own car previously

towed by George Smith Towing and was required to pay cash (in violation of Philadelphia City Code) to get it back. 10/19 Tr. (Holroyd) at 82:20-83:6; *see also* RH 92.  In fact, Mr. Holroyd testified that "the incident was very frustrating to [Mr. Henon].  He was in the office, around this time, discussing this resolution, upset about it."  10/19 Tr. (Holroyd) 83:4-6.  While Mr. Henon had contemplated introducing a resolution in response to his own experience, *it was Mr. Holroyd who dissuaded him from doing so¸* telling him that it would appear "vindictive."  10/19 Tr. (Holroyd) 88:17-25.  And, on August 20, 2015, *a month before Mr. Dougherty's car was towed*, Mr. Henon was quoted in an article advocating against the illegal towing practices of another company.  RH 9.  In that article, Mr. Henon directed his constituents to contact his office regarding any negative experiences with tow truck operators.  *Id.*  Therefore, the Government has failed to establish that Mr. Henon would have otherwise not have taken action against George Smith Towing, and judgment of acquittal must be entered with respect to Count 102.

### D. This is Really A Conflict of Interest Case

As Dougherty asserted in his motion to dismiss, the government attempts to circumvent the *Skilling's* prohibition on honest services fraud based upon an undisclosed conflict of interest by alleging that Dougherty bribed Councilmember Henon.  That the evidence here is insufficient to establish the government's burden of establishing a *quid pro quo* is apparent when one compares the government's evidence here with a case brought pre-*Skilling* based upon the non-impermissible theory of honest services fraud: *United States v. Panerella*, 277 F.3d 678 (3d Cir. 2002).

In *Panerella*, the defendant, who operated a tax collection business that entered into contracts with state and local governments to collect taxes, was convicted of aiding and abetting honest services fraud.  Over a four- year period, the defendant engaged a state senator as a business consultant, paying him $330,000 over the period.  The state senator supported the

defendant's business efforts by "appearing with [the defendant] before local governments in Pennsylvania and attending meetings with him and the Secretaries of two Pennsylvania state agencies . . . in an attempt to obtain state collection contracts" for the defendant.  *Id*.at 681.  The state senator also "spoke and voted against proposed legislation" that would have harmed the defendant's business.  The state senator did not disclose his income from the defendant as required under Pennsylvania law.  Further, "[t]o conceal his financial relationship with [the state senator], [the defendant] directed third parties to make payments to [the state senator] on [the defendant's] behalf."  *Id*.

In finding that the facts alleged in the superseding information were sufficient to sustain his guilty plea, the court held that "where a public official takes discretionary action that the official knows will directly benefit a financial interest that the official has concealed in violation of a state criminal law, that official has deprived the public of his honest services under 18 U.S.C. § 1346."  *Id*.at 691.  The court relied heavily upon the fact that the state senator's conduct was illegal under state law.  *See id*. at 694  ("[t]he intrusion into state autonomy is significantly muted, since the conduct that amounts to honest services fraud is conduct that the state itself has chosen to criminalize.").  The information that the state senator chose to conceal from the public – that he had a financial relationship with the defendant – was material because at the time of the nondisclosure he was taking discretionary action that directly benefited the defendant's business.  *Id*. at 696.  And, according to the court

> "[t]he only difference between a public official who accepts a bribe and a public official who receives payments while taking discretionary action that benefits the payor . . . is the existence *of a quid pro quo whereby the public official and the payor agreed that the discretionary action taken by the public official is in exchange for payment.  Recognizing the practical difficulties in proving the existence of such a quid pro quo, disclosure laws permit the public*

> to judge for itself whether an official has acted on a conflict of
> interest."

*Id.* at 697 (emphasis added).  Post-*Skilling,* the defendant moved to vacate his conviction.  The

court granted relief, recognizing that the theory the government used to prosecute the defendant

was no longer viable.  *See United States v. Panerella*, No. 00-655, 2011 U.S. Dist. LEXIS 84102

(E.D. Pa. Aug. 1, 2011).

Here, the facts are analogous to *Panerella*, as the government has not established

that there was a *quid pro quo*.  Rather, all the Government has shown is that in 2012, when

Henon became a member of Philadelphia's City Council, he retained employment at Local 98.

This was lawful under the Philadelphia Code, which permits outside employment.  RH002,

RH004, RH005.  Indeed, numerous other City Councilmembers, like Councilmember Henon,

maintain outside employment.  *See* RH002, RH004, RH005.  Government then devoted the

entirety of its case not to proving that bribery occurred, but that Mr. Henon took actions to

benefit Local 98, in which he had a personal interest.  That is no longer a viable honest services

fraud theory.

Moreover, the Government would have failed to prove a pre-Skilling conflict of

interest case anyway.  Unlike the state senator in *Panrella*, however, Councilmember diligently

disclosed his position with Local 98 on his state and city Statements of Financial Interest.  *See* G-

513 & G-514.  Although these forms did not require that Councilmember Henon disclose the

amount of his salary, that amount was disclosed to the public through Local 98's LM-2s.  *See* G-

501.  Given that these facts would be insufficient to convict Mr. Dougherty under a conflicts of

interest theory of honest services fraud, they are clearly insufficient to establish his guilt beyond

a reasonable doubt post-*Skilling*.

### E.   Charged Wires Cannot Be Attributed to Mr. Dougherty

To the extent Mr. Dougherty is charged with wire fraud where the transmission of Mr. Henon's paycheck is alleged as the wire transmission, those counts fail.

Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes"the mails to be used." *United States v. Bruno*, No. 2:13-cr-00039-6, 2014 U.S. Dist. LEXIS 62313, at *27 (E.D. Pa. May 6, 2014) (internal citation and quotations omitted); *Pereira v. United States*, 347 U.S. 1, 8-9, 74 S. Ct. 358, 363 (1954).  In *United States v. Bentz*, 21 F.3d 37 (3d Cir. 1994), the Third Circuit, "[r]ecognizing that cases construing the mail fraud statute are applicable to the wire fraud statute as well," examined the record to determine whether the evidence was sufficient to support a finding that the defendant knew that the wire at issue in that case would be used in the ordinary course of business, or should reasonably have foreseen its use.  The Court began by noting that the two methods for proving causation of a wire are theoretically distinct – "[u]nder *Pereira*, the ordinary course of business prong requires knowledge, whereas reasonable foreseeability is an objective test." *Bentz*, 21 F.3d at 40-41 (citing *United States v. Muni*, 668 F.2d 87, 90 (2d Cir. 1981)).

With respect to the first method, the Court underscored that "[u]se of the wire in the ordinary course of business alone is not enough; the defendant must have knowledge of that course of business." *Id.* (emphasis added).  The court found that nothing in the record supported an inference that the defendant, a general foreman and assistant plant manager for a scrap metals broker, knew that his employer used wire transmissions in the ordinary course of its business. With respect to the second method, the court likewise found that there was insufficient evidence to conclude that the defendant should reasonably have anticipated that his employer – which

operated a scrap metal storage facility in Pennsylvania which issued checks drawn on a

Pennsylvania bank – made wire transmissions when preparing his checks. *Id.* at 41.

Here, the Government has offered no evidence that Mr. Dougherty knew or

contemplated the wires would be used to facilitate the offense.  Indeed, as discussed above, the

record reflects that the decision to pay and how to pay Mr. Henon was made by Brian Burrows,

Local 98's President.  Tr. 10/15 (Judge) at 59:16 – 60:1.  Thus, absent any evidence that Mr.

Dougherty either knew that the wires or mail would be used or that he should have reasonably

foreseen their use, judgment of acquittal must be entered.

## IV.     CONCLUSION

For the reasons set forth above, judgment of acquittal must be entered as to all

counts against Mr. Dougherty.

Date: October 29, 2021

<div style="margin-left:40%">

Respectfully submitted,

/s/ Terence M. Grugan
Henry E. Hockeimer, Jr. (I.D. No. 86768)
hockeimerh@ballardspahr.com
Terence M. Grugan (I.D. No. 307211)
grugant@ballardspahr.com
Emilia McKee Vassallo (I.D. No. 318428)
mckeevassalloe@ballardspahr.com
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

</div>