**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL NO. 2:19-cr-0064 |
| v. : | |
| : | |
| JOHN DOUGHERTY and : | |
| ROBERT HENON : | |
| : | |
| : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT JOHN DOUGHERTY'S MOTION FOR**
**JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE, FOR A NEW TRIAL**

## I.      INTRODUCTION

This case is, as this Court has recognized, a case of first impression, raising the application of "honest services" precedent to a unique set of facts.  And, Mr. Dougherty brings this renewed motion for judgment of acquittal or, in the alternative, for a new trial, focusing on the unresolvable tension between what the Government alleged in the Indictment, the applicable law and what was proven (and not proven) at trial.  As we stated previously, the Government has not proven that John Dougherty bribed Robert Henon.

This prosecution was the result of over-zealous prosecutors stitching together inferences, presumptions, and legal fictions to eliminate its burden of proving a crime actually occurred and allow it to reverse-engineer a bribery prosecution from a public official's lawful outside employment.  This conviction was the result of the Government deliberately deceiving the jury into convicting by obliterating any distinction between a conflict of interest and a *quid pro quo*.  This entire case illustrates the worst of what the Supreme Court repeatedly warned against: federal prosecutors manipulating and distorting the law and facts to regulate the conduct of local public officials and their constituents through unlawful and unjust prosecution.  This Court must step in

to undo the injustice the Government has done here.  Evaluating the facts adduced at trial against the law as it is, not as the Government wishes it to be, the Court must set aside the jury's verdict and enter judgment of acquittal or order a new, untainted trial.

## II.    SUMMARY OF THE ARGUMENT

It is a fact that during the alleged conspiratorial period, Mr. Henon – as evidenced by publicly filed disclosures – was an employee of Local 98 and, therefore, earned the benefits of employment – regular salary payments, health benefits, and the use of Local 98 tickets to sporting events.  This arrangement is not illegal.  This does not make a bribe.  It is also a fact that Mr. Dougherty, as business manager, was the leader of Local 98 during the alleged conspiratorial period and for decades before.  This is not illegal.  This does not make a bribe.  It is also a fact that, for decades, Mr. Dougherty lobbied government officials, including Mr. Henon, on behalf of organized labor.  It was his job to do so.  This is not illegal.  This does not make a bribe.  To establish honest services fraud, the law requires the Government prove that all of these facts are linked through an illegal *quid pro quo* agreement.

In contrast to the current state of the law, prior to *Skilling v. United States*, 561 U.S. 358 (2010), the law in the Third Circuit was that an undisclosed conflict of interest was sufficient to convict for honest services fraud under the failure to disclose theory:

> Were it easy to detect and prosecute public officials for bribery, the need for public officials to disclose conflicts of interest would be greatly reduced.  As long as a public official does not act on a conflict of interest, the conflict of interest itself poses little threat to the public.  One reason why federal law and state law mandates disclosure of conflicts of interest, however, is that it is often difficult or impossible to know for sure whether a public official has acted on a conflict of interest. . . . ***The only difference between a public official who accepts a bribe and a public official who receives payments while taking discretionary action that benefits that payor, as Loeper did in this case, is the existence of a*** **quid pro quo** ***whereby the public official and the payor agree that the discretionary action taken by the public official is in exchange for payment***.  Recognizing the practical difficulties in proving the existence of such a *quid pro quo*, disclosure

laws permit the public to judge for itself whether an official has acted on a
conflict of interest.

*United States v. Panarella,* 277 F.3d 678, 698 (3d Cir. 2002) (internal citation omitted and emphasis added).

This is not the law today.  The burden the Government faced here was reflected in the jury charges.  As explained by the Court, the Government was required to prove that "the charged conspiracy **was formed**[1] and existed for some time within the period set forth in the indictment." (Tr. Trans. 38:25 – 39:1 (Nov. 10, 2021)) (emphasis added).  As also charged by the Court, this means the Government was required to prove that the Defendants "formed" an agreement to commit the offense of honest services fraud through bribery during the time frame of the charged conspiracy – "in or about May 2015 to on or about September 2016."  (*Id*. at 32:15-22).  In turn, to prove that the Defendants agreed "to commit the offense of honest services fraud through bribery during the time-frame of the charged conspiracy," the Government was required to prove that, "during the period set forth in the Indictment," "John Dougherty and Robert Henon acted **with the specific intent** to engage in a *quid pro quo* exchange in which **John Dougherty would give**[2] something of value to Robert Henon in which he was not entitled in return for one or more official acts of Robert Henon."  (*Id*. at 58:2-7 (emphasis added)).

---

[1]     Among the numerous strawman arguments we anticipate the Government will assert will likely be that is it not required to prove the exact date on which a conspiracy was formed. To be clear, we are not arguing the Government must prove an agreement was formed on a specific date.  Instead, the law requires that the Government prove that the defendants entered a conspiracy with the requisite intent during the charged time-frame, *i.e.*, May 2015 through September 2016.  *United States v. Atl. States Cast Iron Pipe Co.*, No. 03-852 (MLC), 2007 U.S. Dist. LEXIS 56562, at *198-99 (D.N.J. Aug. 2, 2007).

[2]     That is, John Dougherty, personally.  Not Local 98, not Brian Burrows, not anyone else. John Dougherty, personally, acting with the requisite subjective intent.

In summary, the Government's burden under the law was to prove that: (1) during May 2015 to on or about September 2016; (2) John Dougherty personally gave Mr. Henon employment at Local 98; (3) with the specific intent for that employment to influence Mr. Henon to take official action (as defined by *McDonnell*) that he would not otherwise take. This is the law. As Judge Walls succinctly stated in his opinion in *United States v. Menendez*, 291 F. Supp. 3d 606 (D.N.J. 2018), which was a steam of benefits case: "the relevant timing in a bribery case is that of the agreement" and "[t]he Government has always been required to prove that a public official 'agreed to perform an "official act" ***at the time of the alleged quid pro quo***.'" *Id* at 620, 614-15 (emphasis added).

The Government did none of this because the facts did not fit the law.

These facts[3] adduced at trial are uncontested: In December 2011 – three and a half years before the charged conspiracy allegedly came into existence – Local 98 decided to retain Mr. Henon on its payroll following his election to Philadelphia City Council. Although the parties stipulated that Mr. Dougherty generally possessed the authority to hire employees, the Government proffered no evidence whatsoever that Mr. Dougherty had any **actual** role whatsoever in this specific hiring decision. Instead, the Government proffered evidence that Brian Burrows – Local 98 President – and not John Dougherty decided in February 2012 what Mr. Henon's salary and benefits would be. **No other decisions were made with respect to Mr. Henon's employment subsequent to February 2012**. These undisputed facts mean that Mr. Henon was given the

---

[3] At this stage, the Court is required to evaluate this motion against the facts actually developed at trial, not the allegations as stated in the Indictment. *United States v. Bortnick*, No. 03-CR-0414, 2005 U.S. Dist. LEXIS 33541, at *12 (E.D. Pa. July 20, 2005) ("A court's sole charge in reviewing a Rule 29 motion is to evaluate, given the evidence presented at trial, whether a reasonable jury could have found the essential elements of the crime.").

alleged *quid* in this case, and therefore became entitled to it, no later than February 2012 and, thus, rendered proof of the charges here impossible for the following reasons.

First, the Government failed to proffer any evidence that John Dougherty personally gave or authorized the giving of employment at Local 98 to Mr. Henon at all, let alone during the time-frame of the charged conspiracy.[4] Second, because Mr. Henon already possessed his employment at the time the charged conspiracy allegedly commenced, it could not have formed the basis of a corrupt agreement during the time-frame of the charged conspiracy. In other words, even if Mr. Dougherty had authorized Mr. Henon's employment in 2011 that would only prove that no agreement, corrupt or otherwise, was formed between Mr. Dougherty and Mr. Henon concerning Mr. Henon's employment during the time-frame of the charged conspiracy because the job already belonged to Mr. Henon.[5] Third, because the Government could not and did not prove when the

---

[4]     When deciding to bring this case, the Government faced a dilemma: charge the conspiracy as of the date when Mr. Henon received his employment in 2012 or charge the conspiracy as of when the Government went up on the wire in 2015. If the Government elected the former, it would have no evidence that Mr. Henon took official action in exchange for his job from 2012 through the time it went up on the wiretap. But, by choosing the latter, the Government has no evidence that Mr. Henon's employment was given to him with the requisite intent. This lose-lose scenario is the product of the Government's decision to bring charges against Mr. Dougherty no matter what the law says. That their theory is legally untenable is the Government's problem; not the Court's and not the Defendants'.

[5]     In their initial Rule 29 motion, Defendants explained: "There has never been a case like this. **Never**. There has never been a case where the Government has based a bribery prosecution on a public official's ***pre-existing lawful employment***. **Never**. There has never been a prosecution where a public official legally received a thing of value then, mid-stream and without any evidence or explanation for this metamorphosis, that very same thing of value morphed into an illicit *quid* in a bribery scheme. **Never**." During argument on this motion, the Court directly questioned the Government on this point to which the Government weakly and disingenuously deflected: "I don't even know what that means." (Tr. Trans. 58:18-19 (Nov. 1, 2021) (Costello, F.)). To be sure the Government understands the defense position and can intelligently respond, we make our point as simply as possible: As a matter of both law and common sense, the thing of value underlying a bribe cannot be something the public official already possesses. For example, an individual cannot give a public official cash from the public official's own

---

alleged *quid pro quo* occurred, it could not and did not prove that the Defendants possessed the requisite intent "at the time of the alleged *quid pro quo*." *Menendez*, 291 F. Supp. 3d at 614. Fourth, because the Government could not and did not prove when the alleged *quid pro quo* occurred, it could not and did not prove that the Defendants contemplated "official action" as defined by *McDonnell* "at the time of the alleged *quid pro quo*." *Id.*

Faced with the hopeless incongruity of the facts and law, the Government resorted to deceiving the jury. First, it blatantly misstated the applicable law: "And the Government proved that it existed during the time charged. Whether it existed before that and how long is just not a question before you," (Tr. Trans. 63:5-13 (Nov. 8, 2021) (Costello, F.)); "We don't have to show when it started and we don't have to show when it ended if ever. We have to show that it was in existence during the time charged," (*id.* at 234:13-22 (Witzleben, B.)).[6]

---

wallet as a bribe; an individual cannot give a public official lodging at the public official's own vacation house as a bribe; an individual cannot give a public official a job he already has as a bribe. Therefore, because Robert Henon already had his job at Local 98 as of the commencement of the alleged conspiracy – and was therefore already entitled to his salary and benefits as of the commencement of the alleged conspiracy – John Dougherty could not give him his job to entice him to perform official acts during the alleged conspiracy.

[6]   It is obvious why the Government would resort to misstating the law as such. If the Government is not required to establish when an agreement was reached, how does it prove a corrupt agreement – as opposed to purely parallel conduct – existed at all? The Government's answer: Through circular reasoning – Robert Henon's salary and actions during the time-frame of the charged conspiracy were the result of a corrupt agreement that must have occurred because Robert Henon earned a salary and took official action during the time-frame of the charged conspiracy. We describe herein the myriad ways this absurd reasoning defies applicable law. And, we repeat the Second Circuit's straightforward statement of the law: "An official who merely accepts a thing of value in an otherwise legal manner (*e.g.* client referrals, as permitted under New York law) has not committed a crime. If that official later acts to the benefit of the payor, she still has not committed a crime. It is only upon a showing that, at the time the official accepted the payment, she understood it to be a payment in exchange for official influence on some specific, focused, and concrete matter involving the formal exercise of

Of course, if the Government can't prove when the *quid pro quo* was formed, it cannot prove that a conspiracy to enter into a *quid pro quo* agreement was formed during the time frame of the charged conspiracy or at all, as the Court charged the jury and as the law requires. Nor can it prove that the Defendants possessed the requisite intent "at the time of the alleged *quid pro quo*," as the Court charged the jury and as the law requires. Nor can the Government prove that the Defendants contemplated "official action" as defined by *McDonnell* "at the time of the alleged *quid pro quo*" as the law requires. And so, the Government didn't even try.

After disclaiming any requirement that it prove the Defendants entered into a *quid pro quo*, the Government continued its legal shell game by misleading the jury into believing that an undisclosed conflict of interest is sufficient to convict for honest services fraud: "Because you are no longer giving the public the undivided loyalty that they are owed, you are compromised. The public should not have to guess whose interest you are acting in," (Tr. Trans. 66:9-12 (Nov. 8, 2021) (Costello, F.)); "And these two men here in Philadelphia violated that and they made a mockery of the disclosure requirements that the law puts on them so that we, the people, can see if our public officials are honest," (*id*. at 250:24 – 251:3 (Witzleben, B.)).

> The only difference between a public official who accepts a bribe and a public official who receives payments while taking discretionary action that benefits that payor, as Loeper did in this case, is the existence of a *quid pro quo* whereby the public official and the payor agree that the discretionary action taken by the public official is in exchange for payment.

*Panarella*, 277 F.3d at 697.

Even though this is not the law, the Government made it its case. And, unfortunately, the jury bought it. Speaking to reporters following the verdict concerning members of City Council

---

governmental power that the Government has met its burden." *United States v. Silver*, 948 F.3d 538, 577 (2d Cir. 2020).

holding second jobs, an anonymous juror explained: "There's always going to be a conflict of interest, even if the conflict of interest is only an issue of time. . . . I think the people of Philadelphia are getting shortchanged way too much by Council people who have other jobs." *A Juror in the Dougherty-Henon Trial Says It Was A Lesson in Philly Government – And 'It Was Appalling*,' (THE PHILADELPHIA INQUIRER (Nov. 16, 2021)), available at https://www.inquirer.com/news/john-dougherty-trial-jury-bobby-henon-convicted-charges-philadelphia-20211116.html.

The Government's manipulative approach to this prosecution worked: the Jury here convicted on improper grounds repeatedly encouraged by the Government because the actual facts considered under the applicable law do not and cannot yield a conviction. Tape after tape painting Mr. Dougherty as a "bad guy" – but not someone engaging in bribery – was the key to this conviction. To prevent any further injustice, the Court must enter judgment of acquittal.

## III.   STANDARD OF REVIEW

### A.   Rule 29

Rule 29 of the Federal Rules of Criminal Procedure requires that a court "enter judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Where this standard is met, and even after a "jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). Thus, a court "must grant the motion and enter a judgment of acquittal 'of any offense for which the evidence is insufficient to sustain a conviction.'" *United States v. Pawlowski*, 351 F. Supp. 3d 840, 848 (E.D. Pa. 2018) (quoting Fed. R. Crim. P. 29) (granting in part Defendant's Rule 29(c) motion).

Thus, "if there is substantial evidence . . . to uphold the jury's decision," the court must deny the motion. *United States v. McKelvy*, No. 15-398-3, 2020 U.S. Dist. LEXIS 188788, at *18 (E.D. Pa. Oct. 9, 2020) (quoting *Caraballo-Rodriguez*, 726 F.3d at 430 (internal quotation marks omitted)). However, while this is a "highly deferential" standard, "where the prosecution's failure

is clear, . . . or where the verdict fall[s] below the threshold of bare rationality," a court must grant the motion and enter a judgment of acquittal. *Id.* (internal citations and quotation marks omitted).

In ruling on a motion pursuant to Rule 29, a district court must "review the record in the light most favorable to the prosecution," *United States v. Wolfe*, 245 F.3d 257, 261 (3d Cir. 2001), and "decide whether 'any rational trier of fact could have found proof of the defendant's guilt beyond a reasonable doubt' based upon the available evidence presented at trial." *United States v. Fields*, No. 15-129, 2021 U.S. Dist. LEXIS 164409, at *85 (E.D. Pa. Aug. 31, 2021) (quoting *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d Cir. 2013)). In doing so, "[a]ll reasonable inferences . . . are drawn in favor of the jury's verdict." *United States v. Vederman*, No. 15-346-2, 2019 U.S. Dist. LEXIS 48517, at *3 (E.D. Pa. Mar. 22, 2019). However, permissible inferences must be "*legitimate inferences drawn from proven facts and not mere speculation.*" *United States v. Cegledi*, No. 1:CR-08-281-01, 2010 U.S. Dist. LEXIS 159242, *3 (Feb. 4, 2010 M.D. Pa.). Evidence that only permits a jury conclude that the defendant violated the law based upon mere speculation is not sufficient to meet the government's burden. *United States v. Ordaz*, 119 F. App'x 407, 411 (3d Cir. 2005) (granting Rule 29 motion with respect to a count of wire fraud finding that the jury's determination "based on this record . . . could only be mere speculation.").

Conjecture alone is "not enough to overcome the burden of reasonable doubt." *United States v. Hernandez*, 301 F.3d 886, 890 (8th Cir. 2002). In *Hernandez,* the Eighth Circuit affirmed a Rule 29 judgment of acquittal on charges that the defendant aided and abetted the possession with intent to distribute methamphetamine. *Id.* The district court granted the defendant's motion because the government failed to offer evidence that: (1) established that the defendant knew her boyfriend possessed or delivered methamphetamine to anyone; (2) showed that she knowingly

aided her boyfriend in committing the crime or that she intended for the drug to be delivered to another person; (3) established that the defendant was more than merely present at the scene of the crime; or (4) demonstrated more than mere conjecture of guilt, not an inference of guilt reasonable drawn from the facts. *Id.* In affirming the district court's decision, the Eighth Circuit emphasized:

> When the government's evidence is viewed in its entirety, [the defendant's] activities may be sufficient to raise speculation that she shared [her boyfriend's] criminal intent. However, there is a critical line between suspicion of guilt and guilt beyond a reasonable doubt. . . . Even looking at the government's case in the most favorable light possible, the government has not transcended the realm of speculation to the realm of certainty beyond a reasonable doubt.

*Id.* at 893; *see also United States v. Mora*, 598 F.2d 682, 684 (1st Cir. 1979) ("It is true that the jurors may draw legitimate inferences from the evidence but that does not mean that they have license to let their imaginations run rampant along the lines suggested by the prosecutor in this case.").

### B.      Rule 33

Pursuant to Rule 33, the court may grant a new trial "if the interest of justice so requires." The standard of review under Rule 33 is different than under Rule 29. Here, the evidence is not evaluated in the light most favorable to the Government. Instead, a new trial may be granted if in the view of the court the verdict is against the weight of the evidence. *See United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). The court must consider whether there is "a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *See United States v. Silveus*, 542 F.3d 993, 1004-05, 50 V.I. 1101 (3d Cir. 2008) (quoting *Johnson*, 302 F.3d at 150). Motions under Rule 33 "are not favored and should be 'granted sparingly and only in exceptional cases.'" *Id.* at 1005 (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)).

## IV.     THE COURT'S OPINION ON RULE 29(a) MOTION

The Court denied Mr. Dougherty's prior Rule 29 on November 2, 2021.  On November 23, 2021, the Court issued a Memorandum Opinion (the "Opinion") setting forth its reasoning.  Mr. Dougherty's prior motion raised many of the issues set forth herein.  However, we respectfully submit that the Opinion did not fully and accurately address those arguments.  Mr. Dougherty previously argued that: (1) the Government failed to prove the Defendants entered into a corrupt agreement; (2) the Government failed to prove the Defendants acted with the requisite intent; and (3) the Government failed to prove that the Defendants contemplated "official action" as defined under *McDonnell*.[7]

### A.     Timing of the *Quid Pro Quo*

In the Opinion, the Court correctly stated that "Defendants make an abundance of similar arguments when they argue that it is not possible for the Government to prove the alleged *quid pro quo* in this case."  (Opinion at 1).  Mr. Dougherty's arguments are, indeed, similar and related.  However, the Court went on: "defendants argue that the Government must prove that in 2012, when defendant Robert Henon first became a Philadelphia City Councilmember, he and Dougherty came to the corrupt agreement at that very moment."  (Opinion at 2).  This statement does not precisely reflect our argument because it presumes the corruption of the agreement and reduces our argument to one purely of timing.  Our argument is more nuanced because the law is more nuanced.

Though presented for purposes of briefing and argument in a more parsimonious manner, the relevant elements of bribery – and therefore Mr. Dougherty's arguments the Government failed

---

[7]     Mr. Dougherty hereby incorporates and renews the arguments contained in his initial Motion for Judgment of Acquittal filed on October 29, 2021 upon the close of the Government's case-in-chief.  *See* Dkt. No. 232.

to prove them – are each inextricably intertwined.  For instance, Mr. Dougherty's principle argument is that because Mr. Henon possessed his employment since 2012, his employment cannot be the foundation for a corrupt agreement in 2015.  This is not a "gotcha" argument that the Government is required to prove an exact date when the corrupt agreement was formed and because it cannot do so it cannot prove a *quid pro quo*.  Instead, the time when the corrupt agreement was formed is relevant for three related reasons.

First, to prove a conspiracy to commit honest services fraud, the Government must prove the corrupt agreement to engage in a *quid pro quo* was formed during the charged period of the conspiracy – May 2015 through September 2016.  *See United States v. Blackwell,* 954 F. Supp. 944, 961 (D.N.J. 1997) (Government must prove that "at some point during the period of the conspiracy, the defendant, knowing the purpose of the conspiracy, joined the conspiracy"); *United States v. Atl. States Cast Iron Pipe Co.*, No. 03-cr-852, 2007 U.S. Dist. LEXIS 56562, at *14 (D.N.J. Aug. 2, 2007) ("jury must find that the described conspiracy was formed and existed at or about the time alleged in the Indictment").  Second, the *actus reus* in the crime of bribery is the agreement itself, not any subsequent payments and not any subsequent official actions.  *Evans v. United States*, 504 U.S. 255, 268 (1992) ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense."); *Menendez*, 291 F. Supp. 3d at 620 ("the relevant timing in a bribery case is that of the agreement (and not any resulting exchange).") (citing *United States v. Young*, 651 F. App'x 202, 204 (4th Cir. 2016) ("[T]he timing of the payment in relation to the official act for which it is made is (in theory) irrelevant." (quoting *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998)); *see also United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013) (emphasizing that the timing of the agreement is the pertinent inquiry, not the

timing of the payment). Third, and relatedly, the Government must prove that the relevant *mens rea* – intent to influence and be influenced – existed at the time the *quid pro quo* was formed. *United States v. Ciavarella*, 716 F.3d 705, 729 (3d Cir. 2013) ("The bribery-and-kickback theory of honest services fraud requires a *quid pro quo*, that is, a specific intent to give or receive something of value in exchange for an official act.") (internal quotations marks omitted)).

Therefore, without proof that the *quid pro quo* agreement was formed in the time period of the charged conspiracy, the Government cannot prove that the corrupt agreement was formed in the time period of the charged conspiracy. *United States v. Ramirez*, No. 15-cr-379, 2021 U.S. Dist. LEXIS 116327, at *19 (S.D.N.Y. June 22, 2021) (jury must "find that the conspiracy was formed and existed during the time period charged in the Indictment"); *United States v. Traitz*, No. 99-cr-003, 2002 U.S. Dist. LEXIS 22903, at *6 (E.D. Pa. Nov. 26, 2002) ("[I]t is not essential that the Government prove the conspiracy started and ended precisely in those dates. It is sufficient if you find beyond a reasonable doubt that, in fact, a conspiracy was formed and existed continuously between the dates reasonably near those alleged in the indictment as the beginning and ending dates."). *See also United States v. Davis*, No. 15-138-1, 2018 U.S. Dist. LEXIS 155755, at *8 (E.D. Pa. Sep. 12, 2018) (examining whether defendant participated in a *quid pro quo* through the relevant time period).

Likewise, without proof of when the *quid pro quo* agreement was formed, the Government cannot prove that a *quid pro quo*, as opposed to purely parallel conduct (*i.e.* public official receives things of value and public official performs official action beneficial to payor) existed. *Silver*, 948 F.3d at 577 ("An official who merely accepts a thing of value in an otherwise legal manner (*e.g.* client referrals, as permitted under New York law) has not committed a crime. If that official later acts to the benefit of the payor, she still has not committed a crime. It is only upon a showing that,

at the time the official accepted the payment, she understood it to be a payment in exchange for official influence on some specific, focused, and concrete matter involving the formal exercise of governmental power that the Government has met its burden."); *see also United States v. Kincaid-Chauncey*, 556 F.3d 923, 941-42 (9th Cir. 2009) ("The political system functions because lobbyists and others are able to persuade elected officials of the wisdom or error of policy proposals. . . . [S]uch endeavors . . . are protected by the right to petition the Government for redress of grievance[s] guaranteed by the First Amendment of the United States Constitution. Attempts to persuade or mere favoritism, evidenced by a public official's willingness to take a lobbyist's telephone call or give a lobbyist greater access to his appointment schedule, are not sufficient to demonstrate either the lobbyist's or the public official's intent to deprive the public of honest services." (internal quotation marks omitted)).

Finally, and relatedly, without proof of when the *quid pro quo* was formed, the Government cannot prove that "the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*." *McDonnell v. United States*, 136 S. Ct. 2355, 2371 (2016). "**At the time of the alleged *quid pro quo***." *Id* (emphasis added); *see also Silver*, 948 F.3d at 577.

For these reasons, every single honest services fraud prosecution and decision begins with analysis of the inception of the alleged corrupt agreement.

      1.     *McDonnell.*

In *McDonnell*, the Government charged that "from in or about April 2011 through March 2013, the defendants participated in a scheme to use Robert McDonnell's official position as the Governor of Virginia to enrich the defendants and their family members by soliciting and obtaining payments, loans, gifts, and other things of value from JW and Star Scientific in exchange for Robert McDonnell and the OGV performing official actions on an as-needed basis, as opportunities arose, to legitimize, promote, and obtain research studies for Star Scientific's

products, including Anatabloc." (Indictment at ¶ 22, *United States v. McDonnell*, No. 3:14-cr-12 (Jan. 21, 2014)).

Although Governor McDonnell knew the alleged briber – Jonnie Williams, CEO of Star Scientific – for two years prior to the alleged conspiracy, analysis of the alleged *quid pro quo* began with the consummation of the alleged corrupt agreement when Governor McDonnell began receiving things of value from Mr. Williams. *McDonnell*, 136 S. Ct. at 2362. And analyzing the alleged stream of benefits from the time it began, the Supreme Court reiterated that "the Government was required to prove that Governor McDonnell committed or agreed to commit an 'official act' in exchange for the loans and gifts from Williams." *Id.* at 2365. And it repeated, multiple times, that the Government's burden is to establish that "the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*." *Id*. at 2371. *See also id*. at 2365 ("the Government was required to prove that Governor McDonnell committed or agreed to commit an 'official act' in exchange for the loans and gifts from Williams."); *id.* at 2374 (explaining where witnesses testified Governor McDonnell instructed them merely to attend a meeting "[i]f that testimony reflects what Governor McDonnell agreed to do at the time he accepted the loans and gifts from Williams, then he did not agree to make a decision or take an action on any of the three questions or matters described by the Fourth Circuit.").

Plainly, the entire analysis of the Supreme Court turned on what was contemplated by the Defendants at the time the *quid pro quo* was formed; analysis that cannot occur if the Government cannot point to the time frame when the *quid pro quo* was formed.

      **2.**    *Silver*

The Government's case against Sheldon Silver involved two separate alleged corrupt schemes: (1) the Real Estate Scheme; and (2) the Mesothelioma Scheme.

The Mesothelioma Scheme involved Silver taking "at least five official actions" in exchange for client referrals from the benefitting physician. *Silver*, 948 F.3d at 559. The evidence established that after certain state disclosure requirements changed in 2007, Silver ceased performing official action for the payor and the payor ceased providing referral fees. *Id*. at 560. Silver subsequently complained about no longer receiving referral fees and, later, they resumed. *Id*. at 560-61. Analyzing the alleged *quid pro quo* from this point in time when the Government alleged the *quid pro quo* occurred, the Second Circuit held that "the Government presented no evidence that Silver made any promises to Taub, after 2007, regarding any action on any identified, or even *identifiable*, question or matter – much less a focused or concrete question or matter involving the exercise of governmental power." *Id*. at 569 (emphasis in original).

Concerning the Real Estate Scheme, the Government traced the alleged *quid pro quo* to "a 'side letter' retainer agreement signed by Goldberg, Glenwood, and Silver in December 2011." *Id*. at 563. Pursuant to this side letter agreement, Silver received certain legal referrals for tax certiorari work during the same time he took actions on tax abatement and rent stabilization programs benefitting the payors. *Id*. at 570. And, consistent with *McDonnell*, the question before the Second Circuit was whether Silver entered into the side letter agreement "with the belief that he was expected to influence a *particular* matter, namely the relevant tax abatement and rent stabilization programs." *Id*. (emphasis in original)

Again, in both instances, the dispositive question was the defendant's intent at the discreet time the *quid pro quos* were formed.

### 3. *Menendez*

In *United States v. Menendez*, the Government alleged a conspiracy existed from "in or about January 2006 through in or about January 2013" whereby: (1) "Melgen offered and gave, and Menendez solicited and accepted from Melgen, things of value, including domestic and

international flights on a private jet, first-class domestic airfare, use of a Caribbean villa, access to an exclusive Dominica resort, a stay at a luxury hotel in Paris, expensive means, golf outings, and tens of thousands of dollars in contributions to a legal defense fund" in exchange for Sen. Menendez's performance of official action. (Indictment at ¶¶ 9, 12, *United States v. Menendez*, No. 15-cr-155 (Apr. 1, 2015)).

As required by the law, the court evaluated the sufficiency of the evidence of a *quid pro quo* by evaluating the back and forth flow of benefits and official action from the inception of the alleged *quid pro quo*. *Menendez*, 291 F. Supp. 3d at 616. The court found that because the benefits flowed to the public official at the same time the official actions were performed, the jury could find a *quid pro quo* was formed. *Id.*

And, again, the question for the court was whether intent existed at the consummation of the *quid pro quo*. *Id*. at 612 ("For a public official to be guilty of bribery, the jury must find that he 'agreed to perform an "official act" at the time of the alleged *quid pro quo*.'") (quoting *McDonnell*, 136 S. Ct. at 2371).

### 4.    Application Here

Every single "stream of benefits" case, at its heart, requires a two-part analysis: (1) the establishment of a relationship between a payor and a public official involving the payor giving a stream of benefits to the public official and the public official accepting a stream of benefits from the payor; and (2) a determination of whether that relationship was consummated with corrupt intent, *i.e.* whether that stream of benefits was given to the public official to influence official action and whether that stream of benefits was accepted by the public official knowing it was given in order to influence official action.[8] And, the Government is required to prove that the *quid pro*

---

[8]    We note here the Government's repeated talismanic assertion that the time it went up on a wiretap somehow controls when it could have and was required to prove the *quid pro*

*quo* relationship was corruptly formed in the time-frame set forth in the Indictment as charged by the Grand Jury. *Davis*, 2018 U.S. Dist. LEXIS 155755, at *8. Therefore, the Government's burden here was to prove that Mr. Henon and Mr. Dougherty entered into a corrupt *quid pro quo* during the time-frame set forth in the Indictment. Under the law, it can meet this burden of proof only by proving that Mr. Dougherty gave and Mr. Henon accepted his employment knowing it was given in exchange for official action. The appropriate analysis, thus requires the Court to examine, and the Government to prove, the consummation of Mr. Henon's employment arrangement with Local 98 and then to determine if it was entered into corruptly.

We have repeatedly insisted that the law renders proof of the Government's theory impossible and we do so again here. This if so for two reasons. First, the Government has proffered no evidence of the Defendants' intent at the time the employment arrangement was established. This case therefore fails. Second, even if the Government had offered such proof at trial,[9] it would have impermissibly varied from the charges in the Indictment because the crime – the corrupt agreement – would have occurred outside of the charged conspiracy. *See United States v. Heimann*, 705 F.2d 662, 667 (2d Cir. 1983) (requiring proof of a conspiracy to fall within the

---

*quo*. First, every stream of benefits case described herein and in the federal legal canon somehow proceeded without the apparent investigatory limitations the Government claims it faced here. Second, and more importantly, the Government conveniently ignores that it was investigating this case since at least late 2013 and knew of Robert Henon's Local 98 employment by virtue of Local 98's LM-2s and Mr. Henon's financial disclosures since his election to City Council. (Tr. Trans. 27:14-23 (Oct. 15, 2021) (Thompson, D.) (DOL Investigator testifying that no one at the DOL raised any concerns regarding Mr. Henon's dual employment at Local 98 and City Council from 2013 to present).

[9]     Counsel for the Government admitted it had not and could not make this showing: "Additionally, again as I mentioned, Henon and Dougherty are charged with conspiring to commit honest services fraud from May of 2015 through September of 2016. There basically has been no evidence presented about what happened before that." (Tr. Trans. 62:21-25 (Nov. 8, 2021) (Costello, F.)).

period charged in the indictment); *see also United States v. Ulbricht*, No. 14-CR-68, 2015 U.S. Dist. LEXIS 11938, at *5 (S.D.N.Y. Feb. 2, 2015) ("There is no fatal variance as long as the conspiracy proved at trial falls within the period charged in the Indictment.").

Two cases prove this point. In *United States v. Bryant*, the Government alleged that R. Michael Gallagher bribed state senator Wayne Bryant with employment at the University of Medicine and Dentistry of New Jersey. The Government alleged:

> From in or about the fall of 2002 to in or about February, 2006, in Mercer County and in Camden County, [Bryant and Gallagher] did knowingly and willfully devise and intend to devise a scheme and artifice to defraud the State of New Jersey and its citizens of the right to defendant Wayne R. Bryant's honest services in the affairs of the State of New Jersey.
>
> It was an object of this scheme and artifice to defraud that R. Michael Gallagher used his position as Dean of SOM to put defendant Wayne R. Bryant on the SOM payroll, and thereafter, with others, caused defendant Bryant to receive a stream of corrupt payments and other financial benefits from SOM, in exchange for defendant Bryant using his position as a State Senator to take official action to advocate on behalf of SOM. . . .

(Indictment ¶¶ 17-18, *United States v. Bryant*, No. 07-cr-267 (D.N.J. Mar. 29, 2007)).

The Court found that "the record contains evidence which demonstrates that Defendants sought to engage in a *quid pro quo* arrangement where Bryant would be hired by SOM and compensated for prospective official actions taken in his capacity as a New Jersey Senator." *United States v. Bryant*, No. 07-cr-267, 2009 U.S. Dist. LEXIS 44648, at *12 (D.N.J. May 27, 2009). To prove the *quid pro quo*, the Government proffered evidence that Gallagher voiced concerns about the levels of state funding SOM received and, in response, Bryant sought paid employment at SOM. *Id*. at *13. The Government further proved the corrupt bargain by establishing the SOM position Bryant was given was created solely to hire Bryant and the interview process to fill that position was a sham. *Id*. at *14. Finally, the Government proved that immediately upon receipt of his employment, Bryant began performing official action to benefit

SOM. *Id.* And the Government didn't need wiretaps to prove its case: "The Government also demonstrated through several witnesses and documentary exhibits that prior to the March 25th meeting, the process surrounding the creation of the position at SOM and Bryant's predetermined hiring were indicative of the alleged scheme to defraud New Jersey of Bryant's honest services." *Id.*

Again, the appropriate analysis was whether the relationship between the payor and the public official was corruptly formed.[10] And, to answer that question required examination of evidence from the time the relationship was formed, which was when the *quid* – Bryant's employment – was given. Based on that evidence – witnesses and documents – the court determined that the defendants possessed corrupt intent when they formed the agreement, *id.* at 12; that is, that the defendants possessed the relevant intents "at the time of the alleged *quid pro quo*." *McDonnell*, 136 S. Ct. at 2371.

Similarly, *United States v. Urciuoli*, 613 F.3d 11 (1st Cir. 2010) also involved a bribery scheme centered on an employment arrangement. As the First Circuit described: "[t]he gravamen

---

[10] The Government has made a variety of absurd arguments to deflect from its burden of proof. Among them, the Government has suggested it could never know when a corrupt agreement was formed, invoking its favored dicta of "knowing winks and nods." Of course, we know with precision exactly when the employment agreement here was formed: December 2011. The only question is whether it was "corruptly" formed and the Government has used every tool and artifice at its disposal to avoid confronting this question. Instead, it pleads that because it was not up on a wire in 2011 it could not address this question but still assures the Court, as it assured the jury, that a corrupt agreement must have been formed at some unknown time. Well, it was investigating this case since at least 2013 and still offered no evidence prior to May 2015. And, as noted above, federal agents and prosecutors have used all standard investigatory tools to successfully prove *quid pro quo* bribery. These methods turned up no evidence of a crime here because no crime occurred. Undaunted, the Government recorded tens of thousands of calls involving the Defendants then selected approximately 120 to splice together into a narrative that advanced its objective of bringing charges against Mr. Dougherty.

of the charge against Urciuoli was his role in a scheme to bribe – in the guise of an employment contract – John Celona, then a Rhode Island state senator." *Id*. at 13. In that case, in the summer of 1997, Celona had voted against legislation opposed by Urciuoli. *Id*. However, the vote failed to sustain the veto and the legislation became law. *Id*. Subsequently, Celona asked Urciuoli for a job (which was lawful under Rhode Island law). *Id*. In February 1998, Celona was given an employment contract to perform marketing for Urciuoli's company. *Id*. Subsequently, Celona supported or opposed legislation based on Urciuoli's interests and conducted meetings at his office to assist Urciuoli to resolve business disputes. *Id*. at 13. Evaluating the sufficiency of the evidence, the First Circuit considered first whether Celona's employment agreement was given and later renewed with corrupt intent. *Id*. at 14. Just like every other stream of benefits case, the First Circuit evaluated whether the relationship (in that case, the employment arrangement) was consummated with corrupt intent. *Id*.

Here provides another example of the Government actively misleading the jury because the evidence at trial did not and could not fit the law. Counsel for the Government incredibly stated to the jury that "[t]here basically has been no evidence presented about what happened before [May 2015.]" (Tr. Trans. 62:21-25 (Nov. 8, 2021) (Costello, F.)). This obviously was untrue as there was significant evidence presented as to "what happened" before the Government went up on its wire. The problem for the Government was that evidence proves there was no *quid pro quo*, therefore, the Government had to avoid it and, thus, its burden of proof. Most critically, Mr. Dougherty announced at a Sound and Communications Membership Meeting on December 13, 2011 that, after his election to City Council, "Bobby will still play a role in our union operation and will collect a check from Local 98." (Ex. G-15-21). This piece of evidence that the Government urged the jury did not exist, demonstrates that at the consummation of the

employment arrangement underlying this case, it was the intent of the Defendants that Mr. Henon "would still play a role in our union operation and will collect a check from Local 98." Indeed, that "role in our union operation" was even celebrated in the same announcement: "Bobby Henon . . . has already been influential in helping us get a project labor agreement at the Philadelphia Airport and assisting at the Family Court Project." *Id.* Why does the Government disclaim its burden of proving a *quid pro quo* existed at the consummation of Mr. Henon's employment agreement? Because the evidence proves it did not.

In denying the prior Rule 29 motion, the Court acknowledged:

> Under the Federal Government's prosecution, which I have held was properly brought under the law, every Philadelphia City Councilmember or any public official in the United States, who retains a salary from an outside employer, communicated with that outside employer, and then acts or agrees to act in relation to that communication are then susceptible to a honest services fraud prosecution with only the element of a "corrupt intent" separating them from conviction.

(Opinion at 4 n.3.). It is undoubtedly true that the Government's "theory" presented here would ensnare every public official who retains outside employment and takes official action that benefits the outside employer – a theory that *Skilling*, *McDonnell* and subsequent precedent have roundly rejected. And it is unfortunate that such a theory may survive a motion to dismiss, as it did here. That does not mean that the Government is not still required to prove more to sustain a conviction. It is. It is required to prove a *quid pro quo*, as detailed above. Sustaining this conviction would only validate the unlawful expansion of the honest services fraud jurisprudence the Government has proffered here. Rules 29 and 33 exist so the Court will not do so.

## B. Corrupt Intent

In our prior motion, we also argued that *McDonnell* refined and narrowed precisely what intent the Defendants must possess at the inception of the *quid pro quo* in order for the Government to sustain an honest services fraud conviction. The Court does not appear to have addressed our

argument in the Opinion, though a citation to *United States v. Ganim* suggests the Court addressed an argument we did not make. At no point have we argued that any specific official act must be linked to any specific payment. Nor did we argue that the specific actions the public official would ultimately take must be identified in advance at the time of the formation of the *quid pro quo*. We did not make those arguments previously. We do not make those arguments here.

Instead, we argue that the Second Circuit in *Silver* (which analyzed *McDonnell's* effect on the Second Circuit's stream of benefits jurisprudence under *Ganim*) accurately applied *McDonnell* in determining that at the time the *quid pro quo* was formed, the parties to the *quid pro quo* must have both contemplated the "specific and focused" questions, matter, suits, causes or controversies the public official would later act upon. We further argue that accurately applying *McDonnell* as explained by the Second Circuit here means the Government did not and could not prove that the Defendants contemplated "official action" at the time the *quid pro quo* was consummated.[11]

In *McDonnell*, the Supreme Court unequivocally rejected the Government's broad conception of "official action," by narrowing and defining with precision what Defendants must have contemplated at the time of the alleged *quid pro quo*. *Id*. at 2373; 2371-72; *see also, Silver*, 948 F.3d at 553 (holding that under *McDonnell*, bribery prosecutions require more than a nonspecific promise to undertake official action on any future matter beneficial to the payor).

The *McDonnell* Court explained that "official action" has two components. First, the government must "identify a 'question matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may be law be brought' before a public official." *McDonnell*, 136 S. Ct at 2368 (quoting 18 U.S.C. § 201(a)(3)). Importantly, the Court explained that "it must also be

---

[11]     This argument is both intertwined with our "timing" argument discussed above and an independent dispositive flaw in the Government's case.

something *specific and focused* that is 'pending' or 'may by law be brought before a public official.'" *Id.* at 2372 (emphasis added); *see also id.* at 2374 (noting that the "'question matter cause suit proceeding or controversy' must be more specific and focused than a broad policy objective."). The Court further described it as "something that is relatively circumscribed – the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 2369. Second, the government "must prove that the public official made a decision or took an action '*on*' that question, matter cause, suit, proceeding, or controversy, or agreed to do so." *Id.* at 2368 (emphasis added).

*McDonnell* fundamentally altered the intent required to support a bribery conviction because the requisite intent for both briber and public official require the Defendants contemplate at the time of the *quid pro quo* that the benefit was given in exchange for "properly defined" "official action." *Id*. at 2375 (jury must find defendant "agreed to make a decision or take an action on a properly defined 'question, matter, cause, suit, proceeding or controversy.'"). Indeed, the Supreme Court emphasized that the relevant point in time in a bribery scheme is the moment the public official accepts the payment. *Id*. at 2365 ("[T]he offense is completed at the time when the public official receives a payment in return for his ***agreement to perform <u>specific acts</u>***.") (emphasis added).

Thus because, as the Supreme Court emphasized, the relevant time-period in a bribery prosecution is the moment the *quid pro quo* was formed, the Defendants must have contemplated "properly defined" "official action" at that moment, which involves some action on "specific and focused" questions or matters. *Id*. at 2374. This does not mean that the specific actions the public official would ultimately take on those questions or matters must have been considered in advance. *Silver*, 948 F.3d at 553 ("Even though the particular act of influence need not be identified at the

time of the official's promise, the particular question or matter to be influenced must be."). Nor does this mean that any specific payment must be linked to a specific action. *Id*. at 552 ("Silver is therefore incorrect in arguing that honest services fraud requires evidence of a meeting of the minds.").[12] However, *McDonnell* **does** require that the particular question or matter upon which the public official would later act must be identified at the time of the *quid pro quo*. *Id*. at 553

As the Second Circuit explained: "*McDonnell* re-emphasizes that the relevant point in time in a *quid pro quo* bribery scheme *is the moment at which the public official accepts the payment*." *Id*. at 556 (emphasis in original). Naturally, "[t]he question that arises here, however, is: what must the official promise at the time the bribery offense is committed?" *Id*. The Second Circuit answered that question through a simple application of the language of *McDonnell*. Because "official action" involves some action on a "focused," "concrete," and "specific" question or matter, "*McDonnell* thus stands for the proposition that bribery requires that an official accept a payment, knowing that he is expected to use his office to influence a 'focused,' 'concrete,' and 'specific' question or matter that 'may be understood to refer to a formal exercise of governmental power.'" *Id*. at 557.

Here, under *McDonnell*, the Government is required to prove that at the time Mr. Dougherty and Mr. Henon agreed to the alleged *quid pro quo* they both contemplated that Mr. Henon would take some action on the "specific and focused" "questions or matters" alleged. *See, e.g., Silver*, 948 F.3d at 569 (for bribery prosecution, Government must prove that, "at the time the bribe was accepted [the public official] promised to take official action on *a specific and focused question or matter*." (emphasis in original)).

---

[12]    *Menendez* adjudicated both of these issues. *Menendez* did not adjudicate whether the defendants are required to contemplate "specific and focused" questions or matters at the time of the *quid pro quo*.

The Government has offered no evidence that the Defendants contemplated at the time "Mr. Henon's employment" was given and accepted the six "specific and focused" questions and matters alleged because no such evidence could possibly exist under the Government's theory. Four alleged questions or matters involve purely spontaneous issues, which the Defendants could not have conceived of in advance: (1) the legality of the installation of MRI machines at CHOP; (2) the towing resolution; (3) the Parking Authority Audit; and (4) the Plumbing Code legislation. The Soda Tax legislation emerged as an issue only after Mayor Kenney was elected to office in 2016. And, concerning the Comcast Franchise Agreement, while it arguably was capable of advance consideration, the Government has not presented a single piece of evidence that the Defendants did contemplate Mr. Henon taking some action on the Comcast Franchise Agreement when he accepted his job at Local 98 in 2012. Accordingly, the Government has not – because it could not – produced any evidence that the Defendants understood Mr. Henon's employment was in exchange for some action on these six "specific and focused" questions or matters. *See, e.g., Silver*, 948 F.3d at 569 ("This review reveals that the Government presented no evidence that Silver made any promises to Taub, after 2007, regarding any action on any identified, or even *identifiable*, question or matter – much less a focused or concrete question or matter involving the exercise of governmental power." (emphasis in original)). The Government has, therefore, failed to prove the Defendants possessed the requisite intent to sustain convictions here.

## V.    ADDITIONAL ARGUMENT

### A.    John Dougherty Did Not Give Robert Henon His Job

Beyond the issues squarely addressed in the Opinion, this prosecution suffered additional fatal deficiencies. Most importantly, the Government failed to prove that John Dougherty personally conspired with Robert Henon to enter into a *quid pro quo* at all, let alone in the time-frame charged in the Indictment.

The Government's burden of proof was to establish that John Dougherty personally gave or authorized Local 98 to give Mr. Henon his employment. On this point, there were two pieces of evidence proffered at trial. First, the parties entered a stipulation establishing that John Dougherty "had authority" over hiring decisions at Local 98 but does not say that in every hiring decision Mr. Dougherty asserted that authority. It merely provides that he possessed that authority as a general matter. Second, to establish the giving and receipt of the *quids* alleged – Mr. Henon's salary and benefits – the Government proffered the testimony of Don Judge, Local 98 bookkeeper. (*See* Tr. Trans. (Oct. 15, 2021) (Judge, D.)). Mr. Judge essentially placed an exact date on that critical event: February 20, 2012, when he received from Brian Burrows, Local 98 President, direction to begin providing Mr. Henon a salary based on 20 hours of work per week and benefits calculated from 27 hours of work per week. (*Id*. at 34:19 – 36:4). As an initial matter, the Government not only failed to prove that John Dougherty "gave" Mr. Henon the alleged *quid*, it proved definitively that he did not, Brian Burrows did:

> Q. Okay. Well, let's talk about your style for a minute.
>
> A. Okay.
>
> Q. So, would your style be to confirm that that directive indeed came from Mr. Burrows?
>
> A. Yes. In other words, to confirm or be comfortable as best I can.

(*Id*. at 37:14-20)

Mr. Judge later confirmed Mr. Dougherty was not involved in this decision-making:

> Q. And so that note indicates that you received this direction from Brian Burrows, correct?
>
> A. That's right.
>
> Q. Brian, who you said was Brian Burrows?

A. That's correct.

Q. And he is the President of Local 98?

A. Yes.

Q. So, you didn't receive this direction from Mr. Dougherty regarding the change that occurred in 2012, correct?

A. ***I did not.***

(*Id*. at 59:16 – 60:1).

This testimony alone eviscerates the Government's premise that Mr. Dougherty gave Mr. Henon the alleged bribe. "[A]n individual may not be convicted on the basis of another person's acts which he neither authorized nor adopted." *United States v. Cryan*, 490 F. Supp. 1234, 1242-43 (D.N.J. 1980) (holding that co-defendants could not be convicted for bribery where they had no involvement in the execution of the bribery scheme); *see also United States v. Williams*, 203 F. App'x 976, 988 (11th Cir. 2006) (explaining that mere association is not enough to establish criminal liability).

The Government has repeatedly relied on the "inference" the jury "could" draw from the stipulation that because Mr. Dougherty possessed the authority to hire generally, he must have done so here. That inference while theoretically plausible is neither permissible nor reasonable here because it is directly contradicted by the direct testimonial and documentary evidence proffered through Mr. Judge. Moreover, the law does not permit the jury to inferentially find Mr. Dougherty conspired with Mr. Henon where the evidence states otherwise. While the elements of conspiracy may be proven through circumstantial evidence, the Third Circuit has cautioned that determining the sufficiency of the evidence in "a conspiracy prosecution requires close scrutiny." *See United States v. Coleman*, 811 F.2d 804. 807 (3d Cir. 1987). Close scrutiny is necessary because "a defendant's guilt must always remain 'individual and personal'" as

"conspiracy jurisprudence does not sanction guilt by association." *United States v.* Tyson, 653

F.3d 192, 206, 211 (3d Cir. 2011) (affirming judgment of acquittal on conspiracy charge).

Therefore, "[c]onspiracy cannot be proven 'by piling inference upon inference' where those

inferences do not logically support the ultimate finding of guilt." *United States v. Brodie*, 403

F.3d 123, 134 (3d Cir. 2005) (quoting *Coleman*, 811 F.2d at 808); *Tyson*, 653 F.3d at 206 (same);

*United States v. Rodriguez*, No. 02-198-02, 2003 U.S. Dist. LEXIS 17729, at *26 (E.D. Pa. Oct.

2, 2003) (same).

Not only is a finding that Mr. Dougherty authorized Mr. Henon's employment pure

speculation based on the fact that Mr. Dougherty possessed such authority, it is directly

contradicted by direct evidence. *Ordaz*, 119 F. App'x at 411 (evidence that only permits a jury

conclude that the defendant violated the law based upon mere speculation is not sufficient to meet

the government's burden.).

### B. The Government Improperly Advanced and Argued A Conflict of Interest Theory

Two Circuit Court statements perfectly encapsulate what the Government did and did not

urge upon the jury here.

First, what the Government argued, and which is no longer the law:

> The only difference between a public official who accepts a bribe and a public
> official who receives payments while taking discretionary action that benefits that
> payor, as Loeper did in this case, is the existence of a *quid pro quo* whereby the
> public official and the payor agree that the discretionary action taken by the
> public official is in exchange for payment.

*Panarella*, 277 F.3d at 698.

Second, the Government's burden, which it emphatically disclaimed and more

emphatically failed to meet:

> An official who merely accepts a thing of value in an otherwise legal manner (*e.g.*
> client referrals, as permitted under New York law) has not committed a crime. If

that official later acts to the benefit of the payor, she still has not committed a crime. It is only upon a showing that, at the time the official accepted the payment, she understood it to be a payment in exchange for official influence on some specific, focused, and concrete matter involving the formal exercise of governmental power that the Government has met its burden.

*Silver*, 948 F.3d at 577

*Urciuoli* again provides a useful illustration of a conviction fairly achieved under the law, in contrast to what occurred here. In that case, the defendants had previously been convicted of honest services fraud based on a failure to disclose theory and had their convictions vacated by the First Circuit because the activity at issue involved lawful lobbying. *Urciuoli*, 613 F. 3d at 13. Between the time the convictions were vacated and the retrial, the Supreme Court decided *Skilling*. Thus, "[i]n the new trial, the government presented much of the evidence offered in the first trial, but Celona did not testify and this time the government limited its theory to *quid pro quo* bribery, eschewing any suggestion that – absent bribery – an undisclosed conflict of interest on Celona's part was sufficient, and avoiding reliance on Celona's lobbying relating to the ambulance service." *Id*. Indeed, there the government took great care to ensure its prosecution was lawfully and fairly presented and not tainted by the introduction of impermissible evidence and argument. The First Circuit explained: "[t]he theory that non-disclosure of a conflict of interest was enough, even without a bribe, was advanced by the government in the first trial; but, stripping down its case, the government excluded any such theory from its opening argument, the revised indictment and its closing argument." *Id*. at 15.

The jury instructions also made clear a conflict of interest was not sufficient for a conviction, providing:

The Government must prove beyond a reasonable doubt that Defendant Urciuoli intended the payment to cause John Celona to alter his official acts, to change an official position that he would otherwise have taken or to take official actions that he would not have taken but for the payment;

and that

> [t]he Government has charged honest services mail fraud based on a claim that John Celona was paid to perform certain official acts. Paying a legislator to perform political acts is not the same as employing a legislator in a job which creates a conflict of interest between the legislator's political duties and his employment.

*Id.*

Rather than act within the law and the facts the Government leaned into the impermissible conflict theory repeatedly. The Government repeatedly questioned the accuracy of the various times that Mr. Henon and Local 98 disclosed his employment with the Union. For example, the Government called Department of Labor Senior Investigator Donna Thompson to testify exclusively regarding Local 98's LM-2s and the accuracy of the disclosures made therein with regard to Mr. Henon. (*See, e.g.*, Tr. Trans. 149:11-150:14 (Oct. 14, 2021) (Thompson, D.) (testifying that Local 98 reported that Mr. Henon did not devote any time to "political activities and lobbying")). Special Agent Blake also testified about Local 98's disclosures regarding Mr. Henon's salary and his position at Local 98. (Tr. Trans. 19:13-22 (Oct. 6, 2021) (Blake, J.)). The Government further questioned the validity of the disclosures that Mr. Henon made to the City of Philadelphia and the Commonwealth of Pennsylvania in the Statements of Financial Interest that he filed with each respectively. (*See* Tr. Trans. 25:20-27:9 (Oct. 6, 2021) (Blake, J.) (testifying regarding the disclosure of Local 98 as a "source of income" on Mr. Henon's 2015 Statements of Financial Disclosure); Tr. Trans. 75:16-77:20 (Oct. 19, 2021) (Holyrod, T.) (testifying regarding the manner in which he completed Mr. Henon's Statement of Financial Interest form in 2015, which disclosed that Mr. Henon was an "electrician" employed by Local 98)). In closing, the Government doubled down on this impermissible theory, arguing "all of the disclosures the Defendants made that were required by law, they were misleading, the Defendants did not disclose the true nature of their relationship." (Tr. Trans. 59:1-4) (Nov. 8, 2021) (Costello, F.)).

During closings, the Government pursued this angle with abandon, making statements about illegal conflicts over and over again:

> And because you got to listen to those recordings, you now know that because the only disclosures that the defendants made were misleading, hearing and recording the conversations of the defendants was the only way to reveal the true nature of their corrupt relationship. (Tr. Trans. 63:5-10) (Nov. 8, 2021) (Costello, F.)).

> Because you are no longer giving the public the undivided loyalty that they are owed. You are compromised. The public should not have to guess whose interest you are acting in. (*Id*. at 66:10-12).

> You know why, because you heard the calls because Mr. Henon's private boss, Mr. Dougherty, did not like the deal that Mr. Henon as councilman has struck, using labor's input and everyone else's input to try to do his actual job, the job we pay him for, the job he is supposed to be doing as the City Councilman. (*Id*. at 242:10-15 (Witzleben, B.))

> That is not working for him. That means you're a member of the union, which is aces and not a conflict and not a problem and not something he is proud to be. He could be passionate about that. (*Id*. at 247:13-16).

> And these two men here in Philadelphia violated that and they made a mockery of the disclosure requirements that the law puts on them so that we, the people, can see if our public officials are honest. (*Id*. at 250:24 – 251:3).

Importantly, the Government made these statements only after disclaiming its responsibility to prove a *quid pro quo* – the only thing that distinguishes a conflict of interest from a bribe according to the Third Circuit. (*See, e.g.*, Tr. Trans. 63:5-13 (Nov. 8, 2021) (Costello, F.) ("And the Government proved that it existed during the time charged. Whether it existed before that and how long is just not a question before you"); *id*. at 234:19-22 (Witzleben, B.) ("We don't have to show when it started and we don't have to show when it ended if ever. We have to show that it was in existence during the time charged")). By doing so, it may have achieved a conviction, but it irrevocably tainted these proceedings. *See United States v. Wright*, 665 F.3d 560, 572 (3d Cir. 2012) (vacating honest services fraud convictions where the conflict-of-interest theory was emphasized); *United States v. Bruno*, 661 F.3d 733, 739 (2d Cir. 2011) ("his honest services fraud

conviction on Counts Four and Eight must be vacated because, in light of *Skilling*, the district court's charge incorrectly stated the law. After our review of the record, we agree.").

Of course, that is all this case ever was. As discussed repeatedly, the Government's theory precluded it from ever proving a *quid pro quo* – and therefore bribery – under the applicable law. *See Bryant*, 556 F. Supp. 2d at 419 ("The conceptual distinction between the bribery theory and failure to disclose theory is that, under the failure to disclose theory, the conflict of interest that is not disclosed can be something *less* than a *quid pro quo* agreement to exercise official discretion. The reason that the failure to disclose theory applies even when the conduct at issue falls short of a *quid pro quo* arrangement is that, by failing to disclose a conflict of interest, the official deprives the public of the ability 'to judge for itself when an official has acted on a conflict of interest,' and hence deprives the public of his honest services - even if the official was not actually influenced by a conflict of interest, or did not agree to be influenced." (emphasis in original)). So, well-aware of the substantial analytical over-lap between the failure to disclose theory and the bribery theory of honest services fraud and the infirmities of its own evidence, the Government's only remaining path was to blur the lines between those theories and, consequently, between what is and what is not a crime and hope the jury took the bait.

It is prosecutions like this that demand judicial intervention.

## C.     The Government Failed to Prove Mr. Henon Took "Official Action"

Mr. Dougherty renews each of his arguments set forth in the original Rule 29 Motion as to the alleged official acts. In connection with the CHOP allegations, in addition to the grounds set forth in the original Rule 29, we further argue that forwarding a complaint concerning unlawful activity to the Department of Licenses and Inspection ("L&I") cannot, as a matter of law, be considered a deprivation of honest services. As the First Circuit explained in *Urciuoli I*, "[u]nlike most conduct typically the subject of case law, urging local officials to obey state law is not easily

described as a deprivation of honest services, actually or potentially harmful to the citizens." *United States v. Urciuoli*, 513 F. 3d 290, 295 (1st Cir. 2008). The evidence presented at trial was that contractors were violating state law in the installation of MRI machines at CHOP. Mr. Henon forwarded a complaint about that work to the proper authorities who substantiated the complaint. This is not a crime. It is honest services.

## VI.     CONCLUSION

For the reasons set forth above, the Court must vacate Mr. Dougherty's conviction pursuant to Fed. R. Crim. P. 29 or, alternatively, grant a new trial pursuant to Fed. R. Crim. P. 33.


Date: November 29, 2021

                                                    Respectfully submitted,

                                                    /s/ *Terence M. Grugan*
                                                    Henry E. Hockeimer, Jr. (I.D. No. 86768)
                                                    hockeimerh@ballardspahr.com
                                                    Terence M. Grugan (I.D. No. 307211)
                                                    grugant@ballardspahr.com
                                                    Emilia McKee Vassallo (I.D. No. 318428)
                                                    mckeevassalloe@ballardspahr.com
                                                    Ballard Spahr LLP
                                                    1735 Market Street, 51st Floor
                                                    Philadelphia, PA 19103
                                                    (215) 665-8500