IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 19-64** |
| **JOHN DOUGHERTY**<br>**ROBERT HENON** | **:** | |


# O R D E R

AND NOW, this        day of             , 2022, upon consideration of the Motions of

Defendant John Dougherty for Judgment of Acquittal, and, in the Alternative, a New Trial and

Defendant Robert Henon for Judgment of Acquittal, and the Government's Response, it is

hereby **ORDERED** that the Motions are **DENIED.**

BY THE COURT:

_____
**HONORABLE JEFFREY L. SCHMEHL**
**United States District Court Judge**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


**UNITED STATES OF AMERICA**        :

       **v.**                   :        **CRIMINAL NO. 19-64**

**JOHN DOUGHERTY**             :
**ROBERT HENON**


**GOVERNMENT'S RESPONSE TO
DEFENDANT JOHN DOUGHERTY'S MOTION FOR JUDGMENT OF ACQUITTAL
AND, IN THE ALTERNATIVE, A NEW TRIAL AND DEFENDANT ROBERT HENON'S
MOTION FOR JUDGMENT OF ACQUITTAL**

Defendant John Dougherty's motion for judgment of acquittal and for a new trial, and defendant Robert Henon's motion for a judgment of acquittal, should be denied. They are based on misstatements of the law and mischaracterizations of the evidence that are amplified and twisted into numerous iterations, none of which survive any level of rational scrutiny. This Court should reaffirm its ruling denying the defendants' prior motions for acquittal, which controls the result here.

**I.      Overview.**

The defendants were convicted at trial of honest services fraud, regarding events in 2015 and 2016 during which John Dougherty provided a salary and other benefits worth more than $200,000 to Robert Henon, a Philadelphia City Councilman, in return for Henon's performance of official acts, in essence, any action Dougherty wanted to further his interests. Dougherty acted as the Business Manager of IBEW Local 98, retaining Councilman Henon on Local 98's payroll in exchange for control as desired over Henon's official actions.

Following a lengthy trial, the jury convicted the defendants of a conspiracy to commit honest services mail and wire fraud, and of eight substantive wire and mail frauds related to specific official actions Henon undertook at Dougherty's behest. Specifically, the defendants were convicted of Count 97 (conspiracy to commit honest services mail and wire fraud, in violation of 18 U.S.C. § 371); Count 100 (wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2, related to L&I/CHOP); Count 101 (wire fraud, related to Plumbing Code/Building Trades); Count 102 (wire fraud, related to Towing); Count 103 (wire fraud, related to Towing), Count 105 (wire fraud, related to Comcast), Count 106 (wire fraud, related to Comcast), Count 108 (wire fraud, related to Soda Tax #2), and Count 109 (mail fraud, related to L&I/CHOP). In addition, Henon was convicted on Counts 110 and 114, charging him with honest services wire fraud and federal program bribery, in violation of 18 U.S.C. §§ 1343, 1346, and 18 U.S.C. § 666, respectively, arising from his solicitation and acceptance of a $5,000 campaign contribution from the Communications Workers of America Local 13000 in October of 2015.

Most of this response is focused on the counts on which both defendants were convicted. With regard to those charges, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found that between May 2015 and September 2016 defendant John Dougherty paid defendant Robert Henon bribes in the form of a "stream of benefits," which included Henon's salary from Local 98 and tickets to sporting events, with the intent to influence Henon, and in exchange for Henon's performance of official acts, in Henon's capacity as a member of Philadelphia City Council, and that Henon

accepted the "stream of benefits," with the intent to be influenced by Dougherty in the performance of official acts, and in exchange for official acts.

The crimes rest on a conspiracy or scheme to pay a bribe and thus deprive the citizens of Philadelphia of the honest services of Henon. Honest services bribery involves "a *quid pro quo*, that is, a specific intent to give or receive something of value in exchange for an official act." *United States v. Ciavarella*, 716 F.3d 705, 729 (3d Cir. 2013) (*quoting United States v. Wright*, 665 F.3d 560, 567-68 (3d Cir. 2012)). The bribes in an honest services prosecution can be a "stream of benefits," in which the payor provides numerous benefits in exchange for the recipient's agreement to perform official actions as required. *United States v. Bryant*, 655 F.3d 232, 240-41 (3d Cir. 2011); *United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007) (bribery theory of honest-services fraud satisfied by "stream of benefits" in exchange for some official action, without need to show specific benefit for specific action: "payments may be made with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf") (citation omitted).

Further, the *quid pro quo* need not be explicit or express; the intent of both parties may be proved by circumstantial evidence. "The *quid pro quo* can be implicit, that is, a conviction can occur if the Government shows that [the official] accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity." *United States v. Antico*, 275 F.3d 245, 257 (3d Cir. 2001); *Wright*, 665 F.3d at 568.

Most of the defendants' arguments are targeted at the sufficiency of the evidence of conviction.[1] The question with respect to a judgment of acquittal is whether, "after viewing the evidence in the light most favorable to the prosecution, ***any*** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original). The standard in judging the sufficiency of the evidence is the same as that applied by the Court of Appeals on appellate review. *United States v. Salahuddin*, 765 F.3d 329, 348 (3d Cir. 2014). The Court's review of the sufficiency of the evidence is "highly deferential." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc). The reviewing court "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *Caraballo-Rodriguez*, 726 F.3d at 430, quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).

"The district court - and we - are not to act as a thirteenth juror. Instead, the jury's verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'" *Caraballo-Rodriguez*, 726 F.3d at 431, quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012). *See also Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (evidence supporting guilt is insufficient only if "no rational trier of fact" could reach that conclusion).

All inferences must be taken to support a finding of guilt. "A reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume - even if it

---

[1] Both defendants concede that the jury was properly instructed with regard to every aspect of the law applicable in this case. Defendant Dougherty concedes this explicitly ("the burden the government faced here was reflected in the jury charges," Mtn. 3), while defendant Henon concedes this implicitly, raising no objection to the Court's instructions.

does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam), quoting *Jackson v. Virginia*, 443 U.S. at 326 (1979). As set forth by the Third Circuit:

> While evidence proffered at trial may be consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict – and not to usurp the role of the jury – as long as it passes the "bare rationality" test. Reversing the jury's conclusion simply because another inference is possible – or even equally plausible – is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges . . . . It is up to the jury – not the district court judge or our Court – to examine the evidence and draw inferences. Unless the jury's conclusion is irrational, it must be upheld.

*Caraballo-Rodriguez*, 726 F.3d at 432.

For all of the reasons set forth below, viewing the evidence in the light most favorable to the prosecution, it is clear that any rational trier of fact could have found the defendants' guilt beyond a reasonable doubt, as the trial jury in fact did.

Dougherty also argues, in the alternative, that he is entitled to a new trial. Because, as this response makes clear, the jury's verdict was not against the weight of the evidence, and there is no danger that an innocent person has been convicted, the defendant's motion for a new trial should be denied.[2]

---

[2] Fed. R. Crim. P. 33(a) provides that the district court "may vacate any judgment and grant a new trial if the interest of justice so requires." The Third Circuit stated:

> "A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of evidence only if it 'believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir.2002) (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir.1994)). "Thus, '[m]otions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases.'" *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir.2003) (alteration in original) (quoting *Gov't of V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir.1987)). When evaluating a Rule 33 motion, the district court "does not view the

As has regrettably been true throughout this litigation, the defendants' pleadings contain much hyperbole and invective, unsupported by the actual record or law. The government does not respond here in kind, but rather sets forth the applicable law and facts in a manner more suited to the proper conduct of litigation before this Court.

In his motions, Dougherty advances these arguments: (1) The government failed to prove its case because it did not prove that the illegal arrangement existed at the time Henon's simultaneous employment as a Council member and Local 98 employee began in 2012. (2) The government was required to prove that each official act charged was contemplated and agreed at the time the original quid pro quo agreement was made. (3) Dougherty was not responsible for giving Henon the Local 98 job. (4) The government impermissibly obtained a conviction based on an invalid conflict-of-interest theory. (Dougherty also states that he repeats his earlier arguments about the absence of any official action, but presents no new argument on those points, all of which this Court previously resolved against him.)

For his part, Henon argues that the government failed to prove that he too any official action in exchange for a bribe, essentially echoing Dougherty's arguments, and adding the claim that Henon in fact did considerable work for Local 98 that did not involve his public duties. He also asserts that the acts he took for Dougherty's benefit were not "official acts" as defined by the Supreme Court; and that there was insufficient evidence that the $5,000 campaign donation he received from the Communications Workers of American (CWA) Local 13000 in October 2015 was a bribe.

---

evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *Johnson*, 302 F.3d at 150.

*United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014).

All of these arguments fail, for the reasons set forth at length in the government's earlier response to the defendants' Rule 29 motions (ECF 233), this Court's opinion denying those motions (ECF 252), and for the additional reasons specifically stated here.

## II.    Discussion.

### A.    The Notion That the Government Was Required to Prove the Commencement Date of the Honest Services Scheme, or That the Conspiracy Existed at an Earlier Time, Is Meritless.

Dougherty's primary argument remains the same premise he suggested, and the Court rejected, at the conclusion of the evidence: that the government must prove that the honest services fraud conspiracy began during the period charged in the indictment (May 2015 through September 2016), and because Henon's employment relationship began earlier, it cannot do so and the defendants must be acquitted. This claim is entirely meritless. Moreover, Dougherty overlooks that it is entirely inapplicable to the eight substantive wire and mail fraud charges of which the defendants were convicted.

This Court previously rejected the assertion, stating in part:

> The Government does not need to prove that the stream of benefits began in 2012 when Henon joined City Council. The Government seeks to prove that Henon received a stream of benefits from Dougherty, through Local 98, while Henon was a Councilmember, and Henon committed "official acts" at Dougherty's behest given the benefits. That is precisely what the indictment alleges. The indictment alleges that from May 2015 to September 2016, Dougherty, through Local 98, paid Henon a salary and provided him with sporting event tickets for his "official acts," and all of which were allegedly performed with the corrupt intent to deprive the City of Philadelphia of the intangible right of Councilmember Henon's honest services.

ECF 252 at p. 3. That judgment remains correct.

### 1.    The government charged and proved a conspiracy that took place in 2015 and 2016.

In continuing to present the same argument - that the government was required to prove a quid pro quo agreement at the time that Henon became a City Council member in 2012 and

remained on the Local 98 payroll, the defendants continue to determinedly ignore what the indictment actually charges. The indictment does not charge that a conspiracy to commit honest services wire fraud began in 2012, as the government did not possess evidence to prove that. It charged that a conspiracy existed in 2015 and 2016 for Henon to perform official acts *at that time* in exchange for salary and benefits being provided *at that time.* That is all the government was required to prove, and did prove.

The indictment alleged:

11. Defendant JOHN DOUGHERTY, through Local 98, provided defendant ROBERT HENON with a stream of personal benefits during the time that HENON was a member of Philadelphia City Council. The benefits given to HENON by DOUGHERTY **included a salary from Local 98 and tickets to sporting events**. Specifically:

a. **Local 98 paid ROBERT HENON a salary during the time he served as a City Councilman, totaling $70,649 in 2015 and $73,131 in 2016**. On Local 98's annual LM-2 reports filed with the United States Department of Labor, Local 98 described HENON's position as "office staff." On annual financial disclosure forms that HENON was required to file with the City Board of Ethics in 2015 and 2016, specifying the source, but not the amount, of income over $500 and gifts over $200 (in the aggregate), HENON disclosed Local 98 as a source of income, describing his position as "electrician," while not disclosing any gifts. In fact, throughout the period of the conspiracy, HENON did not work as "office staff" nor as an electrician for Local 98, and HENON did not perform any significant work of any kind for Local 98 apart from his efforts as a member of the Philadelphia City Council to act as directed by and to benefit defendant JOHN DOUGHERTY.

b. **During 2015 and 2016, defendant JOHN DOUGHERTY gave defendant ROBERT HENON tickets to sporting events with a value of approximately $11,807. These tickets were paid for by Local 98.**

12. Defendant JOHN DOUGHERTY gave these things of value to defendant ROBERT HENON with the intent to influence HENON in HENON's capacity as a member of Philadelphia City Council and Chair of the Committee on Public Property, and in exchange for HENON acting on behalf of DOUGHERTY, in his capacity as a member of Philadelphia City Council, and performing official acts as directed by and on behalf of DOUGHERTY.

13. Defendant ROBERT HENON accepted the stream of personal benefits from defendant JOHN DOUGHERTY, knowing that the benefits were given in

exchange for HENON's performance of official acts at the direction of and on behalf of defendant DOUGHERTY. Furthermore, defendants DOUGHERTY and HENON attempted to hide the true nature of their illegal relationship from the public.

These allegations appear in the conspiracy charge, Count 97, at pages 110-11 (emphasis added). They are then repeated and incorporated in the substantive honest services fraud charges, Counts 98-109, at pages 128 and 133.

The Indictment thus explicitly charges that Henon took official actions in exchange for the IBEW 98 salary, as well as sports tickets. The salary, the government proved, was paid on a weekly basis during the period of the scheme, totaling over $70,000 in each year. There is no reason in law or logic that the government was required to prove anything more than these allegations, including whether the defendants acted corruptly in earlier years. The notion that the illegal arrangement may have begun earlier, when Henon's simultaneous City and Local 98 employment commenced, is simply a straw man, divorced from the actual indictment and applicable law.

**2.      The government is never required to prove the commencement of a criminal scheme.**

Even if the quid pro quo arrangement began earlier (which it probably did),[3] the government was certainly not required to prove that.

The government is never required to prove the exact beginning date of a criminal conspiracy, nor is it ever restricted in proving crimes simply because it cannot prove the full

---

[3] What happened here is not a mystery. Dougherty kept Henon on the Local 98 payroll after Henon was elected in 2011, and (as will be addressed in more detail later), there is no evidence that Henon ever did anything thereafter for Local 98 that resembled legitimate work. But that only shows part of the necessary equation. The government is also required to prove beyond a reasonable doubt that Henon agreed to take official acts on Dougherty's behalf in exchange for the salary and benefits, and the evidence of that conduct did not become manifest until a court-authorized wiretap began in 2015.

extent and duration of the criminal plot. It is not unusual for the government to learn of and prove the existence of criminal conduct in its later stages. *See, e.g., United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005) (the government used electronic surveillance to investigate extortionate conduct of city plumbing inspectors that had been taking place for years). If the defendant's apparent theory of the law were accepted, crimes that span a period of time would be immune from prosecution simply because the government did not know about, or have the evidence to prove, the precise moment that the first part of the crime began. As this Court has recognized, that is not the law.

The defendants' suggestion is actually rather stunning, that the government cannot prosecute a criminal conspiracy unless it can identify and prove the moment at which that conspiracy began. Taken to its logical extent, this notion would also apply to any crime involving an ongoing scheme or continuing course of conduct. This would mean that any conspirators, ranging from co-workers pilfering the accounts of their employers, to drug traffickers peddling narcotics, to sworn members of the most sophisticated and pernicious organized crime enterprises, are off the hook so long as the government, even as it has gathered evidence of current criminality, cannot prove when the conspiracy began and for how long it continued. But there is no such rule; a person is liable for criminal conduct at the time it occurs, whether part of an ongoing conspiracy or as a new act.

In fact, it is likely most common that the government does not gather evidence to prove ongoing illegal acts until some time after those acts commenced. The government may prosecute for the acts it can prove as of the time they occurred. What happened in this case is probably rather typical. A rational person can certainly surmise that Dougherty and Henon's conduct was corrupt from the moment that Henon won the election and Dougherty kept him on

the Local 98 payroll. But a logical assumption does not make a criminal case; what is required is proof beyond a reasonable doubt. That proof arrived beginning in 2015, when court-authorized wiretaps revealed the precise details of the official acts that Henon was providing at that time in exchange for Dougherty's largesse. A criminal prosecution based on those acts was manifestly warranted and appropriate.

In support of his fanciful argument, Dougherty focuses specifically on the Supreme Court's description of an honest services scheme as one in which "the public official agreed to perform an 'official act' at the time of the alleged quid pro quo." *McDonnell v. United States*, 136 S. Ct. 2355, 2371 (2016). *See* Dougherty Mtn. 18. But of course, nothing in that statement requires the government to prove *every time* the payor acted to corrupt a public official. What is required, with respect to a conspiracy charge, is proof that at a particular time at least two people agreed that an official would take official action at that time in exchange for a payment. That is exactly what the indictment alleged, as set forth above, and what the government proved here with respect to the defendants' conduct in 2015 and 2016. There is nothing in *McDonnell*, or any other decision, that supports the notion that the government may only prove a quid pro quo agreement at the very first moment that such an agreement was reached, and is thereafter barred from prosecuting repeated executions of the conspiratorial agreement.[4]

---

[4] Dougherty attempts to establish a classic Catch-22. First, he says, "the Government has proffered no evidence of the Defendants' intent at the time the employment arrangement was established. This case therefore fails." Mtn. 18. Then, he continues, "even if the Government had offered such proof at trial, it would have impermissibly varied from the charges in the Indictment because the crime – the corrupt agreement – would have occurred outside of the charged conspiracy." *Id.* In other words, he posits, if there is no available proof regarding the defendants' acts at the beginning of their scheme, the defendants may continue their corrupt arrangement unhindered for the rest of time. The law, of course, is not so nonsensical.

Dougherty repeatedly ignores a key fact: Henon was paid every week. The gravamen of the crime was not the initial "consummation" of their corrupt relationship. The gravamen of the crime is that Dougherty repeatedly paid Henon, and during the period he was being paid Henon repeatedly agreed to take official acts on Dougherty's behalf. That is, after all, precisely the "stream of benefits" theory that the Third Circuit has endorsed. Every single time Henon accepted a salary payment, or took sports tickets, or received some other benefit, during the time that he promised to take official action as requested, a conspiratorial agreement existed and a quid pro quo was consummated (and indeed many such incidents were charged and proven as substantive crimes, as will be discussed later).[5]

---

[5] While focusing on the matter of employment, Dougherty ignores entirely the proof regarding tens of thousands of dollars of other benefits he showered Henon with in 2015 and 2016, that alone support the verdict. In part, the government proved at trial that between May 2015 and May 2016, Dougherty provided Henon with sporting events tickets (and accompanying food charges) that had been paid for by Local 98. Gov. Ex. 192. The evidence showed that sometimes Henon directly asked Dougherty for tickets, and other times Dougherty directly offered Henon the tickets. In three of the five incidents proven at trial, the tickets were in luxury boxes or suites Local 98 had purchased. The events included two Eagles football games, a Phillies game, a lacrosse game (which Henon asked Dougherty about to take his family, and which Dougherty then caused Local 98 to purchase), and the NCAA basketball tournament games played on March 27, 2016, at the Wells Fargo Center. A conservative estimate of the value of these tickets, that Henon was given as part of the *quid pro quo,* was just over $20,000, far beyond the means of the average Philadelphia sports fan.

The tickets that Henon was given as part of the *quid pro quo* included an entire box of tickets for the Eagles game played on December 13, 2015. Dougherty gave Henon these tickets on November 27, 2015; he told Local 98 employee Marita Crawford that Henon was then "in the middle of the Comcast deal" at the time Henon picked up the tickets. Gov. Ex. 2-10100. During a conversation on December 3, 2015 (the day of the committee hearing on the Comcast Franchise Agreement, explained later), Dougherty told Henon "good job today," and talked to Henon about the tickets to the upcoming Eagles game of December 13. Gov. Ex. 1-51561. And exhibiting his consciousness of guilt, Henon later advised Councilwoman Helen Gym, who used one of the tickets, that he was not disclosing his receipt of the tickets, telling her, "there is no trail of anything." Gov. Ex. 6-5328. A rational jury could find a quid pro quo agreement on these facts alone.

As noted, there is no law supporting Dougherty's notion that the government must prove the existence of a quid pro quo arrangement at the moment it began. The cases he cites do not remotely support this incorrect view.

For instance, he cites *United States v. Atl. States Cast Iron Pipe Co.*, 2007 U.S. Dist. LEXIS 56562, at *198-99 (D.N.J. Aug. 2, 2007). It does not assist him. The issue before the court there was whether the government proved that "at the time they conspired, the members of the conspiracy could have expected that [an OSHA] proceeding would be instituted and intended that their actions would obstruct that anticipated proceeding." *Id*. at *197. The district court denied the defendant's motion, observing that there was no requirement that a particular official proceeding be foreseeable at the outset of the conspiracy, one of the objects of which was obstruction, and holding that defendants were not entitled to an acquittal or a new trial. *Id.* at *198, 201. The court stated as follows:

> **There is no requirement that a conspiracy start or end on any specific date**. This Court properly instructed the jury that "the government has sustained its burden of proof as to the existence of the conspiracy if you find that the particular conspiracy **existed** at any point in time reasonably near the dates set forth in the Indictment. (Emphasis added) (citation omitted).

*Id*. at *198. Here, as explained earlier, the government alleged and proved that a conspiracy existed during the dates charged in the indictment. Nothing more was required; certainly *Atl. States Cast Iron Pipe* does not mandate proof of the beginning date of an uncharged part of a conspiracy.

Dougherty also claims that "the Government is required to prove that the quid pro quo relationship was corruptly formed in the time-frame set forth in the Indictment as charged by the Grand Jury," citing *United States v. Davis*, 2018 U.S. Dist. LEXIS 155755, at *8 (E.D. Pa. Sep. 12, 2018), as support for the statement. Mtn. 17-18. *Davis* does not stand for that

proposition. The defendant in *Davis* was convicted of conspiracy to commit honest services fraud for providing a stream of benefits to the Sheriff of Philadelphia in exchange for services contracts from the Sheriff's Office. Davis moved for a judgment of acquittal or, in the alternative, a new trial, arguing that the government failed to prove an overt act within the statute of limitations and the existence of an unlawful agreement. The court denied the motions. The court in *Davis* never suggested, much less held, that the government must prove that an illegal agreement was first formed during the period charged in the Indictment.

Dougherty also cites *United States v. Ramirez*, 2021 U.S. Dist. LEXIS 116327, at *19 (S.D.N.Y. June 22, 2021), in support of his specious claim that "without proof that the quid pro quo agreement was formed in the time period of the charged conspiracy, the Government cannot prove that the corrupt agreement was formed in the time period of the charged conspiracy." Mtn. 13. *Ramirez* also does not support his argument. The issue before the court in *Ramirez*, where the defendant was convicted of conspiring to import cocaine into the United States and conspiring to possess machineguns and destructive devices during and in relation to the charged drug trafficking crime, was whether the evidence sufficiently supported the defendant's conspiracy convictions. The defendant argued that the death of one coconspirator, and the end of his relationship with another, proved that the conspiracy had been terminated, and, as a result, the conspiracies involving the defendant fell outside of the statute of limitations. *Id.* at *18. The court denied the defendant's motions, holding that the evidence showed otherwise. *Id.* at *26. *Ramirez* does not stand for the proposition that the government must prove that the conspiracy was first formed in the period charged in the Indictment. In fact, the *Ramirez* court later stated that the government met its burden in this case by "introducing sufficient evidence to show that such a conspiracy **existed**." *Id.* at *25-26 (emphasis added).

Likewise, Dougherty cited *United States v. Traitz*, 2002 U.S. Dist. LEXIS 22903 (E.D. Pa. Nov. 26, 2002), in support of the same claim. The issue before the district court in *Traitz* was whether the evidence supported the defendants' convictions for participating in a single conspiracy, which the government alleged continued during the incarceration of two of the defendants; the court held that it did. *Id*. at *8, 14. T*raitz* does not stand for the proposition that the government must prove that the conspiracy was first formed in the period charged in the Indictment.[6]

Dougherty's citations to *Ramirez* and *Traitz* were followed by parentheticals containing the phrases that the jury must find that "the conspiracy was formed and existed during the time period charged in the Indictment," *Ramirez* at *19, and that "a conspiracy was formed and existed continuously between the dates reasonably near those alleged in the indictment as the beginning and ending dates," *Traitz* at *6. In neither case did the court hold that the government had to prove that the conspiracy was initially formed during the period charged in the indictment. Furthermore, no Third Circuit model jury instruction contains this counter-intuitive requirement.

Counsel for Dougherty even quotes this Court out of context in this regard, claiming that "[a]s explained by the Court, the Government was required to prove that 'the charged conspiracy was formed and existed for some time within the period set forth in the indictment.' (Tr. Trans. 38:25 – 39:1 (Nov. 10, 2021)," *see* Dougherty Mtn. 3, but omitting the preceding part of the transcript, which reflects that the Court instructed as follows:

_____

[6] The *Traitz* court granted the defendants' motions for a new trial because during jury deliberations, tape recorded trial testimony of several government witnesses was played for the jury pursuant to its request. Neither the court nor counsel were advised of this request. *Id.* at *15.

> **Although Count One [97] of the indictment charges that the conspiracy existed from at least May 2015 to on or about September 2016, it is not essential that the government prove that the conspiracy started or ended on or about those specific dates.** It is sufficient if you find that in fact the charged conspiracy was formed and existed for some time within the period set forth in the indictment.

TT 11/20/21 p. 38, line 20-25; page 39, line 1 (emphasis added).

Like the quotes from *Ramirez* and *Traitz*, it is clear that the phrase "for some time within the period set forth in the indictment" in the Court's instruction to the jury modified "existed," not "formed," especially in light of the Court's Memorandum Opinion of November 29, 2021, denying the defendants' prior Rule 29 motions. ECF 252 at pp. 3-4 ("Supreme Court precedent and Third Circuit precedent does not hold that the Government must prove the very beginning of a stream of benefits theory. . . [t]he Government does not need to prove that the stream of benefits began in 2012 when Henon joined City Council.").

In sum, there is no authority supporting the proposition that the government is required to prove the inception of an honest services fraud conspiracy, and that the quid pro quo agreement existed at that time. What the government is required to prove is that a conspiracy existed during the time period alleged in the indictment. The government did so here.

### 3. Henon was not entitled to the benefits he received.

Relatedly, the defendants make the argument that because Henon "already possessed his employment" in May 2015, it could not be the basis of a corrupt agreement occurring between May 2015 and September 2016, "because the job already belonged to Henon." Dougherty Mtn. 5. Dougherty asserts that "the thing of value underlying a bribe cannot be something the public official already possesses." *Id.* He then goes on to liken defendant Henon's Local 98 salary to "cash from the public official's own wallet," and "lodging at the public official's own vacation house." *Id*. These helpful analogies lay bare the fallacy of the

- 16 -

defendants' contention, which seeks to equate the payment by one to another of an ongoing stream of benefits that is to be earned by ongoing work, and which can be terminated at any time (to wit, a salary), with property that already belongs to the recipient.

The defendants' contention about the government's case suggests that in 2012, Local 98 granted defendant Henon a stream of money-and-benefits-for-life, without regard to whether he did any work for the union. This is another frivolous claim. Henon was not entitled to anything. A person earns a salary for doing a job. The government proved that the only significant work Henon did for Local 98 during the period of the charged conspiracy was advance its interests in his public duties as a member of the City Council. That is why this was a bribe.

Henon never "possessed" his position at Local 98. He was always subject to the authority of Dougherty, who could have terminated him at any time. Gov. Ex. 414. *Cf. Permenter v. Crown Cork & Seal Co.*, 38 F. Supp. 2d 372, 377 (E.D. Pa. 1999), *aff'd*, 210 F.3d 358 (3d Cir. 2000) (Pennsylvania law presumes all employment that is not the subject of a contract is at-will; an at-will employee can be discharged for any or no reason). *See also Conrad v. Northumberland Cty.*, 2010 WL 454960, at *5 (M.D. Pa. Feb. 3, 2010) (at-will employees have no property interest in their employment and serve solely at the pleasure of their employers).

Yet the premise of Dougherty's argument is that one cannot bribe a public official with a job the official already has. Mtn. 5-6. That makes no sense. If the employer says to the public official, "you will keep this job if you start performing official acts in return," and the official agrees, then of course a job that might earlier have been legitimate then becomes a bribe. The evidence here does not suggest any such development in Dougherty and Henon's

relationship. Given that there is scant evidence that Henon, after 2011, ever did anything for Local 98 other than take official acts to benefit it, the rational conclusion is that the illegal agreement existed from the beginning, even if the government could not gather evidence of the official acts until later. But even if that is not so, there is no impediment whatsoever to the government showing that, by 2015, there was an ongoing conspiratorial agreement to exchange the job and its benefits for official acts. That is all the indictment alleged and that the government was required to (and did) prove.

4. **The substantive counts of conviction are not challenged on this basis.**

It further bears noting that the defendants' argument, frivolous as it is, applies only to the conspiracy charge in this case, not the eight substantive fraud counts of conviction. In the substantive counts, the government alleged and proved that a quid pro quo existed at the time of each charged offense, with Dougherty providing payments and Henon agreeing to take action at precisely the times charged in the individual counts. There is no infirmity whatsoever in those allegations.

Dougherty's argument overlooks this fact. The gravamen of each substantive charge, of course, is the actual wire or mailing in furtherance of the scheme, whenever the scheme came into existence, so long as the wire or mailing was in furtherance of the ongoing scheme.[7] Dougherty makes no argument, nor can he, that the convictions on these charges are infirm in any respect.

---

[7] See, for instance, *United States v. Universal Rehab. Servs. (PA), Inc.*, 167 F.3d 171, 179 (3d Cir. 1999), in which the Court vacated the conviction of a defendant because there was insufficient proof of his participation in the scheme at the time the sole mailing of which he was convicted took place. (Other parts of this opinion were superseded en banc, 205 F.3d 657 (3d Cir. 2000), but this part of the panel opinion remains intact.)

Indeed, in presenting the charges, the government carefully linked each charged wire or mailing to a specific official act that was occurring at exactly the same time. In convicting on these charges, the jury necessarily found, beyond a reasonable doubt, that at each time Henon took a specific official act in return for the benefits he was being provided by Dougherty at exactly the same time. Specifically:

-- Count 100 relates to the L&I/CHOP scheme (detailed later in this memorandum), and charges the wire of salary to Henon on August 18, 2015, during the same week that Henon pressured L&I to again interfere, at Dougherty's request, with the installation of medical equipment at CHOP.

Likewise, Count 109 charged the mailing of a notice of violations by L&I to CHOP on July 23, 2015, that was initiated by Henon's actions. Gov. Ex. 202, p. 7-8.

-- Count 101 charged the telephone call on August 20, 2015, Gov. Ex. 4-270a, in which Dougherty directed Henon on what to do regarding plumbing legislation.

-- Count 102 charged the wire of salary to Henon on September 29, 2015, at the same time that Henon's staff, at his direction, was taking steps to draft a resolution attacking a towing company that had offended Dougherty, days after Dougherty had called Henon and demanded that Henon take action.

Count 103 charged an exchange of an email between Henon's staff members doing his bidding on September 30, 2015, to attempt to harm the towing company. Gov. Ex. 31-69.

-- Count 105 charged an email dated November 24, 2015, sent by Henon to a Comcast employee, during the final stages of the franchise agreement negotiations, to advise Comcast to "stop using contractors and subcontractors who don't pay prevailing wage" Gov. Ex 31-148, 31-149.

Count 106 charged the wire of salary to Henon on December 8, 2015, immediately following the events of December 2 and 3, 2015, during which Henon leveraged his public position to satisfy Dougherty's demands regarding Comcast.

-- Count 108 charged the wire of salary to Henon on June 21, 2016, immediately after Henon's vote for the Soda Tax at Dougherty's behest on June 16, 2016.

These substantive charges alleged that Henon took specific official acts at the same time he was receiving salary and other benefits from Dougherty. Dougherty presents no cognizable challenge to any of these counts based on the inception date of the honest services scheme, which is not an element of the substantive charges. The convictions on these counts are therefore valid, at the same time that Dougherty's challenge to the conspiracy charge also fails.

B.      **The Government Validly Proceeded on the Basis of a Stream of Benefits Theory, and in Any Event Linked Each Payment to a Particular Official Act.**

In a related argument, Dougherty contends that the government was required to prove that each official act charged was contemplated and agreed at the time the quid pro quo agreement was first made. Mtn. 25-26. As explained above, his basic premise, that an honest services conspiracy, including a quid pro quo agreement, must be proven as of the moment it first began, is both incorrect and unrelated to the actual charges of this case. For purposes of completeness, we further address the baseless notion that at the supposed time of necessary proof - when the conspiracy began - it is insufficient to allege an official's promise to commit any subsequently requested official act in exchange for a stream of benefits.

Essentially, Dougherty would like this Court to reject the Third Circuit's direction that honest services bribery may be premised on a "stream of benefits," which of course this Court may not do. The Third Circuit has upheld bribes in an honest services prosecution when the bribes were a "stream of benefits," in which the payor provides numerous benefits in exchange for the recipient's agreement to perform official actions as required, *United States v. Bryant*, 655 F.3d 232, 240-41 (3d Cir. 2011), and the bribery theory of honest-services fraud can be satisfied without need to show specific benefit for specific action, *United States v.*

*Kemp*, 500 F.3d 257, 282 (3d Cir. 2007). Instead, "payments may be made with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf." *Id.* (citation omitted).

After *McDonnell*, the Court of Appeals repeated that it is sufficient if the public official "understands that he is expected, as a result of the payment, to exercise particular kinds of influence or to do certain things connected with his office as specific opportunities arise." *United States v. Repak*, 852 F.3d 230, 251 (3d Cir. 2017) (quoting *United States v. Bradley*, 173 F.3d 225, 231 (3d Cir. 1999)).

The Third Circuit's steadfast view is readily explained. To be sure, *McDonnell* stated that an "official act" is "something that is 'pending' or 'may by law be brought before a public official.'" 136 S. Ct. at 2372 (citations omitted). But there is nothing inconsistent in a finding that the specific act contemplated at the time of a payment was *any official action the payor would later request*. Any other view would remove the most thoroughly corrupt arrangements from the reach of the law.

As the government previously set forth at great length in its response to the defendants' last motion for acquittal, Judge Wells, in *United States v. Menendez*, 291 F. Supp. 3d 606, 613-17 (D.N.J. 2018), provided a robust explanation of this point, on which this Court relied in denying the defendants' motions, *see* ECF 252 at p. 4. *Menendez* stated:

> From these statements, Defendants manufacture a temporal requirement at odds with the stream of benefits theory: that the official act that is the object of a quid pro quo must be "specific and focused" and identified at the time the agreement is made. But the two passages Defendants quote from *McDonnell* are distinct. The Government has always been required to prove that a public official "agreed to perform an 'official act' at the time of the alleged quid pro quo." As the Third Circuit said in *Kemp*, "[t]he key to whether a gift constitutes a bribe is whether the parties intended for the benefit to be made in exchange for some official action . . . . " 500 F.3d at 282. That the official acts ultimately taken by the public official must be "specific and focused" under

> *McDonnell* in no way imposes a requirement that they be precisely identified at the
> time the agreement is made.

*Menendez*, 291 F. Supp. 3d at 614-15. The court concluded: "*McDonnell* neither abolished the

stream of benefits theory nor held that an official act that is the object of an illegal *quid pro*

*quo* agreement must be identified at the time the agreement is made. It merely narrowed the

definition of 'official act'; the opinion says nothing new about what nexus must be shown

between a thing of value and an official act. In other words, *McDonnell* is about the *quo*, not

the *pro*. . . . Against the backdrop of established Third Circuit authority approving the stream

of benefits theory, *McDonnell*'s silence regarding that theory cannot be its death knell. The

Court is bound to follow controlling Third Circuit authority, and it does here." *Id.* at 615-16.

Dougherty also continues to incorrectly rely on *United States v. Silver*, 948 F.3d 538

(2d Cir. 2020), as purportedly rejecting the "stream of benefits" theory after *McDonnell*. *See*

Mtn. 23. *Silver*, in fact, says no such thing; it simply found that one of the official acts alleged

by the government in that case ("the Mesothelioma Scheme") was not sufficiently focused to

support liability, while the evidence was sufficient as to other acts. We commend to the Court

the concurring opinion of Judge Lohier in *Silver*, 948 F.3d at 577-79. He carefully explains

the "narrow scope" of the opinion, making clear that the "stream of benefits" theory charged

in this case remains as viable in the Second Circuit as here. He specifically addresses the type

of honest services fraud charged in this case:

> Consider another example not captured by the "as opportunities arise" theory: a
> payment in exchange for a promise to take <u>all</u> future official actions to benefit the
> payor. The payment is not in exchange for a vague promise to act in the payor's
> general interests at discrete moments to be determined only at the official's discretion
> (as alleged in the Mesothelioma Scheme). Instead, it solicits a promise that the official
> will filter <u>every</u> official act through the lens of the payor's interests. In other words, the
> promise is not vague, amorphous, or subject only to the official's discretion of when
> and where to act. Although the matter that is the subject of the promise is broad in
> scope, its contours are clearly defined.

*Id.* at 578-79 (emphasis in original).[8]

In sum, the government was not required to prove the existence of a quid pro quo prior to the period of the conspiracy charged in the indictment, nor, with regard to the specific conspiracy that was charged as existing in 2015 and 2016, was it required to refrain from reliance on the stream of benefits theory repeatedly approved by the Third Circuit.

And finally, and quite significantly, Dougherty's argument remains irrelevant with regard to the eight substantive counts of conviction. With respect to those counts, as explained in detail above, the government specifically alleged and proved that at precise times Dougherty was giving salary payments and other benefits to Dougherty in exchange for very specific official actions. Dougherty presents no challenge to the substantive charges, while his objection to the conspiracy count fails.

**C.      There Was Overwhelming Evidence on Which the Jury Could Rely to Find That Dougherty Was Responsible for Henon's Employment.**

Dougherty continues to argue that there was insufficient evidence that he was responsible for Henon's continued employment with Local 98. Mtn. pp. 4-5, 27-28. He is wrong. There was sufficient evidence from which any rational trier of fact could conclude that

---

[8] The defendant also contends that the government was required to prove that the defendants had identified the official matters (as opposed to official acts) that would be the subject of the honest services conspiracy when Henon was initially retained on the payroll in 2012, primarily citing *Silver* in support of this claim. Dougherty Mtn. 24-26. This argument, like others described above, begins with the baseless claim that the government was required to prove that the corrupt agreement between Dougherty and Henon began in 2012. Dougherty Mtn. 26. Henon mem. at 4-6.  For that reason alone, this argument should be rejected.

Additionally, as set forth above, *Silver* has no application here. As noted above, both the majority and concurring opinions limited the decision to the facts of the case. 948 F.3d at 553 n. 7. ("We express no opinion and need not reach the issue of whether the acceptance of a bribe with a promise to perform an official act in the future upon designation of the official act by the bribe payor at that later date (in essence a retainer) would run afoul of the honest services fraud statutes or the Hobbs Act"). 948 F.3d at 578 (". . . *McDonnell*, in my view, tells us nothing about how or when the question or matter needs to be identified, other than to hold that it must be the subject of an official act. . . [w]e leave for later the question of whether and to what extent the requirement that a specific question or matter must be identified at the time of the promise. . .") (concurring opinion) (citation omitted).

- 23 -

Dougherty decided to keep Henon on the payroll after he was elected to City Council in November 2011, and that he was the person who kept Henon on the Local 98 payroll during 2015 and 2016.

The minutes of the Local 98 Meeting of Sound and Communication division of December 13, 2011, explicitly state: "Business Manager [John Dougherty] talked about Bobby Henon and that he has already been influential in helping us get a project labor agreement at the Philadelphia Airport and assisting at the Family Court Project. Bobby will still play a role in our union operation and will collect a check from Local 98." Gov. Ex 15-21.

The government showed that Dougherty controlled all significant actions of IBEW Local 98 in general, and the hiring and compensation of Henon in particular. The parties entered a stipulation that Dougherty, as Business Manager, was "the principal officer of Local 98, and all other Local 98 officers were required to cooperate with him and not work in conflict with him," and that employees such as Henon "were required to work directly under him and be subject to his authority, and John Dougherty had the authority to discharge such persons at any time." The parties further stipulated that Dougherty "had the authority to approve the hiring of all employees, agents, and consultants who were paid [by] Local 98," and with regard to most employees, including Henon, "had the authority to set the number of hours for which all employees were paid, and had the authority to determine when they should be given payment for vacation days or other days when they were not actually at work." Gov. Ex. 414.

Any rational jury could have easily concluded, based on the stipulation described above, and the other evidence presented at trial concerning the relationship between Dougherty and Henon, that Henon was subordinate to Dougherty, who had the authority to hire and fire Henon, as well as the authority to set the number of hours for which Henon was paid, and that

Dougherty exercised that authority to retain Henon on the payroll in 2012, and keep him on the payroll during 2015 and 2016. That "keeping Henon on the Local 98 payroll, after he was sworn in as a member of City Council on January 6, 2012, was not submitted to any officer, employee, agent, or committee of Local 98 for approval," *see* Gov. Ex. 414, further supports the jury's finding that Dougherty exercised complete control over Henon's employment with Local 98 after Henon was elected to City Council in November of 2011. Indeed, Henon was not just any employee; he was a sitting member of the Philadelphia City Council. The notion that the leader of Local 98 was not responsible for the decision at all times to maintain him on the payroll is absurd; or to put it differently, any rational juror could adopt the inference that Dougherty at all times knew of and was responsible for maintaining the employment of this employee.

Furthermore, Dougherty made a number of statements during 2015 and 2016 that demonstrated his role in continuing to pay Henon. On November 13, 2015, Dougherty told then-Councilman James Kenney regarding Henon: "he's on my payroll." Gov. Ex. 1-46839. On March 26, 2016, Dougherty told Henon, "I got, I made a little adjustment in your, your stuff this month. So you got a little bit more money coming." Gov. Ex. 1-76496. That Henon was paid weekly, and Dougherty could terminate his employment at any time, further demonstrates that there was sufficient evidence from which any rational trier of fact could conclude that Dougherty decided to keep Henon on the payroll after he was elected to City Council in November 2011, and that he was the person who kept Henon on the Local 98 payroll during 2015 and 2016.

The tenor of the numerous calls played at trial showed that both Dougherty and Henon were keenly aware of the nature of their relationship, and that Henon assumed a subordinate

role and took instructions from Dougherty regarding his public duties, as reflected in the excerpts from a few of these calls set forth below.

Marita Crawford told Tommie St. Hill (who works for Local 98, occasionally out of Henon's office), concerning rumors that Henon was running for Majority Leader in City Council, "If John wants to do it. Maybe John says, don't run for Majority, I don't know but . . . John is the boss, that's it . . . Not Bobby, nobody." Gov. Ex. 3-3458 (November 17, 2015).

During a conversation about the plumbing code, Henon told Dougherty "what he was going to do" with the plumbing legislation, which he said he was "running it by you." After Dougherty told him to "Do it," Henon stated "I'm going to do that." Gov. Ex. 4-270a (August 20, 2015).

Complaining about Henon's failure to keep him sufficiently informed about the Comcast franchise agreement negotiations, Dougherty told Marita Crawford, "He can play cute, he can't f***ing play cute with us . . . so he calls me, I don't know what to do, I said I know what the f*** to do. You are the only one I called, I said right. And I'm telling you what to do . . ." Gov. Ex. 1-10373 (November 30, 2015). That same night, Dougherty told Tony Wigglesworth, "Listen, [Henon] absolutely is not doing anything that would, he calls for information and he doesn't do it, and this is becoming a little bit of a problem with him, okay, because he is getting too crafty here, okay, and he's got to understand, look, he wouldn't be in the majority leader position if it wasn't for us." Gov. Ex. 1-50354 (November 30, 2015).

The night before the Council session at which the Comcast agreement was approved, Henon called Dougherty and asked him how he should vote on a different bill (authorizing the construction of a casino in South Philadelphia), asking, "I want to vote for it tomorrow, right? I

mean we want to move it?" to which Dougherty replied "Yeah, yeah." Gov. Ex. 1-53250 (December 9, 2015).

Dougherty emphasizes that Don Judge, a Local 98 employee who worked in the finance department, testified that Brian Burrows directed him, in February of 2012, to cut Henon's Local 98 hours and salary in half. TT 10/15/21 at p. 30-57. Henon had been sworn in as a member of Philadelphia City Council in January 2012, and had continued to receive his full Local 98 salary, which was based on 40 hours. Gov. Ex. 119. Burrows simply informed Judge that Henon's hours should be reduced from 40 to 20 hours, and his pay should be reduced by 50 per cent. Gov. Ex 15-16. No one testified that Burrows had authorized the change, or had any authority or control over Henon's employment at Local 98.

That Dougherty did not perform the administrative tasks involved in arranging the payment of Henon's weekly salary does not absolve him of responsibility (lest any wrongdoer could escape criminal liability by directing a subordinate to carry out tasks in furtherance of a criminal scheme), or compel a different result. The same is true of the fact that, once the employment was set up, the payments were made by automated electronic transactions. Mtn. 11. There was overwhelming evidence from which the jury could have found Dougherty responsible for the corrupt employment arrangement with Henon.

**D.** **The Conviction Is Not Based on a Conflict-of-Interest Theory.**

Dougherty once again alleges that the government's case was impermissibly based on a conflict-of-interest theory. Mtn. 29-34. That is incorrect; the Court explicitly charged the jury of the required elements of honest services fraud, which includes proof of a quid pro quo. (And

the Court has repeatedly rejected Dougherty's claim, starting with the denial of his pretrial motion to dismiss. *See* ECF 158 at p.8.)

The law in this area is well settled. Prior to *Skilling v. United States*, 561 U.S. 358 (2010), the established law in this Circuit permitted conviction for honest services fraud on either of two theories: bribery involving a quid pro quo; or a "conflict of interest," defined as the action of an official taking public action to support an undisclosed interest. *See United States v. Panerella*, 277 F.3d 678 (3d Cir. 2002). An example of the latter theory: A city official owns a parcel of land, without disclosing that interest to the public, and then votes to approve the location of a highway to a place that will tremendously increase the value of that land. Before *Skilling*, in this Circuit, that was honest services fraud in violation of federal law; afterwards, it is not, absent proof of a quid pro quo.

None of this means that the failure to disclose material information is now irrelevant. Of course not. Where the government charges quid pro quo bribery involving a citizen and a public official, it must prove the required mens rea, that is, that the payor acted with the intent to influence the official, and that the official accepted the payment with the awareness that it was given in exchange for an official act. In proving that mens rea, as in any fraud case,[9] the fact that the parties did not disclose the true nature of the payment, or the nature of their relationship, to the public or other interested officials will often be powerful evidence that the accused acted with unlawful intent. So it was here. Henon disclosed that he received a salary

---

[9] *See Third Circuit Model Jury Instruction* 6.18.1341-1 (Scheme to Defraud or to Obtain Money or Property Defined) ("deceitful statements of half-truths or the concealment of material facts or the expression of an opinion not honestly entertained may constitute false or fraudulent statements."); *United States v. Ferriero*, 866 F.3d 107, 120 (3d Cir. 2017) (fraud conviction may be based on the misleading failure to disclose information, or the concealment of material facts; citing cases in support).

from Local 98, but neither he nor Dougherty ever disclosed to anyone that this salary (as well as other undisclosed benefits) was not provided for union labor, but solely to assure Henon's compliance with Dougherty's direction on matters before his City Council office. Instead, on Local 98's annual LM-2 reports filed with the United States Department of Labor, Local 98 described Henon's position as "office." Gov. Ex. 501. On annual financial disclosure forms that Henon was required to file with the City Board of Ethics in 2015 and 2016, specifying the source, but not the amount, of income over $500 and gifts over $200 (in the aggregate), Henon disclosed Local 98 as a source of income, describing his position as "electrician," while not disclosing any gifts. Gov. Ex. 513, 514.

Given that Henon indisputably did not work either as "office staff" or as an electrician, these lies were obviously material evidence of the defendants' mens rea. That the true facts were not disclosed was evidence of the defendants' awareness of the impropriety of their conduct, and supported the inference that their arrangement was a quid pro quo relationship.[10] It was thus entirely appropriate for the government to highlight this evidence as proof of the scheme to defraud through quid pro quo bribery. No case has ever held otherwise, and there is

---

[10] The government also presented evidence of the defendants' additional affirmative attempts to hide the true nature of their relationship and their actions, all of which went to proving the same point. *See, e.g.*, Gov. Ex. 46839, November 13, 2015 (Dougherty to Mayor Kenney: "I call Bobby Henon three times a year"); Gov. Ex. 1-50352, November 30, 2015 (Dougherty to Local 98 employee Chris Rupe: "personally I've never called Bobby . . . this is the only thing I've asked him since he's been in Council"); Gov. Ex. 1-51430, December 3, 2015 (Dougherty to City Council member William Greenlee: "I was dealing with Bobby. . . and I only deal with him sporadically"); Gov. Ex. 4-173, August 19, 2015 (Henon instructs a Local 98 business agent to send him location of job they want L&I to target "and then, and then, and then delete your email"); Testimony of Chris Creelman, 10/12/15, p. 113-16 (Henon instructed staff to use the email address @bobbyhenon.com, because he believed that the federal government could not obtain emails from his private server).

no basis for the claim that the defendants were convicted on the basis of a conflict-of-interest theory that was not presented.

   E.   **There Was Ample Evidence on Which the Jury Could Rely to Find That Henon Took Official Acts in Exchange for His Employment.**

In his motion for acquittal, Henon repeats many of the same arguments presented by Dougherty regarding the purported infirmity of the proof of honest services fraud, such as the unavailing claim that the government was required to prove the inception of the illegal agreement (addressed earlier). In addition, Henon asserts at length, restating an extensive argument presented to and rejected by the jury, that he in fact performed extensive work for Local 98 in exchange for his salary apart from official actions, such that the salary was legitimate and not a bribe. There was ample evidence allowing the jury, crediting all inferences to favor the government, to reject that assertion.

The government proved, and the jury found, that Henon did not earn his Local 98 salary, which was $70,649 in 2015 and $73,131 in 2016, paid weekly, and based on a 20-hour workweek, by performing services for Local 98 that were unconnected to his position as a member of City Council. During 2015 and 2016, Henon was paid for working 20 hours per week. Testimony of Laura Capra, 10/15/21, p. 76-91. Gov. Ex. 119. The evidence showed that Henon did little in exchange for his Local 98 salary and benefits other than act at Dougherty's direction in performing as a member of City Council. There is no evidence that he did any office work, electrical work, or much of anything else for Local 98, and no evidence that he worked 20 hours a week performing tasks for Local 98 that were separate and apart from his position as a member of City Council.

No written work product of any kind by Henon was found at the offices of Local 98 during the searches conducted on August 5, 2016. Furthermore, Henon did not have an office

or work space at Local 98 at that time. Subpoenas requesting any work product pertaining to any services Henon provided to Local 98 in 2015 and 2016 were served on Local 98 during the investigation and before trial. No work product was produced in response to those subpoenas. Testimony of Jason Blake, 10/27/21, p. 94-104. Additionally, Agent Blake also testified that the majority of calls between Dougherty and Henon concerned his work on City Council, as did almost all of the calls between Henon and Local 98 Political Director Marita Crawford. TT 10-28-21, p. 65-85.

Also probative, as discussed earlier, is that both Henon and Local 98 went out of their way to falsify information about the employment provided to government agencies, telling the United States Department of Labor that Henon worked as "office staff" and informing the City Board of Ethics that he worked as an "electrician."

Four of the members of Henon's City Council staff who testified at trial, whose combined tenures spanned the period from January 2012, when Henon was first sworn in as a member of City Council, to September 2016, the end of the period charged in the Indictment, all stated that they were unaware Henon was being paid by, or was allegedly working for Local 98 until May of 2016, when an article in *Philadelphia Magazine* describing the outside incomes of all members of City Council was published. Testimony of Chris Creelman (10/12/15 at p. 90, 114-16), Jolene Byzon (10/18/21 at p. 16-21), Tom Holroyd[11] (10/19/21 at p. 75-78), and Eric Horvath (10/7/21 at p.142-71). No one from Henon's staff replied to the author with a response to the question of what Henon actually did for his union salary, after

---

[11] Tom Holroyd testified that he found out about Henon's Local 98 income when he assisted Henon in completing his public financial disclosure form for the year 2015, which Henon signed and filed in May 2016, the same month that the *Philadelphia Magazine* article was published.

the request had been communicated to Henon and Courtney Voss by staff member Byzon. TT 10/18/21 at p. 16-21; Def. Ex. RH-005, p.5.

Henon's biography on the City Council website, which was written in January 2016 by Jolene Byzon, with input from Henon and Courtney Voss, made no mention of his employment at Local 98. Gov. Ex. 31-151, 31-152.

Ignoring all of this evidence, Henon now relies solely on the testimony of defense witnesses (whom, of course, the jury did not have to credit), whose testimony was completely vague. He relies on statements such as those of Brian Eddis and James Foy, that Henon was seen working "all the time" at the Local 98 office and various union meetings, and of James Dollard, of Local 98, that "Bobby was always there." Mtn. 10.[12]

But notably, no one, including these witnesses called by Henon, could specifically describe what Henon was doing for the $154,000 he received in 2015 and 2016 from Local 98, and how many hours he spent doing it.

For example, Local 98 Assistant Business Manager Jim Foy testified that Henon attended monthly meetings of the Building Trades, but was unable to say whether he was there as a member of City Council or as a member of Local 98, and was unable to say how many of meetings Henon attended in 2015 and 2016. TT 11/2/21 at p. 56-57. Similarly, Foy testified that Henon was a delegate for the AFL-CIO on behalf of Local 98 while on City Council, and had seen him speak on behalf of the union on a few occasions, but was unable to say how many AFL-CIO meetings Henon attended in 2015 and 2016. *Id*. He also said that

---

[12]   At various points in the trial, the defendants suggested that defendant Henon's "work" for Local 98 might properly consist of using his official power as a Councilman at defendant Dougherty's request in ways that might have benefitted Local 98. It appears that at long last the defendants have abandoned that legally baseless argument.

Henon had done "some fundraising" on behalf of the union, and participated in labor walks. *Id*. at p. 60. Foy also testified that Henon helped him when he was attempting to organize the Fox Chase Medical Center' s maintenance workers; however, the only thing that Henon did was identify the parties with whom Foy needed to engage. *Id*. at p. 59.

Pat Eiding, the president of the Philadelphia Council AFL-CIO, testified as a defense witness that Henon was a delegate, and was "involved in just about every event we do, whether it's a rally down at the airport for worker safety and benefits . . . and that I see him all the time." TT 11/3/21 at p. 128-129. Eiding, however, failed to describe the nature of Henon's "involvement" or quantify what he meant by "all the time," or distinguish actions that Henon would obviously take anyway as an elected official.

Brian Eddis, who was hired at Local 98 by Dougherty in 2014, and was currently employed at the Building Trades, of which Dougherty was the Business Manager, testified that he observed Henon doing work for Local 98 "all the time," which he described as "constantly strategiz[ing]." TT 11/3/21 at p. 97. Eddis also testified that in 2015, when there were multiple candidates for Philadelphia City Council whom Local 98 was supporting (including Henon), as well as Kevin Dougherty, the brother of John Dougherty, who was running for the Pennsylvania Supreme Court, Henon was "active with respect to those efforts." *Id*. at p. 98.

James Dollard, who was the safety coordinator for Local 98 from 2001 to 2018, testified that after Henon was elected to City Council, "Bobby was always there [at the offices of Local 98]." Dollard also testified that Henon attended Local 98 events at Thanksgiving, "the alex lemonade stand, toys for tots (at Christmas)," and that "he was doing a lot of other things." Dollard added, however, that "I really didn't know what he was doing, but I would just see him in the hallway. . ." TT 11/2/21 at p. 97-98.

Courtney Voss, Henon's Chief of Staff who began in "2013 or 2014" and had an affair with Henon while working with him, testified that in addition to working "an 80-hour work week for city council," Henon worked "a ton of hours" for Local 98, which she described as attending conferences, Building Trades meetings, AFL-CIO meetings, and "taking calls from labor all the time and working through political issues."[13] She described his job with Local 98 as "really about politics and about managing relationships," which just happens to be closely related to his position on City Council. TT 11/4/21 at p. 142-44.

On Local 98's annual LM-2 reports filed with the United States Department of Labor for 2015 and 2016, which were signed by Local 98 President Brian Burrows, and Financial Secretary Francis Walsh, Henon's position was identified as "office." His salary was categorized by the union as being paid for the following types of work: 1) general overhead - 50 percent; 2) administration - 50 percent. These categories apply to employees who work in and around the union offices and perform administrative and maintenance work, including secretarial and security work. Even though there was a category for political work, which is how Voss generally described his work for Local 98, the portion of Henon's salary that he was paid to do that type of work was listed as zero. Testimony of DOL Investigator Dona Thompson, 10/14/21 at p. 132-51; 10/15/21 at p. 11-24. Gov. Ex. 501, 501b.

On the annual public financial disclosure forms that Henon was required to file with the City Board of Ethics and the Commonwealth of Pennsylvania in 2015 and 2016, specifying the source, but not the amount, of income over $500, Henon described his position with Local 98 as "electrician." Gov. Ex. 513, 514.

---

[13] Tom Holroyd also described City Council as "more than a full-time job." *Id*. at p. 78.

In sum, this was a classic issue for resolution by a jury. There was abundant evidence that Henon did virtually nothing for Local 98 other than serve its needs as a member of City Council, including the content and tenor of the numerous intercepted calls, the absence of any physical evidence of any work, and the false statements to government bodies. The counter-presentation was a vague set of statements by Local 98 employees and others that Henon worked "all the time" for unspecified lengths of time. There was clearly a very strong basis for the jury to agree with the government's position on this point.

The defendants also contend that the arrangement with Henon was permissible because Henon was authorized to accept outside employment, and he disclosed his income from the union. It is true that a member of City Council can accept outside employment; after hours, he or she can be an attorney, architect, electrician, or a number of other things. But the evidence here was sufficient for a reasonable jury to conclude that Henon did little for the union other than act as its advocate and source within the City Council, and that evidence, viewed in the light most favorable to the government, supported the jury's finding that this was honest services fraud, not legitimate outside employment.[14]

---

[14] When denying the defendants' previous motion for acquittal, this Court stated: "Under the Federal Government's prosecution, which I have held was properly brought under the law, every Philadelphia City Councilmember or any public official in the United States, who retains a salary from an outside employer, communicates with that outside employer, and then acts or agrees to act in relation to that communication are then susceptible to a honest services fraud prosecution with only the element of a 'corrupt intent' separating them from conviction." ECF 158 at 4 n.3. The government understands and appreciates this view, but does not believe that it presents an undue concern. The fact of the matter is that a public official who has outside employment, and takes actions to benefit his employer, is on perilous ground; the public has a legal right to the "honest services" of its servants. Still, for the public official willing to take that risk, a criminal conviction will only occur where the government can prove beyond a reasonable doubt that there was a quid pro quo meeting of the minds, that the employer paid the employee in exchange for the official acts, *i.e.*, "corrupt intent." For all the reasons stated here, the government amply proved that the defendants acted with corrupt intent.

Additionally, a jury may find a bribery scheme existed where the recipient has performed some legitimate services in exchange for benefits received. *United States v. Bryant*, 655 F.3d 232, 237 (3d Cir. 2011). In *Bryant*, Third Circuit held that the following jury instruction was proper:

> You may find that any salary and other financial benefits accepted by Wayne Bryant was a bribe even if you also find it was paid, in part, for legitimate work if it was also paid, in part, in return for Wayne Bryant's official action. 655 F.3d at 245–46.

Other courts have taken the same position. *United States v. Urciuoli*, 613 F.3d 11, 14 (1st Cir. 2010) (affirming conviction for honest services fraud even though defendant was paid, in part, for performing "some marketing services"); *United States v. DeMizio*, 2012 WL 1020045, at *8 (E.D.N.Y. Mar. 26, 2012), *aff'd*, 741 F.3d 373 (2d Cir. 2014) (defendants convicted of receiving kickbacks "performed work on no more than 10 to 20 percent of the transactions for which they were paid;" court held that "a kickback may consist of a payment that is partly for legitimate work and partly for some favorable action").[15]

--------

It is simply untrue that the law as affirmed by this Court "would ensnare every public official who retains outside employment and takes official action that benefits the outside employer – a theory that *Skilling*, *McDonnell* and subsequent precedent have roundly rejected." Dougherty Mtn. 22. As stated earlier, action that constitutes only a conflict of interest, as Dougherty describes, is indeed insufficient. The government must instead prove a quid pro quo agreement, as it did here.

[15]   Dougherty also cited *Urciuoli* and the district court's decision denying the defendant's Rule 29 motion in *Bryant, United States v. Bryant*, 2009 U.S. Dist. LEXIS 44648, at *12 (D.N.J. May 27, 2009), in support of his baseless claim that the government must prove that the inception of the conspiracy was in the period charged in the indictment. In both cases, as here, the circumstances of the beginning of the financial relationship that was the basis of the bribes was relevant. But neither decision suggested, much less held, that the government must prove that the illegal agreement was first formed during the period charged in the Indictment, as discussed earlier.

Here, the government presented a compelling case that Henon was paid a huge sum (as well as other benefits he does not mention) to engage in official acts on Dougherty's behalf. The jury's conclusion should not be disturbed.

### F. The Jury Could Find That Specific Actions on Which It Premised Substantive Convictions Were "Official Acts."

In his motions, Dougherty generally denies that he paid for "official acts," as defined by the Supreme Court, but presents no new argument on that point. Dougherty Mtn. 33-34. Henon, for his part, repeats his arguments that he did not take "official acts," presenting assertions this Court has previously denied. The claims remain without merit.

In *McDonnell v. United States,* 136 S. Ct. 2355 (2016), the Supreme Court interpreted "official act" as follows:

> [A]n "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official.

*Id.* at 2371-72. An official act could also include acting or making a decision on a "qualifying step," towards the "question, matter, cause, suit, proceeding or controversy" at hand, such as, in the *McDonnell* case, narrowing the list of potential research projects for state consideration. *Id.* at 2370. Once it is properly instructed, "[i]t is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act.'" *Id.* at 2371.

With respect to each official act charged in the indictment, the defendants sought to dismiss the charges before trial, arguing that the conduct did not comprise official acts under

*McDonnell* as a matter of law. The Court denied every one of these arguments, specifically

addressing all of the official acts proven at trial other than those involving the Soda Tax,

accepting as true the evidence the government said it would present. Similarly, the Court made

essentially the same findings when ruling on the defendants' Rule 29 motions that were made

at the conclusion of the government's case. ECF 252 at pp. 5-9 (filed 11/23/21). Each of

Henon's objections is without merit.

          1.      **The defendants' misuse of the Department of Licenses and Inspection.**

The government presented evidence that defendant Henon, in return for his salary and

other things of value, used his position as a Philadelphia City Councilperson to influence the

operations of the Philadelphia Department of Licenses and Inspection (L&I) in ways that

promoted the interests of Dougherty, the Business Manager of IBEW Local 98. Henon, acting

in response to calls and texts from Dougherty or his surrogates, steered L&I officials towards

construction sites where non-union electricians or other trade unions were installing equipment

or electrical systems that Dougherty wanted Local 98 member electricians to be installing.

By contacting L&I officials, who responded to the councilman's contacts by initiating

enforcement activity, Henon fulfilled his part of the corrupt agreement with Dougherty; that is,

he used his influence to cause official acts to be carried out in return for the salary and other

benefits he received from Local 98.

Dougherty made clear to L&I that he would use Henon to promote his plan. L&I

Commissioner Carlton Williams testified that he was invited to a meeting in Councilman

Henon's office to discuss construction at the Goldtex apartments at 11th and Wood Streets in

Philadelphia. TT 10/12/21 at p. 48. The developers were using non-union labor at the site.

Williams was surprised to see Dougherty at Henon's office. TT 10/12/21 at p. 51. Dougherty,

who did all of the talking, made clear to Williams that he could have Williams removed from his job. TT 10/12/21 at p. 52. Dougherty claimed that there were numerous violations at the work site, violations that made the project unsafe. Williams, accompanied by his staff, personally inspected the site and found no violations. TT 10/12/21 at p. 54.

Henon contacted Williams about other construction locations where Local 98 had an interest in L&I enforcement activity. Williams testified that Henon contacted him about the installation of a scoreboard at Lincoln Financial Field in 2014. Henon claimed that the installers of the scoreboard were not properly licensed and that electrical permits had not been obtained. TT 10/12/21 at p. 56. Williams and his staff inspected the location and met with Local 98 officials and the installers, who were members of the Sheet Metal Workers union. Williams explained that L&I halted the scoreboard installation by issuing a stop work order while he and others studied the situation. TT 10/12/21 at p. 57. Williams removed the stop work order once he determined that the scoreboard installation did not require electrical work and that L&I had previously permitted the Sheet Metal Workers to install scoreboards at Citizens Bank Park. TT 10/12/21 at p. 60.

In September of 2015, Henon also contacted Williams, at Dougherty's request (Gov. Ex. 1-30991; 1-31005), about allegedly unsafe conditions at a work location at the Westin Hotel in Center City Philadelphia. According to Williams, Henon told him in a phone conversation that workers were working on a ceiling above patrons at the hotel, creating unsafe conditions. TT 10/12/21 at pp. 43-44. Williams testified that he personally inspected the Westin Hotel, and the complaint was unfounded.

Dougherty's use of Henon to advance his interest in having union electricians work at construction sites was further illustrated by actions initiated by Henon in July and August of

2015 concerning Children's Hospital of Philadelphia (CHOP). On both occasions, Dougherty and Henon delayed and impeded the installation of MRI and MRI/PET machines at CHOP.

On July 19, 2015, when Dougherty learned that a non-union company was installing an MRI machine at CHOP (Gov. Ex. 1-18455), he directed Henon to contact L&I, telling a Local 98 business agent to "Do it + call Henon … tonight … Call Condi tonight to jump in +resolve." Gov. Ex. 1-18459. An FBI trap and trace showed Henon contacted Commissioner Williams. Testimony of Special Agent Jason Blake, 10/18/21, p. 91-92.

Henon's call to Williams prompted L&I to send an inspector to CHOP. TT 10/12/21 at p. 45. L&I inspector Peter DiLisi arrived at CHOP and inspected the site of the MRI installation. TT 10/12/21 at p. 17. DiLisi's supervisor subsequently ordered him to issue violations for failure to secure an electrical permit, use of an unlicensed contractor, and failure to have a commercial activity license. The violations resulted in L&I issuing a stop work order. TT 10/12/21 at p. 19-20.

Henon took credit for the L&I stop work order. When Dougherty subsequently learned that the installers had resumed work at CHOP, contrary to the stop work order, he called Henon, who claimed responsibility for L&I's action. Gov. Ex. 1-19131.

Dougherty:    You know, and then L&I went out and shut them down, and then somebody gave them the okay, they said, inside the system, today to go to work.

Henon:    Oh really? Uh, well the other one, the other part was me, all right … I'll walk over personally.

In August 2015, Henon learned that Dougherty wanted him to contact L&I about the installation of another sophisticated medical system, this one an MRI/PET machine, that was being installed at CHOP. A Local 98 business agent told Henon: "Doc just asked me to give you a call again about . . . The same thing as before. The one we had that . . . thing down there .

. . L&I. . . . Now we have GE down there doing the same thing, you know." Henon replied,

"Send me the exact location again and, and, and, who it is. This way I can just I can read what

it is, only because I got my hands full. Write it down, too, and text it to me. Don't email . . .

and then, and then, and then delete your email." Gov. Ex. 4-173. When Henon later learned

from the Local 98 official that the machine's manufacturer was installing the MRI/PET, Henon

said, "I'm gonna make the call [to L&I], you know . . ." Henon promptly contacted L&I

Commissioner Williams about the installation. TT 10/12/21 at p. 43. Williams directed

employees to again inspect the CHOP facility. TT 10/12/21 at p. 44. On August 20, 2015, L&I

issued a stop work order to the contractor.

L&I Inspector Robert Donsky testified that he inspected the job site, talked to all parties

involved in the MRI installation, and determined that the employees of the manufacturer were

the best qualified people for the job. TT 10/7/21 at p. 183-210. Donsky said that, despite his

observations and conclusions, his supervisor ordered him to issue a stop-work order. *Id.*

The evidence, viewing all inferences in the light most favorable to the government,

supported the jury's finding that Henon used his position to influence L&I operations and its

employees to perform an "official act"- namely, to inspect the MRI machine installations and

to issue a preliminary stop work order. This influence amounted to exerting pressure and

advice on other officials, including then-Commissioner Williams, who had previously been

threatened by Dougherty in a meeting arranged by Henon.[16] The Supreme Court squarely

addressed this issue in *McDonnell,* holding that:

---

[16] That Carlton Williams testified that he did not feel pressure from Henon, TT
10/21/21 at p. 73, is not dispositive, as it is Henon's intent that controls. Furthermore, Williams
also testified that he felt no pressure after Dougherty told him he could have him removed,
which Williams simply considered an "idle threat." *Id.* It was up to the jury to weigh this
testimony.

A public official may also make a decision or take an action by using his official position to exert pressure on another official to perform an "official act," or by using his official position to provide advice to another official, knowing or intending that such advice will form the basis for an "official act" by another official."

*McDonnell v. United States*, 136 S. Ct. 2355, 2359 (2016). This Court agreed, when it denied the previous motion for acquittal, stating:

As for the L&I topic, the Government presented evidence that John Dougherty personally, and through his constituents, contacted Councilmember Henon about L&I issues at CHOP. Councilmember Henon later contacted the Commissioner of L&I, Carlton Williams, about these L&I complaints. Commissioner Williams then dispatched inspectors to CHOP to investigate the complaints. Taking all reasonable inferences in favor of the Government, a juror could find that Councilmember Henon committed an official act on Dougherty's behalf by pressuring another official, Carlton Williams, to commit an official act of dispatching L&I inspectors to investigate the complaints at CHOP. (Gov Ex. 1-19131.)

ECF 158 at p. 7.

In now again seeking acquittal, Henon suggests that he made a single call to report a code violation reported by a "constituent." Henon Mtn. 12. That does not remotely describe the actual evidence of Henon's persistent pressure campaign to further Dougherty's interests with L&I, backed by Henon's power and influence as a City Councilmember. It falls far short of the showing required to reject the jury's permissible conclusion based on the evidence presented.

## 2. Plumbing legislation.

The government presented evidence that, viewed in the light most favorable to the government, amply supported the jury's finding that Henon agreed to introduce, and then hold, plumbing legislation in conformance with Dougherty's wishes, and in exchange for the things of value he received from Dougherty.

The evidence showed that the Philadelphia Plumbing Code (PPC) is a set of rules and regulations governing plumbing installations in the City of Philadelphia. Around 2015, there was a push to abolish the PPC and replace it through city legislation with the International

Plumbing Code (IPC). The local plumber's unions opposed this, because they believed that the IPC was not suitable to plumbing installations in Philadelphia. Plumbers, including members of the Plumber's Union working in Philadelphia were in favor of modernizing the existing PPC instead of adopting the IPC. Testimony of Richard Lazer, 10/14/21, p. 114-16.

On August 20, 2015, Henon asked Dougherty what he should do concerning the pending Plumbing Code legislation which, he said, "the plumbers don't want." He told Dougherty that he was considering introducing and then holding the legislation until the new mayoral administration took office in January 2016, so the Plumbers had to go through him. Dougherty immediately told Henon to "Do it," to help Dougherty be elected Business Manager of the Building Trades, which was an organization made up of unions representing various trades, such as electricians, plumbers, glazers, and sheet metal workers. Dougherty stated that he believed the head of the Plumbers Union was going to vote against Dougherty for Business Manager of the Building Trades. At the end of the conversation, Henon reminded Dougherty that "this is an us thing." Gov. Ex. 4-270.

During the conversation described above, Henon told Dougherty "what he was going to do" with the plumbing legislation, and said he was "running it by" Dougherty. (He did not say he was giving Dougherty "a heads up" about something that he already decided to do.) After Dougherty told him to "Do it," Henon stated, "I'm going to do that." There was no discussion of the merits of the plumbing legislation, or of alternative courses of action. Gov. Ex. 4-270 (August 20, 2015).

Almost immediately after that call, Dougherty called a Philadelphia elected official to give him notice that Henon was going to use the plumbing codes to leverage the head of the Plumbers Union, and not for any legitimate legislative purpose. Gov. Ex. 1-25167.

In the days before the election for Business Manager of the Building Trades, Dougherty and his aide Marita Crawford, Local 98 Political Director, directed Henon to call union officials to influence their votes, which he did. Gov. Ex. 4-916.

On September 2, 2015, the day of the election, Henon told an elected state official that he was using the legislation concerning the plumbing and electrical codes as leverage for "internal trade politics" and that he intended to "disguise it in the middle of everything" because the Plumbers Union was "against John [Dougherty] . . . you know, with the Building Trades." That same day, Henon attended the meeting of the Building Trades at which defendant John Dougherty was elected Business Manager. Gov. Ex. 4-964.

Henon now presents a one-paragraph statement asserting that he cannot be found liable for this act because although he agreed to introduce plumbing legislation, he did not introduce any such legislation. Mtn. 13.

The jury found otherwise, and it is clear that the evidence, viewed in the light most favorable to the prosecution, sufficiently supported the jury's verdict beyond a reasonable doubt. In consulting with Dougherty, and agreeing to introduce, and then hold, the legislation in conformance with Dougherty's wishes, Henon agreed to perform an official act as defined by *McDonnell.* Introducing, or agreeing to introduce legislation, as well as agreeing not to act upon legislation are all official acts. This Court so held in denying the motion to dismiss the indictment, ECF 158 at pp. 34-36, and in denying the defendants' prior Rule 29 motion on this issue, ECF 252 at p. 7. In the latter ruling, the Court stated:

> As for the Plumbing Code topic, Dougherty and Henon discussed the potential of changing Philadelphia's Plumbing Code and the impact that it could have on Dougherty's interests. Around the time Dougherty and Henon discussed the Plumbing Code, Dougherty was running for the coveted position of being the Business Manager of the Buildings Trades, and the new Plumbing Code could play a part in his election. Dougherty was of the belief that the plumbers union would not be voting in his favor

for the Buildings Trades position, therefore, Dougherty wanted to use the new Plumbing Code against the plumbers since he believed the plumbers did not want the new code enacted. Dougherty asked Henon to delay the new code to hang it over the head of the plumbers union, and he specifically told Henon to "do it." Henon said he would do it, and stated this "is an us thing." (Gov. Ex. 4-270A.) Taking all reasonable inferences in favor of the Government, the Court finds that a juror could find that Councilmember Henon committed an official act or agreed to commit an official act at the behest of Dougherty, namely, to delay the new Plumbing Code.

*Id.*

As this Court held, agreeing to perform an official act is all that is required. *McDonnell*, 136 S. Ct. at 2371-72 ("[t]o qualify as an 'official act,' the public official must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' **or agree to do so**.") (emphasis added). *See also Third Circuit Model Jury Instruction* 6.18.201B1-2 (Bribery of a Public Official – "Official Act" Defined) ("[i]n order to find the defendant guilty of this offense, you must also find that [the public official] made a decision, took an action, **or agreed to make a decision or take an action** on one or more of the identified questions, matters, causes, suits, proceedings, or controversies") (emphasis added); *Third Circuit Model Jury Instruction* 6.18.201B2 (Receiving Bribe by Public Official) ("In order to find the defendant guilty of this offense, you must find that [the public official] . . . received something of value . . . corruptly in return for being influenced in the performance of an official act, that is, [the public official] **intended to perform an official act** in exchange for [a specific thing of value]") (emphasis added).

### 3.     Comcast Franchise Agreement.

Henon again presents an argument this Court has repeatedly denied, that in inserting John Dougherty into the franchise agreement negotiations between Comcast and the City of Philadelphia Henon simply arranged a couple meetings, and otherwise engaged in negotiations on behalf of his constituents. Henon Mtn. 16. The trial evidence, however, presented an

abundant basis for the jury's conclusion that Henon performed official acts benefitting Dougherty, as part of the quid pro quo arrangement.

The evidence established that Henon was the Chair of the Public Property Committee, which was overseeing the negotiations of the Comcast franchise agreement on behalf of the City of Philadelphia, a specific and focused matter involving a formal exercise of governmental power that was pending before Henon in his official capacity. Therefore, any action taken or promised by Henon in relation to the negotiation of the Comcast franchise agreement was an "official act" under *McDonnell*. *See United States v. Conley*, 290 F. Supp. 3d 647, 657 (E.D. Ky. 2017) (process for awarding public contracts satisfied the first prong of *McDonnell*).

In the opinion denying the defendant's motion to dismiss, this Court found as follows:

Moreover, the Government's allegations relative to the Comcast franchise agreement extend well beyond a public official setting up a typical meeting. Indeed, the relevant allegations against Henon include the following:

1) Causing his Chief of Staff to advise a Comcast negotiator that if Comcast hired MJK Electric, it would advance the negotiations;

2) Agreeing to delay the vote to move the franchise agreement out of his committee until it contained the provisions that Dougherty wanted;

3) Allowing Dougherty to participate in the negotiations and demand concessions from Comcast as a condition for the approval of the agreement;

4) Voting to move the agreement out of his committee and present the franchise agreement to City Council;

5) Voting in favor of the franchise agreement; and

6) Drafting an agreement with Comcast memorializing the concessions Henon allowed Dougherty to demand using his City Council office.

ECF 158 at p. 28.

The government proved all of this at trial. After hearing the evidence, this Court held, "Taking all reasonable inferences in favor of the Government, the Court finds that a juror could find that Councilmember Henon did more than just host a meeting between Dougherty and Comcast." ECF 252 at p. 8. Indeed, the evidence established that Henon did not treat Dougherty like the "stakeholders" that he interacted with during the course of the negotiations.

In November 2015, nearing the completion of the negotiations, Henon and Comcast officials discussed and identified the remaining items on which they had not yet reached agreement. By mid-November, it appeared that the parties had reached an agreement. Gov. Ex. 30-5, 30-6 (emails between Henon and David Cohen of Comcast, dated 11/18/21 and 11/19/21). The night of November 30, 2015, after hearing that the City and Comcast had reached a consensus on the franchise agreement, Dougherty made calls to a number of people, including Local 98 employee Marita Crawford, Tony Wigglesworth, an independent labor negotiator, and Henon (twice). Gov. Ex. 1-50352, 1-50354, 1-50367, 2-10373, 4-8883, 4-8891. During these calls, Dougherty learned that the issues he was interested in were not being addressed with Comcast, and he complained that he had not been properly informed about the status of the negotiations by Henon, telling Wigglesworth, for example, "without an agreement from me? What the h***, that doesn't do me any good." Gov. Ex. 1-50354.

By the conclusion of the second call with Dougherty, which occurred late on November 30, Henon agreed to do what Dougherty wanted. Gov. Ex. 4-8891 (Dougherty: Then here's what, and then, you know, you know what you tell them? Listen, scratch the prevailing wage language, give me, ah, um, include business to business, a memorandum of understanding that business to business and the right of way is in the mix. . ." Henon: "I got, I got no problem with that").

Almost immediately after the second call with Dougherty, Henon sent emails to his staff, including Courtney Voss, at around midnight stating that they needed to address the issues Dougherty wanted. Voss's response was that she was confused, and suggested that "[t]here's something you're not telling us." Gov. Ex. 31-197 to 31-200.

The evidence showed that the December 2, 2015, session was part of the ongoing negotiations between Comcast and the City if Philadelphia, and that Henon delayed the December 3, 2015, council session so that Comcast could have an opportunity to address Dougherty's demands, and the agreement could then be voted out of committee.

All three government witnesses who attended the December 2, 2015, session in Henon's office, former Comcast employee Kathleen Sullivan, former Henon staff member Tom Holroyd, and Comcast employee Mark Reilly, testified that they understood that the franchise agreement would not go forward in Henon's committee unless Dougherty's demands were met. Holroyd (10/19/21 at pp. 103, 109-115); Sullivan (10/20/21 at pp. 67-69); Reilly (10/26/21 at p. 25).

The only other person who testified about the December 2, 2015, negotiation session was Courtney Voss, Henon's Chief of Staff, whose entire recollection was as follows:

> Mr. Dougherty provided a lot of background and history on the Petrick agreement and about his relationship with Comcast. Mark Reilly, who might be the best negotiator I have ever seen in my life, is a total pro, heard Mr. Dougherty out.   And then, you know, and then that was largely it. The meeting ended.

TT 11/4/21, at p. 172.

Mark Reilly, however, in an email message sent not long after the session had concluded, described it as follows:

> We reached a deal on terms. It's all about the unions and Johnnie Doc. I met with Doc for over an hour today. **The demand made** is that we agree to have all commercial construction in the public right of way go to the unions. I said if they are going be

competitive. They said they'd be competitive (lie). I have sent Doc our rate card for
construction work. He is going to get back to me. **If we don't agree, he controls the
votes to deny**. Awesome day!

Ex 33-5r (emphasis added).

The evidence also showed that Henon delayed the December 3, 2015, hearing of the

Committee on Public Property so that Comcast could address Dougherty's demands, telling

Dougherty, "I'm not gonna do it without. . . without, without us, right, you." Gov. Ex. 4-9130.

Testimony of Mark Reilly, 10/26/21, p. 31-35. Gov. Ex. 4-9124, 4-9146; Gov. Ex. 4-9163

(series of text messages starting with 4-9163 and ending with 4-9196, 12/3/15).

Dougherty was not treated like any of the "stakeholders" to which Henon refers in his

motion. He was treated like the person who, the evidence showed, paid Henon's salary and

gave him tickets, in exchange for the performance of official acts by Henon. The evidence

sufficiently supported the jury's verdict that Henon used his public position and control of

Council business to act on behalf of Dougherty, who was paying Henon more than $70,000

that year and providing other benefits, to influence Henon's negotiation of and votes for the

Comcast franchise agreement, all of which were official acts.

       **4.**        **Soda tax.**

There was sufficient evidence, taking all inferences in favor of the government, from

which a reasonable juror could find that Henon voted for the Soda Tax in June 2016, in part, in

furtherance of his  corrupt agreement with Dougherty. Presenting legislation, or agreeing to

present legislation, is an official act. *See McDonnell v. United States*, 136 S. Ct. 2355, 2371-72

(2016) (the defendant must decide or act on a question, matter, cause, suit, proceeding or controversy, "or agree to do so").

In his new motion, Henon oddly focuses on the events of 2015, when Henon took actions to support the Soda Tax at Dougherty's behest. Henon Mtn. 17-18. But those events were the subject of what the government referred to as the "Soda Tax #1" part of the honest services scheme, which took place in 2015, and the jury acquitted on the substantive charge related to that allegation.

Rather, the jury convicted on Count 108, related to the "Soda Tax #2" developments in 2016. Henon presents no argument regarding that conviction, which is supported by ample evidence.

The evidence showed that even though Henon was undecided about the tax in April of 2016, Dougherty assured Mayor Kenney as early as February 2016 that Henon would support the Soda Tax and let Henon know that he had done so. Dougherty also subsequently told Henon to stay on course concerning the Soda Tax.

On February 11, 2016, Dougherty told Mayor Kenney that Henon "really wanted to do" the Soda Tax, even though Henon had had made no such statement at the time.

> JK: The funny part about it is, on the sugar tax, he, he is not even fucking paying it. It's the people buying the fucking sodas paying it. So, like, what,
>
> JD: You ought, you ought to talk to Bob, because Bobby really wants to do that. Bobby wanted to do that during his campaign.
>
> JK: But now he, he is backing, he, Richie [Lazer] told me he is backing off.
>
> JD: No, he didn't back off.

Gov. Ex. 1-66097.

During a conversation with Dougherty later that day, Dougherty told Henon that he had

told Mayor Kenney that Henon was interested in the Soda Tax and that Dougherty wanted

Henon to be involved in the negotiations concerning the tax.

> JD:     So, I was in there [City Hall], so we stopped in, me and Tara ran in. So, he
>         [Mayor Kenney] said look I really need the soda, this budget is going to be, I
>         said Jim, it is a complicated thing, I said, Bobby is interested, but we got to talk.
>         He said John, I will give Bobby anything he wants to get this done. So, we will
>         be taking Darrell on probably, you know, he's (UI) in with them I said I get it I
>         said but, I said, you got to talk to us about it. It's got to be a game plan you got
>         to get, you got to tie it into negotiations, you gotta tie it into everything, you
>         know.
>
> RH:     Right, I mean it just can't be a sole, like, hey, just go ahead and introduce it, it's
>         got to be part of something.
>
> JD:     (to third party) It's right here, but it's right here.
>
> RH:     So, I, I, I think if, if he's, if he's smart about it he, he, can box Darrell in, in his
>         initiative, right, in the community schools and, and being able to pay, like, how
>         are you going to pay for it.
>
> JD:     I know. Well, I just want you to be in the middle of the conversation.

Gov. Ex. 4-67631.

In two subsequent conversations with Marita Crawford, the second of which was on

April 16, 2016, however, Henon was still undecided, Gov. Ex. 4-16925 (2/16/16), 4-20809

(4/16/16). But during a conversation a few weeks later, Dougherty told Henon to start setting

up meetings with other council members to support the Soda Tax. Gov. Ex. 4-23749.

Henon's director of communications, Jolene Byzon, testified that the negative impact of

the Soda Tax on the residents of Henon's district outweighed the potential gains, that many of

his constituents were against the tax, and that Henon "agonized" over whether to support the

tax. TT 10/18/21 at p. 52-53. Chris Creelman, another member of Henon's staff, testified about

the number of calls and online posts from constituents who expressed opposition to the Soda Tax. TT 10/12/21 at p. 151-215, Gov. Ex. 31-172, 31-173, 31-174.

The evidence also showed that Dougherty supported the Soda Tax from the outset because it would be the first big achievement for Mayor Kenney, whom Dougherty had supported. Gov. Ex. 1-69284 (February 21, 2016); Gov. Ex. 1- 70963 (February 25, 2016) ("I'm trying to make him successful, because we are getting way more out of him [Kenney] than we ever got"). On March 1, 2016, Dougherty sent Henon a text message, telling him to "stay INFRONT of the soda tax!!" Gov. Ex. 1-72496.

Once it appeared that Henon was going to support the Soda Tax, Dougherty continued to direct him. On or about May 7, 2016, Dougherty instructed Henon to start talking to other Philadelphia City Council members about the soda tax. Gov. Ex. 4-23471. On May 16, 2016, Dougherty told Henon that Henon needed to talk to Mayor Kenney soon about getting a compromise on the soda tax. Gov. Ex. 1- 88786. On May 24, 2016, Dougherty called Henon and told him to stay in the middle of the discussion about the tax and gave him additional instructions. Gov. Ex. 4-25375. Henon voted for the tax on June 16, 2016.

There is sufficient evidence, taking all inferences in favor of the government, from which a reasonable juror could find that Dougherty wanted Henon to support the Soda Tax in 2016, and Henon did so, taking official action at Dougherty's behest, as part of their corrupt agreement.

It remains irrelevant whether Henon would have ultimately taken this action anyway. A bribery offense is committed when the official agrees to accept the bribe in exchange for promising to carry out an official act, regardless whether the act is ultimately

performed. *See United States v. Ozcelik*, 527 F.3d 88, 95 (3d Cir. 2008), citing *United States v. Brewster*, 408 U.S. 501, 526 (1972); *United States v. Orenuga*, 430 F.3d 1158, 1166 (D.C. Cir. 2005).

The district court decision in *Bryant*, which the Third Circuit quoted with approval, reviewed this issue at length and persuasively explained the correct understanding of bribery law:

> Defendants' argument that a further allegation is required proceeds on an incorrect premise: that unless, as a result of a bribe, an official takes actions that he otherwise would not have taken, the official was not influenced by the bribe. But an official can have the intent to be influenced by a bribe, i.e., the "intent to make good on the bargain," *United States v. Ford*, 435 F.3d 204, 213 (2nd Cir.2006), even if, ultimately, the official ends up taking the same action he would likely have taken if he were not bribed. *See United States v. Quinn*, 359 F.3d 666, 675 (4th Cir.2004) (with respect to a conviction for bribery under 18 U.S.C. § 201(b), "it does not matter whether the government official would have to change his or her conduct to satisfy the payor's expectations"); American Criminal Law Review, 834 (Spring 2008) ("Significantly, a payment or promise need not alter a public official's actual course of conduct, as long as the parties to the transaction possessed corrupt intent") (*citing Quinn*, 359 F.3d at 675); cf. 4 Wharton's Criminal Law, § 646 (2007) ("To constitute bribery, there must be a corrupt intent, i.e . . . from the standpoint of the bribee, an intent to use his public office as a means of acquiring an unlawful benefit").

> When an official makes a quid pro quo bribery agreement, explicitly or implicitly, he ceases making decisions according to his best judgment as a legislator on behalf of all the citizens he serves, and allows the payor to place a thumb on the scale of his decision-making process. When a legislator has a "specific intent to . . . receive something of value in exchange for . . . official act[s]," *Kemp*, 500 F.3d at 281 (citation omitted), in addition to whatever considerations he would have brought to bear regarding the merits of such official acts, he also has a corrupt consideration, the bribe. Thus, even if the official actions he ultimately takes in favor of the payor are unchanged, the legislator's decision-making process is still influenced.

> The exercise of a legislator's discretion in unremitting favor of a constituent in the future, even if likely, cannot be certain in light of the competing concerns of the general citizenry and changing, as well as unforeseen, circumstances. Thus, an allegation that a legislator "exchanged" official actions for a bribe necessarily means that the bribe had some influence on that discretion – even if, as things turned out, the official's actions were the same as they would have been absent the bribe. This is because the "exchange" removes discretion from the legislator – which he is obligated to

exercise in the best interests of the public – and instead locks him into a position favoring one constituent, as dictated by the quid pro quo arrangement.

Moreover, a legislator who makes an implicit or explicit agreement to exchange official acts for a payment or benefit clearly has a corrupt intent. The existence of an agreement to exchange official actions for a payment or benefit means that the legislator is aware that the payor intends to influence his official action through the bribe and, by agreeing to the "exchange," confirms to the payor that he will be influenced. Thus, even if his course of conduct remains the same as it would have absent the agreement, the legislator has the corrupt intent to deliver on his end of the bargain, and confirm the payor's expectations.

*United States v. Bryant*, 556 F. Supp. 2d 378, 392-93 (D.N.J. 2008), *aff'd*, 655 F.3d 232 (3d Cir. 2011). Likewise here, regardless of what Henon would have done had he not been paid off, there was sufficient evidence, viewed in the light most favorable to the government, to support the jury's verdict that Henon's support of and vote for the Soda Tax in 2016 was in exchange for the things of value he received from Dougherty, and was in furtherance of the conspiracy.

## 5. Towing resolution.

The evidence showed that on September 22, 2015, defendant Dougherty nearly had his car towed by George Smith Towing because he had doubled-parked, and while his car was being towed, became irate over the experience. He then made five phone calls, between 9:21 and 9:35, to Richard Lazer, who had previously worked for Mayor-elect Kenney, and was subsequently appointed Deputy Mayor for Labor. Gov. Ex. 1-31239, 1-31242, 1-31244, 1-31245, 1-31248.

During the last call, Dougherty told Lazer that he was going to go to Henon and "there will be a bill in Council next week" to "f***" the George Smith Towing Company (and another company that Lazer mentioned). Dougherty also told Lazer, in the same call, that "Bobby Henon will put a bill in tomorrow." Gov. Ex. 1-31248.

Thereafter, at 9:40 p.m., Dougherty called Henon, which was his first contact with Henon that night. TT 10/19/21 at p. 63-65. During that call, Dougherty told Henon about the towing incident, and said, "I think tomorrow we f***ing put in a bill to certify," and that "I think what we do it, we . . . we'll f***ing put a bill through council." Dougherty also told Henon "just tell them you got, because you have heard nothing but complaints." Gov. Ex. 1-31252.

Dougherty also told Henon in that call to "hold hearings again on them," to which Henon replied: "Yep. Yeah, I'll get something, I'll get something together." *Id.*

A week later, on September 29, 2015, Courtney Voss, Henon's Chief of Staff, sent two emails to Tom Holroyd, who was working on Henon's City Council staff. The first directed Holroyd to go to George Smith Towing and take a photo of any sign that said "cash only," within the next 48 hours. (That period encompassing the next date when City Council would be in session.) TT 10/19/21 at p. 81; Gov. Ex. 31-72. The second email directed Holroyd to "Draft resolution calling for hearings into practices and procedures used by George Smith Towing. Make sure you include language in it that enables us to subpoena witnesses." Gov. Ex. 31-73.

Upon receipt of these emails, Holroyd said that he would comply with both requests, but also inquired of Voss whether "we have any complaints or anything I can point to in the draft of the resolution?" TT 10/19/21 at pp. 13-14; Gov. Ex. 31-76. Voss replied: "Yes. Requiring cash payment." Gov. Ex. 31-77. Holroyd followed the instructions from Voss, taking a single visit to George Smith Towing and drafting a resolution. TT 10/19/21 at pp. 83-84.

On September 30, 2015, Holroyd sent a draft of a resolution to Voss, which authorized City Council to hold hearings "to investigate the operations of George Smith Towing Inc," and

to subpoena witnesses. Gov. Ex. 31-78. That same day, Voss forwarded Holroyd's email with the draft resolution to Henon, asking him if he would like to introduce it the following day. Gov. Ex. 31-69. Voss and Henon then had an email exchange concerning the resolution, and whether it would be introduced the next day. Gov. Ex. 31-71. Holroyd also followed up with Henon and Voss about the introduction of the resolution, and weighed in on the wisdom of targeting a single tow company, which had, some months earlier apparently towed Henon's own vehicle. TT 10/19/21 at pp. 88-89. Holroyd then learned that in fact Dougherty's car had been towed. *Id*. at 89.

In denying the defendants' previous motion for acquittal, this Court stated:

As for the towing topic, the Government presented evidence that Dougherty called Henon after Dougherty had an issue with a towing company and its employee. In summation, Dougherty asked Henon to legislatively retaliate against the towing company. Dougherty specifically stated, "I think tomorrow we [] put in a bill . . . . through council . . . . just tell them you got . . . complaints." Henon replied "Yep. Yeah, I'll get something, I'll get something together." (Gov. Ex. 1-31252.) In short time thereafter, Henon had one of his employees, an intern, draft a resolution concerning the towing company. (Gov. Ex. 31-72.) Although the intern's drafted resolution advanced no further than being just emailed within the office, the Court finds that this presents a factual question as to whether Councilmember Henon committed an official act at Dougherty's behest.

ECF 252 at pp. 8-9. The jury's resolution of that issue, on the basis of the evidence presented, should not be disturbed. Henon took steps to draft a resolution at Dougherty's direction, and that is unquestionably an official act.

In seeking acquittal, Henon simply advances his version of the facts: that the drafting took place not because of Dougherty's demand, but because Henon himself was upset when his own car was towed three months earlier. Henon Mtn. 16-19. But it is axiomatic that at this stage inferences must be taken to support the verdict, and the jury's right to choose between competing narratives must be respected. Dougherty's vehement phone calls, in the context of

the entire relationship between Dougherty and Henon, clearly provided a basis for the jury's conclusion that the drafting took place at Dougherty's behest, not for some other reason.

Henon primarily relies on the testimony of his Chief of Staff and mistress, Courtney Voss, who invoked an ostensible District Attorney investigation into a different towing company (A Bob's Towing) in late Summer 2015 and then testified that Henon abandoned his interest in his own resolution in favor of legislation introduced by another Councilmember (even though that legislation did not address tow companies "requiring cash payment"). TT 11/4/21 at pp. 145-154; RH Ex. 109, 110. Conveniently, Voss never mentioned that she told Holroyd to draft a resolution the week after Dougherty's car was towed and was apparently unaware that Henon had agreed to Dougherty's demands that he go after the towing company in City Council.

Even if the defendant's version of the facts could be considered at all compelling (it is not), the timing of Henon's September 22, 2015, agreement to "get something together" to punish George Smith Towing Company, and the directive to draft a  resolution on September 29, 2015, and the fact that the resolution was directed only at the towing company that towed Dougherty's car (George Smith Towing), and also to the precise complaint Dougherty had (driver required cash payment), clearly support the jury's verdict. "A reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam), *quoting Jackson v. Virginia*, 443 U.S. at 326 (1979).

Here, there was sufficient evidence, drawing all inferences in favor of the government, from which any rational jury could find that the official actions related to towing were taken by

Henon at Dougherty's behest, in exchange for the ongoing stream of benefits he received from Dougherty.

### G. There Was Sufficient Evidence That the $5,000 Campaign Donation Henon Received From the CWA Was a Bribe.

Henon also asks this Court to overturn the jury's verdict convicting him of honest services wire fraud and federal program bribery based on his solicitation and acceptance of a $5,000 campaign donation from the Communications Workers of American (CWA) Local 13000 in October 2015. Henon Mtn. 18-20. After tacitly conceding that the jury had been charged entirely correctly with regard to the applicable law, Henon sets forth his own interpretation of some of the evidence (and some things not introduced in evidence). *Id.* at 19-20. In doing so, he not only ignores most of the evidence that was presented at trial, but also ignores the legal standard that governs his motion, suggesting that his own self-serving view of the evidence is dispositive. The question before the Court, of course, is whether "after viewing the evidence in the light most favorable to the prosecution, ***any*** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," to which the answer is yes. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

This Court rejected this claim when denying Henon's previous motion for acquittal, stating:

> The Court finds that the Government has provided enough evidence so that a reasonable juror could find that Councilmember Henon committed official acts for campaign contributions. As for the CWA contribution, the communications requesting and accepting the CWA contributions were in the midst of Councilmember Henon and the CWA discussing the Verizon issue and what Henon could do to help. The same is true for the PPA contribution. Councilmember Henon requested help with getting new windows, and did so while in the midst of discussing the PPA audit with the window provider and how Henon could affect the PPA audit. These are issues for the jury to decide.

ECF 158 at p. 9. (The jury then convicted with respect to the CWA matter and acquitted with regard to the PPA issue.) This Court's judgment was and remains correct.

The evidence showed the following sequence of events:

In fall of 2015, Verizon was completing its buildout under the franchise agreement it had with the City of Philadelphia and was regularly meeting with the City of Philadelphia, specifically with the Office of Information and Technology (OIT), to monitor Verizon's progress. At the same time, Verizon was in labor negotiations with the CWA, a union that represented many of its employees. On September 10, 2015, Jim Gardler, the head of CWA Local 13000, called Henon, complained about Verizon and the contract negotiations, and suggested that Henon could call for an audit or take some action concerning Verizon to assist the CWA with the negotiation. Henon said he would look into it. Gov. Ex. 4-1413.

On September 23, 2015, Henon called Gardler and asked for a campaign contribution of $10,000, or at least $5,000. Gardler said he would talk to Ed Mooney, the head of the international. Gov Ex. 4-1502. Henon called Gardler back 30 seconds later, and told Gardler that he ran into Doug Smith, a Verizon executive, at a coffee shop, and told Smith to work out the contract with CWA.[17] Gov. Ex. 4-1503. Henon then asked Gardler, "So is there anything, should I just listen, or is there anything I should be saying [to Smith]?" Gardler told Henon that what the CWA really needed was a public embarrassment of Verizon concerning the buildout. Henon replied that he would check into the status of the buildout. *Id.*

---

[17] The jury could infer that Henon's action in making two phone calls on September 23, 2015, thirty seconds apart, shows that Henon knew what he was doing was wrong. Essentially putting someone on hold for 30 seconds does not and cannot erase the fact that Henon was asking for campaign contributions at the same time he asked Gardler if there was anything he could do for him as a member of City Council. If they had met in person, and Henon walked around the block between asking for money and offering to act on behalf of Gardler in his official capacity, the result would be the same.

Henon's request to Gardler was followed up in writing. Henon also made a follow-up call to Gardler, leaving a voicemail asking again for a contribution. Gov. Ex. 4-3853 (10/14/15).

On October 16, 2015, Gardler told Henon that he received his written request, which was "going through" CWA's committee. Henon replied, "thank you, Jim, for the record, that the five is the most you have ever given me." Gardler explained that he convinced others in the CWA Local 13000 to approve the contribution by assuring them, "I know what I can ask Bobby to do for us." Gardler then asked Henon to hold a hearing "to put pressure on" Verizon. After Henon said he would see where Verizon was on the buildout, Gardler replied he did not care where they were on the buildout, he just wanted the hearing to put pressure on Verizon in connection with the labor negotiations. Henon agreed, saying, "Alright, you got it." Gov. Ex. 4-4037. *See also* Gov. Ex. 301 (showing spike in donations to Henon by CWA in October 2015).

A few days later, Henon received the $5,000 check from the CWA, and emailed two of his City Council staffers, Courtney Voss and Chris Creelman, and asked them to remind him to schedule a hearing on the Verizon buildout. Gov. Ex. 31-5, 31-6, 31-7.

During a call on November 10, 2015, after Henon suggested that no one in the administration wanted a hearing, Gardler reminded him that "the whole point of doing this on our end is to put some pressure on them with the problems we're having at the bargaining table." Henon agreed to get a December hearing set and use that as leverage. Gov. Ex. 4-7000. On November 25, 2015, Henon told Gardler that he had a meeting with Doug Smith of Verizon at which he told Smith that a hearing had been set, and, according to Henon, the

"color of his face changed." Gardler replied, "Good, good, that is exactly what we want to get out of them." Gov. Ex. 4-7825.

In April of 2016, the negotiations broke down, and CWA went on strike. Henon ordered his staff to schedule a hearing on Verizon's buildout as soon as possible. Gov. Ex. 71-3, 31-9, 31-15, 31-27.

The hearing was finally scheduled for April 29, 2016, allegedly to address the status of Verizon s installation of fiber optic cable in Philadelphia, even though the Philadelphia Office of Information and Technology, which was overseeing the project, had not requested a hearing and did not feel that a hearing was necessary. Testimony of Steve Robertson, 10/13/21, pp. 3-66.

On April 27, 2016, Henon called Gardler and told him to fill as much of the Council chamber with CWA members as possible. Gov. Ex. 4-22310.

The hearing lasted three hours; approximately two hours of it were played for the jury. Gov. Ex. 302. At various points during the hearing, to applause, Henon accused Verizon of lying and failing to verify the status of the buildout, even after he was informed that the verification had been delayed by the CWA strike. CWA's Ed Mooney even sent Dougherty a text during the hearing thanking Dougherty because Henon was "killing" Verizon. Gov. Ex. 1-84690. Henon continued to hold up his end of his corrupt agreement with Gardler a few weeks later, when he made negative comments about Verizon to a radio reporter, and then bragged about it to CWA president Ed Mooney ("I f***ing destroyed them [Verizon] on KYW today," Gov. Ex. 4-23872, 5/10/16), and Jim Gardler ("I was just giving you a heads up. I whacked Verizon again yesterday," Gov. Ex. 4-23952, 5/11/16).

The evidence, viewed in the light most favorable to the government, was sufficient to support the jury's verdict that Henon accepted campaign contributions from the CWA in exchange for putting pressure on Verizon by forcing it to submit to a hearing that was not even necessary. On October 16, 2015, Gardler told Henon that he got his request for a campaign contribution approved by telling the CWA, "I know what I can ask Bobby to do for us." Gardler then did just that - he asked Henon to hold a hearing "to put pressure on" Verizon - making clear exactly what he knew he could ask Henon to do. Henon agreed, and then performed as agreed. The pertinent official act that was the subject of this explicit agreement was a hearing involving Verizon before City Council, clearly an official act.

In the face of all of this evidence, Henon's attempt to induce this Court into setting aside his conviction for this conduct by substituting his assessment of the evidence for that of the jury must be rejected. *See Caraballo-Rodriguez*, 726 F.3d at 430 (the reviewing court "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury."), *quoting United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).

## III.    Conclusion.

For all the above reasons set forth above, the government respectfully requests that the defendants' motions for judgment of acquittal, and Dougherty's motion for a new trial be denied.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
United States Attorney

MICHELLE MORGAN
Assistant United States Attorney
Chief, Corruption and Labor Racketeering


/s/ Frank R. Costello, Jr.
FRANK R. COSTELLO, JR.
RICHARD P. BARRETT
BEA WITZLEBEN
Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this date, I electronically filed the foregoing response with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants, who are identified below.

Henry E. Hockeimer, Jr., Esq.
Terence M. Grugan, Esq.
Emilia McKee Vassallo, Esq.

*Counsel for Defendant John Dougherty*

Brian McMonagle, Esq.

*Counsel for Defendant Robert Henon*

/s/ Frank R. Costello, Jr.
FRANK R. COSTELLO, JR.
Assistant United States Attorney

Dated: January 4, 2022.