IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION<br>No. 19-64 |
| JOHN DOUGHERTY *et al.* | |

**MEMORANDUM OPINION**

**SCHMEHL, J.  /s/ JLS**                                                                   February 24, 2023

After a two-month trial, a jury in Philadelphia, Pennsylvania, returned a partial guilty verdict against Defendants John Dougherty and Robert Henon for political corruption-related crimes. After the Government's case in chief, Defendants moved for Judgments of Acquittal, which this Court predominantly denied. (*See* ECF No. 252.) Following the jury's verdict, Defendants renewed their Motions for Judgement of Acquittal. (*See* ECF Nos. 253, 254.) For the reasons below, Defendants' Motions are denied.

**I.   Background**

A grand jury charged Defendants John Dougherty, Robert Henon, Brian Burrows, Michael Niell, Marita Crawford, Niko Rodriguez, Brian Fiocca, and Anthony Massa in a 116-count indictment alleging embezzlement of union assets; wire, tax and honest services fraud; and other crimes. This Court severed the case into two trials: one for the embezzlement-related counts (Counts 1-96), and a second for the political corruption related counts (Counts 97-116). *See United States v. Dougherty*, 2020 WL 6395464 (E.D. Pa. Nov. 2, 2020). The Court found that the political

corruption trial should proceed first because only two defendants were implicated, and it would therefore be most efficiently managed under COVID-19 pandemic limitations.

This political corruption trial against Defendants Dougherty and Henon had two main parts. The first was an alleged corrupt agreement between the two—a *quid pro quo*. Allegedly, Dougherty, through Local 98, authorized Henon's Local 98 salary while Henon was a Philadelphia City Councilmember "in return for Henon's performance of official acts, in essence, any action Dougherty wanted to further his interests." (ECF No. 271 at 1.) The second part was four federal program bribery counts and three related wire fraud counts against Henon. These counts alleged that Henon solicited and accepted campaign contributions for official acts.

Defendant John Dougherty was raised in South Philadelphia and began working for Local 98 of the International Brotherhood of Electrical Workers in his early adulthood. Over the years, he worked up Local 98's ranks to become Local 98's highest-ranking member, the Business Manager. The Government and Defendants stipulated that Dougherty was "the principal officer of Local 98, and all other Local 98 officers were required to cooperate with him and not work in conflict with him." Dougherty had the authority "to approve the hiring of all employees," "set the number of hours for which all employees were paid," and "to discharge [employees] at any time." (Gov. Ex. 414.)

The evidence at trial showed that Dougherty is one of the most well-connected and influential people in Philadelphia. He made and received daily calls from former and present Philadelphia City Councilmembers and Mayors, Pennsylvania Representatives and Senators, business leaders, union leaders, and more. Through his business decisions, influence, and connections, Dougherty is the primary reason why Local 98 is an economic, political, and social powerhouse in Philadelphia and throughout the Commonwealth of Pennsylvania.

Defendant Robert "Bobby" Henon was an employee of Local 98 since 1989. Like Dougherty, Henon worked up Local 98's ranks. He began as an apprentice, became an electrician, and eventually became Local 98's Political Director. In 2011, Henon won a seat on Philadelphia City Council for the Sixth District, which is situated in the Northeast of Philadelphia. Shortly after Henon's election, Dougherty held a "Sound and Communications Membership meeting" where he told Local 98 employees that "Bobby will still play a role in our union operation and will collect a check from Local 98." (*See* ECF No. 254 at 21; ECF No. 271 at 24.) As an employee of Local 98, Henon fell within Dougherty's authority.

The Philadelphia City Charter permits Councilmembers to retain outside employment so long as they report the employment as required by law. Henon properly reported his Local 98 employment every year from 2011 to 2022, his year of resignation—though he reported his position as an "electrician," while Local 98 recorded his position as "office staff" who worked twenty hours per week. Evidence also showed that many other City Councilmembers retain outside employment like Henon.

Henon's salary, along with sporting event tickets from Local 98, is the *quid* to the Government's alleged *quid pro quo*. The Government alleged and presented evidence at trial that "Dougherty kept him on the payroll, a payroll that was controlled entirely by John Dougherty," so that Henon would "be his man on the inside of City Council." (Trial Tr. Day 21, Gov.'s Closing, at 54-55, 51.) Further, "what did John Dougherty get for his money? He got Henon's votes; he got his public resources, the use of his staff; he got the influence of his office; his ability to hold hearings; to delay hearings; to draft support, introduce and vote for resolutions and bills; and to oppose and vote against resolutions and bills." (*Id.* at 51-52.)

The Government presented the following about Henon's employment and more: In a call with Philadelphia Mayor James Kenney, Dougherty stated that Henon was "on my payroll." (Gov. Ex. 1-46839.) The Political Director of Local 98 stated to a Local 98 employee who often worked with Henon that Henon would run for Majority Leader of City Council "[i]f John wants to do it. Maybe John says, don't run for Majority, I don't know but . . . John is the boss, that's it . . . Not Bobby, nobody." (Gov. Ex. 3-3458.) The Government could not find any work product, office, desk, or anything else that belonged to Henon at Local 98 headquarters when they executed search warrants. Henon's City Council staff were predominantly unaware of his Local 98 employment until *Philadelphia Magazine* wrote on the matter. Henon's online City Council biography never listed his Local 98 employment. Henon told a fellow Councilmember that she need not necessarily report sporting events from Local 98. Lastly, Dougherty and Henon frequently discussed City Council business telephonically.[1]

Correspondingly, Defendants cross examined the Government's lead witness, FBI Special Agent Jason Blake, who relayed nearly all the wiretapped calls and texts during trial about Henon's Local 98 employment. Agent Blake stated that Henon was a Local 98 delegate to the AFL-CIO, attended AFL-CIO meetings, attended Building Trades meetings, and participated in political campaigns of various individuals. (Trial Tr. Day 15, 67-68.) Multiple Local 98 employees testified that Henon attended monthly Local 98 meetings: "Bobby was always there," he did Local 98 work "all the time," and more. Courtney Voss, Henon's Chief of Staff and paramour, testified that he worked eighty hours a week as a Councilmember and "a ton of hours" for Local 98. (ECF No. 253 at 10; ECF No. 271 at 30-34.)

---

[1] Wiretapped calls and texts were by far the predominant form of evidence at trial from the Government.

For the salary and sporting events, Henon allegedly returned "official acts," or the *quo*, on six separate topics, only five of which were ultimately presented to the jury. In no particular order, the five topics were: (1) L&I and CHOP; (2) Plumbing Code; (3) Comcast Franchise Agreement; (4) Towing; and (5) Soda Tax.

The first topic relates to License and Inspection (L&I) issues at the Children's Hospital of Pennsylvania (CHOP). Henon received communications from Dougherty and his constituents about license and inspection issues for the installations of medical equipment at CHOP. The Government presented evidence that prior to the alleged official act(s), Henon hosted a meeting between himself, Dougherty, and Philadelphia Streets and L&I Commissioner Carlton Williams. Dougherty purportedly did most of the talking during the meeting and informed Williams of L&I violations at a work site that Williams stated were later unfounded, and he told Williams that he could have his job taken away from him. Commissioner Williams testified that responding to complaints and having discussions with people like Henon and Dougherty was "his job," he would "frequently" talk to Councilmembers about L&I issues, and that Henon never asked him to do anything unlawful or unethical. (Trial Tr. Day 5, at 27, 33, 74.)

In July and August 2015, Dougherty learned that non-union employees were installing complex medical equipment at CHOP. On both incidents, Dougherty directed constituents to contact Henon about the potential license and inspection issues. Once Henon was notified, Henon contacted Commissioner Williams, L&I inspectors went to the work sites, and stop work orders were issued. (*See* ECF No. 271 at 38-42; ECF No. 253 at 12-13.)

The second topic relates to a Philadelphia Plumbing Code change. In 2015, a plumber's union opposed changing the Philadelphia Plumbing Code to the International Plumbing Code ("IPC"). The plumbers preferred modernizing and amending the existing code to best suit

Philadelphia rather than adopting the IPC. At this time, Dougherty was running for the coveted position of Business Manager of the Building Trades, the top position that brings together many of the local unions. During the campaign, Dougherty believed that the local plumbers opposed his nomination, so he therefore asked Henon to use the potential plumbing code change as leverage against the plumber's union. Dougherty and Henon were telephonically discussing "plumber . . . nonsense . . . that's happening," a conversation in which Henon told Dougherty his plans on the matter, Dougherty replies, "do it," and Henon responds, "I'm just running it by you," "I'm going to do that," and that it was an "us thing." (Gov. Ex. 4-270.) Shortly thereafter, Henon made calls to other union officials to help influence their votes in Dougherty's favor for Business Manager of the Building Trades. (*See* Gov. Ex. 4-916; 964.)

The third topic relates to negotiations of Philadelphia's Comcast franchise agreement, which Henon was overseeing as Chair of the Public Property Committee. Henon's role was to hear from and accommodate as many constituents as possible, like Dougherty, while reaching a deal with Comcast. Meanwhile, Dougherty wanted electrical work for his union in the rollout of the new franchise agreement, which he had achieved under the prior 1999 agreement through a handshake deal. (Trial Tr. Day 13, Mark Reilly, 5-6.)

But the Government presented evidence that Dougherty was treated more favorably than other constituents. When Dougherty and Henon discussed the franchise agreement's language over the phone, Dougherty said, "Listen, scratch the prevailing wage language, give me . . . business to business, a memorandum of understanding that business to business and the right of way is in the mix." Henon responded, "I got no problem with that." (Gov. Ex. 4-8891.) Later in negotiations, Henon invited Comcast's lead negotiator, Mark Reilly, and his coworkers to a meeting with Henon, his staff, and Dougherty. According to Reilly, Dougherty lead the meeting

and was keen on getting work for his union.  Dougherty made a "demand" that "all commercial construction in the public right of way to go to the unions," which was fine with Reilly "if they are going to be competitive[,] [which Dougherty] said they would be competitive. (lie)." (Trial Tr. Day 13, Mark Reilly, 28 (reviewing post-meeting email).)  In another email after the meeting, Reilly relayed that "[e]ither we agree that all right of way commercial business goes to unions or he stops the renewal." (*Id.*)  Ultimately, the agreement between Comcast and Dougherty was never formally memorialized, and a short time after the meeting, the Comcast franchise agreement was voted on and approved by City Council.  (*Id.* at 63.)

The fourth topic relates to Philadelphia's "Soda Tax." Near the beginning of newly elected Mayor James Kenney's administration, establishing a tax on sugary drinks was a prime initiative.  At the time, Henon was arguably undecided on the matter given the implications it would have on his district and other typical legislative considerations.  Dougherty, however, was in favor of the tax for two reasons: Mayor Kenney was for the bill and Dougherty supported Kenney, and the bill could aid Dougherty in an ongoing dispute he had with another local union.  Accordingly, Dougherty told Kenney his thoughts on the tax and informed Kenney that Henon was in favor of the bill.  (Gov. Ex. 1-66097.)  Dougherty then told Henon on multiple occasions that he wanted Henon to be an active participant in the legislative discussions of the tax.  (Gov. Ex. 1-67631; 4-23471; 4-25375.)  The following month, Henon voted in favor of the tax.

The fifth topic relates to a draft resolution regarding towing in Philadelphia.  In June 2015, Henon was frustrated after his car was towed and asked his staff to investigate towing practices in Philadelphia.  (ECF No. 271 at 56-57; Trial Tr. Day 10, 80-85.)  Henon even called the Philadelphia District Attorney's Office about the issue, and his staff began drafting a resolution concerning towing in Philadelphia.  (*Id.*)  Additionally, another Councilmember was investigating

the same issue, but no evidence showed Henon or any other Councilmember ultimately taking affirmative legislative action.

In September 2015, Dougherty's car was towed, and he immediately called the Deputy Mayor for Labor, Richard Lazer.  (ECF No. 271 at 54.)  Dougherty told Lazer that "tomorrow, I am going to Bobby Henon, there will be a bill in Council next week, okay, to fuck [two towing companies]," and "Bobby Henon will put a bill in tomorrow."  (Gov. Ex. 1-31248.)  Dougherty then called Henon and said, "put a bill through council," "I don't abuse government at all, but if they can do that to us, they can do it to anybody . . . . it was just the . . . way they handled it," and "hold hearings again on them."  (Gov. Ex. 1-31252.)  Henon replied, "yeah, I'll get something . . . together."  (*Id.*)  But no evidence showed that a bill was ever presented to City Council.  Henon's staff member, an intern, investigated "George Smith Towing" by going to their place of business, and then drafted a legislative resolution concerning towing practices in Philadelphia.  (ECF No. 271 at 55-56.)  That draft resolution went no further than being emailed from the intern to Henon and his chief of staff.

In the second part of the case, Henon was charged with seven counts relating to campaign contribution bribery and was found guilty of two.  In Fall 2015, Henon was soliciting campaign contributions for his unopposed reelection, and he hired campaign consultant Rachel Doran for assistance.  Doran would host Henon in her office while he telephonically solicited contributions.  (ECF No. 253 at 25.)  Meanwhile, Verizon and Philadelphia were negotiating a new franchise agreement, and Verizon was having general labor dispute issues.  On September 10, 2015, Henon received a call from a friend, Jim Gardler, who is head of the CWA Local 13000 and who represented Verizon's employees in their labor disputes.  Gardler complained about the ongoing Verizon labor issues, and Henon said he would look into it.  (Gov. Ex. 4-1413.)  On September

23, 2015, Henon called Gardler to solicit a campaign contribution. (Gov. Ex. 4-1502.) Henon specifically stated in the beginning of the call that it was "a political call, so I am calling to ask for your continued support for my campaign and my future ambitions." (*Id.*) Henon then stated, "not related, as a matter of fact, I'm going to hang up and call you right back. Alright?" (*Id.*) The two then hung up and Henon redialed Gardler minutes later to discuss Verizon dealings. (*See* Gov. Ex. 4-1503.)

On October 16, 2015, Gardler informed Henon that he was able to get him a $5,000 campaign contribution, and he relayed a conversation he had with his union Board. (Gov. Ex. 4-4037.) Gardler compared donating to a Pittsburgh Councilmember to donating to Councilmember Henon by saying "what's that guy gonna do for us because I know what I can ask Bobby to do for us." (*Id.*) Henon replied "right." (*Id.*) Gardler then requested that City Council hold a hearing on Verizon "to put pressure on" them. (*Id.*) A few days later, Henon received the contribution and then emailed his staff to remind him to schedule a hearing on the Verizon buildout. (ECF No. 271 at 60.) On November 10, 2015, Henon informed Gardler that City Council did not want to hold a hearing on Verizon, but Gardler insisted and said he needed more pressure on Verizon. (Gov. Ex. 4-7000.) Eventually, a City Council hearing was held on Verizon the next month where Henon accused Verizon of mishandling labor issues, amongst other things. (Gov. Ex. 302.)

The counts from the indictment in this trial were Counts 97-116. Prior to presentation to the jury, the Counts were renumbered 1-20. The Court partially dismissed one Count during adjudication of Defendants' first Motion for Acquittal by dismissing Dougherty from all Philadelphia Parking Authority-related counts, and the Government dismissed two counts on their own. Specifically, Count 108 was stricken to the extent that it alleged Philadelphia Parking

Authority acts, and Counts 104 and 107 were dismissed by the Government. Thus, the jury was presented with eighteen total counts: eleven against Dougherty and eighteen against Henon.

After the two-month trial, the jury returned a partial guilty verdict. (*See* ECF Nos. 249 (Henon Verdict Form), 250 (Dougherty Verdict Form).) The jury found Defendants guilty of:

- Count 97: Conspiracy to Commit Honest Services Fraud (Count 1 on Jury Verdict Form);
- Count 100: Wire Fraud relating to L&I/CHOP (Count 4 on Jury Verdict Form);
- Count 101: Wire Fraud relating to Plumbing (Count 5 on Jury Verdict Form);
- Count 102: Wire Fraud relating to Towing (Count 6 on Jury Verdict Form);
- Count 103: Wire Fraud relating to Towing (Count 7 on Jury Verdict Form);
- Count 105: Wire Fraud relating to Comcast (Count 8 on Jury Verdict Form);
- Count 106: Wire Fraud relating to Comcast (Count 9 on Jury Verdict Form);
- Count 108: Wire Fraud relating to Soda Tax #2 (Count 10 on Jury Verdict Form); and
- Count 109: Mail Fraud relating to L&I/CHOP (Count 11 on Jury Verdict Form).

The jury also found Henon guilty of:

- Count 110: Wire Fraud for $5,000 from CWA to Henon's Campaign Account, October 20, 2015 (Count 12 on Jury Verdict Form); and
- Count 114: Federal Program Bribery relating to CWA contribution (Count 16 on Jury Verdict Form).

Now, both Defendants renew their Motions for Judgement of Acquittal pursuant to Federal Rule of Procedure 29. The Court denies their Motions for the same reasons the Court denied their first Motions for Judgement of Acquittal. (*See* ECF No. 252.)

## II. Standard of Review

Defendants' Motions for Acquittal attack the jury's verdict based upon insufficient evidence and doctrinally as to honest services fraud law. In a sufficiency-of-the-evidence claim,

the Court examines the "totality of the evidence, both direct and circumstantial, and interpret the evidence in the light most favorable to the government as to the verdict winner." *United States v. Starnes*, 583 F.3d 191, 206 (3d Cir. 2009) (citations omitted). The jury's verdict shall be upheld when "substantial evidence from which a rational trier of fact could find the essentials elements of the crime beyond a reasonable doubt." *Id.* "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *Id.*; *see also United States v. Pawlowski*, 27 F.4th 897, 902 (3d. Cir. 2022).

**III.   Analysis**

Defendants focus on three issues: (1) the alleged stream of benefits and its *mens rea* requirement; (2) the official acts; and (3) Henon's separate bribery counts.

To prove honest services fraud, the Government must prove a *quid pro quo*, "that is, 'a specific intent to give or receive something of value in exchange for an official act.'" *United States v. Wright*, 665 F.3d 560, 567-68 (3d Cir. 2012) (quoting *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-05 (1999) (emphasis in original)). An alleged "stream of benefits" scheme alters the typical *quid pro quo* standard just slightly and constitutes bribery when:

> the parties intended for the benefit to be made in exchange for some official action; the government need not prove that each gift was provided with the intent to prompt a specific official act. Rather, the *quid pro quo* requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor. Thus, payments may be made with the intent to retain the official's services on an as needed basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf.

*United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007) (citations omitted). A course of conduct of bribes that are disguised as "favors and gifts" given to the public official may prove the briber's and bribee's corrupt intent through circumstantial evidence. *See Wright*, 665 F.3d at 568. "First, [the jury] must conclude that the payor provided a benefit to a public official intending that he will

- 11 -

thereby take favorable action that he would not otherwise take. Second, [the jury] must conclude that the official accepted those benefits intending, in exchange for the benefits, to take official acts to benefit the payor." *Id.*

The "corrupt intent" requirement, Defendants' *mens rea*, and the timing of that intent is Dougherty's main argument. Defendants do not object to the jury instructions but rather attack their conviction by arguing that the Government could not, as a matter of law and fact, prove the crimes as alleged. According to Defendants, the Government was required to prove the following: "the relevant *mens rea*—intent to influence and be influenced—existed at the time the *quid pro quo* was formed" (ECF No. 254 at 13 (citing *United States v. Ciavarella*, 716 F.3d 705, 729 (3d Cir. 2013)); the stream of benefits relationship "was consummated with corrupt intent, *i.e.* whether that stream of benefits was given to the public official to influence official action and that stream of benefits was accepted by the public official knowing it was given in order to influence official action" (ECF No. 254 at 17 (footnote omitted)); and "at the time Mr. Dougherty and Mr. Henon agreed to the alleged *quid pro quo* they both contemplated that Mr. Henon would take some action on the 'specific and focused' 'questions or matters' alleged" (*id.* at 25).

The Court disagrees with Defendants' contentions, as they predominantly misstate the law on honest services fraud. The jury was instructed that:

> [t]he Government must prove that John Dougherty intended to influence official action, and in return Robert Henon understood that Dougherty wanted him to take official action that would benefit Dougherty. . . . The Government must prove beyond a reasonable doubt that the defendants had the specific intent to enter into a quid pro quo or a stream of benefits agreement. For defendant Dougherty, that means he provided things of value to defendant Henon, intending Henon to take official favorable action that he might not otherwise take. For defendant Henon, that means he accepted the things of value, knowing that Dougherty intended to influence him in taking official action, whether he would take the same action or not.

(Trial Tr. Day 21, Jury Instructions, at 59-60.)

The Government presented direct and circumstantial evidence of Defendants' corrupt intent. The Government presented Dougherty telling the Philadelphia Mayor that Henon was "on his payroll"; numerous calls were presented between Dougherty and Henon where they discussed City Council business; Dougherty displayed anger towards Henon when discussing with others how Henon was failing to adequately benefit Local 98; Henon's staff hardly knew of his Local 98 employment; Henon's City Council bio did not state his Local 98 employment; Henon told a fellow City Councilmember that she need not necessarily report Local 98 sporting events; and both sides presented conflicting evidence as to how much work Henon actually performed for Local 98.

The jury was properly instructed on the law and made their findings accordingly. Defendants' contentions that the Government did not or could not prove the *mens rea* requirement is against the jury's findings, which this Court will not disturb given the above evidence and our deferential review. *See Starnes*, 583 F.3d at 206; *see also United States v. Repak*, 852 F.3d 230, 250-51 (3d Cir. 2017) (approving the following jury instructions in a Hobbs Act extortion and federal program bribery case: "[p]assive acceptance of a benefit by a public official is a sufficient basis for this type of extortion if the official knows that he is being offered payment in exchange for his ability to do official acts").

This decision does not run contrary to either *McDonnel* nor *Silver*, which Dougherty primarily relies upon. Like our sister court in the District of New Jersey, this Court finds that the Supreme Court in *McDonnel* did not extrapolate on the *quid* to the *quid pro quo*, nor did it alter the *mens rea* requirement. *See McDonnel v. United States*, 136 S.Ct. 2355, 2371-71 (2016); *United States v. Menendez*, 291 F.Supp.3d 606, 613-14 (D.N.J. 2018). *McDonnel* only redefined the *quo* as to what constitutes an "official act" in honest services fraud. Thus, *McDonnel* requires no change to this Court's analysis.

Likewise, Defendants' acquittal is not demanded by *United States v. Silver*, 948 F.3d 538 (2d Cir. 2020). Although *Silver* provides substantial persuasive authority on core issues of honest services fraud law, that persuasion does not rise to support Defendants' acquittal. The Second Circuit dealt with an "as opportunities arise theory" of bribery which differs slightly from the "stream of benefits theory" that we have here. *Id.* at 578 ("The majority opinion is appropriately narrow . . . the 'stream of benefits' or 'retainer' theories of bribery—are not even implicated in this case.") (Lohier, J., concurring). Regardless, nothing in *Silver* shows that the law was misconstrued or applied incorrectly in this case. *See id.* at 551, 557-58 ("[T]he *mens rea* required for honest services fraud is proof that the defendant intended to deprive another of the intangible right of honest services. . . . [T]he Government must additionally prove . . . an understanding that the . . . payments were made in return for official action, or a promise to perform an official act in exchange for payment . . . . This observation does not signal a change in the law . . . . [N]either the facts of *McDonnell*, nor the Court's opinion, suggest that either the payor or the official must precisely define the relevant matter or question upon which the official is expected to exercise his official power" (footnote omitted)).

Lastly, the very requirement that Defendants complain of—that the Government did not or could not prove Defendants' specific intent—is the precise requirement that distinguishes a bribery case from the kind of conflict-of-interest case that *Skilling* abolished. *See Skilling v. United States*, 561 U.S. 358, 408-14 (2010). Given this Court's approval of the Government's evidence concerning Defendants' *mens rea*, Defendants' conflict of interest argument is correspondingly rejected.

Next, Henon contests whether the evidence supported the jury's finding that he committed "official acts" on the aforementioned five topics, and whether the evidence supported his two

- 15 -

separate bribery counts.  Given this Court's decision on Defendants' first Motions for Judgment of Acquittal, and along with the Court's deferential standard of review, the Court will not disturb the jury's verdict for the same reasons set forth in that decision.  Henon again makes the same evidentiary arguments, which were factual issues for the jury to decide.  (*See* ECF No. 252 at 5-10.)

**IV.     Conclusion.**

For the reasons above, Defendants' Motions for Judgment of Acquittal (ECF Nos. 253, 254) are denied.