IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : CRIMINAL ACTION NO. 19-64 |
| | : |
| JOHN DOUGHERTY | : |

MEMORANDUM OPINION

**SCHMEHL, J.** /s/ **JLS**                                                                July 31, 2023

On January 29, 2019, Defendant John Dougherty was indicted for allegedly embezzling funds of the union he ran, the International Brotherhood of Electrical Workers Local Union 98 ("Local 98" or the "Union"), and for public corruption relating to his dealings with Defendant Robert Henon. The Court bifurcated this First Indictment and held trial on the public corruption charges in late 2021. Ultimately, the jury found Mr. Henon guilty of ten counts and Mr. Dougherty of eight. Mr. Dougherty, together with Defendant Brian Burrows, now faces a trial for the First Indictment's embezzlement charges.

In March 2021, the Government obtained another indictment relating to an altercation that took place at the Live! Casino in Philadelphia. *See United States v. Dougherty et al.*, No. 21-cr-65 (E.D. Pa. March 2, 2021), ECF No. 1. This Second Indictment charges Mr. Dougherty and Mr. Gregory Fiocca with extortion. Over the course of 2022, in preparing for a trial in that case, the Government revealed that it had engaged a confidential informant ("CI") who attended Local 98 meetings and reported to the Government what transpired at those meetings. The Government's CI was active as early as June 2020—in other words, *after* the unsealing of the First Indictment and, therefore, during the timeframe in which Mr. Dougherty was preparing to defend against the public corruption charges set for trial. Now before the Court is Mr. Dougherty's *Motion to Dismiss*

*the Indictment in Light of the Government's Violations of His Fifth and Sixth Amendment Rights and Other Willful Discovery Violations* (ECF No. 417). For the reasons set forth below, Mr. Dougherty's Motion is denied.

I.  **BACKGROUND**

   A.  **Post-First Indictment Investigation and Engagement of the CI**

During the summer of 2020, while Mr. Dougherty was under indictment for the embezzlement and public corruption charges, the Government claims that it was also investigating Mr. Dougherty for post-First Indictment allegations of "witness intimidation and retaliation, embezzlement separate from and occurring well after the charged activities, unlawfully attempting to shut down a website critical of union management, and potential violations of federal law concerning union elections." (Gov.'s Br. 3, ECF No. 424.) To date, Mr. Dougherty is not subject to any charges stemming from these allegations.

Also while Mr. Dougherty was under indictment, the Union held frequent meetings—some in person, and others via video or telephone conferencing. The parties have not described the meetings as open to the public, but according to transcripts of the CI's recordings, they appear to have typically consisted of around 30 Union employees. *See also* Evidentiary Hr'g Tr. 61:11–14, *United States v. Dougherty*, No. 21-cr-65 (E.D. Pa. June 30, 2022), ECF No. 108 [hereinafter the "Hr'g Tr."] (reflecting Agent Blake's agreement that the meetings consisted of "a fairly large group of Local 98 employees"). Mr. Dougherty presided over these meetings and often discussed not only Union business but also the pending criminal charges against him. *Id.* at 61:17–24.

FBI Special Agents Jessica Fear and Jason Blake, who were part of the team investigating Mr. Dougherty, first met with the CI in person in June 2020. During that meeting, the CI claimed Mr. Dougherty was using threats and intimidation at Union meetings, and the CI provided a recording he had made of a meeting held on November 2, 2019. A few days later, the CI provided

three additional recordings of meetings in September and October 2019. The Government asserts that it created a filter team "[n]ot long after" it received these three additional recordings. (Gov.'s Br. 4.) The CI ultimately gave the FBI 31 recordings of Mr. Dougherty,[1] as well as additional information provided to Agent Fear and, infrequently, the filter team itself. The Government then created "source reports" that summarized this information. (*Id.* at 7.)

**B.      Post-Second Indictment Use of the CI**

On August 19, 2020, an incident occurred at Live! Casino which gave rise to the Second Indictment against Mr. Dougherty. The Second Indictment alleges that a pay dispute escalated into a physical altercation between Mr. Dougherty's nephew (and co-defendant), Gregory Fiocca, and an electrical contractor. Mr. Dougherty claims that the Government first learned of the incident from the CI and used this information to commence the investigation that culminated in the Second Indictment. (Def.'s Br. 7, ECF No. 417.) On August 24, 2020, the Government authorized the CI to record Mr. Dougherty during a Local 98 meeting in which he discussed the altercation. According to the relevant source report, Mr. Dougherty explained that everyone should "back Fiocca" as an "extension of the business office." (*Id.* at 8.) Based on the CI's information, Mr. Dougherty claims, the Government obtained and executed a search warrant for Local 98's office in October 2021. (*Id.*) On March 3, 2021, the Second Indictment was unsealed, and the Government arrested Mr. Dougherty at his home. Thereafter, the CI continued to record Mr. Dougherty during Local 98 meetings.

---

[1]     The CI made more than 31 recordings in total, but those additional recordings either captured speakers other than Mr. Dougherty or were the result of the CI mistakenly activating the recording equipment, such as while the CI was at home. Hr'g Tr. 62:12–63:10.

### C. The Government Reveals the Existence of the CI to the Defense

In March 2022, shortly before trial on the Second Indictment was to begin, the Government produced the CI's recording of the meeting held on August 24, 2020, in which Mr. Dougherty discussed the fight at Live! Casino. To safeguard the CI's identity, the Government declined Mr. Dougherty's request to reveal the origin of the recording. On April 4, 2022, the Government disclosed that the CI had supplied information to the Government beginning in mid-2020. Then, on April 27, 2022, the Government revealed that the CI produced over thirty recordings from Local 98 meetings, and the Court ordered *in camera* review of the recordings and source reports. On July 7, 2022, the Court ordered the Government to provide certain materials to Mr. Dougherty. *See* Order, *United States v. Dougherty*, No. 21-cr-65 (E.D. Pa. July 7, 2022), ECF No. 110.

### D. Precautions Taken by the Government

#### 1. Instructions to the CI

Given the dangers inherent to recording an indicted individual preparing for trial, Agent Fear gave the CI certain instructions in the presence of Agent Blake. Specifically, she explained to the CI that Mr. Dougherty faced pending criminal charges, about which the CI should not elicit any information, and that Mr. Dougherty's Sixth Amendment rights had attached. *See* Hr'g Tr. 100:5–101:25. The FBI also instructed the CI not to interfere with Mr. Dougherty's legal defense or disclose any communications between Mr. Dougherty and his attorney.[2] *Id.* The Government claims that consistent with these protocols, the CI never asked Mr. Dougherty any

---

[2] Agent Fear reminded the CI of these instructions more than once, *see* Hr'g Tr. 102:1–22, but did not provide additional instructions specific to the unsealing of the Second Indictment, *see id.* at 131:5–133:2.

questions pertaining to his criminal charges, trial, or defense strategy during the recorded meetings. (Gov.'s Br. 6).

Agent Fear also instructed that if the CI heard any information that could be considered legal advice, Agents Fear and Blake "didn't want to receive that information." Hr'g Tr. 101:18–19. Instead, the FBI would connect the CI to another agent unaffiliated with the investigation into Mr. Dougherty. *Id.* at 101:19–25. Indeed, on more than one occasion, the CI advised Agents Fear and Blake that he had such information, after which the agents followed the prescribed process. *Id.* at 103:8–19. A filter team, discussed below, then created source reports concerning this potentially privileged information and redacted those source reports before turning them over to Agent Fear. *Id.* at 122:13–23.

### 2. The Filter Team

The Government established a filter team to listen to the recordings and redact any potentially privileged information from the transcripts. The Filter Team consisted of three FBI agents and two assistant U.S. attorneys, none of whom were working on the investigation into Mr. Dougherty. The filter team used procedures drafted by Mr. Frank Costello, an assistant U.S. attorney in this case. Hr'g Tr. 56:16–17. Among other things, these procedures identified the attorneys working for both Mr. Dougherty and other relevant parties. *Id.* at 56:18–21. The procedures also explained protected attorney work product, including an attorneys' legal theories about the case. *Id.* at 88:1–16. As the parties have discussed at the June 30, 2022, hearing and thereafter, the procedures discuss the "right to counsel" but do not specifically name the Sixth Amendment or use the phrase "trial strategy." *Id.* at 77:1–78:3. Other than as set forth below,

neither the prosecution team nor Agents Fear and Blake heard the portions of the recordings that the filter team redacted for privilege purposes.[3] *Id.* at 64:1–7.

### E. Mr. Dougherty Seeks Dismissal of the First Indictment

#### 1. Alleged Shortcomings in the Filter Team

The main thrust of Mr. Dougherty's Motion consists of alleged shortcomings in the filter team process, which shortcomings fall into two categories: the procedures were too narrow in scope concerning potentially protected information, and members of the team investigating Mr. Dougherty were improperly intertwined with (or bypassed altogether) the filter team. As to the first point, Mr. Dougherty claims that the procedures were "fatally limited" to only attorney-client privilege and attorney work product. Instead, he argues, they should have also expressly mentioned the Sixth Amendment and confidential defense strategy. (Def.'s Br. 8–9.) Because of this narrow scope, Mr. Dougherty alleges that the prosecution has seen numerous statements that, according to Mr. Dougherty, reveal his confidential defense strategy for the embezzlement case— namely, that despite the Union's "unprecedented growth and improvement" under Mr. Dougherty's leadership, the Union "never updated" its "informal fiscal and management practices," leading to significant "uncompensated hours and expenses he personally accumulated due to the lack of attention and formality." (*Id.* at 21.)[4] Mr. Dougherty also points to the filter

---

[3] To protect the identity of the CI, Agents Fear and Blake made a separate set of redactions to the transcripts before their disclosure to Mr. Dougherty. Hr'g Tr. 64:23–65:5.

[4] Specifically, Mr. Dougherty reproduced the following statements from the recording transcripts as evidence of this confidential defense strategy:

September 28, 2019

> Page 6: I don't even know when I get a raise. All I know I got a raise until you guys get a raise. I couldn't tell you how much money I make, I couldn't tell you how

much money's in the deferred. Tara hands me notes now, because I have to be concerned with that, for the first time in my life.

Page 7: Watch the clock it's like you know, but I want to let you know there's no days off. There's no days off for me.

Page 21: Marketing. Tonight, being at dinner. The golf outings. When I tell you to go to the golf outings, it's not to pull up at 10 o'clock, run to your cart, hit a golf ball, it's to show up at 9 o'clock, get a couple of calls, see people coming in, joke with 'em, have Local 98 golf balls, say by the way Johnny wants you to have these.

October 5, 2019

Page 2: Me and Niko stopped up at the job, what last night we were in the back what, 6 o'clock? Okay so I'm not being I'm not being sarcastic I'm just telling you why we're here and why we, what we've gotta accomplish while we're here. Today I moved it back to 10, so that we could the kids' funeral if you guys want go, a steward down at TastyCake. You know loses his 21 year old daughter, leukemia. Pretty significant. Wanted to have a few people there. Now the old days, okay, Minky picks me up, we go out to get we go stop someplace Einstein Bagels or something okay we get a bagel and coffee, we ride out we go up there early we shake a few hands we go there, we see if the family needs anything and sometime during the week Minky will stop back, and drop something off to the family. Okay. If he got around to putting a receipt in, he'd put a receipt in, if not me and him . . .

Page 3: Four nights a week they showed up with food from, the Melrose, that they never put a receipt in for. For 10, 20 people. . . .

Page 6: You should read the docket you'll see. Everybody they think like , the government thinks that like the stuff I gave out like Friday is, code for fucking some stupid fucking relationship I've got. The whole flower fucking thing. . . So they can't believe that I would be on the phone , trying to get Tommy Rumbaugh, fucking flower show tickets. . . . [T]he Government doesn't understand why I would be on the phone on a Thursday night at 11 o'clock, okay because the flower show ends on Saturday, getting tickets. . . So that's what they do when they say well why are you paying, union resources to go pick up flower show tickets., or , they don't understand , that, I'm in trouble for flower show tickets. I didn't ask for them. . . . You know, I'm fucking in trouble for that.

September 3, 2020

Page 5: Now I love Buddy, this Local union has donated every three four weeks and Bryan Young does a great job, he buys stuff at target and Rite Aid, and we've given him personal money, in fact, I was giving him, he was talking we've given him Dunkin Donuts we're giving him some more, ahh, cards . . .

September 15, 2020

> Page 1: And we also ha-had people lobbying Bradford at a golf outing yesterday about taking the lead on some of that, you know, on the, on the ahh, Commonwealth's project. Talked to everybody, ahh, Brian Fiocca will tell you I was sitting with Lou Barletta and a couple of people today . . . because I'm trying to get, as much money, six-seven hundred million dollars for a subway in, in the Navy Yard . . .

October 17, 2020

> Pages 9–10: I had two of you in the last two weeks tell me, you know, since the government, I don't even go there. No, you have to go there. We are not throwing bricks through a window to get there. You don't care if a guy's wired. Ok. We're not breaking any laws. We don't break any laws. . . . Because my normal (UI) is, my normal thing is, hey what do you need, how do we help you, how many people can I put to work . . . Page 14: Cause we're gonna prove it was a rogue U.S. Attorney who was weaponizing people to protect his pension at Comcast, his family's retirement. Page 15: He's not apologizing for this one, I'm telling you. You know he's kinda pissed, as he should be. He wants to go to trial. You got the U.S. Attorney's wife is the lawyer at Comcast. That was our big fight. Ok. He's asking that question and people get nervous.

November 15, 2020

> Page 6: I guara, guarantee yah the next guy after me doesn't in the middle of an Eagles game talk to 25 people and take 30 phone calls.

April 26, 2021

> Pages 2–3: So, again, Jack and Tara have already given me my dos and don'ts for today, what I can say and what I can't say. . . So, I just want you to know, every freakin', and we were laughing Tara, Jack and myself were in a meeting, one of the lawyers said, you get 150 minimum texts a day. Every day. Saturdays, too.

September 30, 2021

> Page 4: They came back about two years later went after the apprentice training but focused on me, because they, we were using the vendor who was giving money to other labor leaders directly for the use of the vending machines where our vending machines went to apprentice training . . . we didn't have food back then and we didn't have stores across the street back then, that was the only place we could go and get snacks at 11 o'clock on a Saturday night when we were working on trying to clean up the list. And I asked to put Doritos in the machine. So I'm guilty of adding Doritos to the machine.

team's failure to redact a statement relating to the fight at Live! Casino which, Mr. Dougherty claims, reveals his intent to call a particular witness at trial for the Second Indictment.[5]

Second, as to the investigating team's entanglement with (or bypassing of) the filter team, Agents Fear and Blake reviewed certain recordings that had not been turned over to the filter team. In preparing for trial in the extortion case, Agent Blake found that he possessed three such recordings. Because, at that time, the trial was set to begin shortly, Mr. Costello counseled Agent Blake to listen to the tapes himself, provided that he shut off the tapes "if anything that would cross into the Sixth Amendment realm came up." Hr'g Tr. 67:16–24. Agent Blake testified that he did not hear anything from those recordings that concerned trial strategy or privileged information. *Id.* at 68:6–9. Of the numerous statements that, Mr. Dougherty claims, reflect confidential defense strategy, one such statement originates from one of the three recordings reviewed by Agent Blake: "[O]ne of the lawyers said, you get 150 minimum texts a day. Every day. Saturdays, too." (Def.'s

---

November 23, 2021

> Page 1: There's nothing that went on in this union, okay good bad or indifferent (UI). Okay? With taking way more credit to the bad and indifferent than I ever did for the good. Okay? So finish some of this, at no time did we see a problem. And every specialist that I could communicate with (UI).
>
> Page 2: You, that's not in the indictment, I am not worried about the future ones, some of the ones, oh you took from this, I'm telling you at the next one, I'll, the union will owe me money. When they realize all the pay I didn't take . . .
>
> Page 3: Except the US Attorney who proceeded with that stuff was married to the top in-house counsel at Comcast.

(Def.'s Br. 22–25.)

---

[5]  In the unredacted recording transcript, Mr. Dougherty stated, "[T]hat casino would have never went on time, if, if, you ask Dave Thomas, if I don't move to do what I do even when our mayor and governor were trying to sell off the license for, for public education funding. So I get to tell the story, and I get to bring the governor and mayor and everybody in to validate it." (Def.'s Br. 29–30.)

Br. 24 (quoting the recording transcript).) Agent Blake testified that although he heard Mr. Dougherty say that "one of the lawyers said" something, Mr. Dougherty "was talking rather quickly," and Agent Blake "could hear that [Mr. Dougherty and his interlocutors] had moved beyond any type of indication that this was a Sixth Amendment issue or" constituted something "that needed to be redacted." Hr'g Tr. 69:5–22.[6]

After consulting with Mr. Costello, Agent Fear also listened to a recording without first sending it to the filter team, possibly because the team did not exist at that time. This recording, which was the very first that the CI gave to Agent Fear, related to a meeting held on November 2, 2019. Mr. Dougherty has not claimed that this meeting contained any protected information, and Agent Fear testified that she did not hear any such information from that recording. *Id.* at 105:17–20.

Further related to the allegedly improper design of the filter team, Mr. Dougherty takes issue with the fact that FBI agents, not lawyers, conducted the initial review of recordings, and the assistant U.S. attorneys assigned to the filter team reviewed only those portions flagged by the FBI agents—not the entire recording. (Def.'s Br. 9–10.) Mr. Dougherty also asserts that there exists an "inherent bias of a filter team that is composed of agents and AUSAs from the same office as the investigative team." (*Id.* at 33.) Finally, Mr. Dougherty notes that one filter team agent was not totally unaffiliated with the agents investigating Mr. Dougherty, as that agent participated in the execution of a search warrant related to the Second Indictment. (*Id.* at 32.)

---

[6] Agent Blake further testified that on another occasion, the filter team failed to redact a potentially privileged portion of a recording because Mr. Dougherty had mispronounced the name of one of his attorneys. Hr'g Tr. 71:15–21. Agent Fear recognized the mistake and sent the recording back to the filter team for redaction. *Id.*

### 2. The CI's Motives

Separate from the filter team issues, Mr. Dougherty argues that the Government failed to address sufficiently the CI's motives in acting as an informant for the Government. The Government claims that the CI was motivated by concern about the threats and intimidation (Gov.'s Br. 3), but Mr. Dougherty highlights that the CI's self-reported motivation was protecting the integrity of the Union (Def.'s Br. 5). The Government notes that it engaged the CI through "[t]he normal FBI process" and that "[t]he CI was not compensated in any way" (Gov.'s Br. 5), but Mr. Dougherty speculates that "the CI might have been in a position to benefit financially or otherwise should Mr. Dougherty be convicted" (Def.'s Br. 5). On that basis, Mr. Dougherty argues that such motives may have "inspired" the CI "to encourage Mr. Dougherty to express himself more fully than might otherwise have been the case." (*Id.* at 6.) To explore the CI's motives more fully, Mr. Dougherty requests an evidentiary hearing at which he can examine the CI as a witness.

### 3. The Fifth Amendment's Protection Against Outrageous Government Conduct

As another basis for relief, Mr. Dougherty argues that the Government violated his Fifth Amendment right to due process by engaging in "outrageous" conduct. (*Id.* at 34.) In short, Mr. Dougherty ascribes nefarious motives to the Government—namely, that it mischaracterized the nature and relevance of the CI's disclosures. (*Id.* at 34–35.) Mr. Dougherty also questions the Government's claim that it did not pursue (and eventually obtain) the Second Indictment based on the CI's disclosures. (*Id.* at 35.)

## II. ANALYSIS

### A. The Government Did Not Violate the Third Circuit's Restrictions on the Use of a CI

The Third Circuit has held that the Government's use of CI violates a defendant's Sixth Amendment rights in three circumstances: "(1) [when the Government] intentionally plants an

informer in the defense camp; (2) when confidential defense strategy information is disclosed to the prosecution by a government informer; or (3) when there is no intentional intrusion or disclosure of confidential defense strategy, but a disclosure by a government informer leads to prejudice to the defendant." *United States v. Costanzo*, 740 F.2d 251, 254 (3d Cir. 1984) (citing *Weatherford v. Bursey*, 429 U.S. 545 (1977)). For the following reasons, Mr. Dougherty has failed to establish that the Government engaged in any such conduct here.

### 1. Intentional Intrusion into the Defense Camp

The parties have not provided, and the Court has not been able to find, significant analysis of which types of meetings or relationships constitute a "defense camp." The relevant cases, however, suggest that the phrase at least contemplates a close-knit meeting between parties with similar interests and their counsel (or, arguably, other trusted advisors). In *Costanzo*, for example, the Government's CI was a former attorney of the defendant who had "declined to enter an appearance on behalf of any one defendant" and instead "decided that each defendant would retain his own counsel and that he [the former attorney] would work with all the co-defendants." *Costanzo*, 740 F.2d at 254. The *Costanzo* defendant in question then participated in group meetings with the former attorney and co-defendants, in which the former attorney "discussed trial strategy." *Id.* The defendant further testified that he discussed these matters "with the expectation that [the former attorney] was assisting with petitioner's defense and that their conversations with him were confidential." *Id.*

The district court found that no attorney-client relationship existed at the time that the former attorney agreed to act as a CI, and the Third Circuit affirmed that conclusion. *Id.* The Third Circuit then assessed whether the Government's intrusion was intentional, but it did not expressly address whether trial strategy meetings with a former attorney constituted a defense camp. *Id.* One likely implication from this silence is that the Third Circuit thought it

uncontroversial that a defense camp is not strictly limited to meetings between a defendant and his counsel of record but, rather, may also include meetings with trusted advisors, such as former counsel.[7]

Even if a defense camp may include advisors other than counsel, however, the Union's meetings in this case represent less of a camp and more of a village. Although the meetings do not appear to have been public, at least 30 Union employees attended these calls. Mr. Dougherty has not claimed that anyone from his defense team attended these meetings, and many (if not most) attendees were *not* subject to any charges relating to Mr. Dougherty's own. In fact, as Mr. Dougherty himself acknowledges (Def.'s Br. 5–6), the personal ambitions of certain attendees may very well have led them to hope that the Government would *succeed* in its cases against Mr. Dougherty. Additionally, these were Union meetings whose purpose was to address Union business—not the charges and trials arising from this case. Concluding that these meetings constituted a defense camp would strain the natural and legal understanding of the phrase.

Mr. Dougherty's position also fails because even if the Union meetings were a defense camp, he has not shown that the Government *intentionally* invaded that space. In *Costanzo*, the Third Circuit agreed with the district court that the Government's intrusion was not intentional, in part because "the FBI agents instructed [the CI] not to disclose any defense strategy information,"

---

[7] Other key informant cases from Third Circuit suggest, without expressly deciding, that a defense camp may consist of a defendant, his co-defendants, and their respective counsel. *See, e.g.*, *United States v. Levy*, 577 F.2d 200, 204–05 (3d Cir. 1978) (finding a Sixth Amendment violation where the Government CI was a co-defendant with the *Levy* appellant, both were represented by the same counsel, and the CI provided information about the appellant's defense strategy that the CI had gleaned from meetings between the CI, the *Levy* appellant, and their shared counsel); *United States v. Rispo*, 460 F.2d 965, 977–78 (3d Cir. 1972) (finding a Sixth Amendment violation where the Government planted a spurious defendant whose counsel participated in meetings with co-defendants' counsel).

and agents "periodically consulted with their supervisors to make certain that their use of [the CI] remained within legal limits." *Costanzo*, 740 F.2d at 255.

Here, Agents Fear and Blake instructed the CI to withhold potentially protected information from them and, instead, to contact an agent unaffiliated with the investigation. The Government also established a filter team that followed procedures designed to protect confidential information. Even if the Court were to agree with Mr. Dougherty that the Government did not execute these precautions perfectly, the relevant standard is not whether the Government negligently or recklessly intruded into the defense camp; the Government must have *intentionally* done so. As in *Costanzo*, the Government's precautions here indicate that it was, in fact, intentionally seeking to *avoid* any problematic information. Because Mr. Dougherty fails to establish both that the Union meetings were a defense camp and that the Government intentionally intruded into that camp, the first scenario described by the *Costanzo* court is inapplicable here.

### 2. Disclosure of Confidential Defense Strategy

As to the second *Costanzo* scenario, the Government's CI may not disclose confidential defense strategy to the prosecution. If such a disclosure occurs, a defendant need not make an additional showing of prejudice. *Levy*, 577 F.2d at 209–10. Protected information may include strategies such as the witnesses that a defendant intends to call and the information that a defendant may use to impeach the Government's witnesses. *See, e.g.*, *id.* at 204 (finding a Sixth Amendment violation where federal agents (and, ultimately, the prosecution) "learn[ed] that the defense strategy would be to concentrate on the credibility of two key government witnesses").

In *Costanzo*, the Court considered whether the defendant's intent to "get" one of his acquaintances, who was both a private investigator as well as an informant and friend of one of the Government's witnesses. 740 F.2d at 255. The *Costanzo* defendant claimed that this information revealed his intent to subpoena the acquaintance, and once the Government learned of

this fact, the Government helped the acquaintance avoid being subpoenaed. *Id.* The Third Circuit found that, based on other facts in the record, the far more likely interpretation of the defendant's remark was that the defendant intended to harm the acquaintance, not subpoena him. *Id.* at 256. Accordingly, the remark did not reflect confidential defense strategy. *Id.* Likewise, the defendant argued that once the CI revealed that the defendant had taped his meetings with an FBI agent, the Government then knew that the defendant intended to use those recordings to impeach the agent's testimony at trial. *Id.* But the Third Circuit found that this information was not confidential defense strategy, because the Government already knew from other sources that the defendant had taped the agent on at least one occasion, and the CI's disclosure made no "reference to [the defendant's] intended use for the tape." *Id.*

Here, the Government's CI recorded Union meetings and summarized conversations held apart from Mr. Dougherty's meetings with his counsel. There is no indication that the CI ever participated in any such legal meetings. Further, Mr. Dougherty's divulgence of ostensible defense strategy at Union meetings attended by around 30 individuals—many of whom were not Mr. Dougherty's co-defendants and may have even had interests adverse to Mr. Dougherty's own—undermines the claim that his remarks were confidential. *Cf. United States v. Brodie*, 250 F. Supp. 2d 466, 460–70 (E.D. Pa. 2002) (supposed defense strategy was not confidential where "[s]ecretaries know about it and are gossiping about it in a public place over dinner").[8]

---

[8] As another example of supposedly confidential defense strategy, Mr. Dougherty points to his claim that one assistant U.S. attorney prosecuting his case was married to a Comcast executive. That information, however, also was not confidential, as the Government certainly would have been aware of the potential conflicts of its own prosecuting team. *See Costanzo*, 740 F.2d at 256 (disclosure was neither confidential nor prejudicial where the information "had been known to the government for a long time").

Even if the Court considered Mr. Dougherty's statements to be confidential, which they clearly are not, they do not amount to defense strategy. The allegedly improperly disclosed strategy consists of Mr. Dougherty's defense that he accrued significant "uncompensated hours and expenses . . . due to the lack of attention and formality" in the Union's internal procedures, presumably suggesting that any alleged embezzlement was, in fact, what Mr. Dougherty believed to be innocent (albeit informal) reimbursement. (Def.'s Br. 21.) But as in *Costanzo*—where the disclosed information revealed that the defendant had recorded an FBI agent but did *not* reveal that the defendant intended to use the recordings to impeach the agent—the statements cited by Mr. Dougherty merely reflect that he was busy, felt underpaid, and was occasionally frustrated by the informal reimbursement process, not that the centerpiece of his defense to the embezzlement charges would be a lack of criminal intent. Likewise, Mr. Dougherty's comment about "ask[ing] Dave Thomas," when read in context, clearly indicates his belief that Mr. Thomas would agree that Mr. Dougherty was crucial to the completion of the casino—not that Mr. Thomas would be a key defense witness at trial for the First or Second Indictment.

The information obtained by the Government from the CI was neither confidential nor defense strategy. The second *Costanzo* scenario is inapplicable here.

### 3. Disclosures that Prejudiced the Defendant

Even if a defendant has not established the first two *Costanzo* scenarios, a Sixth Amendment violation may still have occurred if "a disclosure by a government informer leads to prejudice to the defendant." *Costanzo*, 740 F.2d at 254. Mr. Dougherty has shown no such prejudice here.

First, as in *Costanzo*, the disclosure of Mr. Dougherty's supposed reference to calling a witness at trial did not result in any prejudice to Mr. Dougherty, as there is no indication in the record that the Government interpreted Mr. Dougherty's remark in that manner. 740 F.2d at 256

("[T]he district court's finding that there was no prejudice is supported by the record evidence showing that the FBI did not understand the [relevant] disclosure to relate to an attempt to subpoena [the supposed witness] . . . ."). Second, and again as in *Costanzo*, because the Government already knew from its wiretaps that Mr. Dougherty worked significant hours and was frustrated by Local 98's reimbursement practices (*see* Gov.'s Br. 15–16), Mr. Dougherty has not shown any prejudice from the disclosure of his remarks reflecting the same, *see Costanzo*, 740 F.2d at 256–57 ("[A]ll the information that was contained in the [relevant] disclosure—that petitioner 'had tape recorded' [an FBI agent]—had been known to the government for a long time.").

Based on the foregoing, Mr. Dougherty has not established that the Government created any of the three scenarios prohibited by the Third Circuit in *Costanzo*. Rather, even if the Government here did not execute its procedures perfectly, the alleged misconduct falls far short of the practices proscribed by cases such as *Levy* and *Rispo*.

### B. The Government's Use of a CI Here Is Not Comparable to *United States v. Henry*

Mr. Dougherty refers to *United States v. Henry* to support an argument that notwithstanding any prophylactic instructions given to a CI, a Sixth Amendment violation may occur in light of the CI's motives and the nature of the CI's conversations with a defendant. 447 U.S. 264, 266 (1980). In *Henry*, however, the Government approached and paid an indicted defendant's cellmate to become friendly with the defendant and learn information regarding the defendant's bank robbery charges. *Id.* The Supreme Court found a Sixth Amendment violation due to several factors: the Government had paid the informant to "deliberately elicit" incriminating information regarding the defendant's bank robbery; the Government only paid the informant if he provided useful information; and the defendant had been living in the same jail cell as the informant, a setting that

produced "powerful psychological inducements [for the defendant] to reach for aid . . . ." *Id.* at 273–74.

These factors are not present in this case. The CI initiated contact with the Government, not the other way around; the Government never paid the CI to "deliberately elicit" information from Mr. Dougherty and instead instructed the CI *not* to elicit protected information; and the CI only recorded Mr. Dougherty during Union meetings with a large audience present. Because Mr. Dougherty's case offers no similarity to the circumstances in *Henry*, Mr. Dougherty's speculation as to the CI's potential motives does not warrant an evidentiary hearing to question the CI directly.

### C. The Government Has Not Engaged in Egregious Conduct that Violated Mr. Dougherty's Fifth Amendment Rights

As a final basis for relief, Mr. Dougherty invokes the Due Process Clause's protection against "outrageous law enforcement investigative techniques." *United States v. Voigt*, 89 F.3d 1050, 1064 (3d Cir. 1996) (gathering authorities). The *Voigt* court focused on one subset of outrageous conduct: "a claim of outrageous government conduct premised upon deliberate intrusion into the attorney-client relationship will be cognizable where the defendant can point to actual and substantial prejudice." *Id.* at 1066. As discussed above, this Court finds that the Government did not intrude into the attorney-client relationship, and the CI's disclosures did not result in prejudice to Mr. Dougherty in any event.

Having concluded that this species of outrageous conduct is not present here, the Court also considers whether the Government's conduct "shocks the conscience" in any other regard. *Id.* at 1065 (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)). The Government has demonstrated that it made good faith efforts to prevent the investigating agents and prosecuting attorneys from acquiring Mr. Dougherty's protected information, and in light of the Third Circuit's admonition that "this court and other appellate courts have . . . exercised extreme caution in finding

due process violations in undercover settings," *United States v. Martino*, 825 F.2d 754, 763 (3d Cir. 1987) (quoting *United States v. Ward*, 793 F.2d 551, 554 (3d Cir. 1986)), this Court rejects Mr. Dougherty's due process claim.[9]

## III.   CONCLUSION

For the foregoing reasons, Mr. Dougherty's Motion is denied.[10]  The Government's conduct in this case falls far short of warranting a dismissal of the First Indictment, a new trial as to the First Indictment's public corruption charges, or any of the other relief requested by Mr. Dougherty.  A corresponding order accompanies this memorandum.

---

[9]  For the same reasons, the Court rejects Mr. Dougherty's suggested alternative remedy of suppressing the recordings, precluding Agents Fear and Blake from testifying at trial, and requiring all of the present prosecutors to recuse themselves from future proceedings in this case.  The Government's conduct in this case does not warrant any of these draconian measures.

[10]  Mr. Dougherty's Motion is limited to the indictment in this case—*i.e.*, the First Indictment.  So, too, is this Court's order.  The Court will address arguments specific to the Second Indictment—such as whether the CI's disclosures played a role in obtaining it—in due course.