## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO.   19-064** |
| **JOHN DOUGHERTY**<br>**BRIAN BURROWS** | **:** | |

## O R D E R

AND NOW, this       day of              , 2023, upon consideration of the Motion of

Defendants John Dougherty and Brian Burrows for Judgment of Acquittal, and the

Government's Response, it is hereby **ORDERED** that the motion is **DENIED.**

**BY THE COURT:**

_____
**HONORABLE JEFFREY L. SCHMEHL**
**United States District Court Judge**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO.   19-064** |
| **JOHN DOUGHERTY**<br>**BRIAN BURROWS** | : | |

<u>**GOVERNMENT'S RESPONSE TO**</u>
<u>**DEFENDANTS JOHN DOUGHERTY AND BRIAN BURROWS'**</u>
<u>**MOTION FOR JUDGMENT OF ACQUITTAL**</u>

The defendants' motion for judgment of acquittal should be denied because there was no variance between the conspiracy charged in the indictment and the evidence introduced at trial. The evidence proved the existence of a single conspiracy with multiple subsidiary schemes implemented to effectuate a single goal—stealing money from the membership of IBEW Local 98. This single conspiracy was charged in Count 1 of the indictment. The defendant's motion is therefore meritless and should be denied.

**I.      Background & Procedural History**

      **a.   Background**

Count One of the Indictment charged the defendants with conspiracy to embezzle funds from a labor union in violation of 29 U.S.C. § 501(c). The object of the conspiracy, as described in the indictment, was to "embezzle, steal, and unlawfully and willfully abstract and convert the moneys, funds, securities, property, and other assets belonging to Local 98 and the

Apprentice Training Fund, for the personal use of the defendants and the use of their families, friends, and commercial businesses."

In order to effectuate this goal, the indictment alleged that the defendants stole in multiple ways. In their Memorandum of Law, the defendants dubbed these schemes—which are outlined in the "manner and means" section of the indictment—as the "Expense Scheme," the "Vendor Scheme," the "Petty Cash Scheme," and the "Ticket Scheme." (Def. Memo. of Law, ECF 609-1 at 3). The government will adopt that nomenclature for the purpose of responding to this motion.[1] The defendants also described the "No-Show Job Scheme" as an arrangement to pay Maureen Fiocca, Sean Dougherty, and Keeley Peltz for work which they did not actually perform.  But the defendants omit a critical aspect of the employee embezzlement scheme which involved both defendants misusing Local 98 employees to complete personal tasks, chores, and errands. Collectively, the misuse and overpay of employees will be referred to as the "Employment Scheme."

The government introduced ample evidence to show that these schemes were part of a single conspiracy as set forth in the indictment. Accordingly, the defendant's motion should be denied.

### b.  Procedural History

The defendants' trial began with jury selection on November 1, 2023. On November 30, 2023, at the close of the government's case, both defendants moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. At the close of the defendants'

---

[1] These "separate" schemes as defined by the defendants intrinsically overlap. For example, the defendants define the object of the Expense Scheme having "Local 98 pay the personal expenses of Mr. Dougherty." But that definition clearly includes the Vendor Scheme, in which Dougherty and Burrows conspired to have Local 98 pay personal renovation and repair expenses with the union's money. Nevertheless, for the purpose of responding to this motion, the government will adopt those categories for ease of disposition.

evidence, this Court held argument on the motion. Later that day, Burrows filed a motion to dismiss Count One of the Indictment and an accompanying Memorandum of Law (ECF 609, 609-1). Dougherty then joined in that motion. (ECF 610). The government now responds.

## II.    Variance Challenges and the Standard of Review

The defendants seek a judgment of acquittal because they allege the government failed to prove the existence of a single conspiracy, and instead proved multiple conspiracies. A "single conspiracy is proved when there is evidence of a large general scheme, and of aid given by some conspirators to others in aid of that scheme." *United States v. Freeman*, 763 F.3d 322, 343 (3d Cir. 2014). The question of whether a single conspiracy or multiple conspiracies exist is a fact question to be decided by a jury. *Id.* A variance challenge, such as the one alleged here, is therefore a challenge to the sufficiency of the trial evidence. *United States v. Fattah*, 914 F.3d 112, 168 (3d Cir. 2019) ("We must determine whether there was sufficient evidence from which the jury could have concluded that the government proved the single conspiracy alleged in the indictment.").

The Court's review of the sufficiency of the evidence is "highly deferential." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc). The question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original). The reviewing court "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *Caraballo-Rodriguez*, 726 F.3d at 430, quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). "The district court—and we—are not to act as a thirteenth juror. Instead, the jury's

verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'" *Caraballo-Rodriguez*, 726 F.3d at 431 (quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012)); *see also Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (evidence supporting guilt is insufficient only if "no rational trier of fact" could reach that conclusion).

The defendants purport to acknowledge the highly deferential standard of review, but the remainder of their memorandum stands in derogation of that standard. At every opportunity, the defendants construe the facts in their own favor and draw all inferences against the government. This is backwards—all inferences must be taken to support a finding of guilt. "A reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam) (quoting *Jackson v. Virginia*, 443 U.S. at 326 (1979)). Therefore, "[w]hile evidence proffered at trial may be consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict—and not to usurp the role of the jury—as long as it passes the 'bare rationality' test. Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges . . . . It is up to the jury—not the district court judge or our Court – to examine the evidence and draw inferences. Unless the jury's conclusion is irrational, it must be upheld." *Caraballo-Rodriguez*, 726 F.3d at 432.

To determine whether the government's trial evidence proved a single or multiple conspiracies, courts must consider three factors while viewing the record in the light most

favorable to the government: (1) whether there was a common goal among the conspirators; (2) whether the agreement contemplated bringing to pass a continuous result that would not continue without the continuous cooperation of the conspirators, and (3) the extent to which the participants overlap in the various dealings. *Fattah*, 914 F.3d at 168. The defendant's motion fails because each of these factors weighs in favor of the government.

Even if a variance occurred, the defendant is not entitled to relief unless the variance prejudices some substantial right of the defendant. *United States v. Camiel*, 689 F.2d 31, 35 (3d Cir. 1982).

## III.    Argument

The defendants' motion should be denied because each of the three factors that the Court must consider weighs in favor of finding that there was a single conspiracy. First, the defendants' actions were driven by a unity of purpose: to unlawfully steal or obtain Local 98's money for their own benefit. Second, success of the conspiracy depended on the participation of both defendants. Finally, the defendants' participation in the schemes overlapped significantly.

### a.   The defendants shared a common goal to use Local 98's money for their personal benefit.

The government satisfied the first *Fattah* factor because the evidence demonstrated that the defendants shared a common objective of stealing money from Local 98, as set forth in the indictment. To determine whether coconspirators shared a common goal, courts must look to the underlying purpose of the criminal activity in a "broad sense." *Fattah*, 914 F.3d at 168 (citing *United States v. Rigas*, 605 F.3d 194, 214 (3d Cir. 2010) (en banc)). This is not a high bar, and the objective of a conspiracy can be articulated "in fairly general terms." *Id.* For example, the Third Circuit has found that coconspirators have shared a common goal of

- 5 -

"enriching themselves through the plunder of their corporate entity," *id.* (citing *Rigas*, 605 F.3d at 214) (internal alterations omitted), making "money by depositing stolen and altered corporate checks into business accounts," *United States v. Greenidge*, 495 F.3d 85, 93 (3d Cir. 2007), and "selling speed." *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989) (internal quotations omitted). "Importantly," the Third Circuit holds, "a common goal may exist even when 'conspirators individually or in groups perform different tasks in pursuing the common goal," or the conspiracy is comprised of "different subgroups committing acts in furtherance of the overall plan." *Fattah*, 914 F.3d at 168 (quoting *United States v. Boyd*, 595 F.2d 120, 123 (3d Cir. 1978)). Put differently, every defendant does not have to be involved in each subsidiary scheme to demonstrate a unity of purpose and sustain a conspiracy conviction. In fact, "it is well-settled that each member of the charged conspiracy is liable for the substantive crimes his coconspirators commit in furtherance of the conspiracy even if he neither participates in his co-conspirators' crimes nor has any knowledge of them." *Id.* (internal quotations omitted).

In *Fattah*, Chaka Fattah Sr. received an illegal loan to his mayoral campaign and then used his political influence and personal connections to engage other individuals in an "elaborate series of schemes aimed at preserving his political status by hiding the source of the illicit loan and its repayment." *Id.* at 127. As part of these schemes, Fattah ordered that the source of the fraudulent loan be concealed in false campaign finance reports ("CFRs"). Following a trial, two of Fattah's codefendants, Brand and Nicholas, claimed that the government's evidence had impermissibly varied from the indictment. Both Brand and Nicholas were involved in repaying the illegal loan obtained by Fattah, but neither participated in the CFR scheme. They argued that the first variance factor was not satisfied

because the goal of the CFR scheme was to cover up how the funds from the illegal loan were spent, and that the object of the repayment scheme was to cover up satisfaction of the illegal loan. Brand also argued that the evidence did not establish that he was even aware of the false CFRs that Fattah filed, and therefore he could not have been part of that scheme.

The Third Circuit rejected this argument. It noted that "the false campaign finance reports, in the narrowest sense, had the specific purpose of covering up how the illegal funds were used," but were also "filed in furtherance of the broader goal shared by the conspirators." *Id*. at 169. Specifically, the CFR scheme sought to "promote Fattah's political and financial goals by preserving his image as a viable candidate and making him appear able to repay or otherwise service his campaign debts without resorting to illegal means." *Id.* This was the shared objective of the loan repayment scheme. The Third Circuit concluded that the existence of two schemes "acting in concert does not undermine the unity of the conspiracy of which they were both a part," and had "no difficulty" rejecting the defendant's claim. *Id.* The Court also rejected the argument that a coconspirator could escape criminal responsibility for acts done in furtherance of a conspiracy of which he had no knowledge, noting that this is contrary to well-settled principals of conspiracy law. *Id.*

The defendants' variance argument should be rejected for the same reason. During this trial, the government proved that the defendants acted in furtherance of a common goal—to steal money from Local 98 for their own benefit. Each of the schemes shared a "unity of purpose" because each was designed to steal money belonging to the membership of Local 98 for the use or benefit of the defendants. *Fattah*, 914 F.3d at 169. For example, the evidence showed that the purpose of the Vendor Scheme was to steal union money. The government introduced ample evidence to show that the defendants used union money to pay for Anthony

Massa's work at their homes, their families' homes, and their personal businesses. This work was done for defendants' benefit, with their knowledge, and buried in Local 98 bills with the express approval of Brian Burrows. The Vendor Scheme provided the defendants with a tangible benefit at the expense of the union membership in furtherance of the object of the conspiracy as set forth in the indictment.

With regard to the Employment Scheme, the defendants ordered union employees, including Niko Rodriguez, Brian Fiocca, Sean Dougherty—referred to as "the kids"—and Robert Hamilton,[2] to perform work that benefited them personally. The defendants then used union money to pay them. *See* Government Exhibits 187, 508, 509, 1-57558. The Expense Scheme involved dozens of claimed business expenditures by Dougherty that were reimbursed because Brian Burrows approved them. And the Petty Cash Scheme was an even more straightforward example of Dougherty stealing union funds. For years, Dougherty received large amounts of funds from Local 98's Committee on Political Education ("COPE") Fund ostensibly for use with elections. While some of the money may have been used for that purpose, Dougherty also used the money for personal purchases including suits for himself and his brother, and shoes for his wife.  As explained below, these schemes were known by Burrows and were only possible with his cooperation.

In sum, all of the schemes and the acts that advanced them were done with one goal— to unlawfully obtain funds that rightfully belonged to Local 98's members and use them for the benefit of the defendants. The defendant's attempt to blur the means of effectuating the object of the conspiracy with the object of the conspiracy itself is unavailing. (*See* Def. Memo.

---

[2] During a portion of the charged conspiracy, Hamilton was paid from the Apprentice Training fund. Investigator Bindu George testified that Burrows also oversaw that money and was a fiduciary of the fund.

of Law, ECF 609-1 at 10). While the immediate goal, "in the narrowest sense," of the Vendor Scheme may have been to obtain "free" construction work from Anthony Massa, and the goal of the Petty Cash Scheme was for John Dougherty to unlawfully obtain cash, that difference does not end the Court's inquiry. *Fattah*, 914 F.3d at 169. *Fattah* counsels that courts must look to the "broader goal shared by the conspirators" to determine if the individual acts were done "in furtherance of this overarching goal." *Id*. Here, the schemes were all executed to steal money from the union for the defendants' benefit. Accordingly, the first factor of the variance test weighs in favor of finding that the government proved a single conspiracy.

### b. The conspiracy and its subsidiary schemes could not have persisted without the continuous cooperation of both defendants.

The second factor also weighs in favor of the government because the criminal conspiracy would not have been possible without the participation of both defendants. The government introduced evidence that Burrows was the president of Local 98 and a member of the Executive Board during the time of the embezzlements described in the indictment. As president, he oversaw the finances of the Union, *see* Government Exhibit 512 at 58-60, and was required by law to hold Local 98's money and property solely for benefit of the membership. 18 U.S.C. § 501(a).  He and Dougherty, who was Local 98's business manager, were the most powerful men in the union. As president, Burrows approved check and reimbursement requests paid out of Local 98's General and Job Recovery funds. *See* Government Exhibit 31, 55, 355, 376, 654. He also approved payroll distributions. *See* Government Exhibit 508, 509.  Burrows was a member of the Executive Board and Finance Committee, both of which were tasked with managing the memberships' money in all its various forms.

Burrows approvals were critical to the success of the Vendor Scheme, the Expense

Scheme, and the Employment Scheme. Without them, Anthony Massa would not have been paid with membership money for the work that he performed on Burrows' house, Dougherty's house, Dougherty's father's house, Doc's Union Pub, and the Pennsport Building. Without Burrows' approval, Dougherty would not have been reimbursed for thousands of dollars' worth of fraudulent reimbursements requested by Dougherty for personal purchases. And without Burrows' approval, the no-show employees would not have been paid and Hamilton would not have received membership money for performing personal chores and errands.

The defendants attempt to distance Burrows from these schemes by claiming that he was unaware of them. That assertion is belied by the evidence, which showed that Burrows was either aware of each scheme or consciously disregarded evidence of them. For example, Burrows personally directed that work completed as part of the Vendor Scheme be billed to the union, and Dougherty admitted that the government's search warrant would uncover evidence of the Vendor Scheme in a phone conversation captured by the Title III wiretap. *See* Government's Exhibit 1-101280.[3]  Specifically, he predicted that the FBI's search warrant would uncover evidence of an "arrangement on the side" that "everyone knows" with a "contractor" who had assisted leak remediation at Dougherty's house. *Id.* The government's evidence unequivocally showed that this contractor was Anthony Massa, who was paid for that work using Local 98 membership money at the direction of Burrows.

The evidence also showed that Burrows was aware of the Employment Scheme. In a recorded call, Burrows lamented that it was "all smoke and mirrors" with "them kids." *See* Government's Exhibit 4-472. The kids refers to Niko Rodriguez, Brian Fiocca (Dougherty's

---

[3] As of the filing of this motion, the government has only obtained limited transcripts from the trial. Specifically, the government has transcripts of Anthony Massa and Lisa Ketterlinus' testimony. The recitation of the trial evidence is therefore based on the recollection of the government attorneys and agents, as well as citation to the exhibits that were admitted at trial.

nephew), and Thomas Rodriguez (the son of Dougherty's mistress, Marita Crawford).

Burrows admitted that he did not "know what they do all day." Viewed in the light most

favorable to the government, this is an admission that Burrows was aware the "kids" were not

performing work for the union. Despite these apparent misgivings, Burrows himself asked

Dougherty to send the kids to pick up trash at Doc's Union Pub, a private business he owned

in a building he owned with Dougherty and coconspirator Michael Neil. *See* Government

Exhibit 1-157558. This recorded call demonstrates that Burrows knew "the kids" performed

work for Dougherty unrelated to union business and were available for personal errands. But

Burrows nevertheless did nothing to curtail their membership-funded salaries. Similarly,

Burrows directed Robert Hamilton, a Local 98 employee, to Doc's Union Pub on a weekly

basis to collect money when he should have been working for the union. Despite these tasks,

which had absolutely no benefit to Local 98, Burrows nevertheless approved Hamilton's pay

each week. Burrows was clearly aware of the Employment Scheme and played a critical role

in its success.

Finally, Government's Exhibit 4-472 proved that Burrows knew that any scrutiny to

Local 98's financial documents would reveal criminal activity. In that call, during which

Burrows speaks with Robert Henon, Burrows warned that Dougherty needed to be cautious

when selecting a new member of the Executive Board. Specifically, he stated that Dougherty

should not select someone who actually "wants to see all of the things" that the Executive

Board was tasked with reviewing. Burrows specifically warned Henon that Dougherty should

avoid an Executive Board member who would ask to see who was on the payroll, and

cautioned against any lengthy inquiry of Local 98's records. Executive Board members were

tasked with reviewing the financial statements of the Union and authorizing certain

expenditures. *See* Government's Exhibit 511. The government's evidence showed that, with Burrows at the helm as president, the Executive Board did not actually conduct any review at all, let alone a meaningful review. Exhibit 4-472 proved that Burrows wanted to maintain that ruse. Testimony from the trial showed that Burrows and the rest of the executive board could have requested to review Dougherty's expense reports, but did not do so. The evidence also revealed that Burrows was uniquely positioned to request such review given his role in reviewing and approving Dougherty's unusual but repetitive request for thousands of dollars in reimbursements for purported union expenditures on his personal credit card and cash gratuities.

Viewed in the light most favorable to the government, this evidence shows that Burrows actively sought to discourage the appointment of anyone who would review the union's expenses or seek to conduct a meaningful oversight of the union expenditures. Such a review would reveal all of the conspiratorial schemes, including the Petty Cash and Expense Schemes.

The evidence showing that Burrows and Dougherty were joint participants in the Vendor, Employment and Expense schemes alone is sufficient to meet the second variance factor. But there is more. Burrows cannot escape criminal liability for the remaining schemes by claiming he simply closed his eyes to them. *See United States v. Stewart*, 185 F.3d 112, 126 (3d Cir. 1999); *United States v. Stuart*, 22 F.3d 76, 81 (3d Cir. 1994). Willful blindness "is a subjective state of mind that is deemed to satisfy a scienter requirement of knowledge." *United States v. Wert-Ruiz*, 228 F.3d 250, 255 (3d Cir. 2000). It applies when a defendant "deliberately closed his eyes to what otherwise would have been obvious to him." *Stuart*, 22 F.3d at 81. Put differently, the government can satisfy a knowledge requirement when "the

defendant himself was subjectively aware of the high probability of the fact in question" but nevertheless deliberately and consciously tried to avoid learning about it. *Wert-Ruiz*, 228 F.3d at 255–56. The "fact in question" here is Dougherty's other myriad thefts from the union. For example, the Petty Cash Scheme would have been obvious to Burrows because each month the finance committee received a document indicating that tens of thousands of dollars in petty cash had been given to Dougherty and not accounted for. *See* Government's Exhibit 69.

Burrows was also on notice that the union's credits cards were vulnerable to fraud and required attention because he received management letters from auditing firms that identified the vulnerability. *See* Government's Exhibits 247, 248, 249, 256. Auditor Kathleen Jackson testified specifically that these warnings were aimed at Dougherty's expenses. Those same letters indicated that Local 98's practice of giving tickets to events was susceptible to abuse because the purpose of the events was not known. The auditors' letters also urged the Executive Board, led by Burrows, to adopt an anti-fraud program. Burrows did not heed any of these warnings. He also did not adopt the recommendation of David Clapcich, an accountant for the union, who similarly stated that Expense Reports "need to be completed or completed more timely." *See* Government's Exhibit 250.  A reasonable juror could conclude that he did so because implementing these programs would reveal his criminal conspiracy with Dougherty.

All of this evidence, taken in the light most favorable to the government, is sufficient to show that Burrows had actual knowledge of each scheme alleged in the indictment. But even if that was not the case, knowledge may be imputed under a willful blindness theory. Burrows was subjectively aware that Dougherty was stealing from the union because he directly participated in the Vendor and Employment schemes. Burrows can therefore not

avoid liability for the remaining schemes by turning a blind eye in violation of his fiduciary duties.

Remarkably, the defendants cite *Wert-Ruiz* to support their assertion that "willful blindness cannot support a conviction for conspiracy." (Def. Memo. of Law at 7). But that reliance is entirely wrong. *Wert-Ruiz affirmed* a conviction for conspiracy and found that the district court did not err by charging willful blindness. *Id.* at 258. In that case, Wert-Ruiz and her husband opened a check cashing business that handled millions of dollars in money transfers each year. *Id.* at 253. She began laundering drug money by remitting payments between individuals in different counties and falsifying receipts designed to conceal the transfers of money—which was often provided in gym bags filled with cash. At trial, Wert-Ruiz admitted to transferring the money and falsifying receipts but denied knowing about her coconspirators' intentions. The evidence showed that Wert-Ruiz was aware, however, that her coconspirators spoke in coded language and lied about the amount of money that they transacted. *Id.* at 254.

At Wert-Ruiz's trial, the jury was instructed on willful blindness. The following charge was given:

> When knowledge of the existence of a particular fact is an essential part of an offense, such knowledge may be established if a defendant is aware of a high probability of its existence, unless she actually believes that it does not exist.
>
> So with respect to the issue of a defendant's knowledge in this case, if you find from all the evidence beyond a reasonable doubt that the defendant deliberately and consciously tried to avoid learning that certain currency was the proceeds of some form of illegal activity, and that the defendants deliberately and consciously tried to avoid learning that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity, you may treat such deliberate avoidance of positive knowledge as the equivalent of

knowledge.

I must emphasize, however, that the requisite proof of knowledge
on the part of a defendant cannot be established by demonstrating
she was negligent, careless or foolish.

*Id.* at 255. After trial, the jury convicted her of conspiracy to commit money laundering.

On appeal, Wert-Ruiz argued that the government had only adduced evidence of her

actual knowledge and there was insufficient evidence of willful blindness. She also argued that

instruction was erroneous because "it is impossible to be willfully blind to participation in a

conspiracy." *Id.* at 255 n.3. The Third Circuit rejected both of Wert-Ruiz's arguments. The

Court found that there was no error in charging the jury on willful blindness even if the

evidence presented could also be interpreted to show actual knowledge. *Id.* at 258 ("Even if

some of the evidence discussed above tends to be consistent only with a finding of actual

knowledge, the government presented ample additional evidence from which a reasonable

inference of willful blindness could be drawn."). The Court noted that a failure to uphold the

district court's instructions "could carry harmful results" and that the "willful blindness

instruction served the important purpose of preventing Wertz-Ruiz from evading culpability if

the jury concluded that due to a willful refusal to connect the dots, Wertz-Ruiz actually did not

know of the purposes of her money laundering activities." *Id.* at 258. The Third Circuit

succinctly concluded that "[d]eliberate ignorance cannot become a safe harbor for culpable

conduct." *Id.*

*Wertz-Ruiz* also summarily rejected the argument that the defendant now advances—

that a defendant cannot be a willfully blind participant in a conspiracy. *Id*. at 255 n.3. The

Court held that this position was foreclosed by its previous decision in *United States v.*

*Anderskow*, 88 F.3d 245, 254 (3d Cir. 1996), where a conviction for conspiracy to commit wire

- 15 -

fraud was affirmed. Accordingly, the defendant's claim that a person cannot be a willfully blind participant in a criminal conspiracy is simply incorrect.

At bottom, the government has satisfied the second prong of the variance test. The evidence shows that the various schemes presented at trial could not have succeeded without both Burrows and Dougherty. The defendant's claim that Burrows did not have knowledge of certain schemes is not supported by the evidence or the law. This factor weighs in favor of finding a single conspiracy.

### c.   The defendants overlapped significantly in the schemes.

Finally, the third variance factor also weighs in favor of the government because, as described above, there was significant overlap between the defendants' involvement in the schemes. The Vendor Scheme required, for example, Dougherty to direct Anthony Massa's work at Dougherty's properties and those of his family members. Burrows then directed where to bill it. Both defendants participated jointly in the Employment Scheme by using the kids and Hamilton for non-union related work. The Ticket and Expense Schemes could not have occurred without Burrows consciously disregarding his duties to manage the union's finances despite knowing that Dougherty was stealing union funds.

The defendants' reliance on *United States v. Kemp* to rebut this argument is unpersuasive. There, Corey Kemp, the former treasurer of Philadelphia, was indicted and tried for conspiracy to commit honest services fraud and related offenses. The indictment alleged that Ronald White, a Philadelphia attorney, acquired control over Kemp by making corrupt payments and gifts to him. White then used his power over Kemp to steer city contracts to companies that White favored. The indictment alleged that La-Van Hawkins, a businessman from Detroit, aided this arrangement by funneling money from White to Kemp. Janice Knight,

White's girlfriend, received a steady stream of city business to her printing company through this arrangement. And two Commerce Bank executives, Glenn Holck and Stephen Umbrell, separately extended loans to Kemp in exchange for preferential treatment on municipal matters, which White helped arrange. *Kemp*, 500 F.3d at 264. All defendants were convicted of conspiracy at trial, and Holck and Umbrell appealed arguing that a variance had occurred.

The Third Circuit agreed and held Holck and Umbrell's loan conspiracy was distinct from the activities of Hawkins and Knight's conspiracies. The Court based its holding on two key facts. First, it found that "the government failed to present evidence that [Holck and Umbrell] knew or should have known about Knight and Hawkins's activities." *Id*. at 288. *Kemp* observed that the government had presented no facts to support its claim that Holck and Umbrell had any knowledge that White was serving interests in addition to theirs. Second, the Court found that Holck and Umbrell's activities were neither interdependent nor mutually supportive with the other members of the conspiracies. The Court reasoned that Holck and Umbrell's transactions were able to proceed without any reliance on Hawkins or Knight. *Id.* at 290–91.

*Kemp* is easily distinguishable. Holck and Umbrell were two bankers who were unrelated to, did not have knowledge of, the other conspirators working with Kemp and White. Here, there can be no credible claim that Burrows and Dougherty did not know of each other's activities. As president and business manager of the union, Burrows and Dougherty were joined in the conspiracy far more closely than Holck and Umbrell were with their unknown conspirators. As described, above, the defendants jointly participated in the Vendor and Employment Schemes along with Anthony Massa, Niko Rodriguez, Brian Fiocca and others. And, as also described above, Burrows at the very least "should have known" about

the Petty Cash, Ticket, Expense Schemes. *Id.* at 288; *accord United States v. Blumenthal*, 332

U.S. 539 (1947) (finding that even though each coconspirator "aided in selling only his part"

of an illegal whiskey trade the conspirators "knew or must have known that others unknown to

them were sharing in so large a project"). The knowledge element that was lacking in *Kemp*

is clearly presented here.

For many of the same reasons, the government has also satisfied the interdependence

prong that was missing from *Kemp*. "In evaluating interdependence, [courts] consider how

helpful one individual's contribution is to another's goals." *Kemp*, 500 F.3d at 289 (quoting

*United States v. Macchia*, 35 F.3d 662, 671 (2d Cir. 1994)). Interdependence can be proven by

showing that "the combined efforts" of the coconspirators was required to ensure the success

of the venture and the actions of one conspirator "facilitated endeavors of other coconspirators

or the venture as a whole." *Id.* at 290 (quoting *United States v. Chandler*, 388 F.3d 796, 811-

12 (11th Cir. 2004)). The actions taken by Burrows and Dougherty were clearly all taken to

facilitate the venture as a whole. Each act was meant to steal money from the union and

benefit the defendants personally.

The defendants attempt to avoid this conclusion by categorizing each *scheme* as a

spoke, and the common goal as the *hub*. They then argue that each scheme/spoke must be

connected to each other. (Def. Memo. of Law, 6). That is wrong. A "hub-and-spoke"

conspiracy is an analytical framework for examining the relationship between coconspirators

and agreements, not schemes. *See Kemp*, 500 F.3d at 288–89 (describing "Kemp and White

[as] the hub" and "Holck and Umbrell, Knight, and Hawkins" as the "spokes"). The

defendants' position, that each scheme must be connected to one another, squarely contradicts

"the well-settled" principle that "each member of the charged conspiracy is liable for the

substantive crimes his coconspirators commit in furtherance of the conspiracy even if he neither participates in his co-conspirators' crimes nor has any knowledge of them." *Fattah*, 914 F.3d at 168. Under the defendants' formulation, each scheme or crime must be directly connected every other scheme or crime to obtain a conviction for conspiracy. That is not the law.

*Blumenthal* is instructive on this point. There, a group of men were involved in a scheme to sell whiskey above authorized prices. The scheme involved multiple salesmen who arranged for the sales of the liquor as intermediaries for the core distributors at the center of the conspiracy. The Court found that a single conspiracy existed despite each salesman only selling his share. It reasoned every member of the conspiracy "knew of and joined the overriding scheme." *Blumenthal*, 332 U.S. at 558. Each person "intended to aid the owner [of the whiskey] . . . to sell the whiskey unlawfully," even if he did not know the owner's identity. *Id.* Each person, therefore, had entered a single conspiracy because "he knew the lot to be sold was larger and thus that he was aiding in a larger plan." *Id.*

*Blumenthal* stands of the proposition that a person need not know every detail of every scheme for a single conspiracy to exist. Rather, the actions of each coconspirator must benefit the conspiracy as a whole, which in turn is evidence of the unlawful agreement. In this case, the government's evidence has shown that the actions taken by defendants Burrows and Dougherty in each various scheme aided the general conspiracy to steal money from the union.

## IV.    Conclusion

The government's trial evidence proved the existence of a single conspiracy to embezzle funds from IBEW Local 98, which is what the indictment charged. Each of the relevant factors weighs in favor of the government. There was no variance, and the defendant's motion should be denied.

Respectfully submitted,
JACQUELINE C. ROMERO
United States Attorney

*/s/ Anthony J. Carissimi*
FRANK COSTELLO
BEA WITZLEBEN
JASON GRENELL
ANTHONY J. CARISSIMI
Assistant United States Attorneys

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this date, I electronically filed the foregoing response with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendants, who are identified below.

Gregory Pagano & Henry George
*Counsel for Defendant John Dougherty*

Thomas Bergstrom and Mark Kasten
*Counsel for Defendant Robert Henon*

<u>/s/ *Anthony J. Carissimi*</u>
ANTHONY J. CARISSIMI
Assistant United States Attorney

Dated: December 3, 2023