**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. 19-64 |
| | : | |
| JOHN DOUGHERTY | : | |

**MEMORANDUM OPINION**

**SCHMEHL, J. /s/ JLS**                                                    **June 21, 2024**

On January 29, 2019, Defendants John Dougherty and Brian Burrows were indicted for allegedly embezzling (and conspiring to embezzle) funds belonging to the union they ran, the International Brotherhood of Electrical Workers Local Union 98 ("Local 98" or the "Union"), as well as for filing false tax returns and fiscal forms.  Trial on these charges occurred from early November through early December 2023, at the close of which Mr. Burrows filed, pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure, his Motion for Judgment of Acquittal on Count One of the Indictment (ECF No. 609).  Mr. Dougherty later moved to join Mr. Burrows's Motion.  (*See* ECF No. 610.)  The Court denied these Motions before charging the jury.  (Order, ECF No. 619.)  On December 7, 2023, the jury convicted both Defendants on Count 1 (conspiracy to embezzle labor union and employee benefit plan assets), among others.  (Jury Verdict Sheet, ECF Nos. 628, 629.)   Thereafter, each Defendant also submitted a post-verdict Motion for Judgment of Acquittal Pursuant to Rule 29(c) (ECF Nos. 652, 655, 683), Mr. Burrows moved for a new trial under Rule 33 (*see* ECF No. 653), and Mr. Dougherty supplemented his initial Rule 29(c) Motion (*see* ECF No. 741).  This memorandum sets forth the Court's reasons for having denied Defendants' pre-verdict Motions under Rule 29(a) and for presently denying their post-verdict Motions under Rules 29(c) and 33.

## I.    BACKGROUND

At the November–December 2023 embezzlement trial,[1] the Government sought to prove that Defendants abused their senior positions in Local 98 to embezzle the Union's assets for their personal use, among other offenses.  The Government argued that Defendants accomplished this by various means and through various individuals.[2]  In Count 1 of the Indictment, the Government elected to frame this conduct as one conspiracy.  Then, in the subsequent Counts, the Government charged various substantive offenses, such as embezzlement and wire fraud, many of which were intertwined with the conspiracy charge in Count 1:  (1) Defendants and Mr. Neill used Union funds to pay a contractor, Mr. Massa, to perform work at personal and commercial residences belonging to Defendants and their private associates; (2) Mr. Dougherty committed embezzlement and wire fraud when he (or subordinates acting at his direction) (a) made personal purchases with Local 98 credit cards, (b) sought reimbursement from the Union for personal purchases, and (c) sought reimbursement for cash tips at certain events; (3) Defendants used Union employees to perform personal work while those employees were on the clock for the Union; (4) Mr. Dougherty provided tickets to events—tickets for which the Union paid—to personal acquaintances; and (5) Mr. Dougherty stole petty cash from a Union fund relating to political education.  The

---

[1]    In November 2020, the Court bifurcated the Indictment (ECF No. 1) in this case to separate those charges concerning public corruption (Counts 97–116) from those concerning embezzlement (Counts 1–96).  (Order, ECF No. 168.)  In October–November 2021, the Court held a trial on the public corruption charges; that trial is not relevant to the present Motions.

[2]    Many of these individuals were former co-Defendants and alleged coconspirators with Mr. Dougherty and Mr. Burrows, including Anthony Massa, Michael Neill, Marita Crawford, Niko Rodriguez and Brian Fiocca.  These five former Defendants pleaded guilty before the embezzlement trial began.  (Guilty Plea Agmt., ECF Nos. 139, 389, 391, 396, 398.)  Accordingly, when the Court refers to "Defendants" in this Memorandum, it refers to Mr. Dougherty and Mr. Burrows alone.

Government also provided evidence that to hide the value of these embezzled assets, Defendants submitted false statements in Union financial forms and their own personal income taxes.[3]

Mr. Burrows argues that the foregoing demonstrates not that Defendants maintained a unitary conspiracy, but rather that they individually pursued a series of unrelated conspiracies, most which did not involve Mr. Burrows.  He seeks to overturn his conviction for Count 1 based on case law that, in certain circumstances, prohibits "variances"—*i.e.*, when the Government alleges one thing in an indictment (here, a unitary conspiracy) and proves a different thing at trial (here, various unrelated conspiracies).  Mr. Dougherty has joined Mr. Burrows's position on this issue and seeks to overturn his conviction on Count 1 for the same reasons.  (Mots. to Join Mot. Filed by Co-Def. Brian Burrows, ECF Nos. 610, 655.)

Mr. Burrows also seeks a new trial under Rule 33 of the Federal Rules of Criminal Procedure based on a willful blindness jury instruction.  In response to Mr. Burrows's argument that much of the misconduct attributed to Mr. Dougherty occurred without the knowledge of Mr. Burrows, the Government advanced the theory that Mr. Dougherty's misconduct was so apparent that it could only have been unknown to Mr. Burrows if the latter had deliberately avoided learning of it.  Accordingly, the Court instructed the jury as follows:

> Now, to find a defendant guilty of the offenses charged in [Counts] 2 through 41, embezzlement of union assets, you must find that the Government proved beyond a reasonable doubt that the defendant acted knowingly.  In this case, there has been a question raised whether the defendants were conscious and aware of the nature of their actions and some of the alleged conspirators, and of the surrounding facts and circumstances pertaining to this offense.
>
> When, as in this case, knowledge of a particular fact or circumstance is an essential part of offense charged, the Government may prove

---

[3]     The Indictment further alleged that Mr. Dougherty impermissibly accepted items of value from a businessman who employed Local 98 electricians, but the Court dismissed these charges during the trial at the request of the Government.  (Order, ECF No. 624.)

the defendant knew of the nature of the actions of some of the alleged co-conspirators, if the evidence proves beyond a reasonable doubt that the defendants deliberately closed their eyes to what would otherwise have been obvious to them.

No one can avoid responsibility for a crime by deliberately ignoring what is obvious, thus you may find the defendants acted knowingly based upon evidence which proves that, one, the defendants objectively believed that there was a high probability that their alleged co-conspirators committed the acts alleged by the government, and two, the defendants consciously used deliberate efforts to avoid knowing about the existence of the alleged acts committed by their alleged co-conspirators.

You may not find that the defendants knew of the nature of the[] actions [of] some of the alleged co-conspirators, if you find that a particular defendant actually believed that this alleged activity did not exist.  Also, you may not find that the defendants knew of the nature of the actions of some of their alleged co-conspirators if you find only that the defendants consciously disregarded a risk that the alleged acts committed by their alleged co-conspirators existed, or that the defendants should have known of their existence, or that a reasonable person would have known of a high probability that the alleged acts committed by their alleged co-conspirators existed.

[I]t is not enough that the defendants may have been reckless or stupid or foolish or may have acted out of inadvertence or accident. You must find that the defendants subjectively believed there was a high probability of the existence of alleged acts committed by their alleged co-conspirators, consciously used deliberate efforts to avoid knowing about them and did not actually believe they were not committed.

(Jury Trial Day 18 Tr. 65:25–67:23, Dec. 5, 2023, ECF No. 672.)  *See also* 3d Cir. Model Crim.

Jury Instructions § 5.06 (reflecting substantially similar instruction).  Mr. Burrows argues that the

Government failed to provide sufficient evidence to support the theory that Mr. Burrows was aware

of a high probability that Mr. Dougherty and others were embezzling Union funds, and he therefore

requests a new trial.

Mr. Dougherty filed his own Rule 29(c) motion in which he seeks acquittal on certain

counts relating to his use of Union funds to pay Mr. Massa for construction completed at personal

and commercial residences belonging to Defendants and their private associates.[4]  Mr. Dougherty argues that Mr. Massa's testimony established that Mr. Dougherty was not aware of Mr. Massa's billing practices; instead, in Mr. Dougherty's view, Mr. Massa led Mr. Dougherty to believe that the renovations to personal properties was performed *gratis* so that Mr. Massa would continue to be one of Mr. Dougherty's preferred contractors for Union work.

Finally, Mr. Dougherty supplemented his initial Rule 29(c) Motion to address a report of a February 26, 2024, interview of one the Assistant U.S. Attorneys prosecuting this case, Mr. Frank Costello.  The report, itself created on March 5, 2024, explains Mr. Costello's determination that although a contractor (other than Mr. Massa) worked on the house of one of Mr. Dougherty's former attorneys but billed that work to the Union, that conduct did *not* support charges of labor bribery, as the Government found no evidence that Mr. Dougherty or his former attorney knew that the contractor had behaved in this manner.  Mr. Dougherty argues that a jury may have concluded that just like he was unaware of this contractor's inclusion of work on the former attorney's home into Union invoices, so too was Mr. Dougherty unaware of Mr. Massa's conduct. Because Mr. Dougherty views this evidence (or, rather, lack thereof) as exculpatory, he argues that it should have been disclosed under *Brady v. Maryland*, 373 U.S. 83 (1967), and that his convictions on the foregoing counts should be overturned.

## II.    STANDARD OF REVIEW

When considering a Rule 29 motion, this Court "must view the evidence in the light most favorable to the government" and "will sustain the verdict if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998) (first citing *United States v. Thomas*, 114 F.3d 403, 405 (3d Cir.

---

[4]      The relevant charges are Counts 2–3, 19, 23–24, 34–36, and 39 of the Indictment.

1997), and then quoting *United States v. Voigt*, 89 F.3d 1050, 1080 (3d Cir. 1996)).  Under this "particularly deferential standard of review," the Court does not itself "weigh the evidence or . . . determine the credibility of the witnesses." *Id.* (quoting *Voigt*, 89 F.3d at 1080).  Instead, when reviewing conflicting facts, the Court "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)).  Given these deferential principles, "a claim of insufficiency of the evidence places a very heavy burden on [a defendant]." *Dent*, 149 F.3d at 187 (quoting *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990)).  These principles apply equally to motions brought under Rule 29(a) and 29(c).  *United States v. Curry*, 2022 WL 445541, at *1 (D.N.J. Feb. 10, 2022) (gathering cases).

Rule 33 authorizes the Court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  In contrast to the foregoing Rule 29 standard, "when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002).  That said, the burden on a moving defendant remains a significant one, because "even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Silveus*, 542 F.3d 993, 1004–05 (3d Cir. 2008) (quoting *Johnson*, 302 F.3d at 150).  Accordingly, Rule 33 motions "are not favored and should be 'granted sparingly and only in exceptional cases.'" *Id.* at 1005 (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)).

III.    ANALYSIS

A.    Prejudicial Variance

Defendants pursue the theory that what appeared to be a coordinated effort among Local 98 officials to plunder the Union's coffers was, in fact, a coincidental array of independent schemes run by high-ranking Union officials who unwittingly pursued asset misappropriation around the same time and by similar means. As explained below, the Government introduced sufficient evidence at trial for the jury to conclude that Defendants' improbable theory was, indeed, not reality.

The Third Circuit has explained that "[a] conviction must be vacated when (1) there is a variance between the indictment and the proof presented at trial and (2) the variance prejudices a substantial right of the defendant." *United States v. John*, 2022 WL 1793032, at *3 (3d Cir. June 2, 2022) (quoting *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989)). "A variance exists where 'a single conspiracy is alleged in the indictment, . . . [but] the evidence at trial proves only the existence of multiple conspiracies.'" *Id.* (quoting *Kelly*, 892 F.2d at 258). When evaluating a putative single conspiracy, this Court should consider (1) whether the conspirators shared a "common goal"; (2) whether the conspiracy would "not continue without the continuous cooperation of the conspirators"; and (3) "the extent to which the participants overlap in the various dealings." *Kelly*, 892 F.2d at 259 (citing *United States v. DeVarona*, 872 F.2d 114, 118–19 (5th Cir. 1989)). Unlike a single conspiracy, multiple conspiracies are instead characterized by "separate networks operating independently of each other." *John*, 2022 WL 1793032, at *3 (quoting *United States v. Perez*, 280 F.3d 318, 342, 346 (3d Cir. 2002)). That said, "a 'finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies . . . .'" *Id.* (quoting *Kelly*, 829 F.2d at 258).

1.      **Common Goal**

The Government provided sufficient evidence at trial for a jury to conclude that Defendants operated a single conspiracy.  First, Defendants had a shared purpose or goal—appropriating Union assets for their personal benefit.  This framing may be somewhat general, but the Third Circuit has endorsed viewing the alleged activity "in a fairly broad sense" and "in fairly general terms."  *United States v. Fattah*, 914 F.3d 112, 168 (3d Cir. 2019) (gathering cases about conspiracies to plunder a corporate employer, "make money by depositing stolen and altered corporate checks," and "make money selling 'speed'").  In *Fattah*, the indictment charged the defendants with conspiring to obtain an illegal campaign loan, misappropriate funds to repay that loan, and falsify campaign finance reports and other documents to conceal such activity.  *Id.*  A defendant who helped misappropriate the repayment funds argued that his conduct was a separate conspiracy from the conspiracy to falsify documents—a scheme in which he did not participate and of which he was unaware.  *Id.*  The Third Circuit disagreed and explained that although "the false campaign finance reports, in the narrowest sense, had the specific purpose of covering up how the illegal loan funds were used during the election," it remained the case that "the false campaign finance reports were also filed in furtherance of a broader goal shared by the conspirators involved in repayment of the . . . loan"—namely, "to promote [the candidate's] political and financial goals by preserving his image as a viable candidate and making him appear able to repay or otherwise service his campaign debts without resorting to illegal means in doing so."  *Id.* at 169.

Likewise, in *John*, the defendant "conspired with multiple people to use force, threats, fraud, or coercion to cause [multiple women and girls] to engage in commercial sex."  2022 WL 1793032, at *4 (quoting *United States v. John*, 2020 WL 4721970, at *3 (E.D. Pa. Aug. 11, 2020)).  The defendant argued that "the two alleged conspiracies were distinct because he had employed different people and prostituted different women."  *Id.*  The Third Circuit explained that "[t]he fact

that [the defendant] employed different people at different times during the conspiracy does not change the conclusion that this was a single conspiracy to '[i]dentify women to prostitute, then prostitute them.'" *Id.*

These principles resolve this case, too. Defendants may have operated various sub-schemes with different participants—*e.g.*, billing private construction work to the Union, improperly reimbursing personal expenses, and having Union employees run personal errands, *inter alia*—but the purpose remained the same throughout: misappropriating Union assets for the benefit of Defendants and their personal associates. Defendants correctly identify some of the *immediate* purposes of these schemes, such as "obtaining free concert tickets and construction work or stealing petty cash" (Def. Brian Burrows' Mem. of L. in Supp. of His Rule 29(c) Mot. for a J. of Acquittal 6, ECF No. 652-1)—but as the Third Circuit explained in *Fattah*, the existence of these "narrow" and "specific" goals is not incompatible with a "broader" goal that unified the single charged conspiracy, *Fattah*, 914 F.3d at 169 (comparing the specific and broader goals of the false campaign finance reports—respectively, covering up the use of illegal loan funds, and preserving the candidate's public image).[5] That Defendants misappropriated Union assets for their personal gain through various coconspirators and methods does not undermine the theory that, across all such methods, they misappropriated Union assets for their personal gain and could not have done so without each other's complicity. *See John*, 2020 WL 4721970, at *3 (one conspiracy does not become multiple simply because the defendant "had employed different people and prostituted different women").

---

[5]   Defendants attempt to distinguish *Fattah* on the basis that the schemes there—misappropriating funds to repay an improper loan and falsifying campaign finance reports—were far more interdependent than those here. This position speaks to the second *Kelly* factor, which the Court discusses below.

Mr. Burrows also presses the point that he did not know of every sub-scheme or its participants and, therefore, did not share a common goal with his putative coconspirators. This position, also raised and rejected in *Fattah*, is unavailing. There, the Third Circuit explained the "well-settled" rule that "each member of the charged conspiracy is liable for the substantive crimes his coconspirators commit in furtherance of the conspiracy even if he neither participates in his co-conspirators' crimes nor has any knowledge of them," subject to three exceptions not invoked here. *Fattah*, 914 F.3d at 169 (quoting *United States v. Bailey*, 840 F.3d 99, 112 (3d Cir. 2016)). The Government also cites a similar situation in *Blumenthal v. United States*, a case in which the U.S. Supreme Court held that even though illegal whiskey sellers did not know every other member in the conspiracy, each seller *did* at least know that he sold a portion of a larger lot and was therefore joining in common purpose with other coconspirators. 332 U.S. 539, 558 (1947).

In contrast to *Blumenthal* stands *Kemp*, on which Defendants rely heavily. There, the Government alleged that two defendants, Stephen Umbrell and Glenn Holck, extended loans to then-Philadelphia City Treasurer Corey Kemp "for the purpose of influencing his decision-making." 500 F.3d at 266. The Government also charged other defendants with bribing Mr. Kemp to direct the city's contracts to those defendants' companies. *Id.* at 265. Umbrell and Holck argued that their loans scheme and the other defendants' contracts scheme reflected different conspiracies and that, therefore, a variance had occurred. The Third Circuit agreed and explained that "the government failed to present evidence that [Umbrell and Holck] either knew or should have known about [the other defendants'] activities," including because the loan scheme was not "the type of conspiracy that *must* have had other members." *Id.* at 288.[6]

---

[6] The Third Circuit also discussed a lack of interdependence and mutual support, *Kemp*, 500 F.3d at 289, discussed further below.

The facts of this case are far more similar to *Blumenthal* than *Kemp*. Here, the Government (1) introduced evidence of Mr. Burrows's heavy involvement in dispatching Mr. Massa to Defendants' various properties and instructing him on how to invoice the Union for that work; (2) established that Mr. Burrows had a Union employee run personal errands and knew that Mr. Dougherty did the same; (3) identified personal parties and dinners—some of which Mr. Burrows attended or otherwise participated in—that Mr. Dougherty had the Union reimburse; (4) argued that Mr. Burrows, as the chairman of the Union's executive board, (a) was concerned about the possibility of inquisitive board members, (b) oversaw board meetings consisting of sham approvals of expenditures already made, and (c) declined to implement outside auditors' suggestions to improve internal controls on reimbursement practices; (5) identified Mr. Burrows as authorizing Union funds to pay for a trip to Costa Rica for Mr. Dougherty's niece; and (6) argued that as part of justifying a sham consulting job for Mr. Dougherty's nephew, Mr. Dougherty sent the nephew to Mr. Burrows to see if the latter needed anything done. Whether Mr. Burrows's involvement in the foregoing transactions represents a large or small share of the overall conspiracy, it certainly provided the jury with sufficient evidence to conclude that, as in *Blumenthal*, Mr. Burrows acted not in a narrow scheme to enrich himself, but rather in a much larger operation that facilitated the misappropriation Union assets to Mr. Dougherty and others. The Government also sufficiently established for the jury that, unlike in *Kemp*, Mr. Burrows had to have known that Mr. Dougherty was similarly spending Union funds for personal gain and was therefore complicit in the various sub-schemes. As listed above, both Defendants relied on each other to execute many of these schemes, and nothing about the nature of this conspiracy or

Defendants' dealings would suggest to Defendants that each Defendant was not also carrying on other similar schemes without both Defendants' direct participation.[7]

For the foregoing reasons, the Court rejects Defendants' position that the charged conspiracy lacked a common goal.[8]

---

[7]     Defendants also discuss *United States v. Camiel*, a case involving the disbursement of no-show patronage jobs in state and city government.  689 F.2d 31, 36 (3d Cir. 1982).  The Third Circuit found no common scheme where (1) putative coconspirators not only lacked an agreement to pursue the scheme but were, in fact, actively "hostil[e]"; (2) a city organization through which certain individuals operated could not "weld[] disparate activities into a common scheme" because, similarly, the organization's members acted for their own ends and often in opposition to other members; and (3) the Government failed to provide sufficient evidence linking the activities of Pennsylvania's two legislative houses into a unified scheme.  *Id.* at 36–37.  Here, however, there is no evidence that Mr. Dougherty and Mr. Burrows operated with hostile and antagonistic aims; instead, the Government proved the contrary.  The above list of activities that involved both Defendants likewise belies any attempt to compare them to the independent operations of the legislative houses in *Camiel*.

[8]     Defendants argue further that in granting various motions to sever this case between charges of public corruption and embezzlement (*see* ECF Nos. 167, 168), this Court rejected the Government's position that defrauding the Union was the common goal that unified the entire Indictment (and, accordingly, the Court should likewise reject the Government's present position that defrauding the Union was the common goal of the embezzlement charges).  Setting aside the fact that the Court's severance memorandum emphasized the danger of prejudice to Defendants under Rule 14(a) of the Federal Rules of Criminal Procedure, not whether the Government appropriately joined Defendants together under Rule 8(b), the Court's ability to sever the Indictment arguably demonstrates that the Government *properly* constructed this case when it charged an embezzlement conspiracy (Count 1) and a distinct public corruption conspiracy (Count 97).  In contrast to Defendants' strained position that, for example, a scheme to improperly reimburse personal expenses with Union funds has a different general purpose than a scheme to bill construction expenses on personal properties to the Union, the embezzlement and public corruption conspiracies more clearly had different general purposes:  The former, to misappropriate Union assets for personal gain; the latter, to deprive Philadelphians of the honest services of their public official.  Regardless of the Government's position in seeking to prevent severance, its structuring of the Indictment in this case reflects an accurate understanding of schemes with different general purposes (*i.e.*, the embezzlement conspiracy and the public corruption conspiracy) and sub-schemes with a shared overarching purpose (*i.e.*, the various ways in which Defendants misappropriated Union assets for their personal benefit).

### 2. Continuous Cooperation of the Conspirators

The second factor concerns whether the conspiracy would "not continue without the continuous cooperation of the conspirators." *Kelly*, 892 F.2d at 259. Put differently, this Court must "consider how helpful one individual's contribution is to another's goals." *Kemp*, 500 F.3d at 289 (citing *United States v. Macchia*, 35 F.3d 662, 671 (2d Cir. 1994)). The *Kemp* court distinguished various government kickback schemes that yielded different outcomes as to this factor. The conspiracy in *United States v. Kenny* was unified because the coconspirators were coordinated and relied on "their common control over the administration of city and county government." *Id.* at 290 (quoting *United States v. Kenny*, 462 F.2d 1205, 1217 (3d Cir. 1972)). This was the case notwithstanding that "the roles played by various conspirators varied from time to time." *Kenny*, 462 F.2d at 1217. By contrast, the putative conspiracies in *United States v. Smith* and *Camiel* were, in fact, disparate schemes: In *Smith*, a defendant's schemes with coconspirators in two states did not benefit both coconspirators and were not mutually contingent, and in *Camiel*, the Government failed to provide evidence linking the activities of the two legislative houses. *Id.* at 290 (first citing *United States v. Smith*, 82 F.3d 1261, 1271 (3d Cir. 1996), and then citing *Camiel*, 689 F.2d at 37). The *Kemp* court also favorably quoted an Eleventh Circuit case underscoring that "there was no such interdependence of the spokes. The combined efforts of the spokes were not required to insure the success of the venture. No spoke depended upon, was aided by, or had any interest in the success of the others. Each spoke acted independently and was an end unto itself. The actions of one spoke did not facilitate the endeavors of other coconspirators or the venture as a whole." *Id.* (quoting *United States v. Chandler*, 388 F.3d 796, 811–12 (11th Cir. 2004)).

As in *Kenny*, key to the success of Defendants' scheme here was "their common control over" the Union. The Government sufficiently supported its theory that both Defendants gatekept

essential Union powers:  Mr. Dougherty, as the Union's leader, could bless (or block) any of the sub-schemes; Mr. Burrows, as the Union's second-highest ranking official and Chairman of the Executive Board, had financial oversight duties that, if exercised diligently, could have revealed the sub-schemes to the Board.  *See* Fattah, 914 F.3d at 170 (second factor favored the Government because, in part, "maintaining secrecy surrounding the illegal loan and the misappropriated funds used to repay it required the continuous cooperation of the conspirators").  Although not each Defendant had a significant role in every sub-scheme, what *was* essential to the success of *every* sub-scheme was, at the very least, both Defendants' affirmative decision to abdicate their responsibilities and look the other way—precisely the mutual dependence and facilitation discussed by *Chandler*.  The necessary and mutually beneficial nature of Defendants' arrangement distinguishes their conspiracy from the deficient conspiracies alleged in *Smith* and *Camiel*.

Mr. Burrows argues that a differing cast of coconspirators evidences that the various sub-schemes could have succeeded independently of one another.  He claims, for example, that Mr. Dougherty and an office manager were the only two people necessary for the sub-scheme to make personal purchases with Union funds via improper reimbursements and use of Local 98 credit cards.  He acknowledges his involvement in the sub-scheme to have the Union foot the bill for construction work on personal homes, but he argues that this time *Mr. Dougherty* lacked any awareness of this scheme (and was therefore not essential to its success).[9]  There being no overlap

---

[9]     This theory is difficult to accept.  Why would Mr. Burrows arrange for Mr. Massa to provide hundreds of thousands of dollars in Union-paid renovations to the private property of Mr. Dougherty and his family?  Perhaps to curry favor with the Union's leader—but that would require informing Mr. Dougherty of the favor.  If that was not the case, then Mr. Burrows would have the Court overturn the jury's verdict on the theory that Mr. Burrows was simply performing good works without seeking recognition for them.  But as discussed below, *see infra* Section III.C., the Government submitted evidence that Mr. Dougherty directly knew of Mr. Massa's activities or, at the very least, deliberately avoiding learning more about them.  This evidence sufficed to

in either Defendant's participation in the other's activities, Mr. Burrows concludes that any given sub-scheme could have prevailed without the uninvolved individual. But that conclusion does not follow. As in *Kenny*, where a critical component of the Third Circuit's variance analysis was the defendants' "common control over the administration of city and county government," 462 F.2d at 1217, the successful execution of all sub-schemes relied on the complicity of Defendants, the two most power individuals in the Union—complicity reflected by their refusal to faithfully execute their duties, their affirmative avoidance of information and internal reforms that would have more concretely exposed their wrongdoing, and their mutual knowledge of at least some of each other's activities.[10]

Similar to Mr. Burrows's arguments concerning the first factor, Mr. Burrows also attempts to characterize this case as a hub-and-spokes conspiracy with Mr. Dougherty as the central hub and Mr. Burrows as but one spoke who was unaware of the other spokes. *Cf., e.g.*, *Kotteakos v. United States*, 328 U.S. 750, 753 (1946) (no single conspiracy where spokes-defendants fraudulently obtained loans through central hub-defendant because the spokes-defendants had no relationship with each other—in other words, there was no "rim of the wheel to enclose the spokes"). Mr. Burrows's interpretation, however, is simply not the case that the Government made to the jury. In a hub-and-spokes framework, Mr. Burrows is best understood as *part of the hub with Mr. Dougherty*, not a mere spoke. It was the combined powers afforded to *both* Defendants

---

support the jury's apparent decision to endorse the Government's theory and not Mr. Burrows's. As the jury appears to have concluded, it simply defies credulity that Mr. Dougherty was not aware and involved in the contractor sub-scheme.

[10]     The combination of these activities likewise rebuts any potential conclusion that the jury convicted Defendants merely for either knowing about the sub-schemes or acting negligently in failing to learn of them. From this evidence, the jury could have concluded that Defendants' failure to stop each other's sub-schemes was not negligent behavior but deliberate (and therefore criminal).

(and their decision not to exercise certain powers) that acted as the common foundation of the various sub-schemes.  Unlike *Kotteakos*, Mr. Dougherty did not utilize Mr. Burrows to run simply one sub-scheme of many; instead, as the Government showed at trial, Mr. Burrows's facilitation was necessary to maintain *all* sub-schemes.  And unlike *Kemp*, where the evidence did not establish (and the nature of the scheme precluded inferring) certain defendants' knowledge of other coconspirators' activities, the Government here established by sufficient evidence that Mr. Burrows knew of many of the sub-schemes, including ones which he did not initiate.  He knew, for example, that Mr. Dougherty improperly used Union employees to run personal errands—indeed, Mr. Burrows himself misused a Union employee in the same manner—and he worried about executive board members who might ask too many questions about the Union's finances, from which a jury could infer that he knew of improper reimbursements.

For these reasons, the second factor suggests that the Government properly charged the embezzlement conspiracy as a single conspiracy.

### 3.      Participants' Overlap

The third factor addresses "the extent to which the participants overlap in the various dealings."  *Kelly*, 892 F.2d at 259.  The *Kelly* court, when assessing this factor, emphasized that the coconspirators there shared an overarching purpose, not antagonistic cross-purposes.  *Id.* at 260.  Other courts have considered "overlapping goals, methods and personnel" while acknowledging that "[a] single conspiracy finding does not require every member to participate in every transaction."  *DeVarona*, 872 F.2d at 119–20; *see also Kemp*, 500 F.3d at 291 ("[T]here must be overlap among the spokes, not just between the hub and the various spokes. . . .  [T]he inquiry must focus . . . on the character of the agreements between the spokes.").

This Court discussed above that Mr. Dougherty and Mr. Burrows shared the common goal of misappropriating Union assets for their personal benefit, were not operating at cross-purposes,

and were invariably essential to each of the sub-schemes.  Again, Mr. Burrows attempts to frame himself as a spoke isolated from all other spokes, but as before, Mr. Burrows is best understood as part of the hub along with Mr. Dougherty.  In any event, the Government provided sufficient evidence here for a jury to conclude that the conspiracy's goals, methods, and personnel overlapped.  For example:  Mr. Burrows approved payments to acquaintances of Mr. Dougherty for little to no work that benefitted the Union; several of the Union employees that Defendants (and Mr. Neill) tasked with personal work also used Union cards to make personal purchases for Mr. Dougherty; and Ms. Crawford misspent Union funds on personal trips and dinners, and she also had personal work done at her house by Union-paid employees and contractors.  Defendants shared a common goal, utilized similar methods to achieve that goal, and tasked many of the same subordinates with executing those methods.  The Court therefore rejects Defendants' claim that the charged conspiracy lacked overlapping goals, methods, and personnel.

For these reasons, the Court finds that the three *Kelly* factors suggest that the Government sufficiently established the existence of a single conspiracy, and there was therefore no variance from the conspiracy charged in the Indictment.[11]  These reasons support the Court's denial of Defendants' pre-verdict Rule 29(a) motions (ECF Nos. 609, 610), and the Court likewise denies Defendants' post-verdict Rule 29(c) motions (ECF Nos. 652, 655, 683).

### B.    Willful Blindness Jury Instruction

Mr. Burrows requests a new trial pursuant to Rule 33 on the basis that there was not sufficient evidence to warrant the Court's willful blindness charge to the jury.  As the Court explained to the jury, the Government may establish knowledge by showing that a defendant

---

[11]    Because the Court finds that no variance occurred, it need not consider whether a substantial right of Defendants' was prejudiced.

"'subjectively believed that there was a high probability that [the fact or circumstance of which knowledge is required for the charged offense] existed' and that the defendant 'consciously took deliberate actions to avoid learning,' or 'used deliberate efforts to avoid knowing' that that fact or circumstance existed." *United States v. Onque*, 665 F. App'x 189, 197 (3d Cir. 2016). Mr. Burrows argues that the evidence showed instead that Mr. Dougherty and an office manager hid Mr. Dougherty's improper expenditures and reimbursements from Mr. Burrows, and that Mr. Burrows was entitled to rely on Mr. Dougherty's affidavit that the expenditures were legitimate. In this framing, Mr. Burrows claims, there was never any indication of Mr. Dougherty's fraudulent conduct that Mr. Burrows chose to ignore.

In *United States v. Stadtmauer*, the Government charged the defendants with conspiring to file tax returns that falsely claimed certain types of expenditures as fully deductible business expenses.  620 F.3d 238, 243 (3d Cir. 2010).  When one defendant argued that a willful blindness instruction was inappropriate because no Government witness claimed that the defendant deliberately shielded himself from incriminating knowledge, the Third Circuit disagreed and explained that evidence of conscious avoidance need only be circumstantial, not direct.  *Id.* at 259 (citing *United States v. Singh*, 222 F.3d 6, 11 (1st Cir. 2000)).  The Court pointed to evidence that the defendant "was intimately involved with the operations of the partnerships, . . . spent very little time reviewing the partnerships' tax returns, and never asked questions of [an accounting firm] as to the propriety of the expenses deducted therein."  *Id.*  From this, a jury could infer that either (1) the defendant "relied in good faith on his accountants to prepare the tax returns consistent with applicable law (and thus had no need to review them closely)," or (2) "deliberately avoided 'ask[ing] the natural follow-up question[s]' . . . ."  *Id.* (quoting *United States v. Wert-Ruiz*, 228 F.3d 250, 257 (3d Cir. 2000)) (alterations in original).  The Third Circuit determined that "[i]n this

context, we conclude that the Court did not abuse its discretion in giving a willful blindness instruction." *Id.* at 260.

*Stadtmauer* patently tracks with this case and makes clear that the Government provided sufficient evidence to justify a willful blindness instruction here. As in *Stadtmauer*, the jury could have drawn from the trial evidence that Mr. Burrows, as the Chairman of the Executive Board and a member of the Finance Committee, was "intimately involved" with the running of the Union yet spent "little time" reviewing the reimbursement and expenditure documents available to him. When also considering evidence that Mr. Burrows (1) received Union-paid construction work to his personal properties and knew that Mr. Dougherty received the same, (2) knew that he and Mr. Dougherty used Union employees to run personal errands, (3) worried about the addition of Executive Board members who would ask too many questions, and (4) did nothing to address concerns from auditors about the Union's reimbursement practices, it is readily apparent why a jury might conclude that Mr. Burrows *deliberately*—not negligently—avoided learning about all of the conspiracy's sub-schemes.[12] For the foregoing reasons, the Court therefore rejects the request for a new trial.

---

[12]     Mr. Burrows also argues that a new trial is necessary because willful blindness cannot support a conviction for criminal conspiracy. Mr. Burrows elides the distinction between willful blindness, which *can* support such a conviction, and negligence, which cannot. The case Mr. Burrows cites makes this very point: "Willful blindness is not to be equated with negligence or a lack of due care," as "a defendant may [not] be convicted simply because he or she should have known of facts of which he or she was unaware." *United States v. Wert-Ruiz*, 228 F.3d 250, 255 (3d Cir. 2000) (citing *United States v. One 1973 Rolls Royce*, 43 F.3d 794, 807–08 (3d Cir. 1994)). The Court's instructions here unequivocally foreclosed the possibility that the jury would convict Mr. Burrows for mere negligence:

> [Y]ou may not find that the defendants knew of the nature of the actions of some of their alleged co-conspirators if you find only that the defendants consciously disregarded a risk that the alleged acts committed by their alleged co-conspirators existed, or that the

### C.     Mr. Dougherty's Knowledge that Mr. Massa Billed the Union for Non-Union Work

Mr. Dougherty points to Mr. Massa's testimony that he did not tell Mr. Dougherty about the fact that he was billing renovations on personal properties to the Union and, in fact, led Mr. Dougherty to believe that he was performing the work for free (in order to curry favor with Mr. Dougherty).   The Government, however, sufficiently established that Mr. Dougherty had knowledge of Mr. Massa's activities.   The trial evidence showed that around the time that this sub-scheme began, and after Mr. Massa invoiced the Union for work performed on the personal residence of an individual who subsequently quit the Union, Mr. Dougherty instructed Mr. Massa to withdraw the invoice to the Union and collect from the individual instead—arguably showing that Mr. Dougherty approved of billing the Union for non-Union work as long as the beneficiary was in favor.   Later, Mr. Dougherty also had extensive contact with Mr. Massa about the renovations at various personal residences and non-Union businesses owned by Mr. Dougherty and his associates, yet Mr. Dougherty never paid a bill for this work.   At a pub in which Mr. Dougherty effectively maintained an ownership stake, tax returns claimed that the business had

---

defendants *should have known* of their existence, or that a *reasonable person would have known* of a high probability that the alleged acts committed by their alleged co-conspirators existed.

*[I]t is not enough that the defendants may have been reckless or stupid or foolish or may have acted out of inadvertence or accident.* You must find that the defendants subjectively believed there was a high probability of the existence of alleged acts committed by their alleged co-conspirators, consciously used deliberate efforts to avoid knowing about them and did not actually believe they were not committed.

(Jury Trial Day 18 Tr. 67:7–23 (emphases added).)   The Court therefore rejects Mr. Burrows's position.

spent less than $3,000 in maintenance over the same five-year period in which Mr. Massa was paid almost $40,000 for work at the pub.  After the execution of search warrants by the FBI, however, Mr. Massa began invoicing Mr. Dougherty, who finally began paying Mr. Massa.  The Government also introduced a post-search call in which Mr. Dougherty worries that investigators will find evidence of an improper arrangement with a contractor.  The jury could have credited Mr. Dougherty's claim that he believed Mr. Massa was currying favor with hundreds of thousands of dollars in free labor, but they ultimately did not—and the Government's evidence was more than sufficient to support that determination.[13]

### D.   *Brady* Violation

In Mr. Dougherty's supplemental Rule 29(c) filing, he argues that a memorandum memorializing prosecutors' decision not to pursue certain charges is exculpatory and, therefore, should have been turned over by the Government.  Prosecutors decided not to prosecute these charges after finding insufficient evidence that Mr. Dougherty knew that a contractor (other than Mr. Massa) had billed the Union for work on the private residence of prior counsel for Mr. Dougherty.  In Mr. Dougherty's view, had he been aware of the reason for this decision, he would have argued to the jury that just like he was unaware of this particular contractor's behavior, so too was Mr. Dougherty unaware of Mr. Massa's fraudulent billing practices.

The prosecutor's interview, however, did not occur until February 2024, and an FBI agent created the report in March 2024—both long after the conclusion of this trial.  Assuming, for the sake of argument, that this material is exculpatory, there was nothing for the Government to turn

---

[13]    To the extent that Mr. Dougherty wishes to portray the contractor sub-scheme with Mr. Massa as the project of Mr. Burrows only, this evidence belies Mr. Dougherty's claim to being merely negligently uninformed.  A jury could have concluded from the foregoing evidence that Mr. Dougherty was aware of the improper billing practices and, to the extent that he did not know every detail about all of the renovations, had deliberately avoided learning of such details.

over until *after* the jury had rendered its verdict in December 2023.  Courts have held that "[i]f the [prosecution] does not possess evidence, it cannot violate its obligations under *Brady* by failing to produce such non-existent evidence."  *Shoulders v. Eckard*, 2016 WL 1213627, at \*1 (W.D. Pa. Mar. 29, 2016) (gathering cases).  Accordingly, this Court rejects Mr. Dougherty's *Brady* claim.

## IV.   CONCLUSION

For the foregoing reasons, the Court denies Defendants' Motions.   During the embezzlement trial, this Court filed an order corresponding to the Rule 29(a) Motions (*see* Order, ECF No. 619) and will file contemporaneously herewith an order corresponding to the Rule 29(c) and 33 Motions.