IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | | |
| | : | CRIMINAL NO. 19-64 |
| JOHN DOUGHERTY | | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

I.    **INTRODUCTION**

Defendant John Dougherty stands convicted of stealing more than $500,000 from the members of Local 98 and depriving the citizens of Philadelphia of the honest services of codefendant Robert Henon, a former member of Philadelphia City Council, by paying him more than $200,000 in bribes.

On November 15, 2021, defendant John Dougherty was convicted of paying bribes to codefendant Robert Henon in the form of salary and benefits from Local 98 worth more than $200,000, between May 2015 and September 2016. Dougherty paid Henon in return for Henon's performance of official acts, which acts, in essence, were anything that Dougherty requested of Henon in his role as a member of Philadelphia City Council.

On December 7, 2023, Dougherty was convicted of embezzling more than $500,000 from Local 98 and the Apprentice Training Fund, from in or about April 2010 through August 2016.[1]

---

[1]    The Indictment was severed into two trials between Counts 1 through 96 (charging embezzlement, tax, and labor bribery offenses against Dougherty, Burrows, Neill, Crawford, Rodriguez, and Fiocca), and Counts 97-116 (corruption counts against Dougherty and Henon).

Defendant Dougherty was the Business Manager of Local 98, the highest ranking and most powerful office in the union.  Dougherty was required by law to protect the interests of the members of Local 98.  During the period charged in the Indictment, 2010 through 2016, Dougherty used his power and authority to steal from the union and to allow his codefendants to do the same.  During 2015 and 2016, Dougherty also used his position to bribe codefendant Robert Henon, a former employee of Local 98 and member of Philadelphia City Council, to perform official acts, many of which benefitted only Dougherty.

For the reasons set forth below, the government requests a sentence within the advisory guideline range as calculated by the Probation Office - a term of incarceration of 135 to 168 months.  This sentence is sufficient, but not greater than necessary, and reflects the seriousness of Dougherty's crimes, promotes respect for the law, promotes general deterrence, and accounts for the history and characteristics of the defendant.

Because two of the victims of the defendant's crimes - Local 98 (and thus its members), and the U.S. government (and its taxpayers) - have losses, that can be quantified, he is required to make full restitution, jointly and severally with his codefendants.  The losses to Local 98 include not only the thefts from Local 98, but also Local 98's expenditures for professional fees paid in connection with the government's investigation and prosecution.

The government has submitted, under separate cover, a proposed order of forfeiture for $353,941.35, which represents the value of property which constitutes or is derived from proceeds that the defendant himself obtained as a result of the offenses of conviction, as alleged in the Notices of Forfeiture of the indictment.

A.      **Counts of Conviction**

On November 15, 2021, following a 25-day jury trial Dougherty was found guilty on Count 97 (conspiracy to commit honest services mail and wire fraud, in violation of 18 U.S.C. § 371); Count 100 (wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2, related to L&I/CHOP); Count 101 (wire fraud, related to Plumbing Code/Building Trades); Count 102 (wire fraud, related to Towing); Count 103 (wire fraud, related to Towing); Count 105 (wire fraud, related to Comcast); Count 106 (wire fraud, related to Comcast); Count 108 (wire fraud, related to Soda Tax #2); and Count 109 (mail fraud, related to L&I/CHOP).

On December 7, 2023, following a 20-day jury trial, Dougherty was convicted on Counts 1, 2, 3, 5-8, 10-13, 15-19, 21-32, 34-36, 38, 39, 41, 43-46, 48-51, 53-66, 67, 68, 70-73, and 75-78. Count 1 charged Burrows, Dougherty, and codefendants Neill, Marita Crawford, Niko Rodriguez, Brian Fiocca, and Anthony Massa with conspiring to embezzle the funds, property, and other assets of Local 98 and the Apprentice Training Fund, from in or about April 2010 through August 2016. Counts 2-41 charged Dougherty and Burrows with embezzlements arising from their use of construction contractor and codefendant Massa to perform maintenance and repair work at multiple properties owned by them or by family members, which was paid for by Local 98 through the submission of false invoices at the direction of Burrows and codefendant Neill (who had previously pled guilty). Counts 43-68 charged Dougherty with wire fraud arising from his use of Local 98 credit cards for personal expenses, and the submission of false expense reports to cover up the thefts, in violation of 18 U.S.C. §§ 1343, 1349, and 2.

Counts 70, 71, 72, and 73 charged Dougherty and Burrows with causing false statements to be made on the form LM-2 that Local 98 was required to file annually with the

- 3 -

Department of Labor for 2015 and 2016, as well as causing false information to be reflected in the books and records of Local 98 for those years.  Dougherty was also convicted of filing false federal income tax returns based on his failure to report the money he embezzled from Local 98 for calendar years 2013-16 (Counts 75-78, respectively).

## II.   OFFENSE CONDUCT

### A.   Dougherty's Corrupt Relationship with Codefendant Robert Henon.

During the period charged in the Indictment, May 2015 through September 2016, Henon was a member of Philadelphia City Council; Dougherty was the Business Manager of IBEW Local 98.  Before Henon was first elected to Philadelphia City Council in November of 2011, he had been employed by Local 98 as its Political Director.  After Henon was sworn in as a member of City Council in January 2012, Dougherty kept Henon on Local 98's payroll.

The following passage in the minutes of the Local 98 Meeting of the Sound and Communication Division of December 13, 2011, reflects that Dougherty, who was the Business Manager at the time, was the person responsible for keeping Henon on the payroll of Local 98 after he was elected to Philadelphia City Council "Business Manager [John Dougherty] talked about Bobby Henon and that he has already been influential in helping us get a project labor agreement at the Philadelphia Airport and assisting at the Family Court Project. Bobby will still play a role in our union operation and will collect a check from Local 98."[2]  As proven at trial, Henon was given, and accepted, the salary and other benefits from

---

[2]   The parties stipulated that Dougherty, as Business Manager, had the authority to approve the hiring of anyone paid by Local 98, and that Henon's employment at Local 98, after he was sworn in as a member of City Council on January 6, 2012, was not submitted to any officer, employee, agent, or committee of Local 98 for approval. See Gov. Ex. 414 (corruption trial).

Dougherty, through Local 98, in exchange for Dougherty's influence and control over Henon's official actions from at least May 2015 through September 2016.

During 2015 and 2016, while Henon was a full-time member of City Council, Henon collected a salary from Local 98 of $70,649 in 2015 and $73,131 in 2016. During the same period, Dougherty gave Henon tickets to sporting events, valued at approximately $20,509.05; the tickets were paid for by Local 98.

On November 13, 2015, Dougherty provided an apt description of his relationship with Henon when he told then-Councilman James Kenney, "He's on my payroll."[3]  The evidence showed that Dougherty got what he paid for.  Every time he demanded that Henon take some official action that Dougherty wanted, Henon held up his end of their corrupt bargain.  He never said no. He never refused any of Dougherty's demands.  Such corruption undermines the basic tenet of a civilized society: public trust in government.  The seriousness of the harm that the defendants' conduct has inflicted upon the City of Philadelphia and the public cannot be overstated.

### 1.    Dougherty and Henon Hide the True Nature of their Relationship.

Neither Dougherty nor Henon ever disclosed to Local 98, the public or other elected officials the true nature of the salary and other things of value Henon received from Local 98,

---

[3]  On November 17, 2015, Marita Crawford, who frequently relayed orders from Dougherty to Henon, told Tommie St. Hill (who was paid by Local 98 as a consultant during 2015 and 2016), addressing rumors that Henon was considering running for Majority Leader in City Council, "If John wants to do it. Maybe John says, don't run for Majority, I don't know but . . . John is the boss, that's it . . . Not Bobby, nobody."

which was that Dougherty gave them to Henon in return for any official action that Dougherty wanted Henon to take on his behalf.

Henon disclosed that he received a salary from Local 98, but he never disclosed to anyone that this salary (as well as other undisclosed benefits) was not provided for union labor, but solely to assure his compliance with Dougherty's direction on matters before his City Council office.

On Local 98's annual LM-2 reports filed with the United States Department of Labor in 2015 and 2016, Henon's position was described as "office staff." On annual financial disclosure forms that Henon was required to file with the City Board of Ethics in 2015 and 2016, specifying the source, but not the amount, of income over $500 and gifts over $200 (in the aggregate), Henon identified Local 98 as a source of income, describing his position as "electrician," while not disclosing any gifts. Henon did no office work for Local 98, nor did he ever perform any electrical work for the union.

Dougherty went even further, making several false statements in an attempt to distance himself from Henon. On May 4, 2015, Dougherty called Henon to discuss an editorial that appeared in the Philadelphia Inquirer on May 3, 2015, which was critical of Dougherty and his close relationship with Henon. Dougherty told Henon that he was dictating a response to the editorial to the spokesperson for Local 98, that the response would be drafted so it would appear to be from Henon, and that it would say that Henon operated independently of Dougherty. Dougherty further advised that the response would state that Dougherty only called Henon "four times in four years." The proposed submission, under Henon's byline, stated, in

part, that "John [Dougherty] has never asked me to vote a certain way or introduce legislation on his behalf . . . I'm lucky if I hear from him more than once every few months." PSR. ¶ 144.

On November 30, 2015, Dougherty told a Local 98 employee, "Look, for me personally, okay, for me personally I've never called Bobby . . . I know he gets, a little annoyed when, I, I get like this, like on point, but it's the only time [during the Comcast Franchise Agreement negotiations] I have ever called him for anything that I wanted." On November 30, 2015, Dougherty told a labor consultant, "This [Comcast Franchise Agreement] is the only thing I've asked him since he's been in Council." On December 3, 2015, Dougherty told a Philadelphia City Council member, "I was dealing with Bobby . . . And I only deal with him sporadically." PSR. ¶ 144. These false statements clearly reflect Dougherty's awareness of the illegal nature of his relationship with Henon.

### 2.   Officials Acts Demanded by Dougherty and Performed by Henon.

#### a.   Dougherty Misuses the Department of Licenses and Inspection to the Detriment of CHOP.

On two separate occasions in July and August of 2015, on Dougherty's orders, Henon delayed and impeded the installation of MRI and MRI/PET machines at Children's Hospital of Philadelphia (CHOP).  The defendants' actions were especially egregious because the work they stopped involved the installation of extremely sophisticated, and lifesaving but potentially dangerous diagnostic equipment, which was being installed by technicians hired by the companies who manufactured the machines.  An inspector from L&I who analyzed the situation concluded that these technicians were the most qualified people to install the equipment.  Although CHOP had used union labor to construct the building into which the MRI machines were being installed, if the technicians hired by manufacturer of the machine

did not install it, CHOP would lose the warranty on the equipment, which cost millions of dollars.

None of this mattered to Dougherty. In July 2015, when Dougherty learned that a non-union company was installing an MRI machine at CHOP, he directed a Local 98 employee to contact Henon, who immediately called L&I Commissioner Carlton Williams. Henon's call to Williams prompted L&I to send an inspector to CHOP. The supervisor of the inspector subsequently ordered the job to be shut down for failure to secure an electrical permit, use of an unlicensed contractor, and failure to have a commercial activity license. When Dougherty subsequently learned that the installers had resumed work at CHOP, he angrily called Henon, who claimed responsibility for L&I's initial action, and said he would get right on it.

In August 2015, Dougherty again requested Henon to contact L&I about the installation of another similar sophisticated diagnostic machine, an MRI/PET machine, that was being installed at CHOP. When Henon later learned from the Local 98 official that the machine's manufacturer was installing the MRI/PET machine, Henon promptly contacted L&I Commissioner Williams about the installation. Williams directed employees to again inspect the CHOP facility. On August 20, 2015, L&I issued a stop work order to the contractor. Because of administrative delays, the stop work order remained in place for months.

L&I Inspector Robert Donsky testified that he inspected the job site, talked to all parties involved in the installation, and determined that the employees of the manufacturer were the best qualified people for the job, and there was no L&I violation, because no electrical permit was required. Donsky said that, despite his observations and conclusions, his supervisor ordered him to issue a stop-work order.

In short, in these instances, Dougherty had Henon use his position as a public official to improperly shut down machine installations at Children's Hospital, in an attempt to get Local 98 work that electricians were not qualified to do, at a facility that had been built with union labor, preventing the medical professionals at CHOP from most effectively treating sick children.

> **b. Dougherty has Henon Delay Legislation to Help Dougherty Become the Business Manager of the Building Trades.**

In September of 2015, Dougherty was running for Business Manager of the Building Trades,[4] a position that would pay him an additional $147,000 a year. Dougherty knew that the Plumbers Union opposed him. Henon, who, as a member of Council was involved at the time in revising the Philadelphia Plumbing Code, knew this also. To assist Dougherty, Henon agreed to advocate replacing the local plumbing code with the International Plumbing Code, which he knew the Plumbers Union did not want, and then hold it, to, in his words, "make Plumbers come to him," to force the head of the Plumber's Union to vote for Dougherty for Business Manager of the Building Trades.

On August 20, 2015, Henon asked Dougherty what he should do concerning the pending Plumbing Code legislation which, he said, "the plumbers don't want." He told Dougherty that he was considering introducing and then holding the legislation until the new mayoral administration took office in January 2016, so that the Plumbers would have to go through him. Dougherty immediately told Henon to "do it," to help Dougherty be elected Business Manager of the Building Trades. Dougherty stated that he believed the head of the

---

[4] The Building Trades is an organization made up of unions representing various trades, such as electricians, plumbers, glazers, and sheet metal workers.

Plumbers Union was going to vote against Dougherty for Business Manager of the Building Trades.[5] At the end of the conversation, Henon reminded Dougherty that "this is an us thing."

Once again, Dougherty's personal desires drove Henon's actions as a member of City Council. There was no discussion of the merits of the plumbing legislation, or of alternative courses of action.

On September 2, 2015, Henon attended the meeting of the Building Trades at which defendant Dougherty was elected Business Manager. As recounted by Dougherty, Henon told the other union leaders that he "heard you want to get in on that bill me and Johnny are doing with Jimmy Kenny," reminding them all that Henon was there in his capacity as a member of City Council.

### c. Henon Holds Up the Comcast Franchise Agreement for Dougherty.

During 2015, Comcast, a cable service provider, was negotiating the terms of the renewal of a 15-year franchise agreement with the City of Philadelphia to provide cable service within the City.  The negotiations started in early 2015 and involved representatives of the Mayor's Office, the Philadelphia Office of Technology, Comcast officials, other members of City Council, and public interest groups.  In November 2015, the parties reached a tentative agreement.

The night of November 30, 2015, after hearing that the City and Comcast had reached a consensus on the franchise agreement, Dougherty made several angry telephone calls, two of which were to Henon.  During one of those calls, Dougherty reminded Henon where his loyalties should lie - "[W]ithout an agreement from me? What the h***, that doesn't do me any

---

[5]       This conversation contained the following exchange:
RH:      F*** the Plumbers.
JD:      Do it because it helps me with the Building Trades thing.

good." By the end of the second call with Dougherty that night, Henon agreed to act on behalf of Dougherty, not the public.

To appease Dougherty, Henon agreed to hold up the franchise agreement, which was valued at more than $30 million to the City of Philadelphia, and was designed, in part, to provide low-cost or free Internet service to millions of its citizens. Even Henon's staff was confounded by his quick about-face.

On December 2, 2015, the day before the Public Property Committee was scheduled to vote on moving the franchise agreement out of committee, Dougherty used Henon's Philadelphia City Council chambers to meet with the Comcast officials who were negotiating the franchise agreement. No one who had been negotiating the agreement on behalf of the City of Philadelphia was present. During this private negotiation, which Dougherty conducted, Dougherty delivered an ultimatum: if Comcast did not agree to give certain work to members of the Building Trades, the agreement would never get out of committee. In emails to colleagues, the lead negotiator for Comcast described Dougherty's demands as extortion.

The next morning, December 3, 2015, Dougherty reminded Henon, "Last time I checked, you weren't getting anything from Comcast." During another call with Dougherty a few minutes later, after explicitly noting what a good deal the Comcast Franchise Agreement was for the City, Henon told Dougherty, "I'm not gonna do it without. . . without, without us, right, you." Comcast agreed to Dougherty's demands. Later that day, Henon voted to move the Franchise Agreement out of committee. It was approved by the full City Council a week later.

       **d.  Dougherty has Henon Draft a Towing Resolution Because Dougherty was Angry That a Tow Truck Driver Would Not Accept Payment by Credit Card After His Car was Towed.**

On September 22, 2015, at night, while his car was being towed because it was parked illegally, Dougherty made five frantic and angry phone calls to Richard Lazer, who was working on the transition team for Mayor-elect Kenney and was also on Dougherty's payroll. During the last call, Dougherty told Lazer that he was going to go to Henon and "there will be a bill in Council next week" to "f***" the George Smith Towing Company (and another company that Lazer mentioned). Dougherty also told Lazer, in the same call -- despite having not communicated directly with Henon about this yet -- that "Bobby Henon will put a bill in tomorrow."

Later that night, Dougherty called Henon, told him about the towing incident, and said, "I think tomorrow we f***ing put in a bill to certify," and that "I think what we do it, we . . . we'll f***ing put a bill through council." Dougherty also told Henon in that call to "hold hearings again on them," to which Henon replied, "Yep. Yeah, I'll get something, I'll get something together."

A week later, Henon's Chief of Staff ordered a staff member, by email, to draft a resolution "calling for hearings into practices and procedures used by George Smith Towing." She also directed the staff member to: "Make sure you include language in it that enables us to subpoena witnesses."  Dougherty's primary complaint to Henon had been that the tow truck driver did not accept payment by credit card to pay the fee to release his car, and therefore was unable to give him $10 in change, telling Henon, "That $10 is going to cost their f***ing industry a bundle."  The draft resolution reflected that it was "for the purposes of protecting the general welfare and public interest of the residents of Philadelphia," when in fact the purpose

of the draft resolution, which was never introduced, was to punish a specific business due to a petty and vindictive demand by Dougherty.

> **B.**    **Dougherty Abused his Power and Authority by Stealing from the Members of Local 98 and Allowing his Codefendants to do the Same.**

As the Business Manager of Local 98, Dougherty held the most powerful and highest office at the Local. He was a fiduciary of Local 98 and all Trust funds associated with Local 98 and all related entities, such as the Apprentice Training Fund. As such, he had a legal duty, set forth in Section 501(a) of Title 29 of the United States Code, to hold the money and funds of Local 98 solely for the benefit of the union and its members. 29 U.S.C. § 501(a). The evidence proved that he repeatedly violated his duty to the members, stole money from them for his personal benefit, and allowed his codefendants, including Local 98 President Brian Burrows and Michael Neill, head of Apprentice Training, to do the same.

Dougherty was required by virtue of his office, by statute, the IBEW Constitution, and the By-Laws of Local 98, to oversee the finances of Local 98 and protect the interests of its members.  He chose the interests of himself and his codefendants over the interests of his members. The IBEW Constitution, excerpts of which are set forth below, describe the authority of the business manager of an IBEW local:

> **ARTICLE XVI DUTIES OF LOCAL UNION OFFICERS**
>
> **Business Manager**
>
> Sec. 2. L.U.'s requiring a local business representative or representatives, shall elect one person to be known as a business manager. **He shall appoint any and all other representatives or assistants. These shall work directly under him and be subject to his authority. He may discharge them at any time**. When a representative or assistant is discharged by the business manager, he shall not be reemployed or paid by the L.U. in any capacity during the term of office of such business manager without his consent. However, this does not disqualify any discharged assistant or

representative from running for office at the next election. **The business manager shall be the principal officer of the L.U. and all other L.U. officers shall cooperate with the business manager and shall not work in conflict with him.** (Emphasis added.)

Sec. 8. **The business manager shall be the principal officer of the L.U.** and shall be held responsible to the L.U. and to the I.P. for results in organizing his jurisdiction, for establishing friendly relations with employers, and for protecting the jurisdiction of the I.B.E.W It shall be his responsibility to keep accurate statistics, or to see that such statistics as required by the I.P. are kept, and shall cooperate fully with the Research and Technical Services Department of the I.B.E.W. **The business manager or his designee shall serve as** a permanent member of the negotiating committee and serve as **a trustee on all trust funds of the L.U. provided for in the collective bargaining agreements.** He shall attend all meetings of the L.U. Executive Board and have a voice but no vote. He shall have such authority and perform such other duties as are provided in this Constitution or may be provided for in the L.U. bylaws. (Emphasis added.)

The success of the conspiracy of which Dougherty and Burrows were convicted, and which codefendants Michael Neill, Marita Crawford, Niko Rodriguez, Brian Fiocca, and Anthony Massa joined, depended on hiding the true nature of the unlawful expenditures from the members of Local 98, from whom the money was being stolen. The position of power and authority that Dougherty held, and the way he wielded it, prevented anyone from questioning his criminal conduct. Additionally, the Local 98 official in the best position to question Dougherty, and to stop him, was codefendant Brian Burrows, a coconspirator and participant in the embezzlements.  The Executive Board, of which Burrows was the Chairman, did not conduct any meaningful review or oversight of the ways in which the funds of Local 98 were spent.  Similarly, Burrows was a member of Local 98's Finance Committee, which was allegedly monitoring Dougherty's undocumented use of more than $50,000 of cash that came from Local 98.  No one in any position of authority ever questioned or confronted Dougherty about anything.

- 14 -

Defendant Dougherty's thefts demonstrated a sense of entitlement that was on full display on October 30, 2015, when Dougherty offered a membership to the Sporting Club at the Bellevue in Philadelphia to a family member, explaining that "I got a different world than most people ever exist in. I am able to take care of a lot of people all the time." The defendant neglected, however, to add that his apparent generosity was, in fact, funded by the members of Local 98.

### 1. Examples of Dougherty Thefts for his Personal Benefit and that of this Family and Close Friends

#### a. Use of Local 98 Credit Cards for Personal Purchases

Dougherty repeatedly used, allowed, and encouraged others close to him to use, Local 98 credit cards to make personal purchases, and then had Local 98 pay for these expenses by submitting false expense reports that contained a fictitious description of a business purpose for the expenditures. Dougherty even went so far as to arrange to have more than one credit card issued to him by Local 98 so that there would be a card he could give "the kids" (employees of Local 98 who effectively served as his personal assistants) to make purchases.

These personal purchases on the Local 98 cards in Dougherty's name included an array of meals as well as innumerable personal items, including not only gasoline for Dougherty's father's car, but groceries from Target. In each instance, Dougherty told Lisa Ketterlinus, the Local 98 employee tasked with helping Dougherty complete his expense reports, that these items were business expenses. When Ketterlinus noticed the large number of purchases from Target, and the absence of receipts (which, of course, would have shown the nature of the items purchased), she eventually reached out to the Target store and made plans to get the receipts for these purchases. Dougherty intervened, telling Ketterlinus that he himself would go to the store to get the receipts, and later reporting back that the store was unable to produce

them.  *See* Trial tr. 11-7-23 at p. 83-90 (Ketterlinus testimony); Gov. Ex. 47 (Ketterlinus note about Target contact).

Among the hundreds of these thefts in the form of personal purchases on Dougherty's Local 98 cards were not only various and sundry items for his household, including a vacuum cleaner, *see* Gov. Ex. 20 at p. 4, a coffee machine, *see* Gov. Ex. 20 at p. 1, new patio cushions for his front porch, *see* Gov. Ex. 20 at p. 21; groceries, including numerous cases of bottled water and packages of baby wipes, *see e.g.* Gov. Ex. 20 at p. 23 (purchase commenced when Dougherty's wife texted him "We need water") and p. 19 (purchase occurs after Dougherty tells Niko Rodriguez: "We gotta do an H20 and a wipe thing"), and a birthday cake for his father, *see* Gov. Ex. 20 at p. 22; but also expensive clothing for Dougherty, *see* Gov. Ex. 20 at p. 6; as well as a multitude of meals for his family, friends, and those he favored for personal reasons.  These meals ranged from expensive takeout meals from The Palm, *see* Gov. Ex. 20 at pp. 24 & 26, to sit down dinners for members of his family before attending a musical, Gov. Ex. 20 at p 29, to a dinner for his wife's birthday, *see* Gov. Ex 200, to a dinner to celebrate Marita Crawford's birthday,[6] *id.,* to family meals and carryout at casual restaurants.  *See* Gov. Ex. 20 at p. 14 (Famous Dave's barbeque) and p. 16 (Old Original Nick's Roast Beef sandwiches).

Dougherty's extensive and various ways of embezzling from Local 98 resources sometimes overlapped and crossed into different aspects of his life.  For example, while on a gambling trip with codefendant Marita Crawford (during which some personal meals were

---

[6] The parties stipulated at trial that the defendant and Crawford were having an affair during the period of the charged conduct, which was relevant to prove that the charged expenditures of Local 98 funds that were for the benefit of Crawford, the Political Director of Local 98, were personal, and not made for the benefit of the union as whole.

charged to Local 98 credit cards)**,** *see* Gov. Ex. 273, Dougherty had a Local 98 employee use a Local 98 credit card to buy roses for Dougherty's wife. *See* Gov. Ex. 20 p 18.

### b. Personal Purchases on Dougherty's Personal Credit Card Claimed as Business Expenses

Dougherty also used his personal credit card for personal purchases that he falsely claimed were business expenses, and obtained reimbursement for from Local 98.  He was convicted on Counts 11, 22, and 30, which charged him with embezzlements arising from such purchases.  Even though to make such claims for reimbursement, Dougherty had to take affirmative steps (such as submitting his statement from his personal credit card and affirmatively requesting reimbursement), for almost every month between January 2013 and January 2016, Dougherty received a reimbursement check for business-related transactions he falsely claimed to have made using his personal card. Unlike his expense reports on which he was required to document the reason for his use of his Local 98 card, which he routinely submitted months late, Dougherty regularly submitted these false reimbursement claims on a timely basis, almost immediately after receiving the statement for his personal American Express card.

Among the personal expenditures on his personal card that Dougherty claimed were business expenses were purchases of boxes and a meal for "the kids" who were sent to the New Jersey shore to pack up Dougherty's vacation rental home, *see* Count 22; Gov. Ex 23 at pp. 3 and 4; and a purchase of food for his wife and his in-laws that Dougherty directed one of "the kids" to make on Monday, August 26, 2015, while Dougherty and his wife travelled back from the New Jersey shore.  *See* Gov. Ex. 23 at p. 3.

- 17 -

### c.  Personal Cash Expenditures Claimed as Business Expenses

Dougherty also sought reimbursement for cash expenditures for personal purchases that he falsely claimed were business purchases.  Among the examples of this theft proved at trial was the theft charged in Count 41, on which Dougherty was convicted for falsely claiming that the cash he spent to buy food for a birthday celebration for Marita Crawford's son (one of the "kids," Thomas Rodriguez), was a business expense.  Other examples included numerous brunches with his wife, other meals for various family members, and purchases of hams – for his family and for Crawford - that he audaciously claimed were donated to charity.  *See* Gov. Ex. 22.

### d.  Purchases of Event Tickets for Family and Friends

Even though Local 98 spent millions of dollars on tickets and suites at local sports arenas, Dougherty also ordered the additional purchases of tickets to concerts and sporting events for his family and friends.  Between May 2015 and May 2016, these ticket purchases cost Local 98 at least $15,698. The purchases included concert tickets for his daughter Erin Dougherty, his nieces, and Marita Crawford's family and friends, and theater tickets for his wife and sister. *See* Gov. Ex. 46; Trial tr. 11-28-23 at pp. 109-110 (Blake); Gov. Ex. 2-102a.

### e.  Theft of Cash

As of August 4, 2016, Dougherty had received $53,778.04 in cash from Local 98's COPE (political action committee) funds that were unaccounted for in union records.[7]  At trial, it was shown that on May 19, 2015, Dougherty had received $13,791.00 of this cash,

---

[7]  The trial evidence showed that, in addition to these COPE funds, Dougherty also took $1,000 from Local 98's general "petty cash" fund in May of 2016, and put that in his "personal" petty cash till. *See* Gov. Exs 67B & 68B. This additional $1,000 in loss to Local 98 does not appear to be included in the PSR.

ostensibly for the primary election.  Records from numerous local retailers showed that between May 21, 2015, and May 31, 2015, Dougherty spent $11,587.96 in cash on personal items, including at luxury clothing stores in Philadelphia, such as $1,345.30 at Brooks Brothers and $7,000.00 at Boyds for suits for himself and his brother.

### f.  Claimed Cash Gratuities

Between July 1, 2015, and January 11, 2016, Dougherty falsely claimed to have spent $1,600 of his own money on cash gratuities for which he requested reimbursement from Local 98 (Job Recovery Fund). Calls to which Dougherty was a party or pole camera video showed that Dougherty was not present at several of the events at which he claimed to have given cash tips.  His claim - that he gave cash even though he did not attend - was refuted by other evidence, included at least one call captured on the Court-authorized wiretap, in which he expressly instructed Crawford, who was at the event, to leave the tip on the union's credit card, and not to leave cash. Trial tr. 11-28-23 at pp. 129-134 (Blake); Gov. Ex. 10-12325a. Moreover, the trial testimony made clear that as early as 2012, Ketterlinus discerned, and pointed out to Dougherty, that his claimed cash tips were often in addition to tips left on the union's credit cards, *see e.g.,* Trial tr. 11-7-23 at pp. 128 & 129 (Ketterlinus), resulting in unreasonably large tips. *Id.* (Ketterlinus' calculations included an example that showed that if cash was actually given on top of the credit card gratuity, tip would have been 72%).  Because he (correctly) believed he could nonetheless get away with it, Dougherty continued to claim reimbursements for cash he allegedly left for tips at events he did not attend.  Trial tr. 11-7-23 at p. 129 (Ketterlinus).

### g.  Use of Local 98 Employees for Personal Errands and Chores

The trial evidence showed that Dougherty frequently used Local 98 employees to do personal chores and errands for him.  These tasks included picking up Dougherty's dry cleaning, making runs to his bookmaker, washing his stoop, buying goods at Target to deliver to his home, washing and gassing his father's car, running errands to the New Jersey shore to check on his father's house or retrieve his father's mail, or setting up (and breaking down) Dougherty's shore vacation rental house, picking up and delivering food to his extended family, and cleaning and organizing Marita Crawford's home.

Even though this was a theft from Local 98, *see, e.g.*, *United States v. Rumore*, 2008 WL 2755827 *5 (SDNY 2008) (union official's expenditure of union funds for chauffeuring the official's daughters from school, working on the official's house, running personal errands was theft or embezzlement, as it is "self-evident that the value of labor paid for by an organization is an asset of that organization"), in light of all the other more clearly calculable losses, the government did not calculate the amount lost wages that this cost the union in the PSR's calculation of loss in this case.  Nonetheless, this conduct should be considered in determining the appropriate sentence.

### 2.  Examples of Dougherty Paying Family Members and Friends and for Services not Performed.

Dougherty used Local 98 funds to pay family members and friends for hours they did not work and for tasks they did not perform.

Dougherty had Local 98 pay his nephew, Sean Dougherty, $8,000 for weeks when he was on vacation or attending school full-time. Defendant Dougherty even called his brother Kevin Dougherty, Sean's father, to tell him about the weeks he paid Sean while Sean was attending college. Dougherty also had Local 98 pay Maureen Fiocca, his niece, who had been

hired by Dougherty as a summer employee, a total of $5,400 for hours she was not working, attending college as a full-time student/athlete, and on a college trip to Costa Rica. Dougherty also had Local 98 pay $3,995.00, from the Local 98 Job Recovery Fund, for the travel and housing of Maureen Fiocca and a classmate to attend a basketball tournament in Costa Rica sponsored by her college.

Keeley Peltz, the daughter of George Peltz, an electrical contractor and close friend of Dougherty who was charged separately, was hired by Dougherty to intermittently work for Local 98 and was paid a total of $13,500.00 for hours she did not work and while she was attending college. This total also included a check for $1,500.00, which Dougherty gave her because she was purchasing a new house.

Dougherty's nephew George Fiocca was paid $7,500 for consulting work that was not performed. Dougherty told Fiocca to submit the consulting invoices because Fiocca needed the money to pay for a house he had recently purchased.

Dougherty paid Bruce Bennett, a close friend of Marita Crawford, $1,500 in Local 98 funds for electrical work he completed at Crawford's house. Dougherty also paid Local 98 consultant John Cooper $5,000 in Local 98 funds to accompany Marita Crawford to Florida on a personal trip. During recorded conversations with Crawford, Cooper told Crawford that he did not want to accept the $5,000 from Dougherty. During the last of the calls, he told Crawford " . . . Johnny talked to me today and I said f**k it, 'cause he wants somebody to go with ya, he's got another check for me for five grand, he told me."

### 3. Dougherty Had His Personal Construction Expenses and Those of His Family Paid by Local 98.

Defendants Dougherty, Burrows, and Neill fraudulently used the funds of Local 98 and the Apprentice Training program to pay contractors, including codefendant Anthony Massa, to

work on their homes, other properties they owned, and the homes of family members and close friends.  Dougherty frequently called Massa to perform repairs, restoration and remediation work at his home and homes of his family.  Local 98 paid for work at the residence of his daughter Erin Dougherty (Count 2), the residence of his sister Maureen Fiocca (Count 3), Doc's Union Pub (Counts 19 and 35) of which he owned a one-third interest, his residence (Counts 23, 34 and 39), and the residence of his father (Counts 24 and 36).  As a direct result of these false billings, which were orchestrated by codefendants Burrows and Neill, Local 98 paid approximately $380,000 to Massa Construction for work on personal properties owned by Dougherty, Burrows, Neill, and their families.[8]

## III.   SENTENCING CALCULATION

### A.   Statutory Maximum Sentence – Honest Services Bribery Counts

Dougherty was convicted of conspiracy to commit honest services mail and wire fraud, in violation of 18 U.S.C. § 371 (Count 97), and related substantive honest services wire and mail fraud counts, in violation of 18 U.S.C. §§ 1341, 1343, and 1346 (Counts 100-103; 105, 106, 108) and 109, arising from his payment of bribes to Henon in the form of Henon's Local 98 salary, benefits, and tickets.

The defendant is subject to the following statutory maximum sentences:

Count 97 (conspiracy to commit honest services mail and wire fraud, in violation of

---

[8] During and post-trial, Dougherty argued that he was unaware of the false billings submitted by Burrows.  In its ruling on the defendants' post-trial Rule 29 Motions, this Court rejected that argument, stating that, "As the jury appears to have concluded, it simply defies credulity that Mr. Dougherty was not aware and involved in the contractor sub-scheme;" ECF 747, p.14-15 n. 9, and, "[t]o the extent that Mr. Dougherty wishes to portray the contractor sub-scheme with Mr. Massa as the project of Mr. Burrows only, this evidence belies Mr. Dougherty's claim to being merely negligently uninformed. A jury could have concluded from the foregoing evidence that Mr. Dougherty was aware of the improper billing practices and, to the extent that he did not know every detail about all of the renovations, had deliberately avoided learning of such details." *Id.*, p. 21 n. 13.

18 U.S.C. § 371) - 5 years;

Counts 100-103; 105, 106, 108 and 109 (honest services fraud counts, in violation of 18 U.S.C. §§ 1341, 1343, and 1346, arising from his corrupt relationship with codefendant Robert Henon) - 20 years each;

The maximum total statutory sentence faced by the defendant is a term of imprisonment of 165 years, a fine of $2,250,000 ($250,000 per count), three years of supervised release, and a mandatory $900 Special Assessment. Forfeiture of all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offenses charged in Counts 97, 100-103; 105, 106, 108 and 109 may also be ordered.

### B.     Statutory Maximum Sentence – Embezzlement and Tax Counts

The defendant is subject to the following statutory maximum sentences:

Count 1 (conspiracy to embezzle labor union and employee benefit plan assets, in violation of 18 U.S.C. § 371) - 5 years' imprisonment;

Counts 2, 3, 5-8, 10-13, 15-19, 21-32, 34-36, 38, 39, and 41 (embezzlement and theft of labor union assets, arising from the false billing of maintenance and repair work at multiple properties owned by Dougherty, his family, his codefendants, and others, which was paid for by Local 98, in violation of 29 U.S.C. § 501(c)) - 5 years' imprisonment per count;

Counts 43-46, 48-51, 53-66, 67, and 68 (wire fraud counts, in violation of 18 U.S.C. §§ 1341 and 1343 arising from arising from Dougherty's use of Local 98 credit cards for personal expenses, and the submission of false expense reports to cover up the thefts - 20 years imprisonment per count;

Counts 70 and 71(falsification of labor union annual report, in violation of 29 U.S.C. §§ 431 and 439(b)) - one year imprisonment per count;

Counts 72 and 73 (falsification of labor union financial records, in violation of 29 U.S.C. §§ 436 and 439(c)) - one year imprisonment per count;

Counts 75-78 (making and subscribing to false federal income tax returns, in violation of 26 U.S.C. § 7206(1)) - 3 years' imprisonment per count.

Counts 1 2, 3, 5-8, 10-13, 15-19, 21-32, 34-36, 38, 39, 41, 43-46, 48-51, 53-66, 67, 68, 75-78: The maximum fine is $250,000 per count. 18 U.S.C. § 3571(b)(3). Counts 70-73: The maximum fine is $100,000 per count. 18 U.S.C. 3571(b)(5).

- 23 -

The maximum total statutory sentence faced by the defendant is a term of imprisonment of 1,096 years, a fine of $17,650,000, three years of supervised release, and a mandatory $7,300 Special Assessment.  Forfeiture of all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offenses charged in Counts 1, 2, 3, 5-8, 10-13, 15-19, 21-32, 34-36, 38, 39, 41, 43-46, 48-51, 53-66, 67, and 68 may also be ordered.  Restitution also shall be ordered.

**C.     Statutory Maximum Sentence – All Counts of Conviction**

The maximum total statutory sentence faced by the defendant on all counts of conviction on Indictment No. 19-64 is a term of imprisonment of 1,261 years, a fine of $19,900,000, three years of supervised release, and a mandatory $8,200 Special Assessment.

**D.     Sentencing Guidelines Calculation - All Counts of Conviction**

The Guidelines calculation set forth in the Presentence Investigation Report results in an advisory Guideline Range of a term of imprisonment of 135 months to 168 months, based on a total offense level of 33 and a Criminal History Category of I.  The government concurs. The offense level calculation is as follows:

**Honest Services Fraud**

| | | |
|---|---|---|
| Base Offense Level: U.S.S.G. § 2C1.1(a)(2) - | | +12 |
| More than One Bribe: U.S.S.G. § 2C1.1(b)(1) | | +2 |
| Value of Payments: | U.S.S.G. § 2C1.1(b)(2); 2B1.1(b)1(F) - total value of the benefits received exceeded $150,000 but was less than 250,000 | +10 |
| Offense involved an elected public official: U.S.S.G. § 2C1.1(b)(3) | | +4 |
| Aggravating Role - 3B1.1(b) The defendant was an organizer or leader and the criminal activity involved five or more participants or was "otherwise extensive." | | + 4 |
| Total Offense Level | | 32 |

**Embezzlement**

| | |
|---|---|
| Base Offense Level – 2B1.1(a)(2): | 7 |
| Loss ($591,341.24) (b)(H) $550,000 - $1,500,000: | +14 |
| Aggravating Role - 3B1.1(b) The defendant was an organizer or leader and the criminal activity involved five or more participants: | + 4 |
| Abuse of a position of trust – 3B1.3: | + 2 |
| Total: | 27 |

**Filing of False Tax Returns**

The tax loss caused by the filing of false returns by Dougherty was between $40,000 and $100,000, specifically, $83,856.00; therefore, the base offense level for the tax offenses is 14, which is increased by 2 levels because the defendant failed to report or to correctly identify the source of income exceeding $10,000.00 in any year from criminal activity. Because the total offense level for the tax offenses is 16, it does not affect the total range applicable to the defendant under the Grouping Rules.

**The Total Offense Level is 33.**

Pursuant to USSG §3D1.4(a), (b) and (c). the group with the highest offense level, the honest services counts (32), is increased by one level, resulting in a total offense level of 33. *See* PSR, ¶¶ 186-192.  Based on a total offense level of 33 and a criminal history category of I, the guideline imprisonment range is 135 months to 168 months.

**IV.   POST-INDICTMENT THREATS MADE BY DOUGHERTY**

The Indictment in this case was returned in January of 2019.  In the months that followed, instead of trying to reassure the employees and members of Local 98 that no matter the outcome of the pending criminal case, he would make sure their future, and the future of

their union, was secure, Dougherty, who remained Business Manager until November 16, 2021 (the day after his first conviction), chose instead to spread fear of retribution and attempt to intimidate potential witnesses. This conduct clearly warrants consideration at sentencing.

On November 2, 2019, Dougherty spoke at a Local 98 meeting attended by approximately 30 Local 98 officers, business agents, organizers, consultants, and employees. During the meeting, he made the following statements about and threats directed to any Local 98 members and employees whom he believed were speaking to the FBI:

> I got three contracts, an election, and a legal issue next year. **And for the one or one person or whoever, is a f\*\*\*ing p\*\*\*y in the room who continues to sit here and eat at this table, and f\*\*\* us by putting out little information, I'm getting close to you baby I'm getting close to you. You're never going to see it coming.** I'm this close to you. Right now. [name of Local 98 employee], how close am I?

> [employee]: That close.

> JD: Okay? I'm this close. You're never going to see it coming. This ain't wanna fire ya. Okay? You'll know it's happening when it happens. Okay? And be nice to your family too. **You going to f\*\*\* around with that mouth I'm coming after everything you have, and everything you f\*\*\*ing own.** Lawyers, everything. I've picked up mail at f\*\*\*ing State Rep. offices, City Council office, I picked up mail outside some of your houses. Okay, I'm this f\*\*\*ing close. Okay? **And I want you to run to the IO [IBEW International]. I want you to run to the Feds.** I want you to go there. Because everything I'm going to do is by the book. But at the end of the day, none of you when you find out, you won't be living in this area, okay? Because I find it unbelievably weak and womanly that you can sit here. In fact, I told some of ya, I'm not sure who I'm paying when I leave here. So that way you can get together with [former Local 98 employees] and run a whole different team of things.

> So, when I beat you, I can get rid of you, anyway and then I can come back and sue you. For not showing up for work, all the things I've been meeting with lawyers about. For not doing your job. I can sue you for the $21,000 I have to hire other people, to do your job. You understand how I'm not real happy, with the fact that, ok, that you sit here, and act like you're part of the union, you're not part of the union. Okay . . .

> You guys understand? What you're supposed to do? You understand that right? Okay? If you got, listen, if you're so far in, **on something that you've got to sit here and rat or make up, you should just take the easy**

**way just go right to the bridge and jump and free fall. I'll give you a gift, the gun's in my car. I'll have somebody pick up the truck later. Go right to the bridge.** If you can't pay your bills, or you got caught doing something, or you got leverage, or you got caught stealing something, or, or you know, screwing your friend. You know if you got caught after a referral, or you got caught you know, saying you were a business agent and shaking somebody down or moving juice or taking juice or DUI or hitting somebody, why would you want to go through life what I'm about to do? **I'm going to make sure everybody everywhere, everybody at your kids' school everywhere knows that you're a punk and a rat and a creep.** Okay? So why don't you just take a second, and do yourself a fav-, do your kids, your wives, your kids don't want to grow up knowing your daddy's a rat, daddy's a punk. Okay just go right to the bridge. Jump right off the bridge. Make it easy. Make it easy. (Emphasis added.)

On July 14, 2020, defendant Dougherty convened a meeting of business agents and employees before the swearing in of the Local 98 officers who had been recently elected. Approximately 34 attendees, including codefendant Brian Burrows, were present. Dougherty made the following statements concerning the discovery he had received in this case, and threats directed to any Local 98 members and employees whom he believed were speaking to the FBI:

> Because I know things that you'll never know. I have seven hundred thousand pieces of discovery. I've got a computer full of phone conversations. And I've got every interview. **I can tell you, every word, that everyone here said.** When they were interviewed, on the phone, et cetera. Okay.

> Here's the problem. I have to sue you. Because I can't bring you up on charges with the way that they play the system, and I can't beat you up. And you can say oh, well, he can't beat me up anyway, yeah, I can. Don't book it. Don't play with that. At this level, when you're playing with my family and my life, okay, I can. And there's nobody here will get back up a second time. **The first time you get up the second time I run you over.**

> This should be a great night. This should be a f***ing exciting night. You should be ecstatic. This is a night we used to sit around drink beer and exchange gifts. This is a night I used to buy everybody briefcases, okay. **I can't buy a briefcase for yous all because some j***-off who you're**

- 27 -

**helping, is watch – waiting for the LM-2's so he can go online with it.**
F***ing stupid f***s.  You're the ones that cost yourself.  (Emphasis added.)

On July 30, 2020, during a conference call on which approximately 30 Local 98 officers, business agents, organizers, consultants, and employees participated, Dougherty made the following statements about and threats to any Local 98 members and employees whom he believed were providing information to law enforcement:

Okay now, there's a show on Netflix, called Bad Blood it's a Mob thing. **Every show, they say one thing.  They say, 'Everybody is brought down, by someone on the inside.'**  Every show they bring it up.  The lead actor the lead guy, just everybody.  Okay.  And then, today, not once but twice, okay, I came across, basically the same reference.  And that is, okay, 'The one who is given the most, will hurt the family the deepest.'  Okay.  I seen it twice today.  'The one who is given the most, will hurt the family the deepest.'  Well remember just like the tv show says, **'Everybody's brought down by someone on the inside.'**  Now, I never intend to let that happen to me, okay, because I'm paying attention every single day.

Okay remember what I told you.  Okay.  The comment.  'The one who is given the most will hurt the family the deepest.'  **And 'Everybody is brought down by somebody on the inside' as per Bad Blood.**

**So then when I read things like, 'Everybody is brought down by someone on the inside,'** or 'The one who is given the most, is the one that will hurt the family the deepest.'  They're things that, one was said twice today, okay, out of the clear blue, and the other one's on every show.  Now obviously, they just don't make stuff up, a lot of that's real life.  That's why, pings that occur, at 6 o'clock when there's only five people in the Union Hall, are interesting to me.  And that's why, I'm never going to raise my voice no more.  **Because most people know that you're not going to see it coming.**

On August 6, 2020, Dougherty spoke at a Local 98 meeting he convened, which was attended by approximately 30 Local 98 officers, business agents, organizers, consultants, and employees.  During the meeting, he told the attendees that he had been involved in thirty fights, repeated his prior comments about the discovery and knowing

what everyone said about him, and made the following statements about and threats to any

Local 98 members and employees whom he believed were speaking to the FBI:

> I had f***ing fights.  You know how many f***ing fights I had early on?
> Thirty f***ng fights . . .  You guys understand how f***ng pissed I am?
> I'm pissed because I've got f****ing guys telling me now, there are
> f***ng guys that are f***ing, f***ing other guys in the room. . .
>
>  C'mon anybody understand nobody f***ing look I told you.  Every
> f***ing, serious f***ing TV show.  **Every f***ing it's the f***ing
> stupid f***ing ego that kills the f***ing system from the inside.**  So
> I'm not, I told you I watched that Bad Blood I f***ing, there's only like
> 14 of them.  **Four of the five said hey look, the system, is always
> brought down by somebody on the inside.**  That's why he traveled by
> himself I should've taken a f***ing page out of his book.  Okay.
>
> I read, remember I read all the f***ing paperwork.  I got all the
> paperwork.  **I could tell you every f***ing interview, everything
> everybody said about (UI)**.  I got it all.  In fact I got a computer
> downstairs getting upgraded again to take with me so I can follow-up this
> weekend.  I can tell you what [ ] said for four and a half hours.  Okay.  I
> can tell you what [ ] said.  **I can tell you who tried to cut a deal.  I can
> tell you who they went to.  I know all that.**
>
>  Every day's going to be f***ing wait til, **I got two kids that can't wait
> to tell me who inside the system was talking to them** . . .  [name of
> Local 98 employee] can't wait to f***ing ah, now I wanna talk to you.
> He well he can't wait to come down and tell me, I'll, I'll tell you
> everybody you've got two f***ing guys inside, they'll f*** you, they're
> part of my, they they help me with f***ing (UI) they help me with this . . .
> **One of you guys gotta choke [same name] put him under the f***ing
> water.**  Okay. (Emphasis added.)

During and after the August 5, 2016, searches, Dougherty began attempting to

identify the person associated with Local 98 whom he believed had cooperated with the FBI

before the execution of the search warrants. At 7:56 am on August 5, 2016, while the

searches were being conducted, Dougherty told a Local 98 employee, "You know, probably

somebody on the inside because they're, they're asking questions that only people on the

inside would know, so we gotta figure that out too, you know." Gov. Ex. 1- 99071.  On

August 14, 2016, Dougherty told a Local 98 official, "There's, there's somebody else, you know, somebody else that's in the know, you know, that's, there's like a couple little things there's very few people know that what, you know."  Gov. Ex. 1-101280.

    Dougherty's statements that are set forth above reflect that he attacks and is prepared to retaliate against anyone who speaks to law enforcement.[9]  These threats were intended to intimidate.[10]  Dougherty knew that many of the attendees were interviewed by the government and testified before the grand jury during the investigation of the case, and he told them, on two separate occasions, (July 14, 2020, and August 6, 2020), that he knew what everyone said, identifying at least two of the interviewees by name. This evidence should be considered as part of the history and characteristics of the defendant, and aid in the determination of where within the applicable Guideline Range to sentence the defendant.

## V.    ANALYSIS OF THE SECTION 3553 FACTORS.

    The Supreme Court has declared, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  In addition to the Guidelines, this Court must

---

[9]  The evidence presented during the trial of the corruption charges showed that in 2015, Dougherty threatened to retaliate against the Teamsters Union, through Henon, advising an official of the Philadelphia Convention Center that if the head of the Teamsters continued "using the Convention Center against [his brother, Kevin Dougherty, who was running for the Pennsylvania Supreme  Court at the time] . . . he is going to wind up with a f***ing soda tax which is going to kill him. . . . and Bobby Henon is delivering that message."

[10]  On January 8, 2021, the United States Department of Labor filed a civil suit against IBEW Local 98, alleging that Local 98 officers and members "intimidated and threatened the livelihoods of three of its members who intended to seek or nominate others for office in its June 2020 election, causing them to withdraw from doing so."  The complaint alleged, among other things, that Dougherty called a Local 98 member who had expressed an interest in running for the Local 98 Executive Board, and told him that, "It'll be a long three years if you lose."

also consider all the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).  A thorough consideration of the 3553(a) factors in this case supports the need for a sentence of incarceration within the advisory Guideline range of 135 to 168 months.  The most pertinent factors are discussed below.

> **A.** **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

It is difficult to overstate the seriousness of Dougherty's crimes given the unique positions of trust that he held, and that elected public officials hold. Codefendant Robert Henon was not a low-level administrator with little or no decision-making authority or influence who accepted a small bribe to take a single official action that affected a small number of people. To the contrary, Henon was a powerful, influential, and long-serving member of Philadelphia City Council.  Dougherty paid Henon to forsake his duty to provide honest services to the people of Philadelphia.

Dougherty was the Business Manager of Local 98, the highest ranking and most powerful office in the union. Dougherty was required by law to protect the interests of the members of Local 98. During the period charged in the Indictment, 2010 through 2016, Dougherty used his power and authority to steal from the union and to allow his codefendants to do the same. He abdicated his duty to protect the finances and assets of Local 98 and to insure they were used only for the benefit of the union as a whole. His wide-ranging abuse of the trust (and good will) that had been invested in him by the union's members, and his encouragement of others under his command to also steal from the members, make his crimes even more serious.

Dougherty may contend that the good he believes he has done for Local 98, and what Local 98 members have done for the community, somehow entitle him to leniency. Indeed, he is likely to claim that he is responsible for the growth of Local 98 during his tenure, and for the concomitant increase in work and benefits for Local 98's members. But good deeds are expected of elected union officials, and the duties of Business Manager included responsibility for advancing the interests of the members. And Dougherty was well-paid for his work. From 2010 through 2016, Dougherty was paid a total salary of $1,407,385.00 by Local 98. Further, of course, no good deeds can outweigh the damage done by Dougherty's betrayal of the members who paid his salary, and from whom he stole more than $500,000, and the benefits to the community from the growth of Local 98 do not outweigh the harm to the public's confidence in government caused by his bribery of codefendant Robert Henon.

This Court should impose a sentence that reflects the seriousness of Dougherty's willingness to deprive the citizens of Philadelphia of their right to Henon's honest

representation, free of any undue and illegal influence, and undermine the public's confidence

in its elected representatives. As the Eleventh Circuit observed:

> Bribery cannot properly be seen as a victimless crime, for in a sense it
> threatens the foundation of democratic government. Putting aside the
> financial havoc it can cause, **bribery tears at the general belief of the
> citizenry that government officials will carry out their duties honestly**,
> if not always competently. And that harm, though it may at times appear
> intangible, is real. *United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir.
> 2014) (emphasis added).

This Court should impose a sentence that also reflects the seriousness of Dougherty's

thefts from Local 98, which were committed continuously over the course of six years and

would have continued even longer - and likely spread even wider within Local 98 - had they

not been discovered through the painstaking work of federal law enforcement agents.

Dougherty's abuse of his position as the most powerful and well-paid Local 98 official was

apparently borne from a sense of entitlement, and his lack of remorse and vindictive bullying

of potential government witnesses once his theft was detected compound the harms arising

from his abuse of power that was the subject of the crimes of which he stands convicted.

Dougherty's crimes have inflicted immeasurable harm upon Local 98 and the City of

Philadelphia.  Justice demands that he be held fully accountable for his actions.

> **B.      The need to afford adequate deterrence to criminal conduct, and to
> protect the public from further crimes of the defendant**

While it is unlikely that Dougherty will ever again be able to hold a union office, the

sentence imposed must also be sufficient to deter him should be ever again be in a position of

trust, and, most importantly, it must be sufficient to deter other officials in positions of public

trust. *See United States v. Phinazee*, 515 F.3d 511, 515-16 (6th Cir. 2008) (deterrence for §

3443(a) purposes includes both specific and general deterrence). Dougherty's corruption, both

in his bribery of Henon and in his thefts from Local 98, requires a very significant sentence in

order to dissuade other public officials from similar conduct. This is why courts have observed:

> Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct . . .

*United States v. Spano*, 411 F.Supp. 2d 923, 940 (N.D. Ill. 2006).

Dougherty's convictions did not arise from a single, isolated, or impulsive event. They arose instead from a long-term series of corrupt acts intended to increase his influence and line his own pockets at the expense of the public's trust in government and men and women of Local 98 who had placed their trust in him. The most pertinent and compelling factor here is the seriousness and continuing nature of the crimes. Had his crimes and those of his coconspirators not been discovered through the hard work of numerous federal law enforcement agents and investigators, it is likely that they would have continued unabated. Given the difficulty in detecting public corruption, anything less than a Guideline sentence in this case could easily lead other union officials to believe that the potential benefits of corruption outweigh the costs.

The public also needs to know that a conviction for corruption involving elected public officials and union officials will be adequately punished. Deterrence is a particularly compelling basis for a guideline sentence in a case like this where the community in general, and politicians and labor leaders in particular, are watching closely.

## C.     The need to avoid unwarranted sentence disparities

The best way to ensure that the defendant's sentence is fashioned in a fair and objective manner is to impose a sentence within the properly-calculated sentencing guideline range.

Although the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984.

Imposing a sentence within the advisory range for imprisonment that is called for in the guidelines should mean that the defendant receives the same or similar sentence that any defendant who abused a position of trust to commit the same or similar crimes, caused the same or similar amount of loss, and had the same or a similar criminal history to the defendant, faces. This will avoid unwarranted sentencing disparities.

The Third Circuit has observed that "[a] sentence that falls within the guidelines range is more likely to be reasonable than one outside the guidelines range." *United States v. Ricks*, 494 F.3d 394, 399 (3d Cir. 2007). *See also Rita v. United States*, 551 U.S. 338 (2007) (noting that when "both the sentencing judge and the Sentencing Commission ... reach[ ] the same conclusion as to the proper sentence ... [t]hat double determination significantly increases the likelihood that the sentence is a reasonable one"). The best way to avoid sentencing disparity in this case is to impose a sentence within the applicable advisory guideline range.

### 1.   The Sentences for the Codefendants in this Case

This Court previously sentenced almost all of Dougherty's codefendants in this case. For the corruption crimes, on March 3, 2022, this Court sentenced defendant Robert Henon to 42 months' imprisonment, a fine of $50,000, and ordered Henon to forfeit $207,948.70 of proceeds of the offenses of conviction.

- 35 -

For the embezzlement crimes, this Court sentenced Michael Neill, former Local 98 Apprentice Training Director,[11] to 13 months in prison and ordered him to pay $92,733 in restitution and to forfeit $25,259.  Pursuant to a plea agreement, Neill pled guilty to four counts of embezzlement of union funds, one count of theft from an employee benefit plan, and one count of filing false federal income tax returns, and accepted responsibility for his crimes. The loss for purposes of the Guidelines, consistent with the plea agreement, was approximately $92,733.67, resulting in an advisory sentencing guidelines range of 18-24 months for imprisonment. The loss figure attributable to Neill was the sum total cost of the renovations, improvements, and repairs by Massa and his company to defendant Neill's home and the home of a close friend, as well as a proportionate share of the work done at the Pennsport Building and Doc's Union Pub.[12]  Neill, who entered into a plea agreement, was not convicted of conspiracy, and, unlike Burrows, did not have any control or authority over the money or assets of Local 98.

On June 26, 2024, this Court sentenced defendant Brian Burrows to 48 months' imprisonment and ordered Burrows to forfeit $135,689.11 in proceeds of the offenses of conviction that he obtained.

### 2.  The Appropriate Sentence for Dougherty

Dougherty's sentence should far exceed his codefendants' for at least three reasons. First, none of his codefendants was convicted of, or committed, the broad and pervasive swath of crimes for which this defendant now must account.  Indeed, Henon's sentence of 42 months

---

[11]  Neill was the head of the Apprentice Training Fund, which is a separate entity from Local 98.

[12] Because the defendants should be held jointly and severally liable for restitution, any restitution ultimately paid by Neill should satisfy some portion of the restitution owed by Burrows and Dougherty.

of imprisonment was for honest services bribery he committed with Dougherty for which no other codefendant was charged, while Burrows' sentence of 48 months of imprisonment was for entirely separate crimes involving embezzlements from Local 98 that he committed with Dougherty for which Henon was not charged.

Second, the evidence at both trials demonstrated that Dougherty was the primary driver of both the conspiracy to rob the citizens of Philadelphia of the honest services of their elected councilman and the conspiracy to rob the union members of their funds. Indeed, the evidence strongly suggests that without Dougherty initiating these schemes, his codefendants may not even have engaged in criminal activity at all.

Third, none of the other defendants displayed any of the animus, hostility, and obstructive conduct toward witnesses that defendant Dougherty displayed.

In short, Dougherty occupies a unique position among his codefendants. He is alone at the center of both conspiracies of which he was convicted. His sentence should reflect that. A sentence for Dougherty's crimes must account for his corruption convictions, including his control and influence over codefendant Robert Henon, his embezzlement convictions, including his authority and control over his codefendants, and his culpability relative to codefendant Brian Burrows (including the nature and scope of Dougherty's thefts), and account his obstructive conduct. Accordingly, a sentence that significantly exceeds 90 months, the sum of the sentences of incarceration imposed on Henon (42 months) and Burrows (48 months), is clearly warranted here. The applicable guidelines range provides just such a sentence. ,

## VI.   RESTITUTION

The government recommends that Dougherty be ordered to pay restitution, jointly and severally with his codefendants, in the amount of $2,116,629.99, which consists of the loss to Local 98 caused by the charged conduct ($591,341.24), and the legal and accounting fees paid by Local 98 in connection with the government's criminal investigation ($1,525,288.75). *See* PSR at ¶151.  The government also requests restitution to the IRS in the amount of $126,261.58 for taxes and interest. *See* PSR at ¶73.

## VII.   THE DEFENDANT SHOULD NOT BE FREE ON BAIL PENDING APPEAL.

Defendant Dougherty is likely to request that he remain on bail while he appeals his conviction and sentence. His request should be denied.

There is a presumption against bail pending appeal. *United States v. Porat*, 2022 WL 1308506, at *1–2 (E.D. Pa. May 2, 2022); *United States v. Foxworth*, 2019 WL 454426, at *2 (E.D. Pa. Feb. 4, 2019); *United States v. Fattah*, 224 F. Supp. 3d 443, 445-49 (E.D. Pa. 2016); 18 U.S.C. § 3143(b)(1). To overcome this presumption, the defendant must show (1) by clear and convincing evidence he is unlikely to flee or be a danger to others and (2) the appeal is not for the purpose of delay and raises a "substantial question" that, if resolved in his favor, is "likely to result in reversal or an order for a new trial of **all counts** on which imprisonment has been imposed." *United States v. Miller*, 753 F.2d 19, 24 (3d Cir. 1985) (emphasis added); 18 U.S.C. § 3143(1)(A)-(B).

Section 3143 of Title 18 of the United States Code provides as follows:

> **18 U.S.C. §3143  (b) Release or detention pending appeal by the defendant.**--(1) Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a

petition for a writ of certiorari, be detained, unless the judicial officer finds--

    (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

    (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in--

    (i) reversal,

    (ii) an order for a new trial,

    (iii) a sentence that does not include a term of imprisonment, or

    (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

The Third Circuit recognized in *Miller* that, as a general rule, defendants should not be free on bail pending appeal, stating, "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even permit it in the absence of exceptional circumstances." *See* 753 F.2d at 22 (quoting H.R. Rep. No. 91-907, at 186-87 (1970)).

For a question to be substantial, "the issue on appeal [must] be significant in addition to being novel, not governed by controlling precedent or fairly doubtful." *See United States v. Smith*, 793 F.2d 85, 88 (3d Cir. 1986). The absence of controlling precedent is not itself enough to meet this test. *See id.* A question is substantial if the defendant can demonstrate that it is "fairly debatable" or is "debatable among jurists of reason." *See id.* at 89. To grant bail pending appeal, any substantial question, as noted above, must affect the entire action, not just a part of it. The question must be "so integral to the entire case against defendants that an appellate decision" to the contrary "is likely to require reversal or a new trial **of all counts** on which defendants have been sentenced to imprisonment." *See United States v. Miller*, 753 F.2d at 24

(emphasis added). If the substantial question or questions are not related to all counts, "the statutory criteria for bail pending appeal would not be met as to the unaffected counts, and bail may be denied." *See id. See also United States v. Fattah,* 224 F. Supp. 3d 443, 445–49 (E.D. Pa. 2016).

This Court denied the defendants' motions for new trials after each of the trials in this case, and recently denied the defendant's motion to dismiss the Indictment and for a new trial on the corruption charges because of alleged violation of his Fifth and Sixth Amendment right to counsel. ECF 512. Codefendant Robert Henon's appeal of his conviction on the corruption charges was denied by the Third Circuit. No. 23-1463; ECF 45.  None of the issues raised by this case are novel, not governed by controlling precedent, or fairly doubtful.  Furthermore, no question is so integral to the entire case against the defendant that an appellate decision to the contrary would likely require reversal or a new trial of all counts on which the defendant will sentenced to imprisonment.  For these reasons, the defendant cannot overcome the presumption that he should not remain on bail pending appeal.

## VIII.   CONCLUSION

For all the reasons set forth above, the government respectfully recommends the imposition of a sentence that includes a term of incarceration of between 135 to 168 months. The recommended sentence is sufficient, but not greater than necessary; it reflects the seriousness of the defendant's crimes, promotes respect for the law, promotes general deterrence, and accounts for the history and characteristics of the defendant.

To rightfully deprive the defendant of his ill-gotten gains, the government also seeks a forfeiture money judgment in the amount of $353,941.35. In addition, to reimburse the union

(and the taxpayers) for the losses from the defendant's crimes, the government seeks restitution to Local 98 of $2,116,629.99, to be imposed jointly and severally with his co-defendants,[13] and restitution to the IRS of $126,261.58 for taxes and interest.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney


*/s/ Frank R. Costello, Jr.*
FRANK R. COSTELLO, JR.
BEA L. WITZLEBEN
RICHARD P. BARRETT
JASON GRENELL
ANTHONY J. CARISSIMI
Assistant United States Attorneys

---

[13] Each defendant involved in the embezzlement should be jointly and severally liable for the loss, with each defendant's liability capped at the respective amount ordered by the Court.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this date, I electronically filed the foregoing response with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to Gregory Pagano, Esquire, counsel for defendant John Dougherty.


_/s/ Frank R. Costello, Jr._____
FRANK R. COSTELLO, JR.
Assistant United States Attorney

Dated: July 5, 2024.