IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. 19-64-1 |
| | : | |
| JOHN DOUGHERTY | : | |

MEMORANDUM OPINION

**SCHMEHL, J.** /s/ **JLS**                                                                                                                         July 9, 2024

Presently before the Court are Defendant John Dougherty's various requests to dismiss the Indictment (ECF No. 1) or, alternatively, vacate certain convictions on the basis that his prior counsel was conflicted. For the following reasons, the Court denies Mr. Dougherty's requests.

I. BACKGROUND

A. The Conflicts Claims

To defend against charges of public corruption and embezzlement (among other related counts), Mr. Dougherty retained the Philadelphia-based law firm Ballard Spahr LLP.[1] In November 2020, the Court bifurcated the Indictment such that the public corruption and embezzlement charges would proceed in two separate trials. (Order, ECF No. 168.) Thereafter, at the October–November 2021 public corruption trial, a jury found Mr. Dougherty guilty of eight counts.[2] (Jury Verdict Form, ECF No. 250.) As relevant here, certain public corruption charges

---

[1] Ballard Spahr has also represented Mr. Dougherty for prior matters, but those instances are not relevant to the present issue.

[2] The jury empaneled for the embezzlement trial convicted Mr. Dougherty of 67 additional counts. (Jury Verdict Form, ECF No. 629.) As the Court previously ruled, the effects of any conflicts in Ballard Spahr's representation of Mr. Dougherty did *not* extend to the embezzlement portion of this case. (Mem. Op., ECF No. 474.) Accordingly, the subject of the present

involved the City of Philadelphia's negotiations with Comcast about the renewal of those parties' cable franchise agreement.  In short, the Government alleged that Mr. Dougherty, through Defendant Robert Henon, unduly delayed these negotiations by insisting that Comcast commit to giving certain fiber optic work to union contractors.  One relevant instance of these negotiations was a meeting on December 2, 2015, attended by Mr. Henon, Mr. Dougherty, and two Comcast employees, one of which was Kathleen Sullivan.

Nearly one year after the jury's verdict, in August 2022, all Ballard Spahr attorneys sought to withdraw from the case, citing "significantly diverging opinions" between the attorneys and Mr. Dougherty regarding defense strategy for the then-upcoming embezzlement trial.  (Mot. to Withdraw as Counsel at 2, ECF No. 345.)  After holding a hearing, the Court granted the request. (Order, ECF No. 355.)  Considering Mr. Dougherty's diminishing financial condition, the Court appointed Caroline Goldner Cinquanto as counsel under the Criminal Justice Act.  (Order, ECF No. 372.)  At Ms. Cinquanto's request, the Court also appointed Alan Tauber as co-counsel on January 9, 2023.  (Order, ECF No. 404.)

The Cinquanto–Tauber defense team claimed to have uncovered "significant conflicts of interest" in Ballard Spahr's representation of Mr. Dougherty that violated his "Sixth Amendment right to counsel and his Fifth Amendment right to due process" and "contaminated and rendered invalid" all preceding proceedings.  (Def. John Dougherty's Mot. to Dismiss the Indictment or, in the Alternative, Vacate the Convictions Returned on Nov. 15, 2021 Due to the Violation of Mr. Dougherty's Sixth Am. Right to Conflict Free Couns. at 2, ECF No. 429 [hereinafter First Conflicts Motion].)  According to the First Conflicts Motion, the alleged conflicts were threefold:  First,

---

memorandum remains only the effect of potential conflicts in Ballard Spahr's representation of Mr. Dougherty through August 2022, when Ballard Spahr attorneys withdrew from the case.

Comcast was a significant client of Ballard Spahr and an important witness in the public corruption trial, yet Ballard Spahr defended Mr. Dougherty regarding, in part, his negotiations with Comcast (*id.* at 3–5, 7); second, a Ballard Spahr attorney was implicated in Mr. Dougherty's alleged embezzlement by having construction work performed at the attorney's personal residence, allegedly at the Union's expense (*id.* at 5–7); and third, Ballard Spahr allegedly represented Local 98, a victim of (and therefore a party adverse to) Mr. Dougherty (*id.* at 7). Mr. Dougherty suggested that the appropriate remedy would be to dismiss the Indictment or, at least, to vacate the convictions from the trial for public corruption. (*Id.* at 2.)

Mr. Dougherty's financial condition eventually improved, and he retained his present private counsel, Gregory Pagano. That counsel supplemented the First Conflict Motion and raised concerns that the then-acting United States Attorney was married to a Comcast executive, potentially suggesting an improper motive in initiating the investigation and prosecution of Mr. Dougherty. (Def. John Dougherty's Am. Mot. to Dismiss the Indictment or, in the Alternative, Vacate the Convictions Returned on Nov. 15, 2021 Due to the Violation of Mr. Dougherty's Sixth Am. Right to Conflict Free Couns. at 3, ECF No. 521 [hereinafter Second Conflicts Motion].) The Second Conflicts Motion also argued that because a Ballard Spahr partner was, at the time, under consideration for the position of U.S. Attorney in this District, and (again) because Comcast was a significant client of Ballard Spahr, Mr. Dougherty's defense team had further reason to act obsequiously towards both the prosecution and Comcast. (*Id.* at 7–8.)

On March 20, 2024, the Court held a hearing to develop the factual record as to Mr. Dougherty's claims in the First and Second Conflicts Motions.[3] Henry Hockheimer, Jr., the

---

[3] Ms. Cinquanto and Mr. Tauber returned to this case to assist Mr. Pagano at this hearing.

Ballard Spahr partner who headed the defense of Mr. Dougherty until his August 2022 withdrawal, testified at this hearing about the relationships between his firm, Comcast, the Union, and himself.[4] Mr. Dougherty also testified about his relationship with Mr. Hockheimer. At the start of the hearing, the parties clarified that Mr. Dougherty had withdrawn with prejudice *all* of the foregoing claims, save one from the First Conflicts Motion: namely, whether Mr. Hockheimer and his firm, due to their relationship with Comcast, had a conflict of interest that improperly prevented them from (1) calling David Cohen, a top Comcast executive, to testify as a witness at the public corruption trial, and (2) effectively cross-examining Ms. Sullivan, who was involved in the negotiations with Mr. Dougherty. (Tr. of Conflicts Hr'g at 5:2–9:23, ECF No. 727.) Following the hearing, Mr. Dougherty's counsel filed a supplemental brief memorializing this remaining claim. (Def. John Dougherty's Suppl. Mem. in Supp. of Mot. to Vacate His Conviction Due to Couns.'s Conflict of Interest, ECF No. 730 [hereinafter Third Conflicts Motion].)

**B.    The Relationship Between Ballard Spahr, Mr. Hockheimer, and Comcast**

Mr. Hockheimer testified that Comcast was a "long-standing" and financially significant client of Ballard Spahr, dating back to a time before Mr. Hockheimer joined the firm. (Tr. of Conflicts Hr'g at 15:14, 15:25–16:12.) And because partners at the firm receive a distribution of the firm's yearly profits, some portion of Mr. Hockheimer's pay was derived from the firm's work for Comcast. (*Id.* at 17:14–17.) As to his own relationship with Comcast, Mr. Hockheimer represented Comcast—in particular, one or two witnesses from a Comcast subsidiary—in just one matter in 2014 or 2015. (*Id.* at 15:18–24.)

---

[4]    To proceed with his claims, Mr. Dougherty waived attorney–client privilege as to the conflicts issues. (Order, ECF No. 677.)

In 2016, when Government agents executed search warrants at locations including Mr. Dougherty's home, the documentation for these searches indicated to Mr. Hockheimer that one subject of interest to the authorities was Philadelphia's franchise agreement with Comcast. (*Id.* at 18:3–6.)  Mr. Hockheimer testified that, as a result, he spoke to the firm's general counsel and "decided, almost immediately, to put up an ethical wall." (*Id.* at 18:12–19:22.)  Because of this ethical wall, attorneys and support staff working on Comcast matters did not have "any visibility" as to the work performed for Mr. Dougherty's defense, and *vice versa*. (*Id.* at 19:24–20:8.)  Notably, Mr. Hockheimer testified that no Ballard Spahr attorneys represented Comcast as to the investigation of Mr. Dougherty; instead, Comcast sought counsel from Davis Polk & Wardwell LLP.[5] (*Id.* at 28:8–13.)  Although Mr. Hockheimer did not recall a *specific* conversation with Mr. Dougherty about the firm's contemporaneous representation of Comcast, he testified that he and Mr. Dougherty "talked regularly" about that fact, that Mr. Dougherty was "well aware" of it, and that Mr. Dougherty repeatedly insisted that Mr. Hockheimer was still Mr. Dougherty's preferred counsel. (*Id.* at 21:20–22:22.)  Mr. Dougherty, however, denied that Mr. Hockheimer had ever had a "detailed" conversation about the ethics wall. (*Id.* at 165:7–20.)

Once a grand jury indicted Mr. Dougherty and others in January 2019, Mr. Hockheimer convened another meeting with the firm's top brass to confirm that leadership had no issue with Mr. Hockheimer representing Mr. Dougherty "zealously," as he was obligated to do. (*Id.* at 26:6–25.)  The firm's leadership affirmed it had no concerns. (*Id.* at 27:1–2.)  And although Mr.

---

[5] At the hearing, Mr. Tauber cited an email that appeared to indicate that there were, indeed, other Ballard Spahr attorneys advising Comcast on the investigation into Mr. Dougherty; Mr. Hockheimer, however, credibly insisted that the email's author was mistaken. (*Id.* at 28:22–29:6, 87:21–24.)  This email indicates, in fact, that when an attorney requested access to Mr. Dougherty's file, Mr. Hockheimer denied this request because that attorney had worked on Comcast matters. (*Id.* at 87:4–13.)

Dougherty never completed a written statement memorializing his waiver of potential conflicts (*id.* at 24:23), it was at this meeting with Ballard Spahr leadership that the meeting attendants determined that they did not need a conflicts waiver—specifically on the grounds that Comcast was not a party to the criminal case, and in Ballard Spahr's view, was not a victim, as the victims of public corruption are the politician's constituents (*id.* at 27:2–4, 84:9–17)—*i.e.*, the citizens of the City of Philadelphia who were deprived the honest services of their councilmember. Mr. Hockheimer informed Mr. Dougherty of this meeting, and Mr. Dougherty again reiterated that Mr. Hockheimer was "[his] guy" (*id.* at 26:6–28:3); Mr. Dougherty, however, disputed that Mr. Hockheimer ever told him of this post-Indictment meeting with Ballard Spahr leadership (*id.* at 166:5–12). Finally, Mr. Tauber noted that in 2021, before the public corruption trial began, Mr. Dougherty "assume[d] that Comcast is putting a tremendous amount of pressure on my lawyer . . . ." (*Id.* at 32:13–14.) Mr. Hockheimer denied that anyone ever pressured him personally and testified that if someone had, he "would have left" the firm. (*Id.* at 33:17–19.)

In direct contrast to the foregoing, Mr. Dougherty testified that, in short, Mr. Hockheimer explained nothing to him. According to Mr. Dougherty, Mr. Hockheimer did *not* mention that (1) the Comcast negotiations were a subject of the Government's search (*id.* at 124:20–23), (2) there was a potential conflict in Ballard Spahr's representation of both Comcast and Mr. Dougherty (*id.* at 125:16–19), or (3) Mr. Dougherty could obtain independent counsel to advise him about this potential conflict (*id.* at 126:7–10). After learning that Comcast was involved in the case, Mr. Dougherty nonetheless kept Mr. Hockheimer as his counsel because he trusted Mr. Hockheimer. (*Id.* at 127:16–18.)

### C. The Decision Not to Call Mr. Cohen as a Witness and the Cross-Examination of Ms. Sullivan

In preparing for the public corruption trial, Mr. Dougherty suggested that Mr. Cohen may be a helpful witness. (Tr. of Conflicts Hr'g at 36:3.) Mr. Dougherty and Mr. Cohen had a "long-standing relationship" through which they amicably resolved "various labor disputes," including a prior franchise agreement between Comcast and the Philadelphia government. (*Id.* at 37:2–10, 139:3–140:3.) Mr. Dougherty believed that because of this relationship, Mr. Cohen would testify that he was not "surprise[d]" that Mr. Dougherty was involved in the negotiations and understood the negotiations to be "nothing more than doing business." (*Id.* at 128:4–7, 157:10–16.) Mr. Dougherty apparently repeatedly requested that Mr. Hockheimer call Mr. Cohen as a witness or, at the very least, interview him. (*Id.* at 157:21–158:10.)

Mr. Hockheimer did not believe that Mr. Cohen would meaningfully assist the Ballard Spahr defense team's theory of the case—namely, that Mr. Dougherty's negotiations with Comcast constituted routine, non-criminal lobbying for the benefit of unionized contractors. (*Id.* at 35:20–24, 36:4–6.) Mr. Cohen, for example, did not attend the December 2, 2015, meeting that played an important role in the Government's case at the public corruption trial. (*Id.* at 92:23–93:1.) The two Comcast employees who did attend, including Ms. Sullivan, were called by the Government and subject to cross-examination by Mr. Hockheimer. (*Id.* at 93:2–4.) Further, Mr. Hockheimer was concerned that there was no Form FD-302 memorializing any interview that the Government conducted with Mr. Cohen, and Mr. Hockheimer was therefore unsure of "what . . . the Government [would] have in their arsenal that they could use if [Mr. Hockheimer] call[ed] Mr. Cohen as a witness." (*Id.* at 38:22–25.)

Significantly, one such weapon from that arsenal arose at the hearing before this Court: While the franchise agreement negotiations were ongoing, Mr. Cohen apparently indicated via

multiple emails that he believed Mr. Dougherty's demands were "unlawful" and "illegal." (*Id.* at 42:20–21, 104:8–106:1.) As Mr. Tauber argued, Mr. Cohen's characterization could be interpreted as suggesting that Mr. Dougherty's conduct was not necessarily criminal but, rather, merely inconsistent with the federal laws that regulate franchise agreements; Mr. Hockheimer, however, worried that calling Mr. Cohen would permit the Government to show Mr. Cohen's comments to a jury and argue that Mr. Cohen's use of "illegal" indeed meant "criminal." (*Id.* at 42:22–43:3, 43:21–24, 46:3–11.) Additional facts lent credence to the fear that calling Mr. Cohen would do more harm than good: (1) Mr. Hockheimer successfully moved this Court to preclude the Government from introducing a similar email from another Comcast employee that described Mr. Dougherty's demands as "extortion," and calling Mr. Cohen might re-open that door (*id.* at 93:5–20); (2) counsel for Mr. Dougherty's co-defendants agreed with Mr. Hockheimer's assessment (*id.* at 108:3–12); and (3) Mr. Dougherty previously expressed to Mr. Hockheimer his belief that Mr. Cohen was behind the Government's investigation and prosecution of Mr. Dougherty (*id.* at 99:20–23). Mr. Dougherty, however, denied saying that Mr. Cohen had pressured various individuals to initiate this case. (*Id.* at 169:5–170:8.) He also denied that another co-defendant's counsel agreed with Mr. Hockheimer's assessment; instead, Mr. Dougherty claimed that his co-defendant's attorney told Mr. Dougherty that the attorney would have called Mr. Cohen had he been in Mr. Hockheimer's place. (*Id.* at 175:11–24.)

Although the Ballard Spahr defense team ultimately declined to call Mr. Cohen at the public corruption trial, Mr. Hockheimer did (1) identify other potential witnesses from Comcast with the help of Mr. Dougherty, (2) advise the firm of these potential Comcast witnesses and confirm that the firm had no issue with calling them, and (3) subpoena those witnesses. (*Id.* at 89:9–90:24.) Ultimately, the Government called these witnesses in its case-in-chief, and Mr.

Hockheimer testified that his cross-examination did not "pull any punches" and was ultimately successful. (*Id.* at 91:19–22, 96:3.) In particular, Mr. Hockheimer elicited from Ms. Sullivan "some very good testimony" that at a meeting in which another Comcast employee had mentioned paying for a wedding, Mr. Dougherty replied that "my guys need to pay for their daughters' weddings, too." (*Id.* at 96:8–20.) Mr. Hockheimer felt that this comment "was squarely within the theme we were trying to develop, which was, everything [Mr. Dougherty] was doing was trying to get jobs for his guys," and Mr. Hockheimer even referenced that comment in his closing argument. (*Id.* at 96:20–22, 97:5.) After eliciting such favorable testimony on cross-examination, Mr. Hockheimer testified that he observed the sound strategy of "[s]it down and shut up." (*Id.* at 97:14–16.) He then consulted with the rest of the defense team and Mr. Dougherty, and no one suggested any further questions. (*Id.* at 98:1–9.) As Mr. Tauber pointed out at the conflicts hearing, however, Mr. Hockheimer failed to highlight evidence that Ms. Sullivan requested that Mr. Dougherty attend the December 2, 2015 meeting—a fact that may have rebutted the Government's theory that Mr. Dougherty was the driving force behind the meeting. (*Id.* at 115:17–116:8.)

## II. STANDARD OF REVIEW

The right to counsel provided by the Sixth Amendment includes the "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981); *see also Strickland v. Washington*, 466 U.S. 668, 688 (1984) (the "certain basic duties" that counsel owes a criminal defendant include "a duty of loyalty, a duty to avoid conflicts of interest"). Courts distinguish between cases of actual conflicts and potential conflicts; only the former is relevant

here.[6] "An actual conflict claim arises after trial upon the discovery of a previously unnoticed conflict of interest on the part of trial counsel. '[A] defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.'" *United States v. Morelli*, 169 F.3d 798, 810 (3d Cir. 1999) (alteration in original) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)).

As relevant here, an actual conflict of interest exists "if, during the course of the representation, the . . . interests [of the defendant and of the other party represented by that defendant's counsel] diverge with respect to a material factual or legal issue or to a course of action." *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988) (quoting *Sullivan v. Cuyler*, 723 F.2d 1077, 1086 (3d Cir. 1983)); *see also Cuyler*, 446 U.S. at 350 (actual conflict exists where counsel "actively represented conflicting interests"). In cases of multiple representation,[7] the defendant must satisfy two prongs to establish an actual conflict:

---

[6] Cases of potential conflicts are more prophylactic in nature and arise where this Court "is aware, or should be aware, of a potential conflict of interest on the part of the defendant's attorney," at which point this Court "must inquire as to whether the defendant is aware of and waives this conflict." *Morelli*, 169 F.3d at 811 (gathering cases). At the time of the public corruption trial, this Court was not aware, nor did it have any basis to be aware, of the alleged conflict now raised by Mr. Dougherty—and Mr. Dougherty has not pursued this argument in briefing. Nor did the prosecution or Ballard Spahr, if either was aware of a potential conflict, have an obligation to disclose such concern. *Id.* The Court therefore focuses only on whether an actual conflict existed.

[7] Joint representation, in contrast, consists of "representation of more than one defendant at the same trial." *Morelli*, 169 F.3d at 810. Mr. Dougherty initially claimed that one basis for Ballard Spahr's alleged conflict was that the firm's attorneys represented Comcast witnesses in this case. At the conflicts hearing, however, Mr. Dougherty's present counsel confirmed that he withdrew that particular claim, and indeed Mr. Hockheimer insisted that no Ballard Spahr attorney worked on Comcast matters arising from the investigation into Mr. Dougherty. (Tr. of Conflicts Hr'g at 8:6–13, 28:8–13.) Multiple representation therefore more accurately describes Mr. Dougherty's remaining claim, as it includes situations where counsel "actively represented conflicting interests"—namely, where the "personal interests of counsel . . . were 'inconsistent, diverse or otherwise discordant' with those of his client and . . . affected the exercise of his professional judgment on behalf of his client." *Gov't of Virgin Islands v. Zepp*, 748 F.2d 125, 135

> First, he must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

*Morelli*, 169 F.3d at 810 (quoting *Gambino*, 864 F.2d at 1070). Upon satisfying both prongs, "the defendant is entitled to a reversal for inadequate assistance of counsel without demonstrating prejudice." *Id.* (citing *Strickland*, 466 U.S. at 692).[8]

### III. ANALYSIS

Courts have prudently observed that "an attorney who cross-examines former"—and, presumably even more so, concurrent—"clients inherently encounters divided loyalties." *United States v. Moscony*, 927 F.2d 742, 750 (3d Cir. 1991) (gathering authorities). In such cases, the attorney has countervailing obligations to (1) protect the sensitive information derived from representing a former or concurrent client, and (2) use all information available to the attorney—such as the just-mentioned sensitive information—to zealously cross-examine witnesses. *Id.* at 750–51. This divided loyalty, however, does not arise in cases like the present one.

First, Mr. Hockheimer testified credibly that no Ballard Spahr attorney worked on Comcast matters arising from the investigation into Mr. Dougherty. Given that, it was not the case that either "the representation of one client [was] directly adverse to another client" or "there [was] a significant risk that the representation of one or more clients [was] materially limited by the

---

(3d Cir. 1984) (first quoting *Cuyler*, 446 U.S. at 350, and then quoting Model Code of Pro. Resp. EC 5-2, 5-14 (Am. Bar Ass'n 1980)).

[8] A defendant unable to meet this standard "can still bring a conventional ineffective assistance claim under *Strickland*, but the defendant must then show prejudice." *Morelli*, 169 F.3d at 810 n.15. Mr. Dougherty has not asserted such a claim at this time.

lawyer's responsibilities to another client." Pa. R. Prof. Conduct § 1.7(a).  In short, there was no concurrent representation as to this criminal case.  This fact distinguishes the present case from many cases cited by Mr. Dougherty in which a firm represented both a defendant and government witnesses in the same criminal matter.

Second, the firm erected an effective ethics wall that precluded the sharing of information between Mr. Dougherty's defense team and other Ballard Spahr attorneys working on Comcast matters.  There was therefore no possibility that Mr. Hockheimer or his team would encounter information of Comcast's that they were obligated both to protect as confidential client information and to employ at trial as information useful to Mr. Dougherty's defense.  Indeed, evidence from the conflicts hearing indicated that Mr. Hockheimer in fact prevented an associate who had worked on Comcast matters from accessing files related to Mr. Dougherty.  *Cf. Hempstead Video, Inc. v. Village of Valley Stream*, 409 F.3d 127, 138 (2d Cir. 2005) ("We see no reason why, in appropriate cases and on convincing facts, isolation—whether it results from the intentional construction of a 'Chinese Wall,' or from de facto separation that effectively protects against any sharing of confidential information—cannot adequately protect against that."); *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 225 (6th Cir. 1988) (holding that the implementation of "institutional screening mechanisms" rebuts a claim that confidential information flows between members of a firm).

Third, Mr. Dougherty knew early into this case that his negotiations with Comcast might play a role in his prosecution, yet he reiterated that Mr. Hockheimer was "[his] guy."  Mr. Dougherty's testimony indicated that when he *was* dissatisfied with a different firm's representation, he had no difficulty replacing that counsel with Mr. Hockheimer. (Tr. of Conflicts Hr'g at 162:13–163:10.)  And although, on one occasion, Mr. Dougherty speculated that Comcast

was pressuring Mr. Hockheimer, this self-described "assum[ption]" is outweighed by his previously longstanding confidence in Mr. Hockheimer. Indeed, at no point until *after* Mr. Dougherty's conviction did he express to this Court any doubt in Mr. Hockheimer's loyalty or capabilities. The Court moderates some of the credibility it affords to Mr. Dougherty's testimony given its timing and the inescapable fact that it now serves Mr. Dougherty's interests to characterize his relationship with Mr. Hockheimer in this manner.

Fourth, and finally, Mr. Hockheimer himself repeatedly testified that his loyalty to Mr. Dougherty was totally unshakeable and undivided. He did not face pressure from other Ballard Spahr attorneys who dealt with Comcast. He testified that had he felt any such pressure or that any type of conflict arose in his representation of Mr. Dougherty, he would have left the firm to continue representing Mr. Dougherty rather than drop Mr. Dougherty as a client. And as before, Mr. Dougherty's "assum[ption]" that Comcast was pressuring Mr. Hockheimer does not rebut Mr. Hockheimer's credible testimony on this issue.

The lack of an actual conflict becomes more apparent when considering Mr. Hockheimer's reasons for declining to pursue the alternative defense strategy proposed by Mr. Dougherty—namely, calling Mr. Cohen to testify that he was not surprised by Mr. Dougherty's involvement in the negotiations and that such discussions were "nothing more than doing business."[9] Mr. Hockheimer identified numerous credible concerns with calling Mr. Cohen. First and foremost, there was a serious risk that Mr. Cohen's testimony could open the door to damaging characterizations of Mr. Dougherty's participation in the negotiations—characterizations that

---

[9] The Court assumes, without deciding, that Mr. Dougherty has identified an alternative defense strategy. Because the Court ultimately holds that no actual conflict existed, it need not reach this issue.

Mr. Hockheimer had successfully fought to keep out of the jury's consideration. The Court understands Mr. Tauber's position that even if Mr. Cohen opened that door and the jury learned that Comcast employees believed the negotiations to be "illegal," "unlawful" and "extortion," Mr. Hockheimer may have been able to mitigate the damage with follow-up questioning. But that position seeks to transform a reasonable exercise of professional judgment into a case of constitutionally conflicted representation. The case law does not go so far. *See United States v. Kilpatrick*, 798 F.3d 365, 375 (6th Cir. 2015) (when assessing an allegedly conflicted lawyer's choice between alternative courses of action, "the more reasonable the lawyer's choice, the less likely it was the result of actual conflict").

Second, Mr. Cohen did not attend the relevant meeting, and Mr. Hockheimer ably cross-examined those who did.[10] Third, Mr. Dougherty apparently indicated to Mr. Hockheimer not just that Mr. Cohen may be helpful but that, paradoxically, he also may have had some role in bringing the investigation and prosecution of Mr. Dougherty to pass—adding yet one more reason for Mr. Hockheimer to have concerns about calling Mr. Cohen as a witness. Fourth, even if Mr. Hockheimer had some loyalty to Comcast due to his firm's representation of the company in

---

[10] To the extent that Mr. Dougherty raised concerns about the cross-examination of Ms. Sullivan as another defense strategy foregone because of alleged loyalty between Mr. Hockheimer and Comcast, the Court rejects that position as well. Mr. Hockheimer ended that witness's cross-examination after eliciting testimony favorable to Mr. Dougherty. As Mr. Hockheimer alluded to in his testimony, ending on a compelling piece of favorable testimony is a tried-and-true tactic of defense attorneys everywhere. Although he could have pressed on to ask whether Ms. Sullivan invited Mr. Dougherty to the meeting on December 2, 2015, Mr. Hockheimer exercised sound professional judgment in declining to do so, and at the time neither Mr. Dougherty nor the other defense attorneys suggested that Mr. Hockheimer ask that question (or any other questions). As the Government points out in its brief, this very well could have been because Ms. Sullivan in fact may *not* have requested Mr. Dougherty's presence: After all, why would Comcast executives seek to invite the influence of a very powerful counterparty who was, in those very same negotiations, making demands that the other members of the Comcast team described as illegal, unlawful, and extortion?

unrelated matters—and the Court found above that he did not—Mr. Dougherty has not explained how that loyalty compelled Mr. Hockheimer to not call Mr. Cohen as a witness. In fact, as discussed at the conflicts hearing, Mr. Hockheimer had no issue subpoenaing other Comcast employees that he would have called as witnesses had the Government not done so first. For these reasons, Mr. Dougherty has failed to establish even the slightest causal connection between any supposed loyalty to Comcast and the decision not to call Mr. Cohen.

## IV.     CONCLUSION

The Court finds that Mr. Hockheimer and his team did not have an actual conflict of interest that impacted their decision-making in fashioning a defense for Mr. Dougherty. The Court therefore rejects the remaining claim in the Third Conflicts Motion. A corresponding order accompanies this memorandum.