IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | |
| | : | CASE NO. 19-CR-64 |
| JOHN DOUGHERTY | : | |

DEFENDANT JOHN DOUGHERTY SENTENCING MEMORANDUM

Defendant, John Dougherty, respectfully submits this sentencing memorandum to assist this Court in fashioning a sentence sufficient, but not greater than necessary, to meet the goals of sentencing set forth in 18 U.S.C. § 3553[1].

## I. INTRODUCTION

John Dougherty dedicated more than half of his life to zealously advocating for organized labor. He dedicated a significant part of his life to helping the poor, the sick, the substance abuse addicts, the forgotten people in society and those less fortunate. He dedicated a significant part of his life to helping his neighborhood and the City of Philadelphia become a better place. He dedicated much of his life to his immediate family, as well as his widowed sister and her four children, and his father until he passed away in October 2023. Since 2017, John Dougherty has dedicated almost all of his time to keeping his wife Cecelia of over 40 years alive. She is gravely ill and he provides for her daily care. He is her only available caregiver.

Mr. Dougherty's lifelong commitment to service to others, as well as the nature of the offenses, and the reasons mentioned below, all support a significant downward departure from the sentencing guidelines. Cecelia Dougherty's condition is so fragile and so complex that it

[1] Defendant incorporates into sentencing memorandum the objections to the PSR that were sent to the parties on June 24, 2024.

warrants a delay in the service of any prison sentence that might be imposed by the Court.

U.S. Probation calculated the U.S.S.G. range of 135 months to 168 months. However, depending on how the Court calculates the 2B1.1 loss amount and the 3B1.1(a) adjustment for role in the offense, the offense level could be lower. The defense submits that whatever guideline range is calculated by the Court, a substantial downward departure is warranted. Mr. Dougherty is an individual whose significant history of community service and charitable works justifies a substantial downward departure. Mr. Dougherty's personal history is unique in this sense and it alone warrants a downward departure.

The defense recognizes that the defendant violated the law and thereby violated a position of trust and a fiduciary duty to his Union membership. But Mr. Dougherty's offense conduct should be considered in the context of Mr. Dougherty's history of community service and charitable works, which began long before the offense conduct, and will continue to the end of his life. The offense conduct should also be considered in the context of the tremendous and tireless work that Mr. Dougherty did for Local 98.

## II. **SENTENCING FACTORS UNDER TITLE 18 SECTION 3553(a)**

After reviewing the sentencing guidelines and considering potential reasons for departing, the Court must impose a sentence sufficient, but not greater than necessary, to meet the goals of sentencing set forth in 18 U.S.C. § 3553(a). The Court must consider the factors in section 3553(a) and determine whether an upward or downward deviation from the guidelines is appropriate based on the Defendant's case. For the reasons set forth below it is respectfully suggested that there are many reasons that the Court can impose a sentence below the guideline in Mr. Dougherty's case.

### A. History and Characteristics of the Defendant

John Dougherty made a significant and positive impact on the lives of countless individuals. This is corroborated by letters from hundreds of individuals, many of whom would appear at sentencing and testify under oath if called upon (Exhibit A, Book of Letters and Supplemental Book of Letters).

The letters are from people of all walks of life. Many letters were written by ordinary neighborhood people who have known Mr. Dougherty his entire life or for decades - which is itself a reflection of his good character - and some were written by ordinary people from far and wide. Some are from officers of the International Brotherhood of Electrical Workers (IBEW) and some are from dues paying Local 98 members - active and retired (i.e., George M. Rohanna, retired Local 98 member). One letter is from former Governor of Pennsylvania, Mayor of Philadelphia, and District Attorney of Philadelphia, Edward G. Rendell, others are from a former U.S. Congressmen and many other elected officials. Some are from priests, nuns and a rabbi. Many letters are from family members of sick or disabled children or spouses who John helped. More are from recovering addicts or family of addicts that John helped over the years. Many of the letters are from individuals who know John and his wife Cecelia and are familiar with the vital and daily care he provides to her. This case has received widespread media coverage. Most, if not all, are very much aware of Mr. Dougherty's convictions and the evidence presented at the trials - including the bad acts evidence presented by the government.

These letters are proof of who Mr. Dougherty is beyond what is contained in the court record or the news media. They demonstrate that he possesses a true commitment to caring for, and caring about, *all* people. The letters submitted are collectively the voices of a small portion of those who know him and despite the convictions and despite how the government or the news

media portrays him, they maintain unwavering support for Mr. Dougherty. It is a significant factor that respectfully should be factored into the sentence and punishment.

The Court, unlike the Guidelines range, can and should, take into account Mr. Dougherty's extraordinary service to others. It is respectfully suggested that the Court should consider Mr. Dougherty's contributions to his communities. He is an asset to Pennsport, which is now his former neighborhood due to the fact that he and Cecelia moved to an apartment that is wheelchair accessible and across the street from McGee Hospital, and he is an asset to the Tri-State area in general. Mr. Dougherty will continue to serve the greater good. Keeping him in custody for an unnecessarily long period of time will have a negative impact on society.

*(i) Service to Pennsport Neighborhood and South Philadelphia and other Philadelphia Communities*

John was committed to making his neighborhood the best it could be to entice residents to stay and not move away. His personal philosophy told to many was, and still is, "you won't forget where you came from if you never move." He helped to clean the streets, gutters, alleyways, graffiti, crime, etc. He got funding for ball parks and sports programs. He coached all sports and encouraged other parents to do the same. He served as president of the Pennsport Civic Association for 30 years and never missed a meeting. He encouraged investment to increase quality of life and in turn property values. In the words of Barbara Barrett:

> John Dougherty is a pillar in the community . . . On many holidays, John Dougherty always provided many needy families with food baskets, etc. he always showed such kindness.

Dr. Gerard V. Vernose, M.D., resident of South Philadelphia stated that:

> John is a major support figure to all of South Philadelphia. He is a column of strength, who has supported all in need in South Philadelphia.

A handwritten letter from John B. Hall, 74 year old resident of John Dougherty's neighborhood reflects that Mr. Hall is not closely acquainted with Mr. Dougherty, he is not a member of Local 98. He stated:

> My opinion is totally objective . . . I love my neighborhood and thanks to Doc it not only survives but continues to thrive. I would have to write a book to explain how much good he has done for old timers like myself and young people like my grandchildren . . . Bottom line: John is a very good man that has done so much good in his life.

John Dougherty's commitment to his community, far and wide, included many youth recreation fields and leagues, Toys and Turkeys drives, Alex's Lemonade Stand, disaster relief efforts, and more. Rev. Joseph Campellone describes John's involvement as follows:

> As an alumnus of the Edward O'Malley Athletic Association, John has a special affinity for Philadelphia's underfunded, volunteer driven youth recreation leagues. It has often occurred to me that without John Dougherty there would be little in the way of youth sports in Northeast Philadelphia.

Michael Fera stated:

> Through his actions, John has demonstrated that true community transcends neighborhoods, race, and religion. John has always fostered a sense of unity, inclusion, and belonging across the City of Philadelphia. Witnessing John bring people together is something that I emulate to this very day.

According to neighbor Terry Duczkowski:

> I am not involved in politics on any level. I know John through my daughter, who has been best friends with his stepdaughter, Tara Chupka, since nursery school . . . I watched as John and Cecie raised Tara and gave her the care and love that any parent would give their own child. Tara has come into adulthood as a well-rounded, generous, kind and respectful human being. I live in the same neighborhood as John since birth, he was the President of our Civic Association and let me tell you, he saved our neighborhood!

Anthony Barbera stated:

> **If every neighborhood was fortunate enough to have a John Dougherty, the world would be a better place because of it. John is a good man who has made mistakes. In his heart I know he realizes he must pay for those**

> **mistakes. I humbly ask you for leniency for John as you deliberate his sentence.**

*(ii) SERVICE TO THE CITY OF PHILADELPHIA AND COMMONWEALTH OF PENNSYLVANIA*

John Dougherty's community contributions are not limited to those in his neighborhood. Lawrence Ceisler, who has known John Dougherty professionally and personally for about 30 years says that:

> I can confidently say both [his neighborhood and the City of Philadelphia] are better places because of John.

Letter from Edward G. Rendell, Governor, described two examples of John's dedication to the common good; first, his role in negotiating a labor dispute at the Convention Center which led to generating billions of dollars of income for the City and Commonwealth and second, in building shelter and homes for the homeless:

> [i]t is not an exaggeration to say that John played a critical role in working out this fundamental issue [modification of Union rules], leading to our ability to capture billions in Convention Center revenue, and creating thousands of jobs for Pennsylvania workers. The second example is when John led the effort to build a new, much needed homeless reception center for the City. John persuaded the trades to do the construction work at cost, which made the project viable. This important construction project made it possible to get so many homeless people and families off the streets. I'm familiar with its operation because, when I was Mayor, every Christmas Eve I would take boxes of candy and presents to the Center to wish everyone a Happy Christmas. I think it was one of the most important things I did in my time as Mayor, and it would not have been possible without John's leadership . . .**These are but two examples. There are many, many more. I can honestly say that John has done so much good for the City we both love and its citizens. And he gained nothing for himself, except the respect of so many.**

Letter from Pennsylvania Supreme Court Justice Sandra Schultz Newman (retired), stated that:

> I have known John for many years. I found Mr. Dougherty to be fair, thoughtful and politically open-minded. He also has worked very hard for the City he loves and his family faces many challenges because of his wife's profound disability . . .

Letter from John J. McNichol, stated:

> . . . I am president and CEO of the PA Convention Center. As such, the vitality of our hospitality industry is perhaps my most important responsibility. I became president in 2014 during a difficult time. The Center was not performing well and there were major customer concerns about the cost and performance of Union labor . . . John Dougherty stepped up and helped bring about meaningful changes . . . Put simply, John has been a great partner in making the PA Convention Center a world-class venue. His leadership and vision made our success possible.

Letter from Francis McLaughlin, Painters & Allied Trades, District Council 21, Business Manager/Secretary Treasurer:

> John's work was responsible for bringing countless millions of dollars and thousands upon thousands of work hours to the City of Philadelphia and surrounding area. Ordinary people's lives have been improved by John's advocacy for projects like the Pennsylvania Convention Center addition, Lincoln Financial Field, Citizens Bank Park, and many other high-profile projects. It is not hyperbole to say these jobs would not have happened without John Dougherty.

Alan L. Butkovitz, former City of Philadelphia Controller:

> John Dougherty is a very smart, energetic guy who has much to offer the Philadelphia community in his remaining years of life . . . I hope the Court will be able to have him use his talents to help his family and community in his remaining years.

In addition to the above, Mr. Dougherty served on the Philadelphia Redevelopment Authority and the Delaware River Port Authority for approximately 8 years, without pay. He also served on the Independence Blue Cross Board of Trustees and donated his annual salary to charity.

*(iii) SERVICE TO CHARITY*

One of John Dougherty's passions is charity work for the poor, elderly and disabled children. Sister Mary Scullion, (co-founder of Project Home) stated in her letter:

> John has continuously shown care and compassion for some of Philadelphia's most vulnerable citizens. He used his connections among the trade Unions to provide much needed construction work at no cost to renovate a site for our city's

> homeless population. His leadership made the project possible and served as an integral step in many people taking the necessary steps to obtain permanent housing . . . his charitable works continued through various volunteer activities and organizing drives to collect food, supplies, and toys to families in need . . . John's commitment to helping his fellow Philadelphians, was clear through his long-time charitable acts.

David L. Auspitz stated in his letter that:

> . . . John has helped so many people and organizations, not just in Philadelphia, but the entire Delaware Valley. I remember when the Variety Club charity was in difficult financial shape. John came to their aid and quickly lead them to solvency. I never heard of his ever asking for anything in return. Others will write to you of his many good deeds. It will be a small number compared to those who were helped quickly and quietly.

Joseph J. Sweeney, Chairman of Variety Club, stated:

> . . . most impressive to the entire membership of Variety, was John's personal attention to the children and the families of the children. John attended all of the many Variety events every year, and his time at the events was centered around the children, as he knew all of them on a first name basis, and he was known for this.

Stu Bykofsky, Daily News/Inquirer, columnist (retired), stated that he has known John for 40 years and that:

> I am here to present information about the 'other' John Dougherty, the man who has embraced and supported charities serving children, gays, the homeless, the powerless . . . In 2009 the charity [Variety Club] fell into a death spiral after the Great Recession. It was in a $5-million hole, almost impossible to climb out of. John Dougherty returned for an unprecedented third term as president. There was nothing in it for him except risk - he could have been in the cockpit when the charity crashed and burned. He reached out to his friends, he called in come chits and probably wrote some others, and he *single handedly* saved the charity that went on to offer services to hundreds of children living with disabilities.

Don Siegel stated in a letter to the Court, regarding John's charitable works:

> In the immediate aftermath of 9/11, he organized volunteers in Philadelphia to gather critical medical supplies, food and equipment, and load up a couple of tractor trailers to send to NYC. He also organized a blood drive for the victims of 9/11. In the aftermath of hurricane Katrina John organized an event at the Phillies Stadium to gather donations and critical supplies, including generators for the hurricane victims in New Orleans. He also arranged for tractor trailers to deliver

> the items to New Orleans . . . Time and time again John has answered the call of community service in the Philadelphia area and beyond. He has been the go-to person in Philadelphia for getting things done in the community.

James Dintino, Chairman of the Board of Revision of Taxes in Philadelphia, stated that despite the fact that neither he nor his family are affiliated with IBEW:

> . . . we do not share the same political ideology . . . his body of work far transcended his Union, and political involvement . . . Philadelphia is a better place with . . . John Dougherty in it.

John Dougherty's generosity and kindness was not limited to those in his family or circle of friends or his neighborhood. He helped all in his community. Rabbi Hirshi Spatz, Director, Chabad of Fairmount, stated in a letter to the Court:

> . . . I confidently attest to his [John Dougherty] support and commitment to helping our community. John's kindness and willingness to help have been a beacon of hope for us. When we outgrew our small space on Spring Garden Street, he opened the doors of the IBEW Local 98 ball to our community, providing a safe and welcoming space for us to come together and celebrate our High Holiday services and other community events . . . John's compassion, empathy and understanding towards others are qualities that are very precious . . . he has consistently demonstrated a willingness to go above and beyond to help those in need, and his dedication to our community has created a sense of brotherhood. While I acknowledge John's conviction, I firmly believe that he is a fundamentally good person who has made a positive impact on our community . . . His exceptional character and value to society cannot be overstated. I implore you to consider these qualities when deterring his sentence.

*(iv) SERVICE TO SUBSTANCE ABUSE ADDICTION*

John Dougherty helped countless people with substance abuse addictions. He started programs within Local 98 to help members and helped many others who were not members. As stated by Dorothy M. Miller:

> The number of members he helped through addiction to become/return to productive citizens cannot be counted.

Dr. Michael I. Callanan, has known John Dougherty for over 40 years. He is an IBEW Member and retired Executive Director of the National Joint Apprenticeship and Training Committee. In a letter to the Court, he stated that:

> . . . Mr. Dougherty has been responsible for changing the course of many lives . . . As he did so often, he gave my son a chance and he successfully completed the apprenticeship program and became a journeyman wireman. Unfortunately, his personal struggles continued, and on December 9, 2018, he died from a drug overdose. Mr. Dougherty called me when he heard and was a source of comfort to me and my family as we tried to deal with the tragic loss of my son . . . Mr. Dougherty called me sometime in 2018 I believe, and asked if I would speak to all 400+ IBEW apprentices at a Mental Health Summit he had scheduled in Philadelphia for all IBEW apprentices. Mr. Dougherty hired a full-time Drug and Alcohol Counselor and set up a system to support any IBEW member who needed help in battling addiction . . . It is my sincere hope that stories such as mine, truly and accurately reveal for you the character of Mr. Dougherty and the many ways he worked so tirelessly to improve the lives of others and that you can take this into consideration as you reflect on your responsibility to determine his sentence.

Rosemarie Mellwig is a resident of South Philadelphia for 70 years and has been married for 49 years. In her letter describes John Dougherty as:

> pillar of strength in our community . . . His dedication and loyalty in our community and beyond is unparalleled. My son . . . is a recovering addict. Without John's help I know my son would not be here with us today. At one point I felt like my son was losing his battle with addiction when he overdosed. At that time my son did not have medical insurance. I went to John, and he helped us out with getting my son into a rehab facility. Through the years John continued to be my son's friend and mentor.

Tom Betteridge, provided a first-hand account of how Mr. Dougherty has helped him change his life:

> In 2002, he helped me put my life back together when I was so riddled with drugs and alcohol that I was unemployable. Because of his help, I went from being someone who couldn't even hold a job, to someone that holds a position of authority.

Ryan M. Fisher stated that Mr. Daugherty was instrumental in his battle with addiction issues:

> John went above and beyond his role in the Union by personally advocating for me to seek treatment for my addiction. He connected me with resources and supported my journey towards recovery every step of the way. His unwavering belief in my potential and his willingness to invest time and effort into my well being were instrumental in helping me achieve sobriety and stability in my life.

Letter from Maurice Hartey reflects the fact that John Dougherty assisted addicts who were not members of the Local:

> **To put it bluntly, and with no exaggeration, John and his network saved my son's life.** Even with all he has going on in his life, particularly with his wife's illness, he continues to routinely check in and make sure my son is doing well and to let me know if he needs anything to reach out.

*(v) SERVICE TO THE SICK*

Edward Guzak describes Mr. Dougherty's assistance in his great-granddaughter's treatment for cystic fibrosis as follows:

> When My great granddaughter was diagnosed with cystic fibrosis and we needed a sponsor to have shirts made for the Great Strides Walk at Citizen Bank Park, I knew I could count on Johnny. He even went above and beyond to donate an extra nebulizer machine so my granddaughter wouldn't have to worry about not having the proper medical equipment for her daughter if the one she had were to stop working.

Vanessa Gervasi DeRose, "professional and personal friend" of John Doughtery stated in her letter that:

> Her husband was diagnosed with stage 4b esophageal cancer. John helped to find the best medical care "made phone calls, raised money and checked in with me often."

Dorothy M. Miller stated that John:

> Showed up at funerals, paid for a funeral for a kid he didn't know who died suddenly, did food drives, helped veterans and all the while worked and cared for his extremely ill wife.

*(vi) COMMITMENT TO LOCAL 98 AND ORGANIZED LABOR*

Second only to family, John Dougherty's biggest commitment in life was to Local 98 and organized labor. He was the face of Local 98 and he spent almost every waking hour of every day of the week working to improve it. He did it for the membership he served. He did it to give them a better standard and quality of living, financial security, and safety in the workplace. He expanded its geographic territory, its diversity, membership, hours worked, etc.

Don Siegel, stated that at the time John was elected Business Manager of Local 98:

> It was close to bankruptcy and there were almost 1,000 of the approximately 1,600 LU 98 members out of work and running out of health benefits. During those early years I witnessed first-hand how hard John worked to restore the financial health of LU 98 and its benefit funds which were clearly underfunded at the time. John and his staff took a cut in pay for a few years while working 7 days a week to restore LU 98 funds and put people back to work. Under John's leadership, LU 98 eventually became one of the most financially healthy locals in the IBEW, increased its membership to approximately 4600, and increased job opportunities for its members . . . I have personally witnessed his commitment to Philadelphia and the members of Local 98 over the many years that I have known him. During these most recent trials John has been described as a selfish, egoistic person who only cares for himself, but these trials simply do not define the John Dougherty that I know. In all his conversations and official dealings with me he has always put the interests of his members first. The real defining moment for me in observing John's character was when he came to the aid of a member who had been electrocuted and severely injured while working on a high voltage system. It was normal for John to aid members, friends and other community members in time of need, but this member was a political adversary who had a long-running feud with John. That didn't matter; when John heard about the accident he immediately came to his aid and made sure that his family was taken care of during his recovery. John visited the hospital several times, ensuring that he had whatever he needed. There is so much more that I could say about John's character; however, I close by stating that as long as I have known John, I have found him to be one of the most generous and hardworking people I know. My hope is that you will consider all the above in your deliberations regarding sentencing, and I am asking for as much leniency as allowed in your final decision.

Salvatore (Sam) Chilia, from Ohio, a retired IBEW, Secretary-Treasurer states:

> He is "aware of his longstanding commitment to his community and the International Brotherhood of Electrical Workers (IBEW) Local 98 . . . Throughout his career, Mr. Dougherty has passionately advocated for workers' rights and played a crucial role in enhancing the livelihoods of individuals within the

> electrical trade and construction industry. Under his leadership, Local 98's membership more than doubled to approximately 4,600 members. Wages and benefits also experienced significant increases, leading Local 98 to become one of the most financially robust locals in the IBEW. These improvements created more job opportunities for Union members, highlighting Mr. Dougherty's unwavering commitment to their well-being". Mr. Chilia does not ignore the fact that Mr. Dougherty was "convicted of serious charges". But asks that the Court "see the potential for rehabilitation and the chance for Mr. Dougherty to contribute positively once again to society."

In a letter to the Court, C. James Spellane, of Chevy Chase, Maryland, (retired Media Director, IBEW, Washington, D.C., 1993 to 2014), stated that:

> John Dougherty is a dynamic force in the economy and politics of the Philadelphia area. Under John's leadership, the local expanded its share of the traditional construction market within its jurisdiction, while finding new opportunities for employment in the then rapidly expanding field of technology. We have grown accustomed to political leaders who talk about putting people to work. John Dougherty is a union leader who put words into action and has had a positive impact on countless lives throughout the region . . . I respectfully ask that you consider the full measure of the man and his work and hope you find that a degree of leniency is appropriate.

Frederic B. Sargent, a former CEO of a nationally-ranked electrical construction company, from Pittsburgh, Pennsylvania, stated:

> With over 50 years of experience in the industry, I now devote my time to the continuing development and growth of both the electricians' workforce and the contracting business. From that vantage point I can reflect on the appreciation that I have always had for the enduring contribution that John Dougherty has made to the benefit of the electrical field and indeed to the benefit of the entire construction industry over the 30+ years that I have known him. If it seems remarkable that someone from 'management' would compliment someone from 'labor' in this way, it goes to the undeniable fact that John Dougherty is a remarkable man. In every situation in which we have ever found ourselves, I have always been completely convinced that he has honestly been guided solely by a vision to achieve the most he could achieve on behalf of his local Union members . . . **I commanded an armored cavalry combat platoon in Vietnam in 1968-69. If I ever had to do it again, I would want John Dougherty in my platoon because of his personal character and the kind of fairness and devotion that has always displayed on behalf of his Union and its purpose.**

Another business owner, Bruce D. Shelly, of Shelly Electric Company, Inc., Philadelphia, shares a similar opinion. In a letter to the Court he states that:

> I have known John Dougherty for close to 30 years and he has been one of the best business managers that IBEW local Union 98 and the NECA Electrical contractors in Philadelphia could ever find. His character, friendship and ability to get things done cannot be repeated by anyone in the future. John has personally assisted me in personal matters as well as helping many of our electricians during their times of hardship.

John Dougherty is a person who truly cared for the best interests of his membership and their health and wellbeing. Stephen K. Klasko, M.D., M.B.A., Former President and CEO, Thomas Jefferson University and Jefferson Health who came to know John professionally through Union negotiations and personally through the devastating neurosurgical procedures his wife endured, in a letter to the Court stated that:

> Professionally, I found John to not just be passionate about his Union but about the individuals that were impacted. In every negotiation, he emphasized what the individuals and the organization were doing for the city. I was incredibly impressed with his knowledge and caring for individual Union members who were going through difficult times, injuries or deaths of family members. It seemed he knew every member and would be passionate about making sure that he personally was there to help them. The only time he ever asked anything of me would be when a member was at one of my hospitals and to make sure they were getting good care. The few times that we had issues with entities that were considering utilizing non-Union members, John was respectful and in almost every situation we were able to come up with an equitable solution and in most cases secured a Union contract. He was masterful and sincere in talking about the benefits (predominantly around health and education) that Union workers were able to secure compared to non-Union workers.

Jeffrey B. Rotwitt, a practicing attorney for nearly 50 years with "extensive dealings with the business and real estate industries", wrote a letter in which he stated:

> It was in this context where I first met John Dougherty as the head of Local 98. Although we were adversaries, I found him to be a skilled proponent for his Union members while still not losing sight of the big picture . . . I came to learn about the many steps that he took, both large and small, to advance his Union's interests as well as the personal and family needs of the Union members.

John Dougherty's almost 30 years of work as Business Manager to Local 98 is still highly praised by members - despite the convictions, the government evidence at trial and the media coverage. In a letter to the Court, John J. Condi stated that he joined Local 98 in 1976 as an apprentice and thereafter worked his way up to managing an office for one of the largest electrical contractors in the region, states that:

> I have known and associated with John Dougherty for the majority of my time in the business and I have had many dealings with him. **John has always been a man of his word and never once did I doubt his integrity and honesty. He invested his entire life to the betterment of Local Union 98 and especially its members but even more important is his contributions to the community. John was always looking out and helping the less fortunate in the area through programs and events that he developed.**

John helped to grow Local 98 territory thereby protecting jobs and man hours. This was an extraordinary time commitment for which he did not get paid but did it for the betterment of the Local. Boe Lawless, Business Manager of Local 380 stated in a letter to the Court that:

> In 2014 John and Local Union 98 stepped in and helped merge our struggling Union with his. John oversaw a seamless transition of our Local into 98's, which was not an easy task to integrate 800 established workers and assimilate them with the thousands of established members of Local Union 98. During the transition John ensured all Local Union 380 members felt that they had always been a member of Local Union 98's. After the transition John asked me to continue to work as a Business Agent for Local Union 98 . . . Prior to that I thought that I had known John well, however while serving alongside of him I realized his ability to connect with people and help lead them to a better future. John worked tirelessly to help build a better Union and give back to the communities that the Local served . . . a servant to his community.

John Dougherty has made efforts to diversify the electrical trade to include females, other races and persons from all parts of the City. Letter from Leigh-Ann Wilson, Special Education Director, P.E.T. Charter High School, stated:

> Mr. Dougherty has worked tirelessly with a team of educators, colleagues in the trades, and community members to begin his remarkable and ongoing journey of service to the children and young adults of Philadelphia . . . Mr. Dougherty's

> biggest impact [at the school] was the 1-1 support he offered to one of our intellectually disabled students . . . [t]o this young man John Dougherty was not simply an employer; he was a mentor, a teacher, a father figure and a friend. His desire and ability to form nurturing relationships, guilty upon inclusivity and mutual respect, is nothing short of extraordinary . . . I ask you today to consider the exemplary impact Mr. John Dougherty has had on the children and young adults of our city, in determining his fate. His contribution to and support of our school community has always been, and continues to be, honorable and profound.

A consistent observation in many letters is that John Dougherty is a workaholic and has a work ethic that is second to none. The evidence at the trial supports this as well. There were over 100,000 Title III intercepts - there were hundreds, some days over five hundred - communications per day, seven days a week.

*(vii) Service to Cecelia Dougherty*

John Dougherty's most important service is to his wife. He has dedicated the past 7 years of his life to keeping his wife alive. He has done so, successfully, against medical odds and opinions. He is committed to being at her side almost 24 hours per day in an effort to provide her with meticulous personal care. Christine Pluta, D.O. Medical Director, one of Celica's doctors, described her condition and Mr. Dougherty's caretaker responsibilities as follows:

> Cecelia has what is called an anoxic brain injury from an intracranial hemorrhage. This brain injury has left her quadriplegic and dependent on 24 hour skilled care for survival. She resides at home with around the clock caregivers and highly specialized equipment. John not only is her primary caregiver but manages all of her medical equipment and supplies, manages her health insurance bills and referrals, coordinates her medical appointments and transportation, and handles the scheduling of caregivers and therapists. He is the only one who knows and understands every nuance of her care because he has dedicated the past 6 years of his life to learning every detail involved in her life sustaining medical regiment.
>
> It has become clear to me that, despite all of the skilled medical personnel involved in Cecelia's care, her husband, John, is the reason she remains alive with quality of life. I truly believe that without John present, Cecelia's physical and mental health would suffer to such an extreme that it would not be possible for her to survive at home.

Donna Gentile O'Donnell, Ph.D. tells the story in her letter about an evening in March of 2017:

> [w]e all sat in the surgical waiting room, for hours. Around 3AM, [the surgeon] Dr. Jabbour came out. Cealie had made it through the surgery, and the next 24-48 hours would be the most critical. That night began a journey for John, Cealie, and their families, which would shape so much pain and suffering in the weeks and months and years ahead. I know there are critics of John's who deny his deep and abiding commitment to Cealie. I bore witness that night to how deeply embedded in John's heart and soul is his commitment to Cealie . . . I hope Your Honor will take all of this into consideration in weighing what sentence to give John. Because it is not only a sentence for John. It is a sentence for Cealie too. Both of them have suffered so much and the heartaches of these circumstances continue.

Mr. Dougherty should be permitted to continue this work as he is the only person that can or will do it. Numerous individuals also provide first hand accounts of Cecelia's condition and John's function as caretaker. Lifelong friend of Daniel J. McBride stated in a letter to the Court:

> Perhaps the kindest thing that I know John has ever done, and continues to do, is to provide the best care possible to his wife Celie. His devotion to her ongoing care and recovery is inspirational. There were so many occasions over these last few years that our friends would gather, but John wouldn't attend in order to stay near Celie. In closing, I simply ask Your Honor for leniency toward John, and to take into consideration the number of people that he has helped over many decades when making your sentencing decision.

Again quoting from Mr. Chilia's letter cited above stated:

> In addition to his community service, John has been the chief caretaker for his wife Cellie who suffered a stroke several years ago that has left her paralyzed and severely disabled. His dedication and devotion to her 24-hour care has been crucial to her survival and has allowed her to be cared for at home. His devotion to her is one of the virtues I admire most about him.

Mr. Ceisler also knows much about this aspect of John's life as well. He was present when John got the call that Cecelia was on the floor at home and unresponsive. He stated:

> Of course, John's deepest dedication is to his wife Cecelia . . . John would not consider his care for her to be a sacrifice, but I know it has been . . . From the first day she suffered, John has been at her side. I have witnessed that part of his life over these many years and I have never seen such love between two people in this

> type of situation for this period of time. **There is no doubt that without John's love and care for her, she would not be with us today.** For her sake alone, I would hope you would be as lenient as possible.

A friend of John and Cecelia Dougherty, Linda L. Young stated in her letter:

> Watching John take care of Ceilie throughout the years has been nothing short of amazing. **I am not sure how he does it but I've never once heard him complain, lose his cool, or get discouraged. John is committed to taking care of her. Ceilie needs John**.

Quoting again from Dr. Klasko's letter:

> Personally, I spent significant time with John at Magee rehab hospital when his wife was recuperating from a significant brain bleed that left her nearly incapacitated. **In my forty year medical career, I have rarely encountered a husband as devoted to the recovery of his spouse.** John would celebrate every movement that she made and according to the nurses was there for hours nearly every day. Further, John started to view the caregivers as part of 'his family' and would make sure that if they were working during holidays or weekends he would get them lunch or dinner . . . **In summary, of all the individuals and leaders I met during my eight plus years at Jefferson, John stands out as one of the most caring, empathetic individuals I met.** There were too numerous to count instances where a visit from John made a difference in someone's life . . . As someone who has seen upfront and personal, the good that John Dougherty can do, I would respectfully and humbly ask you to consider leniency . . . Philadelphia will be better off with the 'good' John can do post-conviction.

Terry Duczkowski, stated:

> John takes care of her 24 hours a day and makes sure she receives the best care possible. Every day he and his wife live in their own prison, it would be a horrible hardship for him to be away from her.

Cecelia requires constant care, and even though she has caregivers who are trained to operate very specialized equipment, John manages it and does it himself as well. John's intimate knowledge of Cecelia makes him uniquely qualified - he is not replaceable. Whether it is helping move Cecelia from the hospital bed/wheelchair with the assistance of a "Hoyer Lift" to avoid bed sores every 2 to 3 hours, changing her catheter when the caregivers are gone, monitoring and repairing the equipment, running out to the drugstore at all hours of the day and night, adjusting

her foot braces which become tight causing her pain from the swelling of her feet, or just sitting beside her holding her hand and talking to her. John does it all and oversees it all. It was her wish to stay at home rather than be hospitalized, and John is doing everything in his power to ensure her wish is fulfilled. John manages visiting caregivers schedules, pay, insurance company referrals, and all equipment for life-saving and comfort care requirements. Lastly, Cecelia is on the verge of being completely blind and now more than ever, she needs John.

Cecelia Dougherty's fragile state and complex health issues and his role as her only available caregiver under USSG 1B1.13(b)(3), weigh heavily in favor of a sentence that will permit John to be at her side until there is a change in circumstances.

B. Nature and Circumstances of Offense

There is an analytical difference between the evidence necessary to support a guilty verdict and the vast spectrum of culpable conduct, motivations for that conduct, and resulting harm - all of which are relevant in determining sentence. *U.S. v. Orton*, 73 F.3d 311, 333 (11th Cir. 1996)("Fraud schemes . . . come in various forms, and we must consider the nature of the scheme in determining what method is to be used to calculate the harm caused or intended). Honest services fraud is difficult to define and all courts for decades have grappled with its definition, breadth and how to interpret its scope and constitutionality. *U.S. v. Wright*, 665 F.3d 560 (3d Cir. 2012); *U.S. v. Riley*, 621 F.3d 312 (E.D. Pa. 2010). Mr. Dougherty recognized that his conduct resulted in damage to Local 98 and the public at large as is present in all corruption cases. But Mr. Dougherty respectfully suggests that there are mitigating factors regarding his motives and intent which should be considered by the Court.

The Sentencing Commission has also recognized the vast range of conduct covered under sections 2B1.1 and 2C1.1. The background commentary recognizes that "the object and nature

of a bribe may vary widely from case to case" and that "[c]onsequently, a guideline for the offense must be designed to cover diverse situations."

The sentences for embezzlement and fraud under the USSG should not be categorically embraced and are problematic in their own right. The driving force behind sentences imposed in fraud cases is the fraud loss table, which is not tethered to any reasonable measure of the seriousness of white-collar fraud. Frank O. Bowman, III *The 2001 Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History,* 35 Ind. L. Rev. 5, 18 (2001)("The penalty ranges for federal economic offenses seem almost whimsical, owing more to the political enthusiasm of the moment they were enacted than any reasoned effort to compare the relative seriousness of different crimes.").

A review of cases involving embezzlement and fraud convictions reveals that there has been considerable criticism of USSG Section 2B1.1, the fraud loss table. *U.S. v. Stuart*, 22 F.3d 76, 82 (3d Cir. 1994)("[W]e are left with the definite impression that, notwithstanding the proper application of the Guidelines, a nine-level enhancement under these circumstances may well overstate both the degree of Stuart's criminality and his need to be corrected."); *U.S. v. Algahaim,* 842 F.3d 796, 800(2d Cir. 2016)("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to condiment a non-Guideline sentence."); *U.S. v. Corsey,* 723 F.3d 366, 379 (2d Cir. 2013)("The loss guideline. . . was not developed by the Sentencing Commission using an empirical approach based upon data about past sentencing practices. As such, district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that the guidelines provide."). *U.S. v. Lay*, 568 F.Supp. 2d 791, 810 (N.D. Ohio 2008)(varying downward by applying only half of the

enhancement for loss); *U.S. v. Lamonda*, No. 6:05-cr-131-Orl-28UAM, 2008 WL 68744, at *9 (M.D. Fla. Jan. 2, 2008)("The fraud loss table not only drives the seriousness of the penalty, but it does so with precision, providing incrementally longer prison terms as the amount of loss increases. This formulaic approach is ironic because the means of determining loss is not at all precise; the method of assessing loss perhaps depends on the nature of the fraud in question.").

This is an uncommon embezzlement case. Typically in these cases the victims are not also beneficiaries. The members of Local 98 are unquestionably victims here. But they are also beneficiaries. The members of Local 98 - and the tens of thousands of family members they support - certainly benefited substantially for decades, as a direct result of Mr. Dougherty. His good work cannot be erased by the bad work that is the foundation of his convictions. Mr. Dougherty was the face of Local 98, he worked nonstop, he lived modestly in the same community as his members, he was thus always accessible, he did not have a vacation home, and it was largely because of his dedication and tireless work that the Union grew in numbers, man hours, benefits, funds, and wealth, in the decades of his leadership, constant work and zealous representation. Under "the USSG, the *recommended prison term is influenced heavily by the loss suffered by the victims". U.S. v. Agarwal,* 24 F. 4th 886, 888 (3d Cir. 2022)(Emphasis added). Any prison term should be tempered by John Dougherty's good works on behalf of Local 98. A downward variance under 3553(a) is warranted in this case for Mr. Dougherty's good works performed on behalf of Local 98.

Mr. Dougherty and his staff were compensated by salary. Those who worked for him, day in and day out (the "kids"), worked when John worked - all the time. They all worked extended hours - for which they were not compensated. The "kids" did personal errands on behalf of John Dougherty as well. Although he utilized his staff for personal errands, he was working while they

were assisting him with his personal affairs. While recognizing the seriousness of the offense, Mr. Dougherty submits that the Guidelines calculation overstated the amount of loss by failing to take into consideration the benefits received by the Union by using his staff for personal errands.

Mr. Dougherty accepts and recognizes that he harmed Local 98 in many ways. First and foremost he hurt the Union economically, and secondly, he tarnished the goodwill and reputation they all worked very hard to create. It is respectfully suggested that there are facts and factors which warrant mitigation in assessing the motive and intent to commit the crimes in question. Mr. Dougherty's primary motive in the honest services fraud crimes was to benefit the Union. As for the embezzlement cases some facts should be recalled to put the conduct into context; a) Anthony Massa testified that John never told him to do anything wrong or illegal nor did he disclose to John the crimes he was committing; b) Lisa Ketterlinus testified that John Dougherty "never" instructed her to do anything wrong or illegal; c) the timing of the embezzlement is important as many of the credit card embezzlement convictions were reconciled during the March 2016 Easter weekend when approximately a year of credit card transactions were reconciled to file the LM2 by April 1st; d) Mr. Dougherty was extremely busy with Union and political work in 2015 and 2016; e) again, the timing is a factor of other credit card embezzlement convictions, which were reconciled 18 months after the August 5, 2016 search warrant executions due to the fact that the FBI confiscated the Local 98 business records.

C. <u>Seriousness of the Offense, Respect for the Law and Provide Just Punishment</u>

The Court cannot discard consideration of the impact of political corruption and embezzlement on public trust and victims. However a sentence in the guideline range is unnecessary to reflect the seriousness of the offense and to promote respect for the law. It is

respectfully submitted that a sentence within or anywhere near the USSG range would constitute excessive punishment and thereby undermine respect for the law.

Excessive punishment, perhaps more than insufficient punishment, diminishes respect for the law. *U.S. v. Coughlin*, No. 06-20005, 2008 WL 313099, at *5 (W.D.Ark. Feb. 1, 2018)(expressing concern that an unduly harsh sentence would "engender[] derision of the law" because "those aware of the defendant's medical condition that might well be outraged by the criminal justice system, the despite the great investments of intelligence and moral judgment that contribute to the system produces a sentence plainly inhumane").

D. <u>Adequate Deterrence to Criminal Conduct and Protect Public from Further Crimes of the Defendant</u>

The Court must impose a sentence that "protect[s] the public from further crimes of the defendant." 18 U.S.C. Section 3553(a)(2)(C). Imposing a below-Guideline sentence neither condones nor endangers the public; rather, it properly reflects the culpability of the defendant in the light of all of the purposes of sentencing. To protect the public there is no need to imprison Mr. Dougherty because there is no risk he will reoffend. He has no prior criminal history, the conduct of conviction (while ongoing) was isolated to a pattern of behavior, the convictions are the result of his position as the business manager of a Union, and most importantly, the results of the conduct and subsequent convictions have destroyed his life. While the very real prospect of losing his liberty remains primary among the potential consequences, the personal and financial and professional impact of the convictions are profound and forever life changing to himself, his loved ones, and his community (near and far). Everything this man has done and all of his accomplishments will be forgotten or at least forever shadowed by his criminal convictions. The collateral consequences of this case have been disastrous and utterly life altering for Mr. Dougherty. The media scrutiny, the negative publicity and the evidence adduced at trial which

exposed not just the criminal acts but personal bad acts is more than enough to deter Mr. Dougherty and any other individual from committing a similar course of conduct.

According to a study funded by the Department of Justice, recidivism is more likely when a defendant has a prior criminal history, substance abuse history, mental health history, unemployment and unstable living history. William Rhodes, et al., *Recidivism of Offenders on Federal Community Supervision*, at 1, Abt Associates, Dec. 21, 2012 (prepared for Bureau of Justice Statistics and Office of Probation and Pretrial Services). Mr. Dougherty has no prior criminal history, he has no history of substance abuse, mental health problems and he is more than capable of living a stable and productive life.

Factors that decrease the risk of recidivism include having a strong support system, marketable educational skills, a motivation to change, and age. *Id.* Mr. Dougherty's personal history shows his risk of recidivism is extremely low.

As for general deterrence under 18 U.S.C. Section 3553(a)(2)(B), it is not necessary to sentence Mr. Dougherty within the guidelines to accomplish that goal. In fact, a sentence well below the guidelines in this case would still constitute a significant punishment and, therefore promote respect for the law and general deterrence. As with specific deterrence, imposing a sentence well below the guidelines neither condones the conduct nor endangers the public; rather, it properly reflects the culpability of the defendant in light of all of the purposes of sentencing.

Research on deterrence and criminal sentencing proves that, particularly for cases which fall into the so-called category of "white collar" cases, "informal sanctions (such as social censure, shame and loss of respect)" are "equally important [as imprisonment] in producing the deterrent outcome." Zvi D. Gabby, *Exploring the Limits of the Restorative Justice Paradigm: Restorative*

*Justice and White Collar Crime,* 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).There is no empirical evidence that lengthy sentences provide any additional deterrent effect. *Id.* (no evidence supporting the "conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders"); *see also,* David Weisburd, et al. *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995)("It has often been assumed by scholars and policy makers that white-collar criminals will be particularly affected by imprisonment. Our analyses suggest that this assumption is wrong, at least as regards to official reoffending among those convicted of white-collar crimes in the federal courts. We find that prison does not have a specific deterrent impact on the likelihood of rearrest over a 126-month follow-up period."). A sentence below the guideline range will prove for general deterrence.

E. Kind of Sentences Available and Avoid Unwarranted Sentencing Disparities

While the Court must consider the Guidelines calculation as part of the sentencing process, the Guidelines merely "serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Rather than simply impose a sentence within the Guidelines range, the Court must consider the whole range of factors listed in 18 U.S.C. § 3553 and determine the sentence that is "'sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *Id*. at 101 (quoting 18 U.S.C. § 3553). Indeed, the Court may not even "presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. In determining the sufficient sentence, it is important to examine the ruination that Mr. Dougherty has already suffered as a result of his conduct and this prosecution and

conviction. While these consequences are not a complete substitute for judicial punishment, they are critically important to assessing what further punishment is necessary in this case. The sentencing court has wide latitude to impose a sentence below the Guidelines range, "perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007) (internal citations omitted). Here, the 3553(a) factors overwhelmingly support a sentence that is well below the applicable Guidelines range.

Section 3553(a)(6) requires the Court to avoid "unwarranted sentence disparities among defendants who have been found guilty of similar conduct." Often, the government argues that sentencing within the applicable guideline range is a means to accomplish that goal. That reasoning fails in this case for this reason: The Background commentary to Section 2C1.1 recognizes that the guideline was "designed to cover diverse situations." In practice, sentencing judges recognize this "diversity," which is reflected in the sentencing statistics published by the Sentencing Commission.

Sentencing judges across the country recognize the very point the defense makes concerning the offense conduct: that honest services fraud and Section 2C1.1 apply to a broad spectrum of conduct, motivations and harms. That premise invites the Court to examine the offense conduct and conclude that Mr. Dougherty's conduct is sufficiently mitigated to support a downward variance.

A sentence within the suggested Guideline range would result in unwarranted sentencing disparity. Looking at the codefendants in this case, the average sentence is approximately 2 years

in prison; Robert Henon after trial was sentenced to 42 months incarceration, Brian Burrows after trial was sentenced to 48 months, Michael Neill after a guilty plea was sentenced to 13 months, Niko Rodriquez after a guilty plea was sentenced to 3 years probation, Brian Fiocca was sentenced to 3 years probation, and Anthony Massa who cooperated and testified at the embezzlement trial, is awaiting sentencing.

The United States Attorney's Office, Eastern District of Pennsylvania, website, news page, reports the following sentences imposed, *U.S. v. Simpson,* $3.2 million fraud case 41 months; *U.S. v. Davis,* $2.1 million fraud theft case 33 months; *U.S. v. Uzor,* $1.1 million embezzlement case 48 months; *U.S. v. Brown,* carjacking with a firearm case 105 months; and *U.S. v. Fayez,* 8 gunpoint robberies and 1 gunpoint carjacking 162 months. Each defendant in the above theft cases received sentences under 5 years yet involved far greater loss amounts; and the government is asking for far more punishment in this case - 14 years. Each defendant convicted of gunpoint robberies - serious crimes of violence - received less than 14 years. It is doubtful that any of the defendants in the above referenced cases enjoyed Mr. Dougherty's extraordinary history of community service and charitable service and letters from hundreds of supporters.

Looking at a case within this district in 2009, *U.S. v. Fumo* it appears that the sentence requested by the government is excessive. In Fumo, the loss amount as calculated by the Court was about $2.4 million; most of which was money skimmed from a charity used for Mr. Fumo's personal benefit. Per the USSG calculations Mr. Fumo's range was approximately 200 months. After extensive hearings the sentence imposed by the Court was 61 months.

Mr. Dougherty's sentence is not required to be the highest of all defendants in this case. It can be less than Burrows' sentence of 48 months given his extraordinary personal history and

other factors stated herein. Mr. Dougherty's sentence should be lower than Fumo's - far less considering his background and history.

F. *Need for Restitution*

This Court convened a restitution hearing on July 8, 2024, and the amount of restitution will be determined by the Court regarding the legal and accounting expenses incurred by the Union as a result of the federal investigation of this indictment. As for the loss amount we will leave it to the Court's discretion at sentencing. It should be noted that as to honest services fraud Mr. Henon did perform work for Local 98 while serving on the City Council. The Union was the beneficiary of the honest services fraud. The Union was the beneficiary of Mr. Dougherty's services of 30 years.

## III. LOSS AMOUNT

The § 2B1.1 sentencing guidelines based on the loss amounts of $606,772.80 and the $202,948.70 are both overstated. Some portion of that amount was used to gain contracts and secure employment for the Union, resulting in economic benefit for the members of Local 98. There was some legitimate purpose and element to some of the spending that was the basis of the honest services fraud as well as the embezzlement. As previously stated the Union was a victim but also a beneficiary. Mr. Dougherty's actions underlying the convictions were obviously criminal but the vast majority of his actions on behalf of the Union were beneficial. The loss amount for the embezzlement is also overstated because it was proven at trial that Anthony Massa overbilled Local 98 for his work. While not binding on the Court or the government, it should be noted that the government agreed to a loss and restitution amount of under $549,999.00 in a prior written plea agreement.

Additionally, USSG § 2B1.1 does not account for inflation. When these guidelines were made (in 1987) the loss amount, adjusted for inflation, would be roughly $75,000 in 1987 and would increase 7 offense levels. (https://data.bls.gov/cgi-bin/cpicalc.pl). Today, $202,948.70 increases the sentence by 10 offense levels. This difference in level calculation increases the recommended sentence by between 37 and 75 months. Even without considering inflation, guidelines are now two to three times higher for the same crime and amount of loss than they were in 1987 when the guidelines were made. ((USSG Ch. 5, Pt. A (Sentencing Table) (1987),(13 USSG Ch. 5, P. A (Sentencing Table) (2023)).

## III. **CONCLUSION**

Good work does not absolve bad work. But good work cannot be erased. We do not ask the Court to excuse the crimes committed by John Dougherty. We ask that the Court consider the innumerable charitable acts and good works in delivering the appropriate and fair sentence. We also ask the Court to consider Mr. Dougherty's role as the only available caregiver to Cecelia Dougherty in fashioning a sentence. For all the reasons stated above, and any other reasons within the Court's discretion, Mr. Dougherty requests a sentence that is not greater than necessary to serve the ends of justice.

Respectfully submitted:

*/s/ Gregory J. Pagano*

Attorney for Defendant, John Dougherty
1315 Walnut Street, 12th Floor
Philadelphia, PA 19107
215-636-0160

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | |
| | : | CASE NO. 19-CR-64 |
| JOHN DOUGHERTY | : | |

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendant's Sentencing Memorandum has been served upon AUSA Frank Costello , U. S. Attorney's Office, 615 Chestnut Street, Philadelphia, PA l9106, via the Court's Electronic Filing System.

_______/s/___________________________
GREGORY J. PAGANO, ESQUIRE