## THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 19-64-1** |
| | : | |
| **JOHN DOUGHERTY** | | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

### I.    OVERVIEW.

Over the course of several years, defendant John Dougherty, while serving as the Business Manager and fiduciary of a labor union, orchestrated not only a bribery scheme to deprive the citizens of Philadelphia of the honest services of a sitting City Councilman, but an embezzlement scheme that took funds from that union, and defrauded and took money from a political action committee funded by that union. For these crimes, in July 2024, this Court sentenced the defendant to 72 months in prison. At the time of the sentencing, Dougherty's presentation included a request for home confinement, based in significant part on information about the serious health condition of his wife, and the family's clear preference that Mrs. Dougherty be cared for at home. Now, after having served less than 12 months of his well-earned sentence, Dougherty has requested that the Court grant him compassionate release, under 18 U.S.C. § 3582(c)(1)(A)(i). He claims

that his wife's condition, and to some extent his own physical ailments, justify this extraordinary relief. His request should be denied.

As will be explained, Dougherty himself is in decent health, and does not present any medical condition that remotely satisfies the standard allowing consideration for early release on medical grounds.

The situation involving his wife, without doubt, is much more complex. The undersigned remain profoundly sympathetic to her plight, as we know the Court is as well. But the pertinent circumstances are materially unchanged. Mrs. Dougherty is entirely disabled, and receiving around-the-clock care, and while she would benefit as well from the presence of her husband, that fact does not distinguish this case from that of countless defendants whose loved ones suffer as a result of their crimes. This Court already fully assessed this situation when making its sentencing decision.

Dougherty claims that the situation is different now, because the funds needed to pay for Mrs. Dougherty's enormously expensive care will run out during the upcoming year. But that does not warrant release. The fact of the matter is that his wife requires specialized, professional care, and she needs it around the clock. If the money for private care runs out, whether Dougherty is incarcerated or not, the family must find resources to provide 24-hour coverage for the necessary care. John Dougherty himself is not a medical professional and cannot personally provide this care, and never provided 24-hour assistance. As will be explained, the likely outcome is clear – like millions of other Americans who require life-sustaining care, either as a result of old age or profound illness, she must turn to the generous assistance provided by Medicaid for either in-home

- 2 -

or nursing home care. In short, the one changed circumstance suggested by Dougherty –
that funds to pay for private care are running out – does not support his release.

And finally, even if there were an extraordinary and compelling reason here
allowing consideration for compassionate release, such relief should be denied, upon
consideration of the 18 U.S.C. § 3553(a) sentencing factors. The severity of Dougherty's
corruption offenses, in combination with the very short portion of his sentence he has
served, independently warrant denial of his motion.

## II.    BACKGROUND.

For years leading up to his indictment, the defendant was handsomely paid to be
the Business Manager of Local 98 of the International Brotherhood of Electrical Workers
(IBEW). While employed in this fiduciary position, Dougherty abused his position of
trust, embezzling from Local 98 in almost every conceivable way, including by having
renovations made to his house, buying expensive meals and trips for himself, his family,
and his mistress, and having the employees of the union undertake personal tasks for him
and his family members. In all, the estimated amount Dougherty stole from the union was
almost $600,000. In addition, Dougherty used union funds to bribe a sitting City
Councilman to do his bidding rather than representing the people of Philadelphia. The
illicit stream of benefits to the Councilman that Dougherty had the union pay included a
weekly salary, benefits, and tickets to sporting events.

Dougherty was tried separately for his embezzlement and corruption crimes.
Dougherty's corruption trial resulted in a jury's November 16, 2021, verdict convicting
him (along with then-Councilman Robert ("Bobby") Henon) of conspiracy to commit

honest services fraud, 18 U.S.C. § 371, and honest services wire fraud, 18 U.S.C. § 1343, 1346. On or about March 1, 2023, Henon was sentenced to 42 months' imprisonment.[1] Dougherty's embezzlement trial did not occur until late 2023, largely due to Dougherty's issues with counsel. On December 7, 2023, the jury in the second trial convicted Dougherty (along with his trial co-defendant, the President of Local 98, Brian Burrows) of conspiracy to embezzle labor union and pension plan assets, 18 U.S.C. § 371, embezzlement of labor union assets, 29 U.S.C. § 501(c), wire fraud, 18 U.S.C. § 1343, 1349, falsification of labor union annual reports, 29 U.S.C. §§ 431(b), 439(b), falsification of labor union financial records, 29 U.S.C. § 436, 439(c), and making and subscribing to false federal income tax returns, 26 U.S.C. § 7206(1). Burrows was sentenced to 48 months' imprisonment on June 26, 2024.[2]

On July 11, 2024, after extensive briefing, a sentencing hearing for Dougherty was held. At that hearing, among other things, the Court determined that the applicable advisory sentencing guidelines range was 108-135 months, and weighed the parties' presentations about the relevant sentencing factors under 18 U.S.C. § 3553(a). Dougherty's daughters described their mother's medical condition – diagnosed in about

---

[1]  The Third Circuit affirmed Henon's conviction. *United States v. Henon*, 2024 WL 2746981 (3d Cir. May 29, 2024). Henon completed the term of imprisonment on June 24, 2025, and is serving a term of supervised release.

[2]  Burrows appealed, in No. 24-2766, asserting one issue, that his speedy trial rights were violated. The matter has been fully briefed and remains pending in the Third Circuit. He is serving his term of imprisonment, with a minimum release date of August 27, 2027.

1999 – and the projected fatality that would result. They explained that a catastrophic event for Cecilia Dougherty occurred in about 2017, and that she thereafter required full-time care. They also testified to their preference for home care over institutional care. The court imposed a sentence of 72 months. Dougherty reported to prison on or about October 1, 2024.[3]

On or about June 6, 2025, Dougherty submitted a request to the warden for support for compassionate release. The request was based on his wife's medical condition and his own health. The warden denied this request. On August 28, 2025, less than a year into his six-year prison term, the defendant submitted a motion to this Court for compassionate release. Thus, the government agrees that more than 30 days have passed since the defendant's request to the warden, and that he therefore has satisfied the administrative exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A).

---

[3] Dougherty obtained a brief delay in his reporting date due to circumstances surrounding recent surgeries for both him and his wife. He sought bail pending appeal, mentioning his wife's condition as an important reason for it. ECF 818 at pp. 4-7. The Court denied that request. ECF 822. Dougherty's appeal, at No. 24-2733, remains pending. It has not yet proceeded to briefing, due to defense counsel's requests for additional transcripts, and then the withdrawal of that counsel due to appointment to the bench, and appointment of new counsel.

Dougherty sought and received court-appointed counsel on appeal. In contrast, his compassionate release motion was filed by private counsel. It is unknown whether that attorney was compensated, and how that would be reconciled with Dougherty's requests for court-appointed counsel. (Nor is it clear who paid for the very detailed Medical Cost Projection expert report presented by the defendant as Exhibit C, dated August 20, 2025, listing attorney Christopher Armstrong as the "requesting attorney." Also, Armstrong's name does not appear on the defendant's motion and to our knowledge he is not a member of the firm of the attorney whose name does appear.)

## III.    DISCUSSION.

### A.    Governing Law.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the

First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy

statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of

title 18, shall describe what should be considered extraordinary and compelling reasons

for sentence reduction, including the criteria to be applied and a list of specific examples.

Rehabilitation of the defendant alone shall not be considered an extraordinary and

compelling reason."[4] "[T]he "extraordinary and compelling" standard remains "inherently narrow" and "stringent." *United States v. Rodriguez-Pena*, 108 F.4th 12, 17 (1st Cir. 2024) (citations omitted).

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

This policy statement is binding. The governing compassionate release statute, § 3582(c)(1)(A)(i), states that a reduction in sentence must be "consistent with applicable policy statements issued by the Sentencing Commission . . . ." *See Dillon v. United States*, 560 U.S. 817, 821 (2010) (holding that under the materially identical provision in

---

[4]  The inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon v. United States,* 560 U.S. 817, 827-28 (2010) (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under 18 U.S.C. § 3582(c)(2)).

Further, this Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review); *see also, e.g.*, *United States v. Aguibi*, 858 F. App'x 485, 486 n.2 (3d Cir. 2021) (not precedential; per curiam) ("To the extent that Aguibi requested a transition to home confinement, the Bureau of Prisons has the sole authority to place a prisoner in home confinement."); *United States v. Saunders*, 986 F.3d 1076, 1078 (7th Cir. 2021); *United States v. Houck*, 2 F.4th 1082, 1085 (8th Cir. 2021); *United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020) (Sanchez, C.J.).

18 U.S.C. § 3582(c)(2) regarding application of retroactive guideline amendments that the criteria stated by the Sentencing Commission are binding).[5] In *United States v. Rutherford*, 120 F.4th 360 (3d Cir. 2024), the Court held that one specific portion of the compassionate release guideline – § 1B1.13(b)(6) – cannot supplant the directive of Congress that a change made in 2018 to sentencing under 18 U.S.C. § 924(c) does not apply retroactively. The Third Circuit otherwise made clear that it does "not gainsay that the Commission's policy statements are generally binding on us." *Id.* at 375.

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Hampton*, 985 F.3d 530, 533 (6th Cir. 2021); *United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021); *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and

---

[5] Prior to November 1, 2023, the Sentencing Commission had not updated its pertinent policy statement, § 1B1.13, since Congress amended the compassionate release statute in 2018. Accordingly, courts held that the earlier policy statement was not binding during that period, but could be considered as advisory. *United States v. Andrews*, 12 F.4th 255, 260 (3d Cir. 2021). The Commission has now updated the policy statement, which is therefore now binding in defining the circumstances that qualify as "extraordinary and compelling." *See* § 3582(c)(1)(A)(i), 28 U.S.C. § 994(t) (directing the Commission to define qualifying circumstances); *see, e.g.*, *United States v. Bryant*, 144 F.4th 1119, 1124 (9th Cir. 2025) (explaining that the amendment supersedes earlier precedent finding the previous version of § 1B1.13 inapplicable to defendant-filed motions, and that the current version is binding).

"extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (citations omitted).[6]

This exceptional remedy does not exist to permit reconsideration of the defendant's original sentence. *United States v. Hunter*, 12 F.4th 555, 569 (6th Cir. 2021) ("Section 3582(c)(1)(A) precludes a court from simply taking facts that existed at sentencing and repackaging them as 'extraordinary and compelling.' The problem with such an approach is that it renders the general rule of finality and the extraordinary-and-compelling-reasons requirement 'superfluous, void or insignificant.' . . . 'No such design can be attributed to a rational Congress.'")(citations omitted); *United States v. Bryant*, 144 F.4th 1119, 1127 (9th Cir. 2025) ("In enacting § 3582(c)(1)(A), Congress did not authorize district courts to take a second bite at the sentencing apple. Rather, compassionate release is a limited, discretionary exception to the default rule that a federal defendant will serve his entire sentence.").

---

[6]  The statute provides that rehabilitation alone is not a basis for compassionate release. 28 U.S.C. § 994(t). *See United States v. Claudio*, 2022 WL 1623650, at *3 (E.D. Pa. May 23, 2022) (Kearney, J.) ("[The defendant's rehabilitation does not constitute an extraordinary and compelling reason for release. We commend [him] for his efforts towards rehabilitation. But we are not a parole board reducing sentences simply for good behavior while incarcerated; we must also find extraordinary and compelling reasons for release.").

**B.    The Defendant's Circumstances.**

Dougherty does not present an "extraordinary and compelling reason" allowing consideration for compassionate release.

**1.  Dougherty's wife's condition.**

Dougherty's wife, Cecilia Dougherty, is profoundly disabled as a result of a long-standing neurological condition, that culminated in a devastating brain injury in 2017. The government does not dispute the defense representation that she presents "irreversible neurological decline, including quadriplegia, PEG tube dependence, and total immobility. She is bedridden 24/7 and requires help with all basic activities, including eating, toileting, and bathing." Mtn. 30.[7] The defense expounds:

> Following a catastrophic brain bleed in 2017, she became quadriplegic, nonverbal, and fully reliant on medical devices and full-time support for every essential function. She requires nutrition and medication via PEG tube, bowel and bladder care, catheterization, repositioning, suctioning for secretions and airway clearance, physical therapy, range-of-motion exercises, regular hygiene, and interpretation of eye and hand signals as her only means of communication. For years, Mr. Dougherty managed this care himself—alone. He did not outsource it to aides, nurses, or institutions.

Mtn. 44. All of that appears true, except for the last two sentences. Dougherty did not care for his wife alone. Rather, both before and after his incarceration, his family has relied on extensive professional care at all hours from in-home nurses.

Notably, although Mrs. Dougherty's medical condition is indeed tragic, her condition is the same today as it was at the time of sentencing. The defense made a very

---

[7]  The motion is not paginated, and the government refers to the PDF page number.

similar presentation to the Court at that time. Indeed, the December 4, 2023, letter from Mrs. Dougherty's attending physician, Christine Pluta, that is attached as Exhibit D to the defendant's compassionate release motion, is the same letter on which the defendant relied at sentencing. *See* ECF 770 (defense sentencing memorandum) at 16. Further, that letter more accurately stated that Mrs. Dougherty was "dependent on 24 hour skilled care for survival. She resides at home with around the clock caregivers and highly specialized equipment. John not only is her primary caregiver but manages all of her medical equipment and supplies, manages her health insurance bills and referrals, coordinates her medical appointments and transportation, and handles the scheduling of caregivers and therapists."[8]

Presented with all of this information, this Court took into account Mrs. Dougherty's condition and all of the other 18 U.S.C. § 3553(a) sentencing factors, and determined that the below-guideline 72-month sentence was warranted.

At this time, Dougherty presents only one purported change in circumstances: that the substantial fund established to pay for professional care for his wife is being depleted at the rate of $44,070 per month, and will be exhausted within about seven months. On

---

[8] A second, undated letter from Dr. Pluta that is also part of Exhibit D to the compassionate release motion was presented to this Court along with Dougherty's motion to postpone surrender. See Exh. A to ECF 817.

The defendant's daughter, Erin Dougherty, also gave a detailed statement to the Court at sentencing, explaining that "[h]e has been her sole caretaker, and she has a team of people who help him." ECF 783 (transcript) at 52. Erin Dougherty detailed the extensive efforts Dougherty undertook to care for his wife and coordinate her care that is very similar to what Dougherty wishes to resume now. *Id.* at 52-53.

that basis, he seeks consideration for compassionate release, under Section 1B1.13(b)(3)(B) of the pertinent guideline, which refers to: "The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner."

This provision does not apply in this case, however. Dougherty certainly would be a caretaker for his wife, but he is not the only available caretaker, and indeed not a sufficient caretaker by himself. The fact of the matter is that Mrs. Dougherty requires specialized assistance, and not only that, she needs it 24 hours a day. The 13-minute video provided by the defense, linked at PDF page 17 of the motion, depicting Mrs. Dougherty's tragic condition, makes this obvious.[9]

Dougherty observes that he could provide assistance in coordinating his wife's care, as in scheduling providers, ordering supplies, and the like. But that is plainly occurring now, likely through the assistance that his daughters are able to provide. The government does not dispute that Dougherty's two daughters have busy lives and cannot provide full-time care. Further, for the reasons explained here, they too are not in any position anyway to provide the professional medical care Mrs. Dougherty receives.

_____

[9]  The defense motion states that the video shows "two nurses—working in tandem—struggle to accomplish basic tasks that Mr. Dougherty performed alone for years." Mtn. 16. In fact, the tasks depicted are far from basic, including the efforts of two nurses to move Mrs. Dougherty into a specialized winch to lift and transport her from her bed to a bathroom to perform hygienic tasks. These labors and procedures were not conceivably performed by Dougherty at all necessary times during the day, alone, as discussed further below. In addition, as also discussed later, Dougherty says that he himself is now aging and ailing, making it even more impossible for him to serve as the sole caregiver.

Rather, like all devoted children of an ailing parent, they are assisting to the reasonable extent they are able (according to their affidavits, up to 40 hours a week each), and that has evidently provided the non-medical assistance that Mrs. Dougherty needs.

But as the defendant states in the motion, his daughter Erin Dougherty "lacks the specialized medical training required to care for my wife's complex needs, including catheterization, IV medication management, PEG tube maintenance, and pressure injury prevention." Mtn. 6. Further, with regard to his other daughter, Tara Chupka, the defendant acknowledges, "Like Erin, Tara has no clinical training to provide advanced medical care. Without professional nursing, her efforts, however loving, could place Cecelia in jeopardy." Mtn. 7. *See* Mtn. 83 (Ms. Chupka states in her affidavit that her mother "requires around-the-clock care and cannot be left alone for even short periods."); Mtn. 92 (Erin Dougherty attests, "She cannot be left alone, not even for 30 seconds.").

The same conclusion applies to John Dougherty. He cannot provide specialized care for all of 24 hours, and in fact he never did. While at liberty, from the time of his wife's discharge from a rehabilitation facility in 2020 through September 2024, Dougherty not only could not but did not provide specialized round-the-clock care. During much of that time, he had full-time employment, and attended to legal and trial matters. Then too, he retained nurses at all hours to provide the necessary care. (Tellingly, the author of the presentence report related that when she conducted a home visit on March 14, 2024, two nurses were present along with Dougherty. PSR ¶ 213.)

- 13 -

So if indeed a financial challenge is impending, it will arrive whether or not Dougherty is in custody. Either way, an arrangement for nursing care for Mrs. Dougherty must be made.

Dougherty asserts, "When the trust funds run out of money later this year, without her husband's hands-on support, Cecelia's nursing care will for all intents and purposes stop. Without her husband's aid, Cecelia's death is not speculative; it would be imminent." Mtn. 13. "For Cecelia Dougherty, the Court's decision will determine whether she lives or dies." Mtn. 14.

That is untrue. Our society does not leave a paralyzed person alone in a bed to die. There are many available public assistance options, that the Dougherty family apparently is going to need whether or not John Dougherty is in custody.[10]

We do not explore all of the possible alternatives here, but highlight one: nursing care paid for by Medicaid. That is the course followed by many hundreds of thousands of Americans.[11] As the Pennsylvania government site regarding the program states, "Many

---

[10]  At most, John Dougherty at liberty would be able to relieve some of the burden placed on his daughters. But this family situation does not stand as an extraordinary circumstance. *See, e.g.*, *United States v. Akram*, 568 F. Supp. 3d 295, 298 (W.D.N.Y. 2021) ("Unfortunately, families often suffer due to the criminal conduct and subsequent incarceration of one of their members, and Defendant's family is likely no exception to this harsh reality.").

[11]  "As of July 2024, there were 1.2 million people living in nursing facilities, over 60% of whom had Medicaid as a primary payer." www.kff.org/medicaid/5-key-facts-about-nursing-facilities-and-medicaid (accessed Sept. 2, 2025).

individuals pay for LTC [long-term care] with personal funds and eventually reduce their resources to the Medicaid LTC limits."[12]

Aware of this alternative, Dougherty asserts: "But Cecelia will NOT be Medicaid eligible for in-home nursing care because she and John Dougherty currently receive and will continue to receive the following pension benefits monthly: IBEW 98: $3,237.09; IBEW International: $144.04; and NEBF (National Electrical Benefit Fund): $1,049.60; for a total of $4,430.73."  The defendant thus posits that he must be released so he can provide her care.

The premise of the defendant's argument, however, is not accurate. Medicaid eligibility is a complex subject, and we provide only a brief overview here. It suffices to show that Cecilia Dougherty plainly can qualify for coverage.[13]

------------------------------------

[12]  This statement appears at www.pa.gov/agencies/dhs/resources/aging-physical-disabilities/medicaid-payment-long-term-care (accessed Sept. 2, 2025). Additional information in the text above regarding Pennsylvania eligibility is derived from that official site, as well as a resource compendium at www.medicaidlongtermcare.org/eligibility/pennsylvania/ and a legal article at www.nolo.com/legal-encyclopedia/when-medicaid-pennsylvania-will-pay-nursing-home-assisted-living-home-health-care.html (both accessed Sept. 2, 2025).

[13] Dougherty also asserts that "even if" his wife could qualify for Medicaid, she would need to leave her private home, and "would receive for [sic] less care" than he could provide if he were released. Mtn. 9. This notion – that Mrs. Dougherty's care at an institution designed to provide full-time care would be inferior to care by the defendant – is wholly unsupported. While of course most people wish to see their loved ones cared for at home, as noted above, for over one million Americans, such care is not an option.

 Perhaps recognizing this, Dougherty also suggests, in more than one place in his filing, that his wife would not be accepted in any care facilities because she presents a

*continued . . .*

Medicaid eligibility (referred to in Pennsylvania as Medical Assistance (MA)) presents limits on a recipient's assets and income. There are a variety of available programs for eligible people, that provide nursing home care, or in-home care, or other benefits in appropriate circumstances. We focus here on eligibility for full-time nursing home care under what is referred to as Medically Needy Only (MNO) coverage. The actual determination regarding the appropriate location of services, and level of benefits, would be determined by a county assistance officer.

To receive MA nursing home coverage as a medically needy person, the individual must have no more than $2,000 in assets. A person with more than that may "spend down" to meet the requirement. It appears that Cecilia Dougherty has no assets.

---

unique situation: with cognitive abilities, but in need of full-time care. *See, e.g.,* ECF 16, 29, 31. This statement is also wholly unsupported, notwithstanding the large number of pages of exhibits. The motion states:

> There are no institutional alternatives. Cecelia's cognition remains intact, and as such, she has been deemed ineligible for disability-based nursing homes. No skilled nursing facility has accepted her due to her high-acuity physical condition. The family has pursued every public and private alternative, including Medicaid eligibility, but no viable solution exists. The reality is simple: without Mr. Dougherty home to resume full-time caregiving, Cecelia Dougherty will die.

Mtn. 16. The defense presents no evidence whatsoever of any effort to seek a public alternative. And viewing the 13-minute video provided by counsel (linked at PDF p. 17 of the motion), it is inconceivable to conclude that she does not qualify for public assistance in her profoundly disabled condition. *See, e.g.*, *United States v. Nishida*, 2023 WL 7222875, at *3 (D. Haw. Nov. 2, 2023) (denying compassionate release where the defendant "provided insufficient detail . . . about the financial constraints that bar outside caregiving, or about whether Medicare, Medicaid, or other county, state, or federal programs can provide assistance").

As for income, the recipient must have no more than $425 per month in income. Notably, and contrary to John Dougherty's suggestion, a spouse's assets do not count toward that limit.[14] Here, it appears that all of the pensions listed belong to John, not Cecilia, leaving her personally far below the income threshold.

Further, even if the patient's income exceeds the $425 monthly limit, she remains eligible for MA coverage. What happens is that the person must contribute all of her income to the nursing home and other medical expenses, and is permitted to keep only a personal needs allowance of $45 per month. After all of her income above $45 per month is paid to the nursing home or for other permitted medical expenses, MA covers all remaining nursing home costs.[15]

In sum, if in fact John Dougherty were the only available caregiver for his wife, and would be able to provide the services needed to maintain her, he would have a more

---

[14] In fact, where the spouse in the community is impoverished (referred to by the state as the "community spouse"), the state permits the "institutionalized spouse" to contribute more income to the community spouse above the $425 monthly limit. The disabled person is permitted to help her spouse in the community; the obligation is not applied in reverse. The Pennsylvania government site explains: "The community spouse is not required to pay for the institutionalized spouse's long-term care services. The community spouse is allowed to keep all of his/her own earnings, regardless of the amount, and that income is not included in determining the institutionalized spouse's eligibility for Medicaid long-term care."

[15] In Pennsylvania, this eligibility is assessed on a six-month basis. The state examines whether the applicant's income over six months exceeds $2,550 (that is, $425 per month for six months), and if so, the extent to which nursing home costs exceed the total. If the nursing home costs are higher, then the path described above should be approved – all of the person's income other than $45 per month is paid to the nursing home or for other medical costs, and then MA pays the remaining costs.

compelling claim under the compassionate release statute. But the situation, regrettably, remains the same as it was at the time of sentencing. Cecilia Dougherty, sadly, requires around-the-clock care, much of it specialized. While John Dougherty might well be able to assist were he available, that assistance is not sufficient. She still requires nursing care, and if the funds for that run out, public assistance is available. This Court's conclusion should remain that in the meantime, Dougherty should serve the sentence for his criminal conduct that this Court deemed appropriate.

## 2. Dougherty's medical condition.

Dougherty also seeks consideration for compassionate release on the basis of his own medical condition. He does not present an "extraordinary and compelling reason" in this regard, either.

At 65 years of age, he is in decent health. He resides in general population, and engages without assistance in all activities of daily living (ADLs). He does not meet the Guidelines' definition of an extraordinary medical condition, which is either a terminal illness, or "a serious physical or medical condition" or "deteriorating physical or mental health because of the aging process" "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13(b)(1)(A), (B). Nor does he meet the definition of "suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." USSG § 1B1.13(b)(1)(C). Dougherty does not show otherwise. He states:

Mr. Dougherty's worsening condition includes:

• Delayed healing and wound separation following surgery on September 6, 2024.

• Ongoing foot infection confirmed by MRI, showing soft tissue abnormalities and possible bone involvement.

• Persistent bacterial and fungal cultures (Staphylococcus epidermis and Candida albicans), requiring multiple courses of antibiotics.

• Emergence of hives and open skin sores after extended antibiotic use, which have remained unresolved for over eight months.

• Increasing hip pain and swelling due to compensatory walking patterns, further impairing mobility.

• Absence of regular blood work and inconsistent infection monitoring by BOP medical staff.

• Risk of amputation confirmed by outside specialists, including infectious disease and orthopedic consultations.

Mtn. 8.

The government obtained Dougherty's medical records for the past year from BOP (filed under seal as Exhibit A hereto), and they debunk many of these claims.

Notably, the records show that BOP has in fact provided Dougherty with regular and extensive care for his medical needs, both from BOP practitioners and, when necessary, from outside experts on numerous occasions. That includes regular lab results and monitoring as needed.[16]

---

[16] Dougherty also seeks relief based on "[s]ystemic care delays and institutional deficiencies at FCI Lewisburg, as documented by the Department of Justice Office of the Inspector General." Mtn. 8. However, he does not explain how any of these alleged deficiencies particularly impact him, as opposed to all inmates. *See, e.g.*, *United States v.*
*continued . . .*

The most notable issue presented thus far was post-operative complications from a procedure Dougherty underwent on September 6, 2024, shortly before he entered federal custody. At that time, a calcaneal bone spur was removed from his foot. There were later concerns regarding infection and resistance to antibiotics, and possible osteomyelitis. Through a number of treatments and visits with specialists, these concerns were resolved. There is residual concern that the foot repair may affect Dougherty's gait, which is being monitored.

With that matter resolved, health providers have focused on Dougherty's hip pain, for which he receives periodic steroidal injections from BOP providers, and dermatological conditions, that are monitored by specialists and treated with medication. *See* Exh. A at PDF pp. 164-65 (comprehensive summary of the dermatological conditions).

Apart from that, he presents ordinary conditions of asthma, sinusitis, hypertension, gastro-esophageal reflux disease, and hyperlipidemia, that are treated with routine medications such as inhalers, a statin, and Losartan for hypertension.

In sum, Dougherty's assertion that he suffers from "multiple chronic, painful, and degenerative conditions that substantially impair his ability to care for himself while incarcerated," is entirely belied by the detailed medical records. He does not present any

---

*Robinson*, 2022 WL 11005332, at *1 (3d Cir. 2022) (not precedential) (generalized concerns about prison conditions that are applicable to all inmates do not present an "extraordinary and compelling reason").

extraordinary medical condition allowing consideration for the exceptional remedy of early release. And to the extent he has any objection to the pace or extent of the medical care (an objection that seemingly would be quite meritless), he can raise that through the administrative dispute process within BOP. *See, e.g.*, *United States v. Miller*, 2021 WL 2711728, at *3 (N.D. Cal. July 1, 2021) (Breyer, J.) (explaining that the compassionate release guideline "refers to medical conditions that, by their nature, cannot be treated effectively in prisons. It does not encompass medical conditions that are treatable in prison, even when treatment appears to be inadequate. . . . Mr. Miller has alternative avenues to obtain improved medical care. Prisoners routinely bring constitutional claims based on inadequate medical care. . . . Mr. Miller's argument that inadequate medical care makes him eligible for compassionate release under § 3582(c)(1)(A) . . . suggests that Congress intended that statute to serve as an end-run around this established framework. Not so.").

### 3.  "Age, rehabilitation and lack of penological justification."

The defendant also seeks compassionate release based on his "age, record of rehabilitation, and absence of any legitimate penological purpose for his continued incarceration." Mtn. 34. But as stated earlier, rehabilitation alone is not a basis for relief, 28 U.S.C. § 994(t), nor is a reassessment of the sentence allowed at this time. And the subject of age is addressed in the guideline at Section 1B1.13(b)(2), and as Dougherty acknowledges, he plainly does not qualify for consideration under that provision, as he has not served 75% of his sentence, nor is he "experiencing a serious deterioration in physical or mental health because of the aging process."

And in any event, the defendant's age, lack of prior criminal convictions, and the Section 3553 factors – including the need for general deterrence – were all considered and taken into account just a year ago when the defendant was sentenced. His good conduct during his first 11 months of incarceration does not remotely warrant a drastic reduction in his sentence.

### C.    Consideration of 18 U.S.C. § 3553(a) Factors

For the reasons discussed above, compassionate release is not warranted here. Even if the defendant had presented a basis for consideration, however (which he does not), the Court would then need to consider all pertinent circumstances, including the 3553(a) factors. *See United States v. Doe*, 833 F. App'x 366 (3d Cir. 2020) (per curiam) (not precedential) (summarily affirming the denial of compassionate release, in a case in which the defendant presented medical risk, upon holding that the district court did not abuse its discretion in considering the nature of the offense, the defendant's history, and the status of the virus at the facility); *United States v. Bullock*, 833 F. App'x 934 (3d Cir. 2021) (per curiam) (not precedential) (granting motion for summary affirmance of denial of compassionate release, as the district court did not abuse its discretion in denying relief for medically vulnerable inmate upon considering the 3553(a) factors, including the

substantial time remaining to be served on the sentence and the defendant's criminal history and institutional infractions).

Consideration of these factors show that compassionate release is not appropriate. Foremost among those factors in this case are the nature and circumstances of the offenses and the need to reflect the seriousness of the offenses, promote respect for the law, and provide just punishment.

Dougherty wielded a tremendous amount of power during his tenure at Local 98, and he chose, over the course of years, to abuse that power. He corrupted a Philadelphia City Councilman with bribes, having that Councilman ask "how high" when Dougherty said "jump." His bribes caused the unconscionable corruption of public services, ranging, this Court will recall, from the delay in installation of MRI machines for children diagnosed with cancer at Children's Hospital, to threats of ruin against a specific private towing company that had had the temerity to tow Dougherty's double-parked car. In addition, he chose to abuse his power to steal from the union members who had entrusted him with some of their hard-earned income. His graft ranged from the ridiculous to the sublime, including claiming reimbursement for cash tips he never gave to the attendants at luxury boxes at concerts and sporting events and purloining concert or sporting event tickets purchased by the union for use by family members, to expensive meals at Philadelphia restaurants for his wife and family and horse-racing trips and lavish birthday celebrations for his mistress and friends. Dougherty's crimes were committed when he was a seasoned adult, and took place over the course of years. And, in committing his

- 23 -

embezzlement and theft, he brought into the scheme with him several other employees of the union who then sustained felony convictions for their participation in the thefts.

At Dougherty's sentencing, this Court granted Dougherty a significant downward variance from the advisory guidelines range, which called for a sentence of 108-135 months. Instead, the Court decided, 72 months' imprisonment was sufficient, but not greater than necessary, to effectuate the purposes of sentencing. In light of this record, it defies credulity now for the defendant to suggest, as he does in the present motion, that his 11-month tenure in prison is sufficient to satisfy the purposes of sentencing.[17] Dougherty should be required to serve the sentence that this Court imposed for his criminal conduct.

The defendant fails to demonstrate how release, 11 months into a 72-month sentence for serious public corruption and financial crimes by a fiduciary, reflects the seriousness of the offenses, promotes respect for the law, and provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A); *see, e.g., United States v. Pawlowski*, 967 F.3d 327 (3d Cir. 2020) (inmate was eligible for consideration, as he suffered from hypertensive heart disease, COPD, dyspnea (shortness of breath), and sleep apnea, and had only one lung as a result of a pulmonectomy, putting him at risk from COVID-19, but the district court did not abuse its discretion in concluding that release, after only 19 months of a 180-month term for public corruption, was not warranted under the 3553(a)

---

[17] It is also surprising to see the defendant characterized in his motion as someone with no "indication of instability or aggression," DE 852 at p. 41, in light of some of the recordings to which this Court has been privy.

factors; the court properly relied on the limited time served, the seriousness of the crime (political corruption), and the sentencing disparity with a co-defendant's sentence that would result if the defendant were released).

For all of these reasons, the motion for compassionate release should be denied.

Respectfully yours,

DAVID METCALF
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


*/s Bea L. Witzleben*
BEA L. WITZLEBEN
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

George Bochetto, Esq.

*/s Bea L. Witzleben*
BEA L. WITZLEBEN
Assistant United States Attorney

Dated:  September 9, 2025.